UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| IN RE: MOVEIT CUSTOMER DATA SECURITY BREACH LITIGATION | * * * * | |
| This Order Relates To: | * * | |
| <u>Cooper v. American Multi-Cinema, Inc. and AMC Entertainment Holdings, Inc., d/b/a AMC Theaters,</u> No. 24-cv-11127 | * * * * * | MDL No. 23-md-03083-ADB-PGL |
| <u>Newman v. American Multi-Cinema, Inc. d/b/a AMC Theaters,</u> No. 24-cv-11359 | * * * * | |
| <u>Pratt v. Cadence Bank,</u> No. 23-cv-12996 | * * * | |
| <u>Adams v. Cadence Bank,</u> No. 23-cv-13071 | * * * | |
| <u>Triplett v. Cadence Bank,</u> No. 24-cv-10657 | * * * | |
| <u>Thompson v. Franklin Mint Federal Credit Union,</u> No. 23-cv-12885 | * * * * | |
| <u>Harris v. Franklin Mint Federal Credit Union,</u> No. 23-cv-12891 | * * * * | |
| <u>Bronson v. Franklin Mint Federal Credit Union,</u> No. 23-cv-12893 | * * * * | |
| <u>Brown v. Franklin Mint Federal Credit Union,</u> No. 23-cv-12894 | * * * * | |
| <u>Liptock v. MasTec, Inc.,</u> No. 23-cv-12985 | * * * | |

<u>Dudurkaewa, et al. v. MidFirst Bank et al.</u>,     *
No. 24-cv-10186     *
     *
<u>Strother v. MidFirst Bank</u>,     *
No. 23-cv-12898     *
     *
<u>Strucke v. Midland Financial Co.</u>,     *
No. 23-cv-12771     *
     *
<u>De Medicis v. MidFirst Bank</u>,     *
No. 23-cv-13057     *
     *
<u>Reardon v. Progress Software Corp.</u>,     *
No. 24-cv-11574     *
     *
<u>Twoguns v. M&T Bank Corp.</u>,     *
No. 24-cv-11702     *
     *
<u>Wormack v. M&T Bank Corp.</u>,     *
No. 24-cv-11701     *
     *
<u>Cantrell v. Pathward, N.A. et al.</u>,     *
No. 23-cv-12554     *
     *
<u>Kent v. Pathward, N.A. et al.</u>,     *
No. 23-cv-12764     *

**<u>MDL Order No. 21</u>**

BURROUGHS, D.J.

     Before the Court is an omnibus Motion to Compel Arbitration filed by a consortium of

defendants in the above-captioned multi-district litigation (the "Moving Defendants").[1]  [ECF

---

[1] The Moving Defendants are American Multi-Cinema Inc., Franklin Mint Federal Credit Union, MidFirst, Midland Financial Co., Pathward, N.A., and M&T Bank.  Cadence Bank was originally a party to the motion but later reached a preliminary settlement and sought leave to withdraw its motion.  <u>See</u> [ECF No. 1263].  The Court grants that request.  As explained below, MasTec, Inc. also joined the motion to compel arbitration, but the plaintiffs implicated in MasTec's motion agreed to refer their claims to arbitration subject to stipulated terms, <u>see</u> [ECF Nos. 1032, 1146], which the Court addresses <u>infra</u>.

No. 929 ("Motion" or "Mot.")].  For the reasons that follow, the Motion to Compel is

**GRANTED IN PART**, **DENIED IN PART**, and otherwise **STAYED**, as set forth herein.

## I.    BACKGROUND

### A.    Factual Background

The Court draws the following facts from the complaints in the transferred cases and the

materials submitted in support of or in opposition to the motion.  See <u>Air-Con, Inc. v. Daikin</u>

<u>Applied Latin Am., LLC</u>, 21 F.4th 168, 171 & n.1 (1st Cir. 2021).  These facts are undisputed

unless specifically noted.

#### 1.    American Multi-Cinema, Inc. and AMC Entertainment Holdings, Inc.

Defendants American Multi-Cinema, Inc. and AMC Entertainment Holdings, Inc.

(together, "AMC") own and operate a national movie theater chain.  Plaintiffs Melanie Newman

("Newman") and Nicholas Cooper ("Cooper"), both former employees of AMC, signed

agreements containing arbitration terms (the "AMC Agreement") during AMC's onboarding

process on September 8, 2021, and September 29, 2022, respectively.  [ECF No. 929-1

("Martinez-<u>Newman</u> Decl.") ¶¶ 5–6]; [ECF No. 929-2 ("Martinez-<u>Cooper</u> Decl.") ¶¶ 5–6].  In

relevant part, the AMC Agreement contains the following terms:

> [Y]ou and AMC agree to submit any claims or disputes relating to
> your employment or the termination of your employment to final
> and binding arbitration before a neutral, independent third party (an
> arbitrator), pursuant to the Federal Arbitration Act, and not to any
> court. Both you and AMC are giving up any right to have a judge or
> jury trial with regard to these claims, other than as specifically stated
> in this Agreement.
>
> **What claims are subject to mandatory arbitration?**
>
> The disputes to be arbitrated under this Agreement include, but are
> not limited to, claims of discrimination, harassment, hostile work
> environment, retaliation, wrongful discharge/termination, breach of

> (express or implied) contract, tort claims, claims related to pay or
> benefits (including any leave of absence), claims related to work
> hours or work time, and any other claims or disputes relating to your
> employment or the termination of your employment . . . and where
> permitted by law, all state and local laws, regulations, and
> ordinances prohibiting discrimination, and any other common law
> claim or federal, state, or other governmental statute, regulation, or
> ordinance (the "Claims").

[Martinez-Newman Decl. Ex. A-1 at 1].[2]

Cooper attests that he worked at an AMC movie theater in Leawood, Kansas for four

days. [ECF No. 1031-1 ("Cooper Decl.") ¶ 2]. On the day of his onboarding:

> [Cooper] met with someone from AMC and was told that [he] had
> to sign several employment forms before they would be able to give
> [him] a work schedule. The process of signing the forms was rushed.
> [He] was not given time to read through the forms and [he] was not
> given the opportunity to ask questions, nor did the person who gave
> [him] the forms to sign explain the content of each document.
> Instead, [he] was told that everything [he] was signing related to pay
> ([he] recall[s] signing a W-4 form, a direct deposit form and other
> income paperwork).

[Id. ¶ 4]. Cooper "was not told that one of [the forms] was an arbitration agreement, nor did

anyone explain to [him] the scope and duration of the arbitration agreement." [Id. ¶ 5]. AMC

did not provide "an opportunity to revise or negotiate any of the terms," but instead "led

[Cooper] to believe that the forms were standard paperwork and that it was a take-it-or-leave-it

---

[2] The AMC Agreement also includes a class-action waiver, stating that "[a]ll Claims will be
arbitrated on an individual basis and may not be heard or considered on a class, collective,
representative, or other basis involving the combination of your or AMC's Claims with the
Claims of another party." [Martinez-Newman Decl. Ex. A-1 at 1]. "[T]he arbitrator, and not any
federal, state, or local court, shall have exclusive authority to resolve any dispute relating to the
formation, enforceability, applicability, or interpretation of this Agreement, including without
limitation any claim that this Agreement is void or voidable." [Id.]. The AMC Agreement
provides that it "survive[s] termination of the employment relationship and shall apply to all
Claims, regardless of whether they arise or are asserted during employment or after termination
of employment." [Id. at 2].

offer."  [Id. ¶ 6].  Cooper did not receive "copies of any of the forms [he] had executed" and so "was not able to review the terms and conditions of the purported arbitration agreement."  [Id. ¶ 9].  He "was never told that [his] personal information would be maintained on AMC's computer systems" or that "AMC would continue to maintain [his] personal information on its computer systems even after he ended his employment with AMC."  [Id. ¶ 7].

Newman did not file a declaration in support of her opposition.

### 2.    Franklin Mint and Federal Credit Union

Franklin Mint and Federal Credit Union ("FMFCU") is a Pennsylvania-based credit union sued as part of this MDL by Plaintiffs Tanya Bronson ("Bronson"), Tina Thompson ("Thompson"), Michael Harris ("Harris"), and Steven Brown ("Brown").  FMFCU contends that each of the foregoing plaintiffs is bound by a mandatory arbitration clause and class-action waiver contained in the Membership Agreement and Customer Disclosures (the "A&Ds" and "A&D Arbitration Clause").  On the third paragraph of the first page, the A&Ds contain the following language:

> YOU UNDERSTAND THAT THIS AGREEMENT CONTAINS AN AGREEMENT BY BOTH PARTIES TO RESOLVE DISPUTES THAT ARISE BY AN INDIVIDUAL ARBITRATION PROCEEDING HELD IN ACCORDANCE WITH THE ARBITRATION PROVISION, AND THAT THE PARTIES HAVE AGREED NOT TO RESOLVE SUCH DISPUTES AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS ACTION PROCEEDING.

[ECF No. 929-4 ("Walters Decl.") Ex. B at 1].  The A&Ds further provide for mandatory arbitration in the following provision:

> **DISPUTE RESOLUTION-MANDATORY ARBITRATION. READ THIS PROVISION CAREFULLY AS IT WILL HAVE A SUBSTANTIAL IMPACT ON HOW LEGAL CLAIMS YOU AND WE HAVE AGAINST EACH OTHER WILL BE RESOLVED.**

Except as expressly provided herein, any controversy, dispute or claim ("Claim") arising out of or relating to this Agreement, Your Account, and/or the relationships of the parties hereto shall be resolved or otherwise settled by binding arbitration administered by the American Arbitration Association ("AAA"), under the AAA Consumer Rules in effect at the time the Claim is filed. Such arbitration shall take place in Delaware County, Pennsylvania. The arbitrator's decision shall be final, binding and non-appealable.

\*\*\*

To the extent a court has jurisdiction as explicitly agreed to in this Section, the court with exclusive jurisdiction shall be the Court of Common Pleas located in Delaware County, Pennsylvania. **THE PARTIES UNDERSTAND THAT THEY WOULD HAVE HAD THE RIGHT TO LITIGATE THROUGH A COURT AND TO HAVE A JUDGE OR JURY DECIDE THEIR CASE. HOWEVER, THEY UNDERSTAND AND CHOOSE TO HAVE ANY CLAIMS DECIDED THROUGH AN ARBITRATION. IF THE PARTIES PURSUANT TO AN EXCEPTION EXPRESSLY PROVIDED HEREIN PROCEED TO LITIGATION, THE PARTIES EXPRESSLY AGREE TO WAIVE THE RIGHT TO TRIAL BY JURY.**

[Id.].

### i.    Bronson and Thompson

Bronson and Thompson were members of the Wawa Employees Credit Union on May 31, 2022, when FMFCU and the Wawa credit union merged. [Mot. at 8–9]; [Walters Decl. ¶¶ 2, 4]. FMFCU asserts that it mailed a packet to Bronson and Thompson that explained the merger and provided a copy of the A&Ds, which contained the A&D Arbitration Clause. [Mot. at 9]; [Walters Decl. ¶¶ 2–5]; [id. Ex. B]. FMFCU mailed the A&Ds to the addresses on file for Bronson and Thompson, and FMFCU did not receive a notice that the packets had failed to be delivered. [Id. ¶ 3]. The A&D Arbitration Clause permitted recipients to opt-out of the arbitration terms by providing written notice to FMFCU before May 20, 2022. [Id. ¶¶ 5–6]. FMFCU asserts that it never received opt-out requests from either Bronson or Thompson, [id. ¶ 6], and FMFCU subsequently provided Bronson and Thompson with FMFCU membership

numbers and account information, [id. ¶ 7].  Bronson and Thompson were members of FMFCU when this litigation was filed.  [Id.].  Although neither Bronson nor Thompson disputes that they did not opt out of the A&D Arbitration Clause, both insist that they never received the A&D mailings.  [ECF No. 1031-2 ("Bronson Decl.") ¶¶ 3–8]; [ECF No. 1031-3 ("Thompson Decl.") ¶¶ 3–9)].

### ii.    Harris

Harris opened an FMFCU account in October 2021 in person at a Philadelphia branch. [Walters Decl. ¶¶ 9–10].  During the application process, FMFCU provided Harris a copy of the A&Ds, including the A&D Arbitration Clause.  [Id. ¶ 11].  Harris signed an account application that, in relevant part, "acknowledge[d] receiving a copy of the [A&Ds]" and required Harris to "agree to be bound by the terms and conditions found therein."  [Id. ¶ 12].  The parties agree on these facts, although Harris disputes whether his agreement to be bound by the A&Ds incorporates the A&D Arbitration Clause.  See [Opp. at 5].

### iii.    Brown

Brown became a member of FMFCU by applying online for a loan in April 2023.  He signed an electronic consent form, which required Brown to acknowledge that FMFCU would provide key documents related to his application in electronic form and would request a digital signature to authorize his application.  [Walters Decl. ¶ 16]; [id. Ex. G].  After Brown signed the e-consent, FMFCU provided additional documentation, including an electronic copy of the A&Ds, for his electronic signature.  [Id. ¶ 17].  Brown electronically signed a "Membership Authorization," which required him to "acknowledge receipt of and agree to the terms and conditions" of those documents by clicking past a "Membership Authorization" webpage.  [Id. ¶ 18]; [id. Ex. H].

### 3.    MidFirst Bank and Midland Financial Co.

Plaintiffs Chris Rubenstein ("Rubenstein"), Andrew Strother ("Strother"), Darryl Strucke ("Strucke"), Petimat Dudurkaewa ("Dudurkaewa"), David De Medicis ("De Medicis"), Sherry Linman ("Linman"), and Linman's minor child ("L.L."), have brought claims against Midland Financial Co. and/or its subsidiary, MidFirst Bank (together, "MidFirst").  [ECF No. 929-6 ("Caswell Decl.") ¶ 3].  Although certain plaintiffs signed up for accounts under MidFirst's Vio Bank or (since-discontinued) Monifi brands, all of the aforementioned plaintiffs except for De Medicis held accounts with MidFirst when the bank moved to compel arbitration.  [Id. ¶¶ 6, 52, 57, 61, 65, 69, 73].[3]  Each plaintiff's account agreement contains the following or a substantively identical provision[4]:

> **ARBITRATION PROVISION.   PLEASE REVIEW AND READ THIS ARBITRATION PROVISION CAREFULLY. IF YOU DO NOT REJECT THIS ARBITRATION PROVISION** [through the "Opt-Out Process"]**, IT WILL BE PART OF THIS AGREEMENT AND WILL HAVE A SUBSTANTIAL IMPACT ON THE WAY YOU OR WE WILL RESOLVE ANY CLAIM THAT YOU OR WE HAVE AGAINST EACH OTHER, NOW OR IN THE FUTURE.   Arbitration is the process for settling disputes where the determination is made by an impartial third party.  Arbitration binds the parties to a type of resolution outside of the courts.**

---

[3] MidFirst inaccurately states that "[p]laintiffs are current MidFirst account holders," but the record makes clear that De Medicis is no longer an account holder.  [Mot. at 20–21]; [Caswell Decl. ¶ 73].  The allegedly applicable arbitration provision, however, provides that "[t]his Arbitration Provision shall survive the repayment of all amounts owed under this Agreement, the closing of your Account, any legal proceeding and any bankruptcy to the extent consistent with applicable bankruptcy law."  [Caswell Decl. ¶ 48].

