**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE: MOVEIT CUSTOMER DATA SECURITY BREACH LITIGATION<br><br>This Document Relates To:<br><br>ALL CASES | MDL No. 1:23-md-03083-ADB-PGL |

**JOINT SUBMISSION REGARDING INITIAL PROPOSED CASE**
**SCHEDULE PURSUANT TO MDL ORDER NO. 9**

**TABLE OF CONTENTS**

**Page**

I.     AREAS OF AGREEMENT................................................................................1

II.    AREAS OF DISPUTE ...................................................................................2

III.   PARTIES' POSITIONS.................................................................................3

      A.      To Achieve Efficiency, Plaintiffs Suggest a Sequenced Approach Beginning with Progress and Large Diverse Defendants to Generate Generally Applicable Answers Across the MDL ....................................3

            1.      Overview of the MDL...................................................................5

            2.      Plaintiffs' Proposal as to Pleadings, Motion Practice, and Discovery. .........................................................................................6

            3.      Plaintiffs' Proposal Is Efficient and Will Present Cross-Cutting Issues to the Court for Resolution....................................8

            4.      Defendants' Proposal Imposes Unnecessary Burdens on Plaintiffs and the Court with No Corresponding Benefits. .........................11

            5.      Defendants' Proposed Fact Sheets Are Unnecessary at this Juncture.......................................................................................12

            6.      The Rule 12 Motion Practice Suggested by Defendants Remains Vague but Appears Unwieldy........................................13

      B.      Defendants' "Concurrent Tracks" Case Management and Scheduling Proposal................................................................................15

            1.      Defendants' Proposal Provides Efficiencies, Ensures Fairness, and Comports With The JPML's Reasoning for Creating the MDL ......................................................................15

                  a.      Defendants' Concurrent Tracks Proposal ......................................15

                        (1)      Defendants' Concurrent Track Structure Would Enable the Court to Decide Threshold Dispositive Issues Impacting All Plaintiffs and Defendants at Once and Thereby Streamline and Narrow the Remaining Parties and Issues for Continued Litigation.........................................................16

(2)     Defendants' Concurrent Track Structure Would Centralize Common Issues, Reduce Duplicative Briefing, and Ensure All Defendants Are Given a Fair Opportunity to Present Their Defenses Now ..............................................18

b.     Defendants' Proposal for the Exchange of Preliminary Fact Sheets, the Filing of Consolidated Amended Complaints, and Preliminary Briefing of Dispositive Motions on Threshold Issues ......................................19

(1)     Defendants' Proposed Case Schedule Pursuant to Its Concurrent Track Approach ......................22

2.     Defendants Propose the Exchange of Preliminary Fact Sheets ..........................................................................23

a.     Benefits of Exchanging Preliminary Fact Sheets..........................23

(a)     The Substance of Defendants' Proposed Preliminary Fact Sheets ........................27

(2)     Defendants' Proposed Preliminary Dispositive Motions on Threshold Issues ..........................29

(3)     Threshold Issues Concerning Standing and Related Issues....................................................................29

(4)     Threshold Issues Concerning Arbitration and Class Action Waivers .................................................31

3.     Plaintiffs' Proposal Undermines the Purposes of the MDL and is Inefficient, Unprecedented, and Unfair .........................................32

a.     Plaintiffs' Proposed Structure Is an Ill-Conceived, Non-Representative Bellwether Proposal That Is at Odds with the Purpose for Which This MDL Was Created ..................................................................................32

b.     Plaintiffs' Proposal Would Result in Duplicative Briefing, Prolonged Litigation, and Would Not Promote the Efficient Resolution of Common, Broadly Applicable Issues ............................................................33

c.     Plaintiffs' Bellwether Proposal Would Create Fundamental Unfairness That Would Preclude the Vast Majority of Defendants From Participating in the Litigation for Years and Would Impose

Inordinate Costs on a Few of the Defendants with
the Most Individuals mpacted ........................................................36

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Allergan Biocell Textured Breast Implant Prod. Liab. Litig.*,
2022 WL 3211421 (D.N.J. Aug. 9, 2022) ...............................................................................24

*In re: Anthem, Inc. Data Breach Litigation*,
MDL No. 2617 (N.D. Cal.) .....................................................................................................38

*In re Aqueous Film-Forming Foams Products Liab.*,
2021 WL 7343719 (D.S.C. Feb. 8, 2021) ................................................................................9

*In re: Aqueous Film-Forming Foams Products Liability Litigation*,
No. 2:18-mn-2873-RMG (D.S.C.) .......................................................................................9, 10

*Beck v. Vision Service Plan Ins. Co.*,
600 F. Supp. 3d 145 (D. Mass. 2021) ....................................................................................32

*In re Blackbaud Customer Data Breach Litig.*,
MDL No. 2972, No. 3:20-mn-02972-JFA, Order # 4 (D.S.C. Feb. 3, 2021) ..........................30

*Broussard v. Meineke Discount Muffler Shops, Inc.*,
155 F.3d 331 (4th Cir. 1998) .................................................................................................36

*In re Cap. One Consumer Data Sec. Breach Litig.*,
2022 WL 18107626 (E.D. Va. Sept. 13, 2022) .......................................................................24

*In re Capital One*,
Case 1:19-md-02915-AJT-JFA, Doc. 600-1 ............................................................................30

*In re Capital One Consumer Data Sec. Breach Litig.*,
MDL No. 1:19-md-2915 (E.D. Va.) ......................................................................................4, 11

*Dunson v. Cordis Corp.*,
No. 16-CV-03076-EMC, 2016 WL 5335551 (N.D. Cal. Sept. 23, 2016), *aff'd*,
854 F.3d 551 (9th Cir. 2017) .................................................................................................34

*In re Gerber Prods.*,
1:21-cv-269 (E.D. Va.) ...........................................................................................................11

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
139 S. Ct. 524 (2019) .............................................................................................................31

*Lawless v. Steward Health Care Sys., LLC,*
    894 F.3d 9 (1st Cir. 2018) ................................................................................................29

*In re: Lumber Liquidators Chinese-Manufactured Flooring Products Marketing,*
    *Sales Practices and Products Liability Litigation,*
    MDL No. 2627 .................................................................................................................37

*In re Lumber Liquidators,*
    MDL No. 1:15-md-2627 ...................................................................................................11

*In re Marriott Int'l Inc.,*
    78 F.4th 677 (4th Cir. 2023) ......................................................................................32, 37

*In re Marriott Int'l, Inc. Customer Data Security Breach Litigation,*
    19-md-2879 (D. Md.), Dkt. 331 ......................................................................................37

*In re: Marriott International Customer Data Security Breach Litigation,*
    No. 19-md-2879 (D. Md. June 10, 2019) (ECF No. 279) .........................................4, 9, 37

*McIntosh v. Royal Caribbean Cruises, Ltd.,*
    2018 WL 1732177 (S.D. Fla. Apr. 10, 2018) .................................................................32

*Monahan v. Romney,*
    2009 WL 10694327 (D. Mass. Sept. 3, 2009), *aff'd*, 625 F.3d 42 (1st Cir.
    2010) ...............................................................................................................................26

*In re Nat'l Prescription Opiate Litig.,*
    956 F.3d 838 (6th Cir. 2020) ............................................................................................8

*In re: National Prescription Opiate Litigation,*
    MDL NO. 2804 (N.D. Ohio) .............................................................................................38

*In re: National Prescription Opiate Litigation,*
    No. 1:17-md-0280 (N.D. Ohio) .......................................................................................10

*Nelson v. Adams USA, Inc.,*
    529 U.S. 460 (2000) .........................................................................................................26

*Pagan v. Calderon,*
    448 F.3d 16 (1st Cir. 2006) ..............................................................................................29

*In re Phenylpropanolamine (PPA) Prods. Liab. Litig.,*
    460 F.3d 1217 (9th Cir. 2006) ...........................................................................................8

*Rodriguez-Rivera v. Allscripts Healthcare Sols., Inc.,*
    43 F. 4th 150 (1st Cir. 2022) .............................................................................................31

*Roman v. Spirit Airlines, Inc.*,
482 F. Supp. 3d 1304 (S.D. Fla. 2020) ..................................................................32

*Taylor v. UKG, Inc.*,
--- F. Supp. 3d ---, 2023 WL 8291834 (D. Mass. Sept. 15, 2023)....................................16, 30

*United Steelworkers of Am. v. Am. Mfg. Co.*,
363 U.S. 564 (1960)......................................................................................31

*Webb v. Injured Workers Pharm.*,
72 F.4th 365 (1st Cir. 2023)..............................................................................8

**Statutes**

MCL §§ 20.132, 22.314 ...................................................................................9

**Other Authorities**

Fed. R. Civ. P. 12(b)(6)...........................................................................2, 13, 14, 37

Fed. R. Civ. P. 26(d)(1)..................................................................................26

Fed. R. Civ. P 26(f) ...................................................................................... *passim*

Hon. Eldon E. Fallon *et. al.*, *Bellwether Trials in Multidistrict Litigation*, 82 TUL.
L. REV. 2323, 2345 (2008) ..............................................................................34

Judge Eldon E. Fallon, *Bellwether Trials*, 89 UMKC L. REV. 951, 951–52 (2021) .....................34

Pursuant to MDL Order No. 9, Plaintiffs' Co-Lead Counsel and Liaison and Coordinating Counsel (collectively, "Plaintiffs") and the Defense Liaison Committee ("Defendants," and together with Plaintiffs, the "parties"), by and through their respective counsel of record, hereby submit the following with respect to the proposed case management schedule:

Since the issuance of MDL Order No. 9, the parties have met and conferred on numerous occasions in an effort to reach agreement on a case management schedule they could jointly propose to the Court. Despite their significant efforts, and though they did reach agreement on a few issues, it is clear the parties have fundamentally different views as to how this consolidated litigation should proceed.

For the ease of the Court's review, the parties have identified below their areas of agreement, an overview of their areas of dispute, and then each provide their respective proposals and arguments in support. The parties appreciate the Court's consideration of their respective positions and will be prepared to discuss the areas of dispute (and their respective proposals) in more detail during the March 11, 2024 status conference.

