**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE: MOVEIT CUSTOMER DATA SECURITY BREACH LITIGATION<br><br>This Document Relates To:<br><br>*Cooper v. American Multi-Cinema, Inc. and AMC Entertainment Holdings, Inc., d/b/a AMC Theaters*,<br>No. 24-cv-11127 (D. Mass.)<br><br>*Newman v. American Multi-Cinema, Inc. d/b/a AMC Theaters*,<br>No. 24-cv-11359 (D. Mass.)<br><br>*Pratt v. Cadence Bank*,<br>No. 23-cv-12996 (D. Mass)<br><br>*Adams v. Cadence Bank*,<br>No. 23-cv-13071 (D. Mass)<br><br>*Triplett v. Cadence Bank*,<br>No. 24-cv-10657 (D. Mass)<br><br>*Thompson v. Franklin Mint Fed. Credit Union*, No. 1:23-cv-12885 (D. Mass.)<br><br>*Harris v. Franklin Mint Fed. Credit Union*, No. 1:23-cv-12891 (D. Mass.)<br><br>*Bronson v. Franklin Mint Fed. Credit Union*, No. 1:23-cv-12893 (D. Mass.)<br><br>*Brown v. Franklin Mint Fed. Credit Union*, No. 1:23-cv-12894 (D. Mass.)<br><br>*Liptock v. MasTec, Inc.*,<br>No. 23-cv-12985 (D. Mass)<br><br>*Dudurkaewa et al. v. MidFirst Bank et al.*,<br>No. 24-cv-10186 (D. Mass.)<br><br>*Strother v. MidFirst Bank*,<br>No. 23-cv-12898 (D. Mass)<br><br>*Strucke v. Midland Financial Co.*,<br>No. 23-cv-12771 (D. Mass.)<br><br>*De Medicis v. MidFirst Bank*,<br>No. 23-cv-13057 (D. Mass.) | MDL No. 1:23-md-03083-ADB<br>Hon. Allison D. Burroughs |

| | |
|---|---|
| *Cantrell v. Pathward, N.A. et al.,* No. 23-cv-12554 (D. Mass.) | ) ) |
| *Kent v. Pathward, N.A. et al.,* No. 23-cv-12764 (D. Mass.) | ) ) ) |
| *Fields v. Pathward, N.A. et al.,* No. 23-cv-13058 (D. Mass.) | ) ) ) ) |

**Motion to Compel Arbitration and to Stay Litigation By Defendants American Multi-Cinema, Inc., AMC Entertainment Holdings, Inc. d/b/a AMC Theatres, Cadence Bank, Franklin Mint Federal Credit Union, MasTec, Inc., MidFirst Bank, Midland Financial Co., and Pathward, N.A.**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................ 1

BACKGROUND ......................................................................................................... 2

    A.    Plaintiffs entered into binding arbitration agreements that cover their claims against the Arbitration Defendants. ................................. 2

        1.    American Multi-Cinema, Inc. and AMC Entertainment Holdings, Inc. ..................................................................... 2

        2.    Cadence Bank ............................................................... 4

        3.    Franklin Mint Federal Credit Union ........................................... 7

            a.    Plaintiffs Bronson and Thompson ................................ 8

            b.    Plaintiff Harris ...................................................... 10

            c.    Plaintiff Brown ...................................................... 11

            d.    The Relevant FMFCU Arbitration and Class Waiver Provisions ................................................... 12

        4.    MasTec, Inc. ................................................................ 14

        5.    MidFirst Bank and Midland Financial Co. ............................ 15

        6.    Pathward, N.A. ............................................................. 21

    B.    Plaintiffs filed putative class actions notwithstanding their agreements to pursue individualized arbitration. ............................... 23

ARGUMENT ......................................................................................................... 24

I.    The FAA Requires Enforcement of Plaintiffs' Arbitration Agreements. ....... 24

    A.    Plaintiffs entered into binding arbitration agreements. ..................... 25

        1.    American Multi-Cinema, Inc. and AMC Entertainment Holdings, Inc. ..................................................................... 25

        2.    Cadence Bank ............................................................... 27

        3.    Franklin Mint Federal Credit Union ........................................... 29

        4.    MasTec, Inc. ................................................................ 34

        5.    MidFirst Bank and Midland Financial Co. ............................ 36

        6.    Pathward, N.A. ............................................................. 40

    B.    Plaintiffs' claims fall within the scope of their arbitration agreements. ................................................................... 43

    C.    Plaintiffs agreed to individualized arbitration proceedings. .............. 45

i

**TABLE OF CONTENTS**
(continued)

**Page**

D.      Some Plaintiffs agreed that questions of arbitrability would be decided by the arbitrator.................................................................. 46

II.    The Court Should Address Subject Matter Jurisdiction First, But If It Concludes It Has Jurisdiction, Then Plaintiffs' Claims Against The Arbitration Defendants Should Be Stayed Pending Arbitration. .................. 48

CONCLUSION.................................................................................................... 50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amadasun v. Google, Inc.*,
2022 WL 2829644 (N.D. Ga. July 19, 2022) ........................................................ 49

*Aste v. Metropolitan Life Ins.*,
728 N.E.2d 629 (Ill. App. Ct. 2000) ..................................................................... 42

*AT&T Mobility LLC v. Concepcion*,
563 U.S. 333 (2011) ....................................................................................... 24, 46

*AT&T Techs., Inc. v. Commc'ns Workers of Am.*,
475 U.S. 643 (1986) ............................................................................................. 45

*Austin v. J.C. Penney Corp., Inc.*,
2019 WL 76889 (D. Kan. Jan. 2, 2019) .......................................................... 25, 26

*Bernal v. Charter Cnty. Mut. Ins. Co.*,
209 P.3d 309 (Okla. 2019) ................................................................................... 37

*Beture v. Samsung Elecs. Am., Inc.*,
2018 WL 4259845 (D.N.J. July 18, 2018) ....................................................... 41, 42

*Bombin v. Southwest Airlines Co.*,
2023 WL 5832166 (E.D. Pa. Sept. 7, 2023) ......................................................... 46

*Bonilla v. Adecco USA, Inc.*,
2024 WL 945310 (E.D. Pa. Mar. 5, 2024) ........................................................... 33

*Bosse v. N.Y. Life Ins. Co.*,
992 F.3d 20 (1st Cir. 2021) .................................................................................. 48

*Bracy v. Macy's Retail Holdings, Inc.*,
2020 WL 1953647 (E.D. Pa. Apr. 23, 2020) ........................................................ 31

*Clutts v. Dillard's, Inc.*,
484 F. Supp. 2d 1222 (D. Kan. 2007) .................................................................. 27

*Coulter v. Experian Info. Solutions, Inc.*,
2021 WL 735726 (E.D. Pa. Feb. 25, 2021) ........................................................... 46

*Crean v. Morgan Stanley Smith Barney, LLC*,
652 F. Supp. 3d 171 (D. Mass. 2023) ................................................................... 25

iii

# TABLE OF AUTHORITIES

**Page(s)**

*Dean Witter Reynolds, Inc. v. Byrd*,
470 U.S. 213 (1985) ......................................................................................... 25

*Duke v. Luxottica U.S. Holdings Corp.*,
2023 WL 6385389 (E.D.N.Y. Sept. 30, 2023)......................................................... 49

*Eagle v. Kansas Couns., Inc.*,
2013 WL 100113 (D. Kan. Jan. 8, 2013) ................................................................ 26

*Epic Sys. Corp. v. Lewis*,
584 U.S. 497 (2018) ......................................................................................... 46

*In re Estate of Atkinson*,
231 A.3d 891 (Pa. Super. Ct. 2020)...................................................................... 32

*Eubanks v. Gasbuddy, LLC*,
2022 WL 16963807 (D. Mass. Nov. 16, 2022)........................................... 39, 41, 42

*Felling v. Hobby Lobby, Inc.*,
2005 WL 928641 (D. Kan. Apr. 19, 2005).............................................................. 26

*First Options of Chicago, Inc. v. Kaplan*,
514 U.S. 938 (1995) ......................................................................................... 25

*Fraga v. Premium Retail Servs., Inc.*,
2023 WL 8435180 (D. Mass. Dec. 5, 2023) ........................................................... 35

*Fteja v. Facebook, Inc.*,
841 F. Supp. 2d 829 (S.D.N.Y. 2012) ........................................................... 41, 42

*Garg v. VHS Acquisition Subsidiary No. 7*,
2021 WL 1873962 (D. Mass. Mar. 9, 2021) ........................................................... 35

*Genzyme Corp. v. F.D.I.C.*,
657 F. Supp. 2d 281 (D. Mass. 2009) ...................................................................... 5

*Hallam v. Southaven R.V. Ctr., Inc.*,
2019 WL 4675380 (N.D. Miss. Sept. 25, 2019)................................................. 28, 29

*Hancock v. Am. Tel. & Tel. Co.*,
701 F.3d 1248 (10th Cir. 2012) ................................................................... 38, 40

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
586 U.S. 63 (2019) ........................................................................................... 48

# TABLE OF AUTHORITIES

**Page(s)**

*In re Jamster Mktg. Litig.*,
2008 WL 4858506 (S.D. Cal. Nov. 10, 2008) ........................................................ 25

*Jang Won So v. EverBeauty, Inc.*,
2018 WL 259393 (N.J. Super. Ct. App. Div. Jan. 2, 2018) ................................... 42

*Jenkins v. PetSmart, LLC*,
2023 WL 8548677 (E.D. Pa. Dec. 11, 2023)......................................................... 46

*Johnson v. Uber Techs., Inc.*,
2018 WL 4503938 (N.D. Ill. Sept. 20, 2018)....................................................... 42

*Juric v. Dick's Sporting Goods, Inc.*,
2020 WL 4450328 (W.D. Pa. Aug. 3, 2020) ......................................................... 33

*Kindred Nursing Ctrs. Ltd. P'Ship v. Clark*,
581 U.S. 246 (2017) ............................................................................................. 25

*Kirleis v. Dickie, McCamey & Chilcote, P.C.*,
560 F.3d 156 (3d Cir. 2009).................................................................................. 29

*Lamps Plus, Inc. v. Varela*,
587 U.S. 176 (2019) ........................................................................................ 45, 46

*Levin v. Dalva Bros., Inc.*,
459 F.3d 68 (1st Cir. 2006).................................................................................... 37

*Matthews v. Gucci*,
2022 WL 462406 (E.D. Pa. Feb. 15, 2022)...................................................... 29, 31

*McCrossin v. Comcast Spectator, LLC*,
311 A.3d 1115 (Pa. Super. Ct. 2024)................................................................... 32

*Melena v. Anheuser-Busch, Inc.*,
847 N.E.2d 99 (Ill. 2006) ..................................................................................... 40

*MetroPCS Commc'ns, Inc. v. Porter*,
273 So.3d 1025 (Fla. Dist. Ct. App. 2018) ...................................................... 41, 42

*Meyer v. Uber Techs., Inc.*,
868 F.3d 66 (2d Cir. 2017)............................................................................... 41, 42

*Miracle-Pond v. Shutterfly, Inc.*,
2020 WL 2513099 (N.D. Ill. May 15, 2020) .................................................... 41, 42

# TABLE OF AUTHORITIES

**Page(s)**

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
460 U.S. 1 (1983) .................................................................................... 24, 45

*Ne. Data Sys. v. McDonnell Douglas Comput. Sys. Co.*,
986 F.2d 607 (1st Cir. 1993) ........................................................................ 27

*Nelson v. Gobrands, Inc.*,
2021 WL 4262325 (E.D. Pa. Sept. 20, 2021) ............................................... 46

*Nettles v. Midland Funding LLC*,
983 F.3d 896 (7th Cir. 2020) ....................................................................... 49

*Neuhoff v. Marvin Lumber and Cedar Co.*,
370 F.3d 197 (1st Cir. 2004) ........................................................................ 36

*In re New England Mut. Life Ins. Co. Sales Pracs. Litig.*,
236 F. Supp. 2d 69 (D. Mass. 2002) ............................................................. 28

*Noble v. Samsung Elecs. Am., Inc.*,
682 F. App'x 113 (3d Cir. 2017) ................................................................... 34

*NPS LLC v. Ambac Assurance Corp.*,
706 F. Supp. 2d 162 (D. Mass. 2010) ........................................................... 27

*Pacanowski v. Alltran Fin., LP*,
271 F. Supp. 3d 378 (M.D. Pa. 2017) ........................................................... 31

*Perez-Tejada v. Mattress Firm, Inc.*,
2019 WL 830450 (D. Mass. Feb. 21, 2019) .................................................. 35

*Pittsburgh Logistics Sys., Inc. v. R. Keppel Trucking, LLC*,
153 A.3d 1091 (Pa. Super. Ct. 2017) ........................................................... 29

*Putnam Res. v. Pateman*,
958 F.2d 448 (1st Cir. 1992) ........................................................................ 36

*Raw Life Organics LLC v. SBL, LLC*,
2021 WL 217765 (S.D. Fla. Jan. 6, 2021) .................................................... 42

*Rent-A-Ctr., W., Inc. v. Jackson*,
561 U.S. 63 (2010) ....................................................................................... 48

*In re Rotondo Weirich Enters., Inc.*,
583 B.R. 860 (E.D. Pa. Bankr. 2018) ........................................................... 49

# TABLE OF AUTHORITIES

**Page(s)**

*Santos v. Gen. Dynamics Aviation Servs. Corp.*,
  984 So.2d 658 (Fla. Dist. Ct. App. 2008) ............................................................. 42

*Schuster v. Uber Techs., Inc.*,
  2019 WL 2536780 (M.D. Fla. June 13, 2019) ....................................................... 42

*Sherrer v. Covenant Health & Rehab of Picayune, LLC*,
  2012 WL 1067910 (S.D. Miss. Mar. 29, 2012) ...................................................... 29

*Shinberg v. Bruk*,
  875 F.2d 973 (1st Cir. 1989) ........................................................................... 36, 37

*Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*,
  549 U.S. 422 (2007) ....................................................................................... 48, 49

*Sithon Maritime Co. v. Holiday Mansion*,
  177 F.R.D. 504 (D. Kan. 1998) ........................................................................... 26