[4] MidFirst describes the arbitration provisions as substantively identical, with the exception that the September 2022 account agreement to which Dudurkaewa is bound defines "Covered Claims" and "Claim" more broadly than earlier iterations of the agreement, to include "any dispute about the validity, enforceability, coverage, or scope" of the arbitration provision.  See [Caswell Decl. Ex. E ¶ 28(c)].  The parties appear to agree that this difference is not material to the instant motion.

[Id. Ex. E ¶ 28 (Sept. 2022 MidFirst Account Agreement)]; see also [id. Ex. F ¶ 28 (Oct. 2018

MidFirst Account Agreement) (same)]; [id. Ex. H ¶ 28 (Mar. 2022 Vio Bank Account

Agreement) (same)]; [id. Ex. I ¶ 28 (May 2020 Vio Bank Account Agreement) (same)]; [id. Ex. J

¶ 7.h (May 2021 Monifi Account Agreement) (same)].  The Opt-Out Process permitted plaintiffs

to reject the arbitration agreement "by mailing [MidFirst] a written rejection notice," which

would be "effective only if it is signed by [all account holders], and such notice is received

within thirty (30) days after the day you open your Account."  [Id. Ex. E ¶ 28(a) (Sept. 2022

MidFirst Account Agreement)]; see also [id. Ex. F ¶ 28(a) (Oct. 2018 MidFirst Account

Agreement) (same)]; [id. Ex. H ¶ 28(a) (Mar. 2022 Vio Bank Account Agreement) (same)]; [id.

Ex. I ¶ 28(a) (May 2020 Vio Bank Account Agreement) (same)]; [id. Ex. J ¶ 7.h.1 (May 2021

Monifi Account Agreement) (same)].

     As MidFirst explains in its motion, in addition to the opt-out process, the arbitration

provisions also contain the following terms:

- A specification that the parties subject to arbitration include "MidFirst Bank" and "any parent, subsidiary or affiliate of MidFirst Bank."
- A clause defining "Covered Claims" to include, in relevant part, "any claim, dispute or controversy between [the account holder] and [MidFirst Bank] that in any way arises from or relates to this Agreement, your Account, [or] any products or services offered by us."[5]
- A class-action waiver.[6]

---

[5] See supra note 4.

[6] The class-action waivers state that "**FOR CLAIMS SUBJECT TO ARBITRATION: . . . YOU MAY NOT PARTICIPATE IN A CLASS ACTION IN COURT OR IN A CLASS-WIDE ARBITRATION, EITHER AS A PLAINTIFF, CLASS REPRESENTATIVE OR CLASS MEMBER**."  [Caswell Decl. Ex. E ¶ 28(g) (Sept. 2022 MidFirst Account Agreement) (emphasis in original)]; [id. Ex. F ¶ 28(g) (Oct. 2018 MidFirst Account Agreement) (same)]; [id. Ex. H ¶ 28(g) (Mar. 2022 Vio Bank Account Agreement) (same)]; [id. Ex. I ¶ 28(g) (May 2020 Vio Bank Account Agreement) (same)]; [id. Ex. J ¶ 7.h.7 (May 2021 Monifi Account Agreement) (same)].

- A specification that the account agreement "involves interstate commerce and is governed by the FAA and not by any state arbitration law."

[Caswell Decl. Ex. E ¶ 28(a)–(c), (g), (i) (Sept. 2022 MidFirst Account Agreement)]; see also [id. Ex. F ¶ 28(a)–(c), (g), (i) (Oct. 2018 MidFirst Account Agreement) (same)]; [id. Ex. H ¶ 28(a)–(c), (g), (i) (Mar. 2022 Vio Bank Account Agreement) (same)]; [id. Ex. I ¶ 28(a)–(c), (g), (i) (May 2020 Vio Bank Account Agreement) (same)]; [id. Ex. J ¶ 7.h.1–3, 7.h.7, 7.h.9 (May 2021 Monifi Account Agreement) (same)].  None of the MidFirst Plaintiffs provided written notice opting out of the arbitration provision.  [Caswell Decl. ¶ 74].

Four plaintiffs — Rubenstein, Strother, Strucke, and Dudurkaewa — opened MidFirst or Vio Bank accounts online.  [Caswell Decl. ¶¶ 49–52, 58–69].  MidFirst declares that each of these plaintiffs "would have been presented with and required to click through a page entitled 'Accept Disclosures,' stating that the customer 'must and agree to,'" in relevant part, "'the Account Agreement and Disclosure,' with those words hyperlinked to the applicable [agreement]."  [Mot. at 19 (citing Caswell Decl. ¶¶ 9–13)].  Relying on a declaration from Strucke, these plaintiffs aver that "the Plaintiffs were never aware of, nor knowingly agreed to, any provision containing both an arbitration agreement and class action waiver."  [Opp. at 6 (citing ECF No. 1031-4 ("Strucke Decl.") ¶¶ 5–6)].

In June 2021, De Medicis opened two accounts through Monifi's online sign-up process. [Caswell Decl. ¶¶ 70–71].  MidFirst asserts that as part of this sign-up process, De Medicis would have been required to click a check box beside a hyperlink that stated, "I have read and agree to the Monifi Terms and Conditions & Privacy Notice," and which linked to the May 2021 Monifi AAD.  [Id. ¶¶ 14–16].  "In September 2022, when the Monifi brand was discontinued, De Medicis did not open a new MidFirst account and his Monifi account was subsequently closed." [Mot. at 20 (quoting Caswell Decl. ¶ 73)].  De Medicis disputes that he was "aware of, [or]

10

knowingly agreed to, any provision containing both an arbitration agreement and class action waiver."  [Opp. at 6 (citing ECF No. 1031-5 ("De Medicis Decl.") ¶¶ 5–6)].

Linman and L.L. opened a joint MidFirst account in person in May 2019.  [Caswell Decl. ¶¶ 53–57].  MidFirst avers that "Linman and L.L. received a copy of the October 2018 MidFirst AAD, and signed a signature card," which stated that they had "received a copy of MidFirst Bank's Account Agreement and Disclosures" and agreed to be bound by them.  [Mot. at 20–21 (quoting Caswell Decl. ¶¶ 17–20 & Ex. K)].

### 4.    Pathward

Pathward, N.A. ("Pathward") is a financial services company and the issuer of the H&R Block Prepaid Emerald Mastercard, a prepaid debit card.  [ECF No. 929-7 ("Rigney Decl.") ¶ 4].  Plaintiffs Tracy Alcott ("Alcott"), Michelle Cantrell ("Cantrell"), Melissa Fields ("Fields"), and Jacob Kent ("Kent") are Emerald Card holders.

Pathward submitted a declaration to the effect that each plaintiff agreed to mandatory arbitration by accepting the terms of Pathward's Online and Mobile Banking Agreement through a browser or mobile app interface in January 2023.  [Rigney Decl. ¶¶ 11–14 & Exs. 2–3].  Specifically, after logging in to their online accounts in January 2023, [id. ¶¶ 11–14 & Exs. 2–3], the Pathward Plaintiffs were presented with prompts to check a box next to an acknowledgment

that "[they] agree to Online Banking Agreement," [id. Exs. 4–6]  The images below depict the interface on a desktop browser and on an Android app, respectively:



[Id. Exs. 4, 5].  As shown above, the words "Online Banking Agreement" appeared as an underlined hyperlink in green text.  By clicking on the hyperlink, a plaintiff could view the Online and Mobile Banking Agreement.  [Id. ¶ 16].  A user could not proceed past the described screen to use the online services without clicking or pressing the check box before clicking the green "Next" button.  [Id. ¶¶ 15–25 & Exs. 4–6].

The introductory section of the Online Mobile and Banking Agreement stated that the agreement includes "a binding arbitration agreement in Section 6 that requires resolution of disputes by individual arbitration rather than by jury trials or class actions."  [Rigney Decl. Ex. 1 § 1].  The arbitration clause provided that "all disputes and claims between [the customer] and the Covered Parties," which includes Pathward, "shall be resolved through binding individual

arbitration unless you opt out of this Arbitration Agreement" by filling out an online form or mailing a written letter.  [Id. § 6.1]; see also [id. § 6.4 (prohibiting class actions and other representative claims)].  The agreement is "governed by, and interpreted, construed, and enforced in accordance with, the Federal Arbitration Act and other applicable federal law."  [Id. § 6.7].  The arbitrator shall decide "[a]ll issues" except those "relating to the arbitrability of disputes and the validity, enforceability, and scope of [the agreement]."  [Id. § 6.1].

### 5.    M&T Bank

M&T Bank Corporation ("M&T Bank") is a New York-based bank, of which Plaintiffs Monica Twoguns ("Twoguns"), Dalisa Wormack ("Wormack"), and Bridget Reardon ("Reardon") are account holders.  [ECF No. 1016-1 ("Dowd Decl.") ¶¶ 2, 9, 16].  After Twoguns and Reardon opened accounts, M&T sent them a welcome packet that included a document titled "Consumer Deposit Account Terms and Conditions."  [Id. ¶¶ 3, 17]; [id. Exs. A, C].  Wormack received a "General Deposit Account Agreement."  [Id. ¶ 10]; [id. Ex. B].  All of the documents contained an identical arbitration clause, which read:

> Each dispute or controversy that arises out of or is related to your account with us, or any service we provide in connection with your account, or any matter relating to your or our rights and obligations provided for in this Agreement or any other agreement between you and us relating to your account or a service provided by us in connection with your account, whether based on statute, contract, tort, fraud, misrepresentation or any other legal or equitable theory, including any claim for interest and attorney's fees, where applicable (any "Claim"), must be determined on an individual basis by binding arbitration in accordance with the Federal Arbitration Act ("FAA" – Title 9 of the United States Code) under the auspices of JAMS, the arbitration administrator.

[Id. Ex. A at 63; Ex. B at 17; Ex. C at 63].  The agreement also required Plaintiffs to waive their right to file class claims.  [Id. Ex. A at 64; Ex. B at 18; Ex. C at 64].  It further allows the plaintiffs to opt out of arbitration "by mailing [M&T] a rejection notice by 30 days after the date you open

your account." [Id. Ex. A at 63; Ex. B at 17; Ex. C at 63]. According to M&T's records, none of the Plaintiffs opted out. [Id. ¶¶ 8, 15, 22]. Finally, the agreement stated that it would be "governed by . . . the law of the state or other jurisdiction in which your account was opened without regard to the law of any other state or jurisdiction." [Id. Ex. A at 66; Ex. B at 19; Ex. C at 66]. Wormack and Reardon opened their accounts in New York, [id. ¶¶ 2, 16], and Twoguns opened her account in Massachusetts, [id. ¶ 9].[7]

### B.    Procedural History

The Court assumes the parties' familiarity with the factual allegations and procedural history broadly applicable to this MDL and therefore focuses only on the procedural facts necessary to decide the pending motions.

On April 25, 2024, this Court entered MDL Order No. 13, which scheduled the briefing of motions for motions concerning subject-matter jurisdiction and arbitration. [ECF No. 874]. Per that order, Moving Defendants, excluding Defendant M&T Bank Corporation ("M&T"), filed a joint motion on June 3, 2024, to compel arbitration of Plaintiffs' claims and to stay further litigation pending the outcome of arbitration. [ECF No. 929 ("Motion" or "Mot.")]. After the Motion was filed, two cases against M&T were transferred to the MDL on June 7, 2024 (Twoguns and Wormack), and one case against M&T was filed directly in the MDL on June 18, 2024 (Reardon) (together, the "M&T Actions"). [ECF No. 1016 ("M&T Mot.")]. On June 26, 2024, Defendant M&T submitted a brief in support of the Motion. [Id.].

_____

[7] M&T's opening brief stated that Wormack opened her account in Massachusetts. [M&T Br. at 2]. As it forthrightly (if belatedly) acknowledged in reply, Wormack's account was in fact opened in New York.

14

Plaintiffs opposed on July 3, 2024.  [ECF No. 1030 ("Opp.")].  On the same day, Plaintiff Liptock filed a separate response, [ECF No. 1032], to which Defendant MasTec, Inc. replied on August 8, 2024, [ECF No. 1146 ("MasTec Reply")].  Moving Defendants jointly replied to Plaintiffs' opposition on August 9, 2024.  [ECF No. 1147 ("Reply")].  On August 23, 2024, Plaintiffs moved for the Court to strike facts related to the M&T Actions newly introduced in Defendants' reply and alternatively requested permission for leave to respond to these facts. [ECF No. 1167]; see also [ECF No. 1168 (memorandum in support)].  M&T did not oppose the request for further briefing, see [ECF No. 1192], which the Court granted, see [ECF No. 1403]. Plaintiff sur-replied on March 5, 2025.  [ECF No. 1415 ("Sur-Reply")].

## II.    DISCUSSION

### A.    Legal Standard

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–16, "embodies [a] national policy favoring arbitration and places arbitration agreements on equal footing with all other contracts," Soto-Fonalledas v. Ritz-Carlton San Juan Hotel Spa & Casino, 640 F.3d 471, 474 (1st Cir. 2011) (quoting Buckeye Check Cashing v. Cardegna, 546 U.S. 440, 443 (2006)).  The FAA provides that "[a] written provision in . . . a contract . . . to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  Congress enacted the FAA "to counter hostility toward arbitration," Waithaka v. Amazon.com, 966 F.3d 10, 24 (1st Cir. 2020), and promote federal policy favoring the "the enforceability, according to their terms, of private agreements to arbitrate."  Volt Info. Scis. v. Bd. of Trs. of Leland Stanford Jr. Univ., 489 U.S. 468, 476 (1989).  "[T]he FAA does not compel arbitration unless the Court is satisfied that there exists a valid agreement to arbitrate."  Emmannuel v. Handy Techs., 442 F.

Supp. 3d 385, 391 (D. Mass. 2020) (citing Volt, 489 U.S. at 468, 478), aff'd, 992 F.3d 1 (1st Cir. 2021); see also Morgan v. Sundance, Inc., 596 U.S. 411, 418 (2022).