## I.    AREAS OF AGREEMENT

Though the parties differ in their views of the larger framework for the case (*i.e.*, a "tranche" approach versus consolidated complaints encompassing all Plaintiffs and Defendants, as described in Section II below), the parties have been able to reach agreement regarding three issues:

1. Some form of Consolidated Amended Complaints should be filed within sixty (60) days of the Court's entry of a case management scheduling order.

2. "Short Form" or abbreviated Consolidated Amended Complaints may be sufficient for many plaintiffs and defendants. For example, "Short Form" Consolidated Amended Complaints could simply reference a common statement of facts in one of the applicable "Long Form" Consolidated Amended Complaints; and

3. Threshold dispositive issues, including, but not limited to, standing, sovereign immunity, and jurisdictional issues, should be briefed first (though the parties disagree as to whether  motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) should be briefed simultaneously).

These common areas of agreement can be applied to whichever case management framework and schedule the Court orders.

## II.    AREAS OF DISPUTE

Though the parties have been able to find agreement on a few central issues, Plaintiffs and Defendants have fundamentally different opinions as to how this litigation should be structured and how it should proceed.

In short, Plaintiffs propose a case management structure and schedule that would sequence the filing of Consolidated Amended Complaints into tranches, with Consolidated Amended Complaints against the largest defendants including Progress, consistent with how other judges have efficiently litigated MDLs to generate generally applicable answers across the different parties. In Plaintiffs' view, this guidance may lead to resolution of some cases, or foregoing certain cases, without the cost and time drain of Defendants' proposed "everything all at once" approach.

By contrast, Defendants propose a case management structure and schedule that would centralize groups or "tracks" of Defendants based on factual commonality and relationships among each group of defendants (*see* **Appendix A**), and proceed with litigation across those tracks concurrently, including by having omnibus initial dispositive motions. Defendants' "concurrent track" approach would, in Defendants' view, facilitate streamlined pleading where shared factual nuclei exist within each tranche. This approach would enable the Court to move all of the lawsuits forward efficiently on concurrent tracks all at once, rather than staggering the litigation into a sequence of non-representative tranches. Plaintiffs' proposed sequential staggering would be unfair to Defendants placed in the early tranches, forcing them to bear a disproportionate cost and

burden of litigating issues that are also relevant to parties whose cases are sidelined. At the same time, other Defendants would have to wait years before their threshold dispositive issues are heard, while incurring costs during that time. Those Defendants would be deprived of the opportunity to contribute to the briefing and defense of these common threshold issues, even though they could be affected by the Court's resolution of those issues in the early-tranche cases. As described in greater detail in Section II.B below, Defendants believe their Concurrent Track Approach promotes the efficient administration of the consolidated litigation and request the Court enter a case management and scheduling order that implements Defendants' proposed Concurrent Track Approach and case schedule.

The parties' competing proposals for case management, as well as each party's proposed case schedule, are provided below in greater detail for the Court's consideration.

## III.    PARTIES' POSITIONS

**A.    To Achieve Efficiency, Plaintiffs Suggest a Sequenced Approach Beginning with Progress and Large Diverse Defendants to Generate Generally Applicable Answers Across the MDL**

The number of Defendants centralized into this single MDL makes it one of the most sprawling in recent history. Rather than burdening the Court and the parties with trying to simultaneously advance hundreds of lawsuits against  more than one hundred defendants (and counting), Plaintiffs propose following the example of other MDL proceedings where the transferee courts have recognized the benefit of initially focusing the litigation on core parties and claims.  In Plaintiffs' view, no jurist should be asked to resolve Rule 12 motions as to 100+ defendants at once; proceeding quickly against a handful of defendants involved in the largest breaches will resolve key issues and help focus and stage the rest of the litigation.

Specifically, Plaintiffs propose to first proceed against Progress Software Corporation and five others: PBI, Welltok, Maximus, Genworth, and Delta Dental. The Proposed Defendants were

involved in some of the largest breaches, represent a variety of different relationships to Progress (vendors, vendor contracting entities, and direct users), and served as custodians for different types of breached data (financial data and health data). Beginning with these Proposed Defendants will directly advance the litigation while simultaneously enabling the Court to make rulings that will guide and narrow the subsequent proceedings.

Plaintiffs propose to file consolidated amended complaints against the Proposed Defendants within sixty days, and to commence full-blown Rule 12 Motions practice (encompassing all bases, including Article III standing, CAFA jurisdiction, and the sufficiency of the claims as pled). As to discovery, Plaintiffs propose that discovery against Progress commence first, as it will have general applicability to the entire MDL proceeding, and that the parties conduct Rule 26 conferences as to the scope of discovery against the other Proposed Defendants as in the normal course.[1]

Plaintiffs' proposal emerged from extensive research into effective strategies pursued in previous multi-defendant MDLs. Successful MDL's employing Plaintiffs' proposed approach include data breach cases like *Marriott* and *Capital One*, as well as other multi-defendant MDLs, like *Opioids* and *AFFF* (discussed below). These cases demonstrate that front-loading consolidated pleadings, motions practice, and discovery against a few of the largest defendants will be the most efficient path forward. Rulings as to the Proposed Defendants will inform all counsel's understanding of key issues by providing all counsel with guidance that is widely applicable to the variety of circumstances presented in this MDL. Quick rulings on, e.g., Article III standing and the scope of differently situated Defendants' duty to protect data will efficiently

---

[1] Plaintiffs have already extended invitations to all interested Defendants to commence settlement discussions. Discussions with Defendants who have expressed an interest will proceed simultaneously.

drive this case towards resolution (via settlements, dismissals, or, where needed, additional litigation) without unnecessarily burdening counsel and the Court.

### 1.    Overview of the MDL.

As of February 2, 2024, the MDL encompassed approximately 101 primary Defendants[2] and 365 plaintiffs. Of those 101 primary Defendants:

- 80 primary Defendants appear to have been subject to breaches involving less than 1 million consumers;

- 62 primary Defendants have been subjected to breaches involving less than 500,000 consumers;

- 39 primary Defendants are named in only a single complaint;

- 78 primary Defendants are named in 5 or fewer complaints;

- 13 primary Defendants are named more than 5 complaints; and

- 6 primary Defendants, including Progress, are named in more than 10 complaints.

However, these numbers are subject to change as more cases are transferred into the MDL on a near-daily basis. These include new plaintiffs asserting claims against Defendants already in the MDL, as well as claims asserted against defendants who were not previously tagged. Affected companies are still notifying affected consumers, and—given that the breach happened just last summer (2023)—the statutes of limitations on plaintiffs' claims are nowhere near expiring. Lead Counsel recently tagged several additional cases which now await transfer orders from the JPML. *See* CTO-31, ECF No. 754. Most of the complaints in the MDL provide detail about how Plaintiffs

---

[2] This count is based on which Defendants appear to be primary, and does not include corporate parents, etc. If these other parties were included, the number of Defendants would be considerably higher.

were affected by the breach and specific allegations as to the nature of the information impacted. For example:

- 28 complaints include allegations that the consumers suffered an out-of-pocket loss;

- 67 complaints allege the consumer experienced fraud;

- 65% of Plaintiffs hail from 10 highly populous states (California, Florida, Pennsylvania, Illinois, Louisiana, Maryland, Ohio, Texas, New York, Georgia); and

- Defendants' headquarters are similarly concentrated, with 47 of the primary Defendants headquartered in those same states.

**2.      Plaintiffs' Proposal as to Pleadings, Motion Practice, and Discovery.**

Plaintiffs' Proposed Schedule is attached as **Appendix B**.

Plaintiffs propose to file a consolidated amended complaint against each of the following Proposed Defendants within sixty (60) days of this Court's order on the parties' competing proposals:

1. Progress: Breach of approximately 40,000,000 consumers

2. PBI (Vendor): Breach of approximately 20,000,000 consumers

3. Maximus (Direct User): Breach of approximately 11,000,000 consumers

4. Welltok (Vendor): Breach of approximately 8,500,000 consumers

5. Delta Dental (Direct User): Breach of approximately 7,000,000 consumers

6. Genworth (Vendor Contracting Entity via PBI): Breach of approximately 2,500,000 consumers

A chart summarizing information about each Proposed Defendant is attached as **Appendix C**.

To minimize repetition, Plaintiffs will draft a statement of common facts setting forth basic factual allegations that will be incorporated into each of these complaints by reference.[3] After Plaintiffs file consolidated amended complaints against these Defendants, these six Defendants will file responsive pleadings or Rule 12 motions, to which Plaintiffs will respond.

The Proposed Defendants are among the largest in terms of numbers of consumers impacted and volume of complaints filed. To maximize efficiency and ensure cross-cutting claims are presented to the Court, Plaintiffs have selected Defendants who have different relationships with Progress (vendors, vendor customers, direct users) and held different types of data (health data and financial data).  Additionally, the Proposed Defendants have each been sued by Plaintiffs from multiple states and are headquartered in different states where many other Defendants in the MDL are also headquartered (IL, MA, MN, VA). In total, there are over 100 Plaintiffs in the MDL who have asserted claims against the five Proposed Defendants other than Progress. Proceeding first with these five Proposed Defendants along with Progress itself, will enable this litigation to commence in an efficient manner and will facilitate a logical sequence to the litigation process.

Given that discovery from Progress is central to the issues in this MDL, Plaintiffs propose that discovery as to Progress open now. Plaintiffs' proposed initial discovery requests, which will be shared with Progress ahead of the March 11th conference, will focus on issues that are generally applicable across this litigation. With respect to the other five Proposed Defendants, shortly after the initial complaints are filed, the parties will file Rule 26 reports which set forth their positions

---

[3] This common factual statement can also be used as a foundation for subsequent complaints. It will facilitate singular references to specific facts in briefing and ruling and will also ease the process for any future necessary amendments.

as to discovery in light of anticipated Rule 12 motions. Plaintiffs suggest that shortly after the initial Rule 12 motions are briefed, the parties begin to meet and confer regarding the benefits to be gained (if any) from commencing a subsequent tranche (or tranches) of consolidated amended complaints, motions and discovery, and the timing of any subsequent tranche (or tranches).