*Skuse v. Pfizer, Inc.*,
  236 A.3d 939 (N.J. 2020) .................................................................................... 40

*Smith v. Fed Ex*,
  2022 WL 2819142 (W.D. Okla. July 19, 2022) .................................................. 38, 39

*Smith v. Spizzirri*,
  144 S. Ct. 1173 (2024) ..................................................................................... 49, 50

*St. Joe Corp. v. McIver*,
  875 So.2d 375 (Fla. 2004) ................................................................................... 40

*Steel Co. v. Citizens for a Better Env't*,
  523 U.S. 83 (1998) ............................................................................................. 48

*Stinger v. Chase Bank, USA, NA*,
  265 F. App'x 224 (5th Cir. 2008) ......................................................................... 28

*Sw. Energy Production, Co. v. Forest Res., LLC*,
  83 A.3d 177 (Pa. Super. Ct. 2013) ....................................................................... 32

*In re Syngenta AG Mir162 Corn Litig.*,
  2021 WL 3025471 (D. Kan. May 14, 2021) ........................................................... 26

*Vacca v. Brigham & Women's Hosp., Inc.*,
  156 N.E.3d 800 (Mass. App. Ct. 2020) ................................................................. 34

# TABLE OF AUTHORITIES

**Page(s)**

*Vadnais v. NSK Steering Sys. Am., Inc.*,
   675 F. Supp. 2d 205 (D. Mass. 2009) ................................................................... 34

*In re Volkswagen & Audi Warranty Extension Litig.*,
   692 F.3d 4 (1st Cir. 2012) ..................................................................................... 36

*Williams v. TAMKO Bldg. Prod., Inc.*,
   451 P.3d 146 (Okla. 2019) ..................................................................................... 38

*Williams-Jackson v. Innovative Senior Care Home
   Health of Edmond, LLC*,
   727 F. App'x 965 (10th Cir. 2018) ........................................................................ 27

**Statutes**

Federal Arbitration Act, 9 U.S.C. §§ 1–16 ..........................................................*passim*

   9 U.S.C. § 2 ............................................................................................................ 24

   9 U.S.C. § 3 ................................................................................................ 24, 49, 50

28 U.S.C. § 1407 ......................................................................................................... 28

**INTRODUCTION**

The cases addressed in this motion are part of the multi-district litigation relating to a data incident involving Progress Software Corporation in May 2023. The Plaintiffs in these cases assert claims against the following Defendants (collectively, the "Arbitration Defendants"):

- American Multi-Cinema, Inc. and AMC Entertainment Holdings, Inc. d/b/a AMC Theatres;

- Cadence Bank;

- Franklin Mint Federal Credit Union;

- MasTec, Inc.;

- MidFirst Bank and Midland Financial Co.; and

- Pathward, N.A.

Those claims are based on allegations about the Arbitration Defendants' use of Progress's MOVEit file-transfer product and the claimed effect of the data incident involving Progress on the personal information Plaintiffs provided to the Arbitration Defendants in the course of their relationship.

But the merits of those claims are for an arbitrator to decide. All Plaintiffs who are the subject of this motion agreed to broad arbitration provisions that cover the claims they are asserting against the Arbitration Defendants and require them to resolve their disputes through individual arbitration. Under the Federal Arbitration

1

Act ("FAA"), 9 U.S.C. §§ 1–16, those arbitration agreements are fully enforceable as a matter of federal law.[1]

Accordingly, the Arbitration Defendants move to compel arbitration of Plaintiffs' claims against them and to stay further litigation of those claims pending the outcome of arbitration. That said, for the reasons explained in Part II below, the Arbitration Defendants respectfully submit that the Court should first address whether it has subject matter jurisdiction over the claims that are the subject of this motion; but if the Court concludes that it does have jurisdiction, it should compel each of these Plaintiffs to arbitrate their claims against the Arbitration Defendants on an individual basis.

## BACKGROUND

**A.    Plaintiffs entered into binding arbitration agreements that cover their claims against the Arbitration Defendants.**

As discussed below, all Plaintiffs whose claims are the subject of this motion entered into arbitration agreements that encompass their claims against the Arbitration Defendants.

**1.    American Multi-Cinema, Inc. and AMC Entertainment Holdings, Inc.**

Defendants American Multi-Cinema, Inc. and AMC Entertainment Holdings, Inc. d/b/a AMC Theatres (together, "AMC") own and operate movie theaters across

---

[1] None of the moving Defendants is currently seeking to enforce a stand-alone class-action waiver outside of the context of an arbitration agreement. But as detailed below, each arbitration provision precludes participation in a class action and requires individualized arbitration. Defendants reserve their right to assert contractual stand-alone class-action waivers at an appropriate juncture.

the country as AMC Theatres. Plaintiffs Melanie Newman and Nicholas Cooper are former AMC employees. Both Newman and Cooper signed an Agreement to Arbitrate with AMC prior to beginning their employment, which provided that any claims relating to their employment would be subject to individual, non-class arbitration. Decl. of Natalie Martinez ¶¶ 5–6, *Newman v. American Multi-Cinema, Inc.*, No. 23-cv-2358 (D. Kan. Nov. 21, 2023), ECF No. 21-1 ("*Newman* Decl."); Decl. of Natalie Martinez ¶¶ 5–6, *Cooper v. American Multi-Cinema, Inc.*, No. 23-cv-2434 (D. Kan. Nov. 27, 2023), ECF No. 14-1 ("*Cooper* Decl.").[2]

On September 8, 2021, prior to beginning her employment with AMC, Newman signed a form titled "Agreement to Arbitrate" ("AMC Arbitration Agreement"). *See Newman* Decl. ¶ 6 & Ex. A-1. On September 29, 2022, prior to beginning his employment, Cooper signed an identical Agreement to Arbitrate. *Cooper* Decl. ¶ 6 & Ex. A-1. The AMC Arbitration Agreement provides in relevant part:

> [Y]ou and AMC agree to submit any claims or disputes relating to your employment or the termination of your employment to final and binding arbitration before a neutral, independent third party (an arbitrator), pursuant to the *Federal Arbitration Act*, and not to any court. Both you and AMC are giving up any right to have a judge or jury trial with regard to these claims, other than as specifically stated in this Agreement.
>
> **What claims are subject to mandatory arbitration?**
>
> The disputes to be arbitrated under this Agreement include, but are not limited to, claims of discrimination, harassment, hostile work environment, retaliation, wrongful discharge/termination, breach of (express or implied) contract, tort claims, claims related to pay or benefits (including any leave of absence), claims related to work hours or work time, and any other claims or disputes relating to your employment or the termination of your employment . . . and where

---

[2] These declarations, which were filed in the transferor courts, have been submitted again with this motion.

> permitted by law, all state and local laws, regulations, and ordinances prohibiting discrimination, and any other common law claim or federal, state, or other governmental statute, regulation, or ordinance (the "Claims").

*See, e.g.*, *Newman* Decl. Ex. A-1 at 1. The AMC Arbitration Agreement excludes from coverage complaints filed with the Equal Employment Opportunity Commission, National Labor Relations Board, Department of Labor, or claims filed under the Sarbanes-Oxley Act, for workers' compensation or unemployment benefits, or claims for equitable relief. *Id.*

The AMC Arbitration Agreement also includes a class action waiver, stating: "All Claims will be arbitrated on an individual basis and may not be heard or considered on a class, collective, representative, or other basis involving the combination of your or AMC's Claims with the Claims of another party." *Id.* Additionally, "the arbitrator, and not any federal, state, or local court, shall have exclusive authority to resolve any dispute relating to the formation, enforceability, applicability, or interpretation of this Agreement, including without limitation any claim that this Agreement is void or voidable." *Id.* The AMC Arbitration Agreement explicitly "survive[s] termination of the employment relationship and shall apply to all Claims, regardless of whether they arise or are asserted during employment or after termination of employment." *Id.* at 2.

### 2. Cadence Bank

Cadence Bank is a regional banking franchise across the South and Texas that offers a variety of financial services, including banking services to individual

consumers. In October 2021, Cadence Bancorporation merged with BancorpSouth Bank and was renamed Cadence Bank.[3]

Cadence Bank's services are governed by contract, which customers acknowledge and accept as part of opening their accounts and which includes mandatory arbitration of claims and a class action waiver.[4] The claims of Plaintiffs Calvin Adams, Tammy Pratt, and Latrice Triplett (collectively, the "Cadence Plaintiffs") arise out of accounts opened with either BancorpSouth Bank or Cadence Bank. Each agreed to arbitrate their claims against Cadence Bank and waived any right to participate in a class action.[5]

Each Cadence Plaintiff executed an "Account Agreement" as part of opening an account. Decl. of Brianna Sparks ("Sparks Decl.") ¶¶ 3, 5, 7. By signing and executing their respective Account Agreements, each Cadence Plaintiff agreed to the applicable Terms and Conditions and acknowledged receipt thereof. *Id.* Exs. A at 1,

---

[3] *See* Federal Deposit Insurance Corporation, BancorpSouth Bank Form 8-K Current Report (filed Oct. 28, 2021), https://bit.ly/3wQfn7R. Cadence Bank asks this Court to take judicial notice of the preceding publicly filed Form 8-K. *See Genzyme Corp. v. F.D.I.C.*, 657 F. Supp. 2d 281, 284 (D. Mass. 2009) (taking judicial notice of public filings with a federal agency).

[4] The agreements between Cadence Bank and its customers mandate pre-filing efforts to resolve any disputes and allow either side to elect for certain disputes to proceed in small claims court in lieu of arbitration. *See* Sparks Decl. Exs. B at 3, D at 3, F at 3. By moving to compel arbitration, Cadence Bank does not waive and expressly reserves all rights contained in its agreements. Other Arbitration Defendants have similar provisions in their agreements and similarly do not waive, and expressly reserve, their rights under their respective agreements.

[5] Plaintiffs Chris and Taylor Marsh—the remaining Plaintiffs with claims against Cadence Bank—do not have agreements to arbitrate with Cadence Bank. Their claims are subject to dismissal pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), as will be set forth in Defendants' forthcoming motion to dismiss.

5

C at 1, E at 1. On August 13, 2021, Triplett signed and executed an Account Agreement. *Id.* Ex. A at 1. Pratt signed and executed an Account Agreement on November 22, 2021. *Id.* Ex. C at 1. Finally, Adams signed and executed an Account Agreement on August 3, 2023. *Id.* Ex. E at 1.

The relevant dispute resolution provisions contained in the Terms and Conditions that each Plaintiff agreed to by signing and executing their Account Agreements are identical (the "Cadence T&Cs"). *See* Sparks Decl. Exs. B at 1, 3–4, D at 1, 3–4, F at 1, 3–4. The top of the first page of the Cadence T&Cs states prominently in capitalized text:

> NOTICE OF SETTLEMENT CONFERENCE, MEDIATION, ARBITRATION, WAIVER OF JURY TRIAL, AND WAIVER OF CLASS ACTION: THIS AGREEMENT CONTAINS PROVISIONS FOR SETTLEMENT CONFERENCE, MEDIATION, ARBITRATION, WAIVER OF JURY TRIAL, AND WAIVER OF CLASS ACTION . . . . BY OPENING YOUR ACCOUNT OR OTHERWISE CONTINUING TO USE YOUR ACCOUNT FOLLOWING RECEIPT OF THESE TERMS AND CONDITIONS, YOU AGREE TO SUCH TERMS. FOR CLAIMS SUBJECT TO BINDING ARBITRATION, NEITHER YOU NOR WE WILL HAVE THE RIGHT TO PURSUE SUCH CLAIMS IN COURT OR HAVE A JURY DECIDE SUCH CLAIMS. ADDITIONALLY, YOU WILL NOT HAVE THE RIGHT TO BRING OR OTHERWISE PARTICIPATE IN ANY CLASS ACTION OR SIMILAR PROCEEDING EITHER IN COURT OR IN ARBITRATION.

*Id.* Exs. B at 1, D at 1, F at 1. The Cadence T&Cs provide for mandatory arbitration, beginning in bolded, italicized text:

> ***Binding Arbitration.*** If a settlement conference or mediation is unsuccessful, you agree that any dispute, claim, or controversy of any kind between you and the Company (whether it arises out of or relates to this Agreement, or to your Account, or any transactions involving your Account, or any service or product related to your Account or the business dealings between us and you) either you or the Company can choose to have that dispute resolved by binding arbitration. . . .

You and we agree, upon written demand made by you or us, to submit to binding arbitration all disputes, controversies, and claims, whether based on contract, fraud, tort, intentional tort, statute, regulation, constitution, common law, equity, or any other legal basis or theory, and whether pre-existing, present, or future, that arise out of or relate to: (a) this Agreement, your Account, any transaction involving your Account, any service or product related to your Account, or any advertisements, promotions, representations or oral or written statements related to this Agreement or your Account; (b) the relationships that result from this Agreement (including, to the fullest extent permitted by applicable law, relationships with third parties who are not parties to this Agreement or this arbitration provision); (c) your relationship with us that relates to this Agreement or any other agreement or relationship or dealings that you have with us that is not also subject to a different agreement to arbitrate; (d) the dealings between the parties; or (e) the validity, interpretation, scope or enforceability of this Agreement or the interpretation or scope of the Arbitration Clause. . . .

*Id.* Exs. B at 3, D at 3, F at 3 (the "Cadence Arbitration Agreement"). Finally, the

Cadence T&Cs also clearly state in bolded, italicized text followed by capitalized text:

***Class Action Waiver.*** TO THE EXTENT PERMITTED BY APPLICABLE LAW, YOU HEREBY AGREE THAT ANY CLAIM, LITIGATION OR ARBITRATION ARISING OUT OF ISSUES RELATING TO YOUR ACCOUNT OR ANY OTHER DISPUTE OR CONTROVERSY BETWEEN YOU AND US REGARDING YOUR ACCOUNT WILL NOT PROCEED AS PART OF A CLASS ACTION AND YOU AND THE COMPANY HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY AND IRRECOVABLY WAIVE ANY RIGHT TO PROCEED IN ANY CLASS ACTION OR SERVE AS A CLASS REPRESENTATIVE.