In evaluating motions to compel arbitration under the FAA, "district courts . . . apply the summary judgment standard." Air-Con, 21 F.4th at 175. The movant bears the initial burden of producing evidence "(1) that a valid agreement to arbitrate exists, (2) that they are entitled to invoke the arbitration clause, (3) that the other party is bound by that clause, and (4) that the claim asserted comes within the clause's scope." Bossé v. N.Y. Life Ins. Co., 992 F.3d 20, 27 (1st Cir. 2021) (alterations omitted) (quoting Grand Wireless, Inc. v. Verizon Wireless, Inc., 748 F.3d 1, 6 (1st Cir. 2014)). "[I]f the party moving to compel arbitration meets its initial burden of production, the non-moving party must offer evidence supporting its own case," Crean v. Morgan Stanley Smith Barney, LLC, 652 F. Supp. 3d 171, 175 (D. Mass. 2023) (quoting Casale v. Ecolab Inc., No. 21-cv-00126, 2022 WL 1910126, at *4 (D. Me. June 3, 2022)), but "[t]he non-moving party 'cannot avoid compelled arbitration by generally denying the facts upon which the right to arbitration rests," Air-Con, 21 F.4th at 175 n.8 (quoting Soto v. State Indus. Prods., 642 F.3d 67, 72 n.2 (1st Cir. 2011)). "Rather, the party must identify specific evidence in the record demonstrating a material factual dispute for trial.'" Id. (citation omitted). If, however, the non-movant sets forth "materials that create a genuine issue of fact about a dispute's arbitrability, the district court 'shall proceed summarily' to trial to resolve that question." Id. at 175 (first citing 9 U.S.C. § 4; and then quoting Neb. Mach. Co. v. Cargotec Sols., LLC, 762 F.3d 737, 744 (8th Cir. 2014)). As when ruling on a summary judgment motion, the Court "construe[s] the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in its favor." Id.

"If a genuine dispute exists," then "the court convenes a hearing" to resolve the contested facts and "determine[] whether the parties agreed to arbitrate." Casale v. Ecolab, 585 F. Supp. 3d 99, 104 (D. Me. 2022) (citing Air-Con, 21 F.4th at 173). A court may enforce a valid arbitration agreement "by staying existing litigation pending arbitration . . . or compelling the parties to arbitrate and dismissing the action." Bekele v. Lyft, 199 F. Supp. 3d 284, 293 (D. Mass. 2016) (citing 9 U.S.C. §§ 3, 4), aff'd, 918 F.3d 181 (1st Cir. 2019). If a federal court finds that a dispute is subject to arbitration under the FAA and a party requests a stay, then the Court may not dismiss the case even if all claims are subject to arbitration. Smith v. Spizzirri, 601 U.S. 472, 475–76 (2024).

## B.    Analysis

"Because arbitration is a creature of contract, principles of state contract law control the determination of whether a valid agreement to arbitrate exists." Rivera-Colón v. AT&T Mobility P.R., Inc., 913 F.3d 200, 207 (1st Cir. 2019) (citation and internal quotation marks omitted). As the matters now before the Court differ as to both their facts and the governing state law, what follows is a case-by-case review of the law and facts applicable to each of the Defendants' motions. Although the core principles of contract law are largely consistent from state to state, there are some variations that make a difference, as discussed below.

### 1.    AMC

A choice-of-law provision in the AMC Agreement provides that claims arising from or otherwise subject to the agreement shall be governed by Kansas law. E.g., [Newman Decl. Ex. A-1 at 2]. In Kansas, as elsewhere, contracts may be formed through the acceptance of an offer in exchange for consideration. Howard v. Ferrellgas Partners, L.P., 92 F. Supp. 3d 1115, 1124 (D. Kan. 2015). AMC contends that under Kansas law, Cooper and Newman each agreed to

arbitrate when they electronically signed the AMC Agreement, which included arbitration terms. In particular, AMC argues that "Newman and Cooper's electronic signatures to [the AMC] Agreement unambiguously manifested their intent to be bound by its terms, and clearly bound them to arbitrate employment-related disputes with AMC, including the claims asserted here." [Mot. at 26].  AMC also asserts that the contract's terms are definite, and that the parties' mutual obligation to arbitrate constitutes valuable consideration.  [Id. at 26–27].

Cooper and Newman contest AMC's motion on two grounds.  First, they assert that there was no "meeting of the minds" or mutual understanding as to whether the arbitration clause would cover claims related to post-employment injuries resulting from a data breach such as the MOVEit Incident, as required under Kansas law.  [Opp. at 10–11 (quoting Duling v. Mid Am. Credit Union, 530 P.3d 737, 745 (Kan. Ct. App. 2022))].  They contend that the question before the Court is "whether the Plaintiffs understood at the time that they executed the arbitration agreement that it covered the types of post-employment, non-employment claims at issue here." [Id. at 10].  Second, they argue that claims arising from the MOVEit breach fall outside the scope of the arbitration agreement.  [Id. at 11].

As to contract formation, Cooper and Newman overstate the relevance of their subjective belief that the arbitration agreement would not "require arbitration of claims such as the data breach claims at issue here."[8]  [Opp. at 11].  In Kansas, the "meeting of the minds" inquiry looks

---

[8] Treatises make clear, consistent with Kansas case law, that despite "the familiar statement . . . that a contract requires a 'meeting of the minds' of the parties . . . the fundamental basis of contract in the common law is reliance on an outward act," not the "[s]ecret hopes and wishes" of a single party to an agreement.  Williston on Contracts § 4:1 & n.5 (4th ed. 2024) (emphasis added) (citing, in relevant part, Unified Sch. Dist. No. 446, Indep., Kan. v. Sandoval, 286 P.3d 542 (Kan. 2012)).  The inquiry therefore "focus[es] not on the question of whether the subjective minds of the parties have met, but on whether their outward expression of assent is sufficient to form a contract."  Id.

to "'objective, observable manifestations of intent to contract,' rather than the purely subjective

intent of the parties" as to the meaning of the agreement.[9]  Howard, 92 F. Supp. 3d at 1124

(citation omitted); accord Williston on Contracts § 4:1 ("[I]t was long ago settled that secret,

subjective intent is immaterial, so that mutual assent is to be judged only by overt acts and words

rather than by the hidden, subjective or secret intention of the parties.").  Plaintiffs' own cases

reiterate this point: mutuality "is measured not by the parties' subjective intent, but by their

outward expressions of assent."  Duling, 530 P.3d at 749.

A meeting of the minds may be found where "the terms of the parties' agreement [are]

complete and definite enough that each party reasonably understands the rights and obligations

created."  Duling, 530 P.3d at 747.  These principles apply with equal force in the context of

arbitration agreements.  See id. (noting that Kansas courts "generally 'seek to uphold arbitration

agreements even when the contract provisions are somewhat unclear and indefinite'" (quoting

Heartland Premier, Ltd. v. Grp. B & B, LLC, 31 P.3d 978, 981 (Kan. Ct. App. 2001))); City of

Lenexa v. C.L. Fairley Constr. Co., 777 P.2d 851, 854–57 (Kan. 1989) (tracing origins of

arbitration agreements under Kansas law and noting that Kansas statutes seek to "enforce

arbitration agreements as a matter of . . . public policy" (citation omitted)).

Thus, Cooper and Newman's hindsight assertions concerning their state of mind when

they contracted with AMC cannot overcome what Kansas law identifies as their

contemporaneous outward expressions of assent.  The plain text of the agreement, which sets

_____

[9] To the extent this point or the facts raised in Cooper's declaration resemble an assertion that the AMC Agreement is void on the ground of fraud or unilateral mistake, the opposition briefing makes no attempt to develop either argument.  Cf. Mogel v. UNUM Life Ins. Co. of Am., 646 F. Supp. 2d 177, 185 (D. Mass. 2009) (undeveloped arguments "not only deprive[] the Court of adequate grounds upon which to rule, but also impair[] the defendant's ability to offer a meaningful response").

forth the parties' agreement to "submit any claims or disputes relating to [the plaintiffs']

employment" to arbitration, [Martinez-Newman Decl. Ex. A-1 at 1]; [Martinez-Cooper Decl. Ex.

A-1 at 1], readily discloses "the terms by which the parties intended to be bound and carry out

their intentions." Duling, 530 P.3d at 745.  Cooper and Newman each signed the agreement,

directly below language stating, in bolded capital letters, that:

> **THIS AGREEMENT CONTAINS A BINDING ARBITRATION PROVISION WHICH MAY BE ENFORCED BY THE PARTIES. BOTH AMC AND THE EMPLOYEE UNDERSTAND THAT BY USING ARBITRATION TO RESOLVE DISPUTES THEY ARE GIVING UP ANY RIGHT THAT THEY MAY HAVE TO A JUDGE OR JURY TRIAL WITH REGARD TO ALL ISSUES CONCERNING EMPLOYMENT.**

[Martinez-Newman Decl. Ex. A-1 at 2]; [Martinez-Cooper Decl. Ex. A-1 at 2]; Oesterle v. Atria

Mgmt. Co., No. 09-cv-04010, 2009 WL 2043492, at *6 (D. Kan. July 14, 2009) ("[A] party who

signs a written contract is bound by its provisions." (alteration in original) (quoting Albers v.

Nelson, 809 P.2d 1194, 1197 (Kan. 1991))).  These outward indicia of assent provide adequate

grounds for the Court to conclude that the AMC Agreement was supported by mutual assent

under Kansas law, notwithstanding what Cooper and Newman now assert was their "actual or

real intention."[10]  Murphey v. Mid-Century Ins. Co., No. 13-cv-2598, 2014 WL 2619073, at *4

(D. Kan. June 12, 2014) (quoting Sw. & Assocs. v. Steven Enters., 88 P.3d 1246, 1249 (Kan. Ct.

---

[10] To the extent that the facts Cooper avers in his declaration suggest he may have been induced
to sign the AMC Agreement, this argument fails.  AMC correctly observes that parties "have a
duty to learn the contents of a written contract before signing it," including by "reading the
contract and obtaining an explanation of its terms," Oesterle, 2009 WL 2043492, at *5–6, and
"in the absence of fraud, a unilateral mistake will not excuse nonperformance of a contract,"
Albers, 809 P.2d at 1198.  Cooper has developed no legal argument concerning fraud or
unilateral mistake.  See supra note 9.

App. 2004)).  The Court therefore concludes that the parties formed a valid arbitration agreement.

Cooper and Newman also dispute whether the scope of the AMC Agreement encompasses their claims stemming from the MOVEit incident and, if so, whether the scope and duration of the agreement makes it unconscionable and, therefore, unenforceable.  The plain language of the agreement, however, assigns both questions — which turn on the arbitrability of Cooper and Newman's claims and the enforceability of the AMC Agreement — to the arbitrator.

The FAA allows parties to an arbitration agreement to reserve "gateway" issues concerning arbitration for the arbitrator, rather than the court, including "whether a . . . binding arbitration clause applies to a certain type of controversy."  Green Tree Fin. Corp v. Bazzle, 539 U.S. 444, 452 (2003).  Consequently, because courts cannot "rewrite the parties' contract," "where the parties 'by clear and unmistakable evidence' delegate issues of arbitrability to the arbitrator, 'the courts must respect the parties' decision as embodied in the contract' and send the issue to the arbitrator to decide."  Bossé, 992 F.3d at 27 (quoting Henry Schein, Inc. v. Archer & White Sales, Inc., 568 U.S. 63, 69–71 (2019)).  If the court finds that "a valid [arbitration] agreement exists," and further concludes that "the agreement delegates the arbitrability issue to an arbitrator" through a delegation clause,[11] the FAA forbids the court from "decid[ing] the arbitrability issue" itself.  Id. at 28 (quoting Henry Schein, 568 U.S. at 69); see also Henry Schein, 568 U.S. at 68 (holding that the FAA requires courts to delegate arbitrability pursuant to a valid delegation clause even if the court "thinks that the argument that the arbitration

---

[11] A delegation clause "refer[s] to an agreement to submit issues of arbitrability to the arbitrator." Bossé, 992 F.3d at 27 n.7.  It "is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other."  Id. (quoting Henry Schein, 568 U.S. at 68).

agreement applies to a particular dispute is <u>wholly groundless</u>" or "frivolous" (emphasis added
and citation omitted)).

The AMC Agreement's delegation clause identifies "<u>the arbitrator</u>, and not any federal,
state, or local court," as holding the "exclusive authority to resolve any dispute relating to the . . .
<u>enforceability</u> or <u>applicability</u>" of the agreement.[12]  [Martinez-<u>Newman</u> Decl. Ex. A-1 at 1
(emphases added)]; [Martinez-<u>Cooper</u> Decl. Ex. A-1 at 1] (same)]; <u>cf.</u> <u>Bossé</u>, 992 F.3d at 35
(Barron, J., dissenting) (distinguishing narrow delegation clauses only covering claims "that the
arbitration agreement itself encompasses" from broader delegation clauses that provide for "the
question of the arbitration agreement's scope to be itself decided through arbitration").  The
delegation clause is therefore a validly formed agreement between the parties.

Consequently, this Court is the wrong forum for resolving Newman and Cooper's claim
that the agreement is overbroad and unconscionable.  In Kansas, as in most jurisdictions,
unconscionability is not a question of validity but rather asks whether a valid agreement is
enforceable.  <u>See</u> <u>Adams v. John Deere Co.</u>, 774 P.2d 355, 362 (Kan. Ct. App. 1989).  Because
Newman and Cooper do not challenge the enforceability of the delegation clause specifically,
their argument concerning whether the AMC Agreement is broadly unconscionable is for the
arbitrator to decide.  <u>See</u> <u>Rent-A-Ctr., W. v. Jackson</u>, 561 U.S. 63, 72 (2010) ("[U]nless Jackson
challenged the delegation provision specifically, we must treat it as valid under § 2, and must
enforce it under §§ 3 and 4, leaving any challenge to the validity of the Agreement as a whole for

---

[12] The delegation clause also purports to delegate issues related to "formation."  [Martinez Decl.
at 4].  Case law is clear, however, that the court, and not the arbitrator, must decide in the first
instance whether the parties are bound by the arbitration agreement.  <u>Howsam v. Dean Witter
Reynolds, Inc.</u>, 537 U.S. 79, 84 (2002).

the arbitrator.").  The Court thus must "enforce[e] th[e] agreement according to its own language and . . . refer[]" the remainder of the dispute "to the arbitrator."  Bossé, 992 F.3d at 28.