Defendants have raised concerns that Plaintiffs have (or will) somehow "cherry-pick" Plaintiffs to be named in consolidated amended complaints in an unfair way. This concern is unfounded. Plaintiffs' Lead Counsel will choose putative class representative plaintiffs and prepare their proposed consolidated amended complaints just as they would in any other litigation and, in making their proposal to Defendants, have committed to naming Plaintiffs who have experienced diverse categories of harm, *including* Plaintiffs who do not allege actual misuse of their data, who, contrary to Defendants' position, have standing under *Webb v. Injured Workers Pharm.*, 72 F.4th 365, 374, 375 (1st Cir. 2023) (noting identity theft allegations regarding plaintiff Webb supported standing for plaintiff Charley, even though he did not aver personal misuse). Thus, Plaintiffs share Defendants interest in presenting standing-related issues squarely to the Court.

### 3.    Plaintiffs' Proposal Is Efficient and Will Present Cross-Cutting Issues to the Court for Resolution.

It is well recognized that MDL transferee courts have broad discretion to organize and manage a large volume of actions in a manner that is compatible with the unique challenges of the case. *See, e.g.*, *In re Nat'l Prescription Opiate Litig.*, 956 F.3d 838, 845 (6th Cir. 2020) ("In discretionary matters going to the phasing, timing, and coordination of the cases, the power of the MDL court is at its peak.") (internal citation omitted).[4] MDL Courts may employ "innovative,"

---

[4] *See also In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 460 F.3d 1217, 1231–32 (9th Cir. 2006) ("Coordination of so many parties and claims requires that a district court be given

"creative," and "experimental" strategies "to achieve both fairness and efficiency" and to balance "conflicting demands for speedy adjudication and fairness to all parties." MANUAL FOR COMPLEX LITIGATION ("MCL") §§ 22.1, 22.2; *see also* 13 Fed. Proc. Forms § 49:125 ("[T]he transferee judge is authorized to design a pretrial program which will accommodate both the common and individual interests of the parties . . ."). One time-proven strategy to avoid stagnation in large multi-defendant MDLs is to focus on a small number of "bellwether" exemplar cases at the outset. This permits the court to examine the most important common issues early on for use as a model in the rest of the litigation. MCL §§ 20.132, 22.314. Bellwether cases have been employed in large MDLs to provide an efficient path to test the plaintiffs' claims early on, providing guidance to the parties on a path toward future trials or settlement. MCL § 20.132 (citing *In re Air Crash Near Cali, Colombia on Dec. 20, 1995*, MDL No. 1125, Order No. 1522 (S.D. Fla. Jan. 12, 2000)).

Courts in both data breach and non-data breach cases have employed the organizational approach recommended by Plaintiffs here, litigating some claims/defendants initially and sequencing the remaining matters.

For example, in *In re: Marriott International Customer Data Security Breach Litigation*, No. 19-md-2879 (D. Md. June 10, 2019) (ECF No. 279), the Court limited motion to dismiss briefing for the Consumer Track to 10 claims selected by the parties.

Another example of using bellwether or representative parties is in *In re: Aqueous Film-Forming Foams Products Liability Litigation*, No. 2:18-mn-2873-RMG (D.S.C.). The court recognized "[t]he presence of various different types of cases, claims, and parties in this MDL [which] requires different Bellwether processes for the different case types that will proceed on

broad discretion to structure a procedural framework for moving the cases as a whole as well as individually, more so than in an action involving only a few parties and a handful of claims."); *In re Aqueous Film-Forming Foams Products Liab.*, 2021 WL 7343719, at *1 (D.S.C. Feb. 8, 2021) ("Courts are given broad discretion to manage an MDL docket containing voluminous cases.").

different schedules and therefore be governed by subsequent CMOs." *Id.* at ECF No. 1049 at 1. On December 28, 2020, the court set up a bellwether process for the "Water Provider cases" by ordering the Plaintiff and Defendant leadership to select twelve representative cases from the pool of Water Provider cases. *Id.* at ECF No. 1049 at 2. The court laid out criteria and a process for selecting the bellwether cases, authorized further discovery to be taken in the selected cases, and set briefing schedules for motions to dismiss in the cases. *Id.* at ECF No. 1049 at 2-7. The bellwether approach culminated in historic settlements with the public water systems plaintiffs and two sets of defendants—the Dupont entities ($1.185 billion) and 3M (up to $12.53 billion). *Id.* at ECF No. 3393 at 8; 3370-1 at 7. A settlement as to Dupont was reached on June 30, ECF No. 3393 at 9, and the settlement with 3M was reached on June 22, 2023, ECF No. 3370-1 at 8.

Similarly, the court in *In re: National Prescription Opiate Litigation*, No. 1:17-md-0280 (N.D. Ohio) used a bellwether defendant to develop generally applicable answers for other litigants. There, the court used bellwethers and a strategic sequencing and bifurcation of claims to "expedite and economize the resolution of [the] cases and possibly the MDL" by taking advantage of similarities across cases and previously decided issues. *Id.* ECF No. 3315 at 2. By avoiding the simultaneous adjudication of multiple claims against multiple defendants, the court was able to focus on the most important claims against the most important defendants, and ultimately "save the parties immeasurable cost and time." *Id.* at 3-4 (citing MCL § 22.315). Concretely, this approach permitted a subset of the parties to go from selecting bellwether cases to judgment on a subset of the plaintiffs' claims against a subset of the defendants in less than two and a half years. *See Id.* at ECF No. 3261 (beginning the process of selecting bellwether cases for a subset of parties ("Track 3") on April 16, 2020); ECF No. 3325 (setting a schedule for discovery, motions to

dismiss, and trial for the bellwethers); ECF No. 4614 (entering partial judgment on the claims tired in the Track 3 bellwether on August 22, 2022).[5]

### 4. Defendants' Proposal Imposes Unnecessary Burdens on Plaintiffs and the Court with No Corresponding Benefits.

Contrary to Defendants' assertion, there is little, if any, marginal benefit to attempting to simultaneously litigate threshold issues on behalf of claims advanced by hundreds of Plaintiffs against all Defendants. No matter how many Plaintiffs are nominally encompassed in any motions practice, the reality is that courts almost always *group* similarly situated individual plaintiffs when briefing, arguing and deciding Article III and Rule 12 motions. Moreover, this MDL is at its inception—more cases are still being filed and transferred. Rather than generating efficiencies, by insisting on addressing all plaintiffs and all defendants simultaneously, Defendants' proposal maximizes the amount of work that lawyers have to do in preparing complaints and briefs, and the amount of work the Court has to do in rendering opinions. This work will result in little, if any, marginal benefit in terms of providing the parties with additional guidance. Specifically, the following specific aspects of Defendants' proposal should be rejected:

---

[5] Another variant is the use of representative complaints. This model uses a single complaint with a subset of plaintiffs from the most populous states to test legal arguments and has yielded expeditious results in several complex cases. *See, e.g., In re Lumber Liquidators*, MDL No. 1:15-md-2627 (ECF Nos. 528, 562, 597, 722, 1164, 1339) (resolving the economic loss claims based upon a single representative complaint within two years); *In re Capital One Consumer Data Sec. Breach Litig.*, MDL No. 1:19-md-2915 (E.D. Va.) (ECF No. 302, 354, 386, 394, 2218) (using a representative complaint with ten plaintiffs from six states as exemplary of the claims and motion practice; case resolved within two years); *In re Gerber Prods.*, 1:21-cv-269 (E.D. Va.) (ECF Nos. 106, 170 at 13-14, 210), (using representative complaint in consolidated case of over 25 class actions as it "focus[ed] the parties on a smaller number of issues" while also allowing the court to efficiently resolve cross-cutting issues. Whole action dismissed after a ruling on Article III standing on the representative complaint).

**5.        Defendants' Proposed Fact Sheets Are Unnecessary at this Juncture.**

Defendants' proposal begins with wildly imbalanced Plaintiff and Defendant "fact sheets." The proposed Defendant Fact Sheets ("DFS") are practically useless. They are based on a prior filing regarding a census of defendants (ECF 157 at 6) which is no longer needed. The DFS calls for limited information that is already available from the breach notices, fails to describe the precise PII/PHI that was exfiltrated in each case, and fail to include any of the terms of service that the Defendants might rely on to seek to compel arbitration or otherwise abrogate Plaintiffs' access to the courts by forcing a waiver of class claims.

In contrast to this paltry disclosure, Defendants propose to seek extensive information from Plaintiffs, many of whom may not even remain in the case after threshold legal issues are decided on a bellwether basis. Defendants claim that the Plaintiffs fact sheets will assess "whether certain claims may be candidates for expedited resolution through voluntary withdrawal," assist with dispositive motions, "group cases for motions practice or into litigation tracks," and identify "for targeted discovery." *See* Defendants' Position, III.B.1(2)(a), below. None of these justifications wash. To immediately force fact sheets ignores the counsel that this Court picked to vet the hundreds of plaintiffs who have already filed. Further, the cases in this MDL are all pled as class actions, and new cases are being filed and tagged in on a weekly basis. Thus, even if fact sheets identify some Plaintiffs as poor class representatives, those *individual Plaintiffs'* decisions not to pursue claims cannot and will not deter other, more suitable Plaintiffs from pleading class claims. Put simply, weeding out a few individual Plaintiffs now (even if Defendants were successful) will provide relatively little, if any, benefits.

Ironically, Defendants cite the Federal Judicial Center's discussion of fact sheets to help to "select bellwether cases." But Defendants steadfastly resist the idea of any "bellwethers" or representative Defendants and will not commit to identifying any such exemplars even after this

arduous process is completed. Instead, they propose only that after all Plaintiffs' work has been done, the parties "meet and confer" to decide whether any master motions can be filed. The time to identify the right Defendants for significant motions is *now*. Efficiency can be achieved by adjudicating claims alleged on behalf of large classes by multiple Plaintiffs whose allegations cut across industries, data types, and geographies. Those cases can be identified now without fact sheets (as Plaintiffs have done), and this MDL should proceed by addressing those claims first.

### 6.   The Rule 12 Motion Practice Suggested by Defendants Remains Vague but Appears Unwieldy.

Defendants fail to explain the efficiencies to be achieved by forcing the immediate filing of all complaints against all Defendants by all Plaintiffs. Instead, Defendants simply state that, after Plaintiffs expend enormous resources re-pleading complaints against all Defendants in the MDL and completing fact sheets, Defendants will then be able to engage in a meaningful meet and confer that *may* lead to some "master" motions to dismiss on common grounds. But for the Court to assess any purported efficiencies associated with Defendants' proposal, more explanation and commitment to a concrete path forward is needed from Defendants.