*Id.* Exs. B at 4, D at 4, F at 4.

### 3.    Franklin Mint Federal Credit Union

Franklin Mint Federal Credit Union ("FMFCU") is a credit union headquartered in Delaware County, Pennsylvania. FMFCU delivers financial products and services to over 141,000 members, including for Plaintiffs Tanya Bronson, Tina Thompson, Michael Harris, and Steven Brown (collectively, the

"FMFCU Plaintiffs"). In July and August 2023, FMFCU was named in four lawsuits by the FMFCU Plaintiffs due to injuries they claim they suffered following the MOVEit Data Incident. Their cases were later transferred to this MDL.

The terms and conditions of the FMFCU Plaintiffs' relationship with FMFCU are governed by the FMFCU Agreements and Disclosures to which the FMFCU Plaintiffs agreed to be bound at the time they entered into a relationship with FMFCU. As described in further detail below, those Agreements and Disclosures require that their claims be brought individually and in arbitration.

### a.      Plaintiffs Bronson and Thompson

Bronson and Thompson were former members of Wawa Employees Credit Union ("WECU") before they became members of FMFCU in late May 2022, after FMFCU and WECU merged. *See* Decl. of Dean Walters ¶ 2.[6] Before the merger became effective, on or about April 16, 2022, FMFCU mailed to Bronson and Thompson, as well as to other WECU members, a letter advising them of the merger and the changes to the terms of their credit union relationship effective upon the date of merger (the "WECU Notice"). *Id.* ¶¶ 2, 3. The WECU Notice was mailed to the address on file for both Bronson and Thompson. *Id.* ¶ 3. FMFCU did not receive a notice that the WECU Notices sent to Bronson or Thompson had been bounced or otherwise returned as undeliverable. *Id.*

---

[6] For any redacted FMFCU exhibits referenced in the Walters Declaration or herein, FMFCU will supply unredacted copies at the request of any FMFCU Plaintiff or the Court.

The WECU Notice informed Bronson and Thompson that the WECU/FMFCU merger would become effective on May 31, 2022. *Id.* ¶ 4. The WECU Notice also advised Bronson and Thompson that they and other WECU members would be subject to a new Membership and Account Agreement and Consumer Disclosures ("FMFCU Account Agreement"), which would also become effective on May 31, 2022. *Id.* The FMFCU Account Agreement was enclosed with the WECU Notice and included, as a relevant to this motion, a copy of the November 2020 Agreements and Disclosures ("November 2020 A&Ds") in effect at the time, which provided for mandatory arbitration and waiver of class action claims. *Id.* ¶¶ 4 & 5. The WECU Notice finally stated that the November 2020 A&Ds would become binding on former WECU members if they did not follow the opt out instructions provided in the WECU Notice. *Id.* ¶¶ 5 & 6. Specifically, in order for an individual to opt out, he or she had to provide written notice to FMFCU before May 20, 2022, stating that he or she did not agree to be bound to the arbitration provision in the November 2020 A&Ds. *Id.*

According to FMFCU's records of opt outs, neither Bronson nor Thompson wrote to opt out of mandatory arbitration and therefore "agree[d] to resolve all disputes or claims arising out of or relating to [their] membership by arbitration on an individual basis." *Id.* ¶ 6 (quoting WECU Notice). Indeed, FMFCU mailed Bronson and Thompson a second letter to the same addresses on file welcoming them to the "FMFCU Family" and providing them their new FMFCU member numbers. *Id.* ¶ 7. Neither Bronson nor Thompson avers that she opted out of the agreement to arbitrate or the class waiver.

Accordingly, FMFCU's relationship with Bronson and Thompson is governed, as relevant here, by the November 2020 A&Ds. *See id.* Ex. B ("November 2020 A&Ds"). Bronson and Thompson continue to be FMFCU members as of the date of this motion. *Id.* ¶ 8.

### b.    Plaintiff Harris

On or about October 28, 2021, Harris opened two accounts at FMFCU's University City branch after filling out a paper application. Walters Decl. ¶¶ 9–10.

As was standard practice at the time, Haris was provided with a copy of the Agreements and Disclosures in effect in October 2021 as part of his paper application. *Id.* ¶ 11. In October 2021, the November 2020 A&Ds were in effect. *Id.*; *see also id.* Ex. B.

Harris warranted and acknowledged that he received a copy of the November 2020 A&Ds as part of his application by filling out and signing his application on or about October 28, 2021. *Id.* ¶ 12. He further warranted that he would "agree to be bound by the terms and conditions found within [his] application for membership and to the bylaws, rules and regulations of Franklin Mint Federal Credit Union in effect from time to time," and "further acknowledge[d] receiving a copy of the [November 2020] Agreements and Disclosures related to [his] Account(s) and . . . agree[d] to be bound by the terms and conditions found therein." *Id.* (quoting Walters Decl. Ex. D ("Person Application")). Harris signed "Signature Cards" for the two accounts on the same date. *Id.* ¶ 10 (citing Walters Decl. Ex. E ("Signature Cards")).

FMFCU's relationship with Harris is therefore governed in relevant part by the November 2020 A&Ds. As of the date of this motion, Harris continues to be an FMFCU member. *Id.* ¶ 13.

### c.    Plaintiff Brown

On or about April 13, 2023, Brown became a FMFCU member after he applied and was approved for a loan under FMFCU's "Upgrade Loan" program online. Walters Decl. ¶ 14; *see also id.* Ex. F ("Loan Agreement and Promissory Note").[7]

To submit his application electronically, Brown had to complete several steps. One of those steps was reviewing and agreeing to FMFCU's "eConsent Letter," which provided that, "[t]o use electronic signatures and receive documents electronically in connection with your use of this platform, you must read and consent to the terms outlined in this document, which require your ability to access and retain electronic Documents." *Id.* ¶ 16 (quoting *id.* Ex. G ("eConsent Letter")).

After acknowledging the eConsent Letter, FMFCU provided Brown with other documents electronically that he was required to review and acknowledge to submit his application. *Id.* ¶ 17. Specifically, Brown was provided with an electronic copy of the November 2020 A&Ds that were in effect at the time. *Id.* Brown was later required to review and "acknowledge" a webpage titled "Membership Authorization," which required Brown to warrant and acknowledge (via clicking past the Membership Authorization webpage) that he (a) "hereby appl[ied] for membership in Franklin Mint Federal Credit Union" and (b) "acknowledge[d] receipt of and agree[d] to the

---

[7] The "Upgrade Loan" application process is explained in detail in paragraphs 15 through 19 of the Walters Declaration.

terms and conditions of the below agreements or disclosures," including the "Account Agreements and Disclosures/Privacy Notice," i.e., the November 2020 A&Ds. *Id.* ¶ 18 (quoting *id.* Ex. H ("Membership Authorization")). Brown digitally signed the Membership Authorization on October 11, 2023. *Id.* Brown successfully completed his application and was approved for same after completing the online application process described in part above. *Id.*

Accordingly, FMFCU's relationship with Brown is governed in relevant part by the November 2020 A&Ds. Brown continues to be an FMFCU member as of the date of this motion. *Id.* ¶ 20.

### d.    The Relevant FMFCU Arbitration and Class Waiver Provisions

As outlined above, the FMFCU Plaintiffs are subject to the November 2020 A&Ds. The November 2020 A&Ds provide, in all capital letters, a notice that appears as follows in paragraph 3 on the first page of the A&Ds:

> YOU UNDERSTAND THAT THIS AGREEMENT CONTAINS AN AGREEMENT BY BOTH PARTIES TO RESOLVE DISPUTES THAT ARISE BY AN INDIVIDUAL ARBITRATION PROCEEDING HELD IN ACCORDANCE WITH THE ARBITRATION PROVISION, AND THAT THE PARTIES HAVE AGREED NOT TO RESOLVE SUCH DISPUTES AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS ACTION PROCEEDING.

Walters Decl. Ex. B at 1. With respect to mandatory arbitration, the November 2020 A&Ds further provide as follows (the "FMFCU Arbitration Provision"):

> **DISPUTE RESOLUTION-MANDATORY ARBITRATION. READ THIS PROVISION CAREFULLY AS IT WILL HAVE A SUBSTANTIAL IMPACT ON HOW LEGAL CLAIMS YOU AND WE HAVE AGAINST EACH OTHER WILL BE RESOLVED.**

12

Except as expressly provided herein, any controversy, dispute or claim ("Claim") arising out of or relating to this Agreement, Your Account, and/or the relationships of the parties hereto shall be resolved or otherwise settled by binding arbitration administered by the American Arbitration Association ("AAA"), under the AAA Consumer Rules in effect at the time the Claim is filed. Such arbitration shall take place in Delaware County, Pennsylvania. The arbitrator's decision shall be final, binding and non-appealable.

***

To the extent a court has jurisdiction as explicitly agreed to in this Section, the court with exclusive jurisdiction shall be the Court of Common Pleas located in Delaware County, Pennsylvania. **THE PARTIES UNDERSTAND THAT THEY WOULD HAVE HAD THE RIGHT TO LITIGATE THROUGH A COURT AND TO HAVE A JUDGE OR JURY DECIDE THEIR CASE. HOWEVER, THEY UNDERSTAND AND CHOOSE TO HAVE ANY CLAIMS DECIDED THROUGH AN ARBITRATION. IF THE PARTIES PURSUANT TO AN EXCEPTION EXPRESSLY PROVIDED HEREIN PROCEED TO LITIGATION, THE PARTIES EXPRESSLY AGREE TO WAIVE THE RIGHT TO TRIAL BY JURY.**

*Id.* at 3 (emphasis in original).

With respect to class claims, the November 2020 A&Ds state as follows (the "FMFCU Class Action Waiver Provision"):

**CLASS ACTION WAIVER.** Any Claim against [FMFCU] must be brought in the respective party's individual capacity and not as a plaintiff or class member in any purported class, collective representative, multiple plaintiffs or similar proceeding ("Class Action"). The parties expressly waive any ability to maintain a Class Action in any forum. The arbitrator shall not have authority to combine or aggregate similar claims or conduct any Class Action, nor make an award to any person or entity not a party to the arbitration. Any claim that all or part of this Class Action Waiver is unenforceable, unconscionable, void, or voidable may be determined only by a court of competent jurisdiction and not by an arbitrator. The parties agree that the courts with exclusive jurisdiction shall be the Court of Common Pleas located in Delaware County, Pennsylvania. **THE PARTIES UNDERSTAND THAT THEY WOULD HAVE HAD THE RIGHT**

13

**TO BE A PARTY TO A CLASS OR REPRESENTATIVE ACTION. HOWEVER, THEY UNDERSTAND AND CHOOSE TO HAVE ANY CLAIMS DECIDED INDIVIDUALLY THROUGH AN ARBITRATION.**

*Id.* (emphasis in original).

### 4.      MasTec, Inc.

Defendant MasTec, Inc. ("MasTec") is a civil engineering and construction company based out of Coral Gables, Florida, that provides building, installation, and maintenance for communications, energy, utility, and other infrastructure sector customers. Plaintiff Joseph Liptock is a former employee of MasTec who signed a Mutual Agreement to Arbitrate with MasTec, which provided that any claims relating to his employment would be subject to individual, non-class arbitration. Decl. of April Moore ¶ 6.

Specifically, Liptock worked at MasTec from March 21, 2022 through September 8, 2023. Moore Decl. ¶ 5. On March 17, 2022, prior to his employment and through the onboarding process as a new employee, Liptock electronically signed a form titled "Mutual Arbitration Agreement" ("MasTec Arbitration Agreement") (attached as Moore Decl. Ex. A-1). *Id.* ¶ 6. The MasTec Arbitration Agreement provides in relevant part:

> This Mutual Arbitration Agreement ("Agreement") is between Employee and MasTec, Inc., including all MasTec, Inc. subsidiaries (the "Company"). The parties agree that the Federal Arbitration Act, 9 U.S.C. § 1 et seq. governs this Agreement. The parties also understand and agree that the Company is engaged in transactions involving interstate commerce, and that this Agreement evidences a transaction involving interstate commerce. **Except as it otherwise provides, this Agreement is intended to apply to the resolution of disputes that otherwise would be resolved in a court of law, and therefore this Agreement requires all such disputes be resolved only by a**

14

> **single arbitrator through final and binding arbitration and not by way of court or jury trial.**

*Id.* Ex. A-1 at 1 (emphasis in original). The MasTec Arbitration Agreement "applies to any claims or disputes that may arise between Employee and Company, including without limitation any dispute arising out of, or related to, Employee's application and selection for employment, employment and/or separation of employment with the Company." *Id.*

The MasTec Arbitration Agreement also includes a class action waiver, stating: "The Company and Employee agree to bring any claim on an individual basis only. Accordingly, [ ] the Company and Employee waive **any right for any dispute to be brought, heard or arbitrated as a class and/or collective action and the Arbitrator will have no authority to hear or preside over any such claim ("Class Action Waiver").**" *Id.* Ex. A-1 at 3 (emphasis in original). Additionally, "the Arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute relating to the validity, applicability, enforceability, unconscionability or waiver of this Agreement, including, but not limited to any claim that all or any part of this Agreement is void or voidable; however, the preceding sentence does not apply to the Class Action Waiver in Section 5." *Id.* Ex. A-1 at 1. The MasTec Arbitration Agreement explicitly "survive[s] the termination of [the] Employee's employment and the expiration of any benefit." *Id.* Ex. A-1 at 4.

### 5.    MidFirst Bank and Midland Financial Co.

Seven Plaintiffs (the "MidFirst Plaintiffs") have brought claims against either MidFirst Bank ("MidFirst") and/or its parent company, Midland Financial Co.

15

("Midland"). Decl. of Derek Caswell ¶ 3. Midland is an Oklahoma corporation, and both MidFirst and Midland have their principal places of business in Oklahoma. *Id.* ¶¶ 6–7. MidFirst provides financial services under its own name and through its divisions, including its Vio Bank division, and previously did so under its Monifi division which was discontinued as a brand in September 2022. *Id.* ¶ 6. Plaintiffs are current MidFirst account holders. *Id.* ¶¶ 52, 57, 61, 65, 69, 73.