For the foregoing reasons, AMC's motion to compel arbitration as to Cooper and Newman is **<u>GRANTED</u>**.  The Court agrees with AMC that although the arbitration agreement does not cover equitable relief, expediency (given the prospect of a preclusive ruling) counsels in favor of staying Plaintiffs' requests for an injunction pending the arbitration of their legal claims, which is so ordered.  See Sevinor v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 807 F.2d 16, 20 (1st Cir. 1986); Utley v. Goldman Sachs & Co., 883 F.2d 184, 187 (1st Cir. 1989) (noting that district courts have discretion to "stay litigation of non-arbitrable claims").

### 2.    Franklin Mint Federal Credit Union

FMFCU and the plaintiffs suing it agree that Pennsylvania law applies to the claims at issue in these cases.  [Mot. at 29]; [Opp. at 12].

### a.    Bronson and Thompson

"Under Pennsylvania law, contract formation requires: (1) a mutual manifestation of an intention to be bound, (2) terms sufficiently definite to be enforced, and (3) consideration." Kirleis v. Dickie, McCamey & Chilcote, P.C., 560 F.3d 156, 160 (3d Cir. 2009).  Bronson and Thompson contend that a genuine dispute of material fact exists as to mutuality.  [Opp. at 13–14].  Although FMFCU states that it mailed agreements that included binding arbitration clauses to both Bronson and Thompson and that neither followed the opt-out procedures in the agreements, [Mot. at 30–31], Bronson and Thompson dispute (1) that they received the November 2020 mailing containing the arbitration provision and (2) that they otherwise manifested an intent to be bound by that arbitration provision, [Opp. at 13].

To satisfy its initial burden, FMFCU invokes Pennsylvania's mail-receipt rule, which provides that "proof of mailing raises a rebuttable presumption that the mailed item was received by the intended recipient, and this presumption is not nullified solely by testimony denying receipt of the mailed item." Stephenson v. AT&T Servs., Inc., No. 21-cv-0709, 2021 WL 3603322, at *4 (E.D. Pa. Aug. 13, 2021).

FMFCU, however, overlooks the "axiomatic" principle that, to trigger the presumption of mailing in the first place, the party seeking its benefit must "adduce evidentiary proof that the letter was," in fact, "mail[ed]." Geise v. Nationwide Life & Annuity Co. of Am., 939 A.2d 409, 423 (Pa. Super. Ct. 2007) (quoting Commonwealth v. Thomas, 814 A.2d 754, 758–59 (Pa. Super. Ct. 2002)). "'Offering generic testimony as to the standard mailing procedures for . . . notices' is insufficient to trigger the presumption." Envt'l Equip. & Serv. Co. v. Wachovia Bank, N.A., 741 F. Supp. 2d 705, 724 (E.D. Pa. 2010) (quoting Thomas, 814 A.2d at 760). Rather, to raise a presumption of receipt, FMFCU must offer "proof that the letter was signed in the usual course of business and placed in the regular place of mailing." Id. at 723 (quoting Geise, 939 A.2d at 423). Here, FMFCU's only evidence of mailing is a declaration by FMFCU's chief legal officer stating as follows:

> As part of the merger [between WECU and FMFCU], FMFCU mailed a notice to all WECU members advising them of the merger and the changes to the terms of their credit union relationship effective upon the merger of WECU and FMFCU (the "WECU Notice"). Tanya Bronson and Tina Thompson were former WECU members.
>
> On or about April 16, 2022, FMFCU mailed the WECU Notice to Ms. Bronson and Ms. Thompson at the addresses on file for each of them, respectively. A copy of the WECU Notice is attached hereto as Exhibit A. FMFCU did not receive a notice that the WECU Notices sent to Ms. Bronson's or Ms. Thompson's addresses on file were returned as undeliverable.

24

[Walters Decl. ¶¶ 2–3].

This declaration lacks "the level of detail that parties are routinely asked to provide to trigger the presumption" of mailing and, in fact, is even weaker evidence than declarations that courts have previously deemed inadequate as a matter of Pennsylvania law.  Envt'l Equip. & Serv., 741 F. Supp. 2d at 723–24.  In Environmental Equipment & Services, the Eastern District of Pennsylvania received an affidavit from an employee of Wachovia Bank seeking to establish proof of mailing.  Id. at 723.  The affidavit asserted that welcome packages containing arbitration terms were sent to:

> the address of each customer as set forth in a System Files Database. The address contained in the System Files Database was the address provided by the customer upon account opening . . . .  That database was the same used for sending monthly account statements to First Union customers.

Id.  The affidavit also contained additional details, explaining that the affiant had been "present as each of those [welcome] packages was addressed and prepared for mailing."  Id. (alteration in original).  In addition, the affidavit explained that "[t]o insure accuracy, a live laser verification process was utilized so that the address of each customer was accurately captured for purposes of mailing the introductory packages."  Id.

Even so, the "affidavit fail[ed] to provide a sufficient level of detail with regard to how the packages were prepared for mailing and it does not demonstrate that the packages were 'placed in the regular place of mailing.'"  Env't Equip. & Serv., 741 F. Supp. 2d at 723–24.  Like that affidavit, here, the Walters Declaration lacks key details.  See id. at 724 (first discussing Carnathan v. Ohio Nat'l Life Ins. Co., No. 06-cv-00999, 2008 WL 2578919, at *4 (M.D. Pa. June 26, 2008); and then discussing Geise, 939 A.2d at 424–25).  Critically, the declaration lacks any information concerning "the business's mailing practices" and "copies of the correspondence

bearing [Bronson or Thompson's] name."[13]  Id. at 724; accord Szymanski v. Dotey, 52 A.3d 289, 293 (Pa. Super. Ct. 2012) (holding witness' "testimony did not constitute competent evidence of mailing because she offered no testimony or evidence that she had placed the notice in the office's regular place of mailing or on the custom as to the mailing of such notices").  Rather, the declaration "offer[s]" little beyond "generic" assertions that FMFCU sent packages to the address on file, which Pennsylvania courts have found "insufficient to trigger the presumption."  Envt'l Equip. & Serv., 741 F. Supp. 2d at 724 (quoting Thomas, 814 A.2d at 760).

FMFCU maintains that these facts are more akin to Bracy v. Macy's Retail Holdings, No. 19-cv-03825, 2020 WL 1953647 (E.D. Pa. Apr. 23, 2020), and that, like the movant in Bracy, it has "submitted evidence showing it mailed [Thompson and Bronson] materials advising [them] of [FMFCU's] arbitration program, enclos[ed] the arbitration agreement and provid[ed] opt-out instructions, and [the] mailing materials were not returned as undeliverable."  [Mot. at 31].  The decision in Bracy, however, is vague on the key material issue here: the factual content of the affidavit that the court relied on as "evidentiary proof that the letter [had been] mail[ed]."  Geise, 939 A.2d at 423 (citation omitted).  Macy's had provided a declaration by the company's "custodian of records for the [a]rbitration [p]rogram" based on unspecified "business records" indicating that "the materials were mailed to Plaintiff and were not returned as undeliverable."  Bracy, 2020 WL 1953647, at *5–6.  Yet the court's ruling neither (1) describes the contents of either the custodian's declaration or the business records, nor (2) cites or discusses Pennsylvania law governing the evidentiary showing necessary to permit the finding of a valid contract by

---

[13] The accompanying exhibits show a generic version of the WECU Notice that lacks any information identifying Bronson or Thompson as a recipient.  [Walters Decl. Ex. A].

mailing.  Given the lack of factual or legal detail on the key issue before the Court, <u>Bracy</u> is

unpersuasive for present purposes.

  Drawing all reasonable inferences from the factual deficiencies in Bronson and

Thompson's favor, <u>see</u> <u>Air-Con</u>, 21 F.4th at 177, FMFCU has not made the necessary showing

under Pennsylvania law to warrant a presumption that the WECU Notice was mailed to them.  In

the absence of proof of mailing, the Court cannot conclude that there was an offer, let alone an

acceptance, and therefore, cannot conclude that a valid agreement to arbitrate exists between the

parties.  Because FMFCU has not shown that the WECU Notice was mailed to Bronson and

Thompson, it has not carried its threshold burden under the FAA to show the existence of a valid

agreement to arbitrate and that Bronson and Thompson are bound by it.[14]  The Court need go no

further.  FMFCU's motion is therefore **<u>DENIED</u>** as to Bronson and Thompson.

### b.  Harris

  FMFCU contends that Harris agreed to arbitrate by signing an account application stating

that Harris "acknowledge[d] receiving a copy of the [A&Ds]" and "agree[d] to be bound by the

terms and conditions found therein," including its arbitration provisions.  [Walters Decl., Ex. D

at 2].  Although Harris does not dispute that the A&Ds contain an arbitration provision and that

the account application expressly incorporated the A&Ds, Harris nonetheless contends that the

---

[14] FMFCU maintains that Bronson and Thompson's declarations are inadequate to rebut the
presumption "because they state only that Thompson and Bronson can't <u>remember</u> receiving
the[] letters," [Reply at 4], which does not carry their burden under Pennsylvania law.  But "the
non-moving party's burden 'to offer evidence supporting its own case' does not arise 'unless the
moving party meets its initial burden' of production."  <u>Air-Con</u>, 21 F.4th at 177 (quoting
<u>Carmona v. Toledo</u>, 215 F.3d 124, 133 (1st Cir. 2000)).  Because FMFCU has not carried its
burden, the Court takes no position on how Thompson and Bronson may seek to refute the
presumption in subsequent proceedings.  <u>See</u> <u>Panzer v. Verde Energy, USA, Inc.</u>, 507
F. Supp. 3d 606, 614–16 (E.D. Pa. 2020) (discussing applicable standards for proving lack of
receipt on a motion to compel).

application failed to conspicuously notify Harris about the arbitration terms.  See [Opp. at 15 & n.8 (citing In re Est. of Atkinson, 231 A.3d 891, 895 (Pa. Super. Ct. 2020))].

In general, under Pennsylvania law, "[t]he terms of a contract include terms in documents that a signed contract document specifically and clearly identifies and expressly incorporates by reference."  Atkinson, 231 A.3d at 899.  Harris urges a narrow reading of Atkinson, whereby in order to incorporate the contents of an underlying document, contracting parties must specifically and clearly identify the "terms" to be incorporated.  [Opp at 15 n.8].  In Atkinson, the agreement at issue in that case indicated "in bold, right above [the signature line], that [the signatory] was agreeing to arbitration."  231 A.3d at 899.  On Harris's proposed reading of that case, the incorporation clause in his account agreement is not binding as to the arbitration clause because it only references the A&Ds generally, and does not specifically reference the arbitration clause contained therein.

The Court reads Atkinson differently.  It is true that Pennsylvania law requires a "specific[] reference" in a signed agreement to "separate documents," like the A&Ds, to make the latter documents part of the contract.  Atkinson, 231 A.3d at 899 (citation omitted); see also id. (explaining that a "document that parties specifically referenced in their agreement" may become "part of their agreement").  That said, such a reference need not specifically identify the underlying terms to be incorporated.  To the contrary, "arbitration provisions, like other contractual provisions, may be incorporated by reference through general incorporation provisions."  Century Indem. Co. v. Certain Underwriters at Lloyd's, London, 584 F.3d 513, 534 (3d Cir. 2009); accord Sw. Energy Prod. Co. v. Forest Resources, LLC, 83 A.3d 177, 187 (Pa. Super. Ct. 2013) ("It is a general rule of law in the Commonwealth that where a contract refers to and incorporates the provisions of another, both shall be construed together." (citation omitted)).

28

Indeed, singling out the A&Ds for an arbitration-only requirement of clause-specific notice, as Harris apparently urges, would thwart Congress's purpose in enacting the FAA: namely, "plac[ing] arbitration agreements 'upon the same footing as other contracts.'" Air-Con, 21 F.4th at 168 (quoting Scherk v. Alberto-Culver Co., 417 U.S. 506, 511 (1974)); see also Century Indem., 584 F.3d at 531 (observing that applying a more demanding standard to incorporation of arbitration agreements by reference would be "antithetical to the goals and policies of the FAA," and cited favorably in Atkinson).

Therefore, under Pennsylvania law, the account agreement validly incorporated the A&Ds, including the A&D Arbitration Clause. The Account Agreement required Harris to "acknowledge receiving a copy of the [A&Ds] related to [his] Account(s) and . . . agree to be bound by the terms and conditions found therein," including the arbitration clause. [Walters Decl. ¶ 12]. That language "specifically and clearly identifie[d]" the A&D's and "expressly incorporate[d]" their contents, creating a valid agreement to arbitrate. Atkinson, 231 A.3d at 899; see also Sw. Energy, 83 A.3d at 187.

Moreover, Harris does not dispute FMFCU's assertion that the bank "provided [Harris] with a hard copy of the November 2020 A&Ds that were and remain in effect at FMFCU" at the time he opened his account. [Walters Decl. ¶¶ 9–11]. Thus, the parties agree that the A&Ds were available to Harris when he signed the account agreement. Cf. Carr v. First Commonwealth Bank, 293 A.3d 599, at *7 (Pa. Super. Ct. 2023) (unpublished table decision) (distinguishing Atkinson by noting non-movant "did not receive [the purportedly incorporated documents] when he or she signed the contract"). Since he has not placed this or any other

material fact in dispute,[15] the Court concludes that a valid agreement to arbitrate exists between Harris and FMFCU.

### c. Brown

FMFCU contends that Brown is bound to arbitration based on the following facts:

1. "As part of the application process, [Brown] consented to receiving all membership documents, including the November 2020 A&Ds, electronically (although he had the ability to print any document if he wished)." [Mot. at 32 (citing Walters Decl. ¶¶ 15–17)].

2. "To complete his application, Brown was required to click past a page including a short paragraph stating that he acknowledged receipt of the November 2020 A&Ds, among other documents, and affirmed acceptance to the terms and conditions of the November 2020 A&Ds." [Id. at 32–33 (citing Walters Decl. ¶ 18)].

3. "FMFCU's application software does not allow an applicant to proceed and complete the application until he or she affirmatively acknowledged the Membership Authorization by checking a box which provides his or her e-signature." [Id. at 33 (citing Walters Decl. ¶ 18 n.1)].

The interface Brown clicked through is depicted below:

---

[15] Harris also suggests, without citing legal authority, that FMFCU's motion must fail because it has not provided evidence concerning details about the application process, including whether FMFCU gave Harris time to review the A&Ds or alerted him that they contained an arbitration agreement. [Opp. at 15–16]. But Harris does not actually contend that he was denied an opportunity to review the documents, nor does he cite any authority, under Pennsylvania law or otherwise, for why FMFCU's failure to foreclose that possibility in its own affidavit means the bank's motion should be denied as a matter of law.