For instance, while Defendants' pay lip service to efficiency and non-duplication, they make no concrete suggestions or commitments about how to move this litigation forward efficiently. Questions left unanswered include: (a) how many Rule 12 motions will be filed; (b) what will those motions encompass; and (c) how many Defendants will join in a single motion? Nor do Defendants address the particular issues the Court asked the parties to address, including a "proposed deadline for filing a Fed. R. Civ. P 26(f) Report; and "proposed deadlines for filing any Fed. R. Civ. P. 12(b)(6) motions, including a description of whether and how those motions will be limited to a particular number of individual cases and/or issues." Instead, the only binding commitment made is that after Plaintiffs expend tremendous resources completing fact sheets,

drafting master complaints, and shoehorning themselves into Defendant's desired tracks, Defendants will "meet and confer" about how to next proceed.

Rather than making a specific proposal regarding motions practice, Defendants have instead described an *aspiration* to file an "omnibus" motion on Article III standing that individual Defendants will be able to supplement with add-on individualized arguments. This promises to turn initial motion practice into an unwieldy, multi-headed hydra that will only be compounded by Defendants' additional proposal that all Defendants within a given "track" might simultaneously file other joint motions addressing arbitration, class waivers, sovereign immunity or CAFA jurisdiction.[6] This will almost certainly result in multiple additional motions, by multiple defendants, with multiple add-ons—a process with no foreseeable end that will inundate the Court with paper and that is completely antithetical to the efficiencies demanded by the MDL process. Moreover, *Defendants proposed wave of initial motions will not even address the sufficiency of the sufficiency of the pleadings under Rule 12(b)(6),* a gatekeeping task that should be promptly conducted (at least as to bellwethers) to drive the litigation forward.

In short, there is no reason—fairness related or otherwise—why *every* Defendant in this MDL needs to have complaints against them re-pled, first assert *all* their "jurisdictional" defenses, including standing, and obtain repeated rulings on those defenses *now* while indefinitely postponing merits-related 12(b)(6) motions and discovery as to all Defendants. Indeed, Defendants dithering demonstrates the wisdom of Plaintiff's proposal. Proceeding first with a logical cross-

---

[6]Plaintiffs asked Defendants to identify which Defendants intend to file arbitration, class waiver, sovereign immunity, or CAFA jurisdiction-challenging motions. Defendants' liaisons represented that they had asked Defendants to provide such information, but that, as a general matter, they did not believe Defendants could determine whether they would file those motions without seeing consolidated complaints. Of course, the Defendants *already have* complaints pending against them, and should be able to assess their defenses based on the complaints *already filed*. It is not readily apparent why or how a number of Plaintiffs repleading their claims into a single complaint would assist Defendants in assessing what defenses they intend to assert.

section of the largest Defendants quickly elevates common issues to the fore, while simultaneously advancing the bulk of the overall litigation. Plaintiffs' proposal avoids the cumbersome and time-consuming aspects of Defendant's proposal while progressing cross-cutting issues.

**B.    Defendants' "Concurrent Tracks" Case Management and Scheduling Proposal[7]**

> **1.    Defendants' Proposal Provides Efficiencies, Ensures Fairness, and Comports With The JPML's Reasoning for Creating the MDL**
>
> > **a.    Defendants' Concurrent Tracks Proposal**

Defendants' proposal leverages the MOVEit MDL for its intended purpose: to centralize similar issues into concurrent tracks in order to create efficiencies for the prompt administration of all actions—not just the claims of a small subset of Defendants and Plaintiffs.[8]  As detailed below, Defendants propose that this litigation move forward globally across defendants in a manner that addresses the type of "systemic issues" that this Court indicated at the November 30, 2023 status conference would be important to decide in the earliest stages of this MDL. Specifically, Defendants propose that after the exchange of fact sheets, Plaintiffs will file consolidated amended complaints in each track (*see* **Appendix A**), and in response, Defendants will file omnibus motions to dismiss on threshold dispositive issues.  This will enable the court and the parties to determine early on which parties will remain in the MDL and, correspondingly, how best to organize the litigation that follows.

---

[7] Defendants respectfully request that for future joint submissions, the Court order the parties to share their respective proposed sections at least two business days before the deadline for submission to the Court.  With respect to this submission, Defendants shared their proposed section, substantially and substantively similar to the version submitted here, on February 1, 2024. While Plaintiffs provided a five and one-half page high-level outline of purported areas of agreement and disagreement on February 12, despite repeated requests by Defendants, Plaintiffs did not provide their 12-page proposed section until 11:40 pm Eastern on Thursday February 15, 2024, approximately 18 hours before the parties' joint submission was due.

[8] This proposal reflects consensus of the Defendants.  Individual Defendants reserve the right to submit separate filings that express their supplemental or alternative positions.

> **(1)** **Defendants' Concurrent Track Structure Would Enable the Court to Decide Threshold Dispositive Issues Impacting All Plaintiffs and Defendants at Once and Thereby Streamline and Narrow the Remaining Parties and Issues for Continued Litigation**

Many defendants have been sued only by individuals whose theories of injury are indistinguishable from the plaintiffs whose claims this Court dismissed for lack of Article III standing in *Taylor v. UKG, Inc.*, --- F. Supp. 3d ---, 2023 WL 8291834, at *5–7 (D. Mass. Sept. 15, 2023) (dismissing claims of injury-in-fact premised on increased risk of future harm theory where there were no allegations of some misuse of data; "prophylactic costs to mitigate" risk of future harm; and diminution in value of personal information).  Other defendants do not belong in federal court for other threshold reasons, including because they have been sued only by plaintiffs (i) who are non-diverse on behalf of other non-diverse putative class members and thus CAFA jurisdiction does not exist, or (ii) who are subject to binding arbitration agreements that those defendants wish to invoke.  And some defendants are entitled to sovereign immunity and thus suits against them must proceed in state court, if at all.

These issues cut broadly across all the different "role[s]" of Defendants implicated in this litigation—*e.g.*, whether those defendants sold the MOVEit software, licensed and used it directly, or contracted with someone who did—and apply regardless of which of the "multiple sectors of the economy" a particular defendant does business.  JPML Order at 4.  Resolving such systemic issues at the threshold stands to eliminate dozens of plaintiffs and entire defendants from this MDL.

Defendants' view is that these issues are best teed-up through consolidated complaints in concurrent tracks.  This would greatly convenience the Court and the parties alike.  It would allow them to focus on a single document or several documents containing all the relevant allegations, rather than having to flip back and forth between the hundreds of existing complaints.

This approach would also permit the Court and the parties to efficiently address issues of broad—if not global—applicability both in the early stages of litigation and into discovery for cases surviving dismissal. To take one early-stage example, with respect to Plaintiffs' suits against many defendants where the liability theory flows through a vendor's use of the MOVEit software to provide services for those defendants, *see generally* JPML Order nn. 2, 5 (recognizing the central role vendors play in cases brought against other defendants), the allegations in the existing complaints boil down to a claim that each of the dozens of defendants are liable in negligence because they hired the same vendor to perform services for each of them and that vendor, in turn, used the MOVEit software. Across dozens of individual complaints against customers of particular vendors, for example, there is not a single paragraph pleaded that is specific to any one of those customers with respect to any particulars of its relationship to the vendor in question. Rather, these many complaints plead that each customer hired the vendor, that vendor in turn used MOVEit, the vendor experienced a cybersecurity incident due to use of MOVEit, and therefore all of the vendor's customers are liable because the vendor's use of MOVEit exposed the vendor's customers' customers' data. It seems far preferable for all parties and the Court to address customer-defendants of a particular vendor in a single master complaint that encompasses all of the customers that hired said vendor, rather than again wade through dozens of complaints that presently exist against the many discrete customers of each particular vendor, as well as the dozens more complaints in which a particular vendor is named as a defendant without any of its customers also being named as defendants. And should such claims against a vendor and its customers survive dismissal, discovery can unfold at the same time as to that vendor and all its customers (and their customers, some of which also are named as defendants), thus eliminating the multiple rounds of discovery that would occur if cases against each of the vendor's customers' (and their

customers) were serially litigated—perhaps with years in-between claims against each discrete customer.

The same considerations can be applied more broadly to other groups of Defendants than just the one example above because Plaintiffs have brought similar allegations irrespective of whether the defendant is a vendor that obtained data from contracting entities or a direct user that transferred data of its customers that consist of Plaintiffs and putative class members. At bottom, those claims allege the vendors or direct users knew or should have known that the software allegedly was defective and therefore should have ceased using it or taken other steps to have protected customers' data. To the extent claims against Direct User and Vendor Defendants survive dismissal, discovery can similarly unfold at the same time as to overlapping issues.

> **(2)     Defendants' Concurrent Track Structure Would Centralize Common Issues, Reduce Duplicative Briefing, and Ensure All Defendants Are Given a Fair Opportunity to Present Their Defenses Now**

The filing of consolidated complaints, after Plaintiffs' Lead Counsel have the benefit of information regarding where each Defendant fits in terms of the categories of relationship to MOVEit and to particular users, will be made significantly easier. These commonalities will also enable Defendants to work cohesively, as they already have through the early stages of this MDL, briefing common issues collectively and later in common discovery. This will minimize duplicative briefing before the Court and minimize the discovery obligations of every party in the MDL. Indeed, Plaintiffs note that "courts almost always group similarly situated individual plaintiffs when briefing, arguing, and deciding Article III and Rule 12 motions." But the Court grouping Plaintiffs and Plaintiffs cherry picking strong Plaintiffs are not the same thing. Furthermore, under their proposal, there will not be many Plaintiffs to group together. Plaintiffs acknowledge that the Court is capable of adjudicating their claims based on apparent similarities,

which Defendants anticipate identifying in their omnibus briefing. That Defendants are currently unable to define with certainty a proposed omnibus motion structure when they have not had the opportunity to review any consolidated complaints does not render Defendants' proposal impossible or impractical.

Furthermore, fairness dictates that each direct user, vendor, and customer of a vendor should have the opportunity to respond (or, alternatively, certainty that it will remain in litigation) at the same time, and that no Defendant is forced to effectively subsidize litigation for other unrelated Defendants in the same position. That is, no single or handful of direct users should have to subsidize litigation for other direct users; vendors for other vendors, and customers of vendors for other customers of that vendor. In sum, Defendants' proposal recognizes and seeks to build on what the JPML rightly called the "interconnectedness among defendants" in choosing to form this MDL. *See* JPML Order at 4. Finally, in proposing to proceed in this manner, Defendants also seek to ensure that all cases in the MOVEit MDL will now move forward at a pace like they would have absent the MDL, while also benefitting from the efficiencies of centralization.