The relationship between MidFirst and each MidFirst customer, including all MidFirst Plaintiffs, is governed by an "Account Agreement and Disclosure" ("AAD"). At all times since their enrollment as banking customers through MidFirst Bank (including its Vio Bank and/or Monifi divisions), all MidFirst Plaintiffs have been bound by an AAD with arbitration and class action waiver provisions. *See* Caswell Decl. Ex. E (Sept. 2022 MidFirst AAD); *id.* Ex. F (Oct. 2018 MidFirst AAD); *id.* Ex. H (March 2022 Vio Bank AAD); *id.* Ex. I (May 2020 Vio Bank AAD); Ex. J (May 2021 Monifi AAD). MidFirst Plaintiffs are subject to binding AADs with arbitration and class action waiver provisions.[8]

Each of the MidFirst Plaintiffs' AADs includes an arbitration provision similarly stated as follows:

> **ARBITRATION PROVISION. PLEASE REVIEW AND READ THIS ARBITRATION PROVISION CAREFULLY. IF YOU DO NOT REJECT THIS ARBITRATION PROVISION IN ACCORDANCE WITH [the first subparagraph] BELOW, IT WILL**

---

[8] These arbitration and class action waivers provisions are very similar to one another with minor procedural changes made over time, and the inclusion of an even broader definition of "Covered Claims" in the September 2022 MidFirst AAD. The arbitration and class action waiver provisions of all relevant MidFirst Bank, Vio Bank, and Monifi AADs are presented and compared at length in the Caswell Declaration. *See* Caswell Decl. ¶¶ 21–48.

16

> **BE PART OF THIS AGREEMENT AND WILL HAVE A SUBSTANTIAL IMPACT ON THE WAY YOU OR WE WILL RESOLVE ANY CLAIM THAT YOU OR WE HAVE AGAINST EACH OTHER, NOW OR IN THE FUTURE. Arbitration is the process for settling disputes where the determination is made by an impartial third party. Arbitration binds the parties to a type of resolution outside of the courts.**

Caswell Decl. Ex. E ¶ 28 (Sept. 2022 MidFirst AAD) (emphasis in original); *id.* Ex. F ¶ 28 (Oct. 2018 MidFirst AAD) (same); *id.* Ex. H ¶ 28 (March 2022 Vio Bank AAD) (same); *id.* Ex. I ¶ 28 (May 2020 Vio Bank AAD) (same); *id.* Ex. J ¶ 7.h (May 2021 Monifi AAD) (same).

Each arbitration provision in the MidFirst Plaintiffs' AADs also includes the following:

*First*, an "opt-out" clause that expressly allowed Plaintiffs to reject the AAD's arbitration provision: "**If you do not want this Arbitration Provision to apply, you may reject it by mailing us a written rejection notice [. . .] A rejection notice is effective only if it is signed by you (including both or all of the Account owners, if applicable), and such notice is received within thirty (30) days after the day you open your Account.**" Caswell Decl. Ex. E, ¶ 28(a) (Sept. 2022 MidFirst AAD) (emphasis in original); *id.* Ex. F, ¶ 28(a) (Oct. 2018 MidFirst AAD (same); *id.* Ex. H ¶ 28(a) (March 2022 Vio Bank AAD) (same); *id.* Ex. I ¶ 28(a) (May 2020 Vio Bank AAD) (same); *id.* Ex. J ¶ 7.h.1 (May 2021 Monifi AAD).

*Second*, a clause specifying that the parties subject to arbitration include "MidFirst Bank," "any *parent*, subsidiary or affiliate of MidFirst Bank," and "any other person or company that provides any services in connection with this Agreement or your Account if you assert a Claim against such other person or

17

company at the same time you assert a Claim against" MidFirst Bank or any affiliated entity. Caswell Decl. Ex. E ¶ 28(b) (Sept. 2022 MidFirst AAD) (emphasis added); Ex. F ¶ 28(b) (Oct. 2018 MidFirst AAD) (same); *id.* Ex. H, ¶ 28(b) (March 2022 Vio Bank AAD) (same); *id.* Ex. I ¶ 28(b) (May 2020 MidFirst AAD) (same); *id.* Ex. J ¶ 7.h.2 (May 2021 Monifi AAD) (same).

*Third*, a clause defining "Covered Claims" to include, *inter alia*, "any claim, dispute or controversy between you and us [MidFirst Bank] that in any way arises from or relates to this Agreement, your Account, [or] *any products or services offered by us*." Caswell Decl. Ex. E ¶ 28(c) (Sept. 2022 MidFirst AAD) (emphasis added)[9]; *id.* Ex. F ¶ 28(c) (Oct. 2018 MidFirst AAD) (same); *id.* Ex. H ¶ 28(c) (March 2022 Vio Bank AAD) (same); *id.* Ex. I ¶ 28(c) (May 2020 Vio Bank AAD) (same); *id.* Ex. J ¶ 7.h.3 (May 2021 Monifi AAD) (same).

*Fourth*, a class action waiver, stating that, "**FOR CLAIMS SUBJECT TO ARBITRATION: (1) YOU MAY NOT PARTICIPATE IN A CLASS ACTION IN COURT OR IN A CLASS-WIDE ARBITRATION, EITHER AS A PLAINTIFF, CLASS REPRESENTATIVE OR CLASS MEMBER . . .**" Caswell Decl. Ex. E ¶ 28(g) (Sept. 2022 MidFirst AAD) (emphasis in original); *id.* Ex. F ¶ 28(g) (Oct. 2018 MidFirst AAD) (same); *id.* Ex. H ¶ 28(g) (March 2022 Vio Bank AAD) (same); *id.* Ex.

---

[9] As referenced above, the September 2022 MidFirst AAD expanded the definition of "Covered Claims" to also include "any dispute about the validity, enforceability, coverage or scope of this Arbitration Provision or any part thereof (including, without limitation, subparagraph (g), captioned 'No Jury Trial or Class Claims' (the 'Class Action Waiver')," and defines the term "Claim" to include "any dispute about the validity, enforceability, coverage or scope" of the Arbitration Provision. Caswell Decl. Ex. E ¶ 28(c).

18

I ¶ 28(g) (May 2020 Vio Bank AAD) (same); *id.* Ex. J ¶ 7.h.7 (May 2021 Monifi AAD) (no emphasis).

*Finally*, a clause specifying that the arbitration provision "involves interstate commerce and is governed by the FAA and not by any state arbitration law." Caswell Decl. Ex. E ¶ 28(i) (Sept. 2022 MidFirst AAD); *id.* Ex. F ¶ 28(i) (Oct. 2018 MidFirst AAD); *id.* Ex. H ¶ 28(i) (March 2022 Vio Bank AAD); *id.* Ex. I ¶ 28(i) (May 2020 Vio Bank AAD); *id.* Ex. J ¶ 7.h.9 (May 2021 Monifi AAD).

Each MidFirst Plaintiff agreed to the arbitration provision in one or more of the AADs (with a more recent AAD superseding previous AADs in some cases). How a MidFirst Plaintiff initially consented to arbitrate as part of the process of opening their respective MidFirst, Vio Bank, or Monifi accounts varies slightly based on that customer's account type and account history. A brief description for each MidFirst Plaintiff is set forth below:

*First,* several MidFirst Plaintiffs signed up for their accounts through the MidFirst or Vio Bank online sign-up process. As part of these sign-up processes, each customer would have been presented with and required to click through a page entitled "Accept Disclosures," stating that the customer "must read and agree to," *inter alia,* "the Account Agreement and Disclosure," with those words hyperlinked to the applicable AAD. Caswell Decl. ¶¶ 9–13. In particular:

- Strucke opened a Vio Bank account through the online sign-up process in August 2021, and, as part of completing that process, agreed to the May 2020 Vio Bank AAD. *Id.* ¶¶ 66–69.

- Strother opened four Vio Bank accounts through the online sign-up process in August 2021, and opened two additional Vio Bank accounts through the online sign-up process in January 2023 and February 2023, and, as part of

19

completing those processes, agreed first to the May 2020 Vio Bank AAD, and subsequently to the superseding March 2022 Vio Bank AAD. *Id.* ¶¶ 62–65.

- Dudurkaewa opened two MidFirst accounts through the online sign-up process, in December 2020 and in April 2023, and, as part of completing those processes, agreed first to the July 2020 MidFirst AAD and subsequently to the superseding September 2022 MidFirst AAD. *Id.* ¶¶ 49–52.

- Rubenstein opened two Vio Bank accounts through the online sign-up process, in June 2020 and in November 2022, and, as part of completing those processes, agreed first to the May 2020 Vio Bank AAD and subsequently to the superseding March 2022 Vio Bank AAD. *Id.* ¶¶ 58–61.

***Second,*** De Medicis opened two Monifi accounts through the online sign-up process in June 2021. Caswell Decl. ¶ 70. As part of this sign-up process, De Medicis would have been presented with a mobile page entitled "Disclosures," requiring him to tap and place a check mark beside, *inter alia*, "I have read and agree to the Monifi Terms and Conditions & Privacy Notice," with that phrase hyperlinked to the May 2021 Monifi AAD. *Id.* ¶¶ 14–16. In September 2022, when the Monifi brand was discontinued, De Medicis did not open a new MidFirst account and his Monifi account was subsequently closed. *Id.* ¶ 73.[10]

***Finally,*** Linman and her child L.L. opened one joint MidFirst account in person in May 2019. Caswell Decl. ¶¶ 53–57. When opening this account, Linman and L.L. received a copy of the October 2018 MidFirst AAD, and signed a signature card including an agreement to the AAD and an acknowledgment "that I have

---

[10] *See also* Caswell Decl. ¶ 48 ("[T]he May 2021 Monifi AAD provides that 'This Arbitration Provision shall survive the repayment of all amounts owed under this Agreement, the closing of your Account, any legal proceeding and any bankruptcy to the extent consistent with applicable bankruptcy law.'").

received a copy of MidFirst Bank's Account Agreement and Disclosures." *Id.* ¶¶ 17–20 & Ex. K.

Except for De Medicis, each of the MidFirst Plaintiffs still actively maintains an account with MidFirst or Vio Bank. Caswell Decl. ¶¶ 52, 57, 61, 65, 69, 73. None of the MidFirst Plaintiffs provided written notice rejecting the arbitration provision within the AADs' thirty day opt-out period. *Id.* ¶ 74.

### 6.   Pathward, N.A.

Defendant Pathward, N.A. ("Pathward") provides banking and financial services to both individual and corporate clients. Most relevant here, Pathward is the issuer of the H&R Block Prepaid Emerald Mastercard ("Emerald Card"), a reloadable prepaid debit card. Decl. of Nathan Rigney ¶ 4.

The four plaintiffs asserting claims against Pathward in these cases—Tracy Alcott, Michelle Cantrell, Melissa Fields, and Jacob Kent (collectively, "Pathward Plaintiffs")—are all Emerald Card holders (*id.* ¶¶ 5–6) asserting claims against Pathward on that basis. In connection with their Emerald Cards, they each agreed in January 2023 to the Online and Mobile Banking Agreement, including its arbitration provision. *Id.* ¶¶ 7–9 & Ex. 1.[11]

***The Pathward Plaintiffs' acceptance of the Online and Mobile Banking Agreement.*** One of the four plaintiffs accepted the Online and Mobile Banking

---

[11] The Pathward Plaintiffs also agreed to arbitrate on numerous other occasions, including in prior years that they had used the online or mobile services as well as when they applied for and obtained their Emerald Cards. Rigney Decl. ¶ 9 n.1. For purposes of this motion, Pathward focuses on the most recent agreement related to the Emerald Card that the Pathward Plaintiffs accepted prior to filing their lawsuits.

Agreement on a website; the other three did so on their Android smartphones through a mobile application. Specifically, after logging in to their existing online accounts in January 2023 (*id.* ¶¶ 11–14 & Exs. 2–3), the Pathward Plaintiffs were presented with similar screens designed for the website and mobile application, respectively, and each clicked or pressed a check box next to an acknowledgment stating: "I agree to Online Banking Agreement" and then clicked or pressed a green button marked "Next" in white letters to accept that Agreement (*id.* ¶¶ 15–25 & Exs. 4–6). Each Pathward Plaintiff could view the Online and Mobile Banking Agreement by clicking the green, underlined words, "Online Banking Agreement"—immediately next to the check box—that are a hyperlink that takes the user to a page containing the complete document. *Id.* ¶ 16. The Pathward Plaintiffs could not proceed past the described screen to use the online services without clicking or pressing the check box before clicking the green "Next" button. *Id.* ¶ 25.

**The Pathward Plaintiffs did not opt out of arbitration.** Notably, the Online and Mobile Banking Agreement allowed the Pathward Plaintiffs to opt out of the arbitration provision within 30 days after accepting the Agreement by filling out an online form or mailing a simple letter. *Id.* Ex. 1 § 6.1; *see also* Decl. of Bobbie Crew ¶ 5.

None of the Pathward Plaintiffs did so. Crew Decl. ¶ 5. Accordingly, they are all bound by the Online and Mobile Banking Agreement, including its arbitration provision.

22

***The terms of the Pathward Plaintiffs' arbitration agreements.*** The Online and Mobile Banking Agreement informed the Pathward Plaintiffs that it relates to products and services provided to them by "Pathward®, National Association" and that it includes "**a binding arbitration agreement in Section 6 that requires resolution of disputes by individual arbitration rather than by jury trials or class actions**." Rigney Decl. Ex. 1 § 1 (boldface in original).

The arbitration agreement itself requires arbitration of "all disputes and claims between you and the Covered Parties," including Pathward. *Id.* § 6.1. The agreement calls for arbitration conducted by the American Arbitration Association under its Consumer Arbitration Rules. *Id.* § 6.3. The agreement requires arbitration on an individual basis and expressly prohibits class actions, representative claims, and joint and consolidated proceedings. *Id.* § 6.4. It further includes a provision that "any relief" awarded by the arbitrator "must be individualized to you and will not affect any other client." *Id.*

Finally, the arbitration agreement provides that it "shall be governed by, and interpreted, construed, and enforced in accordance with, the Federal Arbitration Act and other applicable federal law." *Id.* § 6.7.