You hereby apply for membership in Franklin Mint Federal Credit Union ("Credit Union" or "we"). You certify that the information you provided for this membership application is complete and true, and submitted for purposes of obtaining the accounts and services requested. You authorize us to obtain and use credit and employment reports, as permitted by law, to verify your eligibility for membership and any accounts and services we may offer you.

You acknowledge receipt of and agree to the terms and conditions of the below agreements or disclosures which govern your membership with us and any accounts and services you may obtain from us, as may be amended from time to time and which are incorporated herein. Notwithstanding anything to the contrary herein or therein, we will not impose any membership-related fees unless you otherwise obtain accounts or services from us that are unrelated to your loan through Upgrade, Inc.

To help the government fight the funding of terrorism and money laundering activities, federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account. What this means for you: When you open an account, we will ask for your name, address, date of birth and other information that will allow us to identify you. The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding.

eConsent
Account Agreements and Disclosures/Privacy Notice
Account Disclosure Schedule of Fees and Charges

[Walters Decl. ¶ 18].

FMFCU contends that under Pennsylvania law, parties may create a valid arbitration

agreement under these circumstances.  See Juric v. Dick's Sporting Goods, No. 20-cv-00651,

2020 WL 4450328, at *3–4 (W.D. Pa. Aug. 3, 2020).  Agreements formed in this way are

commonly called "clickwrap" agreements, a term which refers to digitally created contracts

where users "consent to . . . terms or conditions by clicking on a dialog box on the screen in

order to" use a service.  Feldman v. Google, 513 F. Supp. 2d 229, 236 (E.D. Pa. 2007).  FMFCU

argues that essentially the same facts are now before this Court, and notes that "clickwrap"

agreements of this sort are generally enforceable under Pennsylvania law.  See [Reply at 5–6];

see also Glavin v. JPMorgan Chase Bank, N.A., No. 23-cv-1708, 2024 WL 1536739, at *2 (E.D.

Pa. Apr. 9, 2024).

Brown disagrees, arguing that this is a classic "browsewrap" agreement, a class of digital

contracts that Pennsylvania courts are more "reluctant" to enforce.  [Opp. at 18]; see also [id. at

16–17 (discussing Checchia v. SoLo Funds, No. 23-cv-00444, 2023 WL 3868369 (E.D. Pa. June

7, 2023), <u>vacated and remanded</u>, No. 23-2193, 2024 WL 3717491 (3d Cir. Aug. 8, 2024))].[16]  In

the case Brown relies on, the Eastern District of Pennsylvania describes browsewrap agreements

as follows:

> In browsewrap agreements, a company's terms and conditions are
> generally posted on a website via hyperlink at the bottom of the
> screen. However, unlike online agreements where users must click
> on an acceptance after being presented with terms and conditions
> (known as "clickwrap" agreements), browsewrap agreements do not
> require users to manifestly express assent.

<u>Checchia</u>, 2023 WL 3868369, at *8 (quoting <u>HealthplanCRM, LLC v. AvMed, Inc.</u>, 458

F. Supp. 3d 308, 331 (W.D. Pa. 2020)).  "Instead, in a pure-form browsewrap agreement, the

website will contain a notice that — by merely using the services of, obtaining information from,

or initiating applications within the website — the user is agreeing to and is bound by the site's

terms of service."  <u>HealthplanCRM</u>, 458 F. Supp. 3d at 331 (internal quotation marks and

citation omitted).

The Court concludes that the circumstances here bear a closer resemblance, albeit not a

perfect one, to a "clickwrap" agreement, and that the agreement is enforceable because Brown

manifested an intent to be bound.  Although FMFCU did not ask Brown "to check an 'I Accept'

box, as is the case with a typical clickwrap agreement," <u>HealthplanCRM</u>, 458 F. Supp. 3d at 331,

it is enough that the agreement stated that Brown "acknowledge[d] receipt of and agree[d] to the

terms and conditions of the below agreements or disclosures," [Walters Decl. ¶ 18].  This

language (a) signaled to Brown that further action would constitute "agree[ment]" to the A&Ds,

---

[16] After the filing of Brown's opposition, the Third Circuit vacated the district court's ruling
because it failed to apply the required summary-judgment standard.  Thus, although Brown's
motion argues that <u>Checchia</u> should control the facts here, [Opp. at 16–17], the Court declines to
speculate as to the case's continued relevance apart from its description of browsewrap
agreements, which the Third Circuit did not question.

and (b) informed Brown where to find a copy of the A&Ds: "below."[17]  "Thus, while not strictly 'clickwrap,' the agreement here similarly avoids the concerns regarding lack of notice and manifested assent that often lead courts to decline to enforce pure browsewrap agreements buried 'in obscure sections of a webpage that users are unlikely to see.'"  HealthplanCRM, 458 F. Supp. 3d at 334 (quoting James v. Glob. TelLink Corp., 852 F.3d 262, 267 (3d Cir. 2017)); see also Glavin, 2024 WL 1536739, at *2 (finding a clickwrap agreement where user "affirmatively click[ed] to acknowledge she read and accepted the terms of the Agreements and electronically sign[ed] a Personal Electronic Signature Card . . . contain[ing] the same acknowledgement that [the user] had 'read and agree[d]'" to the terms).  Because Brown does not dispute the only remaining fact necessary to establish a valid contract — that Brown clicked past the consent page — the Court concludes that there is no genuine dispute of material fact that Brown agreed to the A&Ds, including the A&D Arbitration Clause.

> d.  FMFCU's agreements with Harris and Brown are not unconscionable.

Harris and Brown each alternatively contend that even if they agreed to arbitrate, the A&D Arbitration Clause is unconscionable under Pennsylvania law.  [Opp. at 32–33].  "To prove unconscionability under Pennsylvania law, a party must show that the contract was both substantively and procedurally unconscionable."  Quilloin v. Tenet HealthSystem Phila., Inc., 673 F.3d 221, 230 (3d Cir. 2012) (citing Salley v. Option One Mortg. Corp., 925 A.2d 115, 119 (Pa. 2007)).  A contract provision "is procedurally unconscionable where 'there was a lack of meaningful choice in the acceptance of the challenged provision,'" id. at 235 (quoting Salley,

---

[17] The direction to review the A&D's "below" belies Brown's suggestion that "the hyperlinked [A&Ds] were not in close proximity" to the agreement language.  [Opp. at 17].

925 A.2d at 119), and "is substantively unconscionable where it 'unreasonably favors the party asserting it,'" id. at 230 (quoting Salley, 925 A.2d at 119).[18]

Harris and Brown have failed to show that either the A&Ds in general, or the A&D Arbitration Agreement in particular, are procedurally unconscionable, so their unconscionability defense fails.  The Pennsylvania Supreme Court applies a multi-factor analysis to determine procedural unconscionability, examining (1) "the take-it-or-leave-it nature of the standardized form of the document," (2) "the parties' relative bargaining positions," and (3) "the degree of economic compulsion motivating the 'adhering' party."  Salley, 925 A.2d at 125 (quoting Delta Funding Corp. v. Harris, 912 A.2d 104, 111 (N.J. 2006)).  FMFCU concedes that the A&Ds, including the A&D Arbitration Clause, were offered to Harris and Brown on a "take-it-or-leave-it" basis.  [Reply at 21 ("Harris and Brown did not have a right to opt out . . . .")].  Even if the Court assumes that Harris and Brown were each "the weaker party" to their respective agreements, that does not mean they "lack[ed] a meaningful choice" regarding whether or not to accept FMFCU's terms.  Quilloin, 673 F.3d at 237.  As FMFCU observes, Harris and Brown were "free to walk away and use a different banking service," [Reply at 21], and the lack of any sort of "economic compulsion" or other circumstantial duress takes this case out of the heartland of procedural unconscionability, Quilloin, 673 F.3d at 235–36 (quoting Salley, 925 A.2d at 125); cf., e.g., Nino v. Jewelry Exch., Inc., 609 F.3d 191, 202 (3d Cir. 2010) (finding employment contract, including arbitration terms, procedurally unconscionable where plaintiff was "dependent upon [the employer] with respect to his immigration status at the time he accepted

---

[18] The Pennsylvania Supreme Court has indicated that courts should apply a "sliding-scale approach" to this inquiry, so that, for example, "where the procedural unconscionability is very high, a lesser degree of substantive unconscionability may be required."  Salley, 925 A.2d at 125 & n.12.

the job offer" and thus "depended upon [the employer] for his very capacity to work" (internal

quotation marks omitted)).  Thus, although the Court agrees that there is a degree of

adhesiveness underlying this contract, the attendant degree of procedural unconscionability is

nevertheless low.

Because the Pennsylvania Supreme Court applies a "sliding-scale approach" to the

balancing of procedural and substantive unconscionability, the inquiry here ultimately turns on

whether Harris and Brown can show a high degree of substantive unreasonableness.  Salley, 925

A.2d at 125 & n.12.  Harris and Brown complain that (1) the class-action waiver, (2) the jury-

trial waiver, and (3) the fee-shifting provisions both unreasonably stack the deck in favor of

FMFCU.  "It is settled law that an arbitration clause is not unconscionable because it only

permits individual, rather than class, arbitration."  Jordan v. Petco Health & Wellness Co., No.

21-cv-1858, 2022 WL 4237519, at *5 (W.D. Pa. Sept. 14, 2022) (discussing Quilloin, 673 F.3d

at 233); see also AT&T Mobility v. Concepcion, 563 U.S. 333, 346–52 (2011) (holding that

FAA preempts state contract law deeming arbitration-related class waivers unconscionable).

Similarly, "waiver of the right to trial by jury is a necessary consequence of agreeing to have an

arbitrator decide a dispute, and this aspect of an arbitration clause is not substantively

unconscionable."  MacPherson v. Magee Mem'l Hosp. for Convalescence, 128 A.3d 1209, 1222

(Pa. Super. Ct. 2015) (citation omitted).

The fee-shifting provision, however, presents a harder question.  According to the terms

of the agreement, "the costs and expenses of the arbitration proceeding, including the arbitrator's

fees, shall be borne by the nonprevailing party, unless otherwise required by law."  [Walters

Decl. Ex. B at 3].  The Court agrees with plaintiffs that the allocation of such costs could

unreasonably favor FMFCU, since "an arbitration provision that makes the arbitral forum

prohibitively expensive for a weaker party is unconscionable." Clymer v. Jetro Cash & Carry Enters., Inc., 334 F. Supp. 3d 683, 692 (E.D. Pa. 2018) (quoting Parilla v. IAP Worldwide Servs., VI, Inc., 368 F.3d 269, 284 (3d Cir. 2004)). The allocation of the arbitrator's fee, which bears a loose analogy (at best) to the costs of civil litigation,[19] may "impose[] additional expenses for bringing a claim" beyond those that Harris and Brown would "have to bear in a court action." Kohlman v. Grane Healthcare Co., 279 A.3d 42, 50 (Pa. Super. Ct. 2022). And as the Third Circuit has explained, the fact that arbitrator costs are only due if the plaintiff loses does not change that analysis:

> With respect to an employee who is unable to pay the costs of arbitration, we see little difference between a 100% probability that the employee will have to pay half the arbitrator's fees and expenses on the one hand, and an indeterminate (but less than 100%) probability that the employee would have to pay all of the arbitrator's fees and expenses on the other. In either case, the employee must consider whether arbitration will be so prohibitively expensive for her that she cannot take advantage of the arbitral forum. Simply the prospect that the employee may have to pay the entire amount of the arbitrator's fees and expenses may serve to chill her willingness to bring a claim.

Parilla, 368 F.3d at 284.

Indeed, the Third Circuit has held on multiple occasions that almost identical "loser pays" clauses can be unconscionable. Parilla, 368 F.3d at 284; Alexander v. Anthony Int'l, L.P., 341 F.3d 256, 269–70 (3d Cir. 2003). Still, to successfully prove the defense, the plaintiffs in those cases had to offer evidence "showing the likelihood of incurring such costs." Alexander, 341

---

[19] FMFCU suggests that such costs are consistent with the financial burden "borne by any litigant in federal court," and therefore the fee-shifting provision is permissible. McCann v. Neuronetics, Inc., No. 21-cv-01132, 2021 WL 5441094, at *3 (E.D. Pa. Nov. 19, 2021) (citation omitted); [Reply at 21 (citing same)]. Although costs in federal civil litigation, apart from attorney's fees, are ordinarily "allowed to the prevailing party," no litigant is taxed an hourly or daily fee for the court's time. Fed. R. Civ. P. 54(d)(1).

F.3d at 268 (quoting Green Tree Fin. Corp.-Ala. v. Randolph, 531 U.S. 79, 92 (2003)); see also

Clymer, 334 F. Supp. 3d at 692 ("To meet th[e] burden [under Green Tree], a plaintiff must (1)

come forward with some evidence to show the projected fees that would apply to their specific

arbitrations, and (2) show the party's inability to pay those costs."). Thus, "a party seeking to

declare a provision awarding arbitration costs unenforceable must proffer some credible and

substantiated evidence of that party's financial situation as well as the specific costs of

arbitration," Clymer, 334 F. Supp. 3d. at 692, which is absent from the record before the Court in

this case.[20]  By failing to provide any information to that effect, Plaintiffs have failed to meet

their burden of showing that the costs of arbitration are so "prohibitively expensive" as to evince

a high degree of substantive unconscionability.  Id.  This omission is fatal to their defense.

FMFCU's motion is **GRANTED** as to Harris and Brown.

---

[20] Courts do not demand formal submissions, or even affidavits.  For example, in Clymer, the
Court relied on facts submitted within the plaintiff's responsive brief.  334 F. Supp. 3d at 692.
Similarly, in Anthony International, the Third Circuit found an agreement unconscionable based
on "submitted evidence as to the rates of the prospective arbitrators" as well as inferences from
the record concerning the plaintiffs' ability to pay:

> Plaintiffs admittedly did not provide any detailed information about
> their own financial status.  They, however, needed the job at the St.
> Croix refinery, and Alexander also apparently had to support three
> children in college.  As discharged refinery workers, they clearly
> could not meet this financial burden even if the arbitration did not
> last the seven days they predicted.

341 F.3d at 269.  The only hint of cost-related information comes from the parties' incorporation
of the AAA Consumer Arbitration Rules within the arbitration agreement.  But even if the Court
were to consider the AAA's consumer arbitration cost schedule as evidence of the costs of
arbitration, the record would still be still devoid of any information concerning the plaintiffs'
ability to pay.