**b.      Defendants' Proposal for the Exchange of Preliminary Fact Sheets, the Filing of Consolidated Amended Complaints, and Preliminary Briefing of Dispositive Motions on Threshold Issues**

Under Defendants' proposal, the parties will promptly exchange initial discovery in the form of fact sheets, which will guide Plaintiffs in drafting consolidated complaints. Fact sheets will also allow both parties to assess whether settlement or dismissal may be appropriate for certain Defendants before complaints are filed and motions practice begins. Soon after fact sheets are exchanged, any Defendant may elect to opt into a settlement track whereby they will proceed with settlement negotiations in lieu of active litigation. All pleading and responsive deadlines would be stayed for cases in the settlement track. A chart setting out these phases is included below.

As described above, Defendants see tracking as a useful mechanism to organize master complaints that address issues common to groups of defendants, and which would be accompanied by short-form additions for each individual defendant.  Defendants feel strongly that a complaint must be filed against each individual defendant (even if only in short form), or that Plaintiffs formally elect to proceed on the existing complaint where appropriate.  This is necessary—at the most basic level—so defendants know who is suing them and for what, all so that the litigation can proceed efficiently.  Without certainty as to what complaints, claims, and individual plaintiffs are actually live, defendants will be unable to determine what preliminary motions are appropriate and how to drive the matter forward, whether through litigation or by exploring settlement.

Requiring Plaintiffs to file new complaints will provide efficiencies by consolidating splintered, overlapping complaints against particular defendants and allowing the coordination of allegations against "interconnected[] . . . defendants."  *See* JPML Order at 4.[9]  Relatedly, Defendants propose that the categories of Defendants and their similar issues be organized into tracks.  While cases may proceed in tandem, creating buckets or tracks of defendants will serve as a useful organizational tool for purposes of discovery.  Likewise, using this organization construct may help to guide crafting of omnibus motions with sections potentially devoted to all defendants, followed by sections devoted to specific groups of defendants.  A description of the tracks and lists of the Defendants comprising each track are provided in the attached **Appendix A**.  From there,

---

[9] As suggested in Defendants' November 22, 2023 submission, we continue to see efficiencies to overarching consolidated complaints—*e.g.*, a vendor-track complaint that would name a particular vendor and all the impacted entities associated with that vendor's use of the software. In suggesting as much, we—as explained in our December submission—do not seek to require that particular plaintiffs sue or not sue particular defendants.  Finally, while we remain open to other potential ways to structure consolidated complaints, we do not see meaningful efficiencies in, for instance, having one consolidated complaint per defendant for each of the many defendants that should be on a particular track—which would result in, for example, more than 20 consolidated complaints on the PBI track alone.

Defendants suggest that briefing can be sequenced on 12(b)(1) and other threshold issues first, to narrow the action before the Court considers consolidated 12(b)(6) motions.[10]

Additionally, fact sheets will level the information "playing field" of the parties. For example, Plaintiffs' proposal states that "67 complaints allege the consumer experienced fraud." This number is significantly higher than Defendants' collective understanding based on their review of the complaints within this MDL. Thus, fact sheets would ensure all parties have the same understanding of basic allegations and facts and avoid inaccuracies being pled in consolidated complaints (no matter the form they take) and re-stated in subsequent briefing.

Plaintiffs also claim to see little benefit in weeding out some Plaintiffs initially. Not requiring fact sheets would ignore that the Court selected Plaintiffs' Leadership to "vet the hundreds of plaintiffs who have already filed." If not in fact sheets, Plaintiffs provide no explanation for when this vetting would occur. Rather, they appear to prefer to vet just a small subset of Plaintiffs relevant to their hand-picked bellwether Defendants. Simply, Plaintiffs' Leadership wants the responsibility to vet all Plaintiffs without doing so on the scale necessary for this litigation.

---

[10] Any Rule 12 motions that are not addressed in the Rule 12(b)(1) or 12(b)(6) briefing would be preserved for briefing at an appropriate time.

**(1)    Defendants' Proposed Case Schedule Pursuant to Its Concurrent Track Approach**



| 45 days after entry of order adopting early case schedule | |
| --- | --- |
| Exchange of Plaintiff/Defendant Fact Sheets | Settlement Track Opens, Deadlines Stayed |



| 60 days after entry of order adopting early case schedule |
| --- |
| Plaintiffs File Consolidated Amended Complaints in Concurrent Tracks Remaining "Short Form" complaints organized into applicable tracks. |



| 60 days after the last day to file Consolidated Amended Complaint |
| --- |
| Initial Briefing on Threshold Issues |



| Two weeks after close of briefing on dispositive or jurisdictional motions |
| --- |
| Rule 26(f) Conference |

| Two weeks after Rule 26(f) Conference |
| --- |
| Rule 26(f) Reports |

| Event | Deadline / Timing |
| --- | --- |
| Exchange of plaintiff / defendant fact sheets.<br><br>A continuing failure to provide a fact sheet will result in an order to show cause as to why a plaintiff's claims should not be dismissed or a defendant should not be sanctioned. | 45 days after entry of order adopting early case schedule. |
| Formalize creation of settlement track (*i.e.*, a track where Defendants can elect to pursue settlement negotiations with Plaintiffs in lieu of active litigation). | 45 days after entry of order adopting early case schedule. |
| Amended Consolidated Complaints pursuant to proposed concurrent tracking of cases. | 60 days after entry of order adopting early case schedule. |
| Meet and confers to address: | Must be completed two weeks after |

| Event | Deadline / Timing |
|---|---|
| <ul><li>Basis for motions to dismiss;</li><li>Procedure for potential "master" dispositive motions with options for parties to join, and processes for same;</li><li>Increase to page limits; and</li><li>Any other topics to enhance efficiencies.</li></ul> | filing of Amended Consolidated Complaints. |
| Early omnibus dispositive or jurisdictional motions addressing each of the following topics:<ul><li>Standing, and related issues such as cognizable state-law injury;</li><li>sovereign immunity;</li><li>motions to compel arbitration; and</li><li>class action waivers.</li></ul> | 60 days after the last day to file consolidated amended complaints. |
| Oppositions to dispositive or jurisdictional motions. | 45 days after filing of dispositive or jurisdictional motions. |
| Reply briefs in support of dispositive or jurisdictional motions. | 30 days after filing of plaintiffs' Oppositions. |
| Rule 26(f) Conferences | Must be completed two weeks after close of briefing on dispositive or jurisdictional motions. |
| Rule 26(f) Reports | Two weeks after Rule 26(f) Conference. |
| Oral Argument on dispositive or jurisdictional motions. | To be set by the Court at its convenience. |

### 2. Defendants Propose the Exchange of Preliminary Fact Sheets

### a. Benefits of Exchanging Preliminary Fact Sheets

A mutual exchange of early discovery in the form of plaintiff and defendant fact sheets offers significant efficiencies for initial coordination of the case and the identification of issues likely to drive resolution of disputes. In forming this MDL, the JPML noted that such fact sheets can help "streamline[]" "defendant-specific discovery," for example. JPML Order at 5. The benefits of an early exchange are multifold: a well-crafted fact sheet can help group cases into litigation tracks, identify and prioritize resolution of disputes likely to advance the MDL, aid with the efficient drafting of consolidated amended complaints, streamline discovery efforts, and

facilitate early case settlement.  *See, e.g.*, Bolch Judicial Institute, Duke Law School, *Guidelines and Best Practices For Large And Mass-Tort MDLs*, p.10 (2018) (fact sheets "provide an efficient mechanism to assist the parties and the court in assessing whether certain claims may be candidates for expedited resolution through voluntary withdrawal, dispositive motions, or through a settlement process");[11] Margaret S. Williams, *et al.*, *Plaintiff Fact Sheets in Multidistrict Litigation Proceedings: A Guide for Transferee Judges*, FEDERAL JUDICIAL CENTER, 2019 WL 1441822 (2019) ("Information obtained using fact sheets can be used to group cases for motions practice or into litigation tracks, to identify cases for targeted discovery, to select bellwether cases, and to facilitate settlement negotiations."); *In re Allergan Biocell Textured Breast Implant Prod. Liab. Litig.*, 2022 WL 3211421, at *1 (D.N.J. Aug. 9, 2022) (affirming special master order requiring defendant fact sheets; "the purpose of the fact sheets is to provide counsel for both sides with the basic information necessary to move this consolidated proceeding through the process and toward a resolution").

Fact sheets also assist the parties in identifying cases that never should have been filed in the first place, either because they were not properly vetted before the complaint was filed or because further investigation reveals that the claims do not belong in federal court.  *See Guidelines and Best Practices For Large And Mass-Tort MDLs*, at p. 10, Best Practice 1C(v) ("Fact sheets also help to uncover cases that should not have been centralized in the first instance.").  As a result, the use of fact sheets has proven an effective tool to reduce the size and scope of MDL proceedings through voluntary dismissals or remand. *See In re Cap. One Consumer Data Sec. Breach Litig.*, 2022 WL 18107626, at *2, n.4 (E.D. Va. Sept. 13, 2022) (recognizing that "[o]f the 101 MDL Plaintiffs who submitted verified Fact Sheets and documents, an additional 32 eventually chose to

---

[11] *Available                                                                                                      at* https://scholarship.law.duke.edu/cgi/viewcontent.cgi?article=1004&context=bolch.

dismiss their pending complaint"). Plaintiffs claim to see little benefit in weeding out some Plaintiffs initially. Not requiring Plaintiff fact sheets would ignore that the Court selected Plaintiffs' Leadership to "vet the hundreds of plaintiffs who have already filed." If not in fact sheets, Plaintiffs provide no explanation for when this vetting would occur. Rather, they appear to prefer to vet just a small subset of Plaintiffs relevant to their hand-picked bellwether Defendants. Simply, Plaintiffs' Leadership wants the responsibility to vet all Plaintiffs without doing so on the scale necessary for this litigation.