### B.    Plaintiffs filed putative class actions notwithstanding their agreements to pursue individualized arbitration.

Despite agreeing to arbitrate their claims against the relevant Arbitration Defendants, Plaintiffs filed suit against them, asserting a variety of statutory, tort, and contract claims relating to the data incident involving Progress and its MOVEit product. Those cases have been consolidated into this MDL. (A chart summarizing

23

Plaintiffs and their respective underlying complaints is attached as an appendix to this brief.)

## ARGUMENT

**I.      The FAA Requires Enforcement of Plaintiffs' Arbitration Agreements.**

The FAA governs any arbitration agreement that is "written" and contained in a contract "evidencing a transaction involving commerce." 9 U.S.C. § 2. Here, both criteria are met: (i) the arbitration agreements are in writing, and (ii) each contract involves interstate commerce. *See* pages 2–23, *supra*. In addition, many of the arbitration provisions expressly state that they are governed by the FAA.[12]

The FAA provides that arbitration provisions "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. As the Supreme Court has explained, "[t]he overarching purpose of the FAA . . . is to ensure the enforcement of arbitration agreements according to their terms so as to facilitate streamlined proceedings." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011). And this "'liberal federal policy favoring arbitration agreements'" applies "'notwithstanding any state substantive or procedural policies to the contrary.'" *Id.* at 346 (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)). If the parties have a valid agreement to arbitrate and the claims fall within the scope of that agreement, a court must compel arbitration and stay the litigation of those claims. *See* 9 U.S.C. § 3.[13]

---

[12] *E.g.*, *Newman* Decl. Ex. A-1 at 1 (AMC); Sparks Decl. Exs. B at 3, D at 3, F at 3 (Cadence); Walters Decl. Ex. B at 3 (FMFCU); Moore Decl. Ex. A-1 at 1 (MasTec); Caswell Decl. Ex. E ¶ 28(i) (MidFirst); Rigney Decl. Ex. 1 § 6.7 (Pathward).

[13] The fact that these cases are part of a larger MDL or that some cases include claims

24

### A.    Plaintiffs entered into binding arbitration agreements.

Whether a plaintiff entered into an agreement to arbitrate is governed by "ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944 (1995); *Crean v. Morgan Stanley Smith Barney, LLC*, 652 F. Supp. 3d 171, 179 (D. Mass. 2023). As the Supreme Court has underscored, however, the FAA requires that those principles be generally applicable, rather than "singling out" arbitration agreements "for disfavored treatment." *Kindred Nursing Ctrs. Ltd. P'Ship v. Clark*, 581 U.S. 246, 252 (2017); *see also id.* at 254–55 ("A rule selectively finding arbitration contracts invalid because improperly formed fares no better under the [FAA] than a rule selectively refusing to enforce those agreements once properly made.").

Here, each Plaintiff agreed to arbitrate under a process or processes that form valid contracts under the generally applicable law of the relevant states.

### 1.    American Multi-Cinema, Inc. and AMC Entertainment Holdings, Inc.

The AMC Arbitration Agreements provide that "[c]laims subject to this Agreement shall be governed by the laws of the State of Kansas." *See Newman* Decl. Ex. A-1 at 2. Under Kansas law, a valid contract requires offer, acceptance, and consideration. *Austin v. J.C. Penney Corp., Inc.*, 2019 WL 76889, at *4 (D. Kan. Jan.

---

against additional defendants does not affect Plaintiffs' obligation to arbitrate their claims against the Arbitration Defendants. The Supreme Court has held that courts must apply the FAA's mandate to enforce arbitration agreements even if doing so results in piecemeal litigation. *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985); *see also, e.g., In re Jamster Mktg. Litig.*, 2008 WL 4858506, at *4-6 (S.D. Cal. Nov. 10, 2008) (granting motion to compel arbitration as to some plaintiffs in MDL).

2, 2019). In considering offer and acceptance, Kansas courts require mutual intent (a meeting of the minds) as to reasonably defined contractual terms. *See Felling v. Hobby Lobby, Inc.*, 2005 WL 928641, at *3 (D. Kan. Apr. 19, 2005); *Sithon Maritime Co. v. Holiday Mansion*, 177 F.R.D. 504, 506 (D. Kan. 1998) (noting a "meeting of the minds" requires the contract to have "reasonable definiteness" on which such mutual agreement can be based).

Here, offer and acceptance are easily satisfied. Newman and Cooper applied for employment with AMC, AMC presented each with the full AMC Arbitration Agreement, and prior to beginning employment Newman and Cooper voluntarily signed the Agreement. Newman and Cooper's electronic signatures to that Agreement unambiguously manifested their intent to be bound by its terms, and clearly bound them to arbitrate employment-related disputes with AMC, including the claims asserted here. *See In re Syngenta AG Mir162 Corn Litig.*, 2021 WL 3025471, at *11 (D. Kan. May 14, 2021) ("electronic signatures are well-accepted signature methods in a variety of contexts"); *Eagle v. Kansas Couns., Inc.*, 2013 WL 100113, at *4 (D. Kan. Jan. 8, 2013) ("For the purpose of indicating acceptance and approval of [contract terms], electronic/facsimile signatures shall be acceptable.").

Further, the terms of the AMC Arbitration Agreement are sufficiently definite to demonstrate a meeting of the minds. Any reasonable reading of the Agreement makes clear that it concerns all employment-related legal disputes, including tort claims or claims for breach of contract. Thus, the AMC Arbitration Agreement

involves sufficiently defined terms requiring both Newman and Cooper, and AMC, to submit claims that arise between them to binding arbitration.

Consideration also exists here. Newman, Cooper, and AMC mutually agreed that any disputes between them would be subject to arbitration. *See Newman* Decl. Ex. A-1 at 1 ("Both you and AMC are giving up any right to have a judge or jury trial with regard to these claims, other than as specifically stated in this Agreement."); *Cooper* Decl. Ex. A-1 at 1 (same). The parties' *mutual* obligation to arbitrate their claims constitutes sufficient consideration for the Agreement. *See Williams-Jackson v. Innovative Senior Care Home Health of Edmond, LLC*, 727 F. App'x 965, 969 (10th Cir. 2018) ("parties' mutual agreement to arbitrate disputes arising from their employment relationship provides adequate consideration"); *Clutts v. Dillard's, Inc.*, 484 F. Supp. 2d 1222, 1226 n.1 (D. Kan. 2007) (mutual promises to arbitrate constitute sufficient consideration under Kansas law).

### 2.    Cadence Bank

The Cadence Plaintiffs' actions were originally filed in Massachusetts (Triplett and Adams) and Texas (Pratt). Massachusetts choice of law rules apply to Triplett and Adams's claims. *See NPS LLC v. Ambac Assurance Corp.*, 706 F. Supp. 2d 162, 168 (D. Mass. 2010) ("A federal court sitting in diversity evaluates contractual choice of law provisions according to the rules of the forum state, here Massachusetts."). "In the absence of a conflict with public policy, Massachusetts honors choice-of-law provisions in contracts. . . ." *Ne. Data Sys. v. McDonnell Douglas Comput. Sys. Co.*, 986 F.2d 607, 610 (1st Cir. 1993). There is no conflict with Massachusetts public policy where, as here, the "'dispute is essentially a private one,' which . . . has no

27

third-party effects." *Id*. Texas choice of law rules apply to Pratt's claims. *See In re New England Mut. Life Ins. Co. Sales Pracs. Litig.*, 236 F. Supp. 2d 69, 74 (D. Mass. 2002) ("When a case is transferred [under 28 U.S.C. § 1407], . . . the transferee court . . . must apply the choice of law rule of the transferor court. . . .") (cleaned up). "[U]nder Texas choice of law principles, contractual choice of law provisions are generally upheld." *Stinger v. Chase Bank, USA, NA*, 265 F. App'x 224, 228 (5th Cir. 2008). The Cadence T&Cs provide that they are "governed by the laws of the state in which your Account is established." Sparks Decl. Exs. B at 26, D at 26, F at 26. Each Cadence Plaintiff's account was established in Mississippi, so Mississippi law applies to determine the validity of the agreements. *Id*. Exs. A at 1, C at 1, E at 1.

Under Mississippi law, a valid contract requires: "(1) two or more contracting parties, (2) consideration, (3) an agreement that is sufficiently definite, (4) parties with legal capacity to make a contract, (5) mutual assent, and (6) no legal prohibition precluding contract formation." *Hallam v. Southaven R.V. Ctr., Inc.*, 2019 WL 4675380, at *2 (N.D. Miss. Sept. 25, 2019) (citation omitted). Here, each Cadence Plaintiff and the bank mutually agreed to the Cadence Arbitration Agreement when the Cadence Plaintiffs executed their Account Agreements. The contracts were also supported by multiple forms of consideration. The Cadence Plaintiffs received banking services in exchange for agreeing to the terms of their contracts. In addition, the parties' mutual exchange of promises to arbitrate disputes is sufficient consideration. *See* Sparks Decl. Exs. B at 3, D at 3, F at 3 ("You and we agree, upon written demand made by you or us, to submit to binding arbitration all disputes,

28

controversies, and claims . . . ."); *see Sherrer v. Covenant Health & Rehab of Picayune, LLC*, 2012 WL 1067910, at *6 (S.D. Miss. Mar. 29, 2012) (finding sufficient consideration for arbitration agreement because "all that is needed to constitute a valid consideration . . . is that there must be either a benefit to the promissor or a detriment to the promisee") (citation omitted). The Cadence Plaintiffs did not allege any facts suggesting they lacked the legal capacity to form a contract. Finally, the arbitration agreement "is sufficiently definite because it specifies the categories of disputes that will be submitted to arbitration." *Hallam*, 2019 WL 4675380, at *2; *see* Sparks Decl. Exs. B at 3, D at 3, F at 3.

### 3.    Franklin Mint Federal Credit Union

The FMFCU Plaintiffs brought their actions in U.S. District Court for the Eastern District of Pennsylvania and the applicable FMFCU Arbitration Provision should be interpreted under Pennsylvania law. *See* Walters Decl. Ex. B at 5.

Under Pennsylvania law, a contract requires "(1) mutual manifestation of an intention to be bound, (2) terms sufficiently definite to be enforced, and (3) consideration." *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 160 (3d Cir. 2009) (internal citation omitted); *Pittsburgh Logistics Sys., Inc. v. R. Keppel Trucking, LLC*, 153 A.3d 1091, 1092 (Pa. Super. Ct. 2017) (requiring mutual assent and consideration for a valid arbitration agreement). "[A] party challenging an arbitration agreement bears the burden of showing that the arbitration agreement is both procedurally and substantively unconscionable." *Matthews v. Gucci*, 2022 WL 462406, at *10 (E.D. Pa. Feb. 15, 2022) (quoting *Richards v. Am. Acad. Health Sys., LLC*, 2020 WL 2615688, at *6 (E.D. Pa. May 22, 2020)).

29

Here, all the FMFCU Plaintiffs agreed to be bound by the FMFCU Arbitration Provision and Class Action Waiver. First, Bronson and Thompson, former WECU members, were mailed the WECU Notice to the same addresses they have verified in this action as the addresses provided to and on file with FMFCU informing them of the WECU/FMFCU merger and enclosing their new Account Agreements—including the operative November 2020 A&Ds—to review before the merger became effective. Walters Decl. Ex. A. The WECU Notice also explicitly stated that their "Account Agreement . . . **provides for a mandatory agreement to arbitrate and waiver of class action claims**" and informed them that:

> Unless you specifically reject the mandatory arbitration provision in the Consumer Disclosures **prior to May 20, 2022**, you and FMFCU agree to resolve all disputes or claims arising out of or relating to your membership by arbitration on an individual basis. If you reject the agreement to arbitrate, all other parts of the Consumer Disclosures will continue to apply to your account. If you do not reject the agreement to arbitrate as provided in this notice, you will be deemed to accept and agree to the arbitration provision.

> If you would like to opt out of this agreement to arbitrate, please provide written notice to FMFCU at the following address**: Franklin Mint Federal Credit Union, ATTN: Disclosure Notice, 5 Hillman Drive, Suite 100, Chadds Ford, PA 19317**. . . .

*Id.* (emphasis in original). The WECU Notice also provided the exact information that needed to be included in the written notice in order to opt out as well as a telephone number should members have any questions. *Id.* FMFCU confirmed that neither Bronson's nor Thompson's letters were returned as undeliverable. Walters Decl. ¶ 3. FMFCU also verified that Bronson and Thompson did not write FMFCU to opt out. *Id.* ¶ 6. Indeed, Bronson and Thompson were mailed a second New Member Letter to

the same addresses on file welcoming them to the "FMFCU Family." *Id.* ¶ 7 (citing Ex. C). And both Bronson and Thompson continue to be FMFCU members as of the date of this motion. *Id.* ¶ 8.

The Eastern District of Pennsylvania, applying Pennsylvania law, has concluded that plaintiffs under nearly identical circumstances agreed to binding arbitration. *See Bracy v. Macy's Retail Holdings, Inc.*, 2020 WL 1953647, *2, *5–7 (E.D. Pa. Apr. 23, 2020) (finding offer, acceptance, and consideration for a binding arbitration agreement when, (a) defendant submitted evidence showing it mailed employee materials advising her of defendant's arbitration program, enclosing the arbitration agreement and providing opt out instructions, and mailing materials were not returned as undeliverable; (b) employee did not return the opt-out election form required under the instructions; and (c) employee continued to work for defendant, even though she claimed she "did not recall" receiving the mailing materials); *Matthews*, 2022 WL 462406, at *1–2, *6–10 (similar and collecting cases); *Pacanowski v. Alltran Fin., LP*, 271 F. Supp. 3d 378, 742, 744 (M.D. Pa. 2017). The Court should reach the same result here.