3.    **MidFirst Plaintiffs (Dudurkaewa, Rubenstein, Linman and child, Strother, Struck, and De Medicis)**

The parties agree that Oklahoma law applies to the Plaintiffs' claims.  See [Mot. at 36 n.15]; [Opp. at 18].  Under Oklahoma law, a "valid contract requires the parties' mutual consent."  Williams v. TAMKO Bldg. Prod., Inc., 451 P.3d 146, 151 (Okla. 2019).  "A party who manifests assent to a contract's terms is bound by them."  Hancock v. AT&T Co., 701 F.3d 1248, 1256 (10th Cir. 2012).  "The manifestation of assent may be made wholly or partly by written or spoken words or by other acts or by failure to act."  Eakins v. Whaleco Inc., 721 F. Supp. 3d 1252, 1257 (W.D. Okla. 2024) (applying Oklahoma law and quoting Restatement (Second) of Contracts § 19 (Am. L. Inst. 1981)).  Still, "the conduct of a party is not effective as a manifestation of his assent unless he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents."  Id. (cleaned up) (quoting Restatement (Second) of Contracts § 19 (Am. L. Inst. 1981)).  "[A]lthough Internet commerce has exposed courts to many new situations, contract principles remain unchanged."  Walker v. Builddirect.com Techs. Inc., 349 P.3d 549, 553 (Okla. 2015) (citation omitted).  Once a party has manifested her assent to a contract, "failure to read the terms is no excuse."  Hancock, 701 F.3d at 1256.

a.   Dudurkaewa, Rubenstein, Strother, and Strucke

MidFirst contends that Dudurkaewa, Rubenstein, Strother, and Strucke (together, for purposes of this sub-section, "MidFirst Plaintiffs") agreed to the AADs by manifesting their assent through online sign-up agreements with MidFirst Bank or its Vio Bank division.  [Mot. at 38 (citing Caswell Decl. ¶¶ 49–52, 58–69)].  Images of the agreement page appear below:

38



[Caswell Decl. ¶ 10].



[Id. ¶ 12].  No customer could complete the sign-up process without clicking "Continue" on a page entitled "Accept Disclosures," which explained that the customer "must read and agree to . . . 'the Account Agreement and Disclosure,'" with the words "Account Agreement and Disclosure" hyperlinked to the applicable contract terms.  [Id. ¶¶ 9–13].

MidFirst argues that the resulting agreements satisfy the requirements for a valid clickwrap agreement under Oklahoma law.  "[I]f a clickwrap agreement gives a consumer reasonable notice of its terms and the consumer affirmatively manifests assent to the terms, the consumer is bound by the terms."  Hancock, 701 F.3d at 1256.  Oklahoma applies similar principles in the related context of the incorporation of extrinsic documents by reference in

written documents.  See Walker, 349 P.3d at 553 ("A chief consideration of incorporation is

whether the party to be bound had reasonable notice of and assented to the terms to be

incorporated.").  Indeed, actual knowledge of a contract's terms is not essential to the formation

of a valid clickwrap agreement; a valid agreement can still be formed based on constructive

notice where "(1) the website provides reasonably conspicuous notice of the terms to which the

consumer will be bound; and (2) the consumer takes some action, such as clicking a button or

checking a box, that unambiguously manifests his or her assent to those terms."  Eakins, 721

F. Supp. 3d at 1257; Walker, 349 P.3d at 553 ("A party is deemed to have notice of incorporated

terms where a reasonabl[y] prudent person, under the particular facts of the case, should have

seen them.").  "A party's failure to read duly incorporated terms will not excuse the obligation to

be bound."  Walker, 349 P.3d at 553; see also Hancock, 701 F.3d at 1256.

    The Court agrees that the interfaces depicted above gave the users reasonable and

conspicuous notice of the AADs.  This is not a case "[w]here the link to a website's terms of use

is buried at the bottom of the page or tucked away in obscure corners of the website where users

are unlikely to see it."  Eakins, 721 F. Supp. 3d at 1259 (quoting Nguyen v. Barnes & Noble Inc.,

763 F.3d 1171, 1177 (9th Cir. 2014)).  Here, the stipulation to "read and agree" to the A&Ds is

indented on a separate line, in bolded text, directly above the "continue" button.  Cf. id. (finding

no notice to customer where "the terms of use agreement appear[ed] in relatively small font at

the bottom of the screen . . . spatially decoupled from the attention-grabbing orange "Continue"

button that users click to create their account").  Nor is it a case where the interface "fail[ed] to

distinguish" the agreement hyperlink "from its surrounding text."  Id. (citing Berman v. Freedom

Fin. Network, LLC, 30 F.4th 849, 856 (9th Cir. 2022)).  Instead, the hyperlink in this case

"presents with the traditional hallmarks of hyperlinked text," i.e., a blue underlined link labeled

"Account Agreement and Disclosures." See Cullinane v. Uber Techs., 893 F.3d 53, 63 (1st Cir. 2018) ("While not all hyperlinks need to have the same characteristics, they are commonly blue and underlined." (citation and internal quotation marks omitted)); cf. Eakins, 721 F. Supp. 3d at 1259 (finding no notice where link to agreement "appears in grey font against a white backdrop"). Under these circumstances, the Account Disclosures were "reasonably conspicuous," and the MidFirst Plaintiffs' checking of the applicable box constituted a manifestation of assent to the terms contained therein.

The MidFirst Plaintiffs resist this conclusion on two related grounds, neither of which is availing. They contend that (1) "[n]owhere on the 'Accept Disclosures' screen does it mention arbitration," and (2) there is no evidence that they "were required to click through the [AAD] in order to proceed, or whether the Plaintiffs were able to hit 'Continue'" without reading them. [Opp. at 19].[21] Yet they point to no principle of Oklahoma law requiring the sign-up page to disclose that the AADs contain arbitration terms. Indeed, cases applying Oklahoma law have enforced arbitration agreements so long as the consumer was given "reasonably conspicuous notice of the terms," irrespective of whether the consumer actually read them. Eakins, 721 F. Supp. 3d at 1257 (emphasis added). Once MidFirst made the AADs conspicuously available to the Plaintiffs, the "duty" was on the plaintiffs, not MidFirst, "to apprise [themselves] of [the AADs] contents." First Nat'l Bank & Tr. Co. of El Reno v. Stinchcomb, 734 P.2d 852, 854 (Okla. Ct. App. 1987). A party's "failure to read the terms" of an agreement "is no excuse" for non-performance once that party has manifested assent to them. Hancock, 701 F.3d at 1256.

---

[21] Plaintiffs seek to distinguish the Hancock case on the same grounds. See [Opp. at 20].

The MidFirst Plaintiffs also contend that they cannot be bound by the arbitration clause because the sign-up page did not explicitly include the word "arbitration" and instead referred more generally to an "Agreement and Disclosures" (which contained an arbitration agreement). Plaintiffs, however, cite no authority, and offer no persuasive rationale for treating an arbitration clause differently from all the other terms of the agreement. To the contrary, such a requirement would subvert the policy of the FAA, i.e., "to make arbitration agreements as enforceable as other contracts," since clickwrap contracts generally need not do more than conspicuously identify the underlying agreement. Williams, 451 P.3d at 151 (quoting Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 404 n.12 (1967)); accord Air-Con, 21 F.4th at 168 (quoting Scherk, 417 U.S. at 511). The Court therefore concludes that Dudurkaewa, Rubenstein, Strother, and Strucke formed valid agreements to arbitrate with MidFirst.

ii.    De Medicis

Much of the foregoing analysis pertains to Plaintiff De Medicis. De Medicis signed up for an account with Monifi, a former brand of MidFirst, through an online application process that included a "Disclosures" page. [Caswell Decl. ¶ 14]. The disclosures page required De Medicis to place a check mark beside text stating that he "ha[d] read and agree[d] to the Monifi Terms and Conditions & Privacy Notice." [Id. ¶¶ 14–15]. Beneath the affirmation was a hyperlink that read "View Details," and linked to the Terms and Conditions that included mandatory arbitration terms. [Id. ¶ 16]. A copy of the Disclosures screen appears below:



[Id. Ex. C].

De Medicis challenges whether these actions were adequate to create a valid agreement to arbitrate on several grounds that, for the reasons just explained, are unavailing.  De Medicis, like the other MidFirst Plaintiffs, identifies no Oklahoma authority mandating that the Disclosures page "mention arbitration" or requiring that MidFirst offer evidence that "De Medicis accessed the links" to form a valid arbitration agreement.  [Opp. at 21].

De Medicis, however, advances one further argument: analogizing to Eakins, he contends that although the "View Details" link was "underlined," it appeared "in the same font color and size as the preceding text," and "[w]ithout any meaningfully distinguishing features, the hyperlinks presented by MidFirst may not have stood out."  [Opp. at 21].  In Eakins, the Court found that the "defendant's 'Terms of Use' hyperlink, which 'appear[ed] in grey font against a white backdrop . . . [were] neither remarkable nor present[ed] with the traditional hallmarks of hyperlinked text.'"  [Id. (quoting Eakins, 721 F. Supp. 3d at 1259)].  But this factor was not dispositive in Eakins: as the Court's holding made clear, "[t]he App's failure to adequately

distinguish the hyperlinked text, <u>coupled with its obscure placement</u> of the terms of use

agreement, fails the conspicuous test." 721 F. Supp. 3d at 1259. As the Court explained, "the

terms of use agreement appear[ed] in relatively small font <u>at the bottom of the screen</u>" and was

<u>spatially decoupled</u> from" the acceptance button that users had to click. <u>Id.</u>

      A visual examination of the customer interface in <u>Eakins</u> reveals the stark differences that

De Medicis' analogy elides. The user interface in <u>Eakins</u> buried the Terms of Service link in

small, light-gray text <u>beneath</u> the buttons that users would click in order to sign in and,

ostensibly, bind themselves to arbitration. <u>See</u> 721 F. Supp. 3d at 1256 (depicting app interface).

Those buttons included a large orange "Continue" button, and four other colorful buttons

permitting users to log in using Google, Facebook, Apple, or Twitter credentials. <u>Id.</u> Thus, the

Court reasonably concluded that "the hyperlink to the Terms [was] not prominent or particularly

remarkable at the bottom of the page where it is featured." <u>Id.</u> at 1260 (citation omitted). But

apart from using the same font color for the hyperlinked contract terms, the facts here bear no

resemblance to <u>Eakins</u>. First, here, prominent and bolded text at the top of the Disclosures page

specifically drew users' attention to the hyperlink, instructing users to "tap 'View Details' and

agree." [Caswell Decl. Ex. C]. Second, while not colored blue like some hyperlinks, the "View

Details" link was not "spatially decoupled" from the critical features of the Disclosures page;

rather, it was placed directly and markedly below the words "I have read and agreed to the

Monifi Terms and Conditions & Privacy Notice" and accompanying check box. Finally, as De

Medicis acknowledges, the hyperlinked agreement was placed <u>above</u> the "Continue" button that

would bind users to the hyperlinked contract, <u>see</u> [Opp. at 22], not (as in <u>Eakins</u>) far below it,

where a user might not see it or wonder "whether the terms of use agreement even pertain[ed] to

the creation of an account," 721 F. Supp. 3d at 1259.

In sum, the Court rejects De Medicis's reliance on Eakins and concludes that the AADs satisfied Oklahoma law's requirements for creating a valid clickwrap agreement. Because De Medici does not dispute that he clicked the applicable check box on the Disclosure, and that the Terms and Conditions require binding arbitration of disputes arising from their relationship, the Court finds that a valid agreement to arbitrate exists between De Medici and MidFirst.

### iii.    Linman and Child

MidFirst contends that Linman and her minor child L.L. agreed to arbitrate the instant dispute when she "physically signed a signature card at a MidFirst Bank location," in which she "expressly agreed to the AAD and acknowledged that '[she] ha[d] received a copy of MidFirst Bank's Account Agreement and Disclosures.'"  [Mot. at 39 (quoting Caswell Decl. Ex. K)]. MidFirst asserts that, "consistent with MidFirst Bank's ordinary and routine business practices," Linman and L.L. "would have received such a copy."  [Id. at 40].

Linman and L.L. dispute that this satisfies Oklahoma contract formation requirements on two grounds.  First, they complain that the AAD acknowledgement and promissory language are "buried in the middle of a large, single-spaced block of small text on the MidFirst Bank Account Signature Card, amongst other language regarding applying for membership with MidFirst, and there is no mention of arbitration."  [Opp. at 22–23].  To be sure, the disclosure, reproduced below, is one sentence in a paragraph printed in small font just above plaintiffs' signatures:

[Caswell Decl. Ex. K (excerpted)].  But Linman and L.L. provide no legal authority indicating that this disclosure was inadequate as a matter of law, or why it should upset the black-letter principle that a "party who manifests assent to a contract's terms," such as by affixing her signature, "is bound by them, and failure to read the terms is no excuse."  Hancock, 701 F.3d at 1256.

Second, Linman and L.L. contend that MidFirst "fail[ed] to provide evidence or facts regarding its 'ordinary and routine business practices'" beyond asserting that they were followed. [Opp. at 23].  In particular, they contend that it is "unclear whether Plaintiffs Linman and child L.L. received physical copies of the AAD when they signed up for MidFirst Bank."  [Id. at 23 n.12].  It is true that while a party "who had the opportunity to read a contract but did not is bound by the unread terms," a party "c[an]not [have] consent[ed]," if she "did not have an opportunity to read the contract."  Williams, 451 P.3d at 151.  Thus, where a movant relies on evidence of its ordinary business practices to meet its threshold burden of showing a valid agreement to arbitrate, Oklahoma courts look for evidence that the counterparty actually received the agreement and any documents incorporated therein by reference.  Compare Hancock, 701 F.3d at 1257 (finding valid service agreement where "description of [Defendants'] standard practice" indicated AT&T "technicians present[ed] customers with a Welcome Kit containing a printed copy of the TV/Voice terms and give customers an opportunity to review the terms"), with Williams, 451 P.3d at 151 (finding no arbitration contract formed where "[t]here [was] no evidence that the homeowners received any notice of the arbitration agreement").  Absent such evidence, a party is not "bound by the unread terms" because a party cannot manifest assent to contract terms she never received.  Id.

MidFirst has satisfied that standard.  As MidFirst's declaration explains:

> MidFirst Bank employees who assist MidFirst Bank customers in opening new MidFirst Bank accounts are required and trained, as an ordinary and routine business practice, to provide a "New Account Kit" to the new customer. These documents include the written terms and conditions of the account, including the Account Agreement and Disclosures.