Given the efficiencies presented by the use of fact sheets and consistent with the JPML's guidance in its original transfer order, the exchange of fact sheets in complex MDL proceedings is commonplace. *See* Margaret Williams, *et al.*, FEDERAL JUDICIAL CENTER, *Plaintiff Fact Sheets in Multidistrict Litigation: Products Liability Proceedings 2008–2018* (March 2019) (noting that fact sheets were used in over half of all MDL proceedings and "more commonly ordered in larger proceedings").[12] Plaintiffs recognized the benefit of an exchange of fact sheets in advance of consolidated or amended complaints. In their November 22, 2023 submission to the Court, plaintiffs argued that in lieu of stay, "limited discovery, in the form of a census conducted through brief required fact sheets should commence now" to inform proceedings going forward. ECF 157, at 6.

Plaintiffs, however, now assert no fact sheets be exchanged, that Rule 26(f) conferences only occur as to the first tranche of bellwether cases—and then that discovery "open as to Progress" (ostensibly meaning other discovery cannot occur). This disjointed discovery proposal is flawed on multiple levels: First, as detailed herein, refusing to exchange fact sheets eliminates the efficiencies that are realized through such a process. Second, Plaintiffs would have discovery open

---

[12] *Available at* https://www.fjc.gov/sites/default/files/materials/49/PFS%20in%20MDL.pdf.

on May 16, 2024—a week before Defendants must file their motions to dismiss—but (conveniently for Plaintiffs) over a month before Plaintiffs' oppositions to the motions to dismiss are due. Put simply, Plaintiffs are rejecting the mutual exchange of fact sheets and manipulating the proposed schedule to ensure the parties do not have the same availability to information while dismissal briefing occurs.[13] Third, Plaintiffs' suggestion that, following Rule 26(f) conferences, discovery proceed only as to Progress is counter to the Federal Rules and basic equity. It is fundamental that a party's duty to respond to discovery begins after the Rule 26(f) conference. *See* Fed. R. Civ. P. 26(d)(1). Once the 26(f) conferences occur, under the Federal Rules, discovery opens as to all parties that participate, and Progress, as well as other defendants, must be allowed to fully participate in discovery (not only be required to respond to discovery), including by seeking discovery from Plaintiffs.

Moreover, including only select Defendants and Plaintiffs in the initial Rule 26(f) conferences would prejudice individual Plaintiffs and Defendants seeking a timely resolution of their dispute; run afoul of Rule 1's mandate for "speedy . . . determination of every action and proceeding"; and raise serious due process concerns. *Nelson v. Adams USA, Inc.*, 529 U.S. 460, 465 (2000) ("The Federal Rules of Civil Procedure are designed to further the due process of law that the Constitution guarantees."); *see also Monahan v. Romney*, 2009 WL 10694327, at *11 (D. Mass. Sept. 3, 2009), *aff'd*, 625 F.3d 42 (1st Cir. 2010) ("The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner.") (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)).

---

[13] Exchanging fact sheets will also level the information playing field and ensure all parties have the same understanding of basic allegations and facts and avoid inaccuracies being pled in consolidated complaints (no matter the form they take) and re-stated in subsequent briefing. For example, Plaintiffs' proposal states that "67 complaints allege the consumer experienced fraud." This number is significantly higher than Defendants' collective understanding based on their review of the complaints within this MDL.

Plaintiffs accuse Defendants of "dithering" because their counsel cannot yet identify which among them will file preliminary motions without first seeing consolidated complaints. But this only supports the exchange of fact sheets. For example, whether a given Defendant argues a given Plaintiff's claims are barred by a class actions waiver or arbitration agreement depends not only on which Plaintiffs are ultimately named but also who these Plaintiffs actually are. The current complaints contain minimal detail about Plaintiffs, often just their name and state of residence. As millions of individuals are alleged to be involved in the various breaches, Defendants are almost certain to encounter these names multiple times within their customer or client base. Fact sheets providing additional identifying information would allow Defendants to determine with certainty whether such defenses apply and not speculate.

Defendants' proposal eliminates each of the above issues by (1) having the parties exchange fact sheets before amended complaints and dismissal briefing occurs, (2) not having Rule 26(f) conferences until after all dismissal-motion briefing is complete, and (3) having all parties participate in the Rule 26(f) conferences.  Indeed, a mutual exchange of fact sheets is especially important in a case like this-involving numerous plaintiffs and numerous defendants— the categorization of which is itself likely to advance the identification and resolution of the claims and defenses that matter, not just in Plaintiffs' selected cases, but in all cases pending in this MDL.

(a)    **The Substance of Defendants' Proposed Preliminary Fact Sheets**

Defendants anticipate that an exchange of fact sheets would address the following information, subject to further negotiations among the parties.

Plaintiff Fact Sheet Contents

- Biographical information (name, current address, and any information you claim was impacted in the MOVEit incident, including if applicable, date of birth; last four digits of SSN; previous addresses since January 2013 (and dates in use); email addresses).

- Notices received and identification of entity sending notice.

- Relationship to entity providing notice.

- Copy of the notice, or for each notice received (date received; date printed on the notice; does the notice state that personal information was obtained or impacted; what information obtained or impacted).

- Any other information Plaintiff believes was obtained due to the MOVEit incident and basis for belief.

- Has Plaintiff's information been accessed, obtained, or misused by any party without your permission, other than in the MOVEit incident, or has Plaintiff been the victim of any identity fraud since January 2013?  If so, for each instance explain:

    - what happened;

    - what information was accessed, obtained, or misused;

    - how the information was accessed obtained or misused.

- Does Plaintiff attribute any acts of identity theft or fraud to the MOVEit incident? If so, for each act, please:

    - describe the identity theft or fraud, including the date you learned about the identity theft and fraud, and why you believe it is linked to the MOVEit incident;

    - describe any monetary losses or other injuries you suffered as a result of the identity theft or fraud;

    - identify the steps you took in response to the identity theft or fraud.

Defendant Fact Sheet Contents

- Whether the Defendant is a direct user, a vendor, or an indirectly impacted entity.

- Whether the Defendant has sent notice regarding the breach or has had notice sent on its behalf, and where applicable, an exemplar of the notice sent.

- To how many people such notice was sent.

- What, if anything, the notice said about the nature of the information that was impacted by the breach.

- Whether the Defendant has asserted claims against any other person or entity related to the breach.

- Whether the Defendant is also a Defendant in state court actions.

- Whether the Defendant would be interested in proceeding to a non-litigation settlement track.

### (2) Defendants' Proposed Preliminary Dispositive Motions on Threshold Issues

Following exchange of fact sheets and filing of consolidated complaints, the Court can efficiently address threshold issues concerning jurisdiction, arbitrability, and class action waivers as a first step towards efficient resolution of this litigation. Defendants would streamline presentation of these motions by endeavoring to submit a joint motion on behalf of all moving Defendants addressing a particular issue with set page limits and, as necessary, short appendices, charts, or supplemental filings addressing any unique application of the issue to a particular Defendant. Defendants anticipate no more than four to six preliminary, joint motions addressing discrete topics. We discuss further below how resolution of these particular issues will streamline the litigation by narrowing, as appropriate, the class of claims and viable complaints.

### (3) Threshold Issues Concerning Standing and Related Issues

"[F]ederal subject-matter jurisdiction implicates [the Court's] power to hear and determine a case," so a court "must address that issue" at the outset of the matter, "before proceeding further." *Lawless v. Steward Health Care Sys., LLC*, 894 F.3d 9, 16 (1st Cir. 2018) ("A court without jurisdiction is like a king without a kingdom: both are powerless to act."). Indeed, any time "circumstances exist that call federal subject-matter jurisdiction into legitimate question," a federal court "'has an unflagging obligation to inquire *sua sponte* into its own jurisdiction.'" *Id.* (quoting *Watchtower Bible & Tract Soc. of N.Y. v. Colombani*, 712 F.3d 6, 10 (1st Cir. 2013)).

Of particular note is Article III standing. The litigation will benefit from early adjudication of this threshold issue. *See Pagan v. Calderon*, 448 F.3d 16, 26 (1st Cir. 2006) ("A federal court must satisfy itself as to its jurisdiction, including a plaintiff's Article III standing to sue, before addressing his particular claims, regardless of whether the litigants have raised the issue of standing."). Many of the complaints in this MDL seek recovery either largely or exclusively based

on alleged future harm from the data breach but without any allegations of actual misuse of the information. Yet, as this Court recognized in *Taylor*, such allegations may not allege sufficient injury to satisfy the legal requirement of standing. *See* 2023 WL 8291834, at \*6 ("[T]he Court finds that without any allegations of actual misuse of information from the . . . data breach, Plaintiffs' alleged risk of future misuse is not sufficiently imminent or substantial to support standing.").

To the extent certain plaintiffs cannot identify injuries different from those deemed insufficient in *Taylor*, early adjudication of standing will permit the Court to screen out those cases in the MDL before the parties expend substantial resources litigating other issues. To the extent that particular plaintiffs have injury theories different or distinct from those in *Taylor*—*e.g.*, whether based on differences in the types of data particular defendants had or particular circumstances that an individual has allegedly experienced—the parties can then assess whether those issues give rise to early motions practice, as well as how to group any such issues. Under either circumstance, early consideration of standing and related issues such as cognizable state-law injury will materially advance the goal of the MDL. *See, e.g.*, *In re Blackbaud Customer Data Breach Litig.*, MDL No. 2972, No. 3:20-mn-02972-JFA, Order # 4 (D.S.C. Feb. 3, 2021) (frontloading the standing questions). To that end, Defendants request that the Court include questions relevant to any alleged Article III standing on the proposed plaintiff fact sheets, specifically by requiring each plaintiff to specify the alleged injury and harm they claim to have suffered. *See id.* (ordering the exchange of fact sheets at the outset of the MDL in order to ascertain jurisdiction); *In re Capital One*, Case 1:19-md-02915-AJT-JFA, Doc. 600-1, Questions 17-18 (E.D. Va.) (using fact sheet asking plaintiffs what harm(s) they assert); *see also* Bolch Judicial Institute, Duke Law School, Guidelines and Best Practices for Large and Mass-Tort MDLs 10 (2d

ed. 2018) (identifying fact sheets as "useful and efficient initial mechanisms" to understand plaintiffs' injuries and determine whether dismissal may be appropriate).