Harris is also plainly subject to binding arbitration. In or about October 2021, he filled out and signed a paper application at an FMFCU branch and was provided a hard copy of the November 2020 A&Ds that were and remain in effect at FMFCU. Walters Decl. ¶¶ 9–11 (citing Ex. D). The "Signatures" section on the application Harris signed required him to agree that:

> By signing below, You agree to be bound by the terms and conditions
> found within Your application for membership and to the bylaws, rules

31

and regulations of Franklin Mint Federal Credit Union in effect from time to time. **You further acknowledge receiving a copy of the Agreements and Disclosures related to Your Account(s) and You agree to be bound by the terms and conditions found therein.**

*Id.* ¶ 12 (quoting Ex. D) (emphasis added). There can be no dispute that Harris entered into a valid agreement to arbitrate and waived any right to maintain his claims on behalf of a class. *See McCrossin v. Comcast Spectator, LLC*, 311 A.3d 1115, 1122 (Pa. Super. Ct. 2024) (holding that plaintiff entered into valid and binding agreements to arbitrate when he "signed employment agreements that required certain disputes be resolved through the Comcast Solutions Programs . . . which require[d] binding arbitration"). And the fact that Harris signed separate documents as part of his application package is of no moment as the terms of his Person Application clearly incorporate by reference the November 2020 A&Ds. *See, e.g.*, *In re Estate of Atkinson*, 231 A.3d 891, 898–99 (Pa. Super. Ct. 2020) (party who agreed in contract that he signed to be bound by the terms and conditions in other document was bound by arbitration agreement in that other document that was incorporated by reference in the signed contract); *Sw. Energy Production, Co. v. Forest Res., LLC*, 83 A.3d 177, 187–88 (Pa. Super. Ct. 2013) (terms in separate documents incorporated by reference in a written contract constitute terms of that contract).

Finally, Brown also agreed to binding arbitration when he applied for a loan and opened an account with FMFCU. As part of the application process, he consented to receiving all membership documents, including the November 2020 A&Ds, electronically (although he had the ability to print any document if he wished). Walters Decl. ¶¶ 15–17; *see also id.* Ex. H. To complete his application, Brown was

32

required to click past a page including a short paragraph stating that he acknowledged receipt of the November 2020 A&Ds, among other documents, and affirmed acceptance to the terms and conditions of the November 2020 A&Ds. *Id.* ¶ 18. Specifically, FMFCU's application software does not allow an applicant to proceed and complete the application until he or she affirmatively acknowledged the Membership Authorization by checking a box which provides his or her e-signature. *Id.* at ¶ 18 n.1. And like the other FMFCU Plaintiffs, Brown continues to be a member of FMFCU. *Id.* at ¶ 20. Pennsylvania law also recognizes formation of and acceptance to a valid and binding arbitration agreement under these circumstances. *See Juric v. Dick's Sporting Goods, Inc.*, 2020 WL 4450328, at *2 (W.D. Pa. Aug. 3, 2020) (plaintiffs accepted arbitration agreement via electronic onboarding during which new employees are presented "with a series of electronic forms that must be filled out by employees" and "[a]fter an employee has reviewed the Agreement to Arbitrate Claims, the software does not allow them to proceed until they affirmatively acknowledge receiving and agreeing to the terms of the Agreement to Arbitrate Claims by selecting a check box labeled 'Arbitration Agreement Acknowledgment'"; further, "[w]hen employees reach the stage of the Arbitration Agreement, they have the option to click a hyperlink and receive a PDF copy of the Agreement to Arbitrate Claims" and can "print out of a copy of the Agreement for their records" if they wish); *see also Bonilla v. Adecco USA, Inc.*, 2024 WL 945310, at *2–3, *5–6 (E.D. Pa. Mar. 5, 2024). Further, Harris need not even have read the terms of the Website Authorization or the November A&Ds for them to be binding so long as he had

33

reasonable notice of their existence. *See Noble v. Samsung Elecs. Am., Inc.*, 682 F. App'x 113, 116 (3d Cir. 2017) ("Once there is reasonable notice, a party is bound by those terms, even if he failed to read them.").

### 4.      MasTec, Inc.

The MasTec Arbitration Agreement states that "[t]he parties agree that the Federal Arbitration Act [("FAA")], 9 U.S.C. § 1 et seq. governs this Agreement." Moore Decl. Ex. A-1 at 1.

The MasTec Arbitration Agreement does not provide for a choice of law clause, but in the absence of any difference in applicable laws,[14] this Court should apply Massachusetts state contract law to determine the validity of the arbitration agreement.

Under Massachusetts law, "the essential elements of a contract are an offer, acceptance, and an exchange of consideration or meeting of the minds." *Vadnais v. NSK Steering Sys. Am., Inc.*, 675 F. Supp. 2d 205, 207 (D. Mass. 2009) (citing *Quinn v. State Ethics Comm'n*, 516 N.E.2d 124, 127 (Mass. 1987)). A meeting of the minds "requires a bargain in which there is a manifestation of mutual assent to the exchange." *Vacca v. Brigham & Women's Hosp., Inc.*, 156 N.E.3d 800 (Mass. App. Ct. 2020) (citing *Sea Breeze Ests., LLC v. Jarema*, 113 N.E.3d 355, 360 (Mass. App. Ct. 2018)).

---

[14] Plaintiff originally filed his complaint in the United States District Court for the District of South Carolina Charleston Division on November 10, 2023, but there is no material difference between Massachusetts and South Carolina law regarding the validity of contractual arbitration provisions.

In this case, offer and acceptance are easily satisfied. Liptock applied for employment with MasTec, MasTec presented him with the full Agreement to Arbitrate, and Liptock voluntarily signed the Agreement prior to beginning his employment. Liptock's electronic signature to that Agreement unambiguously manifested his intent to be bound by its terms, and bound him to arbitrate employment-related disputes with MasTec, including the claims asserted here. *Fraga v. Premium Retail Servs., Inc.*, 2023 WL 8435180, at *7 (D. Mass. Dec. 5, 2023) (finding the merchandiser's electronic signature was sufficient acceptance of the terms of the arbitration agreement); *see also Perez-Tejada v. Mattress Firm, Inc.*, 2019 WL 830450, at *5 (D. Mass. Feb. 21, 2019) (holding employees' signatures on agreement indicated their intent to enter into the arbitration agreement). Furthermore, the language directly above the signature box clearly states, in all caps, that Liptock "agrees to arbitrate disputes covered by this agreement" and "understand[s] and acknlowedge[s] that [his] electronic signature is as valid and has the same legal effect as an ink signature." Moore Decl. Ex. A-1 at 4; *see Garg v. VHS Acquisition Subsidiary No. 7*, 2021 WL 1873962, at *7 (D. Mass. Mar. 9, 2021), *report and recommendation adopted*, 2021 WL 1220887 (D. Mass. Mar. 31, 2021) (finding electronic signature demonstrated an unambiguous assent to arbitrate where the language above the signature block clearly illustrated the agreement to be bound).

The terms of the MasTec Arbitration Agreement are sufficiently definite to demonstrate a meeting of the minds. Any reasonable reading of the Agreement makes clear that it concerns all employment-related legal disputes, including tort claims or

claims for breach of contract. Thus, the Arbitration Agreement involves sufficiently defined terms requiring Liptock and MasTec to submit claims that arise between them to binding arbitration.

The Arbitration Agreement is also supported by consideration. "In order for a contract to have valid consideration, the contract must be a bargained-for exchange in which there is a legal detriment of the promisee or a corresponding benefit to the promisor." *Neuhoff v. Marvin Lumber and Cedar Co.*, 370 F.3d 197, 201 (1st Cir. 2004) (citing *Hinchey v. NYNEX Corp.*, 144 F.3d 134, 143 (1st Cir. 1998)). Here, Liptock and MasTec mutually agreed that any disputes between them would be subject to arbitration. *See* Moore Decl. Ex. A-1 at 1 ("This Mutual Arbitration Agreement is between Employee and MasTec, Inc., including all MasTec, Inc. subsidiaries" and as such "requires all such disputes be resolved only by a single arbitrator through final and binding arbitration and not by way of court or jury trial."). Their *mutual* obligation to arbitrate their claims constitutes sufficient consideration for the Agreement as both parties agreed to alternative dispute resolution.

### 5.    MidFirst Bank and Midland Financial Co.

Each MidFirst Plaintiff is subject to a binding agreement to arbitrate and class action waiver under Oklahoma law.[15] As discussed above (at Section A.5.), the

---

[15] Typically, in diversity cases, a federal court will apply the forum state's choice-of-law rules to determine which state's law applies. *See Putnam Res. v. Pateman*, 958 F.2d 448, 464 (1st Cir. 1992) ("In diversity cases, the federal courts look to the choice-of-law rules of the forum state . . ."); *In re Volkswagen & Audi Warranty Extension Litig.*, 692 F.3d 4, 18 (1st Cir. 2012) (noting potentially different treatment of "forum" states in MDLs). Under Massachusetts's choice-of-law rules for contract formation, Oklahoma law should apply as the state with the "most significant relationship" to this dispute. *See Shinberg v. Bruk*, 875 F.2d 973, 975 (1st Cir. 1989) (explaining

relationships between MidFirst and the MidFirst Plaintiffs are governed by AADs, which each MidFirst Plaintiff entered into at various times depending on the relevant MidFirst division (MidFirst Bank, Vio Bank, and Monifi) and the time of contracting. The majority of MidFirst Plaintiffs entered into the AADs through an online sign-up process that required an affirmative "click" to continue and consent to the relevant AAD and arbitration agreement in exchange for opening an account. Caswell Decl. ¶¶ 8–16. Linman and L.L. signed up for their MidFirst Bank account in-person and physically signed the relevant signature card affirming their acceptance of the AAD and corresponding arbitration agreement and class action waiver. *Id*. ¶¶ 17–20, 53–57. All MidFirst Plaintiffs, except for De Medicis, have active accounts with MidFirst Bank or Vio Bank. *Id*. ¶¶ 52, 57, 61, 65, 69, 73.

---

Massachusetts's adoption of Restatement (Second) of Conflicts of Law approach) (citing *Bushkin Assocs., Inc. v. Raytheon Co.*, 473 N.E.2d 662, 669 (Mass. 1985)). All MidFirst Plaintiffs except for De Medicis filed their lawsuits in Oklahoma. De Medicis filed his lawsuit directly in Massachusetts following (and solely due to) the formation of the MDL in Massachusetts—not because of any jurisdictional connection of MidFirst or Midland to Massachusetts. Under Oklahoma choice-of-law rules for contracts, courts must apply law of the place "contract performance occurs" or, if no place of performance, the "law of the place the contract is made." *Bernal v. Charter Cnty. Mut. Ins. Co.*, 209 P.3d 309, 315 (Okla. 2019). Here, the following factors overwhelmingly demonstrate that Oklahoma law should apply: (i) six (6) of the seven (7) Plaintiffs originally filed their lawsuits against Midland and MidFirst in Oklahoma (before they were transferred to the MDL), (ii) Midland and MidFirst are both citizens of Oklahoma (i.e., Midland is an Oklahoma corporation with its principal place of business in Oklahoma and MidFirst is a federally chartered savings association with its principal place of business in Oklahoma), and (iii) the underlying alleged actions or omissions in this case relating to Midland and/or MidFirst would have occurred in Oklahoma. Equally, for the purposes of contract formation, MidFirst and Midland are not aware of any conflict between Oklahoma law and the law of any other potential state law that could be at issue. *See Levin v. Dalva Bros., Inc.,* 459 F.3d 68, 73 (1st Cir. 2006) ("An initial task of a choice-of-law analysis is to determine whether there is an *actual conflict* between the substantive law of the interested jurisdictions") (emphasis added).

Under Oklahoma law, "[a] valid contract requires the parties' mutual consent to the terms." *Williams v. TAMKO Bldg. Prod., Inc.*, 451 P.3d 146, 151 (Okla. 2019). "A party who manifests assent to a contract's terms is bound by them, and failure to read the terms is no excuse." *Hancock v. Am. Tel. & Tel. Co.*, 701 F.3d 1248, 1256 (10th Cir. 2012) (applying Oklahoma law). For online "clickwrap" agreements, "basic contract law principles in . . . Oklahoma indicate that if a clickwrap agreement gives a consumer reasonable notice of its terms and the consumer affirmatively manifests assent to the terms, the consumer is bound by the terms." *Id.*; *see also Smith v. Fed Ex*, 2022 WL 2819142, at *5 (W.D. Okla. July 19, 2022) ("'[C]lickwrap' agreements, where an internet user is required to consent to terms by clicking a dialogue box in order to proceed with a transaction, are routinely upheld as creating a binding contract.").

Here, as described above, all MidFirst Plaintiffs were provided notice and consented to their relevant AAD and the corresponding agreement to arbitrate and class action waiver. *Supra* Section A.5.; Caswell Decl. ¶¶ 49–74. Dudurkaewa, Strucke, Strother, and Rubenstein accepted the relevant AAD through an online sign-up process with MidFirst Bank or its Vio Bank division. *Id.* ¶¶ 49–52, 58–69. As part of the sign-up process, each customer would have been presented with and required to click through a page entitled "Accept Disclosures," stating that the customer "must read and agree to," *inter alia*, "the Account Agreement and Disclosure," with those words hyperlinked to the applicable AAD. *Id.* ¶¶ 10–13. De Medicis signed up for his Monifi account through an online sign-up process. *Id.* ¶¶ 70–73. As part of this sign-

up process, De Medicis would have been presented with a mobile page entitled "Disclosures," requiring him to tap and place a check mark beside, *inter alia*, "I have read and agree to the Monifi Terms and Conditions & Privacy Notice," with a hyperlink to view the May 2021 Monifi AAD. *Id.* ¶¶ 14–16. In all cases, the disclosure screen clearly and conspicuously informed these Plaintiffs that they were agreeing to the relevant AAD, provided a clear hyperlink to the AAD, and would not allow the customer to proceed until they had confirmed their agreement by tapping or continuing onto the next screen. It is beyond dispute that the sign-up process for MidFirst and its divisions provided adequate notice of and manifested the MidFirst Plaintiffs' consent to the AAD. *See FedEx*, 2022 WL 2819142, at *5 ("[Defendant] has presented sufficient evidence demonstrating that Plaintiff was notified that he was required to accept [defendant's] User Agreement prior to purchasing an item from its online marketplace, that the User Agreement contained an arbitration provision, and that Plaintiff consented to the User Agreement when he clicked the button necessary to confirm and complete his purchase."); *see also, e.g., Eubanks v. Gasbuddy, LLC*, 2022 WL 16963807, at *2 (D. Mass. Nov. 16, 2022) (Burroughs, J.) (granting motion to compel arbitration where parties agreed plaintiff was "presented with at least a hyperlink to the Terms and Conditions" and defendant then demonstrated that plaintiff could not proceed to the next screen without agreeing to those terms).