[Caswell Decl. ¶ 19]. MidFirst further asserts that Linman and L.L.'s "account was opened in the manner described [in Paragraph 19]," so they "would have received the 2018 MidFirst AAD, including the arbitration provisions." [Id. ¶¶ 55–56]. These facts hardly leave it "unclear whether Plaintiffs Linman and child L.L. received physical copies of the AAD when they signed up for MidFirst Bank" accounts, as Linman and L.L. assert. [Opp. at 23 n.12]. This is particularly so where Linman and L.L. stop short of actually disputing, by affidavit or otherwise, that they received a copy of the AADs during the sign-up process. Cf. Quazilbash v. Wells Fargo & Co., No. 09-cv-0652, 2010 WL 1643778, at *1–2 (N.D. Okla. Apr. 22, 2010) (allowing discovery on contract formation based on material factual dispute because plaintiff (1) filed affidavit "den[ying] entering into [account] agreement," which included an arbitration clause; (2) "argue[d] that th[e] agreement was the product of identity theft"; (3) "sw[ore] that he never applied for or opened an account or line of credit with Wells Fargo"; and (4) insisted "that he ha[d] never lived at the address listed on the account agreement that Wells Fargo invoke[d]"). Because MidFirst has met its burden and Linman and L.L. have not created a genuine dispute of material fact, the Court concludes that a valid agreement to arbitrate exists between the parties.

### iv.    Unconscionability

Plaintiffs argue in the alternative that the MidFirst arbitration provision is unconscionable and therefore unenforceable. In Oklahoma, a party asserting unconscionability must show the now-familiar requirements of procedural and substantive unconscionability. Barnes v. Helfenbein, 548 P.2d 1014, 1020 (Okla. 1976) ("Unconscionability has generally been

recognized to include an absence of meaningful choice on the part of one of the parties, together with contractual terms which are unreasonably favorable to the other part.").  Plaintiffs contend that the MidFirst agreements are procedurally unconscionable because its opt-out terms were "buried deeply within the agreement" and unfairly required Plaintiffs to send written notice within thirty days.  [Opp. at 34].  Plaintiffs, however, provide no authority showing why this approach runs afoul of Oklahoma law.  This Court's task when sitting in diversity jurisdiction "is to predict how the state's highest court would rule on the legal questions before" it.  Smith v. Prudential Ins. Co. of Am., 88 F.4th 40, 48 (1st Cir. 2023); see also id. (explaining that proper sources of state law include "analogous state court decisions, persuasive adjudications by courts of sister states, learned treatises, and public policy considerations identified in state decisional law" (quoting Aubee v. Selene Fin. LP, 56 F.4th 1, 4 (1st Cir. 2022))).  Plaintiffs' failure to point to any legal authority leaves the Court with no basis for a ruling in their favor on procedural unconscionability.  In any case, Plaintiffs' substantive unconscionability argument — that the contract requires waiver of jury trials and class claims — is a non-starter, for reasons already addressed in the context of the FMFCU Plaintiffs.  See supra; Concepcion, 563 U.S. at 344.

### 4.    Pathward

Plaintiffs Alcott, Cantrell, Fields, and Kent (together, for purposes of this sub-section, "Pathward Plaintiffs"), agree with Pathward that Illinois law applies to the purported agreement with Cantrell and Kent, Florida law applies to the agreement with Fields, and New Jersey law applies to the agreement with Alcott.  See [Mot. at 40]; [Opp. at 24].  Pathward contends that "the four Pathward Plaintiffs agreed to the Online and Mobile Banking Agreement, including its arbitration provision," through clickwrap agreements binding them to the "Online Banking Agreement" during the internet-browser or mobile-app login processes used to access their

49

online H&R Block accounts.  [Mot. at 40].  Specifically, after successfully entering a username, password, and two-factor authentication code, Pathward's affidavit explains that each Pathward Plaintiff would reach a "Returning Client Acknowledgement Screen."  [Rigney Decl. ¶¶ 11–25]. The internet-browser version appears on the left below, and the Android mobile-app version appears on the right.




[Rigney Decl. Exs. 4, 5].  The Pathward Plaintiffs were required to click the check box, and then click "Next," in order to proceed past the acknowledgment page and to use Pathward's services. [Id. ¶ 25].  Pathward asserts that, according to its business records, Alcott accepted the agreement using a web browser on January 12, 2023 at 8:34 p.m. CT; Fields did so using an Android app on January 20, 2023 at 11:36 a.m. CT; Cantrell did so using an Android app on January 24, 2023 at 6:57 p.m. CT; and Kent did so using an Android app on January 15, 2023 at 8:12 a.m. CT.  [Id. ¶¶ 8, 10].  Pathward contends that the laws of Illinois, Florida, and New

Jersey uphold the validity of contracts formed in this manner.  See Miracle-Pond v. Shutterfly, Inc., No. 19-cv-04722, 2020 WL 2513099, at *4 (N.D. Ill. May 15, 2020) (under Illinois law, clickwrap agreements that require "clicking a link or pressing a button" to provide "affirmative assent" are enforceable); MetroPCS Commc'ns, Inc. v. Porter, 273 So.3d 1025, 1028 (Fla. Dist. Ct. App. 2018) (same, under Florida law); Beture v. Samsung Elecs. Am., No. 17-cv-05757, 2018 WL 4259845, at *5 (D.N.J. July 18, 2018) (same, under New Jersey law).

The Pathward Plaintiffs oppose arbitration on several grounds.  First, each of them has submitted affidavits asserting that they "do not recall reviewing or agreeing to the 'Online and Mobile Banking Agreement' Defendant relies on," which, they contend, "create[s] a genuine issue of material fact."  [Opp. at 25].  An affidavit simply "aver[ring] that [the non-movant] 'does not recall seeing or reviewing' [an arbitration agreement] . . . does not raise a genuine issue of material fact."  Aucutt v. Pioneer Rests., No. 24-cv-00091, 2024 WL 1906629, at *3 (S.D. Ill. May 1, 2024) (quoting Tinder v. Pinkerton Sec., 305 F.3d 728, 735–36 (7th Cir. 2002)).  Rather, as Pathward contends, the Pathward Plaintiffs must "unequivocally deny" ever having agreed to arbitrate, Blau v. AT&T Mobility, No. 11-cv-00541, 2012 WL 10546, at *3 (N.D. Cal. Jan. 3, 2012) (quoting Perez v. Maid Brigade, Inc., No. 07-cv-03473, 2007 WL 2990368, at *4 (N.D. Cal. Oct. 11, 2007); see also [Reply at 2], which their declarations do not do.

Second, the Pathward Plaintiffs challenge Pathward's decision to provide screenshots of sample consent screens in support of its motion instead of its underlying business records.  [Opp. at 24–25].  Pathward correctly points out that courts regularly rely on screenshots, coupled with sworn declarations based on the personal knowledge of the declarant, as evidence of the circumstances under which clickwrap agreements are reached.  See Lloyd v. Retail Equation, Inc., No. 21-cv-17057, 2022 WL 18024204, at *8 (D.N.J. Dec. 29, 2022) (citing cases).

Moreover, these screenshots, as Pathward argues, are not impermissible "exemplar[s]" of the type that another session of this Court rejected in a previous arbitration motion. See Khath v. Midland Funding, 334 F. Supp. 3d 499, 518 (D. Mass. 2018). In that case, the court declined to rely on an "exemplar" account agreement that purportedly governed the plaintiff's relationship with J.P. Morgan Chase because (1) the Defendant's own submission suggested that "the terms governing [the plaintiff's] account [had] changed over time" and were not captured in the exemplar, and (2) relatedly, "there [was] insufficient evidence that the 'exemplar' agreement . . . contained the pertinent provisions at the relevant time." Id. In other words, Khath does not stand for the proposition that a sample image is "insufficient" per se, as the Pathward Plaintiffs suggest. [Opp. at 25]. Rather, the record in Khath revealed a material dispute as to whether the particular "exemplar" presented to the court was, in fact, identical to the contract the Khath plaintiff had purportedly assented to. See 334 F. Supp. 3d at 517 ("[T]here is no evidence that this particular Chase Agreement governs the [plaintiff's] Account."). Here, Pathward's declaration attests to precisely that fact. Cf. id. ("The declarations provided by [the defendant] . . . only stated that the Chase Agreement is 'an exemplar of the Card Agreement for the [plaintiff's] Account.'"). And although the Pathward Plaintiffs contend, in conclusory fashion, that the "screenshots" bear "no actual connection" to their sign-up process, they offer no factual basis to dispute Pathward's declaration to the contrary. [ECF No. 1031-6 ¶ 9; ECF No. 1031-7 ¶ 9; ECF No. 1031-8 ¶ 9; ECF No. 1031-9 ¶ 9].

Alternatively, the Pathward Plaintiffs contend that the consent page did not provide "reasonable notice regarding the terms of service and arbitration provision." [Opp. at 25]. As shown above and discussed below, however, the consent screen contained multiple features placing Plaintiffs on notice of the underlying agreement.

First, as depicted above, the text at the top of the screen, in large and conspicuous font placed directly above the check box and hyperlink, states: "We've updated our terms and policies."  This, on its own, should have been "sufficient to 'place a reasonable person on notice that there were terms and conditions attached to'" the use of their service "and that it would be wise to find out what the terms and conditions were."  Sgouros v. TransUnion Corp., 817 F.3d 1029, 1036 (7th Cir. 2016) (quoting Hubbert v. Dell Corp., 835 N.E.2d 113, 122 (Ill. 2005)).

Second, the hyperlink to the underlying contract was conspicuously labeled "Online Services Agreement."  Cf. Sgouros, 817 F.3d at 1036 (denying arbitration where "[t]he hyperlinked version of the Service Agreement was not labeled 'Terms of Use' or 'Purchase' or 'Service Agreement,' but rather just 'Printable Version'").

Third, "[t]he terms of the Online Services Agreement were also highlighted by a hyperlink which was clearly and conspicuously set off from the remaining black text in a green, underlined font."  Caimano v. H&R Block, No. 23-cv-03272, 2024 WL 3295589, at *10 (E.D. Pa. July 3, 2024).

Fourth, the check box and Online Services Agreement hyperlink appear above the "next" button allowing users to proceed to access their account information, and Pathward asserts that no user could access their account information without checking that box.  Cf. Eakins, 721 F. Supp. 3d at 1259 (notice insufficient under Oklahoma law where link to agreement appeared below button that manifested assent).

In sum, the text and features on the consent page related to the revised terms and conditions and adequately placed the Pathward Plaintiffs on notice of the Online Service Agreement.

Finally, the Pathward Plaintiffs contend that their agreements are unconscionable, although the precise nature of their argument is hard to pin down.  They initially challenge the inclusion of class-action waivers, generally suggesting that those terms were "obscured" by Pathward during the contract-formation process at H&R Block brick-and-mortar locations. [Opp. at 35–36 (quoting Christensen v. Barclays Bank Del., No. 18-cv-12280, 2019 WL 1921710, at *6 (D. Mass. Apr. 30, 2019))].  The Pathward Plaintiffs also suggest that both the "class action waiver and [the] arbitration provisions were concealed from" them, although they only provide factual allegations regarding Alcott and Cantrell's initial, in-person sign-up process.[22]  [Id. at 36].  Yet even Alcott and Cantrell offer no explanation why a class-action waiver is substantively unconscionable, and their failure to do so is fatal under both New Jersey and Florida law.  See Delta Funding, 912 A.2d at 111 (requiring substantive and procedural unconscionability before finding an otherwise valid agreement unenforceable); Valiente v. StockX, Inc., 645 F. Supp. 3d 1331, 1339 (S.D. Fla. 2022) (citation omitted) (same).  In any event, even assuming that aspects of the in-person sign-up process rendered Alcott and Cantrell's initial agreements with Pathward unconscionable, the Court has already concluded that their later acceptance of the Online and Mobile Banking Agreement comported with settled principles of contract formation, and the Pathward Plaintiffs have raised no defense to the enforcement of the online agreements.[23]  Pathward's motion is **GRANTED**.

––––––––––––––––––––

[22] Neither Kent nor Fields opened their account at physical retail locations, according to Plaintiffs' own characterization of the record, see [Opp. at 7–8], so the court sees no reason to infer that arguments about the nature of the in-person account opening process would apply to them.

[23] Plaintiffs briefly contend that Pathward has not complied with contractual pre-arbitration procedures, and in particular, the obligation to file a pre-arbitration notice of dispute.  See [Opp. at 27–28].  Plaintiffs read their agreement to mean that Pathward had to provide pre-arbitration

5.      **M&T Bank**

M&T Bank contends that Plaintiffs Reardon, Twoguns, and Wormack formed a valid agreement to arbitrate the claims raised in this dispute by accepting M&T's Consumer Deposit Account Terms & Conditions.  According to M&T, Reardon and Twoguns accepted the M&T Terms & Conditions after receiving paperwork by mail, and Wormack accepted the terms while opening an account in-person at an M&T Bank branch.  [M&T Br. 2–3].

i.      Reardon and Twoguns

The Court addresses Reardon and Twoguns together because of the nearly identical facts underlying each of their arbitration disputes, despite their claims being governed by different states' laws (New York and Massachusetts, respectively).[24]  M&T asserts that Reardon and Twoguns each opened accounts with Peoples' United Bank, which was later acquired by M&T. [Dowd Decl. ¶¶ 2, 16]; [ECF No. 1147-2 ("Shea Decl.") ¶ 3].  At the time of the Peoples' United acquisition, M&T, through a vendor, mailed Reardon and Twoguns "a welcome packet that included a document entitled, 'Consumer Deposit Account Terms and Conditions,'" which contained arbitration terms.  [M&T Br. at 2–3].  The packets were mailed to the addresses

---

notice before joining the motion to compel.  But the plain language of the contract makes clear that the "claimant[]" must file such a notice, describing "the nature or basis of the dispute or claim" and "the specific relief sought."  [Rigney Decl. Ex. 1, cl. 6.2(a)].  The Court agrees with Pathward that the plain text, and indeed the only logical reading of this provision, would mean that "[t]he pre-arbitration procedures apply to the party asserting a claim, and Plaintiffs, not Defendant[], are the ones bringing claims here."  [Reply at 24–25]; see also Claimant, Black's Law Dictionary (12th ed. 2024) (defining "claimant" as "[s]omeone who asserts a right or demand").

[24] As noted supra, the Consumer Deposit Account Terms & Conditions contain a choice-of-law clause, which selects federal law and "the law of the state or other jurisdiction in which [the plaintiff's] account was opened" to govern disputes arising from the agreements.  See, e.g., [Dowd Decl. Ex. A at 67].

associated with Reardon's and Twoguns's Peoples United Bank accounts via first-class mail. [Shea Decl. ¶¶ 8–10]. The mailed agreement provided that "[b]y opening or using an Account, [the accountholder] agree[d] to be bound" by its terms. [Dowd Decl. Ex. A at 46–47]. The agreement also allowed recipients to "reject [the] arbitration provision . . . by mailing [M&T] a rejection notice by 30 days after the date you open your account." [Id. at 64]. M&T contends that it never received a rejection notice and that Reardon and Twoguns continued to use their bank accounts with M&T after the agreement was mailed to them. [Dowd Decl. ¶¶ 8, 15, 22]. M&T asserts that it emailed Reardon and Twoguns regarding the Welcome Packets around the time of mailing. [Shea Decl. ¶¶ 10b, 14].