### (4)    Threshold Issues Concerning Arbitration and Class Action Waivers

Preliminary motions will also enable the Court to hear and resolve the issues of arbitration and class action waivers. Some Defendants have contracts with Plaintiffs and putative class members that require arbitration of disputes and/or that waive the ability to file or participate in a class action lawsuit. This litigation will proceed most efficiently and fairly if all relevant defendants are allowed to move to enforce these contracts at the outset of the litigation.[14] Under the Federal Arbitration Act, "courts must enforce arbitration contracts according to their terms." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019). In accordance with this mandate, motions to compel arbitration should be decided before the Court rules on the merits of a dispute. *See id.* at 529 ("[A] court may not 'rule on the potential merits of the underlying' claim that is assigned by contract to an arbitrator, 'even if it appears to the court to be frivolous.'") (quoting *AT&T Techs., Inc. v. Commcn's Workers*, 475 U.S. 643, 649–50 (1986)). Indeed, the Supreme Court has gone so far as to state that, when there is an enforceable arbitration agreement, "courts . . . have no business weighing the merits" of the dispute. *United Steelworkers of Am. v. Am. Mfg. Co.*, 363 U.S. 564, 568 (1960). Thus, when faced with a motion to compel arbitration, courts "should decide only such issues as are essential to defining the nature of the forum in which a dispute will be decided." *Rodriguez-Rivera v. Allscripts Healthcare Sols., Inc.*, 43 F. 4th 150, 171 (1st Cir. 2022).[15]

---

[14] But individual consolidated amended complaints will be crucial on this front to allow Defendants to adequately determine whether any of these contracts apply.

[15] Plaintiffs' proposal would deprive these Defendants of the benefit of their arbitration agreements by forcing them to sit on the sidelines of this MDL for years without any avenue for moving their disputes to arbitration.

For similar reasons, the Court should also address the applicability of class action waivers at the outset. Class action waivers are valid and enforceable. *See Beck v. Vision Service Plan Ins. Co.*, 600 F. Supp. 3d 145, (D. Mass. 2021) ("[A]rbitration clauses containing class action waivers are enforceable under the FAA . . . ."); *McIntosh v. Royal Caribbean Cruises, Ltd.*, 2018 WL 1732177, at *2 (S.D. Fla. Apr. 10, 2018) ("It is well established that parties can agree to class action waivers."). And as other courts have recognized, "the enforceability of a class action waiver should be resolved . . . before discovery begins," and must be resolved before class certification is granted in any event. *Roman v. Spirit Airlines, Inc.*, 482 F. Supp. 3d 1304, 1315 (S.D. Fla. 2020); *see also In re Marriott Int'l Inc.*, 78 F.4th 677, 685 (4th Cir. 2023) (holding the district court "erred by certifying classes against Marriott without first addressing the class-action waiver defense").

3.     **Plaintiffs' Proposal Undermines the Purposes of the MDL and is Inefficient, Unprecedented, and Unfair**

a.     **Plaintiffs' Proposed Structure Is an Ill-Conceived, Non-Representative Bellwether Proposal That Is at Odds with the Purpose for Which This MDL Was Created**

Unlike Defendants' proposal, Plaintiffs' proposal sees little if any "interconnectedness among defendants." Rather, directly contrary to what the JPML envisioned, it focuses on particular "'defendant[s] in isolation.'" JPML Order at 5. It will prevent almost all defendants from participating in the litigation of what are a series of individual bellwether cases and force those Defendants to wait on the sidelines to address threshold issues such as whether Plaintiffs even have standing to bring claims. Plaintiffs' ability to move forward against only their cherry-picked Defendants not only will undermine the purposes for which this MDL was created, it will impose inordinate costs on particular defendants as a large group of Plaintiffs' counsel can marshal resources against an entity they have hand-selected to put in the cross hairs.

- 32 -

Beyond being at odds with Article III, the Federal Arbitration Act, and unfair, this serial approach will dramatically elongate the length of this MDL and arbitrarily create delay for defendants. Plaintiffs' bellwether proposal envisions completing Defendants' proposed case schedule and then repeating that process for successive tranches of Defendants they choose to litigate against. This would multiply the length of the Motion to Dismiss phase many times over. In fact, under Plaintiffs' proposal, it could be years before the second, third, fourth, fifth and so-on tranches of Defendants receive resolution of their motions to dismiss. This timeline does not even account for the motions of the third, fourth, fifth and so-on tranches of Defendants. And, as explained above, it will defeat the purposes of allowing discovery relevant to multiple defendants (*e.g.*, that regarding a particular vendor) to occur in coordinated fashion.

Furthermore, delaying first-party practice will lead to delays in parties' ability to effectively or efficiently litigate third-party claims, which is another subject that the JPML found significant in deciding to form this MDL. *See* JPML Order at 4 (noting certain defendants "have expressed their intent to bring third party claims against [other defendants] in cases in which the plaintiffs have not named them").

> **b.      Plaintiffs' Proposal Would Result in Duplicative Briefing, Prolonged Litigation, and Would Not Promote the Efficient Resolution of Common, Broadly Applicable Issues**

What is more, Plaintiffs' bellwether-based approach supplies little, if any, promise that the issues decided within a particular "sequence" will be broadly applicable.[16] Indeed, "the primary

---

[16] The bellwether Defendants proposed by Plaintiffs are not even representative of all Defendants, despite Plaintiffs' arguments. Plaintiffs have admitted to selecting their bellwethers based solely upon which Defendants have the largest allegedly impacted populations and have provided no insight into why this population will help the Court actually narrow and streamline the issues as to the dozens of Defendants and hundreds of Plaintiffs left on the sidelines. Indeed, Plaintiffs appear to be targeting a group of Defendants with allegedly large impact on similar data elements (i.e. all appear to have impacted Social Security Numbers), while including no

purpose of conducting bellwether trials is not to resolve the thousands of related cases pending in an MDL by one representative proceeding[.]"  Judge Eldon E. Fallon, *Bellwether Trials*, 89 UMKC L. REV. 951, 951–52 (2021).  Rather, the key efficiencies potentially gained from bellwether-type proceedings are twofold.  Bellwethers may assist in focusing the "most predominant and important issues" in the MDL. *Cf.* Hon. Eldon E. Fallon *et. al.*, *Bellwether Trials in Multidistrict Litigation*, 82 TUL. L. REV. 2323, 2345 (2008) (making the point in the context of bellwether trials); Ann. Manual Complex Lit. § 13.15 (4th ed.) ("The selection of cases to be tried is important to the value of the bellwether process.").  Bellwethers may also help facilitate future settlement.  *Cf.* Fallon *et. al.*, *Bellwether Trials in Multidistrict Litigation*, 82 TUL. L. REV. at 2337.

Plaintiffs' fundamental organizing principal is the number of individuals that were potentially affected by the compromise of data that originated with a particular defendant.  Yet, simply because a defendant has many customers does not mean that defendant can or will raise defenses with broad applicability across the MDL, and any determination as to defenses raised by a bellwether defendant would not bind non-bellwether defendants in any event.  *Cf. Dunson v. Cordis Corp.*, No. 16-CV-03076-EMC, 2016 WL 5335551, at \*4 (N.D. Cal. Sept. 23, 2016), *aff'd*, 854 F.3d 551 (9th Cir. 2017) ("As commentators have explained, in common practice, '[t]he results of [bellwether] trials are not binding on the other litigants in the group.  The outcomes can be used by the parties to assist in settlement, but the parties can also ignore these results and insist

---

Defendants with smaller impact that had other data elements impacted (i.e. none of the bellwethers had credit card information impacted, among many other data elements necessary to provide "guidance").  Additionally, Plaintiffs' reliance on the number of complaints filed against those identified Defendants is misleading. Defendants who were among the first to provide public notice of their MOVEit event have a disproportionate number of complaints filed against them, as many (if not most) were filed prior to this MDL being created, often with identical allegations and causes of action by the same attorneys. In essence, the volume of complaints against a given Defendant does not translate to a diversity of claims that necessarily makes it representative of the larger defense group.

on an individual trial.'") (quoting Alexandra D. Lahav, *Bellwether Trials*, 76 GEO. WASH. L. REV. 576, 580–81 (2008)); Fallon, *Bellwether Trials*, 89 UMKC L. REV. at 951 (noting the non-binding nature of bellwether decisions).

By the same token, the types of claims or injury theories a plaintiff may have on behalf of a putative class of one defendant's customers may have little overlap with other plaintiffs who brought suit against other defendants. Bellwethers, therefore, will do little to advance the twin goals of focusing issues for the non-bellwether parties and encouraging settlement. *See* Fallon *et. al.*, *Bellwether Trials in Multidistrict Litigation*, 82 TUL. L. REV. at 2337. Plaintiffs argue without explanation that Defendants' proposal would not provide the parties with "additional guidance" from the Court's decision on early dispositive motions. They claim their bellwether proposal would do so without articulating what such guidance is or how it is useful to non-bellwether parties. By contrast, Defendants' concurrent track proposal would provide the parties with the benefit of decisions, which provide finality and certainty to all.

Furthermore, adjudicating claims against one defendant with many customers may create bottlenecks and inefficiencies for reasons consistent with those articulated above. Again, if a defendant with many affected customers has a relationship to MOVEit that flows through a vendor used by dozens of other defendants, those other defendants-customers' cases will somehow need to catch-up at some undefined point in time to garner the benefits of the type of coordinated discovery that the JPML saw as critical here. *See* JPML Order at 3. Moreover, Plaintiffs' proposal to "sequentially" add consolidated complaints with additional parties will require all Defendants to monitor multiple ongoing iterations of this litigation to identify potential "guidance" applicable to whichever group names that particular Defendant. Plaintiffs argue their proposal avoids additional time and effort for their counsel, while shifting that burden to Defendants. For these

reasons, it is more sensible to structure proceedings around issues that have the potential to eliminate certain Defendants and Plaintiffs altogether from this MDL and streamline and best organize it for those who remain, which is what Defendants have proposed.

> **c.      Plaintiffs' Bellwether Proposal Would Create Fundamental Unfairness That Would Preclude the Vast Majority of Defendants From Participating in the Litigation for Years and Would Impose Inordinate Costs on a Few of the Defendants with the Most Individuals Impacted**

In addition, Plaintiffs' bellwether proposal will create fundamental unfairness because Plaintiffs will select bellwether defendants to advance Plaintiffs' interests, thereby delaying adjudication of the cases perceived to be the weakest and prejudicing the defendants with strong dispositive arguments. The structure envisioned by Plaintiffs here has never been used in a data breach MDL, and instead, is more commonly seen in the product liability context, albeit at a much later stage of proceedings (after the close of discovery and leading up to trial). In that type of MDL, plaintiffs' efforts are frequently concentrated against one defendant, as opposed to cherry-picking defendants as Plaintiffs seek to do here.