Finally, Linman and L.L. physically signed a signature card at a MidFirst Bank location wherein they expressly agreed to the AAD and acknowledged that "I have received a copy of MidFirst Bank's Account Agreement and Disclosures," and,

39

consistent with MidFirst Bank's ordinary and routine business practices, they would have received such a copy. Caswell Decl. ¶¶ 17–20, 53–56, & Ex. K; *see also Hancock*, 701 F. 3d at 1253 (describing process where customer receives paper copy of agreement containing arbitration clause and agrees to having received and acknowledged terms).

All MidFirst Plaintiffs were provided notice of and manifested consent to the relevant AADs and corresponding arbitration agreements and class action waivers contained in those AADs. As such, all MidFirst Plaintiffs must be compelled to arbitrate their claims and precluded from participating in any class action pursuant to the terms of their valid and enforceable agreements.

### 6.    Pathward, N.A.

As detailed above, the four Pathward Plaintiffs agreed to the Online and Mobile Banking Agreement, including its arbitration provision, when they clicked or pressed a check box right next to an acknowledgment that they were agreeing to the "Online Banking Agreement"—with the phrase "Online Banking Agreement" in a green, underlined hyperlink that linked to the full terms—and then clicked a green button marked "Next" at the bottom of the screen.

That process formed a valid contract under the laws of Illinois (Cantrell and Kent), New Jersey (Alcott), and Florida (Fields). All three states follow ordinary contract-formation principles requiring an offer, an acceptance, and consideration. *See*, *e.g.*, *Melena v. Anheuser-Busch, Inc.*, 847 N.E.2d 99, 109 (Ill. 2006); *Skuse v. Pfizer, Inc.*, 236 A.3d 939, 949 (N.J. 2020); *St. Joe Corp. v. McIver*, 875 So.2d 375, 381 (Fla. 2004).

Courts in these states, as in other jurisdictions, have made clear that the rules of contract formation are no different when an individual engages in a transaction on an electronic device or the Internet, explaining that "[w]hile new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract." *Miracle-Pond v. Shutterfly, Inc.*, 2020 WL 2513099, at *4 (N.D. Ill. May 15, 2020) (quoting *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 403 (2d Cir. 2004)); *accord, e.g., MetroPCS Commc'ns, Inc. v. Porter*, 273 So.3d 1025, 1028 (Fla. Dist. Ct. App. 2018) (quoting same); *Beture v. Samsung Elecs. Am., Inc.*, 2018 WL 4259845, at *5 (D.N.J. July 18, 2018) (enforcing agreement formed online); *see also Eubanks*, 2022 WL 16963807, at *3 (the "fundamentals of online contract formation are not different from ordinary contract formation") (Burroughs, J.). Whether on paper or on a screen, courts require "reasonably conspicuous notice of the existence of contract terms and unambiguous manifestation of assent to those terms." *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75 (2d Cir. 2017) (finding arbitration agreement was formed under California law by completing sign up process on a smartphone) (alteration and quotation marks omitted).

The contract formation process here readily complies with these requirements. Courts across the country "routinely uphold" agreements "which require users to click an 'I agree' box after being presented with a list of terms and conditions of use." *Meyer*, 868 F.3d at 75 (citing *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 837 (S.D.N.Y. 2012)). In both *Meyer* and *Fteja*, as here, the full terms were available via a hyperlink on the relevant screen. Those courts—and many others—have held that the fact "[t]hat the

41

Terms of Service were available only by hyperlink does not preclude a determination of reasonable notice." *Meyer*, 868 F.3d at 78 (citing *Fteja*, 841 F. Supp. 2d 839).

Courts in Illinois, New Jersey, and Florida have followed *Meyer*, *Fteja*, or both in upholding online contract formation processes involving websites or mobile applications where terms are presented by hyperlink and the user takes an affirmative action to demonstrate assent to those terms. *See, e.g.*, *Miracle-Pond*, 2020 WL 2513099, at *4; *Johnson v. Uber Techs., Inc.*, 2018 WL 4503938, at *5 (N.D. Ill. Sept. 20, 2018); *Beture*, 2018 WL 4259845, at *5; *Schuster v. Uber Techs., Inc.*, 2019 WL 2536780, at *2–3 & n.1 (M.D. Fla. June 13, 2019); *see also, e.g.*, *MetroPCS*, 273 So.3d at 1029 (citing *Meyer* in upholding contract formed by receipt of text messages containing hyperlink to terms); *Raw Life Organics LLC v. SBL, LLC*, 2021 WL 217765, at *5 (S.D. Fla. Jan. 6, 2021) (same in upholding contract formed by sales orders containing a hyperlink to the terms located online), *report and recommendation adopted*, 2021 WL 217076 (S.D. Fla. Jan. 21, 2021); *Eubanks*, 2022 WL 16963807, at *6 (a checkbox demonstrated a user's "affirmative assent to the agreement").

Finally, the mutual promise to arbitrate between Plaintiffs and Pathward (*see* Rigney Decl. Ex. 1 § 6.1) establishes consideration for the arbitration agreement under the laws of all three states. *See, e.g.*, *Aste v. Metropolitan Life Ins.*, 728 N.E.2d 629, 632 (Ill. App. Ct. 2000); *Jang Won So v. EverBeauty, Inc.*, 2018 WL 259393, at *2 (N.J. Super. Ct. App. Div. Jan. 2, 2018); *Santos v. Gen. Dynamics Aviation Servs. Corp.*, 984 So.2d 658, 661 (Fla. Dist. Ct. App. 2008).

42

In sum, each Plaintiff validly accepted the Online and Mobile Banking Agreement, including its arbitration provision.

## B. Plaintiffs' claims fall within the scope of their arbitration agreements.

Plaintiffs' arbitration agreements cover their disputes here. Each Plaintiff agreed to a broadly written arbitration provision that covers, at minimum, all claims arising out of or related to the relationship between each Plaintiff and the relevant Arbitration Defendant.[16] Those provisions easily encompass Plaintiffs' claims here, which are based on allegations that (i) Plaintiffs provided personal information to the

---

[16] *See*, *e.g.*, **AMC:** *Newman* Decl. Ex. A-1 ("*any claims or disputes relating to your employment*," which explicitly include claims of "breach of (express or implied) contract, tort claims, claims related to pay or benefits (including any leave of absence) . . . and any other claims or disputes relating to your employment") (emphasis added); *Cooper* Decl. Ex. A-1 (same).

**Cadence:** Sparks Decl. Ex. B at 3 ("*any dispute, claim, or controversy of any kind* between you and the Company (whether it arises out of or relates to this Agreement, or to your Account, or any transactions involving your Account, or any service or product related to your Account or the business dealings between us and you)") (emphasis added); *see also id.* Ex. D at 3, Ex. F at 3.

**FMFCU:** Walters Decl. Ex. B. at 3 ("*any controversy, dispute or claim* ('Claim') arising out of or relating to this Agreement, Your Account, and/or the relationships of the parties hereto") (emphasis added).

**MasTec:** Moore Decl. Ex. A-1 at 1 ("any claims or disputes that may arise between Employee and Company, including without limitation *any dispute arising out of, or related to* . . . employment and/or separation of employment with the Company") (emphasis added).

**MidFirst:** Caswell Decl. Ex. E ¶ 28(c) ("any claim, dispute or controversy between you and us [MidFirst Bank] that in any way arises from or relates to this Agreement, your Account, [or] *any products or services offered by us*") (emphasis added).

**Pathward:** Rigney Decl. Ex. 1 § 6.1 ("*all disputes and claims* between you and the Covered Parties shall be resolved through binding individual arbitration," with "Covered Parties" defined to include "Pathward") (emphasis added).

43

Arbitration Defendants during the course of their relationship;[17] and (ii) the

Arbitration Defendants did not adequately safeguard that personal information.[18]

---

[17] *See, e.g.,* **AMC:** *Newman* Compl. ¶¶ 42, 123, 149, 200, 205; *Cooper* Compl. ¶ 7.

**Cadence:** *Pratt* Compl. ¶¶ 13, 24; *Adams* Compl. ¶ 9; *Triplett* Compl. ¶ 9.

**FMFCU:** *Bronson* Compl. ¶¶ 32, 74 ("As a condition of receiving Defendant's services, Defendant requires that Plaintiff and Class Members entrust it with highly sensitive PII."); *Harris* Compl. ¶ 76 ("As a prerequisite of receiving its services, FMFCU requires its employees and members—like Plaintiff and Class Members—to disclose their PII."); *Thompson* Compl. ¶ 23 ("As a condition of receiving banking and other financial products and services from FMFCU, Plaintiff was required to entrust it with her highly sensitive personal information."); *Brown* Compl. ¶ 51 ("As a condition of its relationships with Representative Plaintiff and Class Members, Defendant required that Representative Plaintiff and Class Members entrust Defendant with highly sensitive and confidential PII. Defendant, in turn, stored that information on Defendant's system that was ultimately affected by the Data Breach.").

**MasTec:** *Liptock* Compl. ¶¶ 105, 157, 158.

**MidFirst:** *Dudurkaewa* Compl. ¶ 38 ("Plaintiffs and Class Members are current or former customers of MidFirst who provided their PII to Defendant in exchange for banking and financial services."); *Strother* Compl. ¶ 3 ("Upon information and belief, former and current customers of Vio and MidFirst are required to entrust Defendant with sensitive, non-public PII, without which Defendant could not perform its regular business activities, in order to obtain financial services from Defendant."); *Strucke* Compl. ¶ 8 ("Plaintiff Strucke was required to provide his PII to Midland in connection with using online banking services through MidFirst Bank's online-banking division, Vio Bank."); *De Medicis* Compl. ¶ 119 ("Plaintiff provided his Private Information to MidFirst Bank in the ordinary course of obtaining banking services from MidFirst Bank (and/or any of its divisional banks, such as Monifi Bank.").

**Pathward:** *Cantrell* Compl. ¶¶ 4, 23 ("As a condition of receiving financial services, Pathward requires that its customers, including Plaintiffs and Class Members, entrust it with highly sensitive personal information."); *Kent* Compl. ¶ 8 (similar); *Fields* Compl. ¶ 2 (similar).

[18] **AMC:** *Newman* Compl. ¶ 7; *Cooper* Compl. ¶ 7.

**Cadence:** *Pratt* Compl. ¶¶ 9, 33; *Adams* Compl. ¶¶ 24–29; *Triplett* Compl. ¶¶ 24–29.

**FMFCU:** *See, e.g., Bronson* Compl., ¶¶ 52–57, 86, 100, 101, 104, 106, 110; *Harris* Compl., ¶¶ 27–29, 136, 139, 149, 151; *Thompson* Compl., ¶¶ 26, 49–52, 100, 102, 105, 162, 165; *Brown* Compl., ¶¶ 52, 59–74.

**MasTec:** *Liptock* Compl. ¶¶ 34–35, 37.

44

Even if there were any uncertainty about whether Plaintiffs' claims are within the scope of their arbitration agreements—and there is none—"as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone*, 460 U.S. at 24–25; *see also*, *e.g.*, *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986). As the Supreme Court has reiterated, the "FAA provides the default rule for resolving certain ambiguities in arbitration agreements," including the rule "that ambiguities about the scope of an arbitration agreement must be resolved in favor of arbitration," and that rule preempts any state law to the contrary. *Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 189 (2019) (citing *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985); *Moses H. Cone*, 460 U.S. at 24–25).

### C.    Plaintiffs agreed to individualized arbitration proceedings.

Plaintiffs also agreed to arbitration clauses that expressly provide that their claims must be decided on an individual basis.[19] The FAA requires courts "rigorously

---

**MidFirst:** *Dudurkaewa* Compl. ¶ 1 ("Plaintiffs bring this class action lawsuit against MidFirst for their failure to protect and safeguard the highly sensitive Personally Identifiable Information ('PII') of Plaintiffs and the Class."); *Strother* Compl. ¶ 1 ("Plaintiff brings this class action against MidFirst for its failure to properly secure and safeguard Plaintiff's and other similarly situated MidFirst customers' sensitive information . . ."); *Strucke* Compl. ¶ 1 ("Plaintiff brings this class action against Defendants for their failure to secure and safeguard his and other similarly situated individuals personally identifiable information . . ."); *De Medicis* Compl. ¶ 5 ("Defendant MidFirst failed to adequately safeguard Plaintiff's and Class Members' highly sensitive Private Information that it collected and maintained.").

**Pathward:** *Cantrell* Compl. ¶¶ 8, 37; *Kent* Compl. ¶ 11; *Fields* Compl. ¶ 6.

[19] *See, e.g.*, *Newman Decl.* Ex. A-1 at 1 (AMC); Sparks Decl. Exs. B at 3–4, D at 3–4, F at 3–4 (Cadence); Walters Decl. Ex. B at 3 (FMFCU); Moore Decl. Ex. A-1 at 3 (MasTec); Caswell Decl. Ex. E ¶ 28(g) (MidFirst); Rigney Decl. Ex. 1 § 6.4 (Pathward).

to enforce arbitration agreements," including terms requiring arbitration using "individualized rather than class . . . procedures." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 506 (2018) (internal quotation omitted). Any challenge to the provisions requiring individualized arbitration therefore would be foreclosed by binding Supreme Court precedent. *See, e.g., Lamps Plus*, 587 U.S. at 187; *Epic Sys.*, 584 U.S. at 508–09; *Concepcion*, 563 U.S. at 341–44.[20]

### D. Some Plaintiffs agreed that questions of arbitrability would be decided by the arbitrator.

For some Plaintiffs and Arbitration Defendants, the Court's inquiry should stop after determining that a contract exists, because those Plaintiffs agreed that an arbitrator, not a court, would resolve questions of arbitrability. So, to the extent that Plaintiffs seek to challenge the enforceability of the identified Arbitration Defendants' arbitration provisions, those questions are for arbitrators. Specifically, the Plaintiffs asserting claims against *AMC*, *Cadence*, and *MasTec* agreed that an arbitrator, and not the Court, would resolve threshold questions of arbitrability.