The Court agrees with Reardon and Twoguns that the arbitration agreement is not enforceable against them. M&T asserts that the facts contained in its declarations about the mailing of the welcome packets warrant a presumption that the packets were received, and that Twoguns and Reardon are therefore bound by the contract, including the arbitration terms, contained therein. [Reply at 13].

Massachusetts and New York law both recognize a rebuttable presumption that a properly mailed letter is duly received. In Massachusetts, "[p]roper mailing of a letter is 'prima facie evidence' in civil cases of its receipt by the addressee." Commonwealth v. Crosscup, 339 N.E.2d 731, 738 (Mass. 1975). So too in New York. Meckel v. Cont'l Res. Co., 758 F.2d 811, 817 (2d Cir. 1985). The Court is satisfied that the evidence of mailing is sufficient to trigger a rebuttable presumption of regular mailing under the applicable legal standards.

Still, the mailing presumption is rebuttable. Once a party provides prima facie evidence of regular mailing, the burden of production shifts to their opponent to present evidence that the parcel "failed to reach its destination." Hobart-Farrell Plumbing & Heating Co. v. Klayman, 19

56

N.E.2d 805, 807 (Mass. 1939); Meckel, 758 F.2d at 817–18 (similar).  Here, Reardon and

Twoguns swear under penalty of perjury that they do not recall receipt of the Welcome Packets

and further deny that they intended to manifest assent to the arbitration terms.  [Reardon Decl.

¶¶ 4–5]; [Twoguns Decl. ¶¶ 4–5].

Like a 2004 ALCS highlights reel, these declarations elicit different responses in New

York and Massachusetts.  In New York, a party's "mere denial of receipt," as Reardon's

declaration offers, "does not rebut [the] presumption" of mailing.  Meckel, 758 F.2d at 817.  The

burden of production in Massachusetts is lower, however, and if a party "denies receiving [a]

letter," their denial "presents a question of credibility for a trier of fact."  Natal v. West

Springfield Housing Auth., 230 N.E.3d 1038, at *2 (Mass. App. Ct. 2024) (unpublished table

decision).  Indeed, although most of the cases applying this principle are unpublished, they are

singular in their conclusion that "cross-allegations of mailing and nonreceipt typically create an

issue of fact."  Related Springfield Assocs. Ltd. P'Ship v. Springfield Bus. Improvement Dist.,

898 N.E.2d 889, at *1 (Mass. App. Ct. 2008) (unpublished table decision) (quoting Spilios v.

Cohen, 647 N.E.2d 1218, 1221 (Mass. App. Ct. 1995)); see also Blunsden v. Marks, No. 00-

0559, 2001 WL 771184, at *2 n.3 (Super. Ct. Mass. June 27, 2001) ("[A]s soon as evidence is

introduced that warrants a finding that the letter failed to reach its destination, the evidence of

non-delivery has to be weighed against the likelihood that the mail service was efficient in the

particular instance, presenting a pure question of fact.").[25]  Thus, because Twoguns contests

whether she received the offer at all, the Court cannot compel arbitration without making a

---

[25] Massachusetts law aligns with federal law on the question of how an individual affiant can
rebut a presumption of receipt.  See, e.g., Lupyan v. Corinthian Colls., Inc., 761 F.3d 314, 322–
23 (3d Cir. 2014).  And New York and Massachusetts apply these principles differently than
Pennsylvania, as discussed supra.  See Panzer, 507 F. Supp. at 615.

"factual determination" that Twoguns "received any version of the . . . agreement." <u>Ferrier v. Comcast Corp.</u>, 159 N.E.3d 1070, at *3 (Mass. App. Ct. Dec. 4, 2020) (unpublished table decision). Her declaration therefore creates a factual dispute as to contract formation that is material under Massachusetts law.

Reardon still requires further analysis. She contends that even if M&T has proven receipt, it does not follow (under New York law) that she assented to the terms of the agreement. M&T says she assented by continuing to use her account after receipt of the agreement and by not opting out.

The parties cite different cases pointing to divergent outcomes. M&T cites a Second Circuit summary order enforcing a mailed opt-out arbitration agreement sent by the plaintiff's employer. <u>See</u> <u>Manigault v. Macy's E., LLC</u>, 318 F. App'x 6, 7–8 (2d Cir. 2009). The district court had ruled that the plaintiff's "silence in response to the . . . mailing could not constitute acceptance of Macy's offer to arbitrate disputes" and denied the defendant's motion to compel. <u>Id.</u> at 7. The Second Circuit vacated, finding that because the record showed that the employee "received the mailing . . . , continued with her employment, and did not opt out of arbitration[,] . . . the parties [had] agreed to arbitrate their disputes." <u>Id.</u> at 8. M&T contends that <u>Manigault</u>'s holding controls the outcome here.

Reardon offers competing case law. In <u>Alvarez v. Coca-Cola Refreshments, USA, Inc.</u>, the Eastern District of New York "decline[d] to apply <u>Manigault</u>'s holding to" almost identical facts. 914 F. Supp. 2d 256, 257 (E.D.N.Y. 2012) (applying New York law). Coca-Cola had mailed employees a brochure detailing a corporate mediation program, which stated that "all employees who accept or continue employment with [Coke] agree to resolve all legal claims against [Coke] through [the mediation program] rather than through court." <u>Id.</u> (third alteration

added).  Coke declared that it mailed the brochure to the plaintiff at his address on file, that it was not returned as undeliverable, and that the plaintiff continued to work for Coke.  See id.  The plaintiff denied receiving the brochure and argued that the court could not infer his assent merely from Coke's declaration regarding the mailing of the brochure and his continued employment thereafter.  See id.  The Eastern District of New York sided with the plaintiff, explaining that although evidence of proper mailing may be adequate to establish constructive notice, "providing notice is different from forming a contract."  Id. at 258.  The brochure had "unilaterally extended an offer to an unwitting recipient and informed him that complete non-action would be interpreted as a manifestation of assent to the offer."  Id.  The Court held that to infer contract formation from a presumption of receipt would have impermissibly "force[d] [claims] into arbitration" without evidence of a "clear, explicit and unequivocal agreement to arbitrate."  Id. (quoting Matter of Fiveco, Inc. v. Haber, 893 N.E.2d 807, 809 (N.Y. 2008)).

Alvarez resonates more closely than Manigault with fundamental principles of New York contract law, and the Court therefore finds Alvarez's approach more persuasive.  To be sure, a "contract may be formed by words or by conduct that demonstrate the parties' mutual assent." Manigault, 318 F. App'x at 8.  Thus, longstanding contract principles recognize that "mere silence, . . . unaccompanied by any act," such as the lack of a rejection notice or the passive continued employment or use of M&T's banking services, "may amount to an acceptance." Columbia Malting Co. v. Clausen-Flanagan Corp., 3 F.2d 547, 551 (2d Cir. 1924) (emphasis added).  But an offeror cannot just "state[] that silence will be taken as consent" and, without more, "turn the offer into an agreement."  Id.  Rather, New York law requires some indication that the offeree knew that her silence would constitute assent.  See Maas v. Cornell Univ., 721 N.E.2d 966, 970 (N.Y. 1999) ("The conduct of a party may manifest assent if the party intends to

engage in such conduct and <u>knows</u> that such conduct gives rise to an inference of assent."

(emphasis added)).  In light of these principles, the district court in <u>Alvarez</u> reasonably

concluded that:

> [The plaintiff's] decision to continue working for Coke — something that required no change in his behavior whatsoever — cannot be interpreted as a "clear" or "explicit" agreement unless Coke proves, by a preponderance of the evidence, that [the plaintiff] read or at least received, and thus had the opportunity and obligation to read, the [arbitration] materials.

914 F. Supp. 2d at 258.  In other words, absent evidence of actual receipt, and in the face of the

plaintiff's denial thereof, the court could not determine whether the plaintiff "kn[ew]" that his

continued employment would "give[] rise to an inference of assent," <u>Maas</u>, 721 N.E.2d at 970,

and therefore, his ongoing employment was not a "clear, explicit and unequivocal agreement to

arbitrate" disputes with Coke, <u>Matter of Fiveco</u>, 893 N.E.2d at 809 (citation and internal

quotation marks omitted).  These principles align with the fact presented in M&T's cited cases.

<u>See</u> <u>Dixon v. Dollar Tree Stores</u>, No. 22-cv-131S, 2023 WL 2388504, at *5 (W.D.N.Y. Mar. 7,

2023) (enforcing an opt-out arbitration agreement where the non-movant "admit[ted] to

receiving the Agreement" and merely "denie[d] reading [it]").  And under these principles, the

Court cannot compel arbitration.  Given the lack of evidence that Reardon <u>actually</u> received or

read the Welcome Packet, coupled with her denial, <u>Alvarez</u> and the foregoing principles of New

York law require further factfinding on this question.

ii.    <u>Wormack</u>

That leaves the question of whether Wormack agreed to arbitrate.  In its opening brief

and declaration, M&T states only that Wormack was provided a copy of the opt-out account

agreement when she signed up for an account in person at an M&T location in Massachusetts (in

fact, the record shows that her account was opened in New York, whose law therefore governs

60

her claim pursuant to the choice-of-law clause).[26]  Attached to M&T's reply, it provided a declaration and related records describing the digital audit trail for Wormack's in-person account-opening process.  See [ECF No. 1147-1 ("Cheong Decl.") ¶¶ 7–11, Exs. G, H, I]. According to the declaration, "the M&T Bank General Deposit Account Agreement was provided to Ms. Wormack at around 1:19 p.m. on September 28, 2022," when she opened a checking account, and again at 1:25 p.m., when she opened a savings account.  [Id. ¶¶ 7, 9]. M&T declares that Wormack electronically accepted the terms associated with her checking and savings accounts and never opted out of the arbitration terms.  [Dowd Decl. ¶ 15].

Wormack, making just one argument for why this process did not form a valid agreement to arbitrate, contends that M&T did not give her a "meaningful opportunity to review the . . . General Deposit Account Agreement allegedly provided to her."  [Sur-Reply at 6].  Recall that the General Deposit Account Agreement provided that a party accepted its general terms by "opening . . . an Account."  [Dowd Decl. Ex. A at 66–67].  Wormack observes that according to M&T's own audit trail, she opened her checking account at 1:19:06 p.m. on September 28, 2022, which was the "same hundredth of a second" that she received a copy of the General Deposit Account Agreement.  [Sur-Reply at 7].

Even if it is true that Wormack received a copy of the General Deposit Account Agreement only after she had already agreed to open her checking account, this does not create a genuine dispute of material fact as to whether Wormack is subject to a valid arbitration agreement.  It is undisputed that Womack opened a separate savings account approximately six minutes later, at 1:25:12 p.m. on September 28, 2022.  [Sur-Reply at 7]; [Cheong Decl. ¶ 9].

---

[26] See supra note 24.

Even if it were the case that she had no meaningful opportunity to review the General Deposit Account Agreement before opening her checking account, she was in possession of the agreement by the time she opened her savings account, which was subject to the same terms. The General Deposit Account Agreement also expressly provided a meaningful opportunity for Wormack to review the arbitration terms, since it allowed her thirty days from the date of her savings account opening to reject the arbitration provisions even after accepting the other terms of the agreement. [Dowd Decl. Ex. B at 17]. The Court finds that Wormack had a meaningful opportunity to review the agreement and object to the arbitration terms.

Finally, Wormack suggests that enforcing the arbitration agreement against her would be unconscionable. [ECF No. 1070 at 12–13]. Her agreement, however, incorporates the JAMS arbitration rules, [Dowd Decl. Ex. B at 17 ¶ 3], and courts have made clear that "by incorporating the JAMS arbitration rules into the agreement, the contracting parties" necessarily "delegate[]" issues of "arbitrability to the arbitrator," Neighborly Cap. Co. v. Schumacher Ctr. for a New Econ., 725 F. Supp. 3d 91, 97 (D. Mass. 2024). An unconscionability defense "goes to [a contract's] validity" and, therefore, "arbitrability." Bourque v. Rollins, Inc., No. 24-cv-11831, 2025 WL 360790, at *5 (D. Mass. Jan. 31, 2025) (citation omitted). As such, the Court leaves the question of unconscionability for the arbitrator to decide in the first instance.

M&T's motion is **DENIED** as to Monica Twoguns and Bridget Reardon and **GRANTED** as to Dalisa Wormack.

### 6.    Cadence Bank and MasTec

The Court has reviewed the stipulation between Plaintiffs and Cadence Bank to the effect that those parties have agreed to a settlement agreement in principle. See [ECF No. 1263 at 1]. In light of the parties' agreement, Cadence Bank's motion is **DENIED** with leave to renew

should the parties fail to finalize a formal settlement or in the event any settlement is not preliminarily or finally approved by the Court.  Second, because Plaintiff Joseph Liptock has agreed in principle to stipulate to individual arbitration of his claims against Defendant MasTec, the parties appear to agree that the Court should resolve MasTec's motion by entering a stay. See [ECF Nos. 1032, 1146]; Spizzirri, 601 U.S. at 475–76 (2024).  The case is therefore **STAYED** pending arbitration, and MasTec and Liptock are **ORDERED** to file a joint status report within 90 days.

## III.    CONCLUSION

For the foregoing reasons, the motion to compel arbitration is **GRANTED** as to Plaintiffs Cooper, Newman, Brown, Harris, Dudurkaewa, Strother, Strucke, De Medicis, Cantrell, Fields, Kent, and Wormack, and proceedings in those cases are hereby **STAYED** pending arbitration. The motion is **STAYED** pending arbitration as to Plaintiff Liptock subject to the reporting requirements above.  Cadence Bank's motion to compel is **DENIED** with leave to renew as to Plaintiffs Platt, Adams, and Triplett.  Finally, the motion is **DENIED** pending further factual development as to Plaintiffs Thompson, Bronson, Twoguns, and Reardon.  The parties are to file two joint letters — one from Thompson, Bronson, and FMFCU, and the other from Twoguns, Reardon, and M&T — each of no more than five pages by May 12, 2025 explaining their respective positions on how to proceed.

**SO ORDERED.**

April 28, 2025                                         */s/ Allison D. Burroughs*
                                                          ALLISON D. BURROUGHS
                                                          U.S. DISTRICT JUDGE