The fairness concerns are even more prominent in a litigation like this one, where the parties are in possession of asymmetrical information. Under their proposal, Plaintiffs would be able to cherry-pick bellwethers and successive tranches based on (i) information only Plaintiffs have about which individual plaintiff's case may allegedly be the strongest (or stated differently, they can shield the lion's share of weak plaintiffs from having their claims undone on the merits and/or used to defeat class certification), (ii) states' laws that are arguably more favorable to them (even if those laws aren't likely to be broadly applicable), and (iii) publicly available knowledge regarding allegedly "stronger" or "weaker" Defendants. These are significant concerns generally and are especially concerning in the class action context. *See generally Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 334 (4th Cir. 1998) (explaining "plaintiffs enjoyed

the practical advantage of being able to litigate not on behalf of themselves but on behalf of a 'perfect plaintiff' pieced together for litigation").  In sum, Plaintiffs' proposal does not describe how the bellwethers are going to be predictive and they may well be quite unfair.

Significantly, the MDLs cited by Plaintiffs are either inapposite or show that bellwether defendants are unhelpful here: when defendant bellwethers are used, MDLs typically take significantly longer to reach a conclusion than when issue bellwethers are employed.  Plaintiffs suggest that their proposal matches the "organizational approach" used in *In re Marriott*.  Nothing about *Marriott* is analogous to what Plaintiffs propose here.  That MDL involved only two defendants.  And those defendants had the opportunity to file a motion to dismiss on jurisdictional and Rule 12(b)(6) grounds, regardless of track.  *See In re Marriott Int'l, Inc. Customer Data Security Breach Litigation*, 19-md-2879 (D. Md.), Dkt. 331 (Marriott's Motion to Dismiss in the Government Track); Dkt. 358 (Marriott's Motion to Dismiss in the Financial Institution Track); Dkt. 450 (Marriott's Motion to Dismiss in the Consumer Track); Dkt. 464 (Accenture's Motion to Dismiss in the Consumer Track); Dkt. 647 (Marriott's Motion to Dismiss in the Securities Track); Dkt. 658 (Marriott's Motion to Dismiss in the Derivatives Track).  No defendant had to wait indefinitely on the sideline without the opportunity to be heard on the sufficiency of the claims asserted against them.  Even in the Consumer Track—where plaintiffs and defendants both selected bellwether claims—the plaintiffs did the work to file a consolidated amended complaint naming every consumer plaintiff so that the parties could evaluate the claims and identify those that could potentially provide representative outcomes. Plaintiffs' proposal here neither requires such upfront work nor puts defendants on equal footing in the selection process.

In *In re: Lumber Liquidators Chinese-Manufactured Flooring Products Marketing, Sales Practices and Products Liability Litigation*, MDL No. 2627 (E.D.V.A.), the Court allowed

- 37 -

plaintiffs to draft a representative complaint filing claims under the laws of five different states, one of which would be California, but Plaintiffs were not permitted to limit their selection by defendant. *See also In re: National Prescription Opiate Litigation*, MDL NO. 2804 (N.D. Ohio) (creating tracks of bellwether defendants where certain non-bellwether defendants have yet to file motions to dismiss seven years after the creation of the MDL).  In contrast, Defendants' proposal is much closer to the bellwether claims litigated in *In re: Anthem, Inc. Data Breach Litigation*, MDL No. 2617 (N.D. Cal.), which resulted in an MDL lasting approximately three years, despite having hundreds of claims against more than fifteen defendants.

In addition to the fundamental unfairness of requiring some Defendants to subsidize the litigation and others to sit on the sidelines for potentially years, Plaintiffs' proposal unfairly leverages and pressures Defendants to make an impossible choice between early settlement and litigation purgatory. Plaintiffs' Leadership has begun proposing an immediate but temporary settlement "off-ramp" for Defendants to opt into, which in conjunction with Plaintiffs' bellwether and sequencing proposal, would limit Defendants' ability to obtain "guidance" before engaging in settlement discussions. Defendants not in the initial bellwether complaints will either have to choose to engage in settlement or wait for an indeterminate amount of time until they are selected for the next sequential consolidated complaint. The result of such a structure is a maximization of the number of immediate settlements without having to vet Plaintiffs' claims against those non-bellwether Defendants. By contrast, under Defendants' proposal, all parties have certainty as to when they would be able to raise threshold defenses when deciding whether to engage in early settlement or proceed to early dispositive motions.

DATED this 16th day of February, 2024.        Respectfully submitted,

By:    */s/ Kristen A. Johnson*
       Kristen A. Johnson (BBO# 667261)
HAGENS BERMAN SOBOL SHAPIRO LLP
1 Faneuil Hall Square, 5th Fl.
Boston, MA 02109
Tel:  (617) 482-3700
Fax:  (617) 482-3003
kristenj@hbsslaw.com

*Liaison & Coordinating Counsel*

By:    */s/ E. Michelle Drake*
       E. Michelle Drake
BERGER MONTAGUE, PC
1229 Tyler St., NE, Ste. 205
Minneapolis, MN 55413
Tel:  (612) 594-5933
Fax:  (612) 584-4470
emdrake@bm.net

By:    */s/ Gary F. Lynch*
       Gary F. Lynch
LYNCH CARPENTER, LLP
1133 Penn Ave., 5th Fl.
Pittsburgh, PA 15222
Tel:  (412) 322-9243
Fax:  (412) 231-0246
Gary@lcllp.com

By:    */s/ Douglas J. McNamara*
       Douglas J. McNamara
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave. NW, 5th Fl.
Washington, DC  20005
Tel:  (202) 408-4600
dmcnamara@cohenmilstein.com

By:    */s/ Karen H. Riebel*
       Karen H. Riebel
LOCKRIDGE GRINDAL NAUEN PLLP
100 Washington Ave. S., Ste. 2200
Minneapolis, MN  55401
Tel:  (612) 339-6900
Fax:  (612) 612-339-0981
khriebel@locklaw.com

By:    */s/ Charles E. Schaffer*

- 39 -

Charles E. Schaffer
LEVIN SEDRAN & BERMAN LLP
510 Walnut Street, Ste. 500
Philadelphia, PA  19106
Tel:  (215) 592-1500
Fax:  (215) 592-4663
cshaffer@lfsblaw.com

*Lead Counsel*

DATED this 16th day of February, 2024.   Respectfully submitted,

By: */s/ Aravind Swaminathan*
    Aravind Swaminathan (*pro hac vice*)
ORRICK HERRINGTON & SUTCLIFFE LLP
401 Union Street, Suite 3300
Seattle, WA 98101
(206) 839-4340
aswaminathan@orrick.com

By: */s/ Allison M. Holt Ryan*
    Allison M. Holt Ryan (*pro hac vice*)
HOGAN LOVELLS LLP
555 13th Street NW
Washington, D.C. 20004
(202) 637-5600
allison.holt-ryan@hoganlovells.com

By: */s/ Jack W. Pirozzolo*
    Jack W. Pirozzolo (BBO # 564879)
SIDLEY AUSTIN LLP
60 State Street, 36th Floor
Boston, Massachusetts 02109
(617) 223-0304
jpirozzolo@sidley.com

By: */s/ Nathaniel R. Mendell*
    Nathaniel R. Mendell (BBO # 645283)
MORRISON & FOERSTER LLP
200 Clarendon Street
Boston, MA 02116
617-648-4700
nmendell@mofo.com

By: */s/ Paulyne Gardner*
    Paulyne Gardner (*pro hac vice*)
MULLEN COUGHLIN LLC
426 W. Lancaster Ave., Suite 200
Devon, PA 19333
(267) 930-4770
pgardner@mullen.law

By: */s/ Gilbert S. Keteltas*
    Gilbert S. Keteltas (*pro hac vice*)
BAKERHOSTETLER LLP
1050 Connecticut Avenue, NW
Washington, DC  20026
(202) 861-1530
gketeltas@bakerlaw.com

By: */s/ Jeff Tsai*
    Jeff Tsai (*pro hac vice*)
DLA PIPER LLP
555 Mission Street, Suite 2400
San Francisco, CA 94105-2933
(415) 615-6055
jeff.tsai@dlapiper.com

- 41 -

By: ___/s/ Kristine McAlister Brown___
Kristine McAlister Brown (*pro hac vice*)
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Suite 4900
Atlanta, GA 30309
(404) 881-7584
kristy.brown@alston.com


By: ___/s/ Edward P. Boyle___
        Edward P. Boyle (*pro hac vice*)
VENABLE LLP
151 West 42nd Street, 49th Floor
New York, New York 10036
(212) 808-5675
epboyle@venable.com


By: ___/s/ Kari M. Rollins___
        Kari M. Rollins (*pro hac vice*)
SHEPPARD MULLIN RICHTER & HAMPTON
LLP
30 Rockefeller Plaza
New York, New York 10112
(212) 634-3077
Krollins@sheppardmullin.com

*Defendants' Liaison Counsel*[17]

---

[17] Consistent with MDL Order No. 9 and Plaintiffs' Leadership Team's Communication Structure Proposal (ECF No. 667), the counsel identified as Defendants' Liaison Counsel represent solely their own clients and do not speak for any other Defendants, but have been authorized by the other Defendants to sign this joint submission.

- 43 -

## CERTIFICATE OF SERVICE

I hereby certify that, on this date, the foregoing document was filed electronically via the Court's CM/ECF system, which will send notice of the filing to all counsel of record.


Dated: February 16, 2024                    */s/ Kristen A. Johnson*
                                            Kristen A. Johnson (BBO# 667261)


## LOCAL RULE 7.1 CERTIFICATION

The parties have diligently met and conferred. Plaintiffs provided Defendants with their revision at 11:36 pm Eastern yesterday.  Plaintiffs received Defendants' revised section at 5:01 Eastern today.


Dated: February 16, 2024                    */s/ Kristen A. Johnson*
                                            Kristen A. Johnson (BBO# 667261)