---

[20] The FMFCU Plaintiffs are also prohibited from maintaining a cause of action on behalf of a class because of the stand-alone Class Action Waiver that they consented to through their assent to the November 2020 A&Ds and their continued use of FMFCU's services. The stand-alone Class Action Waiver is fully and separately enforceable. *See, e.g., Jenkins v. PetSmart, LLC*, 2023 WL 8548677, at *14–15 (E.D. Pa. Dec. 11, 2023) (class waiver provision enforceable for same reasons arbitration agreement enforceable); *Bombin v. Southwest Airlines Co.*, 2023 WL 5832166, at *15 (E.D. Pa. Sept. 7, 2023); *Coulter v. Experian Info. Solutions, Inc.*, 2021 WL 735726, at *5 (E.D. Pa. Feb. 25, 2021); *Nelson v. Gobrands, Inc.*, 2021 WL 4262325, at *8 (E.D. Pa. Sept. 20, 2021). But the Court need not reach the stand-alone Class Action Waiver issue here because the November 2020 A&Ds prohibit the maintenance of a class action before a court or in arbitration. Accordingly, the Court should stay the FMFCU Plaintiffs' complaints and enter an order requiring the FMFCU Plaintiffs to bring their claims against FMFCU in arbitration.

*AMC*. The AMC Arbitration Agreement contains a clear and unmistakable provision delegating all questions of arbitrability to the arbitrator in the first instance: "Except as noted in the following paragraph, the arbitrator, and not any federal, state, or local court, shall have exclusive authority to resolve any dispute relating to the *formation, enforceability, applicability, or interpretation* of this Agreement, including without limitation any claim that this Agreement is void or voidable. Thus, except as noted in the following paragraph, the parties voluntarily waive the right to have a court determine the enforceability of this Agreement." *Newman* Decl. Ex. A-1 at 1 (emphasis added); *Cooper* Decl. Ex. A-1 at 1 (same). The paragraph that follows that provision does not contain any applicable exceptions.

*Cadence*. The Cadence Arbitration Agreement has a clear and unmistakable provision delegating issues regarding the "validity, interpretation, scope or enforceability of this Agreement or the interpretation or scope of the Arbitration Clause" to the arbitrator. Sparks Decl. Exs. B at 3, D at 3, F at 3.

*MasTec*. The MasTec Mutual Arbitration Agreement contains a clear and unmistakable provision delegating all questions of arbitrability to the arbitrator in the first instance: "The Arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute relating to the validity, applicability, enforceability, unconscionability or waiver of this Agreement, including, but not limited to any claim that all or any part of this Agreement is void or voidable[.]" Moore Decl. Ex. A-1 at 3.

47

Once the existence of a contract delegating arbitrability has been established, "the courts must respect the parties' decision as embodied in the contract," and allow an arbitrator to resolve the question of arbitrability; that is so even if a court thinks that the argument that a dispute falls within the scope of the arbitration agreement is "frivolous" or "wholly groundless." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 65 (2019); *see also, e.g.*, *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010); *Bosse v. N.Y. Life Ins. Co.*, 992 F.3d 20, 28 (1st Cir. 2021).

**II.    The Court Should Address Subject Matter Jurisdiction First, But If It Concludes It Has Jurisdiction, Then Plaintiffs' Claims Against The Arbitration Defendants Should Be Stayed Pending Arbitration.**

Under the schedule this Court previously entered, defendants were required to file this arbitration motion before filing their motion raising challenges to this Court's subject matter jurisdiction. Dkt. 874; *see also id.* (joint motion to dismiss under Rule 12(b)(1) raising issues of Article III standing currently due on July 23, 2024). But regardless of when briefs on these respective motions are filed, the Arbitration Defendants respectfully submit that the Court should rule on the 12(b)(1) motion prior to this one, because the Court should assure itself that a plaintiff has standing before ruling on the arbitration issues as to that plaintiff. *Cf. Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101 (1998) (standing must be decided before the merits because hypothetical jurisdiction is improper in federal courts).

It is true that, as the Supreme Court has explained, "a federal court has leeway 'to choose among threshold grounds for *denying audience* to a case on the merits.'" *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007) (quoting *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 585 (1999)) (emphasis added). In the

48

years since *Sinochem* was decided, courts had come to different conclusions about whether a court may grant an arbitration motion before assessing whether it has subject matter jurisdiction.[21]

But the Supreme Court's recent decision in *Smith v. Spizzirri*, 144 S. Ct. 1173 (2024), supports addressing subject matter jurisdiction first. *Smith* explains that a court must retain jurisdiction when compelling arbitration and staying the litigation under Section 3 of the FAA (*id.* at 1177–78)—which it could not do if it lacked jurisdiction in the first place. The Court further acknowledged that if there is a "separate reason to dismiss" unrelated to arbitration, including if "the court lacks jurisdiction," then Section 3 is "no bar to dismissing on that basis." *Id.* at 1176 n.2. Moreover, neither *Smith* nor any reading of *Sinochem* would permit a federal court to *deny* an arbitration motion without first ensuring that it has subject matter jurisdiction.

That said, if the Court concludes that it has jurisdiction as to some or all of the subject Plaintiffs' claims, then it should compel arbitration of those claims and stay litigation pending the resolution of those claims through individualized arbitration. Specifically, when, as here, the FAA governs an arbitration provision that covers a plaintiff's claims, Section 3 of the FAA directs the district court to compel arbitration

---

[21] *Compare*, *e.g.*, *Nettles v. Midland Funding LLC*, 983 F.3d 896, 899 (7th Cir. 2020) (deciding standing before arbitrability); *Duke v. Luxottica U.S. Holdings Corp.*, 2023 WL 6385389, at *3 (E.D.N.Y. Sept. 30, 2023) (same), *with Amadasun v. Google, Inc.*, 2022 WL 2829644, at *1 & n.5 (N.D. Ga. July 19, 2022) (granting motion to compel arbitration without reaching subject matter jurisdiction); *In re Rotondo Weirich Enters., Inc.*, 583 B.R. 860, 865 (E.D. Pa. Bankr. 2018) (same without reaching standing).

and stay the litigation of those claims. *See* 9 U.S.C. § 3 (providing for a stay of court proceedings pending the resolution of arbitration). And the recent decision in *Smith* makes clear that this stay is mandatory when requested by a party: "When a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, § 3 of the FAA compels the court to stay the proceeding." 144 S. Ct. at 1178.

## CONCLUSION

The Arbitration Defendants respectfully ask the Court to enter an order: (1) compelling individual arbitration of Plaintiffs' claims against the Arbitration Defendants; and (2) staying further litigation relating to those claims pending the completion of arbitration.

Dated: June 3, 2024

Respectfully Submitted,

/s/ *Kristine McAlister Brown*
Kristine McAlister Brown
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Suite 4900
Atlanta, GA 30309-3424
Telephone: (404) 881-7000
Facsimile: (404) 881-7777
kristy.brown@alston.com

Jared M. Slade
ALSTON & BIRD LLP
2200 Ross Ave., Ste. 2300
Dallas, Texas 75201
Telephone: (214) 922-3400
jared.slade@alston.com

*Attorneys for Defendant Cadence Bank*

/s/ *Archis A. Parasharami*
Archis A. Parasharami (*pro hac vice*)
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
Telephone: (202) 263-3328
Facsimile: (202) 263-5328
aparasharami@mayerbrown.com

Lauri A. Mazzuchetti (*pro hac vice*)
Whitney Smith (*pro hac vice*)
Kelley Drye & Warren, LLP
One Jefferson Road, 2nd Floor
Parsippany, NJ 07054
Telephone: (973) 503-5900
Facsimile: (973) 503-5950
lmazzuchetti@kelleydrye.com
wsmith@kelleydrye.com

Kurt S. Kusiak, (BBO #559254)
Nathalie K. Salomon (BBO #666893)

50

/s/ *Edward J. McAndrew*
Edward J. McAndrew
BAKER & HOSTETLER LLP
1735 Market Street, Suite 3300
Philadelphia, PA 19103
Telephone: (215) 564-8386
emcandrew@bakerlaw.com

Sarah A. Ballard
BAKER & HOSTETLER LLP
1801 California Street, Suite 4400
Denver, CO 80202
Telephone: (303) 861-0600
sballard@bakerlaw.com

*Attorneys for Defendant*
*Franklin Mint Federal Credit Union*


/s/ *Jason K. Fagelman*
Jason K. Fagelman
NORTON ROSE FULBRIGHT US LLP
2200 Ross Avenue, Suite 3600
Dallas, TX 75201
Telephone: (214) 855-8120
jason.fagelman@nortonrosefulbright.com

Sean M. Topping
NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas,
New York, NY 10019
Telephone: (212) 318-3361
sean.topping@nortonrosefulbright.com

*Attorneys for Defendants*
*MidFirst Bank and Midland Financial*
*Co.*

FITCH LAW PARTNERS LLP
84 State Street, 11th Floor
Boston, Massachusetts 02109
Telephone: (617) 542-5542
ksk@fitchlp.com
nks@fitchlp.com

*Attorneys for Defendant*
*Pathward, N.A*

/s/ *Matthew C. Wolfe*
Matthew C. Wolfe
Tara D. Kennedy
SHOOK, HARDY & BACON L.L.P.
111 South Wacker Drive, Suite 4700
Chicago, IL 60606
Telephone: (312) 704-7700
mwolfe@shb.com
tkennedy@shb.com

Anna A. Gadberry
SHOOK, HARDY & BACON L.L.P.
2555 Grand Boulevard
Kansas City, MO 64108
Telephone: (816) 474-6550
agadberry@shb.com

*Attorneys for Defendants American*
*Multi-Cinema, Inc. and AMC*
*Entertainment Holdings, Inc.*

/s/ *Matthew C. Wolfe*
Matthew C. Wolfe
SHOOK, HARDY & BACON L.L.P.
111 South Wacker Drive, Suite 4700
Chicago, IL 60606
Telephone: (312) 704-7700
mwolfe@shb.com

*Attorney for Defendant*
*MasTec, Inc.*

51

52

## CERTIFICATE OF SERVICE

I hereby certify that, on this date, the foregoing document was filed electronically via the Court's CM/ECF system, which will send notice of the filing to all counsel of record.

Dated: June 3, 2024                   /s/ *Archis A. Parasharami*
                                      Archis A. Parasharami

# APPENDIX

| Case | Plaintiffs | Arbitration Defendant(s) | Other Defendants |
|---|---|---|---|
| *Cooper v. American Multi-Cinema, Inc. and AMC Entertainment Holdings, Inc., d/b/a AMC Theaters,* No. 24-cv-11127 (D. Mass.) | Nicholas Cooper | American Multi-Cinema, Inc. and AMC Entertainment Holdings, Inc. | N/A |
| *Newman v. American Multi-Cinema, Inc. d/b/a AMC Theaters,* No. 24-cv-11359 (D. Mass.) | Melanie Newman | American Multi-Cinema, Inc. | N/A |
| *Pratt v. Cadence Bank,* No. 23-cv-12996 (D. Mass) | Tammy Pratt | Cadence Bank | N/A |
| *Adams v. Cadence Bank,* No. 23-cv-13071 (D. Mass) | Calvin Adams | Cadence Bank | Progress Software Corp. |
| *Triplett v. Cadence Bank,* No. 24-cv-10657 (D. Mass) | Latrice Triplett | Cadence Bank | Progress Software Corp. |
| *Thompson v. Franklin Mint Fed. Credit Union,* No. 1:23-cv-12885 (D. Mass.) | Tina Thompson | FMFCU | N/A |
| *Harris v. Franklin Mint Fed. Credit Union,* No. 1:23-cv-12891 (D. Mass.) | Michael Harris | FMFCU | N/A |
| *Bronson v. Franklin Mint Fed. Credit Union,* No. 1:23-cv-12893 (D. Mass.) | Tanya Bronson | FMFCU | N/A |

| | | | |
|---|---|---|---|
| *Brown v. Franklin Mint Fed. Credit Union*, No. 1:23-cv-12894 (D. Mass.) | Steven Brown | FMFCU | N/A |
| *Liptock v. MasTec, Inc.*, No. 23-cv-12985 (D. Mass) | Joseph Liptock | MasTec, Inc. | N/A |
| *Dudurkaewa et al. v. Midfirst Bank*, No. 24-cv-10186 (D. Mass.) (consolidated pre-transfer with No. 24-cv-10187 (D. Mass.); No. 24-cv-10188 (D. Mass.)) | Petimat Dudurkaewa<br><br>Chris Rubenstein<br><br>Sherry Linman<br><br>L.L. | MidFirst Bank<br><br>Midland Financial Co. | N/A |
| *Strother v. MidFirst Bank*, No. 23-cv-12898 (D. Mass) | Andrew Strother | MidFirst Bank | N/A |
| *Strucke v. Midland Fin. Co.*, No. 23-cv-12771 (D. Mass.) | Darryl Strucke | Midland Financial Co. | Progress Software Corporation<br><br>Ipswitch Inc. |
| *De Medicis v. MidFirst Bank*, No. 23-cv-13057 (D. Mass.) | David De Medicis | MidFirst Bank | Progress Software Corporation |
| *Cantrell v. Pathward, N.A.*, No. 23-cv-12554 (D. Mass.) | Michelle Cantrell<br><br>Tracey Alcott | Pathward, N.A. | Progress Software Corp. |

2

| *Kent v. Pathward, N.A.*, No. 23-cv-12764 (D. Mass.) | Jacob Kent | Pathward, N.A. | Progress Software Corp. Ipswitch, Inc. |
|---|---|---|---|
| *Fields v. Pathward, N.A.*, No. 23-cv-13058 (D. Mass.) | Melissa Fields | Pathward, N.A. | Progress Software Corp. |

3