**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE: MOVEIT CUSTOMER DATA SECURITY BREACH LITIGATION | MDL No. 3083<br>Civil Action No. 1:23-md-03083-ADB<br><br>Judge Allison D. Burroughs<br><br>This Document Relates to: |
| DARYL STRUCKE, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>MIDLAND FINANCIAL CO., IPSWITCH, INC., and PROGRESS SOFTWARE CORPORATION,<br><br>Defendants. | Case No. 1:23-cv-12771-ADB |
| ANDREW STROTHER, on behalf of himself, and on behalf of all others similarly situated individuals,<br><br>Plaintiff,<br><br>v.<br><br>MIDFIRST BANK,<br><br>Defendant. | Case No. 1:23-cv-12898-ADB |
| PETIMAT DUDURKAEWA, SHERRY LINMAN, on behalf of her minor child L.L. and all others similarly situated, CHRIS RUBENSTEIN individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v. | Case No. 24-cv-10186-ADB<br>[consolidated with Case Nos. 24-cv-10188-ADB; 24-cv-10187-ADB] |

| | |
|---|---|
| MIDFIRST BANK and MIDLAND FINANCIAL CO., <br><br><br>                              Defendants. | |
| DAVID DE MEDICIS, individually and on behalf of all others similarly situated, <br><br>                              Plaintiff, <br><br>                              v. <br><br><br> PROGRESS SOFTWARE CORPORATION and MIDFIRST BANK, <br><br>                              Defendants. | Case No. 1:23-cv-13057-ADB |

## DECLARATION OF DEREK CASWELL

I, **Derek Caswell**, declare as follows:

1.      I am over 18 and have personal knowledge of the matters stated herein.  I am an employee of MidFirst Bank, a defendant in the above-captioned actions.  I submit this Declaration in support of MidFirst Bank's and Midland Financial Co.'s Motion to Compel Arbitration.

2.      I have worked for MidFirst Bank since March 11, 2013.  I am currently employed as MidFirst Bank's Executive Vice President, Marketing and Products.  My job duties include, among other things, assisting in the management of MidFirst Bank's administration and retention of its customer agreements.  This includes supervising the management and administration of the online-account sign-up process and in-person account sign-up process at MidFirst Bank, as well as its Vio Bank and Monifi divisions, currently and during the relevant periods for the above-captioned actions.  Through my employment, I am familiar with MidFirst Bank's, and its divisions', policies, procedures, and processes relating to online and mobile banking, including the processes and record keeping for enrolling in online and mobile banking and related disclosures

provided to customers.  I am also familiar with the policies, procedures, and processes related to in-person sign-up for new accounts at MidFirst Bank's physical locations.

3.    In preparation for submitting this Declaration, I have also requested and personally reviewed internal business records specific to the accounts of the following MidFirst Bank customers, who I understand are the Plaintiffs in the above-captioned matters:  Petimat Dudurkaewa; Sherry Linman and her child L.L.; Chris Rubenstein; Andrew Strother; Darryl Strucke; and David De Medicis.

4.    The MidFirst Bank records and documents I reviewed:  (a) were made at or near the time of the activities recorded by someone with knowledge, or from information transmitted by someone with personal knowledge; (b) were kept in the course of regularly conducted activities of MidFirst Bank; and (c) were made as a regular practice of such activities.

5.    As such, I am fully familiar with the facts and circumstances herein.  Except where my knowledge is based on my review of MidFirst Bank's records and documents regularly maintained in the ordinary course of business, I have personal knowledge of the facts in this declaration and could competently testify to them if I were called as a witness.

**MIDFIRST BANK**

6.    MidFirst Bank is a federally chartered savings association with its principal place of business in Oklahoma.  MidFirst Bank provides services both under its own name and through its divisions, including its Vio Bank division, and previously provided financial services under its Monifi division, before discontinuing Monifi in September 2022.

7.    Midland Financial Co. is an Oklahoma Corporation and the parent company of MidFirst Bank and has its principal place of business in Oklahoma.

-3-

**ONLINE ACCOUNT SIGNUP**

8.      In order to open an account with MidFirst Bank, or one of its divisions, an applicant may apply (1) online with MidFirst Bank, Vio Bank, or, previously, Monifi; or (2) in person at a physical MidFirst Bank branch location.

9.      To open an online account at MidFirst Bank, Vio Bank, or on Monifi, an applicant is/was required to proceed through an account sign-up process that requires the applicant to input his/her information, and, critically, affirmatively agree to having read and accepted the relevant Account Agreements.

10.     For **MidFirst Bank**, the applicant is presented with an "Accept Disclosures" screen that appears as follows:



11.     A true and correct copy of this screen is attached as **Exhibit A**. This screen is currently in use and was in use when the relevant customer (Plaintiff Dudurkaewa) created her

accounts.  The "Account Agreement and Disclosure" hyperlink would bring the applicant to the relevant account agreement containing the arbitration provision, discussed below in ¶¶ 21-33.

12.     For **Vio Bank**, the applicant is presented with a virtually identical "Accept Disclosures" screen that appears as follows:



13.     A true and correct copy of this screen is attached as **Exhibit B**.  This screen is currently in use and was in use when the relevant customers (Plaintiffs Strucke, Strother, Rubenstein) created their accounts.  The "Account Agreement and Disclosure" hyperlink would bring the applicant to the relevant account agreement containing the arbitration provision, discussed below in ¶¶ 34-44.

14.     For **Monifi**, which was discontinued as a brand on September 21, 2022, applicants who signed up for an account saw the following screen:



15.     The screen required the applicant to tap and agree to each of the disclosures, including the Monifi Terms and Conditions & Privacy Notice.

16.     A true and correct copy of this screen is attached as **Exhibit C**.  This screen was in use when the relevant customer (Plaintiff De Medicis) enrolled and when the Monifi platform was discontinued.  The "Terms and Conditions & Privacy Notice" hyperlink would bring the applicant to the relevant account agreement containing the arbitration provision, discussed below in ¶¶ 45-48.

<u>**IN-PERSON ACCOUNT SIGN-UP**</u>

17.    When an applicant opens a new account in-person at a <u>**MidFirst Bank**</u> branch, they are required to fill out an application and sign a "signature card," which, among other things, states that:

> By signing this Signature Card, I acknowledge that I am opening the MidFirst Bank deposit account shown above. . . . I acknowledge that I have received a copy of MidFirst Bank's Account Agreement and Disclosure ("AA&D") . . .
>
> Exhibit D.

18.    A true and correct blank, currently used sample signature card is attached as **Exhibit D**.

19.    MidFirst Bank employees who assist MidFirst Bank customers in opening new MidFirst Bank accounts are required and trained, as an ordinary and routine business practice, to provide a "New Account Kit" to the new customer.  These documents include the written terms and conditions of the account, including the Account Agreement and Disclosures.  The Account Agreement and Disclosures include the relevant arbitration provision, discussed below in ¶¶ 21-33.

20.    Therefore, regardless of whether an individual applied online or in-person with MidFirst Bank, Vio Bank, or Monifi, all applicants would have been directed to or required to sign account agreements containing an arbitration and class action waiver provision.  *See infra* ¶¶ 21-48 (identifying relevant provisions).

<u>**RELEVANT ACCOUNT AGREEMENTS**</u>

*MidFirst Bank – 2022 AAD*

21.    The first relevant MidFirst Bank Account Agreement and Disclosure ("AAD") is the version dated September 27, 2022 ("2022 MidFirst AAD").  The 2022 MidFirst AAD was in

place when Plaintiff Dudurkaewa opened a MidFirst Bank account on April 10, 2023. A true and correct copy of the 2022 MidFirst AAD is attached as **Exhibit E**.

22.     The 2022 MidFirst AAD applies "[w]ith respect to an account or accounts ('Account') held at MidFirst Bank."  Exhibit E, at 1.

23.     The 2022 MidFirst AAD includes an express arbitration agreement and class action waiver, in bold, as follows:

> **ARBITRATION PROVISION.  PLEASE REVIEW AND READ THIS ARBITRATION PROVISION CAREFULLY.  IF YOU DO NOT REJECT THIS ARBITRATION PROVISION IN ACCORDANCE WITH SUBPARAGRAPH (a) BELOW, IT WILL BE PART OF THIS AGREEMENT AND WILL HAVE A SUBSTANTIAL IMPACT ON THE WAY YOU OR WE [MIDFIRST BANK] WILL RESOLVE ANY CLAIM THAT YOU OR WE HAVE AGAINST EACH OTHER, NOW OR IN THE FUTURE.  Arbitration is the process for settling disputes where the determination is made by an impartial third party.  Arbitration binds the parties to a type of resolution outside of the courts.**
>
> *Id.* ¶ 28.

24.     The 2022 MidFirst AAD further provides that "Covered Claims" include "any claim, dispute or controversy between you and us that in any way arises from or relates to this Agreement, your Account, any products or services offered by us," as well as "any dispute about the validity, enforceability, coverage or scope of this Arbitration Provision or any part thereof (including, without limitation, subparagraph (g), captioned 'No Jury Trial or Class Claims' (the 'Class Action Waiver'). . . ."  The term "Claim" also includes "any dispute about the validity or enforceability of this Agreement as a whole." *Id.*

25.     The 2022 MidFirst AAD further provides that:  "**FOR CLAIMS SUBJECT TO ARBITRATION: (1) YOU MAY NOT PARTICIPATE IN A CLASS ACTION IN COURT OR IN A CLASS-WIDE ARBITRATION, EITHER AS A PLAINTIFF, CLASS REPRESENTATIVE OR CLASS MEMBER . . . .**" *Id.* (emphasis in original).

*MidFirst Bank – 2018 and 2020 AAD Versions*

26.     Plaintiff Linman and child L.L. opened their MidFirst Bank account on May 13, 2019. *See infra* ¶¶ 53-57.  When Plaintiff Linman and L.L. became MidFirst customers, an AAD version from October 2018 ("October 2018 MidFirst AAD") would have applied.  A true and correct copy of the October 2018 MidFirst AAD is attached at **Exhibit F**.

27.     The October 2018 MidFirst AAD includes an arbitration agreement and class action waiver, in bold, as follows:

> **ARBITRATION PROVISION. PLEASE REVIEW AND READ THIS ARBITRATION PROVISION CAREFULLY. IF YOU DO NOT REJECT THIS ARBITRATION PROVISION IN ACCORDANCE WITH SUBPARAGRAPH (a) BELOW, IT WILL BE PART OF THIS AGREEMENT AND WILL HAVE A SUBSTANTIAL IMPACT ON THE WAY YOU OR WE [MIDFIRST BANK] WILL RESOLVE ANY CLAIM THAT YOU OR WE HAVE AGAINST EACH OTHER, NOW OR IN THE FUTURE.**
>
> **Arbitration is the process for settling disputes where the determination is made by an impartial third party. Arbitration binds the parties to a type of resolution outside of the courts.**
>
> Exhibit F, ¶ 28.

28.     The October 2018 MidFirst AAD further provides that "Covered Claims" include "any claim, dispute or controversy between You and Us [MidFirst Bank] that in any way arises from or relates to this Agreement, Your Account, any products or services offered by Us." *Id.*

29.     The October 2018 MidFirst AAD further provides that:  "**FOR CLAIMS SUBJECT TO ARBITRATION: (1) YOU MAY NOT PARTICIPATE IN A CLASS ACTION IN COURT OR IN A CLASS-WIDE ARBITRATION, EITHER AS A PLAINTIFF, CLASS REPRESENTATIVE OR CLASS MEMBER . . . .**" *Id.*

30. Plaintiff Dudurkaewa opened her first MidFirst Bank account on December 17, 2020. *See infra* ¶¶ 49-52. When Plaintiff Dudurkaewa became a MidFirst Bank customer, the July 2020 version of MidFirst Bank's AAD ("July 2020 MidFirst AAD") would have applied. (Superseded for Plaintiff Dudurkaewa by 2022 MidFirst AAD, as discussed in ¶¶ 49-52.) A true and correct copy of the July 2020 MidFirst AAD is attached at **Exhibit G**.

31. The July 2020 MidFirst AAD includes an arbitration agreement and class action waiver, in bold, as follows:

> **ARBITRATION PROVISION. PLEASE REVIEW AND READ THIS ARBITRATION PROVISION CAREFULLY. IF YOU DO NOT REJECT THIS ARBITRATION PROVISION IN ACCORDANCE WITH SUBPARAGRAPH (a) BELOW, IT WILL BE PART OF THIS AGREEMENT AND WILL HAVE A SUBSTANTIAL IMPACT ON THE WAY YOU OR WE WILL RESOLVE ANY CLAIM THAT YOU OR WE HAVE AGAINST EACH OTHER, NOW OR IN THE FUTURE.**
>
> **Arbitration is the process for settling disputes where the determination is made by an impartial third party. Arbitration binds the parties to a type of resolution outside of the courts.**
>
> Exhibit G, ¶ 28.

32. The July 2020 MidFirst AAD further provides that "Covered Claims" include "any claim, dispute or controversy between you and us [MidFirst Bank] that in any way arises from or relates to this Agreement, your Account, any products or services offered by us." *Id.*

33. The July 2020 MidFirst AAD further provides that: "**FOR CLAIMS SUBJECT TO ARBITRATION: (1) YOU MAY NOT PARTICIPATE IN A CLASS ACTION IN COURT OR IN A CLASS-WIDE ARBITRATION, EITHER AS A PLAINTIFF, CLASS REPRESENTATIVE OR CLASS MEMBER . . . .**" *Id.* (emphasis in original).

*Vio Bank – 2022 AAD*

34.     The current Vio Bank AAD has been in place since March 2022.  A true and correct copy of the 2022 Vio Bank AAD is attached **Exhibit H.**  Plaintiffs Rubenstein and Strother would have accepted this agreement during the online process for their most recent accounts sign-ups in November 4, 2022, and February 13, 2023, respectively. *See infra* ¶¶ 58-65.

35.     The 2022 Vio Bank AAD provides that "'Account' means each and every Account held by you at Bank."  Exhibit H, at 1.

36.     The 2022 Vio Bank AAD includes an arbitration agreement and class action waiver, in bold, as follows:

> **ARBITRATION PROVISION. PLEASE REVIEW AND READ THIS ARBITRATION PROVISION CAREFULLY. IF YOU DO NOT REJECT THIS ARBITRATION PROVISION IN ACCORDANCE WITH SUBPARAGRAPH (a) BELOW, IT WILL BE PART OF THIS AGREEMENT AND WILL HAVE A SUBSTANTIAL IMPACT ON THE WAY YOU OR WE [VIO BANK] WILL RESOLVE ANY CLAIM THAT YOU OR WE HAVE AGAINST EACH OTHER, NOW OR IN THE FUTURE.**
>
> **Arbitration is the process for settling disputes where the determination is made by an impartial third party. Arbitration binds the parties to a type of resolution outside of the courts.**
>
> *Id.* ¶ 28.

37.     The 2022 Vio Bank AAD further provides that "Covered Claims" include "any claim, dispute or controversy between you and us [Vio Bank] that in any way arises from or relates to this Agreement, your Account, any products or services offered by us." *Id.*

38.     The 2022 Vio Bank AAD further provides that:  "**FOR CLAIMS SUBJECT TO ARBITRATION: (1) YOU MAY NOT PARTICIPATE IN A CLASS ACTION IN COURT OR IN A CLASS-WIDE ARBITRATION, EITHER AS A PLAINTIFF, CLASS REPRESENTATIVE OR CLASS MEMBER . . . .**" *Id.*

*Vio Bank – 2020 AAD*

39.    Plaintiff Rubenstein opened his Vio Bank account on June 4, 2020.  *See infra* ¶¶ 58-61.  When Plaintiff Rubenstein became a Vio Bank customer, the May 2020 version of Vio Bank's AAD ("2020 Vio Bank AAD") would have applied.  A true and correct copy of the 2020 Vio Bank AAD is attached as **Exhibit I**.

40.    The 2020 Vio Bank AAD provides that "'Account' means each and every Account held by you at Bank."  Exhibit I, at 1.

41.    The 2020 Vio Bank AAD includes an arbitration agreement and class action waiver, in bold, as follows:

> **ARBITRATION PROVISION. PLEASE REVIEW AND READ THIS ARBITRATION PROVISION CAREFULLY. IF YOU DO NOT REJECT THIS ARBITRATION PROVISION IN ACCORDANCE WITH SUBPARAGRAPH (a) BELOW, IT WILL BE PART OF THIS AGREEMENT AND WILL HAVE A SUBSTANTIAL IMPACT ON THE WAY YOU OR WE WILL RESOLVE ANY CLAIM THAT YOU OR WE HAVE AGAINST EACH OTHER, NOW OR IN THE FUTURE.**
>
> **Arbitration is the process for settling disputes where the determination is made by an impartial third party. Arbitration binds the parties to a type of resolution outside of the courts.**

*Id.* ¶ 28.

42.    The 2020 Vio Bank AAD further provides that "Covered Claims" include "any claim, dispute or controversy between you and us [Vio Bank] that in any way arises from or relates to this Agreement, your Account, any products or services offered by us." *Id.*

43.    The 2020 Vio Bank AAD further provides that:  "**FOR CLAIMS SUBJECT TO ARBITRATION: (1) YOU MAY NOT PARTICIPATE IN A CLASS ACTION IN COURT OR IN A CLASS-WIDE ARBITRATION, EITHER AS A PLAINTIFF, CLASS REPRESENTATIVE OR CLASS MEMBER . . . .**" *Id.*

44.     Plaintiff Strother and Plaintiff Strucke opened their first Vio Bank accounts in August 2021.  *See infra* ¶¶ 62-69.  When those Plaintiffs became Vio Bank customers, the 2020 Vio Bank AAD would have also applied, as described above, but was superseded by the 2022 Vio Bank AAD for Plaintiff Strother.

*Monifi – 2021 AAD*

45.     Plaintiff De Medicis opened his Monifi accounts on June 21, 2021.  *See infra* ¶¶ 70-74.  When Plaintiff Medicis became a Monifi customer the May 2021 version of Monifi's AAD version ("May 2021 Monifi AAD") would have applied.  A true and correct copy of the May 2021. Monifi AAD is attached at **Exhibit J**.

46.     The May 2021 Monifi AAD includes an arbitration agreement and class action waiver, in bold, as follows:

> **ARBITRATION PROVISION.**
>
> **PLEASE REVIEW AND READ THIS ARBITRATION PROVISION CAREFULLY. IF YOU DO NOT REJECT THIS ARBITRATION PROVISION IN ACCORDANCE WITH SUBPARAGRAPH (1) BELOW, IT WILL BE PART OF THIS AGREEMENT AND WILL HAVE A SUBSTANTIAL IMPACT ON THE WAY YOU OR WE [MONIFI] WILL RESOLVE ANY CLAIM THAT YOU OR WE HAVE AGAINST EACH OTHER, NOW OR IN THE FUTURE. Arbitration is the process for settling disputes where the determination is made by an impartial third party. Arbitration binds the parties to a type of resolution outside of the courts.**
>
> Exhibit J, ¶ 7.h.

47.     The May 2021 Monifi AAD further provides that "Covered Claims" include "any claim, dispute or controversy between you and us [Monifi] that in any way arises from or relates to this Agreement, your Account, any products or services offered by us."  *Id.*

48.     The May 2021 Monifi AAD further provides that: "**FOR CLAIMS SUBJECT TO ARBITRATION: (1) YOU MAY NOT PARTICIPATE IN A CLASS ACTION IN COURT OR IN A CLASS-WIDE ARBITRATION, EITHER AS A PLAINTIFF, CLASS REPRESENTATIVE OR CLASS MEMBER . . . .**" *Id.*  Additionally, the May 2021 Monifi AAD provides that "This Arbitration Provision shall survive the repayment of all amounts owed under this Agreement, the closing of your Account, any legal proceeding and any bankruptcy to the extent consistent with applicable bankruptcy law." *Id.*

### PLAINTIFF PETIMAT DUDURKAEWA [MIDFIRST BANK]

49.     Based upon my review of MidFirst Banks's business records, Plaintiff Dudurkaewa has had two accounts at **MidFirst Bank**: AZ LiveFree Checking Account, opened December 17, 2020; and AZ LiveFree Checking Account, opened April 10, 2023.

50.     Plaintiff Dudurkaewa opened these accounts online, in both instances, in the manner described above. *See supra* ¶¶ 10-11.

51.     Plaintiff Dudurkaewa would have had to click to agree to both the 2020 MidFirst AAD in 2020 and the subsequent, superseding 2022 MidFirst AAD in 2023, including the arbitration provisions described above. *See supra* ¶¶ 21-25, 30-33.

52.     Plaintiff Dudurkaewa's account opened on April 10, 2023 is active at MidFirst Bank.

### PLAINTIFF SHERRY LINMAN AND CHILD L.L. [MIDFIRST BANK]

53.     Based upon my review of MidFirst Bank's business records, Sherry Linman and her child L.L. have one joint-account at **MidFirst Bank**: Arizona iSave Account opened on May 13, 2019.

54.     A true and correct, redacted copy of Plaintiff Linman and L.L.'s account signature card is attached as **Exhibit K.**

55.     Plaintiff Linman and L.L. opened this account in person at the MidFirst Bank location at 16976 W Bell Rd., Surprise, AZ 85474-8946.  This account was opened in the manner described above. *See supra* ¶¶ 17-20.

56.     Plaintiff Linman and L.L. agreed to and would have received the 2018 MidFirst AAD, including the arbitration provisions as described above.  *See supra* ¶¶ 26-29.

57.     Plaintiff Linman and L.L.'s account is active at MidFirst Bank.

## PLAINTIFF RUBENSTEIN [VIO BANK]

58.     Based upon my review of MidFirst Bank's business records, Plaintiff Rubenstein has two accounts at **Vio Bank**:  Savings Account opened June 4, 2020; Cornerstone Money Market Savings opened November 4, 2022.

59.     Plaintiff Rubenstein opened these accounts online, in both instances, in the manner described above. *See supra* ¶¶ 12-13.

60.      Plaintiff Rubenstein would have had to click to agree to both the 2020 Vio Bank AAD in 2020 and the subsequent, superseding 2022 Vio Bank AAD in 2022, including the arbitration provisions described above. *See supra* ¶¶ 34-44.

61.     Plaintiff Rubenstein's account opened on November 4, 2022 is active at Vio Bank.

## PLAINTIFF STROTHER [VIO BANK]

62.     Based upon my review of MidFirst Bank's business records, Plaintiff Strother has six accounts at **Vio Bank:**  Cornerstone Money Market Savings, opened August 9, 2021; Cornerstone Money Market Savings, opened August 13, 2021; Cornerstone Money Market Savings , opened August 17, 2021; Cornerstone Money Market Savings, opened January 4, 2023;

Cornerstone Money Market Savings; Cornerstone Money Market Savings, opened February 13, 2023.

63. Plaintiff Strother opened these accounts online, in all instances, in the manner described above. *See supra* ¶¶ 12-13.

64. Plaintiff Strother would have had to click to agree to both the 2020 Vio Bank AAD in 2021 and the subsequent, superseding 2022 Vio Bank AAD in 2023, including the arbitration provisions described above. *See supra* ¶¶ 34-44.

65. All of Plaintiff Strother's accounts are active at Vio Bank.

## PLAINTIFF STRUCKE [VIO BANK]

66. Based upon my review of MidFirst Bank's business records, Plaintiff Strucke has one account at **Vio Bank:** Cornerstone Money Market Savings, opened August 19, 2021.

67. Plaintiff Strucke opened this account online in the manner described above. *See supra* ¶¶ 12-13.

68. Plaintiff Strucke would have had to click to agree to the 2020 Vio Bank AAD in 2021 including the arbitration provisions described above. *See supra* ¶¶ 39-44.

69. Plaintiff Strucke's account is active at Vio Bank.

## PLAINTIFF DE MEDICIS [MONIFI]

70. Based upon my review of MidFirst Bank's business records, Plaintiff De Medicis had two accounts at **Monifi**: Monifi Save Account, opened June 1, 2021; Monifi Account, opened June 1, 2021.

71. Plaintiff De Medicis opened these accounts online, in all instances, in the manner described above. *See supra* ¶¶ 14-16.

72.      Plaintiff De Medicis would have had to click to agree to Monifi Terms and Conditions, including the arbitration provisions described above. *See supra* ¶¶ 45-48.

73.      Plaintiff De Medicis's accounts were closed in 2022 and a final check was sent to him on September 22, 2022, upon closing of the accounts.

74.      Based on internal records and my personal knowledge, none of the Plaintiffs provided written notice rejecting the arbitration provisions contained in their respective AADs.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on June 3, 2024 in Oklahoma City, Oklahoma.

  /s/ Derek Caswell
  Derek Caswell

# Exhibit A

  Security

**Your LiveFree Checking Application**

✓ Your Information — 2 Accept Disclosures — ③ Fund Your Account — ④ Finishing Up

## Accept Disclosures

By applying for an account online, you authorize MidFirst Bank, at its discretion, to obtain information relating to your credit and banking history, including but not limited to credit reports and employment verifications in connection with this account. If you are applying for any joint applicants, you confirm that you are authorized to open the account and to consent to the necessary disclosures on behalf of those joint applicants.

To open an account, you'll need to click "Continue" below; and by doing so, you acknowledge that you are signing and agreeing to these terms and that you are opening the account type indicated on your application. But, before you click "Continue," you'll need to complete the online application process. To complete the online application process, you must read and agree to all of the following disclosures. You may wish to print the disclosures for your records.

→    must read and agree to the Consent to Electronic Records

→    must read and agree to the TIN and Backup Withholdings Certification

→    must read and agree to the Account Agreement and Disclosure, Privacy Notice and Truth in Savings Disclosure.

[ Continue ]

You are applying for
LiveFree Checking

Need Help?

Call 888-643-3477

FAQs

Why do I need to review and accept disclosures?

Security

MidFirst Bank uses the latest security technologies to ensure the safety of your personal information.

Learn more about our security measures and browser requirements.

FAQs    Privacy Practices    CA Privacy Practices    Privacy Notice    Terms of Use

Copyright © 2024, MidFirst Bank. Member FDIC.

# Exhibit B

  Security

## Your Cornerstone Money Mrkt Savings Application

✓ Enter Information — **2** Accept Disclosures — ③ Fund Account — ④ Finish Up

## Accept Disclosures

By applying for an account online, you authorize MidFirst Bank, acting through its Vio Bank division, to obtain information relating to your credit and banking history, including, but not limited to, credit reports and employment verifications in connection with this account. If you are applying for any joint applicants, you confirm that you are authorized to open the account and consent to necessary disclosures on behalf of those joint applicants.

Before you open your account, you must read and agree to the following disclosures. These disclosures contain important information about your account. You should print or save the disclosures for your records. By clicking "Continue" below, you acknowledge and agree that your account is subject to terms and conditions contained in the disclosures and that you are opening the account type indicated on your application.

→ **must read and agree** to the Consent to Electronic Records.

→ **must read and agree** to the TIN and Backup Withholdings Certification.

→ **must read and agree** to the Account Agreement and Disclosure, Privacy Notice and Truth in Savings Disclosure.

**Continue**

FAQs

Why do I need to review and accept disclosures?

FAQs    Privacy Practices    CA Privacy Practices    Privacy Notice    Terms of Use

Copyright © 2024, Vio Bank, a division of MidFirst Bank. Member FDIC.

888-999-9170
customerservice@viobank.com

# Exhibit C



# Exhibit D

**MidFirst Bank**®

**Account Signature Card**

Account Title/Address _____

Account Number _____

Date Opened _____

Banking Center Address _____

Account Type Name _____

_____

Account Category _____

_____

Ownership Type _____

_____

Replacement Card _____

Opened By _____

|  | Primary Signer | Signer 2 |
|---|---|---|
| Title or Name | | |
| Relationship Type | | |
| Address | | |
| City, State, Zip | | |
| Tax ID Number | | |
| Date of Birth | | |
| Primary Phone | | |

|  | Signer 3 | Signer 4 |
|---|---|---|
| Title or Name | | |
| Relationship Type | | |
| Address | | |
| City, State, Zip | | |
| Tax ID Number | | |
| Date of Birth | | |
| Primary Phone | | |

**TAXPAYER IDENTIFICATION NUMBER CERTIFICATION** I certify under penalty of perjury that the information provided on this Signature Card, including the taxpayer identification number ("TIN") is true and correct; that I am a U.S. citizen or other U.S. person; and that I am not subject to backup tax withholding because (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service ("IRS") that I am subject to backup withholding as a result of a failure to report all interest or dividends; or (c) the IRS has notified me that I am no longer subject to backup withholding. Alternatively, the foregoing is true with the exception that (check all that apply):

☐ I am subject to backup withholding because of underreported interest and dividends.
☐ I have applied or will soon apply for a TIN. If one is not provided to this institution within 60 days from today, I will be subject to backup withholding.
☐ I am a Foreign Recipient and have provided this institution with the appropriate Form W-8 certification.

Signature _____ Date _____ Taxpayer Identification Number: _____

**IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT.** To help the government fight the funding of terrorism and money laundering activities, federal law requires all financial institutions to obtain, verify and record information that identifies each person who opens an account. What this means for you: When you open an account, we will ask for your name, address, date of birth, and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents.

**ACKNOWLEDGEMENT** - By signing this Signature Card, I acknowledge that I am opening the MidFirst Bank deposit account shown above. I certify that the information contained in this form is correct, and I authorize MidFirst Bank, at its discretion, to obtain information relating to my credit and banking history, including but not limited to credit reports and employment verifications in connection with this account. I acknowledge that I have received a copy of MidFirst Bank's Account Agreement and Disclosure ("AA&D"), Privacy Notice, and the account disclosure specific to this account type (collectively the "Account Documents"), and I agree that I am bound by the terms and conditions contained therein as may be amended from time to time. I understand I may view the current AA&D and Privacy Notice online at midfirst.com/account agreement, and that I may request a copy of the Account Documents at any banking center. If this is an interest-bearing account, I acknowledge that the rate of interest and the annual percentage yield ("APY") has been provided to me, and I understand that this rate of interest and APY will apply to the account shown above. If this account is opened in the name of a business entity, I certify that all persons signing this Signature Card are authorized to act on behalf of the business entity. The undersigned hereby acknowledges and agrees that this original document will be scanned into MidFirst Bank's electronic document retention system, and the electronic image of this document will then become the original document going forward. The undersigned hereby waives any claims based on the production of, or the existence of, the hard-copy, original document.

**ADDITIONAL TERMS**

_____ Date _____ _____ Date _____

_____ Date _____ _____ Date _____

Card 1 of

# Exhibit E

# MIDFIRST BANK®



Effective September 27,2022

# Account Agreement and Disclosure

## Terms and Conditions of Your Account

With respect to an account or accounts ("Account") held at MidFirst Bank, a federally chartered savings association ("MidFirst"), each person who is named as the owner or is authorized to withdraw funds ("you" or "your," whether one or more) and MidFirst ("we," "our" "us" or "Bank") all agree to the following:

**1. AGREEMENT.** Your Account is subject to terms and conditions that we adopt from time to time. This Account Agreement and Disclosure ("Agreement") describes the current terms and conditions.  By signing the Account Signature Card, Receipt of Certificate of Time Deposit, or by clicking the appropriate checkbox and submitting your online application you acknowledge that you have opened the type of account indicated on the applicable account opening document and you received, understand and agree to be bound by the terms and conditions of this Agreement. You have been provided an account disclosure and a fee schedule ("Fee Schedule"), which are incorporated into this Agreement. If you have elected to obtain other services ancillary to your Account, the agreements for those ancillary services also are incorporated into and made a part of this Agreement. We may alter, amend, or rescind, for any reason, any part of these terms and conditions (or any other Account-related agreement or documentation), or add new terms, at any time.  We will give notice of any such changes that may adversely affect you by: (a) posting the same in a conspicuous place in the lobbies of our main office and each of our branches; (b) sending written notice thereof to you at the most recent address indicated on our records; or (c) sending notice to you by electronic mail, as permitted by applicable law, at the most recent electronic mail address indicated on our records. We have no obligation to notify you of changes to the features of your Account that do not adversely affect you in any way.  We may immediately implement changes required by law or regulation or to protect the security of your Account or our system.  When necessary, notice of such changes will follow implementation. Your continued use of the Account after implementation of changes or following notice of changes to this Agreement as described above signifies your continued acceptance of this Agreement and all changes and amendments hereto.  All Account signers authorize us to make inquiries from any consumer reporting agency in connection with this Account.  We reserve the right and may close an Account at any time for any reason.  You may close your Account at any time for any reason, subject to any prior advance notice requirements related to the particular account, early Account closure fees and our Funds Availability Policy.

**2. LAWS, RULES, AND REGULATIONS.** The Account, including deposits to and withdrawals therefrom, is governed by: (a) the laws and regulations of the United States applicable to federal savings associations and, to the extent applicable, the law of the state in which the Account is deemed by us to have been opened; (b) the rules, regulations and orders of the Office of the Comptroller of the Currency, the Federal Deposit Insurance Corporation, the rules and operating procedures of Federal Reserve Banks and of any clearing house association of which we are or may become a member or through which we may send items for collection; and (c) all provisions posted on our premises, enclosed with statements of Account or contained in our bylaws; all as now in effect or as may in the future be issued, modified or amended. Our obligations pursuant to law, regulation or policy applicable only to consumer Accounts shall not apply to business or commercial Accounts. Activity in consumer Accounts is expected to be for consumer purposes. Business or commercial activity should not be conducted in consumer Accounts. Transactions restricted under Unlawful Internet Gambling Enforcement Act (UIGEA) are prohibited and should not be processed through your Account.

**3. ACCOUNT OWNERSHIP.** Other than those persons identified as authorized signers, agents or fiduciaries, the persons or entities identified on the Account Signature Card or during the online application process as owners are the owners of the Account. If more than one person is identified, each indicated person named is an owner and such ownership shall, for the purpose of this Agreement be deemed to be owned by such persons as joint tenants with full rights of survivorship. Business, fiduciary, and association Accounts are held under the terms of documents submitted to us by the person(s) opening the Account If the Account is a Payable on Death ("POD") account, the Account shall be payable on the death of the last Account owner to one or more designated POD beneficiaries, if living, and if not living, to the named estate of the beneficiary.  If more than one beneficiary is designated by the Account owner(s), the beneficiaries, if living, and if not living, the named estate of the beneficiaries, shall share equally in the amount payable on death of the last Account owner. Persons who are identified during the online application process as authorized signers or whose signatures appear on your applicable account opening or related Account documents have the individual authority to withdraw funds from your Account. Any person who is authorized to withdraw funds but who is not the owner of an Account will be considered an agent of the owner of the Account, with the unlimited right to deal with the Account on behalf of the Account owner. We have no duty to inquire as to the authority of an agent to deal with the Account, and we have no liability for permitting an agent to withdraw funds from an Account, regardless of the manner of withdrawal or recipient of the funds.

**4. AUTHORIZED SIGNATURE.** For Accounts opened in person, your signature on the applicable account opening or related Account documents, such as the Account Signature Card or Receipt of Certificate of Time Deposit, is your authorized signature for your Account.  For Accounts opened online, the signature of any authorized signer identified during the online application process is an authorized signature for your Account. For the payment of funds and for other purposes relating to any Account you have with us, we are authorized to recognize your signature, but we will not be liable to you for refusing to honor your checks or other signed instructions if we believe in good faith that

the signature appearing on such checks or instructions is not genuine. We may honor any check or other item drawn against the Account so long as it contains at least one authorized signature. In addition, we may ask for a form of identification for transactions processed in person for authentication purposes.  In the event of a forgery, we shall not be liable if a "reasonable person" who is similarly situated could not have detected the forgery. We may, but are not required to, accept electronic signatures on account-related documents. If you provide us with an electronic signature on any account-related document, you acknowledge and agree that such electronic signature will be valid and binding the same as if you had signed manually, and the electronically-stored document constitutes an original document the same as if executed by hand and stored in paper format. If you provide us with an electronic signature, we may, in our sole discretion, verify the authenticity of such signature; however, we are not obligated to do so.  If you provide us a scanned or facsimile signature, we may, in our sole discretion, accept such signatures; and by so providing, you agree that such scanned or facsimile signatures are valid and binding as an original, without any obligation by us to verify the accuracy thereof.   Unless designated on your Account, we may honor any check or other signed instruction that bears or appears to bear your signature even if it was made or presented by an unauthorized person or with a counterfeit facsimile, electronic, or other signature. You should maintain close control over your facsimile or electronic signature device or stamps and promptly review your statements and cancelled checks for unauthorized use. You agree to hold us harmless from any and all claims and damages that arise based upon said facsimile or electronic signatures.  If you authorize any person to sign your name or otherwise draw against your Account, we may honor any withdrawal signed by or authorized by that person whether or not it exceeds the authority you granted.

**5. CUSTOMER IDENTIFICATION.** As required by federal statute and regulation and by our policy, we may require and may verify certain information regarding individuals at Account opening and as otherwise deemed necessary. This information may include complete customer name, residential or business address, mailing address if different, tax payer identification number, date of birth, government issued photo identification, and other information as may be required by government laws or regulations or as may be deemed appropriate to verify your identity as the customer. This information may be required for all individuals who are deemed owners of the Account, acting as agent on behalf of the Account owner, named as beneficiary on the Account, or otherwise associated with the Account regardless of manner. In order to comply with regulatory requirements, we may require identifying information regarding the beneficial owners of our legal entity customer. Account access or proceeds of Accounts opened without required information or subject to information verification may be restricted until such information is obtained and/or verified. We may close an Account at any time for any reason, including but not limited to identification information deemed by us, in our sole discretion, to be insufficient or unverifiable.

**6. OUR LIABILITY.** We have no obligations or liabilities to you other than those imposed by law or specifically provided herein. Any duty of care imposed on us by law will be fulfilled if the procedures established for the transaction involved are reasonable. We will have no liability for clerical error, inadvertence or oversight, or an honest mistake of judgment.  We have no obligation to verify the accuracy of any information or instructions you provide.

**7. RIGHT TO OFFSET.** We may, at any time at our discretion, and with notice to you, sent either prior to or after the event, apply any part or all of the balance of your Account to fees or any other debt, matured or unmatured, that you or any other Account owner may then owe to us. Accounts subject to our right of offset include Accounts held at any of the Bank's divisions, including but not limited to 1st Century Bank and Vio Bank, and debts owed to Bank include those obligations owed to any of our divisions.

**8. MINOR ACCOUNTS.** If the Account has been opened in the name of an individual of less than eighteen (18) years of age ("Minor"), we may, in our sole discretion, waive the standard transaction fee, Account maintenance fees and any other fees or charges that we deem appropriate during the time the Minor is under age eighteen (18). Upon the Minor reaching eighteen (18) years of age, if we previously waived such fees, we will commence assessing the standard transaction fees, Account maintenance fees and any other fees or charges that are set forth in the Fee Schedule in effect on the date the Minor reaches the age of eighteen (18) years of age, and as the Fee Schedule may be amended from time-to-time thereafter. Upon the Minor reaching age eighteen (18) and thereafter, you agree to pay all standard transaction fees, Account maintenance fees and any other fees and charges regularly charged for similar Accounts.  We may permit a minor Account owner to withdraw funds during minority without the signature of a parent even if the parent is also an owner of the Account.

**9. FEES AND CHARGES.** We may assess such transaction and Account maintenance fees and other charges and in such amounts as may be permitted by law. A separate Fee Schedule has been provided (see paragraph 1).  We may amend this Fee Schedule from time to time. You agree to pay immediately any applicable fees and charges and any expenses we may incur in collection of amounts you owe us or in collection of items deposited with us for deposit to your Account, including, but not limited to, any court costs and attorneys' fees, and we may charge your Account to pay these fees, charges, and expenses. If at any time we are required to engage the services of financial or legal counsel (i.e., an attorney or an accountant) to resolve issues related to an Account, you will pay to us on demand the fees and costs we incur.

**10. YOUR CONTACT INFORMATION.** You will keep us advised of any change of your address. Any notice or Account statement mailed by us to the last address given to us by an owner of the Account will be deemed sufficient. Address change requests are subject to identity verification and must be provided with sufficient time for us to process the change of address. If you provide a phone number to us, whether mobile or otherwise, you expressly agree and consent to be contacted by us and any of our agents, affiliates, contractors, successors or

assigns (collectively "us") at this phone number (including mobile, cellular, wireless or similar devices), for any lawful purpose such as for information, servicing or collection purposes except as otherwise stated below.  The ways in which we may contact you include live operator, automatic telephone dialing systems (auto-dialer), prerecorded and artificial voice message and text/SMS message. If you provide a mobile phone number to us, you agree that we may text you for the purposes of providing transactional Account-related information, not related to collections purposes or marketing purposes.  Message and data rates apply, and your consent to such contacts applies even if you are charged by your service provider for our communication.  You can view our full mobile practices at midfirst.com/alertstermsofuse and our privacy practices at midfirst.com/privacypractices. You authorize these contacts by voice or text even if the number is a mobile phone number or converts to a mobile phone number, and even if you are charged by your service provider.  You authorize us (but we are not obligated) to monitor, record electronically and retain telephone conversations and electronic communications between you (including your purported authorized representatives) and us.  Accordingly, you agree on behalf of yourself, and your employees and agents that we may monitor and record your telephone and electronic communications in connection with your Account at any time.  Unless required by applicable law, we may monitor and record these communications without further notice.  You agree that we may produce the telephonic or electronic recordings or computer records as evidence in any proceedings brought in connection with the Agreement, and you hereby acknowledge the validity and enforceability of such telephonic or electronic recordings. If you provide us with an email address, or if you send us an email, you agree that we may contact you at that email address.

**11. OUR RIGHTS.** We may at any time, and in  our sole discretion with or without prior notice, require a minimum deposit, refuse to accept any deposit or cash any check, limit the amount which may be deposited, charge any Account on which you are a signer (subject to legal restraints) for any negative balance created in another account, return all or pay part of any deposit, or close the Account, returning to you personally, or by mail, either cash or an official check for the balance on deposit in the Account. We may also close an Account at any time for any reason.  If we exercise our right to close your Account or if you close your Account, we may reopen your Account to process outstanding items.  If such item causes a negative balance on your Account, we reserve the right to pursue all remedies available to us, including collection processes. We may decline any transaction, including, but not limited to, any automated teller machine ("ATM") card, debit card, check or automated clearing house ("ACH") transactions.  We may also place an administrative hold on funds on deposit in any Account if we (1) receive a claim from a third party relating to an Account; (2) acquire knowledge of facts which might give rise to a claim by or against us relating to an Account; or (3) if we become aware of facts that to us in our sole judgment appear to indicate that the Account is being used for an improper or unlawful purpose or that you have become the victim of a fraud or undue influence. We may exercise this right even if we are not legally bound to honor the claim. We may hold those funds for a reasonable amount of time to conduct an investigation into the facts. Thereafter, we may either release the funds, apply them against any obligation you may owe us or tender them into a court to resolve the issues. We will not be liable for failing to honor, or for any damage which may result from our failure to honor, any checks, preauthorized transfers, ACH transactions, recurring debit card transactions, or other such transfers or withdrawal orders presented after any such action.

In order to comply with regulatory requirements, we may require additional information on certain transactions including, but not limited to, the source of funds, purpose of the transaction, and/or additional supporting documentation.

You agree that we have been in good faith and have exercised ordinary care if we accept withdrawal requests (whatever the form: paper, electronic or image) from other banks without investigating the genuineness of, or authorization for, the withdrawal. If a withdrawal request is not genuine or is not otherwise authorized by you, our liability will be limited to the amount of the particular withdrawal amount.

**12. DEPOSITS.**
(a) All checks or drafts received by us are at your risk and are credited conditionally to your Account subject to final payment. You authorize us to endorse for you any item deposited to your Account. We have the right to decline debits drawn against such credits. If any item is dishonored on presentation to the financial institution on which drawn, it will be charged back to the Account of deposit or, if such Account does not have sufficient funds, to another Account which the depositor, endorser, or payee is a signer (subject to legal restraints), and you may be charged an applicable fee.
(b) We will not be responsible for any delay in crediting your Account if the deposit ticket accompanying the deposit has not been properly completed.
(c) If you elect to use the night depository or the ATM Electronic Teller Network, you expressly agree to rely upon us or our agent to count and credit the deposit and accept our count as final.
  - You agree that deposits placed in the night depository facility shall be contained in a tamper-proof plastic bag, envelope or other package, as approved by us.
  - Deposits made through the night depository facility shall contain only deposit slip(s), currency, coin and/or negotiable instruments.
  - Deposits made through the night depository facility will be opened and verified each morning of each Business Day.
  - You are solely responsible for any loss or damage resulting from your or your agents' or employees' use of the night depository facility.

(d)  We will not be liable for dishonor of drafts so received in payment for losses thereon or for losses in transit or for negligence or default of other institutions, agents, or subagents but will exercise ordinary care in their selection. We will be deemed to have exercised ordinary care if we send the item by a duly licensed carrier and through any state or federally chartered institution.

(e) Funds deposited will be made available to you under the terms described in the Funds Availability Policy section of this Agreement. When we make funds "available" to you, this does not mean that the funds are "good" or that the deposited item has "cleared" the payor bank.

(f) The outstanding balance of your Account shall not exceed $2,500,000.00 without our prior written consent. Subject to applicable law, at any time, we may limit the amount that may be deposited into your Account.

(g) We may charge back to your Account any items returned to us unpaid or upon which payment has been revoked or rescinded which were deposited into the Account without regard to who made the deposit; whether the deposit was authorized by you; or whether the return to us was timely.

(h) You will not deposit any item not containing the genuine signature of the drawer and the actual endorsement of each payee without our prior written consent. This restriction means that you will not deposit, among other things, "remotely created checks" and "substitute checks" as those terms are defined by law and regulation. If you deposit such items, you agree to reimburse us for losses, costs, and expenses that we may incur associated with such items.

**13. WITHDRAWALS.** You may request the withdrawal of funds from your Account in any amount at any time. Our policy is to pay such withdrawals upon request; however, we are required by federal and state regulations to specifically reserve our right and do hereby reserve our right to require you to give us a seven (7) day written notice of your intention to withdraw funds from your savings Account, money market deposit Account, certificate of deposit or negotiable order of withdrawal account ("NOW Account"). All withdrawals are subject to the availability of funds, as described in the Funds Availability Policy section of this Agreement. We may, at our sole discretion, elect to issue the requested withdrawal amount by Official Check or other means in lieu of cash. Each person who is authorized to withdraw funds from your Account, as indicated on the Account opening documentation, may withdraw funds under any method available to your Account, as described below. Withdrawals by phone transfer or electronic transfer are subject to the terms and conditions described elsewhere in this Agreement. As described in your new Account documents in further detail, certain Accounts allow only a limited number of withdrawals per statement cycle or calendar month, and we may charge a fee for transactions exceeding those limits.   Withdrawals by negotiable instrument may be made only from Money Market Accounts and checking Accounts, and we may refuse payment of any instrument drawn on such an Account other than a negotiable instrument presented upon a form purchased from or approved by us. We do not routinely examine the dates written on items and we are not bound to dishonor any item due solely to the fact that it has been postdated or is more than 6 months old. We may pay items, payment of which have been stopped, after the expiration of the relevant stop payment orders, even though the items may be more than 6 months old.

If your Account is a time deposit, you have agreed to keep the funds on deposit until the maturity of your Account. If your Account has not matured, any withdrawal of all or part of the funds from your Account may result in an early withdrawal penalty. We will consider requests for early withdrawal and, if granted, the penalty provided in the Receipt of Certificate of Time Deposit will apply.

(A) Exceptions. We may let you withdraw money from your Account before the maturity date without an early withdrawal penalty:

(1) When one or more of you dies or is determined legally incompetent by a court or other administrative body of competent jurisdiction or

(2) When the Account is an Individual Retirement Account (IRA) and you have reached the age as determined by IRS guidelines for your Required Minimum Distribution (RMD).

If you make a withdrawal in a foreign currency, the withdrawal will be converted to U.S. dollars. Other fees from such a transaction may apply, and you will be responsible for such additional fees, which may be assessed by a third party.

**14. CHECK CASHING.** We may require identification from persons cashing your checks as we in our sole discretion deem appropriate and may impose fees for cashing checks to the extent permissible by law.

**15. STOP PAYMENT.** You may stop payment of a check, ACH withdrawal, transfer, or preauthorized electronic funds transfer by calling us toll free at 888.MIDFIRST (888.643.3477); by calling or visiting any MidFirst banking center; or through online banking, such as Business Online Banking, Business Online Banking Express or Personal Online Banking, if those services are available on your Account. You must notify us with reasonably sufficient time to allow us to act and fulfill your request. You cannot place a stop payment on one-time debit or ATM card transactions. We have no liability for payment of an item if the stop payment order is received less than 4 hours prior to presentment of an item. A longer period may be necessary depending on the circumstances. We may require a specific period of time in order to fulfill stop payment requests.  We must receive a stop payment order for a preauthorized electronic funds transfer at least three (3) Business Days before the scheduled transfer. If you order us to stop one of these payments three (3) Business Days or more before the transfer is scheduled, and we do not do so, we will be liable for your losses or damages. A written stop payment order expires six (6) months after it is received unless it is renewed in writing by you. For ACH withdrawals, you may stop payment of a one-time withdrawal order or place a

permanent stop payment on the Account prior to the date of remittance for payment.  A permanent stop payment order for ACH withdrawals will remain on your Account indefinitely, unless revoked by you verbally or in writing.  A stop payment order must include your name and Account number and a description of the payment, including the date drawn, check number, the exact amount, and the payee named. You agree to review the information on any stop payment notice that we send you in response to a stop payment order by you and to notify us immediately of any inaccuracy.

The time limitations for stopping, canceling, or changing any bill payments scheduled via Personal Online Banking, Business Online Banking and Business Online Banking Express are contained in your agreements for such services and are not governed by this paragraph.

**16. TELEPHONE TRANSFERS.** By requesting a telephone transfer, you authorize and direct us, as your agent, to transfer funds between the Accounts specified by you in your Account Agreement or otherwise. Transfer will be made pursuant to instructions from you, provided that you identify yourself by providing your Account numbers and other requested information for such services which you have authorized in your Account Agreement or otherwise. You agree to pay any applicable transfer fee in effect on the date of transfer. This fee will be automatically debited from the Account from which you are transferring funds. You represent that you are authorized to withdraw funds from such Accounts. We shall have no liability for any refusal or failure to make a transfer pursuant to telephone instructions. Transfers made pursuant to these terms and conditions shall be at your sole risk.

**17. POWER OF ATTORNEY.** If you wish to designate an attorney-in-fact, you must do so in a form acceptable to us. We reserve the right to refuse to honor any Power of Attorney presented to us, and shall have no liability related to such refusal to the extent permitted by applicable law. We shall have no liability for transactions performed by a purported attorney-in-fact under a Power of Attorney that has been revoked or is otherwise invalid unless we have received written notice of same and have had a reasonable period of time to act upon such notice. We reserve the right to restrict the types or amounts of transactions we will permit an attorney-in-fact to conduct. A person acting under a Power of Attorney is not, by virtue of such power, an owner of the Account, and no funds in the Account belong to the attorney-in-fact by reason of that capacity. The attorney-in-fact has no right of survivorship in the Account by virtue of that capacity.

**18. INTEREST.**  The interest rate specific to your Account can be found on your periodic statement of Account, or in the applicable online banking platform for your Account. Interest will be compounded daily and credited to your Account monthly unless otherwise stated in your Account disclosures. We use the daily balance method to calculate the interest on your Account. This method applies a daily periodic rate to the principal and interest that has been accrued to your Account each day.  The daily periodic rate is calculated by dividing the interest rate by 365.  Account interest begins to accrue on the Business Day funds are collected. If you close your Account before interest is paid, you will not receive your accrued interest. We reserve the right to change our interest rates and Annual Percentage Yields (APY) at any time at our sole discretion, without notice to you.

For regulatory and accounting purposes, your checking and NOW Account will consist of two subaccounts: a checking subaccount and a money market subaccount. This does not affect transactions, funds availability, interest the Account earns, minimum balance requirements, fees and charges, or FDIC insurance coverage associated with your Account.

At various times during the statement cycle, we will transfer funds between the checking subaccount and the money market subaccount. Subaccount activity will not appear on your monthly statements and will not be subject to fees. Account statements will look as if there was only one checking Account. For interest-bearing checking Accounts, both subaccounts will pay the same interest rate and annual percentage yield. For non-interest-bearing checking Accounts, neither subaccount will pay interest. You will have no direct access to the money market subaccount; you may only access the money market subaccount indirectly through transactions on your checking subaccount. This will have no impact on your use of the Account or, for MidFirst interest-bearing checking Accounts, the interest you will earn on your Account balance.

**19. STATEMENT OF ACCOUNT.** Your periodic statement of Account will be prepared as of a date designated by us. Our books will determine the balance of the Account. Your statement will note all deposits, withdrawals, transfers, debits, and adjustments charged or credited to the Account and may provide an image of the front of each item shown on the statement, as required by law. We will attempt to maintain a legible copy of each item destroyed for the time required by law. This obligation is met if we have systems and use equipment that will generally capture and retain an image of the item. You may obtain a copy of any item as maintained in accordance with applicable law. Fees for obtaining such copies are set forth in our Fee Schedule. We are not liable for any loss occasioned because we are unable to provide copies. Your statement will be mailed to the last address we have for you in our system unless you opted to receive statements electronically. If mail to the address on file with us is returned, we will no longer mail statements until we receive an updated address from you. You agree to promptly and carefully examine each statement and, within thirty (30) days after mailing, report to us any unauthorized signature on or alteration of any item, and, within sixty (60) days after mailing, report to us any other error or discrepancy in it or any claim for credit or refund. If no such report and return is made within the applicable period, you will be presumed to have accepted the stated balance as being correct and to have released us from all liability for transactions posted or not posted to the Account, subject to applicable law.

**20. LIMITATIONS.** Any transfer by wire or ACH to or from any of your transaction Accounts must be from, to, or through a domestic financial Institution. You agree that at such time as your Account is credited with the amount of the transfer, or is credited to a debt of yours, or is

otherwise made available to you, any such event shall serve as notification to you of our receipt of the payment order and notice to you of such event. You agree that you will not cause or permit any transfer to any of your transaction Accounts by electronic means, including by wire or ACH, in excess of $1,000,000.00, without our prior written consent. In the event that no such prior written consent is obtained, you agree that we need not accept the transfer, we shall have no obligation to credit the amount of the transfer to your Account, and we may return the amount of the transfer to the sender so long as we make such return by the close of the banking day following the day on which we receive payment for the transfer. We shall not be deemed to have waived any rights under this paragraph 20, or elsewhere in this Agreement based upon any prior transfer to you.

**21. DORMANT ACCOUNTS.** Accounts may be classified as dormant when there have been no customer-initiated transactions for the preceding twelve (12) months. To prevent your Account from becoming dormant, you must initiate one of the following types of transactions: deposit, withdrawal, check, electronic deposit, ATM withdrawal, debit card transaction, telephone transfer or ACH direct deposit. An inactivity fee may be assessed against the dormant balance. We must, in most cases, remit the dormant balance as abandoned property in accordance with applicable law.

**22. ATM CARDS AND DEBIT CARDS.** ATM cards and/or debit cards may be used to access your savings Account if the ownership and persons authorized to withdraw funds are identical to the checking Account for which your ATM card or debit card is issued. We reserve the right to suspend or revoke ATM card and/or debit card privileges at any time. If you use your ATM card or debit card to access an Account that does not have sufficient funds to complete a transaction or that would exceed the daily authorization limit attached to your ATM card or debit card, we may, at our discretion, authorize the transaction. If we authorize a transaction that overdraws your Account, we may assess a fee as described below in paragraph 24, "Overdrafts," and as set forth in the Fee Schedule. Terms and conditions applicable to use of ATM cards and debit cards are also described elsewhere in this Agreement.

**23. ACCOUNTS OF DECEDENTS.** On the death of the owner of your Account, the amount of the credit balance in your Account will be paid as permitted or required by law, federal and state regulations, and in accordance with our security procedures. In the event of a death of an Account owner, Account information will be furnished upon request to the duly appointed estate administrator, trustee or attorney.

**24. OVERDRAFTS.** An Overdraft occurs when you do not have a sufficient Available Balance to cover an item, causing or increasing a negative Available Balance in your Account. At our discretion, we will either pay Overdraft items or return them unpaid. As described in this section and our Fee Schedule, there are fees associated with Overdrafts. You can avoid fees for Overdrafts by making sure that your Account always contains sufficient available funds to cover all of your transactions and any fees related to your Account.
In addition to our standard Overdraft practices described in this Section, which apply to all Accounts, we offer two optional services related to Overdrafts: our Overdraft Privilege Service and Overdraft Protect Service. The Overdraft Privilege Service expands our standard Overdraft practices and may allow you to avoid declined ATM and everyday debit card transactions. The Overdraft Protect Service allows you to link another deposit account or a line of credit to automatically transfer funds to pay for items that overdraw your Account. While fees apply to the Overdraft Protect Service, these fees may be less expensive than the fees for Overdrafts under our standard Overdraft practices or the Overdraft Privilege Service.

    A.   *Discretionary Payment or Return of Items*

You agree that we may pay any item that results in an Overdraft at our sole discretion. This means that we do not guarantee that we will pay or authorize any item or withdrawal request that exceeds your Available Balance. If we pay an Overdraft on one or more occasions, we are not obligated to continue paying future Overdrafts. We have no obligation to notify you before we pay an Overdraft item or before we return an Overdraft item unpaid.

We will not authorize ATM withdrawals or one-time debit card transactions that create or increase a negative Available Balance unless you have opted in to our optional Overdraft Privilege service discussed below in subsection (G).

You agree to pay the amount of any negative balance in your Account and all Overdraft fees immediately upon demand. You agree that we may pursue any collection remedy available under applicable law, and you may become responsible to reimburse us for any related expenses. To the extent permitted by law, you authorize us to deduct any negative balance and any Overdraft fees from any funds that may thereafter be deposited into your Account, even if those funds come from restricted income sources that are exempt from attachment.

    B.   *Available Balance and Ledger Balance*

Your Account's Available Balance and Ledger Balance affect whether we will pay an Overdraft and whether you will be charged a fee. Your Account's Ledger Balance is the current balance of cleared and settled funds in your Account at the beginning of each Business Day. Your Account's Available Balance is the Ledger Balance reduced by any one of the following items that we receive throughout the day, as applicable:

        1.  **Deposit Holds** - Any outstanding holds for deposits that are not yet available under our Funds Availability Policy discussed in Funds Availability section of this Agreement. In the event you deposit a check that is not from a guaranteed source, a hold is placed on the Account to the extent and during the period described in the Funds Availability Policy section of this Agreement. In our discretion, we can reduce the time frame for a hold or choose not

to place a hold at all. For example, in some cases we are able to verify that a check has been honored prior to the time a hold would otherwise expire and can manually remove the hold, making funds available earlier;

2. **Pending Debit Transactions** - Debit card items we have authorized but have not been processed for payment;

3. **Merchant Holds** - Certain types of businesses (for example, hotels, restaurants, pay at the pump and rental or leasing companies) may request debit card authorizations in an amount exceeding the amount they ultimately charge you. When we authorize any debit card transaction, we establish a hold and reduce your Available Balance by the full amount we authorize (which may differ from the transaction amount) until the item is settled for the actual amount of the transaction or is no longer considered to be pending;

4. **Intra-Day Activities** – Certain electronic transactions, including but not limited to wire transfers, ATM withdrawals, and other electronic transfers.

We use your Available Balance to determine whether or not to pay an item that results in an Overdraft on your Account.  We may elect to return items to the presenting institution or merchant when you do not have a sufficient Available Balance in your Account to cover the item. However, if we pay the item, we use your Ledger Balance to determine whether we will charge you a fee for the Overdraft.

C.  *Fees*

You will be charged an Overdraft fee for each item that results in an Overdraft on your Account as follows. Under our basic Overdraft service, we will assess a Paid Overdraft Fee for each item that we pay that results in a negative Ledger Balance in your Account, other than everyday debit card transactions and ATM transactions.  If you opt into the optional Overdraft Privilege Service described in subsection (G), we may also choose to pay ATM and everyday debit card transactions when you do not have sufficient funds and will assess a Paid Overdraft Fee for each transaction we pay that results in a negative Ledger Balance in your Account.

- **For personal deposit accounts:** We do not assess a fee for any item that we return unpaid due to Non-Sufficient Funds.
- **For business accounts:** We will assess a Returned Overdraft Fee (also known as Non-Sufficient Funds fee) for each item that we return unpaid due to non-sufficient funds.

You may also be charged a returned item fee by the institution or merchant that presented the item to us for payment.   We do not control fees assessed by other institutions or by merchants. In any case, if the Ledger Balance in your Account remains negative for seven (7) consecutive calendar days or more, we may assess a one-time Extended Overdraft Fee.

If you enroll in the optional Overdraft Protect Service described in subsection (H), we will assess an Overdraft Protect Transfer Fee each day we make a transfer from a linked deposit account or line of credit to cover an Overdraft on your Account instead of an Overdraft fee.  All fee amounts are set forth in the Fee Schedule for your account. Contact us at 888.MIDFIRST (888.643.3477) to request a copy of your Fee Schedule.

D.  *General Rules Applicable to Overdraft Fee Processing*

We limit the number of Overdraft fees we will assess as follows:

- A maximum of 5 Overdraft fees will be charged on any Business Day.
- We will not charge any Overdraft fees if, at the end of a Business Day, your Ledger Balance is negative by $5.00 or less.
- We will not charge Overdraft fees for Overdrafts caused by fees we assess.

E.  *Posting Order*

We post transactions to your Account during overnight processing, which determines your Ledger Balance at the start of the next Business Day. The order in which we post transactions can therefore determine whether you are charged Overdraft fees and the number of fees you may be assessed.  You agree that we may pay items, including checks, ACH items, and other electronic debits to your Account, in any order that complies with applicable law, and that this order may not align with the order in which the transaction was authorized or presented. Generally, we group transactions into categories by type. We then process and post items by category in the following order:

1. **Deposits and Credits** - First, we add deposits and other credits to your Account.

2. **Priority Items** - Then, we subtract certain priority items such as electronic bill payments, over the counter withdrawals, MidFirst checks cashed or deposited at a banking center or via our mobile app, and outgoing wires. These items are posted to your Account from smallest dollar amount to largest.

3. **Other Electronic Items** - Then, we subtract other electronic items, such as debit card, ATM and ACH items. These items are posted in the order they were authorized or time they are received by us for processing;

4. **Checks** - Checks, which are posted in serial number order.

5. **Fees** - Fees and other service charges.

F.  *Re-presented Items*

When we return items to the presenting institution or merchant because you do not have a sufficient Available Balance, the presenting institution or merchant may re-present the item to us multiple times for payment. If your Available Balance is not sufficient to cover the item when it is re-presented, you may incur a Paid Overdraft Fee (all accounts) or an additional Returned Overdraft Fee (business accounts only).

While we try to avoid charging more than one Paid and/or Returned Overdraft Fee for a re-presented item, certain items may appear to us as separate, unrelated transactions when re-presented, resulting in an Overdraft Fee. If you are charged a duplicate Overdraft Fee for a re-presented transaction, we encourage you to contact us at 888.MIDFIRST (888.643.3477) so we can review your Account.

G. *Optional Overdraft Privilege Service*

We offer an optional discretionary Overdraft service called Overdraft Privilege. With the Overdraft Privilege Service, we may pay ATM and everyday debit card transactions even if you do not have a sufficient Available Balance to cover the transaction.  Not every account is eligible for the Overdraft Privilege Service, and you must opt-in to this service before you can use it. Eligible Accounts must be open for at least thirty (30) days before you can opt in to Overdraft Privilege. You are not required to opt in to Overdraft Privilege. If you opt in to Overdraft Privilege, we may pay ATM or one-time debit card transactions that result in Overdrafts, and you agree that we can assess a Paid Overdraft Fee for any such transactions that result in a negative Ledger Balance in your Account.

If you do not opt into the Overdraft Privilege Service, and you attempt an ATM or everyday debit card transaction at a time when your Account does not have a sufficient Available Balance to cover the transaction, the transaction will be declined and no Paid Overdraft Fee will be charged. Please note that if you do not opt in to Overdraft Privilege, we will continue to apply our standard Overdraft practices to checks, ACH, and recurring debit card transactions and you could still incur a Paid Overdraft Fee if we honor a check, ACH, or recurring debit card transaction that causes or creates an Overdraft on your Account.  In addition, if you hold a business account, you could incur a Returned Overdraft Fee if we return a check, ACH or recurring debit card transaction.

For each of your Accounts, you can opt in to Overdraft Privilege or change your Overdraft Privilege election by calling us toll free at 888.MIDFIRST (888.643.3477); by calling or visiting one of our banking centers; or, for eligible accounts, by clicking the Customer Service tab in Personal Online Banking and selecting "Change Consumer Debit Card and ATM Card Overdraft Settings."

H. *Optional Overdraft Protect Service*

We also offer an optional service, Overdraft Protect, which allows you to authorize automatic transfers from a linked deposit account or line of credit to cover Overdrafts on the Account that you designate. Transfers are subject to availability of funds in your linked Account or line of credit. When you link another deposit account, you represent that you have an ownership interest in and are authorized to withdraw funds from that account. Line of credit services are subject to approval, applicable restrictions, and other limitations. Overdraft Protect is subject to the terms and conditions contained in this Agreement, the Fee Schedule, and your signed Overdraft Protect Agreement and Authorization or the applicable line of credit documents. We charge an Overdraft Protect Transfer Fee each day that we make an automatic transfer to cover an Overdraft.

When you enroll in Overdraft Protect, you authorize and direct us, as your agent, to automatically transfer funds from your linked account or designated line of credit to cover Overdrafts in your designated Account. Your authorization remains in effect until you tell us in writing to terminate your Overdraft Protect Service.  We will automatically transfer funds to cover an Overdraft if your linked account has a sufficient Available Balance, or if your designated line of credit has sufficient available credit, to cover the entire Overdraft amount plus the Overdraft Protect Transfer Fee, except if such action violates state or federal regulation. If one (1) or more items are presented to us and your linked account does not contain sufficient funds, or sufficient credit is not available to cover the entire Overdraft amount caused by all of the items presented as well as the Overdraft Protect Transfer Fee, we will not make an automatic transfer.

For more information about Overdraft Protect, available credit services, applicable terms and conditions, fees and enrollment, please visit the MidFirst Overdraft Services webpage at midfirst.com/overdraftservices, call us toll free at 888.MIDFIRST (888.643.3477) or call or visit any MidFirst banking center.

You may, at any time, cancel Overdraft Protect in writing mailed to MidFirst Bank, Attention: Overdraft Protect, P.O. Box 76149, Oklahoma City, Oklahoma, 73147.Notification of cancellation must be received in writing at least ten (10) days before the effective date of cancellation.


**25. SEVERABILITY.** If an item or condition of this Agreement is found to be illegal or unenforceable, the balance of this Agreement will remain in full force and effect.


**26. NOTICE AND CURE.** Prior to bringing a lawsuit or initiating an arbitration that asserts a claim arising out of or related to this Agreement (as further defined in the Arbitration Provision, a "Claim"), the party asserting the Claim (the "Claimant") shall give the other party (the "Potential Defendant") written notice of the Claim (a "Claim Notice") and a reasonable opportunity, not less than thirty (30) days, to resolve the Claim. Any Claim Notice to you shall be sent in writing to the address we have in our records (or any updated address you subsequently provide to us). Any Claim Notice to us shall be sent by mail to MidFirst Bank, 501 N.W. Grand Boulevard, Oklahoma City, Oklahoma 73118, Attn: Bank Operations Account Claim Notice (or any updated address we subsequently provide). Any Claim Notice you send must provide your name and Account number, as well as your address and a phone number where you can be reached during normal business hours. Any Claim Notice must explain the nature of the Claim and the relief that is demanded. You may only submit a Claim Notice on your own behalf and not on behalf of any other party. No third party, other than a lawyer you have personally retained, may submit a Claim Notice on your behalf. The Claimant must reasonably cooperate in providing any information about the Claim that the Potential Defendant reasonably requests.


**27. WIRE TRANSFERS.**  We reserve the right to place limits on domestic and international incoming or outgoing wire transfers at any time. Limitations may include, but are not limited to, limiting the Accounts from which a wire transfer may be sent, the countries and/or banks to

which a wire transfer may be sent, and/or the amount of a wire transfer, among other restrictions and applicable fees. For additional information on wire transfers, including any limitations, call or visit any MidFirst banking center or call us toll free at 888.MIDFIRST (888.643.3477).

**28. ARBITRATION PROVISION. PLEASE REVIEW AND READ THIS ARBITRATION PROVISION CAREFULLY. IF YOU DO NOT REJECT THIS ARBITRATION PROVISION IN ACCORDANCE WITH SUBPARAGRAPH (a) BELOW, IT WILL BE PART OF THIS AGREEMENT AND WILL HAVE A SUBSTANTIAL IMPACT ON THE WAY YOU OR WE WILL RESOLVE ANY CLAIM THAT YOU OR WE HAVE AGAINST EACH OTHER, NOW OR IN THE FUTURE. Arbitration is the process for settling disputes where the determination is made by an impartial third party. Arbitration binds the parties to a type of resolution outside of the courts.**

(a)  <u>Your Right to Reject Arbitration Provision:</u> **If you do not want this Arbitration Provision to apply, you may reject it by mailing us a written rejection notice which gives your name(s) and Account number(s) and contains a statement that you, both or all of the Account owners, if more than one, reject the Arbitration Provision in this Agreement which governs your Account. The rejection notice must be sent to us at MidFirst Bank, 501 N.W. Grand Boulevard, Oklahoma City, Oklahoma 73118, Attn: Bank Operations Arbitration Rejection. A rejection notice is effective only if it is signed by you (including both or all of the Account owners, if applicable), and such notice is received within thirty (30) days after the day you open your Account (the "Rejection Deadline").**

(b)  <u>Parties Subject to Arbitration:</u> As used in this Arbitration Provision, the terms "we," "us" and "our" mean (a) MidFirst Bank, any parent, subsidiary or affiliate of MidFirst Bank and the employees, officers and directors of such companies ("Bank Parties"); and (b) any other person or company that provides any services in connection with this Agreement or your Account if you assert a Claim against such other person or company at the same time you assert a Claim against any Bank Party.

(c)  <u>Covered Claims:</u> "Claim" means any claim, dispute or controversy between you and us that in any way arises from or relates to this Agreement, your Account, any products or services offered by us, including but not limited to, any debit card or ATM card provided to you, Overdraft Protect, Overdraft Privilege and/or Overdraft credit services, and the advertising and disclosures related to the foregoing, if such Claim, dispute or controversy cannot be resolved without a lawsuit or arbitration proceeding. "Claim" includes disputes arising from actions or omissions prior to the effective date of this Agreement (or prior to the time this Arbitration Provision becomes part of this Agreement). "Claim" has the broadest reasonable meaning, and includes initial claims, counterclaims, cross-claims and third-party claims, inclusive of any damages or other remedies claimed. It includes disputes based upon contract, tort, consumer rights, fraud and other intentional torts, constitution, statute, regulation, ordinance, common law and equity (including any claim for injunctive or declaratory relief). It includes any dispute about the validity, enforceability, coverage or scope of this Arbitration Provision or any part thereof (including, without limitation, subparagraph (g), captioned "No Jury Trial or Class Claims" (the "Class Action Waiver"). The term "Claim" also includes any dispute about the validity or enforceability of this Agreement as a whole.

(d)  <u>Starting an Arbitration:</u> To the extent permitted by the Federal Arbitration Act (the "FAA") and any other applicable law, arbitration may be elected by either party with respect to any Claim, even if that party has already initiated a lawsuit with respect to a different Claim. Arbitration is elected by giving a written demand for arbitration to the other party, by filing a motion to compel arbitration in court or by initiating an arbitration against the other party. We will not demand to arbitrate an individual (non-class, non-representative) Claim that you bring against us in small claims court or your state's equivalent court, if any. However, if that Claim is transferred, removed or appealed to a different court, we then have the right to demand arbitration.

(e)  <u>Choosing the Administrator:</u> "Administrator" means the American Arbitration Association ("AAA"), 1633 Broadway, 10th Floor, New York, NY 10019, www.adr.org; JAMS, 620 Eighth Avenue, 34th Floor, New York, NY 10018, www.jamsadr.org; or any other company selected by mutual agreement of the parties. If both AAA and JAMS cannot or will not serve and the parties are unable to select an Administrator by mutual consent, the Administrator will be selected by a court. The arbitrator will be appointed by the Administrator in accordance with the rules of the Administrator.    However, the arbitrator must be a single neutral arbitrator who is a retired or former judge or a lawyer with at least ten (10) years of experience. You get to select the Administrator if you give us written notice of your selection with your notice that you are demanding to arbitrate any Claim or within twenty (20) days after we give you notice that we are demanding to arbitrate any Claim (or, if you dispute our right to require arbitration of the Claim, within twenty (20) days after that dispute is finally resolved). If you do not select the Administrator within the time specified, we may select the Administrator. Notwithstanding any language in this Arbitration Provision to the contrary, no arbitration may be administered, without the consent of all parties to the arbitration, by any Administrator that has in place a formal or informal policy that is inconsistent with the Class Action Waiver.

(f)  **<u>Court and Jury Trials Prohibited; Other Limitations on Legal Rights:</u> FOR CLAIMS SUBJECT TO ARBITRATION YOU WILL NOT HAVE THE RIGHT TO PURSUE THAT CLAIM IN COURT OR HAVE A JURY DECIDE THE CLAIM. YOUR ABILITY TO OBTAIN INFORMATION AND SEEK DISCOVERY WILL BE MORE LIMITED IN ARBITRATION THAN IN A LAWSUIT. OTHER RIGHTS THAT YOU WOULD HAVE IF YOU WENT TO COURT MAY ALSO NOT BE AVAILABLE IN ARBITRATION.**

(g)  **<u>No Jury Trial or Class Claims:</u> FOR CLAIMS SUBJECT TO ARBITRATION: (1) YOU MAY NOT PARTICIPATE IN A CLASS ACTION IN COURT OR IN A CLASS-WIDE ARBITRATION,  EITHER AS A PLAINTIFF, CLASS REPRESENTATIVE OR CLASS MEMBER; (2) YOU MAY NOT ACT AS A PRIVATE ATTORNEY GENERAL IN COURT OR IN ARBITRATION; (3) CLAIMS BROUGHT BY OR AGAINST YOU MAY NOT BE JOINED OR CONSOLIDATED WITH CLAIMS BROUGHT BY OR AGAINST ANY OTHER PERSON; AND (4) THE ARBITRATOR SHALL HAVE NO POWER OR AUTHORITY TO CONDUCT A CLASS-WIDE ARBITRATION, PRIVATE ATTORNEY GENERAL ARBITRATION OR MULTIPLE- PARTY ARBITRATION.  Collectively, this subparagraph (g) is referred to as the "Class Action Waiver."**

(h)    Location and Costs of Arbitration: Any arbitration hearing that you attend must take place telephonically, electronically, in the federal judicial district in which you reside, or at another location reasonably convenient to you. We will pay any and all fees of the Administrator and/or the arbitrator (i) if applicable law or a rule of the Administrator requires us to, or (ii) if you prevail in the arbitration, which means the arbitrator rules in your favor on the Claim.  Unless applicable law requires otherwise, we will pay our, and you will pay your, lawyers', experts', and witnesses' fees.

(i)    Governing Law: This Arbitration Provision involves interstate commerce and is governed by the FAA and not by any state arbitration law. The arbitrator must apply applicable substantive law consistent with the FAA and applicable statutes of limitations and claims of privilege recognized at law. The arbitrator may award any remedy provided by the substantive law that would apply if the action were pending in court (including, without limitation, punitive damages, which shall be governed by the Constitutional standards employed by the courts).  At the timely request of either party, the arbitrator must provide a brief written explanation of the basis for the award.

(j)    Public Injunctive Relief:  To the extent allowed by applicable law, you also waive your right to seek a public injunction if such a waiver is permitted by the FAA.  If a court nevertheless decides that such a public injunction waiver is not permitted, and that decision is not reversed on appeal, all other Claims will be decided in arbitration under this Arbitration Provision and your Claim for a public injunction then will be decided in court. In such a case the parties will request that the court stay the Claim for a public injunction until the arbitration award regarding individual relief has been entered in court.  You agree that you will request such a stay when required. In no event will a claim for public injunctive relief be arbitrated.

(k)    Arbitration Result and Right of Appeal: Judgment upon the arbitrator's award may be entered by any court having jurisdiction. The arbitrator's decision is final and binding, except for any right of appeal provided by the FAA.  The appealing party will pay the appeal costs for appealing pursuant to the FAA.

(l)    Rules of Interpretation: This Arbitration Provision shall survive the repayment of all amounts owed under this Agreement, the closing of your Account, any legal proceeding and any bankruptcy to the extent consistent with applicable bankruptcy law. In the event of a conflict or inconsistency between this Arbitration Provision, on the one hand, and the applicable arbitration rules or the other provisions of this Agreement, on the other hand, this Arbitration Provision shall govern.

(m)    Severability: If any portion of this Arbitration Provision, other than the Class Action Waiver, is deemed invalid or unenforceable, the remaining portions shall nevertheless remain in force. If a determination is made that the Class Action Waiver is unenforceable, only this sentence of the Arbitration Agreement will remain in force and the remaining provisions shall be null and void, provided that the determination concerning the Class Action Waiver shall be subject to appeal.

## Electronic Funds Transfer Your Rights and Responsibilities

This section describes terms and conditions applicable to electronic funds transfers as required by the Electronic Funds Transfer Act and applicable regulations. This section applies only to electronic fund transfers that authorize us to debit or credit a consumer Account, that is, an Account established primarily for consumer, family, or household purposes. If your Account is primarily for a business purpose, then this section does not apply to you. Electronic fund transfers are generally defined under the Electronic Fund Transfer Act of 1978 and include transfers of funds that you initiate through an electronic terminal, phone, computer, or magnetic tape for the purpose of authorizing a debit or credit to your Account. Please read this disclosure carefully because it describes your rights and obligations for those transactions. You should keep this disclosure for future reference.

Terms and conditions relating to electronic funds transfers conducted through MidFirst online banking, including but not limited to Business Online Banking, Business Online Banking Express or Personal Online Banking are contained in the agreements for such services that you received at the time you applied for the service, and should be read and understood in conjunction with this Agreement. To the extent that the terms or conditions of the MidFirst online banking agreements conflict with this Agreement, the online banking agreements shall control with respect to the details of the service described in the online banking agreement. In all other cases this Agreement shall control.

**DO NOT write your personal identification number ("PIN") on anything or keep it in any form with your ATM card or debit card.**

**1. CARDHOLDER'S LIABILITY & NOTIFICATION PROCEDURES.** Notify us IMMEDIATELY if you believe your ATM card, debit card or PIN has been lost or stolen or if you believe that an unauthorized transfer from your Account has occurred. Telephoning is the best way of minimizing your potential losses. You could lose all the money in your Account in addition to the maximum Overdraft Protect Account balance or reach the limit of your Overdraft credit service, if you have elected these services. If you tell us about the lost or stolen ATM card, debit card or PIN within two (2) Business Days after you learn of the loss or theft, you can lose no more than $50.00 if someone uses your ATM card, debit card or PIN without your permission.

If you do NOT notify us within two (2) Business Days after you learn about the loss or theft of your ATM card or debit card and/or PIN, you could lose as much as $500.00 if we can prove we could have prevented the unauthorized use of your ATM card, debit card or PIN without your permission if you had timely notified us.

Also, if your periodic statement shows unauthorized transactions, notify us at once. If you do not notify us within sixty (60) days after the statement was mailed to you, you may not recover any money you lost if we can prove that we could have prevented an unauthorized transfer if you had timely notified us.

NOTIFICATION PROCEDURES: If you believe your ATM card, debit card or PIN has been lost, stolen, or that someone has transferred or may transfer money from your Account without your permission, during normal business hours, call MidFirst Bank toll free at 888.MIDFIRST (888.643.3477) or visit any MidFirst banking center. After normal business hours, call toll free 800.236.2442 and/or write MidFirst Bank, Attention: EFT Representative P.O. Box 76149, Oklahoma City, Oklahoma, 73147.  If an extraordinary reason (such as a hospital stay) keeps you from promptly notifying or telling us, we may, at our discretion, extend the notification time periods.

Once an ATM card, debit card or PIN is reported lost or stolen, ATMs will disregard transaction requests and may retain the card inside the machine if you or anyone else attempts to use it.

Under the operating rules of the National Automated Clearing House Association, which are applicable to ACH transactions involving your Account, we are not required to give next day notice to you of receipt of an ACH item, and we will not do so. However, we will continue to notify you of the receipt of payments in the periodic statements we provide to you.

**2. BUSINESS DAYS AND PROCESSING DAYS.** Our business days are Monday through Friday, 8:00 a.m. to 5:00 p.m., local time, with the exception of legal holidays, as observed by us or the Federal Reserve Bank of Kansas City ("Business Days").  Our Processing Days are Business Days in addition to select legal holidays.

**3. TYPES OF AVAILABLE TRANSFERS.** For those Accounts associated with your ATM card or debit card, you may use your ATM card or debit card at electronic terminals to:
   a) Withdraw cash from checking Accounts;
   b) Make deposits to checking Accounts;
   c) Withdraw cash from savings Accounts;
   d) Make deposits to savings Accounts;
   e) Transfer funds between checking and savings Accounts upon request;
   f) Inquire as to the amount of your Available Balance; and
   g) Pay for purchases from merchants who have agreed to accept the ATM card and debit card for that purpose.

Some of these services may not be available at all electronic terminals.

**4. ELECTRONIC CHECK CONVERSION.** You may authorize a merchant or other payee to make a one-time electronic payment from your checking Account using information from your check to:

   a) Pay for purchases.
   b) Pay bills.

These electronic check conversions constitute electronic funds transfers.

**5. LIMITATIONS ON CARD TRANSACTIONS.**
We place daily limits on your ATM withdrawals and debit card purchases.  You may use your ATM card or debit card to withdraw funds from your Account from an electronic terminal, such as an ATM. You may also use your debit card to purchase goods and services each day. Withdrawals and purchase transaction amounts are subject to the terms described in our Funds Availability section of this document, the limits set forth below, and the Available Balance of your Account must be sufficient to cover the aggregate of all withdrawals and purchases. We may temporarily reduce the below limits for security purposes, without notification to you.  We may also restrict use of your ATM card or debit card if your account becomes inactive or dormant.
a)   For most consumer customers:
       i.     The cash withdrawal (ATM) and daily cash advance limit, including any ATM fees, is $1,020.
       ii.    The daily purchase limit for Point-of-Sale transactions is $5,000.
b)   For most Private Bank consumer customers:
       i.     The cash withdrawal (ATM) and daily cash advance limit, including any ATM fees is $1,020.
       ii.    The daily purchase limit for Point-of-Sale transactions is $7,500.
c)   For most business customers:
       i.     The daily cash withdrawal (ATM) limit, including any ATM fees is $2,020.
       ii.    The daily cash advance limit is $2,020.
       iii.   The daily purchase limit for Point-of-Sale transactions is $5,000.
d)   For most Solution Checking customers:
       i.     The cash withdrawal (ATM) and daily cash advance limit, including any ATM fees, is $270.
       ii.    The daily purchase limit for Point-of-Sale transactions is $750.

Please note that at certain times mechanical malfunctions of the system may cause withdrawals to be limited to $100.00 cash withdrawal, including ATM fees, and $500.00 at the Point of Sale until the malfunction can be corrected.

**6. CHARGES.** On certain Accounts there may be charges for ATM card and debit card transactions made at non-MidFirst ATMs. There may be a charge for replacement or additional ATM card, debit card or PINs requested as a result of loss or negligence. Please refer to the Fee Schedule for specific fee information related to electronic fund transfers.

If you use your ATM card or debit card to access an Account that does not have sufficient funds to complete a transaction or that would exceed the daily authorization limit attached to your ATM card or debit card, we may, at our discretion, authorize the transaction. If we authorize a transaction that overdraws your Account, we will assess a fee as described in this Agreement in paragraph 24, "Overdrafts," and as set forth in the Fee Schedule.

INTERNATIONAL TRANSACTIONS: If you conduct a transaction with your ATM card or debit card involving multiple currencies or U.S. dollars in a country outside of the United States of America, Puerto Rico or the US Virgin Islands, a transaction fee may appear on your monthly statement from the applicable card network.  We reserve the right to make future changes in your Account and/or ATM card or debit card transaction fees, subject to our giving you notice as required by law.

**7. DOCUMENTATION.** At the time of any card transaction using an ATM card, debit card or Point-of-Sale terminal, you may receive a transaction receipt, which will include the amount, date, type of transfer, identity of Account and bank or merchant, location of terminal, identity of any account where funds are transferred, and transaction identification number unless the transaction is $15.00 or less. If you have arranged to have direct deposits made to your Account at least once every sixty (60) days from the same person or company, you can call us toll free at 888.MIDFIRST (888.643.3477) or call or visit any MidFirst banking center to find out whether or not the deposit has been made. Your regular monthly statement will reflect ATM card or debit card transfers, direct deposits and withdrawals, and preauthorized electronic fund transfers.

**8. RIGHT TO STOP PAYMENT OF PREAUTHORIZED TRANSFERS.** You may stop payment of preauthorized transfers as described in this Agreement in paragraph 15, "Stop Payment". Preauthorized transfers are an electronic fund transfer authorized in advance to recur at substantially regular intervals.  The time limitations for stopping, canceling or changing any bill payments scheduled via MidFirst online banking or mobile banking, if those services are available on your Account, are contained in the Mobile and Online Banking Terms and Conditions and are not governed by this paragraph. The time limitations for stopping, canceling or changing any bill payments scheduled via MidFirst business online or mobile business banking, such Business Online Banking or Business Online Banking Express if those services are available on your Account, are contained in the respective service agreements and are not governed by this paragraph.

You may use your ATM card or debit card to pay for goods and services at retail locations via Point of Sale that display (i)the Visa® if you have our ATM card or debit card with the Visa® symbol or (ii) the MasterCard® if you have our ATM card or debit card with the MasterCard® symbol. We will charge your Account for all purchases and withdrawals made with your ATM card and debit card. The use of your ATM card and debit card to purchase goods and services will constitute a simultaneous withdrawal from your applicable Account. Notwithstanding anything to the contrary, you cannot place a stop payment on one-time transactions made with your ATM card or debit card.

**9. OUR LIABILITY FOR FAILURE TO COMPLETE TRANSACTIONS.** If we do not complete a transaction to or from your Account on time or in the correct amount according to our agreement with you, we will be liable only for your loss or damage to the extent of the amount of the transaction.  We will not be liable, however, if we do not complete a transaction in situations that include, but are not limited to, the following examples:

  a) If, through no fault of ours, you do not have enough money in your Account to make the transaction;
  b) If the transaction would go over the credit limit on any line of credit you may have;
  c) If the ATM where you are making the transaction does not have enough cash to complete the transaction;
  d) If the electronic terminal was not working properly;
  e) If circumstances beyond our control (such as fire, flood, other natural disaster, terrorism, supplier failure, system malfunction, etc.) prevent the transaction, despite reasonable precautions that we have taken;
  f)  If the funds are subject to legal or other encumbrance;
  g) If federal or state banking rules or regulations as issued by the Office of the Comptroller of the Currency, the Federal Reserve Board, the Federal Deposit Insurance Corporation, or other agency with banking oversight might prohibit such transaction; or
  h)  If we fail to complete a transaction because we believe the transaction may be fraudulent.
  Also in the case of any error or malfunction that was not intentional on our part and resulted from a bona fide error, notwithstanding the maintenance of procedures reasonably adopted to avoid any such error, our liability is limited only to actual damages proved.

**10. DISCLOSURE OR ERROR RESOLUTION PROCEDURES AND CONSUMER RIGHTS.** If you think your statement or receipt is wrong, or if you need more information about a transfer listed on the statement or receipt, you must notify us no later than sixty (60) days after we sent the FIRST statement on which the problem or error appeared. Your notice should include:

   a) Your name and Account number;

   b) A description of the error or the transfer you are unsure about and a detailed explanation of why you believe it is an error or why you need more information. Your explanation should be as clear and complete as possible; and

   c) The dollar amount of the suspected error.

If you notify us orally, we may require that you provide us your complaint or question in writing within ten (10) Business Days.

For Electronic Funds Transfers: Within ten (10) Business Days after you notify us of a possible error, we will make a determination as to whether an error occurred. We will correct any determined error promptly. If we need more time or information, we may take up to forty-five (45) days to investigate and determine whether an error occurred. This timeframe may be extended to 90 days for Point of Sale transactions and transactions not initiated within a state. If we decide to do this, we will provisionally credit your Account for the amount you think is in error within ten (10) Business Days after we receive written confirmation of your complaint or question, so that you will have the use of the money during the time it takes us to complete our investigation. If we ask you to confirm your complaint or question in writing, and we do not receive it within ten (10) Business Days, we may not provisionally credit your Account.

For POS, ATM, and Other Electronic Transfers involving New Accounts: For new transaction Accounts (Accounts on which each owner of the Account does not have or has not had within the previous thirty (30) days a transaction Account with us), we may take up to 90 days to investigate your complaint or question and determine whether an error occurred.  If we decide to do this, we will provisionally credit your Account for the amount you think is in error within twenty (20) Business Days after we receive written confirmation of your complaint or question, so that you will have the use of the money during the time it takes us to complete our investigation. If we ask you to confirm your complaint or question in writing, and if we do not receive it within ten (10) Business Days, we may not provisionally credit your Account.

If we issue a provisional credit and ultimately determine that no error occurred, we will debit such provisional credit from your Account.  We will notify you of the date and amount of the debit. We will honor any checks, drafts, or similar third party payables and any preauthorized transfers as provided in the notice that we will send to you.

IN CASE OF ERROR OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS: Telephone us toll free at 888.MIDFIRST (888.643.3477), or write us at MidFirst Bank, Attention: Bank Operations EFT Representative P.O. Box 76149, Oklahoma City, Oklahoma, 73147.

We will communicate the results to you within three (3) Business Days after completing our investigation. If we decide that there was no error, we will send you a written explanation. You may ask for copies of the documents that we used in our investigation.

**11. PROVISIONAL PAYMENT.** Credit given by us to you with respect to an ACH credit entry is provisional until we receive final settlement for such entry through a Federal Reserve Bank. If we do not receive such final settlement, you are hereby notified and agree that we are entitled to a refund of the amount credited to you in connection with such entry, and the party making payment to you via such entry (i.e., the originator of the entry) shall not be deemed to have paid you in the amount of such entry.

**12. CONFIDENTIALITY.** Please reference our Privacy Notice regarding circumstances under which we will disclose information to third parties about your Account.

**13. CHOICE OF LAW.** We may accept on your behalf payments to your Account which have been transmitted through one or more ACH and which are not subject to the Electronic Fund Transfer Act and your rights and obligations with respect to such payments shall be construed in accordance with and governed by the law of the state in which the Account is deemed by us to have been opened or as described in paragraph 1 of this Agreement.

## Funds Availability Policy

**1. GENERAL.** Except as otherwise described below, we will make funds from your deposits available to you on the first Business Day after the day we receive your deposit. However, many exceptions apply, and if you will need the funds from a deposit right away, you should ask us when the funds will be available. Once funds are available, you can withdraw the funds in cash, and we will use the funds to process transactions on your Account.

Please remember that you are responsible for any check you deposit with us that is returned to us unpaid and for any other problem that occurs involving your deposit, even if we previously made funds available to you in connection with such deposit.

**2. WHEN DEPOSITS ARE RECEIVED.** For determining the availability of your deposits, every day is a Business Day, except Saturdays, Sundays, and federal holidays. However, only deposits made to an employee at a banking center, at a MidFirst ATM, or via Mobile Deposit

or Business Mobile Deposit before the cutoff time on a Business Day that we are open will be considered received on that day. For most MidFirst banking centers, the cutoff time is the time the banking center closes on a Business Day.  However, certain MidFirst banking centers have earlier cutoff times, but in no case will the cutoff time be earlier than 2:00 p.m. For most ATMs, the cutoff time is 4:00 p.m. central time. Deposits made after the cutoff time applicable to the banking center or ATM at which the deposit is made or on a day we are not open are considered received on the next Business Day we are open.

Bank by mail deposits received before 4:00 p.m. on a Business Day will be considered received on the day of receipt. Later deliveries and those received on Saturdays, Sundays, and holidays will be considered received on the next Business Day we are open.

Preauthorized electronic deposits will be posted on the effective date for the transaction, if received by the Federal Reserve Bank's last deadline for electronic payments for that same Business Day; otherwise, preauthorized electronic deposits will be posted on the next business day.

3. LONGER DELAYS MAY APPLY. In some cases, we will not make all of the funds that are deposited by check or deposited available to you on the first Business Day after the day of your deposit. Depending on the type of check that you deposit, funds may not be available until the second Business Day after the day your deposit is received. However, the first $225.00 of your deposits may be available on the first Business Day after your deposit is received.

If we are not going to make all of the funds from your deposit available on the first Business Day, we will notify you at the time you make your deposit. We will also tell you when the funds will be available. If your deposit is not made directly to one of our employees, or if we decide to take this action after you have left the premises, we will mail you the notice by the day after we receive your deposit.

Funds you deposit by check may be delayed for a longer period if: (i) we believe a check you deposit will not be paid; (ii) you deposit checks totaling more than $5,525.00 on any one Business Day; (iii) you redeposit a check that has been returned unpaid; (iv) you have overdrawn your Account repeatedly in the last six (6) months; or (v) there is an event that occurs, which is out of our control such as an emergency, communications or computer equipment failure, natural disaster, act of terrorism, sanction or restriction against the transaction, or other event outside our control.

We will notify you if we delay your ability to withdraw funds for any of these reasons, and we will tell you when the funds will be available. They will generally be available no later than the seventh (7th) Business Day after the day of your deposit.

Your deposit may encounter delays if required by law.

4. HOLDS ON OTHER FUNDS -- CHECK CASHING. If we cash a check for you that is drawn on another bank, we may withhold the availability of a corresponding amount of funds that are already in your Account. Those funds will be available at the time funds from the check we cashed would have been available if you had deposited it.

5. HOLDS ON OTHER FUNDS -- OTHER ACCOUNTS. If we accept for deposit a check that is drawn on another bank, we may make funds from the deposit available for withdrawal immediately, but delay your availability to withdraw a corresponding amount of funds that you have on deposit in another account with us. The funds in the other account would then not be available for withdrawal until the time periods that are described elsewhere above for the type of check that you deposited.

6. SPECIAL RULES FOR NEW ACCOUNTS. If you are a new customer, special rules will apply during the first thirty (30) days your Account is open. Funds from electronic direct deposits, cash deposits or wire transfers to your Account will be available on the Business Day we receive the deposit. The first $5,525.00 of a Business Day's total deposits of official, certified, tellers, travelers, and state and local government checks will be available on the first (1st) Business Day after the day of your deposit, if the deposit meets certain conditions. For example, the checks must be payable to you (and you may have to use a special deposit slip). The excess over $5,525.00 will be available on the ninth (9th) Business Day after the day of your deposit. If your deposit on these checks (other than a U.S. Treasury check) is not made in person to one of our employees, the first $5,525.00 will not be available until the   second (2nd) Business Day after the day of your deposit. Funds from all other check deposits will be available on the eleventh (11th) Business Day after the day of your deposit.

## Substitute Checks and Your Rights

To make check processing faster, federal law permits banks to replace original checks with "Substitute Checks." These Substitute Checks are similar in size to original checks with a slightly reduced image of the front and back of the original check. The front of a Substitute Check states: "This is a legal copy of your check. You can use it the same way you would use the original check." you may use a Substitute Check as proof of payment just like the original check.

Some or all of the checks that you receive back from us may be Substitute Checks. This notice describes rights you have when you receive Substitute Checks from us. The rights in this notice do not apply to original checks or to electronic debits to your Account. However, you have rights under other laws with respect to those transactions.

In certain cases, federal law provides a special procedure that allows you to request a refund for losses you suffer if a Substitute Check is posted to your Account incorrectly (for example, if you think that we withdrew the wrong amount from your Account or that we withdrew money from your Account more than once for the same check). The losses you may attempt to recover under this procedure may include the amount that was withdrawn from your Account and fees that were charged as a result of the withdrawal (for example, returned check fees).

The amount of your refund under this procedure is limited to the amount of your loss or the amount of the Substitute Check, whichever is less. You also are entitled to interest on the amount of your refund if your Account is an interest-bearing Account. If your loss exceeds the amount of the Substitute Check, you may be able to recover additional amounts under other law.

If you use this procedure, you may receive up to $2,500.00 of your refund (plus interest if your Account earns interest) within ten (10) Business Days after we received your dispute notice and the remainder of your refund (plus interest if your Account earns interest) not later than forty-five (45) calendar days after we received your dispute notice.

We may reverse the refund (including any interest on the refund and refunded fees) if we later are able to demonstrate that the Substitute Check was correctly posted to your Account.

If you believe that you have suffered a loss relating to a Substitute Check that you received and that was posted to your Account, please contact us toll free at 888.MIDFIRST (888.643.3477). You must contact us within forty (40) calendar days of the date that we mailed the Substitute Check in question or the Account statement showing that the Substitute Check was posted to your Account, whichever is later. We may extend this time period if you were unable to provide a timely dispute notice because of extraordinary circumstances outside your control.

Any dispute notice from you must include:
   a) A description of why you have suffered a loss (for example, you think the amount withdrawn was incorrect).
   b) An estimate of the total actual amount of your loss.
   c) An explanation of why the Substitute Check you received is not sufficient to confirm that you suffered a loss.
   d) A copy of the Substitute Check and/or the following information to help us identify the Substitute Check: identifying information, for example the check number, the name of the person to whom you wrote the check, the amount of the check.

# Exhibit F

# MIDFIRST BANK®

MEMBER FDIC    EQUAL HOUSING LENDER

Version 10/2018

## Account Agreement and Disclosure

### Terms and Conditions of Your Account

With respect to an account or accounts ("Account") held at MidFirst Bank, a federally chartered savings association ("MidFirst"), each person who is named as the owner or is authorized to withdraw funds ("You" or "Your," whether one or more) and MidFirst ("We," "Our" or "Us") all agree to the following:

**1. AGREEMENT.** Your Account is subject to terms and conditions that We adopt from time to time. This Account Agreement and Disclosure ("Agreement") describes the current terms and conditions. By signing the New Account Information, Receipt of Certificate of Time Deposit, or by clicking the appropriate checkbox and submitting Your online application You acknowledge that You have opened the type of account indicated on the applicable account opening document and You received, understand and agree to be bound by the terms and conditions of this Agreement. You have been provided an account disclosure and a fee schedule ("Fee Schedule"), which are incorporated into this Agreement. If You have elected to obtain other services ancillary to Your Account, the agreements for those ancillary services also are incorporated into and made a part of this Agreement. We may alter, amend, or rescind, for any reason, any part of these terms and conditions (or any other Account-related agreement or documentation), or add new terms, at any time. We will give notice of any such changes that may adversely affect You by: (a) posting the same in a conspicuous place in the lobbies of Our main office and each of Our branches; (b) sending written notice thereof to You at the most recent address indicated on Our records; or (c) sending notice to You by electronic mail, as permitted by applicable law, at the most recent electronic mail address indicated on Our records. We have no obligation to notify You of changes to the features of Your Account that do not adversely affect You in any way. We may immediately implement changes required by law or regulation or to protect the security of Your Account or Our system. When necessary, notice of such changes will follow implementation. Your continued use of the Account after implementation of changes or following notice of changes to this Agreement as described above signifies Your continued acceptance of this Agreement and all changes and amendments hereto. All Account signers authorize Us to make inquiries from any consumer reporting agency in connection with this Account. We reserve the right and may close an Account at any time for any reason. You may close Your Account at any time for any reason, subject to any prior advance notice requirements related to the particular account, early Account closure fees and Our Funds Availability Policy.

**2. LAWS, RULES, AND REGULATIONS.** The Account, including deposits to and withdrawals therefrom, is governed by: (a) the laws and regulations of the United States applicable to federal savings associations and, to the extent applicable, the law of the state in which the Account is deemed by Us to have been opened; (b) the rules, regulations and orders of the Office of the Comptroller of the Currency, the Federal Deposit Insurance Corporation, the rules and operating procedures of Federal Reserve Banks and of any clearing house association of which We are or may become a member or through which We may send items for collection; and (c) all provisions posted on our premises, enclosed with statements of Account or contained in Our bylaws; all as now in effect or as may in the future be issued, modified or amended. Our obligations pursuant to law, regulation or policy applicable only to consumer Accounts shall not apply to business or commercial Accounts. Activity in consumer Accounts is expected to be for consumer purposes. Business or commercial activity should not be conducted in consumer Accounts. Transactions restricted under Unlawful Internet Gambling Enforcement Act (UIGEA) are prohibited and should not be processed through Your Account.

**3. ACCOUNT OWNERSHIP.** Other than those persons identified as authorized signers, agents or fiduciaries, the persons or entities identified on the Account Signature Card or during the online application process as owners are the owners of the Account. If more than one person is identified, each indicated person named is an owner and such ownership shall, for the purpose of this Agreement be deemed to be owned by such persons as joint tenants with full rights of survivorship. Business, fiduciary, and association Accounts are held under the terms of documents submitted to Us by the person(s) opening the Account If the Account is a Payable on Death ("POD") account, the Account shall be payable on the death of the last Account owner to one or more designated POD beneficiaries, if living, and if not living, to the named estate of the beneficiary. If more than one beneficiary is designated by the Account owner(s), the beneficiaries, if living, and if not living, the named estate of the beneficiaries, shall share equally in the amount payable on death of the last Account owner. Persons who are identified during the online application process as authorized signers or whose signatures appear on Your applicable account opening or related Account documents have the individual authority to withdraw funds from Your Account. Any person who is authorized to withdraw funds but who is not the owner of an Account will be considered an agent of the owner of the Account, with the unlimited right to deal with the Account on behalf of the Account owner. We have no duty to inquire as to the authority of an agent to deal with the Account, and We have no liability for permitting an agent to withdraw funds from an Account, regardless of the manner of withdrawal or recipient of the funds.

**4. AUTHORIZED SIGNATURE.** For Accounts opened in person, Your signature on the applicable account opening or related Account documents, such as the New Account Information or Receipt of Certificate of Deposit, is Your authorized signature for Your Account. For accounts opened online, the signature of any authorized signer identified during the online application process is an authorized

signature for Your Account. For the payment of funds and for other purposes relating to any Account You have with Us, We are authorized to recognize Your signature, but We will not be liable to You for refusing to honor Your checks or other signed instructions if We believe in good faith that the signature appearing on such checks or instructions is not genuine. We may honor any check or other item drawn against the Account so long as it contains at least one authorized signature. In addition, We may ask for a form of identification for transactions processed in person for authentication purposes. In the event of a forgery, We shall not be liable if a "reasonable person" who is similarly situated could not have detected the forgery. Signatures by facsimile or electronic means may be given full force and effect, without any obligation by Us to verify the accuracy thereof. Unless designated on Your Account, We may honor any check or other signed instruction that bears or appears to bear Your signature even if it was made or presented by an unauthorized person or with a counterfeit facsimile, electronic, or other signature. You should maintain close control over Your facsimile or electronic signature device or stamps and promptly review Your statements and cancelled checks for unauthorized use. You agree to hold Us harmless from any and all claims and damages that arise based upon said facsimile or electronic signatures. If You authorize any person to sign Your name or otherwise draw against Your Account, We may honor any withdrawal signed by or authorized by that person whether or not it exceeds the authority You granted.

**5. CUSTOMER IDENTIFICATION.** As required by federal statute and regulation and by Our policy, We may require and may verify certain information regarding individuals at Account opening and as otherwise deemed necessary. This information may include complete customer name, residential or business address, mailing address if different, tax payer identification number, date of birth, government issued photo identification, and other information as may be required by government laws or regulations or as may be deemed appropriate to verify Your

identity as the customer. This information may be required for all individuals who are deemed owners of the Account, acting as agent on behalf of the Account owner, named as beneficiary on the Account, or otherwise associated with the Account regardless of manner. In order to comply with regulatory requirements, We may require identifying information regarding the beneficial owners of Our legal entity customer. Account access or proceeds of Accounts opened without required information or subject to information verification may be restricted until such information is obtained and/or verified. We may close an Account at any time for any reason, including but not limited to identification information deemed by Us, in Our sole discretion, to be insufficient or unverifiable.

**6. OUR LIABILITY.** We have no obligations or liabilities to You other than those imposed by law or specifically provided herein. Any duty of care imposed on Us by law will be fulfilled if the procedures established for the transaction involved are reasonable. We will have no liability for clerical error, inadvertence or oversight, or an honest mistake of judgment. We have no obligation to verify the accuracy of any information or instructions You provide.

**7. RIGHT TO OFFSET.** We may, at any time at Our discretion, and with notice to You, sent either prior to or after the event, apply any part or all of the balance of Your Account to fees or any other debt, matured or unmatured, that You or any other Account owner may then owe to Us.

**8. MINOR ACCOUNTS.** If the Account has been opened in the name of an individual of less than eighteen (18) years of age ("Minor"), We may, in Our sole discretion, waive the standard transaction fee, Account maintenance fees and any other fees or charges that We deem appropriate during the time the Minor is under age eighteen (18). Upon the Minor reaching eighteen (18) years of age, if We previously waived such fees, We will commence assessing the standard transaction fees, Account maintenance fees and any other fees or charges that are set forth in the Fee Schedule in effect on the date the Minor reaches the age of eighteen (18) years of

age, and as the Fee Schedule may be amended from time-to-time thereafter. Upon the Minor reaching age eighteen (18) and thereafter, You agree to pay all standard transaction fees, Account maintenance fees and any other fees and charges regularly charged for similar Accounts. We may permit a minor Account owner to withdraw funds during minority without the signature of a parent even if the parent is also an owner of the Account.

**9. FEES AND CHARGES.** We may assess such transaction and Account maintenance fees and other charges and in such amounts as may be permitted by law. A separate Fee Schedule has been provided (see paragraph 1). We may amend this Fee Schedule from time to time. You agree to pay immediately any applicable fees and charges and any expenses We may incur in collection of amounts You owe Us or in collection of items deposited with Us for deposit to Your Account, including, but not limited to, any court costs and attorneys' fees, and We may charge Your Account to pay these fees, charges, and expenses. If at any time We are required to engage the services of financial or legal counsel (i.e., an attorney or an accountant) to resolve issues related to an Account, You will pay to Us on demand the fees and costs We incur.

**10. YOUR ADDRESS.** You will keep Us advised of any change of Your address. Any notice or Account statement mailed by Us to the last address given to Us by an owner of the Account will be deemed sufficient. Address change requests are subject to identity verification and must be provided with sufficient time for Us to process the change of address.

**11. OUR RIGHTS.** We may at any time, and in Our sole discretion with or without prior notice, require a minimum deposit, refuse to accept any deposit or cash any check, limit the amount which may be deposited, charge any Account on which You are a signer (subject to legal restraints) for any negative balance created in another account, return all or pay part of any deposit, or close the Account, returning to You personally, or by mail, either cash or an official check for the balance on deposit in the Account. We may also close an Account at any time for any reason. We may decline any transaction,

including, but not limited to, any automated teller machine ("ATM") card, debit card, check or automated clearing house ("ACH") transactions. We may also place an administrative hold on funds on deposit in any Account if We (1) receive a claim from a third party relating to an Account; (2) acquire knowledge of facts which might give rise to a claim by or against Us relating to an Account; or (3) if We become aware of facts that to Us in Our sole judgment appear to indicate that the Account is being used for an improper or unlawful purpose or that You have become the victim of a fraud or undue influence. We may exercise this right even if We are not legally bound to honor the claim. We may hold those funds for a reasonable amount of time to conduct an investigation into the facts. Thereafter, We may either release the funds, apply them against any obligation You may owe Us or tender them into a court to resolve the issues. We will not be liable for failing to honor, or for any damage which may result from Our failure to honor, any checks, preauthorized transfers, ACH transactions, recurring debit card transactions, or other such transfers or withdrawal orders presented after any such action.

In order to comply with regulatory requirements, We may require additional information on certain transactions including, but not limited to, the source of funds, purpose of the transaction, and/or additional supporting documentation.

You agree that We have been in good faith and have exercised ordinary care if We accept withdrawal requests (whatever the form: paper, electronic or image) from other banks without investigating the genuineness of, or authorization for, the withdrawal. If a withdrawal request is not genuine or is not otherwise authorized by You, Our liability will be limited to the amount of the particular withdrawal amount.

**12. DEPOSITS.**

(a) All checks or drafts received by Us are at Your risk and are credited conditionally to Your Account subject to final payment. You authorize Us to endorse for You any item deposited to Your Account. We have the right to decline debits drawn against such

credits. If any item is dishonored on presentation to the financial institution on which drawn, it will be charged back to the Account of deposit or, if such Account has insufficient funds, to another Account which the depositor, endorser, or payee is a signer (subject to legal restraints), and you may be charged an applicable fee.

(b) We will not be responsible for any delay in crediting Your Account if the deposit ticket accompanying the deposit has not been properly completed.

(c) If You elect to use the night depository or the ATM Electronic Teller Network, You expressly agree to rely upon Us or Our agent to count and credit the deposit and accept Our count as final.

- You agree that deposits placed in the night depository facility shall be contained in a tamper-proof plastic bag, envelope or other package, as approved by Us.
- Deposits made through the night depository facility shall contain only deposit slip(s), currency, coin and/or negotiable instruments.
- Deposits made through the night depository facility will be opened and verified each morning of each Business Day.
- You are solely responsible for any loss or damage resulting from Your or Your agents' or employees' use of the night depository facility.

(d) We will not be liable for dishonor of drafts so received in payment for losses thereon or for losses in transit or for negligence or default of other institutions, agents, or subagents but will exercise ordinary care in their selection. We will be deemed to have exercised ordinary care if We send the item by a duly licensed carrier and through any state or federally chartered institution.

(e) Funds deposited will be made available to You under the terms described in the Funds Availability Policy section of this Agreement. When We make funds "available" to You, this does not mean that the funds are "good" or that the deposited item has "cleared" the payor bank.

(f) The outstanding balance of Your Account shall not exceed $2,500,000.00 without Our prior written consent.

(g) We may charge back to Your Account any items returned to Us unpaid or upon which payment has been revoked or rescinded which were deposited into the Account without regard to who made the deposit; whether the deposit was authorized by You; or whether the return to Us was timely.

(h) You will not deposit any item not containing the genuine signature of the drawer and the actual endorsement of each payee without Our prior written consent. This restriction means that You will not deposit, among other things, "remotely created checks" and "substitute checks" as those terms are defined by law and regulation. If you deposit such items, you agree to reimburse us for losses, costs, and expenses that we may incur associated with such items.

**13. WITHDRAWALS.** You may request the withdrawal of funds from Your Account in any amount at any time. Our policy is to pay such withdrawals upon request; however, We are required by federal and state regulations to specifically reserve Our right and do hereby reserve Our right to require You to give Us a seven (7) day written notice of Your intention to withdraw funds from Your savings Account, money market deposit Account or certificate of deposit. All withdrawals are subject to the availability of funds, as described in the Funds Availability Policy section of this Agreement. We may, at Our sole discretion, elect to issue the requested withdrawal amount by Official Check or other means in lieu of cash. Each person who is authorized to withdraw funds from Your Account, as indicated on the Account opening documentation, may withdraw funds under any method available to Your Account, as described below. Withdrawals by phone transfer or electronic transfer are subject to the terms and conditions described elsewhere in this Agreement. As described in Your new Account documents in further detail, certain Accounts allow only a limited number of withdrawals per statement cycle or calendar month, and We may charge a fee for

transactions exceeding those limits. Moreover, if You exceed the regulatory transaction limitations described in Your Account documentation, We may be required to convert Your Account to one that is not subject to regulatory limitation. Withdrawals by negotiable instrument may be made only from Money Market Accounts and checking Accounts, and We may refuse payment of any instrument drawn on such an Account other than a negotiable instrument presented upon a form purchased from or approved by Us. We do not routinely examine the dates written on items and We are not bound to dishonor any item due solely to the fact that it has been postdated or is more than 6 months old. We may pay items, payment of which have been stopped, after the expiration of the relevant stop payment orders, even though the items may be more than 6 months old.

If Your Account is a time deposit, You have agreed to keep the funds on deposit until the maturity of Your Account. If Your Account has not matured, any withdrawal of all or part of the funds from Your Account may result in an early withdrawal penalty. We will consider requests for early withdrawal and, if granted, the penalty provided in the Receipt of Certificate of Time Deposit will apply.

(A) Exceptions. We may let You withdraw money from Your Account before the maturity date without an early withdrawal penalty:

(1) when one or more of You dies or is determined legally incompetent by a court or other administrative body of competent jurisdiction or

(2) when the Account is an Individual Retirement Account (IRA) and You have reached age 70 1/2 and the withdrawal is all or part of Your Required Minimum Distribution (RMD) as determined by IRS guidelines.

If You make a withdrawal in a foreign currency, the withdrawal will be converted to U.S. dollars. Other fees from such a transaction may apply, and You will be responsible for such additional fees, which may be assessed by a third party.

**14. CHECK CASHING.** We may require identification from persons cashing Your checks as We in Our sole discretion deem appropriate and may impose fees for cashing checks to the extent permissible by law.

**15. STOP PAYMENT.** You may stop payment of a check, ACH withdrawal, transfer, or preauthorized electronic funds transfer by calling Us toll free at 888-MIDFIRST (888-643-3477); by calling or visiting any MidFirst banking center; or through online banking, such as iManage Business Express®, iManage Business Banking® or iManage Personal Banking®, if those services are available on Your Account. You must notify Us with reasonably sufficient time to allow Us to act and fulfill Your request. You cannot place a stop payment on any transaction made with Your ATM card or debit card. We have no liability for payment of an item if the stop payment order is received less than 4 hours prior to presentment of an item. A longer period may be necessary depending on the circumstances. We may require a specific period of time in order to fulfill stop payment requests. We must receive a stop payment order for a preauthorized electronic funds transfer at least three (3) Business Days before the scheduled transfer. A written stop payment order expires six (6) months after it is received unless it is renewed in writing by You. For ACH withdrawals, You may stop payment of a one-time withdrawal order or place a permanent stop payment on the Account prior to the date of remittance for payment. A permanent stop payment order for ACH withdrawals will remain on Your Account indefinitely, unless revoked by You verbally or in writing. A stop payment order must include Your name and Account number and a description of the payment, including the date drawn, check number, the exact amount, and the payee named. You agree to review the information on any stop payment notice that We send You in response to a stop payment order by You and to notify Us immediately of any inaccuracy.

The time limitations for stopping, canceling, or changing any bill payments scheduled via iManage Bill Pay, iManage Business Express® or iManage Business Banking® are contained in Your agreements for such

services and are not governed by this paragraph.

**16. TELEPHONE TRANSFERS.** By requesting a telephone transfer, You authorize and direct Us, as Your agent, to transfer funds between the Accounts specified by You in Your Account Agreement or otherwise. Transfer will be made pursuant to instructions from You, provided that You identify yourself by providing Your Account numbers and other requested information for such services which You have authorized in Your Account Agreement or otherwise. You agree to pay any applicable transfer fee in effect on the date of transfer. This fee will be automatically debited from the Account from which You are transferring funds. You represent that You are authorized to withdraw funds from such Accounts. We shall have no liability for any refusal or failure to make a transfer pursuant to telephone instructions. Transfers made pursuant to these terms and conditions shall be at Your sole risk.

**17. POWER OF ATTORNEY.** If You wish to designate an attorney-in-fact, You must do so in a form acceptable to Us. We reserve the right to refuse to honor any Power of Attorney presented to Us, and shall have no liability related to such refusal to the extent permitted by applicable law. We shall have no liability for transactions performed by a purported attorney-in-fact under a Power of Attorney that has been revoked or is otherwise invalid unless We have received written notice of same and have had a reasonable period of time to act upon such notice. We reserve the right to restrict the types or amounts of transactions We will permit an attorney-in-fact to conduct. A person acting under a Power of Attorney is not, by virtue of such power, an owner of the Account, and no funds in the Account belong to the attorney-in-fact by reason of that capacity. The attorney-in-fact has no right of survivorship in the Account by virtue of that capacity.

**18. INTEREST.** Interest on deposits is compounded and distributed as described in Our Account disclosures. We reserve the right to change Our interest rates and annual percentage yields at any time according to Our discretion. Interest is

reflected in Your periodic statement of Account.

For regulatory and accounting purposes, Your checking and NOW Account will consist of two subaccounts: a checking subaccount and a money market subaccount. This does not affect transactions, funds availability, interest the Account earns, minimum balance requirements, fees and charges, or FDIC insurance coverage associated with Your Account.

At various times during the statement cycle, We will transfer funds between the checking subaccount and the money market subaccount. Subaccount activity will not appear on Your monthly statements and will not be subject to fees. Account statements will look as if there was only one checking Account. For interest-bearing checking Accounts, both subaccounts will pay the same interest rate and annual percentage yield. For non interest-bearing checking Accounts, neither subaccount will pay interest. You will have no direct access to the money market subaccount; You may only access the money market subaccount indirectly through transactions on Your checking subaccount. This will have no impact on Your use of the Account or, for MidFirst interest-bearing checking Accounts, the interest You will earn on Your Account balance.

**19. STATEMENT OF ACCOUNT.** Your periodic statement of Account will be prepared as of a date designated by Us. Our books will determine the balance of the Account. Your statement will note all deposits, withdrawals, transfers, debits, and adjustments charged or credited to the Account and may provide an image of the front of each item shown on the statement, as required by law. We will attempt to maintain a legible copy of each item destroyed for the time required by law. This obligation is met if We have systems and use equipment that will generally capture and retain an image of the item. You may obtain a copy of any item as maintained in accordance with applicable law. Fees for obtaining such copies are set forth in Our Fee Schedule. We are not liable for any loss occasioned because We are unable to provide copies. Your statement will be

mailed to the last address We have for You in Our system. If mail to the address on file with Us is returned, We will hold the statement for You to pick up. You will promptly and carefully examine each statement and will, within thirty (30) days after mailing, report to Us any unauthorized signature on or alteration of any item, and will, within sixty (60) days after mailing, report to Us any other error or discrepancy in it or any claim for credit or refund. If no such report and return is made within the applicable period, You will be presumed to have accepted the stated balance as being correct and to have released Us from all liability for transactions posted or not posted to the Account, subject to applicable law.

**20. LIMITATIONS.** Any transfer by wire or ACH to or from any of Your transaction Accounts must be from, to, or through a domestic financial Institution. You agree that at such time as Your Account is credited with the amount of the transfer, or is credited to a debt of Yours, or is otherwise made available to You, any such event shall serve as notification to You of Our receipt of the payment order and notice to You of such event. You agree that You will not cause or permit any transfer to any of Your transaction Accounts by electronic means, including by wire or ACH, in excess of $1,000,000.00, without Our prior written consent. In the event that no such prior written consent is obtained, You agree that We need not accept the transfer, We shall have no obligation to credit the amount of the transfer to Your Account, and We may return the amount of the transfer to the sender so long as We make such return by the close of the banking day following the day on which We receive payment for the transfer. We shall not be deemed to have waived any rights under this paragraph 20, or elsewhere in this Agreement based upon any prior transfer to You.

**21. DORMANT ACCOUNTS.** Accounts may be classified as dormant when there have been no customer-initiated transactions for the preceding twelve (12) months. To prevent Your Account from becoming dormant, You must initiate one of the following types of transactions: deposit, withdrawal, check, electronic deposit, ATM withdrawal, debit card transaction, telephone transfer or ACH direct deposit.

An inactivity fee may be assessed against the dormant balance. We must, in most cases, remit the dormant balance as abandoned property in accordance with applicable law.

**22. ATM CARDS AND DEBIT CARDS.** ATM cards and/or debit cards may be used to access Your savings Account if the ownership and persons authorized to withdraw funds are identical to the checking Account for which Your ATM card or debit card is issued. We reserve the right to suspend or revoke ATM card and/or debit card privileges at any time. If You use Your ATM card or debit card to access an Account that does not have sufficient funds to complete a transaction or that would exceed the daily authorization limit attached to Your ATM card or debit card, We may, at Our discretion, authorize the transaction. If We authorize a transaction that overdraws Your Account, We may assess a fee as described below in paragraph 24, "Overdrafts," and as set forth in the Fee Schedule. Terms and conditions applicable to use of ATM cards and debit cards are also described elsewhere in this Agreement.

**23. ACCOUNTS OF DECEDENTS.** On the death of the owner of Your Account, the amount of the credit balance in Your Account will be paid as permitted or required by law, federal and state regulations, and in accordance with Our security procedures. In the event of a death of an Account owner, Account information will be furnished upon request to the duly appointed estate administrator, trustee or attorney.

**24. OVERDRAFTS.** A transaction or item that results in or creates a negative Available Balance in Your Account is called an "Overdraft." We decide whether to authorize debit card transactions and pay items based on the "Available Balance" of funds in Your Account. We decide whether to assess per-item Overdraft fees based on the "Ledger Balance" of funds in Your Account. An Overdraft that results in or increases a negative Ledger Balance in Your Account will incur a per-item Overdraft fee as described herein and as set forth in the Fee Schedule. As set forth in the Fee Schedule (see paragraphs 1 and 9 of this Agreement) and as permitted by law, We

will assess per-item Overdraft fees for Overdraft items regardless of whether the items are paid or returned.

The "Ledger Balance" is the current balance of funds in Your Account at the beginning of the Business Day. For purposes of determining whether to authorize transactions, We determine the "Available Balance" by taking the Ledger Balance and reducing that amount by any outstanding holds for deposits that are not yet available under Our Funds Availability Policy; by debit card items We have authorized but not processed for payment; and by intra-day activities (including but not limited to wire transfers, ATM withdrawals, and other electronic transfers). Certain business operations (e.g., taxis, hotels, rental or leasing companies) may request debit card authorizations in an amount exceeding the amount they ultimately charge You. When We authorize a debit card transaction, We establish a hold and reduce Your Available Balance by the full amount We authorize (which may differ from the transaction amount) until the item is paid or is no longer considered to be pending. In the event You deposit a check that is not from a guaranteed source, a hold is placed on the Account to the extent and during the period described in the Funds Availability Policy section of this Agreement. In Our discretion, We can reduce the time frame for a hold or choose not to place a hold at all. For example, in some cases We are able to verify that a check has been honored prior to the time a hold would otherwise expire and can manually remove the hold, making funds available earlier in the process.

You agree that We may pay checks and other items, including ACH items and other electronic debits to Your Account, in any order that complies with applicable law. For example:

- We may process deposits before debits.
- We may process certain kinds of electronic items, such as debit card, ATM and ACH items, ahead of other kinds of items, such as checks.
- We may process certain items based on the time they were authorized by Us.

- We may process certain items based on the time they were received for processing.
- We may process checks in serial number order.

Multiple Overdraft fees may be charged to Your Account in one day. Also, items returned to the presenting institution as a result of insufficient funds may be re-presented to Us multiple times for payment by the presenting institution. If sufficient funds are not available in Your Account at the time of re-presentment, an additional Overdraft fee may be incurred. To the extent permitted by law, You authorize Us to deduct any Overdrafts and any Overdraft fees from any funds that may thereafter be deposited into the Account, even if those funds come from restricted income sources that are exempt from attachment.

We are under no obligation to pay or authorize any item or withdrawal request presented if there are insufficient available funds to cover the item. You agree, however, that, in Our sole discretion, We may honor any check, recurring debit card, and/or ACH debits presented to Your Account when there are insufficient available funds to cover such items.

We also offer an optional discretionary Overdraft service, Overdraft Privilege, that may be available to You for ATM and everyday debit card transactions. For each of Your Accounts, You can opt in to Overdraft Privilege (or opt out after first opting in) by calling Us toll free at 888-MIDFIRST (888-643-3477) or by calling or visiting one of Our banking centers. You are not eligible for this Overdraft Privilege service unless You have an eligible Account, and You first opt in to the service. If You do not opt in to this Overdraft Privilege service and You attempt an ATM or everyday debit card transaction at a time when Your Account does not have sufficient available funds to cover the transaction, the transaction will be declined. Please note that if You do not opt in to this Overdraft Privilege service for ATM and everyday debit card transactions: (i) We will continue to apply Our current Overdraft policies to paper check, ACH, and recurring debit card

transactions and (ii) the date items are presented for payment and Our processing order could still cause a paper check, ACH, or recurring debit card transaction to result in an overdraft of Your Account.

You agree that payment of any Overdraft item on any occasion(s) does not obligate Us to pay any future Overdraft items. We have no obligation to notify You before We pay an Overdraft item or before We return an Overdraft item unpaid. You agree to pay the amount of any Overdraft and all Overdraft fees immediately upon demand. You agree that We may pursue any collection remedy available under applicable law, of which You may become responsible to reimburse Us for any related expenses.

You should know that:
- A maximum of 5 per-item Overdraft fees will be charged on any Processing Day.
- We will not charge any per-item Overdraft fees if Your Account is overdrawn by $5.00 or less at the end of a Processing Day.
- We will not charge any per-item Overdraft fees if the only debit items We process on a Processing Day are fees We assess.
- We will charge a one-time Extended Overdraft Fee if Your Account is overdrawn in any amount for at least seven consecutive calendar days. Extended Overdraft Fees are based on Your Ledger Balance.

Under Our Overdraft Protect and Overdraft credit services, You may agree to authorize automatic transfers from a linked Account or through certain credit services to cover Account Overdrafts, subject to availability of funds in Your linked Account or availability of credit subject to applicable restrictions and other limitations. Overdraft Protect is described in further detail near the end of this Agreement. Credit services that may be used for Overdraft protection are subject to the standard applicable credit application, approval and execution of credit documents. For more information about Overdraft Protect, available credit services, applicable terms and conditions, fees and enrollment, please visit the MidFirst Overdraft Services webpage at midfirst.com/overdraftservices, call Us toll free at 888-MIDFIRST (888-643-

3477) or call or visit any MidFirst banking center.

**25. SEVERABILITY.** If an item or condition of this Agreement is found to be illegal or unenforceable, the balance of this Agreement will remain in full force and effect.

**26. NOTICE AND CURE.** Prior to bringing a lawsuit or initiating an arbitration that asserts a claim arising out of or related to this Agreement (as further defined in the Arbitration Provision, a "Claim"), the party asserting the Claim (the "Claimant") shall give the other party (the "Potential Defendant") written notice of the Claim (a "Claim Notice") and a reasonable opportunity, not less than thirty (30) days, to resolve the Claim. Any Claim Notice to You shall be sent in writing to the address We have in Our records (or any updated address You subsequently provide to Us). Any Claim Notice to Us shall be sent by mail to MidFirst Bank, 501 N.W. Grand Boulevard, Oklahoma City, Oklahoma 73118, Attn: Bank Operations Account Claim Notice (or any updated address We subsequently provide). Any Claim Notice You send must provide Your name and Account number, as well as Your address and a phone number where You can be reached during normal business hours. Any Claim Notice must explain the nature of the Claim and the relief that is demanded. You may only submit a Claim Notice on Your own behalf and not on behalf of any other party. No third party, other than a lawyer You have personally retained, may submit a Claim Notice on Your behalf. The Claimant must reasonably cooperate in providing any information about the Claim that the Potential Defendant reasonably requests.

**27. WIRE TRANSFERS.** We reserve the right to place limits on domestic and international incoming or outgoing wire transfers at any time. Limitations may include, but are not limited to, limiting the Accounts from which a wire transfer may be sent, the countries and/or banks to which a wire transfer may be sent, and/or the amount of a wire transfer, among other restrictions and applicable fees. For additional information on wire transfers, including any limitations, call or visit any

MidFirst banking center or call Us toll free at 888-MIDFIRST (888-643-3477).

**28. ARBITRATION PROVISION. PLEASE REVIEW AND READ THIS ARBITRATION PROVISION CAREFULLY. IF YOU DO NOT REJECT THIS ARBITRATION PROVISION IN ACCORDANCE WITH SUBPARAGRAPH (a) BELOW, IT WILL BE PART OF THIS AGREEMENT AND WILL HAVE A SUBSTANTIAL IMPACT ON THE WAY YOU OR WE WILL RESOLVE ANY CLAIM THAT YOU OR WE HAVE AGAINST EACH OTHER, NOW OR IN THE FUTURE.**
**Arbitration is the process for settling disputes where the determination is made by an impartial third party. Arbitration binds the parties to a type of resolution outside of the courts.**

(a) Your Right to Reject Arbitration Provision: **If You do not want this Arbitration Provision to apply, You may reject it by mailing Us a written rejection notice which gives Your name(s) and Account number(s) and contains a statement that You, both or all of the Account owners, if more than one) reject the Arbitration Provision in this Agreement which governs Your Account. The rejection notice must be sent to Us at MidFirst Bank, 501 N.W. Grand Boulevard, Oklahoma City, Oklahoma 73118, Attn: Bank Operations Arbitration Rejection. A rejection notice is effective only if it is signed by You (including both or all of the Account owners), and such notice is received within thirty (30) days after the day You open Your Account (the "Rejection Deadline").**

(b) Parties Subject to Arbitration: As used in this Arbitration Provision, the terms "We," "Us" and "Our" mean (a) MidFirst Bank, any parent, subsidiary or affiliate of MidFirst Bank and the employees, officers and directors of such companies ("Bank Parties"); and (b) any other

person or company that provides any services in connection with this Agreement or Your Account if You assert a Claim against such other person or company at the same time You assert a Claim against any Bank Party.

(c) Covered Claims: "Claim" means any claim, dispute or controversy between You and Us that in any way arises from or relates to this Agreement, Your Account, any products or services offered by Us, including but not limited to, any debit card or ATM card provided to You, Overdraft Protect, Overdraft Privilege and/or Overdraft credit services, and the advertising and disclosures related to the foregoing, if such Claim, dispute or controversy cannot be resolved without a lawsuit or arbitration proceeding. "Claim" includes disputes arising from actions or omissions prior to the effective date of this Agreement (or prior to the time this Arbitration Provision becomes part of this Agreement). "Claim" has the broadest reasonable meaning, and includes initial claims, counterclaims, cross-claims and third-party claims, inclusive of any damages or other remedies claimed It includes disputes based upon contract, tort, consumer rights, fraud and other intentional torts, constitution, statute, regulation, ordinance, common law and equity (including any claim for injunctive or declaratory relief). However, it does not include any dispute about the validity, enforceability, coverage or scope of this Arbitration Provision or any part thereof (including, without limitation, subparagraph (g), captioned "Prohibition Against Certain Proceedings" (the "Class Action Waiver"), the final sentence in subparagraph (m), captioned "Severability," and/or this sentence); all such disputes are for a court and not an arbitrator to decide. Notwithstanding the foregoing, the term "Claim" includes any dispute

about the validity or enforceability of this Agreement as a whole.

(d) Starting an Arbitration: To the extent permitted by the Federal Arbitration Act (the "FAA") and any other applicable federal law, arbitration may be elected by either party with respect to any Claim, even if that party has already initiated a lawsuit with respect to a different Claim. Arbitration is elected by giving a written demand for arbitration to the other party, by filing a motion to compel arbitration in court or by initiating an arbitration against the other party. We will not demand to arbitrate an individual Claim that You bring against Us in small claims court or Your state's equivalent court, if any. If that Claim is transferred, removed or appealed to a different court, We then have the right to demand arbitration.

(e) Choosing the Administrator: "Administrator" means the American Arbitration Association ("AAA"), 1633 Broadway, 10th Floor, New York, NY 10019, www.adr.org; JAMS, 620 Eighth Avenue, 34th Floor, New York, NY 10018, www.jamsadr.org; or any other company selected by mutual agreement of the parties. If both AAA and JAMS cannot or will not serve and the parties are unable to select an Administrator by mutual consent, the Administrator will be selected by a court. The arbitrator will be appointed by the Administrator in accordance with the rules of the Administrator. However, the arbitrator must be a retired or former judge or a lawyer with at least ten (10) years of experience in handling banking disputes. You get to select the Administrator if You give Us written notice of Your selection with Your notice that You are demanding to arbitrate any Claim or within twenty (20) days after We give You notice that We are demanding to arbitrate any Claim (or, if You dispute Our right to require arbitration of the Claim,

within twenty (20) days after that dispute is finally resolved). If You do not select the Administrator within the time specified, We may select the Administrator. Notwithstanding any language in this Arbitration Provision to the contrary, no arbitration may be administered, without the consent of all parties to the arbitration, by any Administrator that has in place a formal or informal policy that is inconsistent with the Class Action Waiver.

(f) Court and Jury Trials Prohibited; Other Limitations on Legal Rights: **FOR CLAIMS SUBJECT TO ARBITRATION YOU WILL NOT HAVE THE RIGHT TO PURSUE THAT CLAIM IN COURT OR HAVE A JURY DECIDE THE CLAIM. YOUR ABILITY TO OBTAIN INFORMATION AND SEEK DISCOVERY WILL BE MORE LIMITED IN ARBITRATION THAN IN A LAWSUIT. OTHER RIGHTS THAT YOU WOULD HAVE IF YOU WENT TO COURT MAY ALSO NOT BE AVAILABLE IN ARBITRATION.**

(g) Prohibition Against Certain Proceedings: **FOR CLAIMS SUBJECT TO ARBITRATION: (1) YOU MAY NOT PARTICIPATE IN A CLASS ACTION IN COURT OR IN A CLASS-WIDE ARBITRATION, EITHER AS A PLAINTIFF, CLASS REPRESENTATIVE OR CLASS MEMBER; (2) YOU MAY NOT ACT AS A PRIVATE ATTORNEY GENERAL IN COURT OR IN ARBITRATION; (3) CLAIMS BROUGHT BY OR AGAINST YOU MAY NOT BE JOINED OR CONSOLIDATED WITH CLAIMS BROUGHT BY OR AGAINST ANY OTHER PERSON; AND (4) THE ARBITRATOR SHALL HAVE NO POWER OR AUTHORITY TO CONDUCT A CLASS-WIDE ARBITRATION, PRIVATE ATTORNEY GENERAL ARBITRATION OR MULTIPLE-PARTY ARBITRATION. Collectively, this Section (g) is**

**referred to as the Class Action Waiver.**

(h) Location and Costs of Arbitration: Any arbitration hearing that You attend must take place at a location reasonably convenient to You. We will pay any and all fees of the Administrator and/or the arbitrator (i) if applicable law requires Us to, (ii) if You prevail in the arbitration, which means the arbitrator rules in Your favor on the Claim or (iii) if You make a written request for Us to pay such fees and We believe You are acting in good faith. If You demand an arbitration, We will pay Your reasonable attorneys' and experts' fees if You prevail or if We must bear such fees in order for this Arbitration Provision to be enforced. Also, We will bear any fees required by applicable law.

(i) Governing Law: This Arbitration Provision involves interstate commerce and is governed by the FAA and not by any state arbitration law. The arbitrator must apply applicable substantive law consistent with the FAA and applicable statutes of limitations and claims of privilege recognized at law. The arbitrator may award any remedy provided by the substantive law that would apply if the action were pending in court (including, without limitation, punitive damages, which shall be governed by the Constitutional standards employed by the courts). At the timely request of either party, the arbitrator must provide a brief written explanation of the basis for the award.

(j) Right to Discovery: In addition to the parties' rights to obtain information or discovery pursuant to the arbitration rules of the Administrator, either party may submit a written request to the arbitrator to expand the scope of discovery normally allowable under such rules.

(k) Arbitration Result and Right of Appeal: Judgment upon the

arbitrator's award may be entered by any court having jurisdiction. The arbitrator's decision is final and binding, except for any right of appeal provided by the FAA. However, if the amount of the Claim exceeds $50,000.00 or involves a request for injunctive or declaratory relief that could foreseeably involve a cost or benefit to either party exceeding $50,000.00, any party can, within thirty (30) days after the entry of the award by the arbitrator, appeal the award to a three-arbitrator panel administered by the Administrator. The panel shall reconsider anew any aspect of the initial award requested by the appealing party. The decision of the panel shall be by majority vote. Reference in this Arbitration Provision to "the arbitrator" shall mean the panel if an appeal of the arbitrator's decision has been taken. The costs of such an appeal will be borne in accordance with subparagraph (h) above, captioned "Location and Costs of Arbitration."

(l)  Rules of Interpretation: This Arbitration Provision shall survive the repayment of all amounts owed under this Agreement, the closing of Your Account, any legal proceeding and any bankruptcy to the extent consistent with applicable bankruptcy law. In the event of a conflict or inconsistency between this Arbitration Provision, on the one hand, and the applicable arbitration rules or the other provisions of this Agreement, on the other hand, this Arbitration Provision shall govern.

(m)  Severability: If any portion of this Arbitration Provision, other than the Class Action Waiver, is deemed invalid or unenforceable, the remaining portions shall nevertheless remain in force. If a determination is made that the Class Action Waiver is unenforceable, only this sentence of the Arbitration Agreement will remain in force and the remaining provisions shall be null and void, provided that the

determination concerning the Class Action Waiver shall be subject to appeal.

(n)  Special Payment: **If (1) You submit a Claim Notice in accordance with this paragraph on Your own behalf (and not on behalf of any other party); (2) We refuse to provide You with the relief You request; and (3) an arbitrator subsequently determines that You were entitled to such relief (or greater relief), the arbitrator shall award You at least $7,500.00 and any fees and costs to which You are entitled.**

**Electronic Funds Transfer
Your Rights and Responsibilities**

This section describes terms and conditions applicable to electronic funds transfers as required by the Electronic Funds Transfer Act and applicable regulations. This section applies only to electronic fund transfers that authorize Us to debit or credit a consumer Account, that is, an Account established primarily for consumer, family, or household purposes. If Your Account is primarily for a business purpose, then this section does not apply to You. Electronic fund transfers are generally defined under the Electronic Fund Transfer Act of 1978 and include transfers of funds that You initiate through an electronic terminal, phone, computer, or magnetic tape for the purpose of authorizing a debit or credit to Your Account. Please read this disclosure carefully because it describes Your rights and obligations for those transactions. You should keep this disclosure for future reference.

Terms and conditions relating to electronic funds transfers conducted through MidFirst online banking, including but not limited to iManage Business Express®, iManage Business Banking®, or iManage Personal Banking® are contained in the agreements for such services that You received at the time You applied for the service, and should be read and understood in conjunction with this Agreement. To the extent that the terms or conditions of the MidFirst online banking agreements conflict with this Agreement, the online banking agreements shall control with respect to the details of the service

described in the online banking agreement. In all other cases this Agreement shall control.

**DO NOT write Your personal identification number ("PIN") on anything or keep it in any form with Your ATM card or debit card.**

**1.  CARDHOLDER'S LIABILITY & NOTIFICATION PROCEDURES.** Notify Us IMMEDIATELY if You believe Your ATM card, debit card or PIN has been lost or stolen or if You believe that an unauthorized transfer from Your Account has occurred. Telephoning is the best way of minimizing Your potential losses. You could lose all the money in Your Account in addition to the maximum Overdraft Protect Account balance or reach the limit of Your Overdraft credit service, if You have elected these services. If You tell Us about the lost or stolen ATM card, debit card or PIN within two (2) Business Days after You learn of the loss or theft, You can lose no more than $50.00 if someone uses Your ATM card, debit card or PIN without Your permission.

If You do NOT notify Us within two (2) Business Days after You learn about the loss or theft of Your ATM card or debit card and/or PIN, You could lose as much as $500.00 if We can prove We could have prevented the unauthorized use of Your ATM card, debit card or PIN without Your permission if You had timely notified Us.

Also, if Your periodic statement shows unauthorized transactions, notify Us at once. If You do not notify Us within sixty (60) days after the statement was mailed to You, You may not recover any money You lost if We can prove that We could have prevented an unauthorized transfer if You had timely notified Us.

NOTIFICATION PROCEDURES: If You believe Your ATM card, debit card or PIN has been lost, stolen, or that someone has transferred or may transfer money from Your Account without Your permission, during normal business hours, call MidFirst Bank toll free at 888-MIDFIRST (888-643-3477) or visit any MidFirst banking center. After normal business hours, call toll free 800-236-2442 and/or write MidFirst Bank, Attention: EFT Representative P.O. Box 76149, Oklahoma City, Oklahoma, 73147.

If an extraordinary reason (such as a hospital stay) keeps You from promptly notifying or telling Us, We may, at Our discretion, extend the notification time periods.

Once an ATM card, debit card or PIN is reported lost or stolen, ATMs will disregard transaction requests and may retain the card inside the machine if You or anyone else attempts to use it.

Under the operating rules of the National Automated Clearing House Association, which are applicable to ACH transactions involving Your Account, We are not required to give next day notice to You of receipt of an ACH item, and We will not do so. However, We will continue to notify You of the receipt of payments in the periodic statements we provide to You.

**2. BUSINESS DAYS AND PROCESSING DAYS.** Our business days are Monday through Friday, 8:00 a.m. to 5:00 p.m., local time, with the exception of legal holidays, as observed by Us or the Federal Reserve Bank of Kansas City ("Business Days"). Our Processing Days are Business Days in addition to select legal holidays.

**3. TYPES OF AVAILABLE TRANSFERS.** For those Accounts associated with Your ATM card or debit card, You may use Your ATM card or debit card at electronic terminals to:
   a) Withdraw cash from checking Accounts;
   b) Make deposits to checking Accounts;
   c) Withdraw cash from savings Accounts;
   d) Make deposits to savings Accounts;
   e) Transfer funds between checking and savings Accounts upon request;
   f) Inquire as to the amount of Your Available Balance; and
   g) Pay for purchases from merchants who have agreed to accept the ATM card and debit card for that purpose.

Some of these services may not be available at all electronic terminals.

**4. ELECTRONIC CHECK CONVERSION.** You may authorize a merchant or other payee to make a one-time electronic payment from Your checking Account using information from Your check to:

   a) Pay for purchases.
   b) Pay bills.

These electronic check conversions constitute electronic funds transfers.

**5. LIMITATIONS ON TRANSACTIONS.** Withdrawals are subject to the following limitations:
   a) You may withdraw the maximum cash withdrawal amount (as referenced below) or Your Account balance (whichever is less) from an electronic terminal, such as an ATM, per day, per ATM card or debit card. You may use Your ATM card or debit card to purchase goods and services each day ("Point of Sale") subject to the limits set forth in below, as long as the Available Balance of Your Account is sufficient to cover the aggregate of all purchases. The cash withdrawal (ATM) and cash advance daily limit, including any ATM fees, is $520.00*for most consumer customers and $1,020.00 for Private Bank consumer customers. The Point-of-Sale daily limit is $2,500.00* for most consumer customers. The cash withdrawal (ATM) and cash advance daily limits, including any ATM fees, for consumer customers with Solution Checking products is $270.00 including any ATM fees . The point-of-sale daily limit for consumer customers with Solution Checking products is $750.00.
   b) Also, note that at certain times mechanical malfunctions of the system may cause withdrawals to be limited to $100.00 cash withdrawal, including ATM fees, and $500.00 at the Point of Sale until the malfunction can be corrected.
   c) Funds deposited will be made available to You under the terms described in the Funds Availability section elsewhere in this Agreement.

*These are the standard limits for most consumer Accounts. Depending on Your Account type, You may qualify for larger or smaller limits.

**6. CHARGES.** On certain Accounts there may be charges for ATM card and debit card transactions made at non-MidFirst ATMs. There may be a charge for replacement or additional ATM card, debit

card or PINs requested as a result of loss or negligence. Please refer to the Fee Schedule for specific fee information related to electronic fund transfers.

If You use Your ATM card or debit card to access an Account that does not have sufficient funds to complete a transaction or that would exceed the daily authorization limit attached to Your ATM card or debit card, We may, at Our discretion, authorize the transaction. If We authorize a transaction that overdraws Your Account, We will assess a fee as described in this Agreement in paragraph 24, "Overdrafts," and as set forth in the Fee Schedule.

INTERNATIONAL TRANSACTIONS: If You conduct a transaction with Your ATM card or debit card involving multiple currencies or U.S. dollars in a country outside of the United States of America, Puerto Rico or the US Virgin Islands, a transaction fee may appear on Your monthly statement from the applicable card network. We reserve the right to make future changes in Your Account and/or ATM card or debit card transaction fees, subject to Our giving You notice as required by law.

**7. DOCUMENTATION.** At the time of any card transaction using an ATM card, debit card or Point-of-Sale terminal, You may receive a transaction receipt, which will include the amount, date, type of transfer, identity of Account and bank or merchant, location of terminal, identity of any account where funds are transferred, and transaction identification number unless the transaction is $15.00 or less. If You have arranged to have direct deposits made to Your Account at least once every sixty (60) days from the same person or company, You can call Us toll free at 888-MIDFIRST (888-643-3477) or call or visit any MidFirst banking center to find out whether or not the deposit has been made. Your regular monthly statement will reflect ATM card or debit card transfers, direct deposits and withdrawals, and preauthorized electronic fund transfers.

**8. RIGHT TO STOP PAYMENT OF PREAUTHORIZED TRANSFERS.** You may stop payment of preauthorized transfers as described in this Agreement. Preauthorized transfers are an electronic fund transfer

authorized in advance to recur at substantially regular intervals. The time limitations for stopping, canceling or changing any bill payments scheduled via MidFirst online or mobile banking, such as iManage Bill Pay, if those services are available on Your Account, are contained in Your MidFirst Bill Pay Terms and Use Agreement and are not governed by this paragraph. The time limitations for stopping, canceling or changing any bill payments scheduled via MidFirst business online or mobile business banking, such as iManage Business Express® or iManage Business Banking  if those services are available on Your Account, are contained in the respective service agreements and are not governed by this paragraph.

You may use Your ATM card or debit card to pay for goods and services at retail locations via Point of Sale that display (i)the Visa® if You have Our ATM card or debit card with  the Visa® symbol or (ii) the MasterCard® if You have Our ATM card or debit card with the MasterCard® symbol. We will charge Your Account for all purchases and withdrawals made with Your ATM card and debit card. The use of Your ATM card and debit card to purchase goods and services will constitute a simultaneous withdrawal from Your applicable Account. Notwithstanding anything to the contrary, You CANNOT PLACE A STOP PAYMENT ON ANY TRANSACTION MADE WITH YOUR ATM CARD OR DEBIT CARD.

**9. OUR LIABILITY FOR FAILURE TO COMPLETE TRANSACTIONS.** If We do not complete a transaction to or from Your Account on time or in the correct amount according to Our agreement with You, We will be liable only for Your loss or damage to the extent of the amount of the transaction. We will not be liable, however, if We do not complete a transaction in situations that include, but are not limited to, the following examples:

a) If, through no fault of Ours, You do not have enough money in Your Account to make the transaction;

b) If the transaction would go over the credit limit on any line of credit You may have;

c) If the ATM where You are making the transaction does not have enough cash to complete the transaction;

d) If the electronic terminal was not working properly;

e) If circumstances beyond Our control (such as fire, flood, other natural disaster, terrorism, supplier failure, system malfunction, etc.) prevent the transaction, despite reasonable precautions that We have taken;

f)  If the funds are subject to legal or other encumbrance;

g) If federal or state banking rules or regulations as issued by the Office of the Comptroller of the Currency, the Federal Reserve Board, the Federal Deposit Insurance Corporation, or other agency with banking oversight might prohibit such transaction; or

h)  If We fail to complete a transaction because We believe the transaction may be fraudulent.

Also in the case of any error or malfunction that was not intentional on Our part and resulted from a bona fide error, notwithstanding the maintenance of procedures reasonably adopted to avoid any such error, Our liability is limited only to actual damages proved.

**10.    DISCLOSURE    OR    ERROR RESOLUTION    PROCEDURES    AND CONSUMER RIGHTS.** If You think Your statement or receipt is wrong, or if You need more information about a transfer listed on the statement or receipt, You must notify Us no later than sixty (60) days after We sent the FIRST statement on which the problem or error appeared. Your notice should include:

a) Your name and Account number;

b)  A description of the error or the transfer You are unsure about and a detailed explanation of why You believe it is an error or why You need more information. Your explanation should be as clear and complete as possible; and

c)  The dollar amount of the suspected error.

If You notify Us orally, We may require that You provide Us Your complaint or question in writing within ten (10) Business Days.

For Electronic Funds Transfers: Within ten (10) Business Days after You notify Us of a possible error, We will make a determination as to whether an error occurred. We will correct any determined error promptly. If We need more time or information, We may take up to forty-five (45) days to investigate and determine whether an error occurred. This timeframe may be extended to 90 days for Point of Sale transactions. If We decide to do this, We will provisionally credit Your Account for the amount You think is in error within ten (10) Business Days after We receive written confirmation of Your complaint or question, so that You will have the use of the money during the time it takes Us to complete Our investigation. If We ask You to confirm Your complaint or question in writing, and We do not receive it within ten (10) Business Days, We may not provisionally credit Your Account.

For POS, ATM, and Other Electronic Transfers involving New Accounts: For new transaction Accounts (Accounts on which each owner of the Account does not have or has not had within the previous thirty (30) days a transaction Account with Us), We may take up to 90 days to investigate Your complaint or question and determine whether an error occurred.  If We decide to do this, We will provisionally credit Your Account for the amount You think is in error within twenty (20) Business Days after We receive written confirmation of Your complaint or question, so that You will have the use of the money during the time it takes Us to complete Our investigation. If We ask You to confirm Your complaint or question in writing, and We do not receive it within twenty (20) Business Days, We may not provisionally credit Your Account.

If we issue a provisional credit and ultimately determine that no error occurred, we will debit such provisional credit from Your Account.  We will notify You of the date and amount of the debit. We will honor any checks, drafts, or similar third party payables and any preauthorized transfers as provided in the notice that We will send to You.

IN CASE OF ERROR OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS: Telephone Us toll free at 888-MIDFIRST (888-643-3477), or write Us at MidFirst Bank, Attention: Bank Operations EFT Representative P.O. Box 76149, Oklahoma City, Oklahoma, 73147.

We will communicate the results to You within three (3) Business Days after completing Our investigation. If We decide that there was no error, We will send You a written explanation. You may ask for copies of the documents that We used in Our investigation.

**11. PROVISIONAL PAYMENT.** Credit given by Us to You with respect to an ACH credit entry is provisional until We receive final settlement for such entry through a Federal Reserve Bank. If We do not receive such final settlement, You are hereby notified and agree that We are entitled to a refund of the amount credited to You in connection with such entry, and the party making payment to You via such entry (i.e., the originator of the entry) shall not be deemed to have paid You in the amount of such entry.

**12. CONFIDENTIALITY.** Please see the section of this Agreement entitled "Customer Information Disclosure" regarding circumstances under which We will disclose information to third parties about Your Account.

**13. CHOICE OF LAW.** We may accept on Your behalf payments to Your Account which have been transmitted through one or more ACH and which are not subject to the Electronic Fund Transfer Act and Your rights and obligations with respect to such payments shall be construed in accordance with and governed by the law of the state in which the Account is deemed by Us to have been opened or as described in paragraph 1 of this Agreement.

### Funds Availability Policy

**1. GENERAL.** Except as otherwise described below, We will make funds from Your deposits available to You on the first Business Day after the day We receive Your deposit. However, many exceptions apply, and if You will need the funds from a deposit right away, You should ask Us when the funds will be available. Once funds are available, You can withdraw the funds in cash, and We will use the funds to process transactions on Your Account.

Please remember that You are responsible for any check You deposit with Us that is returned to Us unpaid and for any other problem that occurs involving Your deposit,

even if We previously made funds available to You in connection with such deposit.

**2. WHEN DEPOSITS ARE RECEIVED.** For determining the availability of Your deposits, every day is a Business Day, except Saturdays, Sundays, and federal holidays. However, only deposits made to an employee at a banking center, at a MidFirst ATM, or via Mobile Deposit or Business Mobile Deposit before the cutoff time on a Business Day that We are open will be considered received on that day. For most MidFirst banking centers, the cutoff time is the time the banking center closes on a Business Day. However, certain MidFirst banking centers have earlier cutoff times, but in no case will the cutoff time be earlier than 2:00 p.m. For most ATMs, the cutoff time is 4:00 p.m. central time. Deposits made after the cutoff time applicable to the banking center or ATM at which the deposit is made or on a day We are not open are considered received on the next Business Day We are open.

Bank by mail deposits received before 4:00 p.m. on a Business Day will be considered received on the day of receipt. Later deliveries and those received on Saturdays, Sundays, and holidays will be considered received on the next Business Day We are open.

Preauthorized electronic deposits will be posted on the effective date for the transaction, if received by the Federal Reserve Bank's last deadline for electronic payments for that same Business Day; otherwise, preauthorized electronic deposits will be posted on the next business day.

**3. LONGER DELAYS MAY APPLY.** In some cases, We will not make all of the funds that are deposited by check or deposited available to You on the first Business Day after the day of Your deposit. Depending on the type of check that You deposit, funds may not be available until the second Business Day after the day Your deposit is received. However, the first $200.00 of Your deposits may be available on the first Business Day after Your deposit is received.

If We are not going to make all of the funds from Your deposit available on the first Business Day, We will notify You at the time

You make Your deposit. We will also tell You when the funds will be available. If Your deposit is not made directly to one of Our employees, or if We decide to take this action after You have left the premises, We will mail You the notice by the day after We receive Your deposit.

Funds You deposit by check may be delayed for a longer period if: (i) We believe a check You deposit will not be paid; (ii) You deposit checks totaling more than $5,000.00 on any one Business Day; (iii) You redeposit a check that has been returned unpaid; (iv) You have overdrawn Your Account repeatedly in the last six (6) months; or (v) there is an event that occurs, which is out of Our control such as an emergency, communications or computer equipment failure, natural disaster, act of terrorism, sanction or restriction against the transaction, or other event outside Our control.

We will notify You if We delay Your ability to withdraw funds for any of these reasons, and We will tell You when the funds will be available. They will generally be available no later than the seventh (7th) Business Day after the day of Your deposit.

Your deposit may encounter delays if required by law.

**4. HOLDS ON OTHER FUNDS -- CHECK CASHING.** If We cash a check for You that is drawn on another bank, We may withhold the availability of a corresponding amount of funds that are already in Your Account. Those funds will be available at the time funds from the check We cashed would have been available if You had deposited it.

**5. HOLDS ON OTHER FUNDS -- OTHER ACCOUNTS.** If We accept for deposit a check that is drawn on another bank, We may make funds from the deposit available for withdrawal immediately, but delay Your availability to withdraw a corresponding amount of funds that You have on deposit in another account with Us. The funds in the other account would then not be available for withdrawal until the time periods that are described elsewhere above for the type of check that You deposited.

**6. SPECIAL RULES FOR NEW ACCOUNTS.** If You are a new customer,

special rules will apply during the first thirty (30) days Your Account is open. Funds from electronic direct deposits, cash deposits or wire transfers to Your Account will be available on the Business Day We receive the deposit. The first $5,000.00 of a Business Day's total deposits of official, certified, tellers, travelers, and state and local government checks will be available on the first (1st) Business Day after the day of Your deposit, if the deposit meets certain conditions. For example, the checks must be payable to You (and You may have to use a special deposit slip). The excess over $5,000.00 will be available on the ninth (9th) Business Day after the day of Your deposit. If Your deposit on these checks (other than a U.S. Treasury check) is not made in person to one of Our employees, the first $5,000.00 will not be available until the second (2nd) Business Day after the day of Your deposit. Funds from all other check deposits will be available on the eleventh (11th) Business Day after the day of Your deposit.

## Substitute Checks and Your Rights

To make check processing faster, federal law permits banks to replace original checks with "Substitute Checks." These Substitute Checks are similar in size to original checks with a slightly reduced image of the front and back of the original check. The front of a Substitute Check states: "This is a legal copy of Your check. You can use it the same way You would use the original check." You may use a Substitute Check as proof of payment just like the original check.

Some or all of the checks that You receive back from Us may be Substitute Checks. This notice describes rights You have when You receive Substitute Checks from Us. The rights in this notice do not apply to original checks or to electronic debits to Your Account. However, You have rights under other laws with respect to those transactions.

In certain cases, federal law provides a special procedure that allows You to request a refund for losses You suffer if a Substitute Check is posted to Your Account incorrectly (for example, if You think that We withdrew the wrong amount from Your Account or that We withdrew money from Your Account more than once for the same check). The losses You may attempt to recover under this procedure may include the amount that was withdrawn from Your Account and fees that were charged as a result of the withdrawal (for example, returned check fees).

The amount of Your refund under this procedure is limited to the amount of Your loss or the amount of the Substitute Check, whichever is less. You also are entitled to interest on the amount of Your refund if Your Account is an interest-bearing Account. If Your loss exceeds the amount of the Substitute Check, You may be able to recover additional amounts under other law.

If You use this procedure, You may receive up to $2,500.00 of Your refund (plus interest if Your Account earns interest) within ten (10) Business Days after We received Your dispute notice and the remainder of Your refund (plus interest if Your Account earns interest) not later than forty-five (45) calendar days after We received Your dispute notice.

We may reverse the refund (including any interest on the refund and refunded fees) if We later are able to demonstrate that the Substitute Check was correctly posted to Your Account.

If You believe that You have suffered a loss relating to a Substitute Check that You received and that was posted to Your Account, please contact Us toll free at 888-MIDFIRST (888-643-3477). You must contact Us within forty (40) calendar days of the date that We mailed the Substitute Check in question or the Account statement showing that the Substitute Check was posted to Your Account, whichever is later. We may extend this time period if You were unable to provide a timely dispute notice because of extraordinary circumstances outside Your control.

Any dispute notice from You must include:
a) A description of why You have suffered a loss (for example, You think the amount withdrawn was incorrect).
b) An estimate of the total actual amount of Your loss.
c) An explanation of why the Substitute Check You received is insufficient to confirm that You suffered a loss.

d) A copy of the Substitute Check and/or the following information to help Us identify the Substitute Check: identifying information, for example the check number, the name of the person to whom You wrote the check, the amount of the check.

### Overdraft Protect

If You have requested or authorized Overdraft Protect services or Overdraft credit services in Your Agreement or otherwise, such services are subject to the terms and conditions contained in this Agreement, the Fee Schedule, and Your signed Overdraft Protect Agreement and Authorization. By requesting Overdraft Protect services or Overdraft credit services, You authorize and direct Us, as Your agent, until Your authorization is revoked in writing and delivered to Us, to effect the automatic transfer of funds from the Transferor Account or designated credit service to the Transferee Account, as identified in the Overdraft Protect Agreement and Authorization, provided the automatic transfer of funds will cover the entire Overdraft amount in the Transferee Account, as well as the associated Overdraft Protect transfer fee, except if such action violates state or federal regulation. You represent that You have an ownership interest in and are authorized to withdraw funds from each of such Accounts. If one (1) or more items are presented to Us and the Transferor Account does not contain sufficient funds or sufficient credit is not available to cover the entire Overdraft amount caused by all of the items presented as well as the Overdraft Protect transfer fee, no transfer will occur and You may be assessed the current Overdraft fee(s). We reserve the right to not make any particular transfer.

You may, at any time, cancel Overdraft Protect services or Overdraft credit services. Notification of cancellation must be received in writing at least ten (10) days before the effective date of cancellation. Notification should be mailed to MidFirst Bank, Attention: Overdraft Protect, P.O. Box 76149, Oklahoma City, Oklahoma, 73147.

# Exhibit G

# MIDFIRST BANK®

Version 07/2020

# Account Agreement and Disclosure

## Terms and Conditions of Your Account

With respect to an account or accounts ("Account") held at MidFirst Bank, a federally chartered savings association ("MidFirst"), each person who is named as the owner or is authorized to withdraw funds ("you" or "your," whether one or more) and MidFirst ("we," "our" "us" or "Bank") all agree to the following:

**1. AGREEMENT.** Your Account is subject to terms and conditions that we adopt from time to time. This Account Agreement and Disclosure ("Agreement") describes the current terms and conditions. By signing the New Account Information, Receipt of Certificate of Time Deposit, or by clicking the appropriate checkbox and submitting your online application you acknowledge that you have opened the type of account indicated on the applicable account opening document and you received, understand and agree to be bound by the terms and conditions of this Agreement. You have been provided an account disclosure and a fee schedule ("Fee Schedule"), which are incorporated into this Agreement. If you have elected to obtain other services ancillary to your Account, the agreements for those ancillary services also are incorporated into and made a part of this Agreement. We may alter, amend, or rescind, for any reason, any part of these terms and conditions (or any other Account-related agreement or documentation), or add new terms, at any time. We will give notice of any such changes that may adversely affect you by: (a) posting the same in a conspicuous place in the lobbies of our main office and each of our branches; (b) sending written notice thereof to you at the most recent address indicated on our records; or (c) sending notice to you by electronic mail, as permitted by applicable law, at the most recent electronic mail address indicated on our records. We have no obligation to notify you of changes to the features of your Account that do not adversely affect you in any way. We may immediately implement changes required by law or regulation or to protect the security of your Account or our system. When necessary, notice of such changes will follow implementation. Your continued use of the Account after implementation of changes or following notice of changes to this Agreement as described above signifies your continued acceptance of this Agreement and all changes and amendments hereto. All Account signers authorize us to make inquiries from any consumer reporting agency in connection with this Account. We reserve the right and may close an Account at any time for any reason. You may close your Account at any time for any reason, subject to any prior advance notice requirements related to the particular account, early Account closure fees and our Funds Availability Policy.

**2. LAWS, RULES, AND REGULATIONS.** The Account, including deposits to and withdrawals therefrom, is governed by: (a) the laws and regulations of the United States applicable to federal savings associations and, to the extent applicable, the law of the state in which the Account is deemed by us to have been opened; (b) the rules, regulations and orders of the Office of the Comptroller of the Currency, the Federal Deposit Insurance Corporation, the rules and operating procedures of Federal Reserve Banks and of any clearing house association of which we are or may become a member or through which we may send items for collection; and (c) all provisions posted on our premises, enclosed with statements of Account or contained in our bylaws; all as now in effect or as may in the future be issued, modified or amended. Our obligations pursuant to law, regulation or policy applicable only to consumer Accounts shall not apply to business or commercial Accounts. Activity in consumer Accounts is expected to be for consumer purposes. Business or commercial activity should not be conducted in consumer Accounts. Transactions restricted under Unlawful Internet Gambling Enforcement Act (UIGEA) are prohibited and should not be processed through your Account.

**3. ACCOUNT OWNERSHIP.** Other than those persons identified as authorized signers, agents or fiduciaries, the persons or entities identified on the Account Signature Card or during the online application process as owners are the owners of the Account. If more than one person is identified, each indicated person named is an owner and such ownership shall, for the purpose of this Agreement be deemed to be owned by such persons as joint tenants with full rights of survivorship. Business, fiduciary, and association Accounts are held under the terms of documents submitted to us by the person(s) opening the Account If the Account is a Payable on Death ("POD") account, the Account shall be payable on the death of the last Account owner to one or more designated POD beneficiaries, if living, and if not living, to the named estate of the beneficiary. If more than one beneficiary is designated by the Account owner(s), the beneficiaries, if living, and if not living, the named estate of the beneficiaries, shall share equally in the amount payable on death of the last Account owner. Persons who are identified during the online application process as authorized signers or whose signatures appear on your applicable account opening or related Account documents have the individual authority to withdraw funds from your Account. Any person who is authorized to withdraw funds but who is not the owner of an Account will be considered an agent of the owner of the Account, with the unlimited right to deal with the Account on behalf of the Account owner. We have no duty to inquire as to the authority of an agent to deal with the Account, and we have no liability for permitting an agent to withdraw funds from an Account, regardless of the manner of withdrawal or recipient of the funds.

**4. AUTHORIZED SIGNATURE.** For Accounts opened in person, your signature on the applicable account opening or related Account documents, such as the New Account Information or Receipt of Certificate of Deposit, is your authorized signature for your Account. For Accounts opened online, the signature of any authorized signer identified during the online application process is an authorized signature for your Account. For the payment

of funds and for other purposes relating to any Account you have with us, we are authorized to recognize your signature, but we will not be liable to you for refusing to honor your checks or other signed instructions if we believe in good faith that the signature appearing on such checks or instructions is not genuine. We may honor any check or other item drawn against the Account so long as it contains at least one authorized signature. In addition, we may ask for a form of identification for transactions processed in person for authentication purposes.  In the event of a forgery, we shall not be liable if a "reasonable person" who is similarly situated could not have detected the forgery.  Signatures by facsimile or electronic means may be given full force and effect, without any obligation by us to verify the accuracy thereof.    Unless designated on your Account, we may honor any check or other signed instruction that bears or appears to bear your signature even if it was made or presented by an unauthorized person or with a counterfeit facsimile, electronic, or other signature. You should maintain close control over your facsimile or electronic signature device or stamps and promptly review your statements and cancelled checks for unauthorized use. You agree to hold us harmless from any and all claims and damages that arise based upon said facsimile or electronic signatures.  If you authorize any person to sign your name or otherwise draw against your Account, we may honor any withdrawal signed by or authorized by that person whether or not it exceeds the authority you granted.

**5.  CUSTOMER IDENTIFICATION.**  As required by federal statute and regulation and by our policy, we may require and may verify certain information regarding individuals at Account opening and as otherwise deemed necessary.  This information may include complete customer name, residential or business address, mailing address if different, tax payer identification number, date of birth, government issued photo identification, and other information as may be required by government laws or regulations or as may be deemed appropriate to verify your identity as the customer. This information

may be required for all individuals who are deemed owners of the Account, acting as agent on behalf of the Account owner, named as beneficiary on the Account, or otherwise associated with the Account regardless of manner. In order to comply with regulatory requirements, we may require identifying information regarding the beneficial owners of our legal entity customer.  Account access or proceeds of Accounts opened without required information or subject to information verification may be restricted until such information is obtained and/or verified. We may close an Account at any time for any reason, including but not limited to identification information deemed by us, in our sole discretion, to be insufficient or unverifiable.

**6.  OUR LIABILITY.** We have no obligations or liabilities to you other than those imposed by law or specifically provided herein. Any duty of care imposed on us by law will be fulfilled if the procedures established for the transaction involved are reasonable. We will have no liability for clerical error, inadvertence or oversight, or an honest mistake of judgment.    We have no obligation to verify the accuracy of any information or instructions you provide.

**7.  RIGHT TO OFFSET.** We may, at any time at our discretion, and with notice to you, sent either prior to or after the event, apply any part or all of the balance of your Account to fees or any other debt, matured or unmatured, that you or any other Account owner may then owe to us.    Accounts subject to our right of offset include Accounts held at any of the Bank's divisions, including but not limited to 1st Century Bank**,** Monifi**,** and Vio Bank, and debts owed to Bank include those obligations owed to any of our divisions.

**8.  MINOR ACCOUNTS.** If the Account has been opened in the name of an individual of less than eighteen (18) years of age ("Minor"), we may, in our sole discretion, waive the standard transaction fee, Account maintenance fees and any other fees or charges that we deem appropriate during the time the Minor is under age eighteen (18). Upon the Minor reaching eighteen (18) years of age, if we previously waived such fees, we will commence assessing the

standard transaction fees, Account maintenance fees and any other fees or charges that are set forth in the Fee Schedule in effect on the date the Minor reaches the age of eighteen (18) years of age, and as the Fee Schedule may be amended from time-to-time thereafter. Upon the Minor reaching age eighteen (18) and thereafter, you agree to pay all standard transaction fees, Account maintenance fees and any other fees and charges regularly charged for similar Accounts.  We may permit a minor Account owner to withdraw funds during minority without the signature of a parent even if the parent is also an owner of the Account.

**9. FEES AND CHARGES.** We may assess such transaction and Account maintenance fees and other charges and in such amounts as may be permitted by law. A separate Fee Schedule has been provided (see paragraph 1).  We may amend this Fee Schedule from time to time. You agree to pay immediately any applicable fees and charges and any expenses we may incur in collection of amounts you owe us or in collection of items deposited with us for deposit to your Account, including, but not limited to, any court costs and attorneys' fees, and we may charge your Account to pay these fees, charges, and expenses. If at any time we are required to engage the services of financial or legal counsel (i.e., an attorney or an accountant) to resolve issues related to an Account, you will pay to us on demand the fees and costs we incur.

**10. YOUR CONTACT INFORMATION.** You will keep us advised of any change of your address. Any notice or Account statement mailed by us to the last address given to us by an owner of the Account will be deemed sufficient. Address change requests are subject to identity verification and must be provided with sufficient time for us to process the change of address. If you provide a phone number to us, you expressly agree and consent to be contacted by us and any of our agents, affiliates, contractors, successors or assigns (collectively "us") at this phone number (including mobile, cellular, wireless or similar devices), for any lawful purpose such as for information, servicing or collection purposes.    The ways in which we may contact you include live operator, automatic

telephone dialing systems (auto-dialer), prerecorded and artificial voice message and text/SMS message. You authorize these contacts by voice or text even if the number is a mobile phone number or converts to a mobile phone number, and even if you are charged by your service provider. You authorize us (but we are not obligated) to monitor, record electronically and retain telephone conversations and electronic communications between you (including your purported authorized representatives) and us. Accordingly, you agree on behalf of yourself, and your employees and agents that we may monitor and record your telephone and electronic communications in connection with your Account at any time. Unless required by applicable law, we may monitor and record these communications without further notice. You agree that we may produce the telephonic or electronic recordings or computer records as evidence in any proceedings brought in connection with the Agreement, and you hereby acknowledge the validity and enforceability of such telephonic or electronic recordings. If you provide us with an email address, or if you send us an email, you agree that we may contact you at that email address.

**11. OUR RIGHTS.** We may at any time, and in our sole discretion with or without prior notice, require a minimum deposit, refuse to accept any deposit or cash any check, limit the amount which may be deposited, charge any Account on which you are a signer (subject to legal restraints) for any negative balance created in another account, return all or pay part of any deposit, or close the Account, returning to you personally, or by mail, either cash or an official check for the balance on deposit in the Account. We may also close an Account at any time for any reason. If we exercise our right to close your Account or if you close your Account, we may reopen your Account to process outstanding items. If such item causes a negative balance on your Account, we reserve the right to pursue all remedies available to us, including collection processes. We may decline any transaction, including, but not limited to, any automated teller machine ("ATM") card, debit card, check or automated clearing house ("ACH") transactions. we may also place an

administrative hold on funds on deposit in any Account if we (1) receive a claim from a third party relating to an Account; (2) acquire knowledge of facts which might give rise to a claim by or against us relating to an Account; or (3) if we become aware of facts that to us in our sole judgment appear to indicate that the Account is being used for an improper or unlawful purpose or that you have become the victim of a fraud or undue influence. We may exercise this right even if we are not legally bound to honor the claim. We may hold those funds for a reasonable amount of time to conduct an investigation into the facts. Thereafter, we may either release the funds, apply them against any obligation you may owe us or tender them into a court to resolve the issues. We will not be liable for failing to honor, or for any damage which may result from our failure to honor, any checks, preauthorized transfers, ACH transactions, recurring debit card transactions, or other such transfers or withdrawal orders presented after any such action.

In order to comply with regulatory requirements, we may require additional information on certain transactions including, but not limited to, the source of funds, purpose of the transaction, and/or additional supporting documentation.

You agree that we have been in good faith and have exercised ordinary care if we accept withdrawal requests (whatever the form: paper, electronic or image) from other banks without investigating the genuineness of, or authorization for, the withdrawal. If a withdrawal request is not genuine or is not otherwise authorized by you, our liability will be limited to the amount of the particular withdrawal amount.

**12. DEPOSITS.**

(a) All checks or drafts received by us are at your risk and are credited conditionally to your Account subject to final payment. You authorize us to endorse for you any item deposited to your Account. We have the right to decline debits drawn against such credits. If any item is dishonored on presentation to the financial institution on which drawn, it will be charged back to the Account of deposit or, if such Account has insufficient funds, to

another Account which the depositor, endorser, or payee is a signer (subject to legal restraints), and you may be charged an applicable fee.

(b) We will not be responsible for any delay in crediting your Account if the deposit ticket accompanying the deposit has not been properly completed.

(c) If you elect to use the night depository or the ATM Electronic Teller Network, you expressly agree to rely upon us or our agent to count and credit the deposit and accept our count as final.

- You agree that deposits placed in the night depository facility shall be contained in a tamper-proof plastic bag, envelope or other package, as approved by us.
- Deposits made through the night depository facility shall contain only deposit slip(s), currency, coin and/or negotiable instruments.
- Deposits made through the night depository facility will be opened and verified each morning of each Business Day.
- You are solely responsible for any loss or damage resulting from your or your agents' or employees' use of the night depository facility.

(d) We will not be liable for dishonor of drafts so received in payment for losses thereon or for losses in transit or for negligence or default of other institutions, agents, or subagents but will exercise ordinary care in their selection. We will be deemed to have exercised ordinary care if we send the item by a duly licensed carrier and through any state or federally chartered institution.

(e) Funds deposited will be made available to you under the terms described in the Funds Availability Policy section of this Agreement. When we make funds "available" to you, this does not mean that the funds are "good" or that the deposited item has "cleared" the payor bank.

(f) The outstanding balance of your Account shall not exceed $2,500,000.00 without our prior written consent.

(g) We may charge back to your Account any items returned to us unpaid or

upon which payment has been revoked or rescinded which were deposited into the Account without regard to who made the deposit; whether the deposit was authorized by you; or whether the return to us was timely.

(h) You will not deposit any item not containing the genuine signature of the drawer and the actual endorsement of each payee without our prior written consent. This restriction means that you will not deposit, among other things, "remotely created checks" and "substitute checks" as those terms are defined by law and regulation. If you deposit such items, you agree to reimburse us for losses, costs, and expenses that we may incur associated with such items.

**13. WITHDRAWALS.** You may request the withdrawal of funds from your Account in any amount at any time. Our policy is to pay such withdrawals upon request; however, we are required by federal and state regulations to specifically reserve our right and do hereby reserve our right to require you to give us a seven (7) day written notice of your intention to withdraw funds from your savings Account, money market deposit Account, certificate of deposit or negotiable order of withdrawal account ("NOW Account"). All withdrawals are subject to the availability of funds, as described in the Funds Availability Policy section of this Agreement. We may, at our sole discretion, elect to issue the requested withdrawal amount by Official Check or other means in lieu of cash. Each person who is authorized to withdraw funds from your Account, as indicated on the Account opening documentation, may withdraw funds under any method available to your Account, as described below. Withdrawals by phone transfer or electronic transfer are subject to the terms and conditions described elsewhere in this Agreement. As described in your new Account documents in further detail, certain Accounts allow only a limited number of withdrawals per statement cycle or calendar month, and we may charge a fee for transactions exceeding those limits.   Moreover, if you exceed the regulatory transaction limitations described in your Account documentation, we may be required to convert your Account

to one that is not subject to regulatory limitation. Withdrawals by negotiable instrument may be made only from Money Market Accounts and checking Accounts, and we may refuse payment of any instrument drawn on such an Account other than a negotiable instrument presented upon a form purchased from or approved by us. We do not routinely examine the dates written on items and we are not bound to dishonor any item due solely to the fact that it has been postdated or is more than 6 months old. We may pay items, payment of which have been stopped, after the expiration of the relevant stop payment orders, even though the items may be more than 6 months old.

If your Account is a time deposit, you have agreed to keep the funds on deposit until the maturity of your Account. If your Account has not matured, any withdrawal of all or part of the funds from your Account may result in an early withdrawal penalty. We will consider requests for early withdrawal and, if granted, the penalty provided in the Receipt of Certificate of Time Deposit will apply.

(A) Exceptions. We may let you withdraw money from your Account before the maturity date without an early withdrawal penalty:

(1) When one or more of you dies or is determined legally incompetent by a court or other administrative body of competent jurisdiction or

(2) When the Account is an Individual Retirement Account (IRA) and you have reached the age as determined by IRS guidelines for your Required Minimum Distribution (RMD).

If you make a withdrawal in a foreign currency, the withdrawal will be converted to U.S. dollars. Other fees from such a transaction may apply, and you will be responsible for such additional fees, which may be assessed by a third party.

**14. CHECK CASHING.** We may require identification from persons cashing your checks as we in our sole discretion deem appropriate and may impose fees for cashing checks to the extent permissible by law.

**15. STOP PAYMENT.** You may stop payment of a check, ACH withdrawal, transfer, or preauthorized electronic funds transfer by calling us toll free at 888-MIDFIRST (888-643-3477); by calling or visiting any MidFirst banking center; or through online banking, such as iManage Business Express®, iManage Business Banking® or iManage Personal Banking®, if those services are available on your Account. You must notify us with reasonably sufficient time to allow us to act and fulfill your request. You cannot place a stop payment on any one-time debit or ATM card transactions. We have no liability for payment of an item if the stop payment order is received less than 4 hours prior to presentment of an item. A longer period may be necessary depending on the circumstances. We may require a specific period of time in order to fulfill stop payment requests.  We must receive a stop payment order for a preauthorized electronic funds transfer at least three (3) Business Days before the scheduled transfer. A written stop payment order expires six (6) months after it is received unless it is renewed in writing by you. For ACH withdrawals, you may stop payment of a one-time withdrawal order or place a permanent stop payment on the Account prior to the date of remittance for payment.  A permanent stop payment order for ACH withdrawals will remain on your Account indefinitely, unless revoked by you verbally or in writing.  A stop payment order must include your name and Account number and a description of the payment, including the date drawn, check number, the exact amount, and the payee named. You agree to review the information on any stop payment notice that we send you in response to a stop payment order by you and to notify us immediately of any inaccuracy.

The time limitations for stopping, canceling, or changing any bill payments scheduled via iManage Bill Pay, iManage Business Express® or iManage Business Banking® are contained in your agreements for such services and are not governed by this paragraph.

**16. TELEPHONE TRANSFERS.** By requesting a telephone transfer, you authorize and direct us, as your agent, to transfer funds between the Accounts

specified by you in your Account Agreement or otherwise. Transfer will be made pursuant to instructions from you, provided that you identify yourself by providing your Account numbers and other requested information for such services which you have authorized in your Account Agreement or otherwise. You agree to pay any applicable transfer fee in effect on the date of transfer. This fee will be automatically debited from the Account from which you are transferring funds. You represent that you are authorized to withdraw funds from such Accounts. We shall have no liability for any refusal or failure to make a transfer pursuant to telephone instructions. Transfers made pursuant to these terms and conditions shall be at your sole risk.

**17. POWER OF ATTORNEY.** If you wish to designate an attorney-in-fact, you must do so in a form acceptable to us. We reserve the right to refuse to honor any Power of Attorney presented to us, and shall have no liability related to such refusal to the extent permitted by applicable law. We shall have no liability for transactions performed by a purported attorney-in-fact under a Power of Attorney that has been revoked or is otherwise invalid unless we have received written notice of same and have had a reasonable period of time to act upon such notice. We reserve the right to restrict the types or amounts of transactions we will permit an attorney-in-fact to conduct. A person acting under a Power of Attorney is not, by virtue of such power, an owner of the Account, and no funds in the Account belong to the attorney-in-fact by reason of that capacity. The attorney-in-fact has no right of survivorship in the Account by virtue of that capacity.

**18. INTEREST.** Interest on deposits is compounded and distributed as described in our Account disclosures. We reserve the right to change our interest rates and annual percentage yields at any time according to our discretion. Interest is reflected in your periodic statement of Account.

For regulatory and accounting purposes, your checking and NOW Account will consist of two subaccounts: a checking subaccount and a money market subaccount. This does not affect transactions, funds availability, interest the

Account earns, minimum balance requirements, fees and charges, or FDIC insurance coverage associated with your Account.

At various times during the statement cycle, we will transfer funds between the checking subaccount and the money market subaccount. Subaccount activity will not appear on your monthly statements and will not be subject to fees. Account statements will look as if there was only one checking Account. For interest-bearing checking Accounts, both subaccounts will pay the same interest rate and annual percentage yield. For non interest-bearing checking Accounts, neither subaccount will pay interest. You will have no direct access to the money market subaccount; you may only access the money market subaccount indirectly through transactions on your checking subaccount. This will have no impact on your use of the Account or, for MidFirst interest-bearing checking Accounts, the interest you will earn on your Account balance.

**19. STATEMENT OF ACCOUNT.** Your periodic statement of Account will be prepared as of a date designated by us. Our books will determine the balance of the Account. Your statement will note all deposits, withdrawals, transfers, debits, and adjustments charged or credited to the Account and may provide an image of the front of each item shown on the statement, as required by law. We will attempt to maintain a legible copy of each item destroyed for the time required by law. This obligation is met if we have systems and use equipment that will generally capture and retain an image of the item. You may obtain a copy of any item as maintained in accordance with applicable law. Fees for obtaining such copies are set forth in our Fee Schedule. We are not liable for any loss occasioned because we are unable to provide copies. Your statement will be mailed to the last address we have for you in our system. If mail to the address on file with us is returned, we will hold the statement for you to pick up. you will promptly and carefully examine each statement and will, within thirty (30) days after mailing, report to us any unauthorized signature on or alteration of any item, and will, within sixty (60) days after mailing,

report to us any other error or discrepancy in it or any claim for credit or refund. If no such report and return is made within the applicable period, you will be presumed to have accepted the stated balance as being correct and to have released us from all liability for transactions posted or not posted to the Account, subject to applicable law.

**20. LIMITATIONS.** Any transfer by wire or ACH to or from any of your transaction Accounts must be from, to, or through a domestic financial Institution. You agree that at such time as your Account is credited with the amount of the transfer, or is credited to a debt of yours, or is otherwise made available to you, any such event shall serve as notification to you of our receipt of the payment order and notice to you of such event. You agree that you will not cause or permit any transfer to any of your transaction Accounts by electronic means, including by wire or ACH, in excess of $1,000,000.00, without our prior written consent. In the event that no such prior written consent is obtained, you agree that we need not accept the transfer, we shall have no obligation to credit the amount of the transfer to your Account, and we may return the amount of the transfer to the sender so long as we make such return by the close of the banking day following the day on which we receive payment for the transfer. We shall not be deemed to have waived any rights under this paragraph 20, or elsewhere in this Agreement based upon any prior transfer to you.

**21. DORMANT ACCOUNTS.** Accounts may be classified as dormant when there have been no customer-initiated transactions for the preceding twelve (12) months. To prevent your Account from becoming dormant, you must initiate one of the following types of transactions: deposit, withdrawal, check, electronic deposit, ATM withdrawal, debit card transaction, telephone transfer or ACH direct deposit. An inactivity fee may be assessed against the dormant balance. We must, in most cases, remit the dormant balance as abandoned property in accordance with applicable law.

**22. ATM CARDS AND DEBIT CARDS.** ATM cards and/or debit cards may be used to access your savings Account if the

ownership and persons authorized to withdraw funds are identical to the checking Account for which your ATM card or debit card is issued. We reserve the right to suspend or revoke ATM card and/or debit card privileges at any time. If you use your ATM card or debit card to access an Account that does not have sufficient funds to complete a transaction or that would exceed the daily authorization limit attached to your ATM card or debit card, we may, at our discretion, authorize the transaction. If we authorize a transaction that overdraws your Account, we may assess a fee as described below in paragraph 24, "Overdrafts," and as set forth in the Fee Schedule. Terms and conditions applicable to use of ATM cards and debit cards are also described elsewhere in this Agreement.

**23. ACCOUNTS OF DECEDENTS.** On the death of the owner of your Account, the amount of the credit balance in your Account will be paid as permitted or required by law, federal and state regulations, and in accordance with our security procedures. In the event of a death of an Account owner, Account information will be furnished upon request to the duly appointed estate administrator, trustee or attorney.

**24. OVERDRAFTS.** A transaction or item that results in or creates a negative Available Balance in your Account is called an "Overdraft." We decide whether to authorize debit card transactions and pay items based on the "Available Balance" of funds in your Account. We decide whether to assess per-item Overdraft fees based on the "Ledger Balance" of funds in your Account. An Overdraft that results in or increases a negative Ledger Balance in your Account will incur a per-item Overdraft fee as described herein and as set forth in the Fee Schedule. As set forth in the Fee Schedule (see paragraphs 1 and 9 of this Agreement) and as permitted by law, we will assess per-item Overdraft fees for Overdraft items regardless of whether the items are paid or returned.

The "Ledger Balance" is the current balance of funds in your Account at the beginning of the Business Day. For purposes of determining whether to authorize

transactions, we determine the "Available Balance" by taking the Ledger Balance and reducing that amount by any outstanding holds for deposits that are not yet available under our Funds Availability Policy; by debit card items we have authorized but not processed for payment; and by intra-day activities (including but not limited to wire transfers, ATM withdrawals, and other electronic transfers). Certain business operations (e.g., taxis, hotels, rental or leasing companies) may request debit card authorizations in an amount exceeding the amount they ultimately charge you. When we authorize a debit card transaction, we establish a hold and reduce your Available Balance by the full amount we authorize (which may differ from the transaction amount) until the item is paid or is no longer considered to be pending. In the event you deposit a check that is not from a guaranteed source, a hold is placed on the Account to the extent and during the period described in the Funds Availability Policy section of this Agreement. In our discretion, we can reduce the time frame for a hold or choose not to place a hold at all. For example, in some cases we are able to verify that a check has been honored prior to the time a hold would otherwise expire and can manually remove the hold, making funds available earlier in the process.

You agree that we may pay checks and other items, including ACH items and other electronic debits to your Account, in any order that complies with applicable law. For example:

- We may process deposits before debits.
- We may process certain kinds of electronic items, such as debit card, ATM and ACH items, ahead of other kinds of items, such as checks.
- We may process certain items based on the time they were authorized by us.
- We may process certain items based on the time they were received for processing.
- We may process checks in serial number order.

Multiple Overdraft fees may be charged to your Account in one day. Also, items returned to the presenting institution as a

result of insufficient funds may be re-presented to us multiple times for payment by the presenting institution. If sufficient funds are not available in your Account at the time of re-presentment, an additional Overdraft fee may be incurred. To the extent permitted by law, you authorize us to deduct any Overdrafts and any Overdraft fees from any funds that may thereafter be deposited into the Account, even if those funds come from restricted income sources that are exempt from attachment.

We are under no obligation to pay or authorize any item or withdrawal request presented if there are insufficient available funds to cover the item. You agree, however, that, in our sole discretion, we may honor any check, recurring debit card, and/or ACH debits presented to your Account when there are insufficient available funds to cover such items.

We also offer an optional discretionary Overdraft service, Overdraft Privilege, that may be available to you for ATM and everyday debit card transactions. For each of your Accounts, you can opt in to Overdraft Privilege (or opt out after first opting in) by calling us toll free at 888-MIDFIRST (888-643-3477) or by calling or visiting one of our banking centers. You are not eligible for this Overdraft Privilege service unless you have an eligible Account, and you first opt in to the service. If you do not opt in to this Overdraft Privilege service and you attempt an ATM or everyday debit card transaction at a time when your Account does not have sufficient available funds to cover the transaction, the transaction will be declined. Please note that if you do not opt in to this Overdraft Privilege service for ATM and everyday debit card transactions: (i) we will continue to apply our current Overdraft policies to paper check, ACH, and recurring debit card transactions and (ii) the date items are presented for payment and our processing order could still cause a paper check, ACH, or recurring debit card transaction to result in an overdraft of your Account.

You agree that payment of any Overdraft item on any occasion(s) does not obligate us to pay any future Overdraft items. We have no obligation to notify you before we

pay an Overdraft item or before we return an Overdraft item unpaid. You agree to pay the amount of any Overdraft and all Overdraft fees immediately upon demand. You agree that we may pursue any collection remedy available under applicable law, of which you may become responsible to reimburse us for any related expenses.

You should know that:
- A maximum of 5 per-item Overdraft fees will be charged on any Processing Day.
- We will not charge any per-item Overdraft fees if your Account is overdrawn by $5.00 or less at the end of a Processing Day.
- We will not charge any per-item Overdraft fees if the only debit items we process on a Processing Day are fees we assess.
- We will charge a one-time Extended Overdraft Fee if your Account is overdrawn in any amount for at least seven consecutive calendar days. Extended Overdraft Fees are based on your Ledger Balance.

Under our Overdraft Protect and Overdraft credit services, you may agree to authorize automatic transfers from a linked Account or through certain credit services to cover Account Overdrafts, subject to availability of funds in your linked Account or availability of credit subject to applicable restrictions and other limitations. Overdraft Protect is described in further detail near the end of this Agreement. Credit services that may be used for Overdraft protection are subject to the standard applicable credit application, approval and execution of credit documents. For more information about Overdraft Protect, available credit services, applicable terms and conditions, fees and enrollment, please visit the MidFirst Overdraft Services webpage at midfirst.com/overdraftservices, call us toll free at 888-MIDFIRST (888-643-3477) or call or visit any MidFirst banking center.

**25. SEVERABILITY.** If an item or condition of this Agreement is found to be illegal or unenforceable, the balance of this Agreement will remain in full force and effect.

**26. NOTICE AND CURE.** Prior to bringing a lawsuit or initiating an arbitration that asserts a claim arising out of or related to this Agreement (as further defined in the Arbitration Provision, a "Claim"), the party asserting the Claim (the "Claimant") shall give the other party (the "Potential Defendant") written notice of the Claim (a "Claim Notice") and a reasonable opportunity, not less than thirty (30) days, to resolve the Claim. Any Claim Notice to you shall be sent in writing to the address we have in our records (or any updated address you subsequently provide to us). Any Claim Notice to us shall be sent by mail to MidFirst Bank, 501 N.W. Grand Boulevard, Oklahoma City, Oklahoma 73118, Attn: Bank Operations Account Claim Notice (or any updated address we subsequently provide). Any Claim Notice you send must provide your name and Account number, as well as your address and a phone number where you can be reached during normal business hours. Any Claim Notice must explain the nature of the Claim and the relief that is demanded. You may only submit a Claim Notice on your own behalf and not on behalf of any other party. No third party, other than a lawyer you have personally retained, may submit a Claim Notice on your behalf. The Claimant must reasonably cooperate in providing any information about the Claim that the Potential Defendant reasonably requests.

**27. WIRE TRANSFERS.** We reserve the right to place limits on domestic and international incoming or outgoing wire transfers at any time. Limitations may include, but are not limited to, limiting the Accounts from which a wire transfer may be sent, the countries and/or banks to which a wire transfer may be sent, and/or the amount of a wire transfer, among other restrictions and applicable fees. For additional information on wire transfers, including any limitations, call or visit any MidFirst banking center or call us toll free at 888-MIDFIRST (888-643-3477).

**28. ARBITRATION PROVISION. PLEASE REVIEW AND READ THIS ARBITRATION PROVISION CAREFULLY. IF YOU DO NOT REJECT THIS ARBITRATION PROVISION IN ACCORDANCE WITH SUBPARAGRAPH (a) BELOW, IT WILL BE PART OF THIS AGREEMENT AND WILL HAVE A SUBSTANTIAL IMPACT ON THE WAY YOU OR WE WILL RESOLVE ANY CLAIM THAT YOU OR WE HAVE AGAINST EACH OTHER, NOW OR IN THE FUTURE.**

**Arbitration is the process for settling disputes where the determination is made by an impartial third party. Arbitration binds the parties to a type of resolution outside of the courts.**

(a) <u>Your Right to Reject Arbitration Provision</u>: **If you do not want this Arbitration Provision to apply, you may reject it by mailing us a written rejection notice which gives your name(s) and Account number(s) and contains a statement that you, both or all of the Account owners, if more than one) reject the Arbitration Provision in this Agreement which governs your Account. The rejection notice must be sent to us at MidFirst Bank, 501 N.W. Grand Boulevard, Oklahoma City, Oklahoma 73118, Attn: Bank Operations Arbitration Rejection. A rejection notice is effective only if it is signed by you (including both or all of the Account owners), and such notice is received within thirty (30) days after the day you open your Account (the "Rejection Deadline").**

(b) <u>Parties Subject to Arbitration</u>: As used in this Arbitration Provision, the terms "we," "us" and "our" mean (a) MidFirst Bank, any parent, subsidiary or affiliate of MidFirst Bank and the employees, officers and directors of such companies ("Bank Parties"); and (b) any other person or company that provides any services in connection with this Agreement or your Account if you assert a Claim against such other person or company at the same time you assert a Claim against any Bank Party.

(c) Covered Claims: "Claim" means any claim, dispute or controversy between you and us that in any way arises from or relates to this Agreement, your Account, any products or services offered by us, including but not limited to, any debit card or ATM card provided to you, Overdraft Protect, Overdraft Privilege and/or Overdraft credit services, and the advertising and disclosures related to the foregoing, if such Claim, dispute or controversy cannot be resolved without a lawsuit or arbitration proceeding. "Claim" includes disputes arising from actions or omissions prior to the effective date of this Agreement (or prior to the time this Arbitration Provision becomes part of this Agreement). "Claim" has the broadest reasonable meaning, and includes initial claims, counterclaims, cross-claims and third-party claims, inclusive of any damages or other remedies claimed It includes disputes based upon contract, tort, consumer rights, fraud and other intentional torts, constitution, statute, regulation, ordinance, common law and equity (including any claim for injunctive or declaratory relief). However, it does not include any dispute about the validity, enforceability, coverage or scope of this Arbitration Provision or any part thereof (including, without limitation, subparagraph (g), captioned "Prohibition Against Certain Proceedings" (the "Class Action Waiver"), the final sentence in subparagraph (m), captioned "Severability," and/or this sentence); all such disputes are for a court and not an arbitrator to decide. Notwithstanding the foregoing, the term "Claim" includes any dispute about the validity or enforceability of this Agreement as a whole.

(d) Starting an Arbitration: To the extent permitted by the Federal Arbitration Act (the "FAA") and any other applicable federal law, arbitration may be elected by either party with respect to any Claim, even if that party has already initiated a lawsuit with respect to a different Claim. Arbitration is elected by giving a written demand for arbitration to the other party, by filing a motion to compel arbitration in court or by initiating an arbitration against the other party. We will not demand to arbitrate an individual Claim that you bring against us in small claims court or your state's equivalent court, if any. If that Claim is transferred, removed or appealed to a different court, we then have the right to demand arbitration.

(e) Choosing the Administrator: "Administrator" means the American Arbitration Association ("AAA"), 1633 Broadway, 10th Floor, New York, NY 10019, www.adr.org; JAMS, 620 Eighth Avenue, 34th Floor, New York, NY 10018, www.jamsadr.org; or any other company selected by mutual agreement of the parties. If both AAA and JAMS cannot or will not serve and the parties are unable to select an Administrator by mutual consent, the Administrator will be selected by a court. The arbitrator will be appointed by the Administrator in accordance with the rules of the Administrator. However, the arbitrator must be a retired or former judge or a lawyer with at least ten (10) years of experience in handling banking disputes. you get to select the Administrator if you give us written notice of your selection with your notice that you are demanding to arbitrate any Claim or within twenty (20) days after we give you notice that we are demanding to arbitrate any Claim (or, if you dispute our right to require arbitration of the Claim, within twenty (20) days after that dispute is finally resolved). If you do not select the Administrator within the time specified, we may select the Administrator. Notwithstanding any language in this Arbitration Provision to the contrary, no arbitration may be administered, without the consent of all parties to the arbitration, by any Administrator that has in place a formal or informal policy that is inconsistent with the Class Action Waiver.

(f) Court and Jury Trials Prohibited; Other Limitations on Legal Rights: **FOR CLAIMS SUBJECT TO ARBITRATION YOU WILL NOT HAVE THE RIGHT TO PURSUE THAT CLAIM IN COURT OR HAVE A JURY DECIDE THE CLAIM. YOUR ABILITY TO OBTAIN INFORMATION AND SEEK DISCOVERY WILL BE MORE LIMITED IN ARBITRATION THAN IN A LAWSUIT. OTHER RIGHTS THAT YOU WOULD HAVE IF YOU WENT TO COURT MAY ALSO NOT BE AVAILABLE IN ARBITRATION.**

(g) Prohibition Against Certain Proceedings: **FOR CLAIMS SUBJECT TO ARBITRATION: (1) YOU MAY NOT PARTICIPATE IN A CLASS ACTION IN COURT OR IN A CLASS-WIDE ARBITRATION, EITHER AS A PLAINTIFF, CLASS REPRESENTATIVE OR CLASS MEMBER; (2) YOU MAY NOT ACT AS A PRIVATE ATTORNEY GENERAL IN COURT OR IN ARBITRATION; (3) CLAIMS BROUGHT BY OR AGAINST YOU MAY NOT BE JOINED OR CONSOLIDATED WITH CLAIMS BROUGHT BY OR AGAINST ANY OTHER PERSON; AND (4) THE ARBITRATOR SHALL HAVE NO POWER OR AUTHORITY TO CONDUCT A CLASS-WIDE ARBITRATION, PRIVATE ATTORNEY GENERAL ARBITRATION OR MULTIPLE-PARTY ARBITRATION. Collectively, this Section (g) is referred to as the Class Action Waiver.**

(h) Location and Costs of Arbitration: Any arbitration hearing that you attend must take place at a location reasonably convenient to you. We will pay any and all fees of the Administrator and/or the arbitrator (i)

if applicable law requires us to, (ii) if you prevail in the arbitration, which means the arbitrator rules in your favor on the Claim or (iii) if you make a written request for us to pay such fees and we believe you are acting in good faith. If you demand an arbitration, we will pay your reasonable attorneys' and experts' fees if you prevail or if we must bear such fees in order for this Arbitration Provision to be enforced. Also, we will bear any fees required by applicable law.

(i) Governing Law: This Arbitration Provision involves interstate commerce and is governed by the FAA and not by any state arbitration law. The arbitrator must apply applicable substantive law consistent with the FAA and applicable statutes of limitations and claims of privilege recognized at law. The arbitrator may award any remedy provided by the substantive law that would apply if the action were pending in court (including, without limitation, punitive damages, which shall be governed by the Constitutional standards employed by the courts). At the timely request of either party, the arbitrator must provide a brief written explanation of the basis for the award.

(j) Right to Discovery: In addition to the parties' rights to obtain information or discovery pursuant to the arbitration rules of the Administrator, either party may submit a written request to the arbitrator to expand the scope of discovery normally allowable under such rules.

(k) Arbitration Result and Right of Appeal: Judgment upon the arbitrator's award may be entered by any court having jurisdiction. The arbitrator's decision is final and binding, except for any right of appeal provided by the FAA. However, if the amount of the Claim exceeds $50,000.00 or involves a request for injunctive or declaratory relief that could foreseeably involve a cost or benefit to either party exceeding $50,000.00, any party can, within thirty (30) days after the entry of the award by the arbitrator, appeal the award to a three-arbitrator panel administered by the Administrator. The panel shall reconsider anew any aspect of the initial award requested by the appealing party. The decision of the panel shall be by majority vote. Reference in this Arbitration Provision to "the arbitrator" shall mean the panel if an appeal of the arbitrator's decision has been taken. The costs of such an appeal will be borne in accordance with subparagraph (h) above, captioned "Location and Costs of Arbitration."

(l) Rules of Interpretation: This Arbitration Provision shall survive the repayment of all amounts owed under this Agreement, the closing of your Account, any legal proceeding and any bankruptcy to the extent consistent with applicable bankruptcy law. In the event of a conflict or inconsistency between this Arbitration Provision, on the one hand, and the applicable arbitration rules or the other provisions of this Agreement, on the other hand, this Arbitration Provision shall govern.

(m) Severability: If any portion of this Arbitration Provision, other than the Class Action Waiver, is deemed invalid or unenforceable, the remaining portions shall nevertheless remain in force. If a determination is made that the Class Action Waiver is unenforceable, only this sentence of the Arbitration Agreement will remain in force and the remaining provisions shall be null and void, provided that the determination concerning the Class Action Waiver shall be subject to appeal.

(n) Special Payment: **If (1) you submit a Claim Notice in accordance with this paragraph on your own behalf (and not on behalf of any other party); (2) we refuse to** **provide you with the relief you request; and (3) an arbitrator subsequently determines that you were entitled to such relief (or greater relief), the arbitrator shall award you at least $7,500.00 and any fees and costs to which you are entitled.**

### Electronic Funds Transfer
### Your Rights and Responsibilities

This section describes terms and conditions applicable to electronic funds transfers as required by the Electronic Funds Transfer Act and applicable regulations. This section applies only to electronic fund transfers that authorize us to debit or credit a consumer Account, that is, an Account established primarily for consumer, family, or household purposes. If your Account is primarily for a business purpose, then this section does not apply to you. Electronic fund transfers are generally defined under the Electronic Fund Transfer Act of 1978 and include transfers of funds that you initiate through an electronic terminal, phone, computer, or magnetic tape for the purpose of authorizing a debit or credit to your Account. Please read this disclosure carefully because it describes your rights and obligations for those transactions. You should keep this disclosure for future reference.

Terms and conditions relating to electronic funds transfers conducted through MidFirst online banking, including but not limited to iManage Business Express®, iManage Business Banking®, or iManage Personal Banking® are contained in the agreements for such services that you received at the time you applied for the service, and should be read and understood in conjunction with this Agreement. To the extent that the terms or conditions of the MidFirst online banking agreements conflict with this Agreement, the online banking agreements shall control with respect to the details of the service described in the online banking agreement. In all other cases this Agreement shall control.

**DO NOT write your personal identification number ("PIN") on anything or keep it in any form with your ATM card or debit card.**

**1. CARDHOLDER'S LIABILITY & NOTIFICATION PROCEDURES.** Notify us IMMEDIATELY if you believe your ATM card, debit card or PIN has been lost or stolen or if you believe that an unauthorized transfer from your Account has occurred. Telephoning is the best way of minimizing your potential losses. You could lose all the money in your Account in addition to the maximum Overdraft Protect Account balance or reach the limit of your Overdraft credit service, if you have elected these services. If you tell us about the lost or stolen ATM card, debit card or PIN within two (2) Business Days after you learn of the loss or theft, you can lose no more than $50.00 if someone uses your ATM card, debit card or PIN without your permission.

If you do NOT notify us within two (2) Business Days after you learn about the loss or theft of your ATM card or debit card and/or PIN, you could lose as much as $500.00 if we can prove we could have prevented the unauthorized use of your ATM card, debit card or PIN without your permission if you had timely notified us.

Also, if your periodic statement shows unauthorized transactions, notify us at once. If you do not notify us within sixty (60) days after the statement was mailed to you, you may not recover any money you lost if we can prove that we could have prevented an unauthorized transfer if you had timely notified us.

NOTIFICATION PROCEDURES: If you believe your ATM card, debit card or PIN has been lost, stolen, or that someone has transferred or may transfer money from your Account without your permission, during normal business hours, call MidFirst Bank toll free at 888-MIDFIRST (888-643-3477) or visit any MidFirst banking center. After normal business hours, call toll free 800-236-2442 and/or write MidFirst Bank, Attention: EFT Representative P.O. Box 76149, Oklahoma City, Oklahoma, 73147. If an extraordinary reason (such as a hospital stay) keeps you from promptly notifying or telling us, we may, at our discretion, extend the notification time periods.

Once an ATM card, debit card or PIN is reported lost or stolen, ATMs will disregard transaction requests and may retain the card inside the machine if you or anyone else attempts to use it.

Under the operating rules of the National Automated Clearing House Association, which are applicable to ACH transactions involving your Account, we are not required to give next day notice to you of receipt of an ACH item, and we will not do so. However, we will continue to notify you of the receipt of payments in the periodic statements we provide to you.

**2. BUSINESS DAYS AND PROCESSING DAYS.** Our business days are Monday through Friday, 8:00 a.m. to 5:00 p.m., local time, with the exception of legal holidays, as observed by us or the Federal Reserve Bank of Kansas City ("Business Days"). Our Processing Days are Business Days in addition to select legal holidays.

**3. TYPES OF AVAILABLE TRANSFERS.** For those Accounts associated with your ATM card or debit card, you may use your ATM card or debit card at electronic terminals to:
  a) Withdraw cash from checking Accounts;
  b) Make deposits to checking Accounts;
  c) Withdraw cash from savings Accounts;
  d) Make deposits to savings Accounts;
  e) Transfer funds between checking and savings Accounts upon request;
  f) Inquire as to the amount of your Available Balance; and
  g) Pay for purchases from merchants who have agreed to accept the ATM card and debit card for that purpose.

Some of these services may not be available at all electronic terminals.

**4. ELECTRONIC CHECK CONVERSION.** You may authorize a merchant or other payee to make a one-time electronic payment from your checking Account using information from your check to:

  a) Pay for purchases.
  b) Pay bills.

These electronic check conversions constitute electronic funds transfers.

**5. LIMITATIONS ON TRANSACTIONS.** Withdrawals are subject to the following limitations:
  a) You may withdraw the maximum cash withdrawal amount (as referenced below) or your Account balance (whichever is less) from an electronic terminal, such as an ATM, per day, per ATM card or debit card. You may use your ATM card or debit card to purchase goods and services each day ("Point of Sale") subject to the limits set forth in below, as long as the Available Balance of your Account is sufficient to cover the aggregate of all purchases. The cash withdrawal (ATM) and cash advance daily limit, including any ATM fees, is $520.00*for most consumer customers and $1,020.00 for Private Bank consumer customers. The Point-of-Sale daily limit is $2,500.00* for most consumer customers. The cash withdrawal (ATM) and cash advance daily limits, including any ATM fees, for consumer customers with Solution Checking products is $270.00 including any ATM fees. The point-of-sale daily limit for consumer customers with Solution Checking products is $750.00.
  b) Also, note that at certain times mechanical malfunctions of the system may cause withdrawals to be limited to $100.00 cash withdrawal, including ATM fees, and $500.00 at the Point of Sale until the malfunction can be corrected.
  c) Funds deposited will be made available to you under the terms described in the Funds Availability section elsewhere in this Agreement.

*These are the standard limits for most consumer Accounts. Depending on your Account type, you may qualify for larger or smaller limits.

**6. CHARGES.** On certain Accounts there may be charges for ATM card and debit card transactions made at non-MidFirst ATMs. There may be a charge for replacement or additional ATM card, debit card or PINs requested as a result of loss or negligence. Please refer to the Fee Schedule for specific fee information related to electronic fund transfers.

If you use your ATM card or debit card to access an Account that does not have sufficient funds to complete a transaction or that would exceed the daily authorization limit attached to your ATM card or debit card, we may, at our discretion, authorize the transaction. If we authorize a transaction that overdraws your Account, we will assess a fee as described in this Agreement in paragraph 24, "Overdrafts," and as set forth in the Fee Schedule.

INTERNATIONAL TRANSACTIONS: If you conduct a transaction with your ATM card or debit card involving multiple currencies or U.S. dollars in a country outside of the United States of America, Puerto Rico or the US Virgin Islands, a transaction fee may appear on your monthly statement from the applicable card network.  We reserve the right to make future changes in your Account and/or ATM card or debit card transaction fees, subject to our giving you notice as required by law.

**7. DOCUMENTATION.** At the time of any card transaction using an ATM card, debit card or Point-of-Sale terminal, you may receive a transaction receipt, which will include the amount, date, type of transfer, identity of Account and bank or merchant, location of terminal, identity of any account where funds are transferred, and transaction identification number unless the transaction is $15.00 or less. If you have arranged to have direct deposits made to your Account at least once every sixty (60) days from the same person or company, you can call us toll free at 888-MIDFIRST (888-643-3477) or call or visit any MidFirst banking center to find out whether or not the deposit has been made. Your regular monthly statement will reflect ATM card or debit card transfers, direct deposits and withdrawals, and preauthorized electronic fund transfers.

**8. RIGHT TO STOP PAYMENT OF PREAUTHORIZED TRANSFERS.** You may stop payment of preauthorized transfers as described in this Agreement. Preauthorized transfers are an electronic fund transfer authorized in advance to recur at substantially regular intervals.  The time limitations for stopping, canceling or changing any bill payments scheduled via

MidFirst online or mobile banking, such as iManage Bill Pay, if those services are available on your Account, are contained in your MidFirst Bill Pay Terms and Use Agreement and are not governed by this paragraph. The time limitations for stopping, canceling or changing any bill payments scheduled via MidFirst business online or mobile business banking, such as iManage Business Express® or iManage Business Banking if those services are available on your Account, are contained in the respective service agreements and are not governed by this paragraph.

You may use your ATM card or debit card to pay for goods and services at retail locations via Point of Sale that display (i)the Visa® if you have our ATM card or debit card with the Visa® symbol or (ii) the MasterCard® if you have our ATM card or debit card with the MasterCard® symbol. We will charge your Account for all purchases and withdrawals made with your ATM card and debit card. The use of your ATM card and debit card to purchase goods and services will constitute a simultaneous withdrawal from your applicable Account. Notwithstanding anything to the contrary, **YOU CANNOT PLACE A STOP PAYMENT ON ANY TRANSACTION MADE WITH YOUR ATM CARD OR DEBIT CARD.**

**9. OUR LIABILITY FOR FAILURE TO COMPLETE TRANSACTIONS.** If we do not complete a transaction to or from your Account on time or in the correct amount according to our agreement with you, we will be liable only for your loss or damage to the extent of the amount of the transaction. We will not be liable, however, if we do not complete a transaction in situations that include, but are not limited to, the following examples:

a) If, through no fault of ours, you do not have enough money in your Account to make the transaction;

b) If the transaction would go over the credit limit on any line of credit you may have;

c) If the ATM where you are making the transaction does not have enough cash to complete the transaction;

d) If the electronic terminal was not working properly;

e) If circumstances beyond our control (such as fire, flood, other natural

disaster, terrorism, supplier failure, system malfunction, etc.) prevent the transaction, despite reasonable precautions that we have taken;

f) If the funds are subject to legal or other encumbrance;

g) If federal or state banking rules or regulations as issued by the Office of the Comptroller of the Currency, the Federal Reserve Board, the Federal Deposit Insurance Corporation, or other agency with banking oversight might prohibit such transaction; or

h) If we fail to complete a transaction because we believe the transaction may be fraudulent.

Also in the case of any error or malfunction that was not intentional on our part and resulted from a bona fide error, notwithstanding the maintenance of procedures reasonably adopted to avoid any such error, our liability is limited only to actual damages proved.

**10. DISCLOSURE OR ERROR RESOLUTION PROCEDURES AND CONSUMER RIGHTS.** If you think your statement or receipt is wrong, or if you need more information about a transfer listed on the statement or receipt, you must notify us no later than sixty (60) days after we sent the FIRST statement on which the problem or error appeared. Your notice should include:

a) Your name and Account number;

b) A description of the error or the transfer you are unsure about and a detailed explanation of why you believe it is an error or why you need more information. Your explanation should be as clear and complete as possible; and

c) The dollar amount of the suspected error.

If you notify us orally, we may require that you provide us your complaint or question in writing within ten (10) Business Days.

For Electronic Funds Transfers: Within ten (10) Business Days after you notify us of a possible error, we will make a determination as to whether an error occurred. We will correct any determined error promptly. If we need more time or information, we may take up to forty-five (45) days to investigate and determine whether an error occurred. This timeframe may be extended to 90 days for

Point of Sale transactions. If we decide to do this, we will provisionally credit your Account for the amount you think is in error within ten (10) Business Days after we receive written confirmation of your complaint or question, so that you will have the use of the money during the time it takes us to complete our investigation. If we ask you to confirm your complaint or question in writing, and we do not receive it within ten (10) Business Days, we may not provisionally credit your Account.

For POS, ATM, and Other Electronic Transfers involving New Accounts: For new transaction Accounts (Accounts on which each owner of the Account does not have or has not had within the previous thirty (30) days a transaction Account with us), we may take up to 90 days to investigate your complaint or question and determine whether an error occurred.  If we decide to do this, we will provisionally credit your Account for the amount you think is in error within twenty (20) Business Days after we receive written confirmation of your complaint or question, so that you will have the use of the money during the time it takes us to complete our investigation. If we ask you to confirm your complaint or question in writing, and we do not receive it within twenty (20) Business Days, we may not provisionally credit your Account.

If we issue a provisional credit and ultimately determine that no error occurred, we will debit such provisional credit from your Account.  We will notify you of the date and amount of the debit. We will honor any checks, drafts, or similar third party payables and any preauthorized transfers as provided in the notice that we will send to you.

IN CASE OF ERROR OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS: Telephone us toll free at 888-MIDFIRST (888-643-3477), or write us at MidFirst Bank, Attention: Bank Operations EFT Representative P.O. Box 76149, Oklahoma City, Oklahoma, 73147.

We will communicate the results to you within three (3) Business Days after completing our investigation. If we decide that there was no error, we will send you a written explanation. You may ask for copies of the documents that we used in our investigation.

**11. PROVISIONAL PAYMENT.** Credit given by us to you with respect to an ACH credit entry is provisional until we receive final settlement for such entry through a Federal Reserve Bank. If we do not receive such final settlement, you are hereby notified and agree that we are entitled to a refund of the amount credited to you in connection with such entry, and the party making payment to you via such entry (i.e., the originator of the entry) shall not be deemed to have paid you in the amount of such entry.

**12. CONFIDENTIALITY.** Please see the section of this Agreement entitled "Customer Information Disclosure" regarding circumstances under which we will disclose information to third parties about your Account.

**13. CHOICE OF LAW.** We may accept on your behalf payments to your Account which have been transmitted through one or more ACH and which are not subject to the Electronic Fund Transfer Act and your rights and obligations with respect to such payments shall be construed in accordance with and governed by the law of the state in which the Account is deemed by us to have been opened or as described in paragraph 1 of this Agreement.

### Funds Availability Policy

**1.   GENERAL.** Except as otherwise described below, we will make funds from your deposits available to you on the first Business Day after the day we receive your deposit. However, many exceptions apply, and if you will need the funds from a deposit right away, you should ask us when the funds will be available. Once funds are available, you can withdraw the funds in cash, and we will use the funds to process transactions on your Account.

Please remember that you are responsible for any check you deposit with us that is returned to us unpaid and for any other problem that occurs involving your deposit, even if we previously made funds available to you in connection with such deposit.

**2. WHEN DEPOSITS ARE RECEIVED.** For determining the availability of your deposits, every day is a Business Day, except Saturdays, Sundays, and federal holidays. However, only deposits made to an employee at a banking center, at a MidFirst ATM, or via Mobile Deposit or Business Mobile Deposit before the cutoff time on a Business Day that we are open will be considered received on that day. For most MidFirst banking centers, the cutoff time is the time the banking center closes on a Business Day.  However, certain MidFirst banking centers have earlier cutoff times, but in no case will the cutoff time be earlier than 2:00 p.m. For most ATMs, the cutoff time is 4:00 p.m. central time.  Deposits made after the cutoff time applicable to the banking center or ATM at which the deposit is made or on a day we are not open are considered received on the next Business Day we are open.

Bank by mail deposits received before 4:00 p.m. on a Business Day will be considered received on the day of receipt. Later deliveries and those received on Saturdays, Sundays, and holidays will be considered received on the next Business Day we are open.

Preauthorized electronic deposits will be posted on the effective date for the transaction, if received by the Federal Reserve Bank's last deadline for electronic payments for that same Business Day; otherwise, preauthorized electronic deposits will be posted on the next business day.

**3. LONGER DELAYS MAY APPLY.** In some cases, we will not make all of the funds that are deposited by check or deposited available to you on the first Business Day after the day of your deposit. Depending on the type of check that you deposit, funds may not be available until the second Business Day after the day your deposit is received. However, the first $225.00 of your deposits may be available on the first Business Day after your deposit is received.

If we are not going to make all of the funds from your deposit available on the first Business Day, we will notify you at the time you make your deposit. We will also tell you when the funds will be available. If your deposit is not made directly to one of our employees, or if we decide to take this action after you have left the premises, we

will mail you the notice by the day after we receive your deposit.

Funds you deposit by check may be delayed for a longer period if: (i) we believe a check you deposit will not be paid; (ii) you deposit checks totaling more than $5,525.00 on any one Business Day; (iii) you redeposit a check that has been returned unpaid; (iv) you have overdrawn your Account repeatedly in the last six (6) months; or (v) there is an event that occurs, which is out of our control such as an emergency, communications or computer equipment failure, natural disaster, act of terrorism, sanction or restriction against the transaction, or other event outside our control.

We will notify you if we delay your ability to withdraw funds for any of these reasons, and we will tell you when the funds will be available. They will generally be available no later than the seventh (7th) Business Day after the day of your deposit.

Your deposit may encounter delays if required by law.

**4. HOLDS ON OTHER FUNDS -- CHECK CASHING.** If we cash a check for you that is drawn on another bank, we may withhold the availability of a corresponding amount of funds that are already in your Account. Those funds will be available at the time funds from the check we cashed would have been available if you had deposited it.

**5. HOLDS ON OTHER FUNDS -- OTHER ACCOUNTS.** If we accept for deposit a check that is drawn on another bank, we may make funds from the deposit available for withdrawal immediately, but delay your availability to withdraw a corresponding amount of funds that you have on deposit in another account with us. The funds in the other account would then not be available for withdrawal until the time periods that are described elsewhere above for the type of check that you deposited.

**6. SPECIAL RULES FOR NEW ACCOUNTS.** If you are a new customer, special rules will apply during the first thirty (30) days your Account is open. Funds from electronic direct deposits, cash deposits or wire transfers to your Account will be available on the Business Day we receive

the deposit. The first $5,525.00 of a Business Day's total deposits of official, certified, tellers, travelers, and state and local government checks will be available on the first (1st) Business Day after the day of your deposit, if the deposit meets certain conditions. For example, the checks must be payable to you (and you may have to use a special deposit slip). The excess over $5,525.00 will be available on the ninth (9th) Business Day after the day of your deposit. If your deposit on these checks (other than a U.S. Treasury check) is not made in person to one of our employees, the first $5,525.00 will not be available until the second (2nd) Business Day after the day of your deposit. Funds from all other check deposits will be available on the eleventh (11th) Business Day after the day of your deposit.

### Substitute Checks and Your Rights

To make check processing faster, federal law permits banks to replace original checks with "Substitute Checks." These Substitute Checks are similar in size to original checks with a slightly reduced image of the front and back of the original check. The front of a Substitute Check states: "This is a legal copy of your check. You can use it the same way you would use the original check." you may use a Substitute Check as proof of payment just like the original check.

Some or all of the checks that you receive back from us may be Substitute Checks. This notice describes rights you have when you receive Substitute Checks from us. The rights in this notice do not apply to original checks or to electronic debits to your Account. However, you have rights under other laws with respect to those transactions.

In certain cases, federal law provides a special procedure that allows you to request a refund for losses you suffer if a Substitute Check is posted to your Account incorrectly (for example, if you think that we withdrew the wrong amount from your Account or that we withdrew money from your Account more than once for the same check). The losses you may attempt to recover under this procedure may include the amount that was withdrawn from your Account and fees that were charged as a result of the

withdrawal (for example, returned check fees).

The amount of your refund under this procedure is limited to the amount of your loss or the amount of the Substitute Check, whichever is less. You also are entitled to interest on the amount of your refund if your Account is an interest-bearing Account. If your loss exceeds the amount of the Substitute Check, you may be able to recover additional amounts under other law.

If you use this procedure, you may receive up to $2,500.00 of your refund (plus interest if your Account earns interest) within ten (10) Business Days after we received your dispute notice and the remainder of your refund (plus interest if your Account earns interest) not later than forty-five (45) calendar days after we received your dispute notice.

We may reverse the refund (including any interest on the refund and refunded fees) if we later are able to demonstrate that the Substitute Check was correctly posted to your Account.

If you believe that you have suffered a loss relating to a Substitute Check that you received and that was posted to your Account, please contact us toll free at 888-MIDFIRST (888-643-3477). You must contact us within forty (40) calendar days of the date that we mailed the Substitute Check in question or the Account statement showing that the Substitute Check was posted to your Account, whichever is later. We may extend this time period if you were unable to provide a timely dispute notice because of extraordinary circumstances outside your control.

Any dispute notice from you must include:
   a) A description of why you have suffered a loss (for example, you think the amount withdrawn was incorrect).
   b) An estimate of the total actual amount of your loss.
   c) An explanation of why the Substitute Check you received is insufficient to confirm that you suffered a loss.
   d) A copy of the Substitute Check and/or the following information to help us identify the Substitute Check: identifying information, for example the check number, the name of the person

to whom you wrote the check, the amount of the check.

## Overdraft Protect

If you have requested or authorized Overdraft Protect services or Overdraft credit services in your Agreement or otherwise, such services are subject to the terms and conditions contained in this Agreement, the Fee Schedule, and your signed Overdraft Protect Agreement and Authorization. By requesting Overdraft Protect services or Overdraft credit services, you authorize and direct us, as your agent, until your authorization is revoked in writing and delivered to us, to effect the automatic transfer of funds from the Transferor Account or designated credit service to the Transferee Account, as identified in the Overdraft Protect Agreement and Authorization, provided the automatic transfer of funds will cover the entire Overdraft amount in the Transferee Account, as well as the associated Overdraft Protect transfer fee, except if such action violates state or federal regulation. You represent that you have an ownership interest in and are authorized to withdraw funds from each of such Accounts. If one (1) or more items are presented to us and the Transferor Account does not contain sufficient funds or sufficient credit is not available to cover the entire Overdraft amount caused by all of the items presented as well as the Overdraft Protect transfer fee, no transfer will occur and you may be assessed the current Overdraft fee(s). We reserve the right to not make any particular transfer.

You may, at any time, cancel Overdraft Protect services or Overdraft credit services. Notification of cancellation must be received in writing at least ten (10) days before the effective date of cancellation. Notification should be mailed to MidFirst Bank, Attention: Overdraft Protect, P.O. Box 76149, Oklahoma City, Oklahoma, 73147.

# Exhibit H

**VIO BANK**

Version 03/2022

# Account Agreement and Disclosure

### Terms and Conditions of Your Account

Vio Bank is a division of MidFirst Bank, a federally chartered savings association. MidFirst Bank is a Federal Deposit Insurance Corporation ("FDIC") member, and your Vio Bank accounts are insured up to the maximum allowed by law. For purposes of FDIC coverage, deposits held at Vio Bank are deposits held at MidFirst Bank and are combined with any other MidFirst Bank deposits. As used in this Account Agreement and Disclosure, "Bank," "we," "us," and "our" mean MidFirst Bank, acting by and through its Vio Bank division; "you," and "your" mean each person who is named as an owner of the Account or anyone who is authorized to withdraw funds from the Account. "Account" means each and every Account held by you at Bank. We do not provide in-branch services for Vio Bank Accounts; this includes check cashing and other services.

With respect to your Account, you agree to the following terms and conditions:

**1. AGREEMENT.** Your Account is subject to the terms and conditions in this Account Agreement and Disclosure ("Agreement"). We may amend these terms and conditions. You can agree to sign certain documents electronically; this includes checking the appropriate box or otherwise indicating your consent electronically. The term "sign" or "signing" in this Agreement means your signature or your electronic signature. By clicking the appropriate checkboxes or otherwise indicating your consent when submitting your online Account application, you acknowledge that you have opened the type of account indicated on the account opening documents; and you received, understand, and agree to be bound by the terms and conditions of this Agreement. You have been provided a specific account disclosure and a fee schedule ("Fee Schedule") for your Account; and that account disclosure and Fee Schedule are incorporated into this Agreement, as they may be amended. If you enroll in Account services, including online and mobile banking services, the agreements for those services also are incorporated into and made a part of this Agreement. We may alter, amend, or rescind, for any reason, any part of this Agreement (or any other Account-related agreement or documentation), or add new terms, at any time. We will give notice of any such changes that may adversely affect you by: (a) posting them online at viobank.com; (b) sending notice thereof to you at the most recent email address indicated on our records, as permitted by applicable law; or (c) as permitted by applicable law; mailing written notice to the most recent address we have in our records. We are not obligated to notify you of changes to features of your Account that do not adversely affect you in any way. We may immediately implement changes required by law or regulation or to protect the security of your Account or our systems. When necessary, we will provide notice of such changes after we implement the changes. Your continued use of your Account or Account services after implementation of any changes or following any notice of changes to this Agreement constitutes your continued acceptance of this Agreement and all changes and amendments hereto. All Account signers authorize us to make inquiries from any consumer reporting agency in connection with the Account(s). We reserve the right and may close an Account at any time for any reason. You may close your Account at any time for any reason, subject to any prior advance notice requirements related to the particular account, early Account closure fees and penalties, as applicable, and our Funds Availability Policy.

**2. LAWS, RULES, AND REGULATIONS.** Your Account, including deposits to and withdrawals therefrom and this Agreement and any Addendum hereto, shall be subject to and are governed by (a) the laws and regulations of the United States, including those applicable to federal savings associations, and (b) to the extent applicable and not preempted or superseded by federal law or regulations, the laws of the State of Oklahoma.

For purposes of clarification, applicable laws and regulations include, without limitation, (a) applicable rules, regulations and orders, the Consumer Financial Protection Bureau, the Office of the Comptroller of Currency, the Federal Deposit Insurance Corporation, and the Federal Reserve Bank, (b) the rules and operating procedures of any clearing house association of which we are or may become a member or through which we may send items for collections, (c) all Account provisions and requirements posted on our premises or on our websites; and (d) all provisions enclosed with or attached to statements of Account, related Account disclosures or contained in our bylaws, all as now in effect or as may in the future be issued, modified or amended. You agree that you will not make transactions that are restricted under the Unlawful Internet Gambling Enforcement Act (UIGEA).

**3. ACCOUNT OWNERSHIP.** The persons or entities you identify as owners during the online application process are the owners of the Account. Fiduciaries, authorized signers, and agents are not considered Account owners. Account ownership shall, for the purpose of this Agreement, be deemed to be joint tenancy with full rights of survivorship as between and among joint Account owners. If the Account is a Payable on Death ("POD") account, the Account shall be payable on the death of the last Account owner to one or more designated POD beneficiaries, if living, and if not living, to the named estate of the beneficiary. If more than one beneficiary is designated by the Account owner(s), the beneficiaries, if living, and if not living, the named estate of the beneficiaries, shall share equally in the amount payable on death of the last Account owner. Persons who are identified during the online application process as authorized signers or whose signatures appear on applicable account opening or related Account documents have the individual authority to withdraw funds from your Account. Any person who is authorized to withdraw funds but who is not the owner of an Account will be considered an agent of the owner of the Account, with the unlimited right to deal

Page **1** of **13**



Vio Bank is a division of MidFirst Bank, Member FDIC. Deposits held at Vio Bank are deposits of MidFirst Bank and are combined with any other MidFirst Bank deposits for FDIC insurance purposes.

with the Account on behalf of the Account owner. We have no duty to inquire as to the authority of an agent to deal with the Account, and we have no liability for permitting an agent to withdraw funds from an Account, regardless of the manner of withdrawal or recipient of the funds.

**4. AUTHORIZED SIGNATURE.** For accounts opened online, the signature of any authorized signer identified during the online application process is an authorized signature for your Account. For the payment of funds and for other purposes relating to any account you have with us, we are authorized to recognize your signature, but we will not be liable to you for refusing to honor checks or other signed instructions if we believe in good faith that the signature appearing on such checks or instructions is not genuine. The Bank may honor any check or other item drawn against the Account so long as it contains at least one authorized signature. In addition, we may ask for a form of identification for transactions processed in person or electronically for authentication purposes.  In the event of a forgery, we are not liable if a "reasonable person" could not have detected the forgery. Additionally, you may authorize the use of a facsimile signature device or electronically generated signature on checks or other instructions for withdrawal by designation on a separate form. If you have authorized the use of a facsimile signature device or electronically generated signature, the Bank may honor any check or other signed instruction that bears or appears to bear your facsimile signature or electronically generated signature even if it was made by an unauthorized person or electronically generated signature or with a counterfeit facsimile device. Therefore, you should maintain close control over your facsimile signature device and any electronically generated signature and promptly review your statements and cancelled checks for unauthorized use of the device or electronic signature. You agree to hold us harmless from any subsequent claims that may arise based upon our reliance upon such a facsimile signature. If you authorize any person to sign your name or otherwise draw against your Account, including withdrawals initiated electronically, we may honor any withdrawal signed by or authorized by that person whether or not it exceeds the authority you granted.

**5. CUSTOMER IDENTIFICATION.** As required by federal statute and regulation and by our policy, we may require and may verify certain information regarding individuals at Account opening and as otherwise deemed necessary. This information may include complete customer name, residential or business address, mailing address if different, tax payer identification number, date of birth, government issued photo identification, and other information as may be required by government laws or regulations or as may be deemed appropriate to verify your identity as the customer. This information may be required for all individuals who are deemed owners of the Account, acting as agent on behalf of the Account owner, named as beneficiary on the Account, or otherwise associated with the Account regardless of manner. In order to comply with regulatory requirements, we may require identifying information regarding the beneficial owners of our legal entity customer.  Account access or proceeds of Accounts opened without required information or subject to information verification may be restricted until such information is obtained and/or verified. We may close an Account at any time for any reason, including but not limited to identification information deemed by us, in our sole discretion, to be insufficient or unverifiable.

**6. OUR LIABILITY.** We have no obligations or liabilities to you other than those imposed by law or specifically provided herein. Any duty of care imposed on us by law will be fulfilled if the procedures established for the transaction involved are reasonable. We will have no liability for clerical error, inadvertence or oversight, or an honest mistake of judgment.  We have no obligation to verify the accuracy of any information or instructions you provide.

**7. RIGHT TO OFFSET & SECURITY INTEREST.** If you owe a debt to us, you grant us a right to offset that debt against any Account you may have. For purposes of this Section 7, Accounts include Vio Bank branded accounts, MidFirst Bank accounts, and accounts you may hold with any of our divisions; and debts include any obligation, except consumer credit card debts, that you may owe to MidFirst Bank or any of its divisions, including Vio Bank.  We may, at any time at our discretion, apply any part or all of the balance of your Account(s) to any debt, matured or unmatured, that you or any other Account owner may then owe to us. We will provide you notice of any offset; however such notice may be provided before or after we exercise our right to offset your Account(s). You also grant us a security interest in and to your Accounts to secure debts you may owe to us.  If your Account is jointly owned, we may apply the funds in the Account to any debt owed by any Account owner.

**8. MINOR ACCOUNTS.** Vio Bank accounts are not available to individuals under age eighteen (18).

**9. FEES AND CHARGES.** We may assess transaction and Account maintenance fees and other charges in amounts as may be permitted by law. A separate Fee Schedule has been provided (see paragraph 1).  We may amend this Fee Schedule from time to time. You agree to pay immediately any applicable fees and charges and any expenses we may incur in collection of amounts you owe us or in collection of items deposited with us for deposit to your Account, including, but not limited to, any court costs and attorneys' fees, and we may charge your Account to pay these fees, charges, and expenses. If at any time we are required to engage the services of financial or legal counsel (i.e., an attorney or an accountant) to resolve issues related to an Account, you will pay to us on demand the fees and costs we incur.

**10. YOUR PHYSICAL AND ELECTRONIC MAIL ADDRESS**.  You must provide us with an accurate and current email address.  You agree that you will advise us immediately of any change to either your physical or email address.  Any notice or Account statement mailed or sent electronically by us to the last physical or email address given to us by an owner of the Account will be deemed sufficient.  Physical and email mail address change requests are subject to identity verification.

**11. OUR RIGHTS.** We may at any time, and in our sole discretion with or without prior notice, require a minimum deposit, refuse to accept any deposit or cash any check, limit the amount which may be deposited, charge any Account on which you are a signer (subject to legal restraints) for any negative balance created in another account, return all or pay part of any deposit, or close the Account, returning to you personally, electronically or by mail, either cash or an official check for the balance on deposit in the Account. We may also close an Account at any time for any reason.  If we exercise our right to close your Account or if you close our Account, we may reopen your Account to process outstanding items.  If such item causes a negative balance on your Account, we reserve the right to pursue all remedies available to us, including collection processes. We may decline any transaction, including, but not limited to, any automated teller machine ("ATM") card, debit card, check or automated clearing house ("ACH") transactions. We may also place an administrative hold on funds on deposit in any Account if we (1) receive


Vio Bank is a division of MidFirst Bank, Member FDIC.  Deposits held at Vio Bank are deposits of MidFirst Bank and are combined with any other MidFirst Bank deposits for FDIC insurance purposes.

a claim from a third party relating to an Account; (2) acquire knowledge of facts which might give rise to a claim by or against us relating to an Account; or (3) if we become aware of facts that to us in our sole judgment appear to indicate that the Account is being used for an improper or unlawful purpose or that you have become the victim of a fraud or undue influence. We may exercise this right even if we are not legally bound to honor the claim. We may hold those funds for a reasonable amount of time to conduct an investigation into the facts. Thereafter, we may either release the funds, apply them against any obligation you may owe us or tender them into a court to resolve the issues. We will not be liable for failing to honor, or for any damage which may result from our failure to honor, any checks, preauthorized transfers, ACH transactions, recurring debit card transactions, or other such transfers or withdrawal orders presented after any such action.

In order to comply with regulatory requirements, we may require additional information on certain transactions including, but not limited to, the source of funds, purpose of the transaction, and/or additional supporting documentation.

You agree that we have been in good faith and have exercised ordinary care if we accept withdrawal requests (whatever the form: paper, electronic or image) from other banks without investigating the genuineness of, or authorization for, the withdrawal. If a withdrawal request is not genuine or is not otherwise authorized by you, our liability will be limited to the amount of the particular withdrawal amount.

**12. DEPOSITS.**
    (a) All checks or drafts received by us are at your risk and are credited conditionally to your Account subject to final payment. You authorize us to endorse for you any item deposited to your Account. We have the right to decline debits drawn against such credits. If any item is dishonored on presentation to the financial institution on which drawn, it will be charged back to the Account of deposit or, if such Account has insufficient funds, to another Account which the depositor, endorser, or payee is a signer (subject to legal restraints), and you may be charged an applicable fee.
    (b) We will not be responsible for any delay in crediting your Account if the deposit ticket accompanying the deposit has not been properly completed.
    (c) Deposits will not be accepted at the night depository or through the ATM Electronic Teller Network. Any deposit you attempt through these channels will be returned to you at the last known physical address we have for you.
    (d) We will not be liable for dishonor of drafts so received in payment for losses thereon or for losses in transit or for negligence or default of other institutions, agents, or subagents but will exercise ordinary care in their selection. We will be deemed to have exercised ordinary care if we send the item by a duly licensed carrier and through any state or federally chartered institution.
    (e) Funds deposited will be made available to you under the terms described in the Funds Availability Policy section of this Agreement. When we make funds "available" to you, this does not mean that the funds are "good" or that the deposited item has "cleared" the payor bank.
    (f) The outstanding balance of your Relationship shall not exceed $2,500,000.00 without our prior written consent. Subject to Applicable Law, at any time, we may limit the amount that may be deposited into your Account.
    (g) We may charge back to your Account any items returned to us unpaid or upon which payment has been revoked or rescinded which were deposited into the Account without regard to who made the deposit; whether the deposit was authorized by you; or whether the return to us was timely.
    (h) You will not deposit any item not containing the genuine signature of the drawer and the actual endorsement of each payee without our prior written consent. This restriction means that you will not deposit, among other things, "remotely created checks" and "substitute checks" as those terms are defined by law and regulation. If you deposit such items, you agree to reimburse us for losses, costs, and expenses that we may incur associated with such items.
    (i) Subject to Applicable Law, we reserve the right at any time to refuse any deposit or transfer of funds into your account; and we may return or hold all or any part of a deposit for any reason.

**13. WITHDRAWALS.** You may request the withdrawal of funds from your Account in any amount at any time, subject to fees and penalties that may apply to your Account type. Our policy is to pay withdrawals upon request; however, we are required by federal and state regulations to specifically reserve our right and do hereby reserve our right to require you to give us a seven (7) day written notice of your intention to withdraw funds from your savings Account, money market deposit Account, certificate of deposit or negotiable order of withdrawal account ("NOW Account").  All withdrawals are subject to the availability of funds, as described in the Funds Availability Policy section of this Agreement and subject to the terms and conditions of money transfer services, including but not limited to the External Transfer Service. We may, at our sole discretion, elect to issue the requested withdrawal amount by Official Check or other means in lieu of cash.  Each person who is authorized to withdraw funds from your Account, as indicated on the Account opening documentation, may withdraw funds under any method available to your Account, as described below. Withdrawals by phone transfer or electronic transfer are subject to the terms and conditions described elsewhere in this Agreement. As described in your new Account documents in further detail, certain Accounts allow only a limited number of withdrawals per statement cycle or calendar month, and we may charge a fee for transactions exceeding those limits.  Moreover, if you exceed the regulatory transaction limitations described in your Account documentation, we may be required to convert your Account to one that is not subject to regulatory limitation. Withdrawals by negotiable instrument may be made only from Money Market Accounts and Checking Accounts, and we may refuse payment of any instrument drawn on such an Account other than a negotiable instrument presented upon a form purchased from or approved by us. We do not routinely examine the dates written on items, and we are not bound to dishonor any item due solely to the fact that it has been postdated or is more than 6 months old. We may pay items, payment of which have been stopped, after the expiration of the relevant stop payment orders, even though the items may be more than 6 months old.

We reserve the right, in our sole discretion, to require additional information to authenticate or validate your identity or a withdrawal request, whether such request is made for Wire Transfer, Official Check, or otherwise.



Vio Bank is a division of MidFirst Bank, Member FDIC.  Deposits held at Vio Bank are deposits of MidFirst Bank and are combined with any other MidFirst Bank deposits for FDIC insurance purposes.

If your Account is a time deposit, you have agreed to keep the funds on deposit until the maturity of your Account. If your Account has not matured, any withdrawal of all or part of the funds from your Account may result in an early withdrawal penalty. We will consider requests for early withdrawal and, if granted, the penalty provided in the Receipt of Certificate of Time Deposit will apply.

(A) Exceptions. We may let you withdraw money from your Account before the maturity date without an early withdrawal penalty:

1)  when one or more Account owner dies or is determined legally incompetent by a court or other administrative body of competent jurisdiction or

2)  when the Account is an Individual Retirement Account (IRA) and You have reached the age as determined by IRS guidelines for Your Required Minimum Distribution (RMD).

If you make a withdrawal in a foreign currency, the withdrawal will be converted to U.S. dollars. Other fees from such a transaction may apply, and you will be responsible for such additional fees, which may be assessed by a third party.

**14. CHECKS & CHECK CASHING.** We do not provide in-branch services for Vio Bank Accounts; this includes check cashing and other services. We do not provide check ordering services for your Account, and we may, in our sole discretion refuse any checks written on your Account. We may require identification from persons cashing your checks as we in our sole discretion deem appropriate and may impose fees for cashing checks to the extent permissible by law. We reserve the right to process checks in accordance with the terms and conditions of this Agreement.

**15. STOP PAYMENT.** You may stop payment of a check, ACH withdrawal, transfer, or preauthorized electronic funds transfer by calling us toll free at 888-999-9170 or through online banking if that service is available on your Account. You must notify us with reasonably sufficient time to allow us to act and fulfill your request. You cannot place a stop payment on any one-time debit or ATM card transactions.  We have no liability for payment of an item if the stop payment order is received less than 4 hours prior to presentment of an item. A longer period may be necessary depending on the circumstances. We may require a specific period of time in order to fulfill stop payment requests.  We must receive a stop payment order for a preauthorized electronic funds transfer at least three (3) Business Days before the scheduled transfer. A written stop payment order expires six (6) months after it is received unless you renew the stop payment order in writing. For ACH withdrawals, you may stop payment of a one-time withdrawal order or place a permanent stop payment on the Account prior to the date of remittance for payment.  A permanent stop payment order for ACH withdrawals will remain on your Account indefinitely, unless revoked by you verbally or in writing.  A stop payment order must include your name and Account number and a description of the payment, including the date drawn, check number, the exact amount, and the payee named. You agree to review the information on any stop payment notice that we send you in response to a stop payment order by you and to notify us immediately of any inaccuracy.

The time limitations for stopping, canceling, or changing any bill payments scheduled online or using a mobile device are contained in the agreements for such services and are not governed by this paragraph.

**16. TELEPHONE TRANSFERS.** By requesting a telephone transfer, you authorize and direct us, as your agent, to transfer funds between the Accounts specified by you. Transfer will be made pursuant to your instructions, provided that you identify yourself by providing your Account numbers and other requested information for such services which you have authorized. We reserve the right to require authorization for such transfers in a form that is satisfactory to us. You agree to pay any applicable transfer fee in effect on the date of transfer. This fee will be automatically debited from the Account from which you are transferring funds. You represent that you are authorized to withdraw funds from such Accounts. We shall have no liability for any refusal or failure to make a transfer pursuant to telephone instructions. Transfers made pursuant to these terms and conditions shall be at your sole risk.

**17. POWER OF ATTORNEY.** If you wish to designate an attorney-in-fact, you must do so in a form acceptable to us. We reserve the right to refuse to honor any Power of Attorney presented to us, and shall have no liability related to such refusal to the extent permitted by applicable law. We shall have no liability for transactions performed by a purported attorney-in-fact under a Power of Attorney that has been revoked or is otherwise invalid unless we have received written notice of same and have had a reasonable period of time to act upon such notice. We reserve the right to restrict the types or amounts of transactions we will permit an attorney-in-fact to conduct. A person acting under a Power of Attorney is not, by virtue of such power, an owner of the Account, and no funds in the Account belong to the attorney-in-fact by reason of that capacity. The attorney-in-fact has no right of survivorship in the Account by virtue of that capacity.

**18. INTEREST.** Interest on deposits is compounded and distributed as described in our Account disclosures. We reserve the right to change our interest rates and annual percentage yields at any time according to our discretion. Interest is reflected in your periodic statement of Account.

For regulatory and accounting purposes, your checking and NOW Account will consist of two subaccounts: a checking subaccount and a money market subaccount. This does not affect transactions, funds availability, interest the Account earns, minimum balance requirements, fees and charges, or FDIC insurance coverage associated with your Account.

At various times during the statement cycle, we will transfer funds between the checking subaccount and the money market subaccount. Subaccount activity will not appear on your monthly statements and will not be subject to fees. Account statements will look as if there was only one checking Account. For interest-bearing checking Accounts, both subaccounts will pay the same interest rate and annual percentage yield. For non-interest-bearing checking Accounts, neither subaccount will pay interest. You will have no direct access to the money market



Vio Bank is a division of MidFirst Bank, Member FDIC.  Deposits held at Vio Bank are deposits of MidFirst Bank and are combined with any other MidFirst Bank deposits for FDIC insurance purposes.

subaccount; you may only access the money market subaccount indirectly through transactions on your checking subaccount. This will have no impact on your use of the Account or, for interest-bearing checking Accounts, the interest you will earn on your Account balance.

**19. STATEMENT OF ACCOUNT.** Your periodic statement of Account will be prepared as of a date designated by us. Our books will determine the balance of the Account. Your statement will note all deposits, withdrawals, transfers, debits, and adjustments charged or credited to the Account and may provide an image of the front of each item shown on the statement, as required by law. We will attempt to maintain a legible copy of each item destroyed for the time required by law. This obligation is met if we have systems and use equipment that will generally capture and retain an image of the item. You may obtain a copy of any item as maintained in accordance with applicable law.  Fees for obtaining such copies are set forth in our Fee Schedule. We are not liable for any loss occasioned because we are unable to provide copies. Your statement will be mailed to the last address we have for you in our system or provided electronically, as agreed by you. If mail to the address on file with us whether physical or electronic, is returned, we will hold the statement for you to contact us with instructions for proper delivery. You agree that you will promptly and carefully examine each statement and will, within thirty (30) days after mailing or electronic transmission, report to us any unauthorized signature on or alteration of any item, and will, within sixty (60) days after mailing or electronic transmission, report to us any other error or discrepancy in it or any claim for credit or refund. If no such report and return is made within the applicable period, you will be presumed to have accepted the stated balance as being correct and to have released us from all liability for transactions posted or not posted to the Account, subject to applicable law. For statements provided electronically, the "sent date" shall be the date that we initiate electronic transmission of such statement or message advising you of the availability of such statement in an electronically accessible format. We will not be responsible for any delay in transmission or your receipt of your statement that is caused by your email or internet service provider.

**20. LIMITATIONS.** Any transfer by wire or ACH to or from any of your transaction Accounts must be from, to, or through a domestic financial Institution. You agree that at such time as your Account is credited with the amount of the transfer, or is credited to a debt of yours, or is otherwise made available to you, any such event shall serve as notification to you of our receipt of the payment order and notice to you of such event. You agree that you will not cause or permit any transfer to any of your transaction Accounts by electronic means, including by wire or ACH, in excess of $1,000,000.00, without our prior written consent. In the event that no such prior written consent is obtained, you agree that we are not required to accept the transfer; we have no obligation to credit the amount of the transfer to your Account; and we may return the amount of the transfer to the sender so long as we make such return by the close of the banking day following the day on which we receive payment for the transfer. We shall not be deemed to have waived any rights under this paragraph 20, or elsewhere in this Agreement based upon any prior transfer to you.

**21. DORMANT ACCOUNTS.** Accounts may be classified as dormant when there have been no customer-initiated transactions for the preceding twelve (12) months.  To prevent your Account from becoming dormant, you must initiate one of the following types of transactions: deposit, withdrawal, check, electronic deposit, ATM withdrawal, debit card transaction, telephone transfer or ACH direct deposit.  An inactivity fee may be assessed against the dormant balance.  We must, in most cases, remit the dormant balance as abandoned property in accordance with applicable law.

**22. ATM CARDS AND DEBIT CARDS.** If available for your Account type, ATM cards and/or debit cards may be used to access your Account if the ownership and persons authorized to withdraw funds are identical to the Account for which your ATM card or debit card is issued. We reserve the right to suspend or revoke ATM card and/or debit card privileges at any time. If you use your ATM card or debit card to access an Account that does not have sufficient funds to complete a transaction or that would exceed the daily authorization limit attached to your ATM card or debit card, we may, at our discretion, authorize the transaction. If we authorize a transaction that overdraws your Account, we may assess a fee as described below in paragraph 24, "Overdrafts," and as set forth in the Fee Schedule. Terms and conditions applicable to use of ATM cards and debit cards are also described elsewhere in this Agreement.

**23. ACCOUNTS OF DECEDENTS.** On the death of the owner of your Account, the amount of the credit balance in your Account will be paid as permitted or required by law, federal and state regulations, and in accordance with our security procedures. In the event of a death of an Account owner, Account information will be furnished upon request to the duly appointed estate administrator, trustee or attorney.

**24. OVERDRAFTS.** A transaction or item that results in or creates a negative Available Balance in your Account is called an "Overdraft."  We decide whether to authorize debit card transactions and pay items based on the "Available Balance" of funds in your Account.  We decide whether to assess per-item Overdraft fees based on the "Ledger Balance" of funds in your Account.  An Overdraft that results in or increases a negative Ledger Balance in your Account will incur a per-item Overdraft fee as described herein and as set forth in the Fee Schedule.  As set forth in the Fee Schedule (see paragraphs 1 and 9 of this Agreement) and as permitted by law, we will assess per-item Overdraft fees for Overdraft items regardless of whether the items are paid or returned.

The "Ledger Balance" is the current balance of funds in your Account at the beginning of the Business Day. For purposes of determining whether to authorize transactions, we determine the "Available Balance" by taking the Ledger Balance and reducing that amount by any outstanding holds for deposits that are not yet available under Our Funds Availability Policy; by debit card items we have authorized but not processed for payment; and by intra-day activities (including but not limited to wire transfers, ATM withdrawals, and other electronic transfers). Certain business operations (e.g., taxis, hotels, rental or leasing companies) may request debit card authorizations in an amount exceeding the amount they ultimately charge you. When we authorize a debit card transaction, we establish a hold and reduce your Available Balance by the full amount we authorize (which may differ from the transaction amount) until the item is paid or is no longer considered to be pending. In the event you deposit a check that is not from a guaranteed source, a hold is placed on the Account to the extent and during the period described in the Funds Availability Policy section of this Agreement. In our discretion, we can reduce the time frame for a hold or choose not



Vio Bank is a division of MidFirst Bank, Member FDIC.  Deposits held at Vio Bank are deposits of MidFirst Bank and are combined with any other MidFirst Bank deposits for FDIC insurance purposes.

to place a hold at all. For example, in some cases we are able to verify that a check has been honored prior to the time a hold would otherwise expire and can manually remove the hold, making funds available earlier in the process.

You agree that we may pay checks and other items, including ACH items and other electronic debits to your Account, in any order that complies with applicable law.  For example:

- We may process deposits before debits.
- We may process certain kinds of electronic items, such as debit card, ATM and ACH items, ahead of other kinds of items, such as checks.
- We may process certain items based on the time they were authorized by us.
- We may process certain items based on the time they were received for processing.
- We may process checks in serial number order.

Multiple Overdraft fees may be charged to your Account in one day.  Also, items returned to the presenting institution as a result of insufficient funds may be re-presented to us multiple times for payment by the presenting institution. If sufficient funds are not available in your Account at the time of re-presentment, an additional Overdraft fee may be incurred. To the extent permitted by law, you authorize us to deduct any Overdrafts and any Overdraft fees from any funds that may thereafter be deposited into the Account, even if those funds come from restricted income sources that are exempt from attachment.

We are under no obligation to pay or authorize any item or withdrawal request presented if there are insufficient available funds to cover the item. You agree, however, that, in our sole discretion, we may honor any check, recurring debit card, and/or ACH debits presented to your Account when there are insufficient available funds to cover such items.

We also offer an optional discretionary Overdraft service, Overdraft Privilege that may be available to you for ATM and everyday debit card transactions. For each of your Accounts, you can opt in to Overdraft Privilege (or opt out after first opting in) by calling us toll free at 888-999-9170. You are not eligible for this Overdraft Privilege service unless you have an eligible Account, and you first opt in to the service. If you do not opt in to this Overdraft Privilege service and you attempt an ATM or everyday debit card transaction at a time when your Account does not have sufficient available funds to cover the transaction, the transaction will be declined. Please note that if you do not opt in to this Overdraft Privilege service for ATM and everyday debit card transactions: (i) we will continue to apply our current Overdraft policies to paper check, ACH, and recurring debit card transactions and (ii) the date items are presented for payment and our processing order could still cause a paper check, ACH, or recurring debit card transaction to result in an overdraft of your Account.

You agree that payment of any Overdraft item on any occasion(s) does not obligate us to pay any future Overdraft items. We have no obligation to notify you before we pay an Overdraft item or before we return an Overdraft item unpaid. You agree to pay the amount of any Overdraft and all Overdraft fees immediately upon demand. You agree that we may pursue any collection remedy available under applicable law, of which you may become responsible to reimburse us for any related expenses.

You should know that:

- A maximum of 5 per-item Overdraft fees will be charged on any Processing Day.
- We will not charge any per-item Overdraft fees if your Account is overdrawn by $5.00 or less at the end of a Processing Day.
- We will not charge any per-item Overdraft fees if the only debit items we process on a Processing Day are fees we assess.
- We will charge a one-time Extended Overdraft Fee if your Account is overdrawn in any amount for at least seven consecutive calendar days. Extended Overdraft Fees are based on your Ledger Balance.

Under our Overdraft Protect and Overdraft credit services, you may agree to authorize automatic transfers from a linked Account or through certain credit services to cover Account Overdrafts, subject to availability of funds in your linked Account or availability of credit subject to applicable restrictions and other limitations. Overdraft Protect is described in further detail near the end of this Agreement. Credit services that may be used for Overdraft protection are subject to the standard applicable credit application, approval and execution of credit documents. For more information about Overdraft Protect, available credit services, applicable terms and conditions, fees and enrollment, please call us toll free at 888-999-9170.

**25. SEVERABILITY.** If an item or condition of this Agreement is found to be illegal or unenforceable, the balance of this Agreement will remain in full force and effect.

**26. NOTICE AND CURE.** Prior to bringing a lawsuit or initiating an arbitration that asserts a claim arising out of or related to this Agreement (as further defined in the Arbitration Provision, a "Claim"), the party asserting the Claim (the "Claimant") shall give the other party (the "Potential Defendant") written notice of the Claim (a "Claim Notice") and a reasonable opportunity, not less than thirty (30) days, to resolve the Claim. Any Claim Notice to you shall be sent in writing to the address we have in our records (or any updated address you subsequently provide to us). Any Claim Notice to us shall be sent by mail to MidFirst Bank, acting by through its Vio Bank division, Attention: Account Claim Notice, P.O. Box 76149, Oklahoma City, Oklahoma 73147 (or any updated address we subsequently provide). Any Claim Notice you send must provide your name and Account number, as well as your address and a phone number where you can be reached during normal business hours and your email address. Any Claim Notice must explain the nature of the Claim and the relief that is demanded. You may only submit a Claim Notice on your own behalf and not on behalf of any other party. No third party, other than a lawyer you have personally retained, may



Vio Bank is a division of MidFirst Bank, Member FDIC.  Deposits held at Vio Bank are deposits of MidFirst Bank and are combined with any other MidFirst Bank deposits for FDIC insurance purposes.

submit a Claim Notice on your behalf. The Claimant must reasonably cooperate in providing any information about the Claim that the Potential Defendant reasonably requests.

**27. WIRE TRANSFERS.** We reserve the right to place limits on domestic and international incoming or outgoing wire transfers at any time if those services are available on your Account. Limitations may include, but are not limited to, limiting the Accounts from which a wire transfer may be sent, the countries and/or banks to which a wire transfer may be sent, and/or the amount of a wire transfer, among other restrictions and applicable fees. For additional information on wire transfers, including any limitations, call us toll free at 888-999-9170.  We may, in our sole discretion, require you to provide us additional information to validate or authenticate wire transfer requests.

**28. ARBITRATION PROVISION. PLEASE REVIEW AND READ THIS ARBITRATION PROVISION CAREFULLY. IF YOU DO NOT REJECT THIS ARBITRATION PROVISION IN ACCORDANCE WITH SUBPARAGRAPH (a) BELOW, IT WILL BE PART OF THIS AGREEMENT AND WILL HAVE A SUBSTANTIAL IMPACT ON THE WAY YOU OR WE WILL RESOLVE ANY CLAIM THAT YOU OR WE HAVE AGAINST EACH OTHER, NOW OR IN THE FUTURE.**
**Arbitration is the process for settling disputes where the determination is made by an impartial third party. Arbitration binds the parties to a type of resolution outside of the courts.**

(a) Your Right to Reject Arbitration Provision: **If you do not want this Arbitration Provision to apply, you may reject it by mailing us a written rejection notice which gives your name(s) and Account number(s) and contains a statement that you, both or all of the Account owners, if more than one) reject the Arbitration Provision in this Agreement which governs your Account. The rejection notice must be sent to us at MidFirst Bank, acting by and through its Vio Bank division, Attention: Arbitration Rejection, P.O. Box 76149, Oklahoma City, Oklahoma, 73147. A rejection notice is effective only if it is signed by you (including both or all of the Account owners), and such notice is received within thirty (30) days after the day you open your Account (the "Rejection Deadline").**

(b) Parties Subject to Arbitration: As used in this Arbitration Provision, the terms "we," "us" and "our" mean (a) MidFirst Bank, its divisions, including but not limited Vio Bank, and any parent, subsidiary or affiliate of MidFirst Bank and the employees, officers and directors of such companies ("Bank Parties"); and (b) any other person or company that provides any services in connection with this Agreement or your Account if you assert a Claim against such other person or company at the same time you assert a Claim against any Bank Party.

(c) Covered Claims: "Claim" means any claim, dispute or controversy between you and us that in any way arises from or relates to this Agreement, your Account, any products or services offered by us, including but not limited to, any debit card or ATM card provided to you, Overdraft Protect, Overdraft Privilege and/or Overdraft credit services, and the advertising and disclosures related to the foregoing, if such Claim, dispute or controversy cannot be resolved without a lawsuit or arbitration proceeding. "Claim" includes disputes arising from actions or omissions prior to the effective date of this Agreement (or prior to the time this Arbitration Provision becomes part of this Agreement). "Claim" has the broadest reasonable meaning, and includes initial claims, counterclaims, cross-claims and third-party claims, inclusive of any damages or other remedies claimed. It includes disputes based upon contract, tort, consumer rights, fraud and other intentional torts, constitution, statute, regulation, ordinance, common law and equity (including any claim for injunctive or declaratory relief). However, it does not include any dispute about the validity, enforceability, coverage or scope of this Arbitration Provision or any part thereof (including, without limitation, subparagraph (g), captioned "Prohibition Against Certain Proceedings" (the "Class Action Waiver"), the final sentence in subparagraph (m), captioned "Severability," and/or this sentence); all such disputes are for a court and not an arbitrator to decide. Notwithstanding the foregoing, the term "Claim" includes any dispute about the validity or enforceability of this Agreement as a whole.

(d) Starting an Arbitration: To the extent permitted by the Federal Arbitration Act (the "FAA") and any other applicable federal law, arbitration may be elected by either party with respect to any Claim, even if that party has already initiated a lawsuit with respect to a different Claim. Arbitration is elected by giving a written demand for arbitration to the other party, by filing a motion to compel arbitration in court or by initiating an arbitration against the other party. The parties may mutually agree in writing to waive arbitration.

(e) Choosing the Administrator: "Administrator" means the American Arbitration Association ("AAA"), 1633 Broadway, 10th Floor, New York, NY 10019, www.adr.org; JAMS, 620 Eighth Avenue, 34th Floor, New York, NY 10018, www.jamsadr.org; or any other company selected by mutual agreement of the parties. If both AAA and JAMS cannot or will not serve and the parties are unable to select an Administrator by mutual consent, the Administrator will be selected by a court. The arbitrator will be appointed by the Administrator in accordance with the rules of the Administrator. However, the arbitrator must be a retired or former judge or a lawyer with at least ten (10) years of experience in handling banking disputes. You get to select the Administrator if you give us written notice of your selection with your notice that you are demanding to arbitrate any Claim or within twenty (20) days after we give you notice that we are demanding to arbitrate any Claim (or, if You dispute Our right to require arbitration of the Claim, within twenty (20) days after that dispute is finally resolved). If you do not select the Administrator within the time specified, we may select the Administrator. Notwithstanding any language in this Arbitration Provision to the contrary, no arbitration may be administered, without the consent of all parties to the arbitration, by any Administrator that has in place a formal or informal policy that is inconsistent with the Class Action Waiver.

(f) Court and Jury Trials Prohibited; Other Limitations on Legal Rights: **FOR CLAIMS SUBJECT TO ARBITRATION YOU WILL NOT HAVE THE RIGHT TO PURSUE THAT CLAIM IN COURT OR HAVE A JURY DECIDE THE CLAIM. YOUR ABILITY TO OBTAIN**



Vio Bank is a division of MidFirst Bank, Member FDIC.  Deposits held at Vio Bank are deposits of MidFirst Bank and are combined with any other MidFirst Bank deposits for FDIC insurance purposes.

**INFORMATION AND SEEK DISCOVERY WILL BE MORE LIMITED IN ARBITRATION THAN IN A LAWSUIT. OTHER RIGHTS THAT YOU WOULD HAVE IF YOU WENT TO COURT MAY ALSO NOT BE AVAILABLE IN ARBITRATION.**

(g)  Prohibition Against Certain Proceedings: **FOR CLAIMS SUBJECT TO ARBITRATION: (1) YOU MAY NOT PARTICIPATE IN A CLASS ACTION IN COURT OR IN A CLASS-WIDE ARBITRATION, EITHER AS A PLAINTIFF, CLASS REPRESENTATIVE OR CLASS MEMBER; (2) YOU MAY NOT ACT AS A PRIVATE ATTORNEY GENERAL IN COURT OR IN ARBITRATION; (3) CLAIMS BROUGHT BY OR AGAINST YOU MAY NOT BE JOINED OR CONSOLIDATED WITH CLAIMS BROUGHT BY OR AGAINST ANY OTHER PERSON; AND (4) THE ARBITRATOR SHALL HAVE NO POWER OR AUTHORITY TO CONDUCT A CLASS-WIDE ARBITRATION, PRIVATE ATTORNEY GENERAL ARBITRATION OR MULTIPLE-PARTY ARBITRATION. Collectively, this Section (g) is referred to as the Class Action Waiver.**

(h)  Location and Costs of Arbitration: To the extent permitted by the Federal Arbitration Act (the "FAA") and any other applicable federal law, arbitration may be elected by either party with respect to any Claim, even if that party has already initiated a lawsuit with respect to a different Claim. Arbitration is elected by giving a written demand for arbitration to the other party, by filing a motion to compel arbitration in court or by initiating an arbitration against the other party. The parties may mutually agree in writing to waive arbitration.

(i)  Governing Law: This Arbitration Provision involves interstate commerce and is governed by the FAA and not by any state arbitration law. The arbitrator must apply applicable substantive law consistent with the FAA and applicable statutes of limitations and claims of privilege recognized at law. The arbitrator may award any remedy provided by the substantive law that would apply if the action were pending in the Oklahoma or federal court (including, without limitation, punitive damages, which shall be governed by the Constitutional standards employed by the courts). At the timely request of either party, the arbitrator must provide a brief written explanation of the basis for the award.

(j)  Right to Discovery: In addition to the parties' rights to obtain information or discovery pursuant to the arbitration rules of the Administrator, either party may submit a written request to the arbitrator to expand the scope of discovery normally allowable under such rules.

(k)  Arbitration Result and Right of Appeal: Judgment upon the arbitrator's award may be entered by any court having jurisdiction, as specified herein. The arbitrator's decision is final and binding, except for any right of appeal provided by the FAA. However, if the amount of the Claim exceeds $50,000.00 or involves a request for injunctive or declaratory relief that could foreseeably involve a cost or benefit to either party exceeding $50,000.00, any party can, within thirty (30) days after the entry of the award by the arbitrator, appeal the award to a three-arbitrator panel administered by the Administrator. The panel shall reconsider anew any aspect of the initial award requested by the appealing party. The decision of the panel shall be by majority vote. Reference in this Arbitration Provision to "the arbitrator" shall mean the panel if an appeal of the arbitrator's decision has been taken. The costs of such an appeal will be borne in accordance with subparagraph (h) above, captioned "Location and Costs of Arbitration."

(l)  Rules of Interpretation: This Arbitration Provision shall survive the repayment of all amounts owed under this Agreement, the closing of your Account, any legal proceeding and any bankruptcy to the extent consistent with applicable bankruptcy law. In the event of a conflict or inconsistency between this Arbitration Provision, on the one hand, and the applicable arbitration rules or the other provisions of this Agreement, on the other hand, this Arbitration Provision shall govern.

(m)  Severability: If any portion of this Arbitration Provision, other than the Class Action Waiver, is deemed invalid or unenforceable, the remaining portions shall nevertheless remain in force. If a determination is made that the Class Action Waiver is unenforceable, only this sentence of the Arbitration Agreement will remain in force and the remaining provisions shall be null and void, provided that the determination concerning the Class Action Waiver shall be subject to appeal.

(n)  Special Payment: If (1) you submit a Claim Notice in accordance with Paragraph 27 on your own behalf (and not on behalf of any other party); (2) we refuse to provide you with the relief you request; and (3) an arbitrator subsequently determines that you were entitled to such relief (or greater relief), the arbitrator shall award you at least $10,000.00, plus attorneys' fees.

**Electronic Funds Transfer
Your Rights and Responsibilities**

This section describes terms and conditions applicable to electronic funds transfers as required by the Electronic Funds Transfer Act and applicable regulations. This section applies only to electronic fund transfers that authorize us to debit or credit a consumer Account, that is, an Account established primarily for consumer, family, or household purposes. If your Account is primarily for a business purpose, then this section does not apply to you. Electronic fund transfers are generally defined under the Electronic Fund Transfer Act of 1978 and include transfers of funds that you initiate through an electronic terminal, phone, computer, or magnetic tape for the purpose of authorizing a debit or credit to your Account. Please refer to your Fee Schedule to determine if certain electronic funds transfers services are not available for your account type. Please read this disclosure carefully because it describes your rights and obligations for those transactions. You should keep this disclosure for future reference.



Vio Bank is a division of MidFirst Bank, Member FDIC.  Deposits held at Vio Bank are deposits of MidFirst Bank and are combined with any other MidFirst Bank deposits for FDIC insurance purposes.

Terms and conditions relating to electronic funds transfers conducted through online and mobile banking are contained in the agreements for such services in effect at the time an electronic funds transfer was made, and should be read and understood in conjunction with this Agreement. To the extent that the terms or conditions of the Vio online banking agreements conflict with this Agreement, the online banking agreements shall control with respect to the details of the service described in the online banking agreement. In all other cases this Agreement shall control.

**DO NOT write your personal identification number ("PIN") on anything or keep it in any form with your ATM card or debit card.**

**1. CARDHOLDER'S LIABILITY & NOTIFICATION PROCEDURES.** Notify us IMMEDIATELY if you believe your ATM card, debit card or PIN has been lost or stolen or if you believe that an unauthorized transfer from your Account has occurred. Telephoning is the best way of minimizing your potential losses. You could lose all the money in your Account in addition to the maximum Overdraft Protect Account balance or reach the limit of your Overdraft credit service, if you have elected these services. If you tell us about the lost or stolen ATM card, debit card or PIN within two (2) Business Days after you learn of the loss or theft, you can lose no more than $50.00 if someone uses your ATM card, debit card and/or PIN without your permission.

If you do NOT notify us within two (2) Business Days after you learn about the loss or theft of your ATM card or debit card and/or PIN, you could lose as much as $500.00 if we can prove we could have prevented the unauthorized use of your ATM card, debit card or PIN without your permission if you had timely notified us.

Also, if your periodic statement shows unauthorized transactions, notify us at once. If you do not notify us within sixty (60) days after the statement was sent or made available to you, you may not recover any money you lost if we can prove that we could have prevented an unauthorized transfer if you had timely notified us.

NOTIFICATION PROCEDURES: If you believe your Card(s) and/or PIN have been lost, stolen, or that someone has transferred or may transfer money from your Account without your permission, call 888-999-9170 or write Vio Bank, Attention: Bank Operations at the following address: P.O. Box 76149, Oklahoma City, Oklahoma, 73147. If a good reason (such as a long trip or hospital stay) kept you from promptly notifying us, we may, at our discretion, extend the time periods. Once an ATM card, debit card or PIN is reported lost or stolen, ATMs will disregard transaction requests and may retain the card inside the machine if you or anyone else attempts to use it.

Under the operating rules of the National Automated Clearing House Association, which are applicable to ACH transactions involving your Account, we are not required to give next day notice to you of receipt of an ACH item, and we will not do so. However, we will continue to notify you of the receipt of payments in the periodic statements we provide to you.

**2. BUSINESS DAYS AND PROCESSING DAYS.** Our business days are Monday through Friday, 8:00 a.m. to 5:00 p.m., Central Time, with the exception of legal holidays, as observed by us or the Federal Reserve Bank of Kansas City ("Business Days"). Our Processing Days are Business Days in addition to select legal holidays.

**3. TYPES OF AVAILABLE TRANSFERS.** For those Accounts associated with your ATM card or debit card, you may use your ATM card or debit card at electronic terminals to:
   (a)  Withdraw cash from checking Accounts;
   (b)  Make deposits to checking Accounts;
   (c)  Withdraw cash from savings Accounts;
   (d)  Make deposits to savings Accounts;
   (e)  Transfer funds between checking and savings Accounts upon request;
   (f)  Inquire as to the amount of your Available Balance; and
   (g)  Pay for purchases from merchants who have agreed to accept the ATM card and debit card for that purpose.

Some of these services may not be available at all electronic terminals.

**4. ELECTRONIC CHECK CONVERSION.** You may authorize a merchant or other payee to make a one-time electronic payment from a checking Account using information from Account checks to:
   (a)  Pay for purchases.
   (b)  Pay bills.
These electronic check conversions constitute electronic funds transfers.

**5. LIMITATIONS ON TRANSACTIONS.** Where available, withdrawals are subject to the following limitations:
   (a)  You may withdraw the maximum cash withdrawal amount (as referenced below) or your Account balance (whichever is less) from an electronic terminal, such as an ATM, per day, per ATM card or debit card. You may use your ATM card or debit card to purchase goods and services each day ("Point of Sale") subject to the limits set forth in below, as long as the Available Balance of your Account is sufficient to cover the aggregate of all purchases. The cash withdrawal (ATM) and cash advance daily limit, including any ATM fees, is $520.00* for most consumer customers and $1,020.00 for Private Bank consumer customers.  The Point-of-Sale daily limit is $2,500.00* for most consumer customers.
   (b)  Also, note that at certain times mechanical malfunctions of the system may cause withdrawals to be limited to $100.00 cash withdrawal, including ATM fees, and $500.00 at the Point of Sale until the malfunction can be corrected.
   (c)  Funds deposited will be made available to you under the terms described in the Funds Availability section elsewhere in this Agreement.



Vio Bank is a division of MidFirst Bank, Member FDIC.  Deposits held at Vio Bank are deposits of MidFirst Bank and are combined with any other MidFirst Bank deposits for FDIC insurance purposes.

*These are the standard limits for most consumer Accounts.  Depending on your Account type, you may qualify for larger or smaller limits.

**6. CHARGES.** On certain Accounts there may be charges for ATM card and debit card transactions made at non-Bank ATMs. There may be a charge for replacement or additional ATM card, debit card or PINs requested as a result of loss or negligence. Please refer to the Fee Schedule for specific fee information related to electronic fund transfers.

If you use your ATM card or debit card to access an Account that does not have sufficient funds to complete a transaction or that would exceed the daily authorization limit attached to your ATM card or debit card, we may, at our discretion, authorize the transaction. If we authorize a transaction that overdraws your Account, we will assess a fee as described in this Agreement in paragraph 24, "Overdrafts," and as set forth in the Fee Schedule.

INTERNATIONAL TRANSACTIONS: If you conduct a transaction with your ATM card or debit card involving multiple currencies or U.S. dollars in a country outside of the United States of America, Puerto Rico or the US Virgin Islands, a transaction fee may appear on your monthly statement from the applicable card network. We reserve the right to make future changes in your Account and/or ATM card or debit card transaction fees, subject to our giving you notice as required by law.

**7. DOCUMENTATION.** At the time of any card transaction using an ATM card, debit card or Point-of-Sale terminal, you may receive a transaction receipt, which will include the amount, date, type of transfer, identity of Account and bank or merchant, location of terminal, identity of any account where funds are transferred, and transaction identification number unless the transaction is $15.00 or less. If you have arranged to have direct deposits made to your Account at least once every sixty (60) days from the same person or company, you can call us toll free at 888-999-9170 to find out whether or not the deposit has been made. Your regular monthly statement will reflect ATM card or debit card transfers, direct deposits and withdrawals, and preauthorized electronic fund transfers.

**8. RIGHT TO STOP PAYMENT OF PREAUTHORIZED TRANSFERS.** You may stop payment of preauthorized transfers as described in this Agreement. Preauthorized transfers are an electronic fund transfer authorized in advance to recur at substantially regular intervals. The time limitations for stopping, canceling or changing any bill payments scheduled via online or mobile banking, such as Bill Pay, if those services are available on your Account, are contained in the applicable service agreement and are not governed by this paragraph.

You may use your ATM card or debit card to pay for goods and services at retail locations via Point of Sale that displays the Visa® if you have our ATM card or debit card with the Visa® symbol. We will charge your Account for all purchases and withdrawals made with your ATM card and debit card. The use of your ATM card and debit card to purchase goods and services will constitute a simultaneous withdrawal from your applicable Account. Notwithstanding anything to the contrary, you CANNOT PLACE A STOP PAYMENT ON ANY TRANSACTION MADE WITH YOUR ATM CARD OR DEBIT CARD.

**9. OUR LIABILITY FOR FAILURE TO COMPLETE TRANSACTIONS.** If we do not complete a transaction to or from your Account on time or in the correct amount according to our agreement with you, we will be liable only for your loss or damage to the extent of the amount of the transaction. We will not be liable, however, if we do not complete a transaction in situations that include, but are not limited to, the following examples:
  (a) If, through no fault of ours, you do not have enough money in your Account to make the transaction;
  (b) If the transaction would go over the credit limit on any line of credit you may have;
  (c) If the ATM where you are making the transaction does not have enough cash to complete the transaction;
  (d) If the electronic terminal was not working properly;
  (e) If circumstances beyond our control (such as fire, flood, other natural disaster, terrorism, supplier failure, system malfunction, etc.) prevent the transaction, despite reasonable precautions that we have taken;
  (f) If the funds are subject to legal or other encumbrance;
  (g) If federal or state banking rules or regulations as issued by the Consumer Financial Protection Bureau, the Office of the Comptroller of the Currency, the Federal Reserve Board, the Federal Deposit Insurance Corporation, or other agency with banking oversight might prohibit such transaction; or
  (h) If we fail to complete a transaction because we believe the transaction may be fraudulent.
Also in the case of any error or malfunction that was not intentional on our part and resulted from a bona fide error, notwithstanding the maintenance of procedures reasonably adopted to avoid any such error, our liability is limited only to actual damages proved. Except as specifically provided herein or by law, we shall not be responsible for any indirect punitive, special, general or consequential damages for any other matter addressed in this Agreement.

**10. DISCLOSURE OR ERROR RESOLUTION PROCEDURES AND CONSUMER RIGHTS.** If you think your statement or receipt is wrong, or if you need more information about a transfer listed on the statement or receipt, you must notify us no later than sixty (60) days after we sent or made available the FIRST statement on which the problem or error appeared. Your notice should include:
  (a) Your name and Account number;
  (b) A description of the error or the transfer you are unsure about and a detailed explanation of why you believe it is an error or why you need more information. Your explanation should be as clear and complete as possible; and
  (c) The dollar amount of the suspected error.

If you notify us orally, we may require that you provide us your complaint or question in writing within ten (10) Business Days.



Vio Bank is a division of MidFirst Bank, Member FDIC.  Deposits held at Vio Bank are deposits of MidFirst Bank and are combined with any other MidFirst Bank deposits for FDIC insurance purposes.

For Electronic Funds Transfers: Within ten (10) Business Days after you notify us of a possible error, we will make a determination as to whether an error occurred. We will correct any determined error promptly. If we need more time or information, we may take up to forty-five (45) days to investigate and determine whether an error occurred. This timeframe may be extended to 90 days for Point of Sale transactions. If we decide to do this, we will provisionally credit your Account for the amount you think is in error within ten (10) Business Days after we receive written confirmation of your complaint or question, so that you will have the use of the money during the time it takes us to complete Our investigation. If we ask you to confirm your complaint or question in writing, and we do not receive it within ten (10) Business Days, we may not provisionally credit your Account.

For POS, ATM, and Other Electronic Transfers involving New Accounts: For new transaction Accounts (Accounts on which each owner of the Account does not have or has not had within the previous thirty (30) days a transaction Account with us), we may take up to 90 days to investigate your complaint or question and determine whether an error occurred.  If we decide to do this, we will provisionally credit your Account for the amount you think is in error within twenty (20) Business Days after we receive written confirmation of your complaint or question, so that you will have the use of the money during the time it takes us to complete our investigation. If we ask you to confirm your complaint or question in writing, and we do not receive it within twenty (20) Business Days, we may not provisionally credit your Account.

If we issue a provisional credit and ultimately determine that no error occurred, we will debit such provisional credit from your Account.  We will notify you of the date and amount of the debit. We will honor any checks, drafts, or similar third party payables and any preauthorized transfers as provided in the notice that we will send to you.

IN CASE OF ERROR OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS: Telephone us toll free at 888-999-9170, or write us at Vio Bank, Attention: Bank Operations P.O. Box 76149, Oklahoma City, Oklahoma, 73147.

We will communicate the results to you within three (3) Business Days after completing our investigation. If we decide that there was no error, we will send you a written explanation. You may ask for copies of the documents that we used in our investigation.

**11. PROVISIONAL PAYMENT.** Credit given by us to you with respect to an ACH credit entry is provisional until we receive final settlement for such entry through a Federal Reserve Bank. If we do not receive such final settlement, you are hereby notified and agree that we are entitled to a refund of the amount credited to you in connection with such entry, and the party making payment to you via such entry (i.e., the originator of the entry) shall not be deemed to have paid you in the amount of such entry.

**12. CONFIDENTIALITY.** Please see the section of this Agreement entitled "Customer Information Disclosure" regarding circumstances under which we will disclose information to third parties about your Account.

**13. CHOICE OF LAW**. We may accept on your behalf payments to your Account which have been transmitted through one or more ACH and which are not subject to the Electronic Fund Transfer Act; and your rights and obligations with respect to such payments shall be construed in accordance with and governed by the law of the State of Oklahoma.

### Funds Availability Policy

**1. GENERAL.** Except as otherwise described below, we will make funds from your deposits available to you on the first Business Day after the day we receive your deposit. However, many exceptions apply, and funds deposited using mobile or online banking services may be subject to different availability as set forth in the agreement covering service you used to deposit funds. If you will need the funds from a deposit right away, you should ask us when the funds will be available. Once funds are available, you can withdraw the funds, and we will use the funds to process transactions on your Account.

Please remember that you are responsible for any check or other funds you deposit with us that is returned to us unpaid and for any other problem that occurs involving your deposit whether made by check or other channel, even if we previously made funds available to you in connection with such deposit.

**2. WHEN DEPOSITS ARE RECEIVED.** For determining the availability of your deposits, every day is a Business Day, except Saturdays, Sundays, and federal holidays. However, only deposits made via Mobile Deposit before the cutoff time on a Business Day that we are open will be considered received on that day. We do not accept cash deposits. The cutoff time for mobile deposit is 8:00 p.m. central time.

Bank by mail deposits received before 4:00 p.m. on a Business Day will be considered received on the day of receipt. Later deliveries and those received on Saturdays, Sundays, and holidays will be considered received on the next Business Day we are open.

Preauthorized electronic deposits will be posted on the effective date for the transaction, if received by the Federal Reserve Bank's last deadline for electronic payments for that same Business Day; otherwise, preauthorized electronic deposits will be posted on the next business day.

**3. LONGER DELAYS MAY APPLY.** In some cases, we will not make all of the funds that are deposited by check or deposited by other channels available to you on the first Business Day after the day of your deposit. Depending on the type of deposit, whether by check or other means, funds may not be available until the second Business Day after the day your deposit is received. However, the first **$200.00\*** of your deposits may be available on the first Business Day after your deposit is received. **\*Effective July 1, 2020, the first $225.00 of Your deposits may be available on the first Business Day after Your deposit is received.**



Vio Bank is a division of MidFirst Bank, Member FDIC.  Deposits held at Vio Bank are deposits of MidFirst Bank and are combined with any other MidFirst Bank deposits for FDIC insurance purposes.

If we are not going to make all of the funds from your deposit available on the first Business Day, we will notify you at the time you make your deposit. We will also tell you when the funds will be available. If your deposit is not made directly to one of our employees, or if we decide to take this action after you have left the premises, we will mail you the notice by the day after we receive your deposit.

Funds you deposit by check may be delayed for a longer period if: (i) we believe a check you deposit will not be paid; (ii) you deposit checks totaling more than **$5,000.00*** on any one Business Day; (iii) you redeposit a check that has been returned unpaid; (iv) you have overdrawn your Account repeatedly in the last six (6) months; or (v) there is an event that occurs, which is out of our control such as an emergency, communications or computer equipment failure, natural disaster, act of terrorism, sanction or restriction against the transaction, or other event outside our control.

We will notify you if we delay your ability to withdraw funds for any of these reasons, and we will tell you when the funds will be available. They will generally be available no later than the seventh (7th) Business Day after the day of your deposit; funds deposited using online or mobile banking services will be made available according to the terms and conditions governing the service

Your deposit may encounter delays if required by law.

**4. HOLDS ON OTHER FUNDS -- CHECK CASHING.** We reserve the right to refuse to cash any check. If we cash a check for you that is drawn on another bank, we may withhold the availability of a corresponding amount of funds that are already in your Account. Those funds will be available at the time funds from the check we cashed would have been available if you had deposited it.

**5. HOLDS ON OTHER FUNDS -- OTHER ACCOUNTS.** If we accept for deposit a check that is drawn on another bank, we may make funds from the deposit available for withdrawal immediately, but delay your availability to withdraw a corresponding amount of funds that you have on deposit in another account with us. The funds in the other account would then not be available for withdrawal until the time periods that are described elsewhere above for the type of check that you deposited.

**6. HOLDS ON OTHER FUNDS—MOBILE AND ONLINE SERVICES.** If you use a mobile or online banking service to deposit funds in your Account, we may place a hold on those funds according to the terms and conditions governing the service you use to deposit those funds. Funds that are deposited through a clearing house transaction, such as an ACH transaction, will be available no later than the eleventh (11) day following receipt of such funds in your Account.

**7. HOLDS ON MOBILE DEPOSIT.** Funds received from mobile deposits are generally made available within the above policy timeframes; however, we reserve the right to make these deposits available at our discretion.

**8. SPECIAL RULES FOR NEW ACCOUNTS.** If you are a new customer of MidFirst Bank, acting by and through its Vio Bank division, special rules will apply during the first thirty (30) days your Account is open. Funds from electronic direct deposits, cash deposits or wire transfers to your Account will be available on the Business Day we receive the deposit. The first **$5,000.00*** of a Business Day's total deposits of official, certified, tellers, travelers, and state and local government checks will be available on the first (1st) Business Day after the day of your deposit, if the deposit meets certain conditions. For example, the checks must be payable to you (and you may have to use a special deposit slip). The excess over **$5,000.00*** will be available on the ninth (9th) Business Day after the day of your deposit. If your deposit on these checks (other than a U.S. Treasury check) is not made in person to one of our employees, the first **$5,000.00*** will not be available until the second (2nd) Business Day after the day of your deposit. Funds from all other check deposits will be available on the eleventh (11th) Business Day after the day of your deposit. ***Please note, effective July 1, 2020, the $5,000.00 will increase to $5,525.00.**

**Substitute Checks and Your Rights**

To make check processing faster, federal law permits banks to replace original checks with "Substitute Checks." These Substitute Checks are similar in size to original checks with a slightly reduced image of the front and back of the original check. The front of a Substitute Check states: "This is a legal copy of your check. You can use it the same way you would use the original check." you may use a Substitute Check as proof of payment just like the original check.

Some or all of the checks that you receive back from us may be Substitute Checks. This notice describes rights you have when you receive Substitute Checks from us. The rights in this notice do not apply to original checks or to electronic debits to your Account. However, you have rights under other laws with respect to those transactions.

In certain cases, federal law provides a special procedure that allows you to request a refund for losses you suffer if a Substitute Check is posted to your Account incorrectly (for example, if you think that we withdrew the wrong amount from your Account or that We withdrew money from your Account more than once for the same check). The losses you may attempt to recover under this procedure may include the amount that was withdrawn from your Account and fees that were charged as a result of the withdrawal (for example, returned check fees).



Vio Bank is a division of MidFirst Bank, Member FDIC.  Deposits held at Vio Bank are deposits of MidFirst Bank and are combined with any other MidFirst Bank deposits for FDIC insurance purposes.

The amount of your refund under this procedure is limited to the amount of your loss or the amount of the Substitute Check, whichever is less. You also are entitled to interest on the amount of your refund if your Account is an interest-bearing Account. If your loss exceeds the amount of the Substitute Check, you may be able to recover additional amounts under other law.

If you use this procedure, you may receive up to $2,500.00 of your refund (plus interest if your Account earns interest) within ten (10) Business Days after we received your dispute notice and the remainder of your refund (plus interest if your Account earns interest) not later than forty-five (45) calendar days after we received your dispute notice.

We may reverse the refund (including any interest on the refund and refunded fees) if we later are able to demonstrate that the Substitute Check was correctly posted to your Account.

If you believe that you have suffered a loss relating to a Substitute Check that you received and that was posted to your Account, please contact us toll free at 888-999-9170. You must contact us within forty (40) calendar days of the date that we mailed the Substitute Check in question or the Account statement showing that the Substitute Check was posted to your Account, whichever is later. We may extend this time period if you were unable to provide a timely dispute notice because of extraordinary circumstances outside your control.

Any dispute notice from you must include:
  (a) A description of why you have suffered a loss (for example, you think the amount withdrawn was incorrect).
  (b) An estimate of the total actual amount of your loss.
  (c) An explanation of why the Substitute Check you received is insufficient to confirm that you suffered a loss.
  (d) A copy of the Substitute Check and/or the following information to help us identify the Substitute Check: identifying information, for example the check number, the name of the person to whom you wrote the check, the amount of the check.

### Overdraft Protect

If you have requested or authorized Overdraft Protect services or Overdraft credit services in your Agreement or otherwise, such services are subject to the terms and conditions contained in this Agreement, the Fee Schedule, and your signed Overdraft Protect Agreement and Authorization. By requesting Overdraft Protect services or Overdraft credit services, you authorize and direct us, as your agent, until your authorization is revoked in writing and delivered to us, to effect the automatic transfer of funds from the Transferor Account or designated credit service to the Transferee Account, as identified in the Overdraft Protect Agreement and Authorization, provided the automatic transfer of funds will cover the entire Overdraft amount in the Transferee Account, as well as the associated Overdraft Protect transfer fee, except if such action violates state or federal regulation. You represent that you have an ownership interest in and are authorized to withdraw funds from each of such Accounts. If one (1) or more items are presented to us and the Transferor Account does not contain sufficient funds or sufficient credit is not available to cover the entire Overdraft amount caused by all of the items presented as well as the Overdraft Protect transfer fee, no transfer will occur and you may be assessed the current Overdraft fee(s). We reserve the right to not make any particular transfer.

You may, at any time, cancel Overdraft Protect services or Overdraft credit services. Notification of cancellation must be received in writing at least ten (10) days before the effective date of cancellation. Notification should be mailed to Vio Bank, Attention: Overdraft Protect, P.O. Box 76149, Oklahoma City, Oklahoma, 73147.



Vio Bank is a division of MidFirst Bank, Member FDIC.  Deposits held at Vio Bank are deposits of MidFirst Bank and are combined with any other MidFirst Bank deposits for FDIC insurance purposes.

# Exhibit I

**VIO BANK**

Version 05/2020

# Account Agreement and Disclosure

### Terms and Conditions of Your Account

Vio Bank is a division of MidFirst Bank, a federally chartered savings association. MidFirst Bank is a Federal Deposit Insurance Corporation ("FDIC") member, and your Vio Bank accounts are insured up to the maximum allowed by law. For purposes of FDIC coverage, deposits held at Vio Bank are deposits held at MidFirst Bank and are combined with any other MidFirst Bank deposits.  As used in this Account Agreement and Disclosure, "Bank," "we," "us," and "our" mean MidFirst Bank, acting by and through its Vio Bank division; "you," and "your" mean each person who is named as an owner of the Account or anyone who is authorized to withdraw funds from the Account. "Account" means each and every Account held by you at Bank. We do not provide in-branch services for Vio Bank Accounts; this includes check cashing and other services.

With respect to your Account, you agree to the following terms and conditions:

**1. AGREEMENT.** Your Account is subject to the terms and conditions in this Account Agreement and Disclosure ("Agreement").  We may amend these terms and conditions. You can agree to sign certain documents electronically; this includes checking the appropriate box or otherwise indicating your consent electronically. The term "sign" or "signing" in this Agreement means your signature or your electronic signature. By clicking the appropriate checkboxes or otherwise indicating your consent when submitting your online Account application, you acknowledge that you have opened the type of account indicated on the account opening documents; and you received, understand, and agree to be bound by the terms and conditions of this Agreement. You have been provided a specific account disclosure and a fee schedule ("Fee Schedule") for your Account; and that account disclosure and Fee Schedule are incorporated into this Agreement, as they may be amended.  If you enroll in Account services, including online and mobile banking services, the agreements for those services also are incorporated into and made a part of this Agreement.  We may alter, amend, or rescind, for any reason, any part of this Agreement (or any other Account-related agreement or documentation), or add new terms, at any time.  We will give notice of any such changes that may adversely affect you by: (a) posting them online at viobank.com; (b) sending notice thereof to you at the most recent email address indicated on our records, as permitted by applicable law; or (c) as permitted by applicable law; mailing written notice to the most recent address we have in our records. We are not obligated to notify you of changes to features of your Account that do not adversely affect you in any way.  We may immediately implement changes required by law or regulation or to protect the security of your Account or our systems.  When necessary, we will provide notice of such changes after we implement the changes. Your continued use of your Account or Account services after implementation of any changes or following any notice of changes to this Agreement constitutes your continued acceptance of this Agreement and all changes and amendments hereto.  All Account signers authorize us to make inquiries from any consumer reporting agency in connection with the Account(s).  We reserve the right and may close an Account at any time for any reason. You may close your Account at any time for any reason, subject to any prior advance notice requirements related to the particular account, early Account closure fees and penalties, as applicable, and our Funds Availability Policy.

**2. LAWS, RULES, AND REGULATIONS.** Your Account, including deposits to and withdrawals therefrom and this Agreement and any Addendum hereto, shall be subject to and are governed by (a) the laws and regulations of the United States, including those applicable to federal savings associations, and (b) to the extent applicable and not preempted or superseded by federal law or regulations, the laws of the State of Oklahoma.

For purposes of clarification, applicable laws and regulations include, without limitation, (a) applicable rules, regulations and orders, the Consumer Financial Protection Bureau, the Office of the Comptroller of Currency, the Federal Deposit Insurance Corporation, and the Federal Reserve Bank, (b) the rules and operating procedures of any clearing house association of which  we are or may become a member or through which we may send items for collections, (c)  all Account provisions and requirements posted on our  premises or on our websites; and (d) all provisions enclosed with or attached to statements of Account, related Account disclosures or contained in our  bylaws, all as now in effect or as may in the future be issued, modified or amended.  You agree that you will not make transactions that are restricted under the Unlawful Internet Gambling Enforcement Act (UIGEA).

**3. ACCOUNT OWNERSHIP.** The persons or entities you identify as owners during the online application process are the owners of the Account. Fiduciaries, authorized signers, and agents are not considered Account owners.  Account ownership shall, for the purpose of this Agreement, be deemed to be joint tenancy with full rights of survivorship as between and among joint Account owners. If the Account is a Payable on Death ("POD") account, the Account shall be payable on the death of the last Account owner to one or more designated POD beneficiaries, if living, and if not living, to the named estate of the beneficiary.  If more than one beneficiary is designated by the Account owner(s), the beneficiaries, if living, and if not living, the named estate of the beneficiaries, shall share equally in the amount payable on death of the last Account owner. Persons who are identified during the online application process as authorized signers or whose signatures appear on applicable account opening or related Account documents have the individual authority to withdraw funds from your Account. Any person who is authorized to withdraw funds but who is not the owner of an Account will be considered an agent of the owner of the Account, with the unlimited right to deal

Page <strong>1</strong> of <strong>13</strong>



Vio Bank is a division of MidFirst Bank, Member FDIC.  Deposits held at Vio Bank are deposits of MidFirst Bank and are combined with any other MidFirst Bank deposits for FDIC insurance purposes.

with the Account on behalf of the Account owner. We have no duty to inquire as to the authority of an agent to deal with the Account, and we have no liability for permitting an agent to withdraw funds from an Account, regardless of the manner of withdrawal or recipient of the funds.

**4. AUTHORIZED SIGNATURE.** For accounts opened online, the signature of any authorized signer identified during the online application process is an authorized signature for your Account. For the payment of funds and for other purposes relating to any account you have with us, we are authorized to recognize your signature, but we will not be liable to you for refusing to honor checks or other signed instructions if we believe in good faith that the signature appearing on such checks or instructions is not genuine. The Bank may honor any check or other item drawn against the Account so long as it contains at least one authorized signature. In addition, we may ask for a form of identification for transactions processed in person or electronically for authentication purposes.  In the event of a forgery, we are not liable if a "reasonable person" could not have detected the forgery. Additionally, you may authorize the use of a facsimile signature device or electronically generated signature on checks or other instructions for withdrawal by designation on a separate form. If you have authorized the use of a facsimile signature device or electronically generated signature, the Bank may honor any check or other signed instruction that bears or appears to bear your facsimile signature or electronically generated signature even if it was made by an unauthorized person or electronically generated signature or with a counterfeit facsimile device. Therefore, you should maintain close control over your facsimile signature device and any electronically generated signature and promptly review your statements and cancelled checks for unauthorized use of the device or electronic signature. You agree to hold us harmless from any subsequent claims that may arise based upon our reliance upon such a facsimile signature. If you authorize any person to sign your name or otherwise draw against your Account, including withdrawals initiated electronically, we may honor any withdrawal signed by or authorized by that person whether or not it exceeds the authority you granted.

**5. CUSTOMER IDENTIFICATION.** As required by federal statute and regulation and by our policy, we may require and may verify certain information regarding individuals at Account opening and as otherwise deemed necessary. This information may include complete customer name, residential or business address, mailing address if different, tax payer identification number, date of birth, government issued photo identification, and other information as may be required by government laws or regulations or as may be deemed appropriate to verify your identity as the customer. This information may be required for all individuals who are deemed owners of the Account, acting as agent on behalf of the Account owner, named as beneficiary on the Account, or otherwise associated with the Account regardless of manner. In order to comply with regulatory requirements, we may require identifying information regarding the beneficial owners of our legal entity customer.  Account access or proceeds of Accounts opened without required information or subject to information verification may be restricted until such information is obtained and/or verified. We may close an Account at any time for any reason, including but not limited to identification information deemed by us, in our sole discretion, to be insufficient or unverifiable.

**6. OUR LIABILITY.** We have no obligations or liabilities to you other than those imposed by law or specifically provided herein. Any duty of care imposed on us by law will be fulfilled if the procedures established for the transaction involved are reasonable. We will have no liability for clerical error, inadvertence or oversight, or an honest mistake of judgment.  We have no obligation to verify the accuracy of any information or instructions you provide.

**7. RIGHT TO OFFSET & SECURITY INTEREST.** If you owe a debt to us, you grant us a right to offset that debt against any Account you may have. For purposes of this Section 7, Accounts include Vio Bank branded accounts, MidFirst Bank accounts, and accounts you may hold with any of our divisions; and debts include any obligation, except consumer credit card debts, that you may owe to MidFirst Bank or any of its divisions, including Vio Bank.  We may, at any time at our discretion, apply any part or all of the balance of your Account(s) to any debt, matured or unmatured, that you or any other Account owner may then owe to us. We will provide you notice of any offset; however such notice may be provided before or after we exercise our right to offset your Account(s). You also grant us a security interest in and to your Accounts to secure debts you may owe to us.  If your Account is jointly owned, we may apply the funds in the Account to any debt owed by any Account owner.

**8. MINOR ACCOUNTS.** Vio Bank accounts are not available to individuals under age eighteen (18).

**9. FEES AND CHARGES.** We may assess transaction and Account maintenance fees and other charges in amounts as may be permitted by law. A separate Fee Schedule has been provided (see paragraph 1).  We may amend this Fee Schedule from time to time. You agree to pay immediately any applicable fees and charges and any expenses we may incur in collection of amounts you owe us or in collection of items deposited with us for deposit to your Account, including, but not limited to, any court costs and attorneys' fees, and we may charge your Account to pay these fees, charges, and expenses. If at any time we are required to engage the services of financial or legal counsel (i.e., an attorney or an accountant) to resolve issues related to an Account, you will pay to us on demand the fees and costs we incur.

**10. YOUR PHYSICAL AND ELECTRONIC MAIL ADDRESS**.  You must provide us with an accurate and current email address.  You agree that you will advise us immediately of any change to either your physical or email address.  Any notice or Account statement mailed or sent electronically by us to the last physical or email address given to us by an owner of the Account will be deemed sufficient.  Physical and email mail address change requests are subject to identity verification.

**11. OUR RIGHTS.** We may at any time, and in our sole discretion with or without prior notice, require a minimum deposit, refuse to accept any deposit or cash any check, limit the amount which may be deposited, charge any Account on which you are a signer (subject to legal restraints) for any negative balance created in another account, return all or pay part of any deposit, or close the Account, returning to you personally, electronically or by mail, either cash or an official check for the balance on deposit in the Account. We may also close an Account at any time for any reason.  If we exercise our right to close your Account or if you close our Account, we may reopen your Account to process outstanding items.  If such item causes a negative balance on your Account, we reserve the right to pursue all remedies available to us, including collection processes. We may decline any transaction, including, but not limited to, any automated teller machine ("ATM") card, debit card, check or automated clearing house ("ACH") transactions. We may also place an administrative hold on funds on deposit in any Account if we (1) receive



Vio Bank is a division of MidFirst Bank, Member FDIC.  Deposits held at Vio Bank are deposits of MidFirst Bank and are combined with any other MidFirst Bank deposits for FDIC insurance purposes.

a claim from a third party relating to an Account; (2) acquire knowledge of facts which might give rise to a claim by or against us relating to an Account; or (3) if we become aware of facts that to us in our sole judgment appear to indicate that the Account is being used for an improper or unlawful purpose or that you have become the victim of a fraud or undue influence. We may exercise this right even if we are not legally bound to honor the claim. We may hold those funds for a reasonable amount of time to conduct an investigation into the facts. Thereafter, we may either release the funds, apply them against any obligation you may owe us or tender them into a court to resolve the issues. We will not be liable for failing to honor, or for any damage which may result from our failure to honor, any checks, preauthorized transfers, ACH transactions, recurring debit card transactions, or other such transfers or withdrawal orders presented after any such action.

In order to comply with regulatory requirements, we may require additional information on certain transactions including, but not limited to, the source of funds, purpose of the transaction, and/or additional supporting documentation.

You agree that we have been in good faith and have exercised ordinary care if we accept withdrawal requests (whatever the form: paper, electronic or image) from other banks without investigating the genuineness of, or authorization for, the withdrawal. If a withdrawal request is not genuine or is not otherwise authorized by you, our liability will be limited to the amount of the particular withdrawal amount.

**12. DEPOSITS.**
   (a) All checks or drafts received by us are at your risk and are credited conditionally to your Account subject to final payment. You authorize us to endorse for you any item deposited to your Account. We have the right to decline debits drawn against such credits. If any item is dishonored on presentation to the financial institution on which drawn, it will be charged back to the Account of deposit or, if such Account has insufficient funds, to another Account which the depositor, endorser, or payee is a signer (subject to legal restraints), and you may be charged an applicable fee.
   (b) We will not be responsible for any delay in crediting your Account if the deposit ticket accompanying the deposit has not been properly completed.
   (c) Deposits will not be accepted at the night depository or through the ATM Electronic Teller Network. Any deposit you attempt through these channels will be returned to you at the last known physical address we have for you.
   (d) We will not be liable for dishonor of drafts so received in payment for losses thereon or for losses in transit or for negligence or default of other institutions, agents, or subagents but will exercise ordinary care in their selection. We will be deemed to have exercised ordinary care if we send the item by a duly licensed carrier and through any state or federally chartered institution.
   (e) Funds deposited will be made available to you under the terms described in the Funds Availability Policy section of this Agreement. When we make funds "available" to you, this does not mean that the funds are "good" or that the deposited item has "cleared" the payor bank.
   (f) The outstanding balance of your Account shall not exceed $2,500,000.00 without our prior written consent. Subject to Applicable Law, at any time, we may limit the amount that may be deposited into your Account.
   (g) We may charge back to your Account any items returned to us unpaid or upon which payment has been revoked or rescinded which were deposited into the Account without regard to who made the deposit; whether the deposit was authorized by you; or whether the return to us was timely.
   (h) You will not deposit any item not containing the genuine signature of the drawer and the actual endorsement of each payee without our prior written consent. This restriction means that you will not deposit, among other things, "remotely created checks" and "substitute checks" as those terms are defined by law and regulation. If you deposit such items, you agree to reimburse us for losses, costs, and expenses that we may incur associated with such items.
   (i) Subject to Applicable Law, we reserve the right at any time to refuse any deposit or transfer of funds into your account; and we may return or hold all or any part of a deposit for any reason.

 **13. WITHDRAWALS.** You may request the withdrawal of funds from your Account in any amount at any time, subject to fees and penalties that may apply to your Account type. Our policy is to pay withdrawals upon request; however, we are required by federal and state regulations to specifically reserve our right and do hereby reserve our right to require you to give us a seven (7) day written notice of your intention to withdraw funds from your savings Account, money market deposit Account, certificate of deposit or negotiable order of withdrawal account ("NOW Account").  All withdrawals are subject to the availability of funds, as described in the Funds Availability Policy section of this Agreement and subject to the terms and conditions of money transfer services, including but not limited to the External Transfer Service. We may, at our sole discretion, elect to issue the requested withdrawal amount by Official Check or other means in lieu of cash.  Each person who is authorized to withdraw funds from your Account, as indicated on the Account opening documentation, may withdraw funds under any method available to your Account, as described below. Withdrawals by phone transfer or electronic transfer are subject to the terms and conditions described elsewhere in this Agreement. As described in your new Account documents in further detail, certain Accounts allow only a limited number of withdrawals per statement cycle or calendar month, and we may charge a fee for transactions exceeding those limits.  Moreover, if you exceed the regulatory transaction limitations described in your Account documentation, we may be required to convert your Account to one that is not subject to regulatory limitation. Withdrawals by negotiable instrument may be made only from Money Market Accounts and Checking Accounts, and we may refuse payment of any instrument drawn on such an Account other than a negotiable instrument presented upon a form purchased from or approved by us. We do not routinely examine the dates written on items, and we are not bound to dishonor any item due solely to the fact that it has been postdated or is more than 6 months old. We may pay items, payment of which have been stopped, after the expiration of the relevant stop payment orders, even though the items may be more than 6 months old.

We reserve the right, in our sole discretion, to require additional information to authenticate or validate your identity or a withdrawal request, whether such request is made for Wire Transfer, Official Check, or otherwise.



Vio Bank is a division of MidFirst Bank, Member FDIC.  Deposits held at Vio Bank are deposits of MidFirst Bank and are combined with any other MidFirst Bank deposits for FDIC insurance purposes.

If your Account is a time deposit, you have agreed to keep the funds on deposit until the maturity of your Account. If your Account has not matured, any withdrawal of all or part of the funds from your Account may result in an early withdrawal penalty. We will consider requests for early withdrawal and, if granted, the penalty provided in the Receipt of Certificate of Time Deposit will apply.

(A) Exceptions. We may let you withdraw money from your Account before the maturity date without an early withdrawal penalty:

1) when one or more Account owner dies or is determined legally incompetent by a court or other administrative body of competent jurisdiction or

2) when the Account is an Individual Retirement Account (IRA) and You have reached the age as determined by IRS guidelines for Your Required Minimum Distribution (RMD).

If you make a withdrawal in a foreign currency, the withdrawal will be converted to U.S. dollars. Other fees from such a transaction may apply, and you will be responsible for such additional fees, which may be assessed by a third party.

**14. CHECKS & CHECK CASHING.** We do not provide in-branch services for Vio Bank Accounts; this includes check cashing and other services. We do not provide check ordering services for your Account, and we may, in our sole discretion refuse any checks written on your Account. We may require identification from persons cashing your checks as we in our sole discretion deem appropriate and may impose fees for cashing checks to the extent permissible by law. We reserve the right to process checks in accordance with the terms and conditions of this Agreement.

**15. STOP PAYMENT.** You may stop payment of a check, ACH withdrawal, transfer, or preauthorized electronic funds transfer by calling us toll free at 888-999-9170 or through online banking if that service is available on your Account. You must notify us with reasonably sufficient time to allow us to act and fulfill your request. You cannot place a stop payment on any one-time debit or ATM card transactions.  We have no liability for payment of an item if the stop payment order is received less than 4 hours prior to presentment of an item. A longer period may be necessary depending on the circumstances. We may require a specific period of time in order to fulfill stop payment requests.  We must receive a stop payment order for a preauthorized electronic funds transfer at least three (3) Business Days before the scheduled transfer. A written stop payment order expires six (6) months after it is received unless you renew the stop payment order in writing. For ACH withdrawals, you may stop payment of a one-time withdrawal order or place a permanent stop payment on the Account prior to the date of remittance for payment.  A permanent stop payment order for ACH withdrawals will remain on your Account indefinitely, unless revoked by you verbally or in writing.  A stop payment order must include your name and Account number and a description of the payment, including the date drawn, check number, the exact amount, and the payee named. You agree to review the information on any stop payment notice that we send you in response to a stop payment order by you and to notify us immediately of any inaccuracy.

The time limitations for stopping, canceling, or changing any bill payments scheduled online or using a mobile device are contained in the agreements for such services and are not governed by this paragraph.

**16. TELEPHONE TRANSFERS.** By requesting a telephone transfer, you authorize and direct us, as your agent, to transfer funds between the Accounts specified by you. Transfer will be made pursuant to your instructions, provided that you identify yourself by providing your Account numbers and other requested information for such services which you have authorized. We reserve the right to require authorization for such transfers in a form that is satisfactory to us. You agree to pay any applicable transfer fee in effect on the date of transfer. This fee will be automatically debited from the Account from which you are transferring funds. You represent that you are authorized to withdraw funds from such Accounts. We shall have no liability for any refusal or failure to make a transfer pursuant to telephone instructions. Transfers made pursuant to these terms and conditions shall be at your sole risk.

**17. POWER OF ATTORNEY.** If you wish to designate an attorney-in-fact, you must do so in a form acceptable to us. We reserve the right to refuse to honor any Power of Attorney presented to us, and shall have no liability related to such refusal to the extent permitted by applicable law. We shall have no liability for transactions performed by a purported attorney-in-fact under a Power of Attorney that has been revoked or is otherwise invalid unless we have received written notice of same and have had a reasonable period of time to act upon such notice. We reserve the right to restrict the types or amounts of transactions we will permit an attorney-in-fact to conduct. A person acting under a Power of Attorney is not, by virtue of such power, an owner of the Account, and no funds in the Account belong to the attorney-in-fact by reason of that capacity. The attorney-in-fact has no right of survivorship in the Account by virtue of that capacity.

**18. INTEREST.** Interest on deposits is compounded and distributed as described in our Account disclosures. We reserve the right to change our interest rates and annual percentage yields at any time according to our discretion. Interest is reflected in your periodic statement of Account.

For regulatory and accounting purposes, your checking and NOW Account will consist of two subaccounts: a checking subaccount and a money market subaccount. This does not affect transactions, funds availability, interest the Account earns, minimum balance requirements, fees and charges, or FDIC insurance coverage associated with your Account.

At various times during the statement cycle, we will transfer funds between the checking subaccount and the money market subaccount. Subaccount activity will not appear on your monthly statements and will not be subject to fees. Account statements will look as if there was only one checking Account. For interest-bearing checking Accounts, both subaccounts will pay the same interest rate and annual percentage yield. For non-interest-bearing checking Accounts, neither subaccount will pay interest. You will have no direct access to the money market

Page **4** of **13**



Vio Bank is a division of MidFirst Bank, Member FDIC.  Deposits held at Vio Bank are deposits of MidFirst Bank and are combined with any other MidFirst Bank deposits for FDIC insurance purposes.

subaccount; you may only access the money market subaccount indirectly through transactions on your checking subaccount. This will have no impact on your use of the Account or, for interest-bearing checking Accounts, the interest you will earn on your Account balance.

**19. STATEMENT OF ACCOUNT.** Your periodic statement of Account will be prepared as of a date designated by us. Our books will determine the balance of the Account. Your statement will note all deposits, withdrawals, transfers, debits, and adjustments charged or credited to the Account and may provide an image of the front of each item shown on the statement, as required by law. We will attempt to maintain a legible copy of each item destroyed for the time required by law. This obligation is met if we have systems and use equipment that will generally capture and retain an image of the item. You may obtain a copy of any item as maintained in accordance with applicable law. Fees for obtaining such copies are set forth in our Fee Schedule. We are not liable for any loss occasioned because we are unable to provide copies. Your statement will be mailed to the last address we have for you in our system or provided electronically, as agreed by you. If mail to the address on file with us whether physical or electronic, is returned, we will hold the statement for you to contact us with instructions for proper delivery. You agree that you will promptly and carefully examine each statement and will, within thirty (30) days after mailing or electronic transmission, report to us any unauthorized signature on or alteration of any item, and will, within sixty (60) days after mailing or electronic transmission, report to us any other error or discrepancy in it or any claim for credit or refund. If no such report and return is made within the applicable period, you will be presumed to have accepted the stated balance as being correct and to have released us from all liability for transactions posted or not posted to the Account, subject to applicable law. For statements provided electronically, the "sent date" shall be the date that we initiate electronic transmission of such statement or message advising you of the availability of such statement in an electronically accessible format. We will not be responsible for any delay in transmission or your receipt of your statement that is caused by your email or internet service provider.

**20. LIMITATIONS.** Any transfer by wire or ACH to or from any of your transaction Accounts must be from, to, or through a domestic financial Institution. You agree that at such time as your Account is credited with the amount of the transfer, or is credited to a debt of yours, or is otherwise made available to you, any such event shall serve as notification to you of our receipt of the payment order and notice to you of such event. You agree that you will not cause or permit any transfer to any of your transaction Accounts by electronic means, including by wire or ACH, in excess of $1,000,000.00, without our prior written consent. In the event that no such prior written consent is obtained, you agree that we are not required to accept the transfer; we have no obligation to credit the amount of the transfer to your Account; and we may return the amount of the transfer to the sender so long as we make such return by the close of the banking day following the day on which we receive payment for the transfer. We shall not be deemed to have waived any rights under this paragraph 20, or elsewhere in this Agreement based upon any prior transfer to you.

**21. DORMANT ACCOUNTS.** Accounts may be classified as dormant when there have been no customer-initiated transactions for the preceding twelve (12) months. To prevent your Account from becoming dormant, you must initiate one of the following types of transactions: deposit, withdrawal, check, electronic deposit, ATM withdrawal, debit card transaction, telephone transfer or ACH direct deposit. An inactivity fee may be assessed against the dormant balance. We must, in most cases, remit the dormant balance as abandoned property in accordance with applicable law.

**22. ATM CARDS AND DEBIT CARDS.** If available for your Account type, ATM cards and/or debit cards may be used to access your Account if the ownership and persons authorized to withdraw funds are identical to the Account for which your ATM card or debit card is issued. We reserve the right to suspend or revoke ATM card and/or debit card privileges at any time. If you use your ATM card or debit card to access an Account that does not have sufficient funds to complete a transaction or that would exceed the daily authorization limit attached to your ATM card or debit card, we may, at our discretion, authorize the transaction. If we authorize a transaction that overdraws your Account, we may assess a fee as described below in paragraph 24, "Overdrafts," and as set forth in the Fee Schedule. Terms and conditions applicable to use of ATM cards and debit cards are also described elsewhere in this Agreement.

**23. ACCOUNTS OF DECEDENTS.** On the death of the owner of your Account, the amount of the credit balance in your Account will be paid as permitted or required by law, federal and state regulations, and in accordance with our security procedures. In the event of a death of an Account owner, Account information will be furnished upon request to the duly appointed estate administrator, trustee or attorney.

**24. OVERDRAFTS.** A transaction or item that results in or creates a negative Available Balance in your Account is called an "Overdraft." We decide whether to authorize debit card transactions and pay items based on the "Available Balance" of funds in your Account. We decide whether to assess per-item Overdraft fees based on the "Ledger Balance" of funds in your Account. An Overdraft that results in or increases a negative Ledger Balance in your Account will incur a per-item Overdraft fee as described herein and as set forth in the Fee Schedule. As set forth in the Fee Schedule (see paragraphs 1 and 9 of this Agreement) and as permitted by law, we will assess per-item Overdraft fees for Overdraft items regardless of whether the items are paid or returned.

The "Ledger Balance" is the current balance of funds in your Account at the beginning of the Business Day. For purposes of determining whether to authorize transactions, we determine the "Available Balance" by taking the Ledger Balance and reducing that amount by any outstanding holds for deposits that are not yet available under Our Funds Availability Policy; by debit card items we have authorized but not processed for payment; and by intra-day activities (including but not limited to wire transfers, ATM withdrawals, and other electronic transfers). Certain business operations (e.g., taxis, hotels, rental or leasing companies) may request debit card authorizations in an amount exceeding the amount they ultimately charge you. When we authorize a debit card transaction, we establish a hold and reduce your Available Balance by the full amount we authorize (which may differ from the transaction amount) until the item is paid or is no longer considered to be pending. In the event you deposit a check that is not from a guaranteed source, a hold is placed on the Account to the extent and during the period described in the Funds Availability Policy section of this Agreement. In our discretion, we can reduce the time frame for a hold or choose not



Vio Bank is a division of MidFirst Bank, Member FDIC. Deposits held at Vio Bank are deposits of MidFirst Bank and are combined with any other MidFirst Bank deposits for FDIC insurance purposes.

to place a hold at all. For example, in some cases we are able to verify that a check has been honored prior to the time a hold would otherwise expire and can manually remove the hold, making funds available earlier in the process.

You agree that we may pay checks and other items, including ACH items and other electronic debits to your Account, in any order that complies with applicable law.  For example:

- We may process deposits before debits.
- We may process certain kinds of electronic items, such as debit card, ATM and ACH items, ahead of other kinds of items, such as checks.
- We may process certain items based on the time they were authorized by us.
- We may process certain items based on the time they were received for processing.
- We may process checks in serial number order.

Multiple Overdraft fees may be charged to your Account in one day.  Also, items returned to the presenting institution as a result of insufficient funds may be re-presented to us multiple times for payment by the presenting institution. If sufficient funds are not available in your Account at the time of re-presentment, an additional Overdraft fee may be incurred. To the extent permitted by law, you authorize us to deduct any Overdrafts and any Overdraft fees from any funds that may thereafter be deposited into the Account, even if those funds come from restricted income sources that are exempt from attachment.

We are under no obligation to pay or authorize any item or withdrawal request presented if there are insufficient available funds to cover the item. You agree, however, that, in our sole discretion, we may honor any check, recurring debit card, and/or ACH debits presented to your Account when there are insufficient available funds to cover such items.

We also offer an optional discretionary Overdraft service, Overdraft Privilege that may be available to you for ATM and everyday debit card transactions. For each of your Accounts, you can opt in to Overdraft Privilege (or opt out after first opting in) by calling us toll free at 888-999-9170. You are not eligible for this Overdraft Privilege service unless you have an eligible Account, and you first opt in to the service. If you do not opt in to this Overdraft Privilege service and you attempt an ATM or everyday debit card transaction at a time when your Account does not have sufficient available funds to cover the transaction, the transaction will be declined. Please note that if you do not opt in to this Overdraft Privilege service for ATM and everyday debit card transactions: (i) we will continue to apply our current Overdraft policies to paper check, ACH, and recurring debit card transactions and (ii) the date items are presented for payment and our processing order could still cause a paper check, ACH, or recurring debit card transaction to result in an overdraft of your Account.

You agree that payment of any Overdraft item on any occasion(s) does not obligate us to pay any future Overdraft items. We have no obligation to notify you before we pay an Overdraft item or before we return an Overdraft item unpaid. You agree to pay the amount of any Overdraft and all Overdraft fees immediately upon demand. You agree that we may pursue any collection remedy available under applicable law, of which you may become responsible to reimburse us for any related expenses.

You should know that:

- A maximum of 5 per-item Overdraft fees will be charged on any Processing Day.
- We will not charge any per-item Overdraft fees if your Account is overdrawn by $5.00 or less at the end of a Processing Day.
- We will not charge any per-item Overdraft fees if the only debit items we process on a Processing Day are fees we assess.
- We will charge a one-time Extended Overdraft Fee if your Account is overdrawn in any amount for at least seven consecutive calendar days. Extended Overdraft Fees are based on your Ledger Balance.

Under our Overdraft Protect and Overdraft credit services, you may agree to authorize automatic transfers from a linked Account or through certain credit services to cover Account Overdrafts, subject to availability of funds in your linked Account or availability of credit subject to applicable restrictions and other limitations. Overdraft Protect is described in further detail near the end of this Agreement. Credit services that may be used for Overdraft protection are subject to the standard applicable credit application, approval and execution of credit documents. For more information about Overdraft Protect, available credit services, applicable terms and conditions, fees and enrollment, please call us toll free at 888-999-9170.

**25. SEVERABILITY.** If an item or condition of this Agreement is found to be illegal or unenforceable, the balance of this Agreement will remain in full force and effect.

**26. NOTICE AND CURE.** Prior to bringing a lawsuit or initiating an arbitration that asserts a claim arising out of or related to this Agreement (as further defined in the Arbitration Provision, a "Claim"), the party asserting the Claim (the "Claimant") shall give the other party (the "Potential Defendant") written notice of the Claim (a "Claim Notice") and a reasonable opportunity, not less than thirty (30) days, to resolve the Claim. Any Claim Notice to you shall be sent in writing to the address we have in our records (or any updated address you subsequently provide to us). Any Claim Notice to us shall be sent by mail to MidFirst Bank, acting by through its Vio Bank division, Attention: Account Claim Notice, P.O. Box 76149, Oklahoma City, Oklahoma 73147 (or any updated address we subsequently provide). Any Claim Notice you send must provide your name and Account number, as well as your address and a phone number where you can be reached during normal business hours and your email address. Any Claim Notice must explain the nature of the Claim and the relief that is demanded. You may only submit a Claim Notice on your own behalf and not on behalf of any other party. No third party, other than a lawyer you have personally retained, may



Vio Bank is a division of MidFirst Bank, Member FDIC.  Deposits held at Vio Bank are deposits of MidFirst Bank and are combined with any other MidFirst Bank deposits for FDIC insurance purposes.

submit a Claim Notice on your behalf. The Claimant must reasonably cooperate in providing any information about the Claim that the Potential Defendant reasonably requests.

**27. WIRE TRANSFERS.** We reserve the right to place limits on domestic and international incoming or outgoing wire transfers at any time if those services are available on your Account. Limitations may include, but are not limited to, limiting the Accounts from which a wire transfer may be sent, the countries and/or banks to which a wire transfer may be sent, and/or the amount of a wire transfer, among other restrictions and applicable fees. For additional information on wire transfers, including any limitations, call us toll free at 888-999-9170.  We may, in our sole discretion, require you to provide us additional information to validate or authenticate wire transfer requests.

**28. <u>ARBITRATION PROVISION</u>. PLEASE REVIEW AND READ THIS ARBITRATION PROVISION CAREFULLY. IF YOU DO NOT REJECT THIS ARBITRATION PROVISION IN ACCORDANCE WITH SUBPARAGRAPH (a) BELOW, IT WILL BE PART OF THIS AGREEMENT AND WILL HAVE A SUBSTANTIAL IMPACT ON THE WAY YOU OR WE WILL RESOLVE ANY CLAIM THAT YOU OR WE HAVE AGAINST EACH OTHER, NOW OR IN THE FUTURE.**
**Arbitration is the process for settling disputes where the determination is made by an impartial third party. Arbitration binds the parties to a type of resolution outside of the courts.**

(a)  <u>Your Right to Reject Arbitration Provision</u>: **If you do not want this Arbitration Provision to apply, you may reject it by mailing us a written rejection notice which gives your name(s) and Account number(s) and contains a statement that you, both or all of the Account owners, if more than one) reject the Arbitration Provision in this Agreement which governs your Account. The rejection notice must be sent to us at MidFirst Bank, acting by and through its Vio Bank division, Attention: Arbitration Rejection, P.O. Box 76149, Oklahoma City, Oklahoma, 73147. A rejection notice is effective only if it is signed by you (including both or all of the Account owners), and such notice is received within thirty (30) days after the day you open your Account (the "Rejection Deadline").**

(b)  <u>Parties Subject to Arbitration</u>: As used in this Arbitration Provision, the terms "we," "us" and "our" mean (a) MidFirst Bank, its divisions, including but not limited Vio Bank, and any parent, subsidiary or affiliate of MidFirst Bank and the employees, officers and directors of such companies ("Bank Parties"); and (b) any other person or company that provides any services in connection with this Agreement or your Account if you assert a Claim against such other person or company at the same time you assert a Claim against any Bank Party.

(c)  <u>Covered Claims</u>: "Claim" means any claim, dispute or controversy between you and us that in any way arises from or relates to this Agreement, your Account, any products or services offered by us, including but not limited to, any debit card or ATM card provided to you, Overdraft Protect, Overdraft Privilege and/or Overdraft credit services, and the advertising and disclosures related to the foregoing, if such Claim, dispute or controversy cannot be resolved without a lawsuit or arbitration proceeding. "Claim" includes disputes arising from actions or omissions prior to the effective date of this Agreement (or prior to the time this Arbitration Provision becomes part of this Agreement). "Claim" has the broadest reasonable meaning, and includes initial claims, counterclaims, cross-claims and third-party claims, inclusive of any damages or other remedies claimed. It includes disputes based upon contract, tort, consumer rights, fraud and other intentional torts, constitution, statute, regulation, ordinance, common law and equity (including any claim for injunctive or declaratory relief). However, it does not include any dispute about the validity, enforceability, coverage or scope of this Arbitration Provision or any part thereof (including, without limitation, subparagraph (g), captioned "Prohibition Against Certain Proceedings" (the "Class Action Waiver"), the final sentence in subparagraph (m), captioned "Severability," and/or this sentence); all such disputes are for a court and not an arbitrator to decide. Notwithstanding the foregoing, the term "Claim" includes any dispute about the validity or enforceability of this Agreement as a whole.

(d)  <u>Starting an Arbitration</u>: To the extent permitted by the Federal Arbitration Act (the "FAA") and any other applicable federal law, arbitration may be elected by either party with respect to any Claim, even if that party has already initiated a lawsuit with respect to a different Claim. Arbitration is elected by giving a written demand for arbitration to the other party, by filing a motion to compel arbitration in court or by initiating an arbitration against the other party. The parties may mutually agree in writing to waive arbitration.

(e)  <u>Choosing the Administrator</u>: "Administrator" means the American Arbitration Association ("AAA"), 1633 Broadway, 10th Floor, New York, NY 10019, www.adr.org; JAMS, 620 Eighth Avenue, 34th Floor, New York, NY 10018, www.jamsadr.org; or any other company selected by mutual agreement of the parties. If both AAA and JAMS cannot or will not serve and the parties are unable to select an Administrator by mutual consent, the Administrator will be selected by a court. The arbitrator will be appointed by the Administrator in accordance with the rules of the Administrator. However, the arbitrator must be a retired or former judge or a lawyer with at least ten (10) years of experience in handling banking disputes. You get to select the Administrator if you give us written notice of your selection with your notice that you are demanding to arbitrate any Claim or within twenty (20) days after we give you notice that we are demanding to arbitrate any Claim (or, if You dispute Our right to require arbitration of the Claim, within twenty (20) days after that dispute is finally resolved). If you do not select the Administrator within the time specified, we may select the Administrator. Notwithstanding any language in this Arbitration Provision to the contrary, no arbitration may be administered, without the consent of all parties to the arbitration, by any Administrator that has in place a formal or informal policy that is inconsistent with the Class Action Waiver.

(f)  <u>Court and Jury Trials Prohibited; Other Limitations on Legal Rights</u>: **FOR CLAIMS SUBJECT TO ARBITRATION YOU WILL NOT HAVE THE RIGHT TO PURSUE THAT CLAIM IN COURT OR HAVE A JURY DECIDE THE CLAIM. YOUR ABILITY TO OBTAIN**


Vio Bank is a division of MidFirst Bank, Member FDIC.  Deposits held at Vio Bank are deposits of MidFirst Bank and are combined with any other MidFirst Bank deposits for FDIC insurance purposes.

**INFORMATION AND SEEK DISCOVERY WILL BE MORE LIMITED IN ARBITRATION THAN IN A LAWSUIT. OTHER RIGHTS THAT YOU WOULD HAVE IF YOU WENT TO COURT MAY ALSO NOT BE AVAILABLE IN ARBITRATION.**

(g)   Prohibition Against Certain Proceedings: **FOR CLAIMS SUBJECT TO ARBITRATION: (1) YOU MAY NOT PARTICIPATE IN A CLASS ACTION IN COURT OR IN A CLASS-WIDE ARBITRATION, EITHER AS A PLAINTIFF, CLASS REPRESENTATIVE OR CLASS MEMBER; (2) YOU MAY NOT ACT AS A PRIVATE ATTORNEY GENERAL IN COURT OR IN ARBITRATION; (3) CLAIMS BROUGHT BY OR AGAINST YOU MAY NOT BE JOINED OR CONSOLIDATED WITH CLAIMS BROUGHT BY OR AGAINST ANY OTHER PERSON; AND (4) THE ARBITRATOR SHALL HAVE NO POWER OR AUTHORITY TO CONDUCT A CLASS-WIDE ARBITRATION, PRIVATE ATTORNEY GENERAL ARBITRATION OR MULTIPLE-PARTY ARBITRATION. Collectively, this Section (g) is referred to as the Class Action Waiver.**

(h)   Location and Costs of Arbitration: To the extent permitted by the Federal Arbitration Act (the "FAA") and any other applicable federal law, arbitration may be elected by either party with respect to any Claim, even if that party has already initiated a lawsuit with respect to a different Claim. Arbitration is elected by giving a written demand for arbitration to the other party, by filing a motion to compel arbitration in court or by initiating an arbitration against the other party. The parties may mutually agree in writing to waive arbitration.

(i)   Governing Law: This Arbitration Provision involves interstate commerce and is governed by the FAA and not by any state arbitration law. The arbitrator must apply applicable substantive law consistent with the FAA and applicable statutes of limitations and claims of privilege recognized at law. The arbitrator may award any remedy provided by the substantive law that would apply if the action were pending in the Oklahoma or federal court (including, without limitation, punitive damages, which shall be governed by the Constitutional standards employed by the courts). At the timely request of either party, the arbitrator must provide a brief written explanation of the basis for the award.

(j)   Right to Discovery: In addition to the parties' rights to obtain information or discovery pursuant to the arbitration rules of the Administrator, either party may submit a written request to the arbitrator to expand the scope of discovery normally allowable under such rules.

(k)   Arbitration Result and Right of Appeal: Judgment upon the arbitrator's award may be entered by any court having jurisdiction, as specified herein. The arbitrator's decision is final and binding, except for any right of appeal provided by the FAA. However, if the amount of the Claim exceeds $50,000.00 or involves a request for injunctive or declaratory relief that could foreseeably involve a cost or benefit to either party exceeding $50,000.00, any party can, within thirty (30) days after the entry of the award by the arbitrator, appeal the award to a three-arbitrator panel administered by the Administrator. The panel shall reconsider anew any aspect of the initial award requested by the appealing party. The decision of the panel shall be by majority vote. Reference in this Arbitration Provision to "the arbitrator" shall mean the panel if an appeal of the arbitrator's decision has been taken. The costs of such an appeal will be borne in accordance with subparagraph (h) above, captioned "Location and Costs of Arbitration."

(l)   Rules of Interpretation: This Arbitration Provision shall survive the repayment of all amounts owed under this Agreement, the closing of your Account, any legal proceeding and any bankruptcy to the extent consistent with applicable bankruptcy law. In the event of a conflict or inconsistency between this Arbitration Provision, on the one hand, and the applicable arbitration rules or the other provisions of this Agreement, on the other hand, this Arbitration Provision shall govern.

(m)   Severability: If any portion of this Arbitration Provision, other than the Class Action Waiver, is deemed invalid or unenforceable, the remaining portions shall nevertheless remain in force. If a determination is made that the Class Action Waiver is unenforceable, only this sentence of the Arbitration Agreement will remain in force and the remaining provisions shall be null and void, provided that the determination concerning the Class Action Waiver shall be subject to appeal.

(n)   Special Payment: If (1) you submit a Claim Notice in accordance with Paragraph 27 on your own behalf (and not on behalf of any other party); (2) we refuse to provide you with the relief you request; and (3) an arbitrator subsequently determines that you were entitled to such relief (or greater relief), the arbitrator shall award you at least $10,000.00, plus attorneys' fees.

**Electronic Funds Transfer
Your Rights and Responsibilities**

This section describes terms and conditions applicable to electronic funds transfers as required by the Electronic Funds Transfer Act and applicable regulations. This section applies only to electronic fund transfers that authorize us to debit or credit a consumer Account, that is, an Account established primarily for consumer, family, or household purposes. If your Account is primarily for a business purpose, then this section does not apply to you. Electronic fund transfers are generally defined under the Electronic Fund Transfer Act of 1978 and include transfers of funds that you initiate through an electronic terminal, phone, computer, or magnetic tape for the purpose of authorizing a debit or credit to your Account. Please refer to your Fee Schedule to determine if certain electronic funds transfers services are not available for your account type. Please read this disclosure carefully because it describes your rights and obligations for those transactions. You should keep this disclosure for future reference.



Vio Bank is a division of MidFirst Bank, Member FDIC.  Deposits held at Vio Bank are deposits of MidFirst Bank and are combined with any other MidFirst Bank deposits for FDIC insurance purposes.

Terms and conditions relating to electronic funds transfers conducted through online and mobile banking are contained in the agreements for such services in effect at the time an electronic funds transfer was made, and should be read and understood in conjunction with this Agreement. To the extent that the terms or conditions of the Vio online banking agreements conflict with this Agreement, the online banking agreements shall control with respect to the details of the service described in the online banking agreement. In all other cases this Agreement shall control.

**DO NOT write your personal identification number ("PIN") on anything or keep it in any form with your ATM card or debit card.**

**1. CARDHOLDER'S LIABILITY & NOTIFICATION PROCEDURES.** Notify us IMMEDIATELY if you believe your ATM card, debit card or PIN has been lost or stolen or if you believe that an unauthorized transfer from your Account has occurred. Telephoning is the best way of minimizing your potential losses. You could lose all the money in your Account in addition to the maximum Overdraft Protect Account balance or reach the limit of your Overdraft credit service, if you have elected these services. If you tell us about the lost or stolen ATM card, debit card or PIN within two (2) Business Days after you learn of the loss or theft, you can lose no more than $50.00 if someone uses your ATM card, debit card and/or PIN without your permission.

If you do NOT notify us within two (2) Business Days after you learn about the loss or theft of your ATM card or debit card and/or PIN, you could lose as much as $500.00 if we can prove we could have prevented the unauthorized use of your ATM card, debit card or PIN without your permission if you had timely notified us.

Also, if your periodic statement shows unauthorized transactions, notify us at once. If you do not notify us within sixty (60) days after the statement was sent or made available to you, you may not recover any money you lost if we can prove that we could have prevented an unauthorized transfer if you had timely notified us.

NOTIFICATION PROCEDURES: If you believe your Card(s) and/or PIN have been lost, stolen, or that someone has transferred or may transfer money from your Account without your permission, call 888-999-9170 or write Vio Bank, Attention: Bank Operations at the following address: P.O. Box 76149, Oklahoma City, Oklahoma, 73147. If a good reason (such as a long trip or hospital stay) kept you from promptly notifying us, we may, at our discretion, extend the time periods. Once an ATM card, debit card or PIN is reported lost or stolen, ATMs will disregard transaction requests and may retain the card inside the machine if you or anyone else attempts to use it.

Under the operating rules of the National Automated Clearing House Association, which are applicable to ACH transactions involving your Account, we are not required to give next day notice to you of receipt of an ACH item, and we will not do so. However, we will continue to notify you of the receipt of payments in the periodic statements we provide to you.

**2. BUSINESS DAYS AND PROCESSING DAYS.** Our business days are Monday through Friday, 8:00 a.m. to 5:00 p.m., Central Time, with the exception of legal holidays, as observed by us or the Federal Reserve Bank of Kansas City ("Business Days"). Our Processing Days are Business Days in addition to select legal holidays.

**3. TYPES OF AVAILABLE TRANSFERS.** For those Accounts associated with your ATM card or debit card, you may use your ATM card or debit card at electronic terminals to:
    (a)  Withdraw cash from checking Accounts;
    (b)  Make deposits to checking Accounts;
    (c)  Withdraw cash from savings Accounts;
    (d)  Make deposits to savings Accounts;
    (e)  Transfer funds between checking and savings Accounts upon request;
    (f)  Inquire as to the amount of your Available Balance; and
    (g)  Pay for purchases from merchants who have agreed to accept the ATM card and debit card for that purpose.

Some of these services may not be available at all electronic terminals.

**4. ELECTRONIC CHECK CONVERSION.** You may authorize a merchant or other payee to make a one-time electronic payment from a checking Account using information from Account checks to:
    (a)  Pay for purchases.
    (b)  Pay bills.
These electronic check conversions constitute electronic funds transfers.

**5. LIMITATIONS ON TRANSACTIONS.** Where available, withdrawals are subject to the following limitations:
    (a)  You may withdraw the maximum cash withdrawal amount (as referenced below) or your Account balance (whichever is less) from an electronic terminal, such as an ATM, per day, per ATM card or debit card. You may use your ATM card or debit card to purchase goods and services each day ("Point of Sale") subject to the limits set forth in below, as long as the Available Balance of your Account is sufficient to cover the aggregate of all purchases. The cash withdrawal (ATM) and cash advance daily limit, including any ATM fees, is $520.00* for most consumer customers and $1,020.00 for Private Bank consumer customers.  The Point-of-Sale daily limit is $2,500.00* for most consumer customers.
    (b)  Also, note that at certain times mechanical malfunctions of the system may cause withdrawals to be limited to $100.00 cash withdrawal, including ATM fees, and $500.00 at the Point of Sale until the malfunction can be corrected.
    (c)  Funds deposited will be made available to you under the terms described in the Funds Availability section elsewhere in this Agreement.



Vio Bank is a division of MidFirst Bank, Member FDIC.  Deposits held at Vio Bank are deposits of MidFirst Bank and are combined with any other MidFirst Bank deposits for FDIC insurance purposes.

*These are the standard limits for most consumer Accounts. Depending on your Account type, you may qualify for larger or smaller limits.

**6. CHARGES.** On certain Accounts there may be charges for ATM card and debit card transactions made at non-Bank ATMs. There may be a charge for replacement or additional ATM card, debit card or PINs requested as a result of loss or negligence. Please refer to the Fee Schedule for specific fee information related to electronic fund transfers.

If you use your ATM card or debit card to access an Account that does not have sufficient funds to complete a transaction or that would exceed the daily authorization limit attached to your ATM card or debit card, we may, at our discretion, authorize the transaction. If we authorize a transaction that overdraws your Account, we will assess a fee as described in this Agreement in paragraph 24, "Overdrafts," and as set forth in the Fee Schedule.

INTERNATIONAL TRANSACTIONS: If you conduct a transaction with your ATM card or debit card involving multiple currencies or U.S. dollars in a country outside of the United States of America, Puerto Rico or the US Virgin Islands, a transaction fee may appear on your monthly statement from the applicable card network. We reserve the right to make future changes in your Account and/or ATM card or debit card transaction fees, subject to our giving you notice as required by law.

**7. DOCUMENTATION.** At the time of any card transaction using an ATM card, debit card or Point-of-Sale terminal, you may receive a transaction receipt, which will include the amount, date, type of transfer, identity of Account and bank or merchant, location of terminal, identity of any account where funds are transferred, and transaction identification number unless the transaction is $15.00 or less. If you have arranged to have direct deposits made to your Account at least once every sixty (60) days from the same person or company, you can call us toll free at 888-999-9170 to find out whether or not the deposit has been made. Your regular monthly statement will reflect ATM card or debit card transfers, direct deposits and withdrawals, and preauthorized electronic fund transfers.

**8. RIGHT TO STOP PAYMENT OF PREAUTHORIZED TRANSFERS.** You may stop payment of preauthorized transfers as described in this Agreement. Preauthorized transfers are an electronic fund transfer authorized in advance to recur at substantially regular intervals. The time limitations for stopping, canceling or changing any bill payments scheduled via online or mobile banking, such as Bill Pay, if those services are available on your Account, are contained in the applicable service agreement and are not governed by this paragraph.

You may use your ATM card or debit card to pay for goods and services at retail locations via Point of Sale that displays the Visa® if you have our ATM card or debit card with the Visa® symbol. We will charge your Account for all purchases and withdrawals made with your ATM card and debit card. The use of your ATM card and debit card to purchase goods and services will constitute a simultaneous withdrawal from your applicable Account. Notwithstanding anything to the contrary, you CANNOT PLACE A STOP PAYMENT ON ANY TRANSACTION MADE WITH YOUR ATM CARD OR DEBIT CARD.

**9. OUR LIABILITY FOR FAILURE TO COMPLETE TRANSACTIONS.** If we do not complete a transaction to or from your Account on time or in the correct amount according to our agreement with you, we will be liable only for your loss or damage to the extent of the amount of the transaction. We will not be liable, however, if we do not complete a transaction in situations that include, but are not limited to, the following examples:
  (a) If, through no fault of ours, you do not have enough money in your Account to make the transaction;
  (b) If the transaction would go over the credit limit on any line of credit you may have;
  (c) If the ATM where you are making the transaction does not have enough cash to complete the transaction;
  (d) If the electronic terminal was not working properly;
  (e) If circumstances beyond our control (such as fire, flood, other natural disaster, terrorism, supplier failure, system malfunction, etc.) prevent the transaction, despite reasonable precautions that we have taken;
  (f) If the funds are subject to legal or other encumbrance;
  (g) If federal or state banking rules or regulations as issued by the Consumer Financial Protection Bureau, the Office of the Comptroller of the Currency, the Federal Reserve Board, the Federal Deposit Insurance Corporation, or other agency with banking oversight might prohibit such transaction; or
  (h) If we fail to complete a transaction because we believe the transaction may be fraudulent.
Also in the case of any error or malfunction that was not intentional on our part and resulted from a bona fide error, notwithstanding the maintenance of procedures reasonably adopted to avoid any such error, our liability is limited only to actual damages proved. Except as specifically provided herein or by law, we shall not be responsible for any indirect punitive, special, general or consequential damages for any other matter addressed in this Agreement.

**10. DISCLOSURE OR ERROR RESOLUTION PROCEDURES AND CONSUMER RIGHTS.** If you think your statement or receipt is wrong, or if you need more information about a transfer listed on the statement or receipt, you must notify us no later than sixty (60) days after we sent or made available the FIRST statement on which the problem or error appeared. Your notice should include:
  (a) Your name and Account number;
  (b) A description of the error or the transfer you are unsure about and a detailed explanation of why you believe it is an error or why you need more information. Your explanation should be as clear and complete as possible; and
  (c) The dollar amount of the suspected error.

If you notify us orally, we may require that you provide us your complaint or question in writing within ten (10) Business Days.



Vio Bank is a division of MidFirst Bank, Member FDIC. Deposits held at Vio Bank are deposits of MidFirst Bank and are combined with any other MidFirst Bank deposits for FDIC insurance purposes.

For Electronic Funds Transfers: Within ten (10) Business Days after you notify us of a possible error, we will make a determination as to whether an error occurred. We will correct any determined error promptly. If we need more time or information, we may take up to forty-five (45) days to investigate and determine whether an error occurred. This timeframe may be extended to 90 days for Point of Sale transactions. If we decide to do this, we will provisionally credit your Account for the amount you think is in error within ten (10) Business Days after we receive written confirmation of your complaint or question, so that you will have the use of the money during the time it takes us to complete Our investigation. If we ask you to confirm your complaint or question in writing, and we do not receive it within ten (10) Business Days, we may not provisionally credit your Account.

For POS, ATM, and Other Electronic Transfers involving New Accounts: For new transaction Accounts (Accounts on which each owner of the Account does not have or has not had within the previous thirty (30) days a transaction Account with us), we may take up to 90 days to investigate your complaint or question and determine whether an error occurred.  If we decide to do this, we will provisionally credit your Account for the amount you think is in error within twenty (20) Business Days after we receive written confirmation of your complaint or question, so that you will have the use of the money during the time it takes us to complete our investigation. If we ask you to confirm your complaint or question in writing, and we do not receive it within twenty (20) Business Days, we may not provisionally credit your Account.

If we issue a provisional credit and ultimately determine that no error occurred, we will debit such provisional credit from your Account.  We will notify you of the date and amount of the debit. We will honor any checks, drafts, or similar third party payables and any preauthorized transfers as provided in the notice that we will send to you.

IN CASE OF ERROR OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS: Telephone us toll free at 888-999-9170, or write us at Vio Bank, Attention: Bank Operations P.O. Box 76149, Oklahoma City, Oklahoma, 73147.

We will communicate the results to you within three (3) Business Days after completing our investigation. If we decide that there was no error, we will send you a written explanation. You may ask for copies of the documents that we used in our investigation.

**11. PROVISIONAL PAYMENT.** Credit given by us to you with respect to an ACH credit entry is provisional until we receive final settlement for such entry through a Federal Reserve Bank. If we do not receive such final settlement, you are hereby notified and agree that we are entitled to a refund of the amount credited to you in connection with such entry, and the party making payment to you via such entry (i.e., the originator of the entry) shall not be deemed to have paid you in the amount of such entry.

**12. CONFIDENTIALITY.** Please see the section of this Agreement entitled "Customer Information Disclosure" regarding circumstances under which we will disclose information to third parties about your Account.

**13. CHOICE OF LAW**. We may accept on your behalf payments to your Account which have been transmitted through one or more ACH and which are not subject to the Electronic Fund Transfer Act; and your rights and obligations with respect to such payments shall be construed in accordance with and governed by the law of the State of Oklahoma.

## Funds Availability Policy

**1. GENERAL.** Except as otherwise described below, we will make funds from your deposits available to you on the first Business Day after the day we receive your deposit. However, many exceptions apply, and funds deposited using mobile or online banking services may be subject to different availability as set forth in the agreement covering service you used to deposit funds. If you will need the funds from a deposit right away, you should ask us when the funds will be available. Once funds are available, you can withdraw the funds, and we will use the funds to process transactions on your Account.

Please remember that you are responsible for any check or other funds you deposit with us that is returned to us unpaid and for any other problem that occurs involving your deposit whether made by check or other channel, even if we previously made funds available to you in connection with such deposit.

**2. WHEN DEPOSITS ARE RECEIVED.** For determining the availability of your deposits, every day is a Business Day, except Saturdays, Sundays, and federal holidays. However, only deposits made via Mobile Deposit before the cutoff time on a Business Day that we are open will be considered received on that day. We do not accept cash deposits. The cutoff time for mobile deposit is 8:00 p.m. central time.

Bank by mail deposits received before 4:00 p.m. on a Business Day will be considered received on the day of receipt. Later deliveries and those received on Saturdays, Sundays, and holidays will be considered received on the next Business Day we are open.

Preauthorized electronic deposits will be posted on the effective date for the transaction, if received by the Federal Reserve Bank's last deadline for electronic payments for that same Business Day; otherwise, preauthorized electronic deposits will be posted on the next business day.

**3. LONGER DELAYS MAY APPLY.** In some cases, we will not make all of the funds that are deposited by check or deposited by other channels available to you on the first Business Day after the day of your deposit. Depending on the type of deposit, whether by check or other means, funds may not be available until the second Business Day after the day your deposit is received. However, the first **$200.00\*** of your deposits may be available on the first Business Day after your deposit is received. **\*Effective July 1, 2020, the first $225.00 of Your deposits may be available on the first Business Day after Your deposit is received.**

Page **11** of **13**



Vio Bank is a division of MidFirst Bank, Member FDIC.  Deposits held at Vio Bank are deposits of MidFirst Bank and are combined with any other MidFirst Bank deposits for FDIC insurance purposes.

If we are not going to make all of the funds from your deposit available on the first Business Day, we will notify you at the time you make your deposit. We will also tell you when the funds will be available. If your deposit is not made directly to one of our employees, or if we decide to take this action after you have left the premises, we will mail you the notice by the day after we receive your deposit.

Funds you deposit by check may be delayed for a longer period if: (i) we believe a check you deposit will not be paid; (ii) you deposit checks totaling more than **$5,000.00*** on any one Business Day; (iii) you redeposit a check that has been returned unpaid; (iv) you have overdrawn your Account repeatedly in the last six (6) months; or (v) there is an event that occurs, which is out of our control such as an emergency, communications or computer equipment failure, natural disaster, act of terrorism, sanction or restriction against the transaction, or other event outside our control.

We will notify you if we delay your ability to withdraw funds for any of these reasons, and we will tell you when the funds will be available. They will generally be available no later than the seventh (7th) Business Day after the day of your deposit; funds deposited using online or mobile banking services will be made available according to the terms and conditions governing the service

Your deposit may encounter delays if required by law.

**4. HOLDS ON OTHER FUNDS -- CHECK CASHING.** We reserve the right to refuse to cash any check. If we cash a check for you that is drawn on another bank, we may withhold the availability of a corresponding amount of funds that are already in your Account. Those funds will be available at the time funds from the check we cashed would have been available if you had deposited it.

**5. HOLDS ON OTHER FUNDS -- OTHER ACCOUNTS.** If we accept for deposit a check that is drawn on another bank, we may make funds from the deposit available for withdrawal immediately, but delay your availability to withdraw a corresponding amount of funds that you have on deposit in another account with us. The funds in the other account would then not be available for withdrawal until the time periods that are described elsewhere above for the type of check that you deposited.

**6. HOLDS ON OTHER FUNDS—MOBILE AND ONLINE SERVICES.** If you use a mobile or online banking service to deposit funds in your Account, we may place a hold on those funds according to the terms and conditions governing the service you use to deposit those funds. Funds that are deposited through a clearing house transaction, such as an ACH transaction, will be available no later than the eleventh (11) day following receipt of such funds in your Account.

**7. HOLDS ON MOBILE DEPOSIT.** Funds received from mobile deposits are generally made available within the above policy timeframes; however, we reserve the right to make these deposits available at our discretion.

**8. SPECIAL RULES FOR NEW ACCOUNTS.** If you are a new customer of MidFirst Bank, acting by and through its Vio Bank division, special rules will apply during the first thirty (30) days your Account is open. Funds from electronic direct deposits, cash deposits or wire transfers to your Account will be available on the Business Day we receive the deposit. The first **$5,000.00*** of a Business Day's total deposits of official, certified, tellers, travelers, and state and local government checks will be available on the first (1st) Business Day after the day of your deposit, if the deposit meets certain conditions. For example, the checks must be payable to you (and you may have to use a special deposit slip). The excess over **$5,000.00*** will be available on the ninth (9th) Business Day after the day of your deposit. If your deposit on these checks (other than a U.S. Treasury check) is not made in person to one of our employees, the first **$5,000.00*** will not be available until the second (2nd) Business Day after the day of your deposit. Funds from all other check deposits will be available on the eleventh (11th) Business Day after the day of your deposit. ***Please note, effective July 1, 2020, the $5,000.00 will increase to $5,525.00.**

**Substitute Checks and Your Rights**

To make check processing faster, federal law permits banks to replace original checks with "Substitute Checks." These Substitute Checks are similar in size to original checks with a slightly reduced image of the front and back of the original check. The front of a Substitute Check states: "This is a legal copy of your check. You can use it the same way you would use the original check." you may use a Substitute Check as proof of payment just like the original check.

Some or all of the checks that you receive back from us may be Substitute Checks. This notice describes rights you have when you receive Substitute Checks from us. The rights in this notice do not apply to original checks or to electronic debits to your Account. However, you have rights under other laws with respect to those transactions.

In certain cases, federal law provides a special procedure that allows you to request a refund for losses you suffer if a Substitute Check is posted to your Account incorrectly (for example, if you think that we withdrew the wrong amount from your Account or that We withdrew money from your Account more than once for the same check). The losses you may attempt to recover under this procedure may include the amount that was withdrawn from your Account and fees that were charged as a result of the withdrawal (for example, returned check fees).



Vio Bank is a division of MidFirst Bank, Member FDIC.  Deposits held at Vio Bank are deposits of MidFirst Bank and are combined with any other MidFirst Bank deposits for FDIC insurance purposes.

The amount of your refund under this procedure is limited to the amount of your loss or the amount of the Substitute Check, whichever is less. You also are entitled to interest on the amount of your refund if your Account is an interest-bearing Account. If your loss exceeds the amount of the Substitute Check, you may be able to recover additional amounts under other law.

If you use this procedure, you may receive up to $2,500.00 of your refund (plus interest if your Account earns interest) within ten (10) Business Days after we received your dispute notice and the remainder of your refund (plus interest if your Account earns interest) not later than forty-five (45) calendar days after we received your dispute notice.

We may reverse the refund (including any interest on the refund and refunded fees) if we later are able to demonstrate that the Substitute Check was correctly posted to your Account.

If you believe that you have suffered a loss relating to a Substitute Check that you received and that was posted to your Account, please contact us toll free at 888-999-9170. You must contact us within forty (40) calendar days of the date that we mailed the Substitute Check in question or the Account statement showing that the Substitute Check was posted to your Account, whichever is later. We may extend this time period if you were unable to provide a timely dispute notice because of extraordinary circumstances outside your control.

Any dispute notice from you must include:
   (a) A description of why you have suffered a loss (for example, you think the amount withdrawn was incorrect).
   (b) An estimate of the total actual amount of your loss.
   (c) An explanation of why the Substitute Check you received is insufficient to confirm that you suffered a loss.
   (d) A copy of the Substitute Check and/or the following information to help us identify the Substitute Check: identifying information, for example the check number, the name of the person to whom you wrote the check, the amount of the check.

### Overdraft Protect

If you have requested or authorized Overdraft Protect services or Overdraft credit services in your Agreement or otherwise, such services are subject to the terms and conditions contained in this Agreement, the Fee Schedule, and your signed Overdraft Protect Agreement and Authorization. By requesting Overdraft Protect services or Overdraft credit services, you authorize and direct us, as your agent, until your authorization is revoked in writing and delivered to us, to effect the automatic transfer of funds from the Transferor Account or designated credit service to the Transferee Account, as identified in the Overdraft Protect Agreement and Authorization, provided the automatic transfer of funds will cover the entire Overdraft amount in the Transferee Account, as well as the associated  Overdraft Protect transfer fee, except if such action violates state or federal regulation. You represent that you have an ownership interest in and are authorized to withdraw funds from each of such Accounts. If one (1) or more items are presented to us and the Transferor Account does not contain sufficient funds or sufficient credit is not available to cover the entire Overdraft amount caused by all of the items presented as well as the Overdraft Protect transfer fee, no transfer will occur and you may be assessed the current Overdraft fee(s). We reserve the right to not make any particular transfer.

You may, at any time, cancel Overdraft Protect services or Overdraft credit services. Notification of cancellation must be received in writing at least ten (10) days before the effective date of cancellation. Notification should be mailed to Vio Bank, Attention: Overdraft Protect, P.O. Box 76149, Oklahoma City, Oklahoma, 73147.



Vio Bank is a division of MidFirst Bank, Member FDIC.  Deposits held at Vio Bank are deposits of MidFirst Bank and are combined with any other MidFirst Bank deposits for FDIC insurance purposes.

# Exhibit J

## MONIFI TERMS AND CONDITIONS
**Effective May 21,2021**

The following are the terms and conditions governing your Monifi Relationship and Accounts (defined below) and use of the Monifi Mobile Application (the "Monifi App") and online banking.

These Terms and Conditions are made up of seven sections, which contain disclosures and information about your Monifi Relationship, Accounts, and Services that may be available to you:

1. *General Terms and Conditions*: This section contains general terms and conditions governing your Monifi Relationship and Accounts (defined below).
2. *Electronic Funds Transfers—Your Rights and Responsibilities*: This section contains important information about your rights related to electronic funds transfers.
3. *Funds Availability*: This section describes our Funds Availability Policies.
4. *Balance Preferences*: This section describes optional services you may use to manage your Spend and Save Balances.
5. *Services*: This section contains the terms and conditions governing Services available to you through the Monifi App and/or online banking.
6. *Zelle Service*: This section contains the terms and conditions governing the Zelle P2P Payments Service
7. *Legal*: This section outlines your and our general legal rights and obligations relating to your Relationship, your Accounts, and the Services.

**To view our privacy practices visit [monifi.com/privacy](monifi.com/privacy).**

## 1. General Terms and Conditions

### a. Your Monifi Relationship

Monifi is a division of MidFirst Bank, a national savings association. For purpose of FDIC insurance coverage, your deposits are considered deposits at MidFirst Bank. In this Agreement, "we," "us," "our," "Monifi," and the "Bank" mean MidFirst Bank, acting by and through its Monifi division. "You" and "your" mean each person who is named an owner or is authorized withdraw funds from an account held at the Bank ("Account") or who is using the Services through the Monifi App or online banking.

When you apply for a Monifi Account, you agree to open a Monifi relationship (your "Relationship"). Your Monifi Relationship is made up of two checking Accounts: a non-interest bearing checking Account (your "Spend Balance") and an interest-bearing (negotiable order of withdrawal "NOW") checking Account (your "Save Balance"). Collectively, your Spend Balance and your Save Balance are called your "Relationship Balance." Your two checking Accounts are collectively called your "Relationship Accounts," or "Accounts," and individually, they are referred to as a "Relationship Account" or an "Account." Monifi Relationships and Accounts are for personal, family, or household purposes only; you may not open a Monifi Relationship for business purposes. You may have only one Monifi Relationship. Your Relationship Accounts may be jointly or individually owned, but each Relationship Account will have identical ownership.

### b.   Agreement

Your Relationship is subject to these Monifi Terms and Conditions (the "Agreement").  We may amend the Agreement at any time. When you open a Relationship you consent to receive account information electronically, including but not limited to disclosures and account statements, and you agree to sign documents and agreements electronically. The term "sign," "signing," or "signature" in the Agreement means (i) your physical signature, as may be required from time to time and (ii) your electronic signature, which includes but is not limited to your indication of consent by checking boxes or clicking buttons in the Monifi App or online banking. By clicking the appropriate checkboxes or otherwise indicating your consent when submitting your application, you acknowledge that you have opened your Monifi Relationship Accounts; and you received, understand, and agree to be bound by the terms and conditions of this Agreement. This Agreement also contains the terms and conditions governing use of the Monifi App, online banking, and the Services as defined in this Agreement.  You may from time to time, be asked to consent via the Monifi App or online banking to additional terms and conditions governing Services or your Relationship and Accounts.  Such terms and conditions are also incorporated into and made a part of this Agreement.  Your continued use of a Relationship Account (or any of the Services) shall be deemed your consent to the terms and conditions in this Agreement as may be amended from time to time.

We may modify, amend, or rescind, for any reason, any part of this Agreement (or any other Relationship-related agreement or documentation), or add new terms, at any time.  As permitted by applicable law, we will give notice of any such changes that may adversely affect you by: (a) posting them online at monifi.com; (b) sending notice to you at the most recent email address indicated on our records; (c) sending notice through the Monifi App; or (d) mailing written notice to the most recent address we have in our records. We are not obligated to notify you of changes to features of your Relationship Accounts that do not adversely affect you in any way.  We may immediately implement changes required by law or regulation or to protect the security of your Relationship Accounts or our systems. When necessary, we will provide notice of such changes after we implement the changes. Your continued use of either of your Relationship Accounts or any of the Services after implementation of any changes or following any notice of changes to this Agreement constitutes your continued acceptance of this Agreement and all changes and amendments hereto.  All Relationship owners authorize us to make inquiries to any consumer reporting agency in connection with their Relationship Accounts.  We reserve the right and may close a Relationship or any Relationship Account at any time for any reason, including but not limited to a determination, in our sole discretion, that your Account(s) are being used for fraudulent or inappropriate purposes.  If an Account has been closed and charged off, we may reopen that Account to allow deposits to be posted and offset against any obligation you owe to us. You may close your Relationship Accounts at any time for any reason, subject to any prior advance notice requirements related to the particular account, as applicable, and our Funds Availability Policy. A request to close one Relationship Account will be deemed by us to be a request to close your Relationship and both Relationship Accounts.

### c.   Laws, Rules, and Regulations

Your Relationship and Relationship Accounts, including deposits to and withdrawals from your Relationship Accounts, and these Terms and Conditions and any Addendum hereto, shall be subject to and are governed by (a) the laws and regulations of the United States, including those applicable to federal savings associations, and (b) to the extent applicable and not preempted or superseded by federal law or regulations, the laws of the State of Oklahoma.

For purposes of clarification, applicable laws and regulations include, without limitation, (a) applicable rules, regulations and orders, the Consumer Financial Protection Bureau, the Office of the Comptroller of Currency, the Federal Deposit Insurance Corporation, and the Federal Reserve Bank, (b) the rules and operating procedures of any clearing house association of which  we are or may become a member or through which we may send items for collections, (c)  all Account provisions and requirements posted on our  premises or on our websites; and (d) all provisions enclosed with or attached to statements of Account, related Account disclosures or contained in our  bylaws, all as now in effect or as may in the future be issued, modified or amended.  You agree that you will not make transactions that are restricted under the Unlawful Internet Gambling Enforcement Act (UIGEA).

### d.  Business Days and Account Access

Our business days are Monday through Friday, 8:00 a.m. to 5:00 p.m., Central Time, with the exception of legal holidays, as observed by us or the Federal Reserve Bank of Kansas City ("Business Days"). Our Processing Days are Business Days in addition to select legal holidays. You may access your Relationship Account information seven (7) days a week, twenty-four (24) hours a day using the Monifi App or online banking, subject to scheduled maintenance or other urgent system maintenance.   You can also contact us by phone at 800-440-1101, Monday-Friday from 7:00 a.m. - 9:00 p.m., Central Time, Saturday from 8:00 a.m. - 6:00 p.m. Central Time, and Sunday from 12:00 p.m. - 4:00 p.m. Central Time.

### e.  Account Ownership

Monifi Relationship Accounts can be owned individually or jointly. The persons you identify as owners during the application process are the owners of both Relationship Accounts. If you identify a joint owner for your Relationship, each Relationship Account will be deemed to be owned in joint tenancy with full rights of survivorship as between and among joint Account owners. If the Account is a Payable on Death ("POD") account, the Account shall be payable on the death of the last Account owner to one or more designated POD beneficiaries, if living, and if not living, to the named estate of the beneficiary.  If more than one beneficiary is designated by the Account owner(s), the beneficiaries, if living, and if not living, the named estate of the beneficiaries, shall share equally in the amount payable on death of the last Account owner. Persons identified during the application process or who have signed applicable account opening or related Relationship documents have the individual authority to withdraw funds from your Account. Any person who is authorized to withdraw funds but who is not the owner of a Relationship Account will be considered an agent of the owner of the Relationship Account, with the unlimited right to deal with the Relationship on behalf of the owner. We have no duty to inquire as to the authority of an agent to deal with the Relationship, and we have no liability for permitting an agent to withdraw funds from an Account, regardless of the manner of withdrawal or recipient of the funds.

### f.  Authorized Signature

The signature of any owner is an authorized signature for your Accounts. For the payment of funds and for other purposes relating to any Account you have with us, we are authorized to recognize your signature, but we will not be liable to you for refusing to honor checks or other signed instructions if we believe in good faith that the signature appearing on items or instructions and authorizations is not genuine. We may, but we are not obligated to, honor any check or other item drawn against your Spend Balance or your Save Balance so long as it contains at least one authorized signature. In addition, we may ask for a form of identification for transactions for authentication purposes.  In the event of a forgery, we

Monifi is a division of MidFirst Bank                    Page 3                                    Member FDIC

v. 05/2021

are not liable if a "reasonable person" could not have detected the forgery. For purposes of this Agreement, we will consider the first physical signature we receive in connection with your Account(s) to be your authorized physical signature. If you authorize any person to sign your name or otherwise draw against your Spend Balance or your Save Balance, including withdrawals initiated electronically using your Monifi credentials, we may honor any withdrawal signed by or authorized by that person whether or not it exceeds the authority you granted. If you provide another person with access to your Relationship Accounts through the Monifi App or online banking by sharing your credentials, we will consider that person to be authorized by you to act on your Relationship Accounts, including making withdrawals and transactions. Such requests may include but are not limited to transfers made using Services such as the External Transfer Service.

### g. Customer Identification

1. As required by federal statute and regulation and by our policy, we may require and may verify certain information regarding individuals at Account opening and as otherwise deemed necessary. This information may include complete customer name, residential or business address, mailing address if different, tax payer identification number, date of birth, government issued photo identification, and other information as may be required by government laws or regulations or as may be deemed appropriate to verify your identity as the customer. This information may be required for all individuals who are deemed owners of the Account, acting as agent on behalf of the Account owner, named as beneficiary on the Account, or otherwise associated with the Account regardless of manner. In order to comply with regulatory requirements, we may require identifying information regarding the beneficial owners of our legal entity customers. Account access or proceeds of Accounts opened without required information or subject to information verification may be restricted until such information is obtained and/or verified. We may close an Account at any time for any reason, including but not limited to identification information deemed by us, in our sole discretion, to be insufficient or unverifiable.

2. We may use service providers to help us verify your identity. Some identity verification methods use your wireless device information, email address, and other personal information. In some instances, we may ask you for biometric information, which consists of your driver's license or comparable identification and a photo (selfie), to help us verify your identity, and we share that information with our service provider for that purpose. **By providing us with a copy of your driver's license or comparable identification and a selfie, you acknowledge and agree that you are consenting to us using this information to verify your identity.** For more information on privacy concerning biometric information, see the privacy provision discussed in section 5(b) of this document.

3. You authorize your wireless operator to disclose your mobile number, name, address, email, network status, customer type, customer role, billing type, mobile device identifiers (IMSI and IMEI) and other subscriber device details, if available to us and service providers for the duration of the business relationship, solely for identify verification and fraud avoidance. See our Privacy Policies at monifi.com/privacy for how we treat your data.

### h. Our Liability

We have no obligations or liabilities to you other than those imposed by law or specifically provided in this Agreement. Any duty of care imposed on us by law will be fulfilled if the procedures established for

the transaction involved are reasonable. We will have no liability for clerical error, inadvertence or oversight, or an honest mistake of judgment.  We have no obligation to verify the accuracy of any information or instructions you provide.

### i.  Right to Offset & Security Interest

If you owe a debt to us, you grant us a right to offset that debt against any account you may have with MidFirst Bank or its divisions. For purposes of this Section, accounts include your Monifi Relationship Accounts, Vio Bank branded accounts, MidFirst Bank accounts, and any other accounts you may hold with any of our divisions. Debts include any obligation, except consumer credit card debts, that you may owe to MidFirst Bank or any of its divisions, including but not limited Vio Bank and Monifi.  We may, at any time at our discretion, apply any part or all of the balance of your Relationship Account(s) to any debt, matured or unmatured, that you or any other Account owner may then owe to us. We will provide you notice of any offset, however such notice may be provided before or after we exercise our right to offset your Relationship Account(s).  You also grant us a security interest in and to your Relationship Accounts to secure debts you may owe to us.  If your Relationship Accounts are jointly owned, we may apply Relationship Account funds to any debt owed by any Relationship owner.

### j.  Fees and Charges

We may assess transaction and Account maintenance fees and other charges in amounts as may be permitted by law. Fees are reflected below and may be amended from time to time, in our sole discretion. You agree to pay immediately any applicable fees and charges and any expenses we may incur in collection of amounts you owe us or in collection of items deposited with us for deposit to a Relationship Account, including, but not limited to, any court costs and attorneys' fees, and we may charge your Relationship Accounts to pay these fees, charges, and expenses. If at any time we are required to engage the services of financial or legal counsel (i.e., an attorney or an accountant) to resolve issues related to your Relationship, you will pay to us on demand the fees and costs we incur.

We may charge the following fees:

1.  Returned Overdraft Fee - $15
    a.  Per ACH or Check returned because your Account(s) do not have sufficient funds.  Monifi does not charge overdraft fees on debit card transactions. For information on Overdrafts, see Paragraph aa.
2.  Balance Protect Service - $5
    a.  If enrolled in the Balance Protect Service, the Balance Protect Service fee is charged to your Save Balance each day a transfer is conducted from your Save Balance to cover a negative balance of any amount at the end of the Processing Day in your Spend Balance, even if the negative balance is less than $5.00.
    b.  For more information on the Balance Protect Service, please see section 4 of this agreement.
3.  Paper Statement - $5
    a.  Charged to your Spend Balance each month when you ask us to mail your Relationship Accounts statements to you.
    b.  Electronic statements are available to view and print in the Monifi App and online banking at no charge.

4. Replacement Debit Card, Expedited Delivery - $30
   a. We may charge an expedited debit card delivery fee upon request made by you.
5. International Transaction – 3% of transaction amount
   a. U.S. Dollar and Foreign Currency Transactions.
6. Incoming Domestic or International Wire– No Charge
   a. Wire transfers that are deposited into your Relationship Accounts from another U.S. or an international bank.
7. Outgoing Domestic Wire - $30
   a. Wire transfer that is originated from your Relationship Account to another U.S. bank account.
8. Copies - $1 each item
   a. Per each item or document copy provided, such as cleared or deposited checks.
9. Research Requests - $40 each hour
   a. Research Labor or Account Reconciliations ($20 minimum charge).
10. Legal Process – fee varies by State
    a. Processing of garnishments, tax or child support levies or other court administrative order against your Relationship Accounts.

### k. Your Addresses and Phone Number

You must provide us with an accurate and current email address and current physical address. You agree that you will advise us immediately of any change to either your physical or email address. Any notice or Relationship Account statement mailed or sent electronically by us to the last physical or email address given to us by an owner of the Account will be deemed sufficient. Physical and email address change requests are subject to identity verification. It is your sole responsibility to ensure that we have a current email and physical address for you in our records; if you change either your email address or your physical address, we will have a reasonable amount of time to change such information in our records.

By providing a phone number to us, you expressly agree and consent to be contacted by us and any of our agents, affiliates, contractors, successors or assigns at this phone number (including mobile, cellular, wireless or similar devices), for any lawful purpose such as for information, servicing or collection purposes. The ways in which we may contact you include live operator, automatic telephone dialing systems (auto-dialer), prerecorded and artificial voice message and text/SMS message. You authorize these contacts by voice or text even if the number is a mobile phone number or converts to a mobile phone number, and even if you are charged by your service provider. You authorize us (but we are not obligated) to monitor, record electronically and retain telephone conversations and electronic communications between you (including your purported authorized representatives) and us. Accordingly, you agree on behalf of yourself, and your employees and agents that we may monitor and record your telephone and electronic communications in connection with your Relationship at any time. Unless required by applicable law, we may monitor and record these communications without further notice. You agree that we may produce the telephonic or electronic recordings or computer records as evidence in any proceedings brought in connection with the Agreement, and you hereby acknowledge the validity and enforceability of such telephonic or electronic recordings. By providing us with an email address, you agree that we may contact you at that email address.

### l.    Our Rights

We may at any time, and in our sole discretion with or without prior notice, require a minimum deposit, refuse to accept any deposit or cash any check, limit the amount which may be deposited, charge any Account on which you are a signer (subject to legal restraints) for any negative balance created in another Account, return all or pay part of any deposit, or close the Account, returning to you personally, electronically or by mail, either cash or a cashier's check for the balance on deposit in the Account. We may also close an Account or your Relationship at any time for any reason.  We may decline any transaction, including, but not limited to, any debit card, check or automated clearing house ("ACH") transactions. Most funds are subject to our Funds Availability Policy set forth in Section 3 of this Agreement.  In some circumstances, we  may, in our discretion, also place an administrative hold on funds on deposit in any Account if we (1) receive a claim from a third party relating to an Account; (2) acquire knowledge of facts which might give rise to a claim by or against us relating to an Account; or (3) if we become aware of facts that to us in our sole judgment appear to indicate that the Account is being used for an improper or unlawful purpose or that you have become the victim of a fraud or undue influence. We may exercise this right even if we are not legally bound to honor the claim. We may hold those funds for a reasonable amount of time to conduct an investigation into the facts. Thereafter, we may either release the funds, apply them against any obligation you may owe us or tender them into a court to resolve the issues. We will not be liable for failing to honor, or for any damage which may result from our failure to honor, any checks, preauthorized transfers, ACH transactions, recurring debit card transactions, or other such transfers or withdrawal orders presented after any such action.

In order to comply with regulatory requirements, we may require additional information on certain transactions including, but not limited to, the source of funds, purpose of the transaction, and/or additional supporting documentation.

You agree that we have been in good faith and have exercised ordinary care if we accept withdrawal requests (whatever the form: paper, electronic or image) from other banks without investigating the genuineness of, or authorization for, the withdrawal. If a withdrawal request is not genuine or is not otherwise authorized by you, our liability will be limited to the amount of the particular withdrawal amount.

### m.   Deposits

1.  All checks or drafts received by us are at your risk and are credited conditionally to your Account subject to final payment. You authorize us to endorse for you any item deposited to your Accounts. We have the right to decline debits drawn against such credits. If any item is dishonored on presentation to the financial institution on which drawn, it will be charged back to the Account of deposit or, if such Account has non-sufficient funds, to another Account which the depositor, endorser, or payee is a signer (subject to legal restraints), and you may be charged an applicable fee.
2.  We will not be responsible for any delay in crediting your Account if the deposit information accompanying the deposit has not been properly completed.
3.  Deposits will not be accepted at any night depository or through the ATM Electronic Teller Network. Any deposit you attempt through these channels will be returned to you at the last known physical address we have for you.  We will not accept deposits to your Relationship

Accounts at a MidFirst Bank location or any division of MidFirst Bank locations. We do not accept cash deposits or checks drawn on non-U.S. entities.

4. You may make deposits to your Relationship Accounts by:
   a. ACH transfer
   b. Wire transfer
   c. Mobile deposit
   d. Zelle
   e. Mailing a check to P.O. Box 76149, Oklahoma City, OK 73147. Check deposits received by mail will be deposited into the Relationship Account you designate. If you do not designate a Relationship Account, check deposits will be made to your Spend Balance.
   f. Limits may apply to the above deposit methods based on the type of transaction.

5. We will not be liable for dishonor of drafts so received in payment for losses thereon or for losses in transit or for negligence or default of other institutions, agents, or subagents but will exercise ordinary care in their selection. We will be deemed to have exercised ordinary care if we send the item by a duly licensed carrier and through any state or federally chartered institution.

6. Funds deposited will be made available to you under the terms described in the Funds Availability Policy section of this Agreement. When we make funds "available" to you, this does not mean that the funds are "good" or that the deposited item has "cleared" the payor bank.

7. The balance of either of your Relationship Accounts shall not exceed $2,500,000.00 without our prior written consent. Subject to applicable law, at any time, we may limit the amount that may be deposited into your Accounts.

8. We may charge back to your Account any items returned to us unpaid or upon which payment has been revoked or rescinded which were deposited into the Account without regard to who made the deposit; whether the deposit was authorized by you; or whether the return to us was timely.

9. You will not deposit any item not containing the genuine signature of the drawer and the actual endorsement of each payee without our prior written consent. This restriction means that you will not deposit, among other things, "remotely created checks" and "substitute checks" as those terms are defined by law and regulation. If you deposit such items, you agree to reimburse us for losses, costs, and expenses that we may incur associated with such items.

10. Subject to applicable law, we reserve the right at any time to refuse any deposit or transfer of funds into your Account; and we may return or hold all or any part of a deposit for any reason.

### n. Withdrawals

You may request the withdrawal of funds from your Relationship Accounts in any amount at any time, subject to fees and penalties that may apply to your Account type. Our policy is to pay withdrawals upon request; however, we are required by federal and state regulations to specifically reserve our right and do hereby reserve our right to require you to give us a seven (7) day written notice of your intention to withdraw funds from your negotiable order of withdrawal account ("NOW Account"), including your Save Balance. **All withdrawals are subject to the availability of funds, as described in the Funds Availability Policy section of this Agreement and subject to the terms and conditions of money transfer Services used to make the withdrawal, including but not limited to the External Transfer Service.** We may, at our sole discretion, elect to issue the requested withdrawal amount by Cashier's Check or other means in lieu of cash.  Each person who is authorized to withdraw funds from your Relationship Accounts, as indicated

on the Relationship opening documentation, may withdraw funds under any method available to each Account in your Relationship, as described below. Withdrawals by phone transfer or electronic transfer are subject to the terms and conditions described elsewhere in this Agreement. We may refuse payment of any instrument drawn on a Relationship Account. We do not routinely examine the dates written on items, and we are not bound to dishonor any item due solely to the fact that it has been postdated or is more than 6 months old. We may pay items, payment of which have been stopped, after the expiration of the relevant stop payment orders, even though the items may be more than 6 months old.

We reserve the right, in our sole discretion, to require additional information to authenticate or validate your identity or a withdrawal request, whether such request is made for Wire Transfer, Cashier's Check, or otherwise.

If you make a withdrawal in a foreign currency, the withdrawal will be converted to U.S. dollars. Other fees from such a transaction may apply, and you will be responsible for such additional fees, which may be assessed by a third party.

### o. Wire Transfers

We reserve the right to place limits incoming or outgoing wire transfers at any time if those Services are available on your Account. Limitations may include, but are not limited to, limiting the Accounts from which a wire transfer may be sent, the countries and/or banks to which a wire transfer may be sent, and/or the amount of a wire transfer, among other restrictions and applicable fees. For additional information on wire transfers, including any limitations, call us toll free at 800-440-1101. We may, in our sole discretion, require you to provide us additional information to validate or authenticate wire transfer requests. Please note, sending an International Wire is not an available feature of your Relationship Accounts.

### p. Checks

If you order checks from us or a third party service, we may, in our sole discretion return any such checks written on your Relationship Accounts. Further, if you order checks from us or a third party, the check stock or other features may make it difficult for us to process the check. If we are unable to process a check that you have ordered from a supplier that we have not approved, you bear the risk of any loss. We reserve the right to process checks in accordance with the terms and conditions of this Agreement.

To the extent we decide to process a check written on a Relationship Account, the following disclosure regarding substitute checks and your rights applies:

1. To make check processing faster, federal law permits banks to replace original checks with "Substitute Checks." These Substitute Checks are similar in size to original checks with a slightly reduced image of the front and back of the original check. The front of a Substitute Check states: "This is a legal copy of your check. You can use it the same way you would use the original check." You may use a Substitute Check as proof of payment just like the original check.

2. Some or all of the checks that you receive back from us may be Substitute Checks. This notice describes rights you have when you receive Substitute Checks from us. The rights

in this notice do not apply to original checks or to electronic debits to your Account. However, you have rights under other laws with respect to those transactions.

3.  In certain cases, federal law provides a special procedure that allows you to request a refund for losses you suffer if a Substitute Check is posted to your Account incorrectly (for example, if you think that we withdrew the wrong amount from your Account or that We withdrew money from your Account more than once for the same check). The losses you may attempt to recover under this procedure may include the amount that was withdrawn from your Account and fees that were charged as a result of the withdrawal (for example, returned check fees).

4.  The amount of your refund under this procedure is limited to the amount of your loss or the amount of the Substitute Check, whichever is less. You also are entitled to interest on the amount of your refund if your Account is an interest-bearing Account. If your loss exceeds the amount of the Substitute Check, you may be able to recover additional amounts under other law.

5.  If you use this procedure, you may receive up to $2,500.00 of your refund (plus interest if your Account earns interest) within ten (10) Business Days after we received your dispute notice and the remainder of your refund (plus interest if your Account earns interest) not later than forty-five (45) calendar days after we received your dispute notice.

6.  We may reverse the refund (including any interest on the refund and refunded fees) if we later are able to demonstrate that the Substitute Check was correctly posted to your Account.

7.  If you believe that you have suffered a loss relating to a Substitute Check that you received and that was posted to your Account, please contact us toll free at 800-440-1101. You must contact us within forty (40) calendar days of the date that we mailed the Substitute Check in question or the Account statement showing that the Substitute Check was posted to your Account, whichever is later. We may extend this time period if you were unable to provide a timely dispute notice because of extraordinary circumstances outside your control.

8.  Any dispute notice from you must include:
    a.  A description of why you have suffered a loss (for example, you think the amount withdrawn was incorrect).
    b.  An estimate of the total actual amount of your loss.
    c.  An explanation of why the Substitute Check you received is not sufficient to confirm that you suffered a loss.
    d.  A copy of the Substitute Check and/or the following information to help us identify the Substitute Check: identifying information, for example the check number, the name of the person to whom you wrote the check, the amount of the check.

### q.  Branch Services

Monifi is a digital-only division of MidFirst Bank and provides its Services to you through the Monifi App, online banking, and by phone. MidFirst Bank locations cannot assist with your Monifi Relationship, and do not provide in-branch services for your Relationship Accounts. In-branch services include but are not limited to check cashing and other services.

### r.  Stop Payment

You may stop payment of a check or an ACH withdrawal, transfer, or preauthorized electronic funds transfer by calling us toll free at 800-440-1101 if that service is available on your Account.  You must notify us with reasonably sufficient time to allow us to act and fulfill your request. You cannot place a stop payment on any one-time debit card transactions.  We have no liability for payment of an item if the stop payment order is received less than 4 hours prior to presentment of an item. A longer period may be necessary depending on the circumstances. We may require a specific period of time in order to fulfill stop payment requests.  We must receive a stop payment order for a preauthorized electronic funds transfer at least three (3) Business Days before the scheduled transfer. We may require you to provide written confirmation of a stop payment order you gave orally; if we require written confirmation, we will provide you with the address where such confirmation must be sent. An oral stop payment order expires after fourteen (14) days if we require you to provide written confirmation and you fail to do so. A written stop payment order expires six (6) months after it is received unless you renew the stop payment order in writing. For ACH withdrawals, you may stop payment of a one-time withdrawal order or place a permanent stop payment on the Account prior to the date of remittance for payment. A permanent stop payment order for ACH withdrawals will remain on your Account indefinitely, unless revoked by you verbally or in writing.  A stop payment order must include your name and Account number and a description of the payment, including the date drawn, check number, the exact amount, and the payee named. You agree to review the information on any stop payment notice that we send you in response to a stop payment order by you and to notify us immediately of any inaccuracy.

The time limitations for stopping, canceling, or changing any bill payments scheduled online or using a mobile device are contained in the terms and conditions governing such Services and are not governed by this paragraph.

### s.  Telephone Transfers

By requesting a telephone transfer, you authorize and direct us, as your agent, to transfer funds between your Spend Balance and your Save Balance as specified by you. Transfer will be made pursuant to your instructions, provided that you identify yourself by providing your Account numbers and other requested information for such services that you have authorized. We reserve the right to require authorization for such transfers in a form that is satisfactory to us. You represent that you are authorized to withdraw funds from such Accounts. We shall have no liability for any refusal or failure to make a transfer pursuant to telephone instructions. Transfers made pursuant to these terms and conditions shall be at your sole risk.

### t.  Interest

Interest is not paid on your Spend Balance.  Interest on deposits is compounded daily and credited to your Save Balance monthly. We reserve the right to change our interest rates and annual percentage yields at any time at our sole discretion. There are no minimum or maximum interest rate limits on your Save Balance.  We use the daily balance method to calculate interest on your Save Balance.  This method applies a daily periodic rate to the principal and interest that has been accrued to your Save Balance each day. The daily periodic rate is calculated by dividing the interest rate by 365.  Save Balance interest begins to accrue on the Business Day funds are collected.  The total dollar amount in your Save Balance will earn the interest rate and annual percentage yield as described below.  The most current rates can be found

on monifi.com.  Interest is reflected in your periodic statements for your Save Balance.  If you close your Relationship Accounts before interest is paid, you will not receive any of the accrued interest.

The current interest rate and annual percentage yield for your Save Balance is listed below.  These rates are accurate as of the date you open your Monifi Relationship.  The interest rate and annual percentage yield is subject to change at any time at the Bank's sole discretion. Fees may reduce earnings.

1. Interest rate: 0.60%
2. Annual Percentage Yield (APY): 0.60%

For regulatory and accounting purposes, each of your Relationship Accounts and any NOW checking accounts, including your Save Balance, will consist of two subaccounts: a checking subaccount and a money market subaccount. This does not affect transactions, funds availability, interest the Account earns, minimum balance requirements, fees and charges, or FDIC insurance coverage associated with your Account.

At various times during the statement cycle, we will transfer funds between the checking subaccount and the money market subaccount. Subaccount activity will not appear on your monthly statements and will not be subject to fees. Account statements will look as if there are only two checking Accounts. For interest-bearing checking Accounts, both subaccounts will pay the same interest rate and annual percentage yield. For non-interest-bearing checking Accounts, neither subaccount will pay interest. You will have no direct access to the money market subaccount; you may only access the money market subaccount indirectly through transactions on your checking subaccount. This will have no impact on your use of the Account or, for interest-bearing checking Accounts, the interest you will earn on your Account balance.

### u.  Statement of Relationship Accounts

We will provide you with a single, consolidated periodic statement of your Relationship Accounts as of a date designated by us. Your periodic statement will include your Relationship Balance, your Spend Balance, and Your Save Balance as well as transaction information for each Relationship Account. Your goals will not appear on your periodic statements; goals are available to view in the Mobile App or online banking. Our books will determine your Relationship Balance, your Spend Balance, and your Save Balance. Your statement will note all deposits, withdrawals, transfers, debits, and adjustments charged or credited to your Relationship Accounts and may provide an image of the front of each item shown on the statement, as required by law. We will attempt to maintain a legible copy of each item destroyed for the time required by law. This obligation is met if we have systems and use equipment that will generally capture and retain an image of the item. You may obtain a copy of any item as maintained in accordance with applicable law.  Fees for obtaining such copies are set forth in the Fees and Charges section of this Agreement. We are not liable for any loss occasioned because we are unable to provide copies. Your statement will be provided electronically, as agreed by you. You are responsible for providing us with an updated and current email address.

You agree that you will promptly and carefully examine each statement and will, within thirty (30) days after electronic transmission or posting, report to us any unauthorized signature on or alteration of any item, and will, within sixty (60) days after electronic transmission or posting, report to us any other error or discrepancy in it or any claim for credit or refund. If no such report and return is made within the

applicable period, you will be presumed to have accepted the stated balance as being correct and to have released us from all liability for transactions posted or not posted to your Relationship Accounts, subject to applicable law. For statements provided electronically, the "sent date" shall be the date that we initiate electronic transmission or posting of such statement or message advising you of the availability of such statement in an electronically accessible format. We will not be responsible for any delay in transmission or your receipt of your statement that is caused by your email or internet service provider.

### v.  Limitations

Any transfer by wire or ACH to or from any of your Relationship Accounts must be from, to, or through a domestic financial Institution. You agree that at such time as your Relationship Account is credited with the amount of the transfer, or is credited to a debt of yours, or is otherwise made available to you, any such event shall serve as notification to you of our receipt of the payment order and notice to you of such event. You agree that you will not cause or permit any transfer to any of your Relationship Accounts by electronic means, including by wire or ACH, in excess of $1,000,000.00, without our prior written consent. In the event that no such prior written consent is obtained, you agree that we are not required to accept the transfer; we have no obligation to credit the amount of the transfer to your Account; and we may return the amount of the transfer to the sender so long as we make such return by the close of the banking day following the day on which we receive payment for the transfer. We shall not be deemed to have waived any rights under this paragraph, or elsewhere in this Agreement based upon any prior transfer to you.

### w.  Dormant Accounts

Your Relationship Accounts may be classified as dormant when there have been no customer-initiated transactions from or to your Spend Balance for the preceding twelve (12) months. If your Spend Balance is deemed dormant, your Save Balance will also be deemed dormant. To prevent your Relationship Accounts from becoming dormant, you must initiate one of the following types of transactions: deposit, withdrawal, electronic deposit, ATM withdrawal, debit card transaction, telephone transfer or ACH direct deposit.  An inactivity fee may be assessed against the dormant Relationship Balance.  We must, in most cases, remit the dormant balance as abandoned property in accordance with applicable law; the dormant balance remitted will be your Relationship Balance.

### x.  Debit Cards

Debit cards may be used to access your Spend Balance, and in some instances, your Save Balance. See the Balance Preferences section of this Agreement for more information on how debit card transactions are authorized.  We reserve the right to suspend or revoke debit card privileges at any time. If you use your debit card to access a Balance that does not have sufficient funds to complete a transaction or that would exceed the daily authorization limit attached to your debit card, we may, at our discretion, authorize the transaction. We reserve the right to restrict certain types of debit card transactions, such as transactions related to gambling. Terms and conditions applicable to use of debit cards are also described elsewhere in this Agreement.

### y.  Allpoint ATM Network

We participate in the Allpoint ATM Network, and we will not assess a fee for debit card transactions conducted at Allpoint ATMs. You may have to accept the on-screen notification of a fee at an Allpoint

ATM, however your Relationship Accounts will not be charged for conducting an ATM transaction at an Allpoint ATM.  You can locate an Allpoint ATM using the Monifi App and in online banking.

ATM transactions not conducted at an Allpoint ATM may be subject to fees charged by the ATM owner.

### z.    Accounts of Decedents

On the death of an owner of your Relationship Accounts, the amount of the credit Relationship Balance will be paid as permitted or required by law, federal and state regulations, and in accordance with our security procedures. In the event of a death of a Relationship Account owner, Relationship Account information will be furnished upon request to the duly appointed estate administrator, trustee or attorney. We may require documentation sufficient to establish the identity of such administrator, trustee, or attorney, in our sole discretion.

### aa. Overdrafts and Non-Sufficient Funds

A transaction or item that results in or creates a negative Available Balance in a Relationship Account is called an "Overdraft." If we process a check or transaction for a Relationship Account, and it results in an Overdraft, we will follow the processes outlined below.  We will not assess a fee if we pay a transaction or item that causes a negative balance in your Relationship Account. However, in our sole discretion, we may return a transaction or item if you do not have sufficient funds in your Relationship Account to cover it. We may assess a fee for items or transactions that we return due to non-sufficient funds in your Account(s). For example, if you have not elected the Balance Protect Service, and you do not have sufficient funds in your Spend Balance to cover an ACH or check withdrawal from your Spend Balance, we may return that transaction unpaid. In that instance, a Returned Overdraft Fee will be assessed in accordance with the Fees and Charges section of this Agreement. Your Spend Balance will not reflect a negative Available Balance as a result of the transaction, and that transaction is not an Overdraft.

Unless you elect the Balance Protect Service described below, we decide whether to authorize transactions and pay items based on the your "Available Spend Balance," which is the Available Balance of funds in only your Spend Balance. If you elect the Balance Protect Service, we decide whether to authorize transactions based on the Available Balance of funds in your Relationship Balance (your "Available Relationship Balance"). With the Balance Protect Service, if your Spend Balance at the end of a Processing Day is not sufficient to cover all authorized transactions and items from your Spend Balance, we will automatically transfer funds from your Save Balance to your Spend Balance to cover the transaction. A fee will be charged for this transfer as set forth in the Fees and Charges section of this Agreement.

It is our practice to decline ATM and everyday debit card transactions that would cause your affected balance to be negative. Your affected balance depends on your Balance Protect Service election. If you have selected the Balance Protect Service, your affected balance is your Relationship Balance; if you have not selected the Balance Protect Service, your affected balance is your Spend Balance.

The "Ledger Balance" is the balance of funds in your affected Relationship Account at the beginning of the Business Day. The "Current Balance" is the Ledger Balance plus or minus your electronic activity for the current day.  For purposes of determining whether to authorize transactions, we determine the "Available Spend Balance" by taking the Ledger Balance and reducing that amount by any outstanding holds for deposits that are not yet available under Our Funds Availability Policy; by debit card transactions we have

v. 05/2021

authorized but not processed for payment; and by intra-day activities (including but not limited to wire transfers, ATM withdrawals, and other electronic transfers). Certain business operations (e.g., taxis, hotels, rental or leasing companies) may request debit card authorizations in an amount exceeding the amount they ultimately charge you. When we authorize a debit card transaction, we establish a hold and reduce the applicable Available Balance by the full amount we authorize (which may differ from the transaction amount) until the item is paid or is no longer considered to be pending. The applicable Available Spend Balance will be your Spend Balance or your Relationship Balance depending on your Balance Protect Service election.

In the event you deposit a check that is not from a guaranteed source, a hold is placed on the affected Relationship Account to the extent and during the period described in the Funds Availability Policy section of this Agreement. In our discretion, we can reduce the time frame for a hold or choose not to place a hold at all. For example, in some cases we are able to verify that a check has been honored prior to the time a hold would otherwise expire and can manually remove the hold, making funds available earlier in the process.

You agree that we may post items, including ACH items and other electronic debits to your affected Relationship Account, in any order that complies with applicable law. For example:

1. We may process deposits before debits.
2. We may process certain kinds of electronic items, such as debit card, ATM and ACH items, ahead of other kinds of items, such as checks.
3. We may process certain items based on the time they were authorized by us.
4. We may process certain items based on the time they were received for processing.
5. We may process checks in serial number order.

You should know that:

1. Any check or ACH transaction that would cause a negative balance in your Relationship Account will be returned, and you may be assessed a Returned Overdraft Fee, as described in the Fees and Charges section of this agreement.
2. A maximum number of five (5) per-item Returned Overdraft Fees will be charged on any Processing Day
3. We will not charge a Returned Overdraft Fee if your Available Spend Balance is overdrawn by $5.00 or less at the end of the Processing Day

To the extent permitted by law, you authorize us to deduct any Overdrafts from any funds that may thereafter be deposited into the affected Relationship Account, even if those funds come from restricted income sources that are exempt from attachment.

We are under no obligation to pay or authorize any item or withdrawal request presented if there are non-sufficient available funds to cover the item. You agree, however, that, in our sole discretion, we may honor any check, recurring debit card, and/or ACH debits presented to your affected Relationship Account when there are non-sufficient available funds to cover such items.

You agree that payment of any Overdraft item on any occasion(s) does not obligate us to pay any future Overdraft items. We have no obligation to notify you before we pay an Overdraft item or before we return

an item or transaction unpaid. You agree to pay the amount of any assessed fees immediately upon demand. You agree that we may pursue any collection remedy available under applicable law, of which you may become responsible to reimburse us for any related expenses.  We will not charge any per-item Returned Overdraft Fees if the only debit items we process on a Processing Day are fees we assess.

## 2.  Electronic Funds Transfer – Your Rights and Responsibilities

This section describes terms and conditions applicable to electronic funds transfers as required by the Electronic Funds Transfer Act and applicable regulations. This section applies only to electronic fund transfers that authorize us to debit or credit a consumer Account, that is, an Account established primarily for consumer, family, or household purposes Electronic fund transfers are generally defined under the Electronic Fund Transfer Act of 1978 and include transfers of funds that you initiate through an electronic terminal, phone, computer, or magnetic tape for the purpose of authorizing a debit or credit to your Account. Certain electronic funds transfer Services may not be available for your account type. Please read this disclosure carefully because it describes your rights and obligations for those transactions. You should keep this disclosure for future reference.

Terms and conditions relating to certain electronic funds transfers conducted through Services available in the Monifi App or through online banking are described below.

**DO NOT write your personal identification number ("PIN") or your Monifi login credentials on anything or keep them in any form with your debit card or device.**

### a.  Cardholder's Liability & Notification Procedures

Notify us IMMEDIATELY if you believe your debit card or PIN has been lost or stolen; if you believe that your Monifi App or online banking login credentials have been compromised; if your device has been lost or stolen; or if you believe that an unauthorized transfer from your Account has occurred. Telephoning is the best way of minimizing your potential losses. You could lose all the money in your affected Relationship Account Balance. If you have elected the Balance Protect Service, you could also lose all of the money in your Relationship Balance.  If you tell us about the lost or stolen debit card, credentials, device, or PIN within two (2) Business Days after you learn of the loss or theft, you can lose no more than $50.00 if someone uses your debit card, debit card number, credentials, and/or PIN without your permission.

If you do NOT notify us within two (2) Business Days after you learn about the loss or theft of your debit card, credentials, device, or PIN, you could lose as much as $500.00 if we can prove we could have prevented the unauthorized use of your debit card, debit card number, credentials, device, or PIN without your permission if you had timely notified us.

Also, if your periodic statement shows unauthorized transactions, notify us at once. If you do not notify us within sixty (60) days after the statement was sent or made available to you, you may not recover any money you lost if we can prove that we could have prevented an unauthorized transfer if you had timely notified us.

NOTIFICATION PROCEDURES: If you believe your debit card, credentials, device and/or PIN have been lost, stolen, or compromised, or that someone has transferred or may transfer money from your Relationship Accounts without your permission, call 800-440-1101 or write to us at Monifi, PO Box 76149, Oklahoma City, OK 73147. If a good reason (such as a long trip or hospital stay) kept you from promptly notifying us, we may, at our discretion, extend the time periods. Once a debit card, PIN, or other access device is reported lost or stolen, ATMs will disregard transaction requests and may retain your debit card inside the machine if you or anyone else attempts to use it.

Under the operating rules of the National Automated Clearing House Association, which are applicable to ACH transactions involving your Relationship Accounts, we are not required to give next day notice to you of receipt of an ACH item, and we will not do so. However, we will continue to notify you of the receipt of payments in the periodic statements we provide to you.

### b. Types of Available Transfers

For the Relationship Account(s) associated with your debit card, you may use your debit card at electronic terminals to:
1. Withdraw cash;
2. Inquire as to the amount of your Available Balance of your Spend Balance; and
3. Pay for purchases from merchants who have agreed to accept debit card for that purpose.

Some of these Services may not be available at all electronic terminals.

### c. Limits on Debit Card Transactions

Where available, debit card withdrawals are subject to the following limitations:
1. You may withdraw the maximum cash withdrawal amount (as referenced below) or your Spend Balance (whichever is less) from an electronic terminal, such as an ATM, per day, per debit card. If you have elected the Balance Protect Service, you may withdraw the maximum cash withdrawal amount referenced below or your Relationship Balance (whichever is less). You may use your debit card to purchase goods and services each day ("Point of Sale") subject to the limits set forth in below, as long as the associated Available Balance is sufficient to cover the aggregate of all purchases. If you have not elected the Balance Protect Service, the associated Available Balance will be the Available Balance of your Spend Balance; if you have elected the Balance Protect Service, the associated Available Balance will be the Available Balance of your Relationship Balance.
2. The daily cash advance limit and the daily cash withdrawal limit, including any ATM fees, are $520.00. The Point-of-Sale daily limit is $2,500.00. At certain times mechanical or network malfunctions may cause cash withdrawals to be limited to $100.00, including ATM fees, and Point-of-Sale transactions to be limited to $100.00 until the malfunction can be corrected.
3. Funds deposited will be made available to you under the terms described in the Funds Availability section elsewhere in this Agreement.

### d. Electronic Check Conversion

You may authorize a merchant or other payee to make a one-time electronic payment from a Relationship Account using Account information. If such transactions are processed as electronic checks, these electronic check conversions constitute electronic funds transfers.

Monifi is a division of MidFirst Bank                    Page 17                    Member FDIC

v. 05/2021

### e. Charges

There may be charges for debit card transactions made at ATMs other than Allpoint ATMs. There may be a charge for replacement or additional debit cards or PINs requested as a result of loss or negligence. Please refer to the Fees and Charges Section of this Agreement for specific fee information related to electronic fund transfers.

If you use your debit card to access a Relationship Account that does not have sufficient funds to complete a transaction or that would exceed the daily authorization limit attached to your debit card we may, at our discretion, authorize the transaction. INTERNATIONAL TRANSACTIONS: If you conduct a transaction with your debit card involving multiple currencies or U.S. dollars in a country outside of the United States of America, Puerto Rico or the US Virgin Islands, a transaction fee may appear on your monthly statement from the applicable card network. We reserve the right to make future changes in your Account and/or debit card transaction fees, subject to our giving you notice as required by law.

### f. Documentation

At the time of any debit card transaction using a debit card or Point-of-Sale terminal, you may receive a transaction receipt, which will include the amount, date, type of transfer, identity of Account and bank or merchant, location of terminal, identity of any account where funds are transferred, and transaction identification number unless the transaction is $15.00 or less. If you have arranged to have direct deposits made to your Account at least once every sixty (60) days from the same person or company, you can call us toll free at 800-440-1101 to find out whether or not the deposit has been made. Your regular monthly statement will reflect debit card transfers, direct deposits and withdrawals, and preauthorized electronic fund transfers.

### g. Right to Stop Payment of Preauthorized Transfers

You may stop payment of preauthorized transfers as described in this Agreement by notifying us orally or in writing at least three Business Days before the scheduled date of the transfer. Preauthorized transfers are an electronic fund transfer authorized in advance to recur at substantially regular intervals. The time limitations for stopping, canceling or changing any bill payments scheduled using the Monifi App or online banking, such as Bill Pay, if those Services are available, can be found in the section of this Agreement describing such Services.

You may use your debit card to pay for goods and services at retail locations via Point of Sale that displays the Visa® symbol if you have our debit card with the Visa® symbol. We will charge Relationship Account(s) for all purchases and withdrawals made with your debit card. The use of your debit Card to purchase goods and services will constitute a simultaneous withdrawal from your applicable Account. Notwithstanding anything to the contrary, YOU CANNOT PLACE A STOP PAYMENT ON ANY TRANSACTION MADE WITH YOUR DEBIT CARD.

### h. Our Liability for Failure to Complete Transactions

If we do not complete a transaction to or from a Relationship Account on time or in the correct amount according to our agreement with you, we will be liable only for your loss or damage to the extent of the amount of the transaction. We will not be liable, however, if we do not complete a transaction in situations that include, but are not limited to, the following examples:

1. If, through no fault of ours, you do not have enough money in your Relationship Account to make the transaction;
2. If the transaction would go over the credit limit on any line of credit you may have;
3. If the ATM where you are making the transaction does not have enough cash to complete the transaction;
4. If the electronic terminal was not working properly;
5. If circumstances beyond our control (such as fire, flood, other natural disaster, terrorism, supplier failure, system malfunction, etc.) prevent the transaction, despite reasonable precautions that we have taken;
6. If the funds are subject to legal or other encumbrance;
7. If federal or state banking rules or regulations as issued by the Consumer Financial Protection Bureau, the Office of the Comptroller of the Currency, the Federal Reserve Board, the Federal Deposit Insurance Corporation, or other agency with banking oversight might prohibit such transaction; or
8. If we fail to complete a transaction because we believe the transaction may be fraudulent.

Also in the case of any error or malfunction that was not intentional on our part and resulted from a bona fide error, notwithstanding the maintenance of procedures reasonably adopted to avoid any such error, our liability is limited only to actual damages proved. Except as specifically provided herein or by law, we shall not be responsible for any indirect punitive, special, general or consequential damages for any other matter addressed in this Agreement.

### i. Error Resolution Procedures and Consumer Rights

If you think your statement or receipt is wrong, or if you need more information about a transfer listed on the statement or receipt, you must notify us no later than sixty (60) days after we sent or made available the FIRST statement on which the problem or error appeared. Your notice should include:

1. Your name and Account number;
2. A description of the error or the transfer you are unsure about and a detailed explanation of why you believe it is an error or why you need more information. Your explanation should be as clear and complete as possible; and
3. The dollar amount of the suspected error.

If you notify us orally, we may require that you provide us your complaint or question in writing within ten (10) Business Days.

For Electronic Funds Transfers: Within ten (10) Business Days after you notify us of a possible error, we will make a determination as to whether an error occurred. We will correct any determined error promptly. If we need more time or information, we may take up to forty-five (45) days to investigate and determine whether an error occurred. This timeframe may be extended to ninety (90) days for Point –of- Sale ("POS") transactions. If we decide to do this, we will provisionally credit your affected Relationship Account for the amount you think is in error within ten (10) Business Days after we receive written confirmation of your complaint or question, so that you will have the use of the money during the time it takes us to complete our investigation. If we ask you to confirm your complaint or question in writing, and we do not receive it within ten (10) Business Days, we may not provisionally credit your affected Relationship Account.

For POS, ATM, and Other Electronic Transfers involving New Relationship Accounts: For new Relationship Accounts (Relationships on which each owner does not have or has not had within the previous thirty (30) days a Relationship with us), we may take up to ninety (90) days to investigate your complaint or question and determine whether an error occurred. If we decide to do this, we will provisionally credit your affected Relationship Account for the amount you think is in error within twenty (20) Business Days after we receive written confirmation of your complaint or question, so that you will have the use of the money during the time it takes us to complete our investigation. If we ask you to confirm your complaint or question in writing, and we do not receive it within twenty (20) Business Days, we may not provisionally credit your affected Relationship Account.

If we issue a provisional credit and ultimately determine that no error occurred, we will debit such provisional credit from your affected Relationship Account. We will notify you of the date and amount of the debit. We will honor any checks, drafts, or similar third party payables and any preauthorized transfers as provided in the notice that we will send to you.

IN CASE OF ERROR OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS: Telephone us toll free 800-440-1101, or write us at Monifi, P.O. Box 76149, Oklahoma City, OK 73147.

We will communicate the results to you within three (3) Business Days after completing our investigation. If we decide that there was no error, we will send you a written explanation. You may ask for copies of the documents that we used in our investigation.

### j. Provisional Payment

Credit given by us to you with respect to an ACH credit entry is provisional until we receive final settlement for such entry through a Federal Reserve Bank. If we do not receive such final settlement, you are hereby notified and agree that we are entitled to a refund of the amount credited to you in connection with such entry, and the party making payment to you via such entry (i.e., the originator of the entry) shall not be deemed to have paid you in the amount of such entry.

### k. Choice of Law

We may accept on your behalf payments to your Relationship Account(s), which have been transmitted through one or more ACH networks and which are not subject to the Electronic Fund Transfer Act. Your rights and obligations with respect to such payments shall be construed in accordance with and governed by the law of the State of Oklahoma.

## 3. Funds Availability Policy

### a. General

Except as otherwise described below, we will make funds from your deposits available to you on the first Business Day after the day we receive your deposit. However, many exceptions apply, and funds deposited using Services may be subject to different availability as set forth in this Agreement. If you will need the funds from a deposit right away, you should ask us when the funds will be available. Once funds are available, you can withdraw the funds, and we will use the funds to process transactions on your Account.

Please remember that you are responsible for any check or other funds you deposit with us that is returned to us unpaid and for any other problem that occurs involving your deposit whether made by check or other channel, even if we previously made funds available to you in connection with such deposit.

### b. When Deposits are Received

For determining the availability of your deposits, every day is a Business Day, except Saturdays, Sundays, and federal holidays. However, only deposits made via Mobile Deposit before the cutoff time on a Business Day that we are open will be considered received on that day. We do not accept cash deposits. The cutoff time for Mobile Deposit is 8:00 p.m. Central Time.

Bank by mail deposits received before 4:00 p.m. Central Time on a Business Day will be considered received on the day of receipt. Later deliveries and those received on Saturdays, Sundays, and holidays will be considered received on the next Business Day we are open.

Preauthorized electronic deposits will be posted on the effective date for the transaction, if received by the Federal Reserve Bank's last deadline for electronic payments for that same Business Day; otherwise, preauthorized electronic deposits will be posted on the next Business Day.

If you need immediate access to your funds, you should consider transmitting your deposit by wire transfer or, when available, by using Zelle. Please note that not all Zelle transfers are instant.

### c. Longer Delays May Apply

In some cases, we will not make all of the funds that are deposited by check or deposited by other channels available to you on the first Business Day after the day of your deposit. Depending on the type of deposit, whether by check or other means, funds may not be available until the fifth Business Day after the day your deposit is received. However, the first $225.00 of your deposits may be available on the first Business Day after your deposit is received.

If we are not going to make all of the funds from your deposit available on the first Business Day, we will notify you the next Business Day. We will also tell you when the funds will be available.

Funds you deposit by check may be delayed for a longer period if: (i) we believe a check you deposit will not be paid; (ii) you deposit checks totaling more than $5,525.00 on any one Business Day; (iii) you redeposit a check that has been returned unpaid; (iv) you have overdrawn your Account repeatedly in the last six (6) months; or (v) there is an event that occurs, which is out of our control such as an emergency, communications or computer equipment failure, natural disaster, act of terrorism, sanction or restriction against the transaction, or other event outside our control.

We will notify you if we delay your ability to withdraw funds for any of these reasons, and we will tell you when the funds will be available. They will generally be available no later than the seventh (7th) Business Day after the day of your deposit; funds deposited using online or mobile banking Services will be made available according to the terms and conditions governing the service.

Your deposit may encounter delays if required by law.

### d. Holds on Mobile Deposits

Funds received from mobile deposits are generally made available within the above policy timeframes; however, we reserve the right to hold these deposits available at our discretion.

### e. Holds on Other Funds – Monifi App or Online Banking Service Deposits Other than Mobile Deposit

If you send funds to your Monifi Relationship Account using a Service through the Monifi App or online banking, other than Mobile Deposit, we may place a hold on those funds according to the terms and conditions governing the Service you use to deposit those funds. **Funds that are deposited through a clearing house transaction, such as an ACH transaction, will be available no later than the fifth (5th) Business Day following receipt of such funds in your Account. This includes funds deposited to your Relationship Account using the External Transfer Service or initial account funding completed via ACH transaction**.

### f. Special Rules for New Accounts

If you are a new Monifi customer, special rules will apply during the first thirty (30) days your Account is open. Funds from electronic direct deposits, cash deposits or wire transfers to your Account will be available on the Business Day we receive the deposit. The first $5,525.00 of a Business Day's total deposits of official, certified, tellers, travelers, and state and local government checks will be available on the first (1st) Business Day after the day of your deposit, if the deposit meets certain conditions. For example, the checks must be payable to you (and you may have to use a special deposit slip). The excess over $5,525.00 will be available on the ninth (9th) Business Day after the day of your deposit. If your deposit on these checks (other than a U.S. Treasury check) is not made in person to one of our employees, the first $5,525.00 will not be available until the second (2nd) Business Day after the day of your deposit. Funds from all other check deposits will be available on the eleventh (11th) Business Day after the day of your deposit.

## 4. Balance Preferences

You can manage your Spend Balance through our Balance Preferences Service. The Balance Preferences Service allows you to choose one or all of three different management Services: Low Balance, High Balance, and Balance Protect. Each of these is optional, and you are not required to elect any one. You may, at your option, enroll in one, two, or all three of the strategies. Balance strategies allow you to set thresholds that are managed automatically, but transfers are made at the end of the Processing Day. The best way to manage your Spend and Save Balances is through the Monifi App.

### a. Low Balance

The Low Balance Service allows you to elect to automatically move money from your Save Balance to your Spend Balance when your Spend Balance drops below an amount that you set (your "Low Balance Threshold"). On any Processing Day, if your Spend Balance drops below your Low Balance Threshold, we will automatically transfer funds from your Save Balance to your Spend Balance on the next Processing Day.  The Low Balance transfer will be the amount sufficient to bring your Spend Balance up to your Low Balance Threshold. If you do not have sufficient funds in your Save Balance to meet your Low Balance Threshold, we will not initiate a transfer. There is no charge for the Low Balance Service.

### b.  High Balance

The High Balance Service allows you to elect to automatically move money from your Spend Balance to your Save Balance when your Spend Balance rises above an amount that you set (your "High Balance Threshold"). On any Processing Day, if your Spend Balance exceeds your High Balance Threshold, we will automatically transfer funds from your Spend Balance to your Save Balance on the next Processing Day.  The High Balance transfer will be the amount sufficient to bring your Spend Balance down to your High Balance Threshold. You should set your High Balance Threshold to an amount sufficient to ensure that your daily transactions will be covered. There is no charge for the High Balance strategy.

### c.  Balance Protect

The Balance Protect Service allows you to conduct transactions based on your total Relationship Balance. Without the Balance Protect Service, we will authorize transactions based on your Available Spend Balance. Accordingly, without the Balance Protect Service, if you do not have a sufficient Available Spend Balance to cover a debit card transaction, we will decline that transaction, and any check or ACH transactions that exceed your Spend Balance will be returned, and you will be charged a Returned Overdraft Fee. If you elect the Balance Protect Service, we will authorize transactions based on your total Relationship Balance. With the Balance Protect Service, on each Processing Day, during nightly processing, if your Spend Balance is less than $0.00 due to transactions you have made, we will initiate a one-time transfer of funds from your Save Balance to your Spend Balance.  You will be charged one fee each day a Balance Protect transfer is made, as set forth in the Fee and Charges section of this Agreement. The transfer will be in an amount sufficient to bring your Spend Balance to $0.00, and the $5.00 Balance Protect Service fee will be charged to your Save Balance. If your Save Balance is not sufficient to cover the deficiency in your Spend Balance *plus* the $5.00 fee, no transfer will occur, and a Returned Overdraft Fee may be assessed.

## 5.  Mobile and Online Banking Services

This section provides the terms and conditions governing the services available to you through the Mobile App and online banking (the "Services" and each a "Service"). Not all Services are available in the Mobile App, and not all Services are available through online banking. Certain Services may have additional eligibility requirements.

### a.  Hardware and Software Requirements

We may change our hardware and software requirements at any time, in our sole discretion. We are not responsible for any third party software you may need to use the Services. Any such software is accepted by you "as is" and is subject to the terms and conditions of the software license agreement you enter into directly with the third party software provider prior to your use of the Services.

1.  To access and/or use the Monifi Mobile App, you must have and maintain, at your own expense, one of the following compatible devices with a current operating system:
    a.  iPhone;
    b.  iPad version 2.0 or higher;
    c.  Android phone;

     d.   Android tablet (in order to use Mobile Deposit, you must have a rear-facing camera)

2. To access and/or use Monifi online banking, you must have the following, for which you are solely responsible:

    a.   A personal computer or other personal device;

    b.   A compatible operating system, (please visit monifi.com/requirements for a complete list of compatible operating systems);

    c.   A secure Web Browser (please visit monifi.com/requirements for a complete list of compatible web browsers) with Internet "cookies" and "JavaScript" enabled or "turned-on";

    d.   Your resolution set at 800x600 or 1024x768; and

    e.   Access to the Internet

You must have software capable of viewing PDF documents, such as Adobe Reader®, and you are solely responsible for ensuring that your operating systems and Internet browsers meet the minimum standards and requirements to use the Services.

Certain Services may require location services; to use such Services, you must enable your device to allow the Monifi App to access your device's GPS tracking capabilities. Other Services, such as Mobile Deposit, may require access to your device's camera, and you must allow the Monifi App to access your camera to use such Services.

### b. Privacy and Your Device

To provide you with the Services, we may collect and use technical data and related information, including but not limited to technical information about your mobile, system, and application software and peripherals, that is gathered periodically to facilitate the provision of Software updates, product support, and other services to you (if any) related to our Services. We may use this information to improve our products or to provide services or technologies to you.

We use third party analytic tools, including software, to help us collect and analyze aggregate anonymous information gathered from your online and mobile interactions with us and information about how you use the Monifi App and Online Banking. We may, at our discretion, record your touch gestures, browsing/scrolling activity in the Monifi App and certain online and mobile banking interactions in order to track application performance, stability, usability, and to identify bugs or errors. We also use this information to better understand and improve online and mobile banking functionality, to provide you a better experience, and to help us identify products and services that may be beneficial to you.

We use biometric information in order to verify your identity. This information may be provided to a service provider in order to provide services such as identity verification, fraud prevention, data analysis, and other related services. These service providers also help us maintain a secure session, authenticate you or your computer/device, to detect, prevent and investigate potential security incidents or fraud, and to verify transactions.

We do not share personally identifiable information with nonaffiliated third parties; however, we share anonymized aggregate information for the purposes described herein. See our Privacy Policies at monifi.com/privacy  for more information on our privacy practices.

### c. Security

1. *Your Monifi Credentials*

When you apply for a Monifi Relationship, you will choose a username and password (your "Monifi credentials" or your "credentials") that you will use to obtain access to the Services, in addition to any other required authentication questions, controls or procedures. If you provide your Monifi credentials to another person, we will consider that person to be your authorized agent. You authorize us to follow any instructions you or your authorized agent enters through the Services using your Monifi credentials. Because your Monifi credentials can be used to access money and information about your Relationship and Relationship Accounts, you should treat your Monifi credentials with the same degree of care and secrecy you use to protect your debit card, personal identification number ("PIN"), or other sensitive personal financial data. If you provide your Monifi credentials for purposes of account or data aggregation, you are solely responsible for any liability you may incur as the result of such sharing, subject to applicable law.

You agree not to give, share, or make available to any person not authorized by you to access your Relationship Accounts, your Monifi credentials or any other secure credentials that you adopt or that are assigned to you or any authentication controls or information. You also agree that you will not write down or store your Monifi credentials for visible viewing, either physically or electronically, in any location visible or accessible to someone who is not authorized to access your Relationship or Relationship Accounts. Further, you agree not to access our system or to access any third party system, which may impact the Services through the use of someone else's Monifi credentials.

If available for your device, you may enable the Monifi App to use biometric recognition, such touch and facial identification, to access your Monifi Relationship and Relationship Accounts. By enabling biometric recognition, you acknowledge that every person with a registered fingerprint on your enabled device will have access to your Monifi Relationship Accounts and Services, such as Bill Pay, External Transfers, and Zelle. It is your responsibility to review the biometric information registered on your device to make sure that each person is authorized to access the personal and financial information available within the Monifi App. Biometric data you use to access the Monifi App is only stored on your device. We do not see or store such biometric information.

Unless the "Electronic Fund Transfer Disclosures" as set forth in this Agreement are applicable, if an order or request received by us purports to have been transmitted or authorized by you, it will be deemed effective even if not so authorized, provided we acted in compliance with the Security Procedures established by the Bank, regarding the order or request. If an order or request was transmitted or authorized by you or is otherwise attributable to you by law, you shall be obligated to pay the amount.

2. *Joint Owners*

We are entitled to rely and act upon instructions, requests, and authorizations from either individual Relationship Account owner (or individual) accessing the Monifi App or online banking on behalf of an owner of a Relationship Account (a "User"). Owners or Users agreeing to the terms of this Agreement will be held responsible, liable, and accountable for their actions and be bound to and liable to any joint owners on the Relationship Accounts. We will have no liability for any reliance on the instructions, requests, authorizations,

actions, and/or omissions of any User or either or both owner(s) individually or jointly, or for the actions of any owner on an Account, except by Applicable Law. We may refuse Services on any Account for any reason.

3.  *Security Procedures*

To protect against unauthorized use of any of the Services by any unauthorized persons or third parties, only Monifi Relationship owners may apply for Monifi Credentials. To minimize the risk of unauthorized access to Account information, you should close your browser, delete temporary Internet files, clear the cache, and delete any cookies if using a public computer. You are responsible for monitoring access to the Services and any activity on your Relationship Accounts. You covenant and agree to comply with all Security Procedures, set forth by the Bank, as may be amended from time to time.

We agree we will validate current Account information as necessary to protect against unauthorized use of any of the Services. Further, to protect against unauthorized transfers, we require a multilevel Security Procedure consisting of Usernames and individual passwords. Other Security Procedures are as follows:

1.  We use certificates to validate the encryption system used for all communication. One or more firewall servers or devices to control the flow of traffic into the Services.
2.  Intrusion detection software to identify attempted intrusions to the Services.
3.  Virus prevention/detection software for continuous protection against infection.
4.  We require login encryption practices. We may, at our discretion, record any call-back conversations with Bank, if applicable.

4.  *Confidentiality*

The Services are the property of Bank and/or Bank's third party service providers, and you covenant and agree not to share or disclose any Confidential Information regarding the terms of this Agreement or the Services to any other persons who do not have a legal need-to-know right. You agree to maintain the confidentiality of the Services.

### d.  Alerts

We may use email, SMS (text) message alerts, or push notifications from the Monifi App ("Alerts") to provide you with information about your Relationship Accounts. You cannot opt out of certain Alerts, such as Alerts notifying you of potential fraud.  You may request that we send you an email Alert upon the occurrence of certain specified events, such as when your Spend Balance reaches a specified minimum or maximum balance or when a transfer has successfully occurred or has failed. Alerts may be received by you via your email address or mobile phone number. In order to request this feature, you must specify the manner of notification in the Monifi App or in online banking. You can also customize certain Alert preferences. You acknowledge and agree that, although we will attempt to transmit Alerts in accordance with your specifications, Alerts are not guaranteed to be accurate, nor are they guaranteed to be sent by us or received by you on a timely basis. You agree that we shall have no liability or responsibility to you or any other parties whatsoever for any damages, losses, fees, fines, or costs associated with delay or failure of an Alert. You agree to take appropriate steps to verify and confirm Alert information independently and periodically verify such information is correct. Alerts may be sent from MidFirst Bank.

By providing us with a mobile number, you authorize us to contact you via SMS (text) message. You may also call Monifi Customer Service at 1-800-440-1101 to verify activity and balances or to obtain information

regarding your Relationship Accounts. YOU ARE AND SHALL REMAIN LIABLE FOR ANY AND ALL WIRELESS CARRIER, INTERNET, OR OTHER MOBILE DEVICE CHARGES THAT MAY APPLY FOR EMAILS AND/OR SMS (TEXT) MESSAGES SENT OR RECEIVED. Please refer to your wireless and/or Internet plan to determine the cost of using the Internet through your wireless device.

### e.  Balance Inquiries and Account Information

You can check your Spend Balance, your Save Balance, and your Relationship Balance and transfer funds among your designated Accounts through Monifi App or online banking. Balance information will be current as of the date and time you access the Mobile App or online banking. Balances displayed may include deposits or transactions still pending and/or subject to verification and may differ from your records because they may not include deposits in progress, debit card authorizations, or other pending withdrawals, payments, transactions, or charges.

### f.  Goals

Goals are an optional feature of your Monifi Save Balance. You can set goals within your Save Balance in the Monifi App or in online banking. When you set a goal, you have the option to elect it as a featured goal that is shown on your Monifi dashboard. You can select up to three featured goals. Goals are provided to you solely as an accounting function and convenience. Goals are not considered separate accounts, and your goals are aggregated and reflected in your total Save Balance. You are solely responsible for the name, amount, and duration of each goal that you set. You may upload images in connection with goals that you set. When you upload an image, you represent that you have the right and authority to use that image, and you grant us a limited license to display that image in the Monifi App and online banking. We reserve the right to change or replace any image you submit in connection with a goal, and we reserve the right to change the name that you assign to a goal.  We may use aggregated and anonymized data about goals for our marketing purposes. Information used for this purpose will not be personally identifiable.

Funds that you do not allocate to a goal make up the unallocated balance of your Spend Balance. Your "Unallocated Balance" is the difference between your Save Balance and the sum of all goals you have established.  Transactions from your Save Balance will first be withdrawn from your Unallocated Balance. If a Save Balance transaction exceeds your Unallocated Balance, any amount of the transaction not covered by the Unallocated Balance will be withdrawn from your non-featured goals in order from highest to lowest goal balance and then from your featured goals from highest to lowest goal balance.  This means that certain goals may be reduced to a zero balance if your Unallocated Balance is not sufficient to cover transactions.

### g.  Categorization

You can categorize your expenses in the Monifi App or in online banking. This service is provided solely as a convenience to you.  Certain expenses may be assigned an expense category automatically. You may reassign expenses as you see fit.  We have no liability for any claims arising based categorization of expenses, whether categorized by you or automatically. Automatic assignment of a category is not dispositive of an expense type, and you should not consider any categorization as tax advice or suggestions. You should not rely on categorization as a substitute for your financial recording keeping.

### h.  Manage Card

You can use the Manage Card to disable your debit card entirely. When you disable your debit card, you will not be able to make any purchases or withdrawals with your debit card.  If your debit card has been lost or stolen, you must still notify us immediately; disabling your debit card is not notice to us of a lost or stolen card. When you restrict usage of your debit card through Manage Card, you acknowledge and agree that you release us from any liability for transactions that may be rejected due to your elected controls.  Disabling your debit card disables only point-of-sale transactions. Recurring transactions that you have established and recurring credits will continue to post even if you have disabled your card.

You acknowledge and agree that we are providing you Manage Card as a convenience only. Your responsibilities to monitor your monthly statements and to provide us with notice of unauthorized transactions or lost or stolen cards are not affected by any elections you make using Manage Card.

### i.  Transfers

You can transfer funds using the "Transfer Money" function in the Monifi App or online banking.  You can transfer funds internally between your Spend Balance and your Save Balance using the Internal Funds Transfer Service; and you can transfer funds between your Spend or Save Balance and accounts at other financial institutions that you link in the External Transfer Service. If the balance from which you are requesting a funds transfer is not sufficient to cover the amount of the requested transfer, we may reject or cancel your request.

### j.  Services Provided by Plaid, Inc.

We have partnered with Plaid, Inc. to provide you with certain Services that allow you to connect your Relationship Accounts with accounts at other financial institutions and to view certain information about your accounts at other financial institutions. Accounts at other financial institutions that you connect to the Monifi App or online banking are your "External Accounts." Certain account types are not allowed for linking. When you provide information for an External Account, you represent that you are an owner of and have full authority to transact on that External Account, including authority to send money to and withdraw money from that External Account using electronic fund transfer Services.

### 1.  *Privacy*

When you connect your External Accounts, Plaid collects login information required by the provider of your External Account. This information may include your username and password, answers to challenge questions, or security tokens. Plaid may also ask you to provide your phone number to help verify your identity. When you provide this information, you authorize us and Plaid to act on your behalf to access and transmit information about your External Accounts. We do not retain your security credentials for other financial institutions, and we will not be responsible for any loss or claim you may incur as the result of providing such information to us or to Plaid.

The information that Plaid collects may vary, depending on the Service you have selected. Generally, Plaid may collect account information such as your account number, name, branch number, and type; your balance; information about transactions and loans, including due dates, interest rate, and loan types; and account owner information. Plaid may also receive device information. Plaid uses your information to operate its services, protect you from fraud, develop new services, investigate misuse of its services, and for other purposes with your consent. Plaid does not sell or rent your information to marketers or other third parties.

Plaid does share your information with its service providers, partners or contractors in connection with the services they perform or with Plaid's developers; if Plaid believes such sharing is necessary to comply with applicable law; if Plaid changes corporate ownership or control; between and among Plaid's affiliates; and as Plaid reasonably believes appropriate to protect your rights, privacy, safety or property or that of Plaid, its developers or partners. Plaid may use your information in an aggregated and anonymized format as allowed under Applicable Law.  You can review Plaid's entire Privacy Policy at plaid.com/privacy.

### 2. *External Aggregated Accounts*

You can elect to view balance and other information, as available, for External Aggregated Accounts using the External Account Service.  We are not the system of record for such External Aggregated Accounts, and information that is displayed is for your convenience only. We are not responsible for ensuring the accuracy or content of any information displayed about an External Aggregated Account, and you should not rely on information displayed through the External Aggregated Service to determine whether you have sufficient funds to make a transfer. Some financial institutions limit the information available for External Aggregated Services, including but not limited to transaction information. Transaction information displayed or provided to you in connection with the External Aggregated Service may not include transaction information for External Aggregated Accounts.

### k.  Ask Monifi

The Ask Monifi Service allows you to use natural language search capabilities to ask questions about your Monifi Relationship Accounts, transactions, and, if applicable, information about External Aggregated Accounts. Information provided through Ask Monifi is provided for convenience only and is subject to limitations on information that may be imposed by other financial institutions for External Aggregated Accounts.  You acknowledge that information provided through Ask Monifi is not guaranteed to be accurate and is subject to limits imposed by other financial institutions.

### l.  External Transfers

You can transfer funds between your Spend Balance or your Save Balance and an External Transfer Account. You can see balance information for your External Transfer Accounts when you use the External Transfer Service. We are not the system of record for information about your External Transfer Accounts. This information is provided as a convenience only, and you should not rely on the balances displayed for you External Transfer Accounts to determine whether you have funds available to make a transfer. You are solely responsible for ensuring that your External Transfer Accounts have sufficient funds for you to make any transfer.

### 1. *Types of External Transfers.*

External Transfers may be either outbound or inbound. Outbound External Transfers are when you transfer funds from your Spend Balance or your Save Balance to an External Transfer Account. Inbound External Transfers are when you transfer funds from an External Transfer Account to your Spend Balance or to your Save Balance.   All External Transfer Accounts that are used to schedule outbound or inbound External Transfers must be properly identified and registered with us.

*2.  Authorization for Inbound External Transfer Accounts.*

By enrolling an External Transfer Account for inbound External Transfers, you represent and warrant that you are an owner of that External Transfer Account, and you authorize us to debit that External Account according to your instructions entered through the Monifi App or online banking and to correct any errors that we may identify. This authorization will remain in effect until you delete the External Transfer Account from the External Transfer service. You should use extreme caution when you register an External Transfer Account for inbound External Transfers; never register an External Transfer Account for inbound transfers if you are not the owner of that account.

*3.  Preauthorized and Recurring External Transfers.*

You may use the External Transfer service to establish pre-authorized transfers on a one-time or recurring basis. Recurring pre-authorized transfers are those transfers that you set-up in advance to automatically occur at regular intervals that you establish. When you set-up an External Transfer in advance, you authorize Bank to initiate such transfers according to the instructions you provide through Online Banking. Your authorization for recurring transfers will remain in effect until you delete such transfers from your External Transfer service. For information regarding stop payments for preauthorized and recurring External Transfers, please see Sections 1(r) and 2(g).

*4.  Cancelling an External Transfer*.

An External Transfer cannot be cancelled once it has been initiated or is in process.

*5.  External Transfer Account Information.*

You are required to complete and provide all of the information we request for External Transfers, including but not limited to account numbers, routing numbers, bank information, and any other information or documentation we may reasonably request. It is your responsibility to ensure the validity and accuracy of any External Account information; we will validate External Accounts based on the information you provide. We may use Plaid, Inc. or other service providers to validate your External Accounts.  If we are unable to validate an External Account, you may not be able to send or receive funds using that account.  Further, outbound External Transfers may not be recoverable if sent to an incorrect account. We reserve the right to reject enrollment of any External Account for the External Transfer Service for any reason.  External Accounts are subject to the rules, terms, conditions, and regulations of the account-holding institution, and your relationship with each External Account provider is independent of us and your use of the External Transfer service.

*6.  Funds Availability and Processing*.

You must have sufficient funds in your applicable Relationship Account and/or the applicable External Account for the External Transfer to be completed. Any External Transfer initiated on any Business Day after 8:00 p.m. Central Time, may not be processed until the next Business Day. **Funds transferred into your Account by External Transfer will be available no later than the fifth (5th) Business Day following the scheduled External Transfer date.** It is recommended that you schedule your External Transfers in advance to allow ample time for us to address any processing errors or issues for failure to confirm the authority or accuracy of information on the External Account. We may notify you of any failure to be able to process any External Transfer as we are made aware of such. Once an External Transfer is initiated or in process, it cannot be cancelled. If an External Transfer is scheduled and authenticated using your Account, computer, and security information,

then any such External Transfer will be your responsibility, regardless of mistake, error, or fraud, subject to applicable law.

### 7. *Limits.*

Inbound and outbound External Transfers may not be less than $.01 or exceed $10,000 daily or per transaction. We reserve the right to limit the number of transfers you may send each day and each month. We may modify limits on amounts of transfers or on the frequency of transfers from time to time or on an exception basis at our sole discretion. Subject to Applicable Law, we shall have no liability to you or any other person or entity whatsoever for any failure to comply with our External Transfer procedures, Security Procedures, the terms of this Agreement, non-sufficient funds in any Account or External Account, inaccurate information provided by you or a third party, system failures or interruptions, or any failure of any External Transfer to be completed as requested and/or scheduled due to any reason, except for our gross negligence or willful misconduct. All External Transfers must be properly authenticated and in compliance with applicable law.

## m. Bill Pay

You can use Bill Pay to schedule payments directly from your authorized and designated Relationship Accounts to businesses, merchants, professionals, and individuals that we approve (each a "Payee"). When you make a payment using Bill Pay, we determine, in our sole discretion, whether the payment will be sent to your Payee by check or electronically. We reserve the right, in our sole discretion, to determine, at any time, whether a Payee will be classified as a business or consumer Payee. Payments may be made only to Payees with a U.S. payment address.

### 1. *How Bills Are Paid.*

Bill Pay allows you to make payments to Payees (defined below) by scheduling a payment in the Monifi App or online banking. We may remit your bill payments by mailing your Payee a check drawn on your designated Relationship Account, electronically as an ACH transaction, or by other acceptable means, as we may determine in our sole discretion.

### 2. *Payees*.

You may make payments through Bill Pay to any business, merchant, or professional that generates a bill or invoice for products or services provided to you, or on your behalf, and that has an address ("Business Payees"). You also may make payments through Bill Pay to individuals, family, or friends for non-business purposes ("Personal Payees"). The terms "Payee" or "Payees" includes both Business Payees and Personal Payees, as applicable. We reserve the right, in our sole discretion, to determine, at any time, how a Payee should be classified. Payments may be made only to Payees with a U.S. payment address.

Certain Payees have provided preferred payment information, which is managed by Bank's service provider ("Managed Payees"); if you identify a Managed Payee, you will be prompted to select that Payee from a drop-down list. You authorize us our third party vendor to adjust Managed Payee information to reflect the information on file with the third party vendor to facilitate payment to such Payees. You must manually enter Payee information for Payees other than Managed Payees.  You must provide us with complete and accurate information to enable us to properly direct a payment to the correct Payee and the correct Payee account ("Payee Information"). Payee Information includes, but is not limited to, the Payee's name, telephone

number, address, and account number. You can enter Payee Information directly through Bill Pay. Additions, deletions and changes to Payee Information are entered directly by you, and are communicated to us upon transmission of the information to us. Additions, deletions, and/or changes to Payees will be effective immediately. We may rely on the accuracy of the Payee Information provided, until such time as you change the Payee information, delete the Payee, or deactivate the Payee using Express Online Banking or you notify us otherwise. Any notifications for additions, deletions, or changes must be in writing and provided to us before they will be effective. We will have a reasonable amount of time to implement changes to your Payee Information. We will endeavor to update all Payee Information change requests within one (1) full Business Day of Bank's receipt of the request.

*3.  Limits.*

Payments may be made in any amount greater than $1.00 and less than $10,000.00 ("Payment Range"). Your total bill payments for any given Business Day may not exceed $20,000.00 ("Daily Payment Range"). We reserve the right to change the Payment Range and/or the Daily Payment Range at any time. Such changes will be effective upon our implementation and posting of such on our systems or website, subject to Applicable Law. Furthermore, we reserve, in our sole discretion, the right to allow exceptions to the Payment Range and Daily Payment Range based upon certain criteria including, but not limited to your total relationship with Bank, your credit scores, and/or special requests.

*4.  Timing of Your Payments and Funds Verification.*

In order to provide sufficient time for payments to be received by your Payees, electronic payments must be scheduled at least three (3) Business Days prior to the due date, and all other payments must be scheduled a minimum of seven (7) Business Days prior to the date the payment is due, excluding any applicable grace periods. Using Bill Pay, you may schedule a payment for delivery by selecting a "Start Date" directing us to transmit payment to your Payee.  You should select a "Start Date" that allows sufficient time for the payment to be delivered by the payment due date set by the Payee. Delivery to the Payee and crediting of your Account with Payee are not guaranteed.  If payment is sent by check, funds for the payment will be deducted from your Account when the check is presented for payment and processed. If payment is sent electronically, funds for the payment will be verified and deducted from your Account on the Start Date.  Payments must be scheduled prior to 8:00 p.m. Central Time for the Start Date to be the Business Day that the payment is scheduled. Payments scheduled after 8:00 p.m. Central Time will have a Start Date of the next Business Day. The date that funds are deducted from your Account may be different than the date a payment is scheduled to be sent or actually sent to the Payee. If your Account has non-sufficient funds or is no longer an active Account in good standing when funds are verified and deducted, (i) payments may be delayed or cancelled, and you will be responsible for any fees or expenses resulting from such a delay or cancellation; and (ii) check payments may be returned unpaid or cause a negative balance in your Account, and you may incur fees as set forth in the Fees and Charges section of this Agreement and any fees assessed by your Payee. We will have no liability for cancelled, delayed, or returned payments. In the event the funds in your designated Relationship Account cannot be verified or are non-sufficient to cover the amount of a bill payment, we may send the bill payment request through our exceptions processing procedures for further funds verification. Any exceptions processing will be in our sole discretion.

5.  *Payment Cancellation by You.*

You may use Bill Pay to electronically change the payment amount and/or the scheduled payment date of any previously scheduled payment, or to electronically cancel a previously scheduled payment, subject to the limitations herein. Future Payments and Recurring Payments may be canceled, changed or rescheduled any time prior to 8:00 p.m. Central Time on the Business Day prior to the scheduled payment date. If your payment has already been transmitted, it may not be cancelled or stopped through Bill Pay. If your payment was transmitted by mailing a check, you may request a stop payment by calling 800-440-1101. We will require your name and account number, the date drawn, the exact amount of the payment, and the Payee Information to attempt to fulfill your request. We may require you to put your request in writing and get it to us within fourteen (14) Business Days after your initial contact to us, or your stop payment order will cease to be binding. All requests to stop payment will incur the stop payment charge as set forth in the Fees and Charges section of this Agreement. ONCE AN ELECTRONIC PAYMENT HAS BEEN TRANSMITTED, IT CAN NOT BE STOPPED.

6.  *Payment Cancellation by Us*.

We reserve the right to refuse, suspend, or reject any payment or payment request and/or to cancel Bill Pay at any time for any reason. We are not responsible for any returned payments or fees associated therewith, due to inaccurate information provided by you, your representatives, or any third parties.

7.  *Future Payments*.

You may schedule a payment up to 364 days in advance.

8.  *Recurring Payments*.

You may schedule payments to Payees to be automatically transmitted in a fixed amount on a weekly, every other week, monthly, quarterly or yearly frequency. If a Recurring Payment date is a day that does not exist in a certain month, then the payment will be transmitted on the next Business Day of the month or the last day of the month. You will receive notification of the amount of a recurring payment to be paid from your designated Account, at least five (5) Business Days prior to the funds being withdrawn from your Account.

9.  *Statements*.

All of your payments and funds transfers made through Bill Pay will appear on your periodic statement(s). You have sole responsibility to monitor and review your statements and the bills paid from your Accounts and to immediately report any suspected fraud or unauthorized access to your Accounts or Account information.

10.  *Fees*.

You will be responsible for any fees associated with Bill Pay, including, but not limited to Returned Overdraft Fees that may be incurred in connection with Bill Pay for non-sufficient funds in or holds on your Account.

11.  *Liability*.

In addition to the liability limits stated elsewhere in this Agreement, you agree that we shall not be liable in the event that a scheduled payment is transmitted in accordance with the timing specifications set forth herein, but is not received by the Payee in a timely manner. You further agree that in any event, notwithstanding the cause of action or theory of liability, our liability related to the timeliness of transfers will

not exceed the lesser of Payee's late fee related to the particular late payments or $25.00. We may suspend, reject, delay, cancel, or refuse a bill payment for any reason and Bank shall have no liability to you or any third party for any such suspended, rejected, delayed, cancelled, or refused bill payment, where we act in good faith. You will be responsible for (i) periodically updating and providing accurate and current personal information; (ii) fulfilling all other obligations under this Agreement. Under no circumstances will we, our affiliates, subsidiaries, officers, employees, or representatives be liable to you or any third parties for any delayed, late, or cancelled payments, fees, expenses, or costs due to non-sufficient funds in your Account, inaccurate information provided by your or your representatives, Services not properly activated, Accounts with restricted funds or instructions, inactive Accounts, or Accounts not in good standing.  We, our affiliates, subsidiaries, officers, employees, or representatives shall not be liable to you or any third parties for any liabilities, damages, fees, expenses, penalties, or costs arising out of your negligence or your failure to monitor your Account and schedule payments accordingly, or for any special, consequential, indirect, incidental, or punitive damages arising from or out of this Bill Payment Agreement.

12. *Right to Terminate*.

We may terminate your use of Bill Pay, in whole or in part, at any time with or without prior notice to you for any reason; and we shall have no liability whatsoever for any failed, terminated, or cancelled payments due to such termination. Your access to Bill Pay will terminate automatically if your Billable Account is closed, or if access to or funds in your Billable Account are restricted for any reason. Termination will not affect your liability or obligations under this Agreement for transactions processed by Bank on your behalf and through any termination or any transfer of Accounts.

### n.  Mobile Deposit

The following terms and conditions apply specifically to use of the Monifi Mobile Deposit Service ("Mobile Deposit"):

1. *Eligible Items.*

You agree to scan and deposit only checks as that term is defined in Federal Reserve Regulation CC ("Reg CC"). You agree that the image of the check transmitted to us shall be deemed an "item" within the meaning of Article 4 of the Uniform Commercial Code as adopted in Oklahoma. You agree that you will not use Mobile Deposit to scan and deposit any checks or other items shown below:

1. Checks or items payable to any person or entity other than you, including a check made payable to you and one or more persons or entities not named as an account holder on your depository Account.
2. Checks or items containing obvious alteration to any of the fields on the front of the check or item, or which you know or suspect, or should know or suspect, are fraudulent or otherwise not authorized by the owner of the account on which the check or item is drawn.
3. Checks or items that are not endorsed on the back of the check as specified in this Agreement.
4. Checks or items previously converted to a substitute checks, as defined in Reg CC.
5. Checks or items drawn on a financial institution located outside the United States.
6. Checks or items that are remotely created checks, as defined in Reg CC.
7. Checks or items dated more than six (6) months prior to the date of deposit.
8. Checks or items that have previously been submitted through Mobile Deposit or through a remote deposit capture service offered at any other financial institution.

9.  Checks or items prohibited by our current procedures relating to the Mobile Deposit or which are otherwise not acceptable under the terms of your Account.

*2. Image Quality.*

The image of an item transmitted to us using Mobile Deposit must be legible. The image quality of the items must comply with the requirements established from time to time by us, American National Standards Institute, the Board of Governors of the Federal Reserve Board, or any other regulatory agency, clearing house or association.

*3. Endorsements and Procedures.*

A check must be endorsed exactly as it is made payable. If a check is made payable to more than one party, each party must endorse the check. You must write "For Deposit at Monifi Only" above the signatures of the endorsing party(ies).  Regulation CC endorsement standards restrict the endorsement of the payee to the top 1.5 inches of the check.  Rubber stamp endorsements are acceptable on checks taken for deposit. You agree to follow any and all other procedures and instructions for use of Mobile Deposit as we may establish from time to time.

4.  *Receipt of Items*.

We reserve the right to reject any item transmitted through Mobile Deposit, at our discretion, without liability to you.  We are not responsible for items we do not receive or for images that are dropped during transmission.  An image of an item shall be deemed received when you receive a confirmation from us that we have received the image. Receipt of such confirmation does not mean that the transmission was error free or complete.

5.  *Fees*.

We may assess fees as set forth in the Fees and Charges section of this Agreement, such as fees for returned items or fees for items dishonored on presentation to the financial institution on which drawn.

6.  *Availability of Funds*.

You agree that items transmitted using Mobile Deposit are not subject to the funds availability requirements of Reg CC. Funds deposited using Mobile Deposit will be available after we receive payment for the funds submitted. We may make such funds available sooner based upon such factors as credit worthiness, the length and extent of your relationship with us, transaction and experience information, and such other factors as we, in our sole discretion, deems relevant.

7.  *Retention and Disposal of Transmitted Items*.

Upon your receipt of confirmation from us that we have received the image of an item, you must retain the original of each item for fifteen (15) Business Days from the date of transmission. You will mark each imaged item as "electronically presented" or "scanned" after it is transmitted to us. Upon our request, you will promptly provide the retained item or a sufficient copy of the front and back of the item to us to aid in the clearing and collection process, to resolve claims by third parties with respect to any item, or for our audit purposes.

8. *Deposit Limits.*

We limit the amount and the number of items that you can deposit using Mobile Deposit daily and monthly. You can view your Mobile Deposit limit in the Monifi App when you initiate a Mobile Deposit. We reserve the right to impose additional limits on the amount(s) and/or number of deposits that you transmit using Mobile Deposit. All limits and amounts may be modified or changed from time to time or on an exception basis by us, in our sole discretion.

9. *Presentment*.

The manner in which the items are cleared, presented for payment, and collected shall be in our sole discretion subject to the terms of this Agreement.

10. *User Warranties and Indemnification.*

You warrant to us that:

1. You will only transmit eligible items.
2. Images will meet the quality standards.
3. You will not transmit duplicate items.
4. You are not aware of any factor which may impair the collectability of the item.
5. You will not deposit or represent the original item.
6. All information you provide to us is accurate and true.
7. You will comply with this Agreement and all applicable rules, laws and regulations. You agree to indemnify us and hold us harmless from any loss for breach of this warranty provision.

## 6. Zelle Service

The following describes the terms and conditions governing your use of the Zelle Service (defined below). Each time you use the Zelle Service, you agree to the terms and conditions set forth herein, as may be amended from time to time.

### a. Description of Services

1. We have partnered with the Zelle Network ("*Zelle*") to enable a convenient way to transfer money between you and others who are enrolled directly with *Zelle* or enrolled with another financial institution that partners with *Zelle* (each, a "User") using aliases, such as email addresses or mobile phone numbers (the "*Zelle* Service"). We will refer to financial institutions that have partnered with *Zelle* as "Network Banks."
2. *Zelle* provides no deposit account or other financial services. *Zelle* neither transfers nor moves money. You may not establish a financial account with *Zelle* of any kind. All money will be transmitted by a Network Bank or Card Network.
3. THE *ZELLE* SERVICE IS INTENDED TO SEND MONEY TO FRIENDS, FAMILY AND OTHERS YOU TRUST. YOU SHOULD NOT USE THE SERVICE TO SEND MONEY TO RECIPIENTS YOU DO NOT KNOW OR YOU DO NOT TRUST.
4. We do not offer protection for purchases or service payments you make using the *Zelle* Service. You should not use the *Zelle* Service to purchase goods or services not yet received or from people you do not know.

### b.  Eligibility, Payment Types, and Authorization

The *Zelle* Service is intended for personal use and should not be used for business or commercial purposes. Not every personal account is eligible for enrollment in the *Zelle* Service; and business accounts are not eligible for the *Zelle* Service. You agree that you will not use the *Zelle* Service to send or receive payments in connection with your business or commercial enterprise.

We reserve the right to decline your enrollment if we believe that you are enrolling to use the *Zelle* Service with a business account or to receive or send business or commercial payments. We further reserve the right to suspend or terminate your use of the *Zelle* Service if we believe that you are using the *Zelle* Service for business or commercial purposes or for any purposes not permissible under applicable law or the terms of this Agreement.

We may, in our sole discretion, decline to enroll any account that we believe poses a risk to you or to us. If you violate any of the terms of this Addendum or the Agreement; if there has been fraud or unauthorized access to your Account or the *Zelle* Service; if there is negative activity on your Account; or, if we encounter any problem with your use of the *Zelle* Service, you agree that we may terminate your access at any time. You agree that you will not use the *Zelle* Service to send money to anyone to whom you are obligated for tax payments, payments made pursuant to court orders (including court-ordered amounts for alimony or child support), fines, payments to loan sharks, gambling debts or payments otherwise prohibited by law; and you agree that you will not use the *Zelle* Service to request money from anyone for any such payments.

When you enroll to use the *Zelle* Service or when you permit others to whom you have delegated to act on your behalf to use or access the *Zelle* Service, you agree to the terms and conditions of this Agreement. You represent that you have the authority to authorize debits and credits to the enrolled bank Account.

### c.  Enrolling for the *Zelle* Service

1.  You must provide us with an email address that you regularly use and intend to use regularly and a permanent U.S. mobile phone number that you intend to use for an extended period of time (i.e., no "burner" numbers). You may not enroll in the *Zelle* Service with a landline phone number, Google Voice number, or Voice over Internet Protocol (VoIP).

2.  Once enrolled, you may:

    a.  Authorize a debit of your enrolled account to send money to another *Zelle* Service User either at your initiation or in response to a request from another *Zelle* Service User; and

    b.  Receive money from another User either at that User's initiation or at your request, subject to the conditions of the Section below titled "Requesting Money."

3.  If at any time while you are enrolled, you do not send or receive money using the Service for a period of 18 consecutive months, we may contact you and/or take other steps to confirm that the U.S. mobile phone number or email address that you enrolled still belongs to you. If we are unable to confirm that you are the owner of the mobile phone number or email address, then you understand that we may cancel your enrollment and you will not be able to send or receive money with the Service until you enroll again.

4.  Once enrolled, a Z logo will appear on your profile picture for each U.S. mobile number and/or email address that you have enrolled with Zelle. The Z logo will be displayed to other Users to aid them in

determining which of your U.S mobile numbers or email addresses should be used to send money with Zelle. If a User sends you money using a different U.S. mobile number or email address that they may have for you (one that is not already enrolled), you will receive a message with instructions on how to enroll with Zelle.

5.   We may not be able to complete your enrollment in the *Zelle* Service if we cannot verify your identity or other necessary information.

6.   You are solely responsible for notifying us of any change to your enrolled email address or mobile phone number, and by providing us with such information, you authorize us to rely on such information until such time as you notify us of a change in a manner that is satisfactory to us.

### d.   Consent to Share Personal Information and Privacy Notice

We may share information about your Accounts and any transactions made using the *Zelle* Service with third parties, including Network Banks and the Network Operator, as necessary to complete transactions; in connection with offering the *Zelle* Service; to facilitate or initiate investigations of claims related to your Account or funds that you send or receive using the *Zelle* Service; to comply with government agency or court orders; as you may otherwise agree; and according to our Privacy Policy.

We make security and the protection of your information a top priority. You can access our Privacy Policy at monifi.com/privacy.

### e.   Wireless Operator Data

We or *Zelle* may use information on file with your wireless operator to further verify your identity and to protect against or prevent actual or potential fraud or unauthorized use of the *Zelle* Service. By using the Service, you authorize your wireless operator (AT&T, Sprint, T-Mobile, US Cellular, Verizon, or any other branded wireless operator) to disclose your mobile number, name, address, email, network status, customer type, customer role, billing type, mobile device identifiers (IMSI and IMEI) and other subscriber status details, if available, to our third party service provider, solely to allow verification of your identity and to compare information you have provided to us or to *Zelle* with your wireless operator account profile information for the duration of our business relationship. See *Zelle's* Privacy Policy zellepay.com/privacy for how it treats your data.

### f.   Consent to Emails and Automated Text Messages

By participating as a User, you represent that you are the owner of the email address, mobile phone number, and/or other alias you enrolled, or that you have the delegated legal authority to act on behalf of the owner of such email address, mobile phone number and/or other alias to send or receive money as described in this Addendum. You consent to the receipt of emails or text messages from us, from *Zelle*, from other Users that are sending you money or requesting money from you, and from other Network Banks or their agents regarding the Services or related transfers between Network Banks and you. You agree that we, *Zelle*, or either of our agents may, use automatic telephone dialing systems in connection with text messages sent to any mobile phone number you enroll. You further acknowledge and agree:

1.   You are responsible for any fees or other charges that your wireless carrier may charge for any related data, text or other message services, including without limitation for short message service. Please check your mobile service agreement for details or applicable fees.

2.   You will immediately notify us if any email address or mobile phone number you have enrolled is (i)

surrendered by you, or (ii) changed by you.

3.   In the case of any messages that you may send through either us or *Zelle* or that we may send or *Zelle* may send on your behalf to an email address or mobile phone number, you represent that you have obtained the consent of the recipient of such emails or automated text messages to send such emails or text messages to the recipient. You understand and agree that any emails or text messages that we send or that *Zelle* sends on your behalf may include your name.

4.   Your wireless carrier is not liable for any delay or failure to deliver any message sent to or from us or *Zelle*, including messages that you may send through us or through *Zelle* or that we may send or *Zelle* may send on your behalf.

5.   To cancel text messaging from us, send STOP to 20736. For help or information regarding text messaging, send HELP to 20736 or contact our customer service at 800-440-1101.

6.   You expressly consent to receipt of a text message to confirm your "STOP" request.

### g.   Receiving Money; Money Transfers by Network Banks

Once a User initiates a transfer of money to your email address or mobile phone number enrolled with the *Zelle* Service, you have no ability to stop the transfer. By using the *Zelle* Service, you agree and authorize us to initiate credit entries to the bank account you have enrolled.

Most transfers of money to you from other Users will occur within minutes. There may be other circumstances when the payment may take longer. For example, in order to protect you, us, *Zelle* and the other Network Banks, we may need or *Zelle* may need additional time to verify your identity or the identity of the person sending the money. We may also delay or block the transfer to prevent fraud or to meet our regulatory obligations. If we delay or block a payment that you have initiated through a request for money, we will notify you in accordance with your User preferences.

If you are receiving a payment from a business or government agency, your payment will be delivered in accordance with both this Agreement, and the procedures of the business or government agency that is sending you the payment.

### h.   Sending Money; Debits by Network Banks

You may send money to another User at your initiation or in response to that User's request for money. You understand that use of this Service by you shall at all times be subject to (i) this Addendum and the Agreement, and (ii) your express authorization at the time of the transaction for us to initiate a debit entry to your designated bank account. You understand that when you send the payment, you will have no ability to stop it. If the person you sent money to has already enrolled with *Zelle*, either in the *Zelle* mobile app or with a Network Bank, the money is sent directly to their bank account (except as otherwise provided below) and may not be canceled or revoked.

In most cases, when you are sending money to another User, the transfer will occur in minutes; however, there are circumstances when the payment may take longer. For example, in order to protect you, us, *Zelle* and the other Network Banks, we may need additional time to verify your identity or the identity of the person receiving the money. If you are sending money to someone who has not enrolled as a User with *Zelle*, either in the *Zelle* mobile app or with a Network Bank, they will receive a text or email notification instructing them on how to enroll to receive the money. You understand and acknowledge that a person to whom you are

sending money and who is not enrolling as a User may fail to enroll with *Zelle*, or otherwise ignore the payment notification, and the transfer may not occur.

The money may also be delayed or the transfer may be blocked to prevent fraud or comply with regulatory requirements. If we delay or block a payment that you have initiated, we will notify you in accordance with your User preferences.

We have no control over the actions of other Users, other Network Banks or other financial institutions that could delay or prevent your money from being delivered to the intended User.

### i.   Funds and Processing

You must have sufficient funds in your Account to send money to a recipient. If you do not have sufficient funds in your account, we reserve the right to refuse to transmit the payment. While most transfers are completed within minutes, some transfers may take additional time to complete. It is your sole responsibility to ensure that you initiate transfers to recipients with sufficient time to meet any deadline or other time frame imposed by you or a recipient. If a transfer is initiated from your Account and authenticated according to the Security Procedures—including but not limited to biometric authentication such as touch or face authentication—you will be responsible for the transfer, regardless of mistake, error, or fraud, subject to applicable law.

### j.   Liability

Neither we nor *Zelle* shall have liability to you for any transfers of money conducted through the *Zelle* Service, including without limitation, (i) any failure, through no fault of us or *Zelle* to complete a transaction in the correct amount, or (ii) any related losses or damages.  Neither we nor *Zelle* shall be liable for any typos or keystroke errors that you may make when using the *Zelle* Service.

YOU AGREE THAT YOU, NOT WE OR *ZELLE*, ARE RESPONSIBLE FOR RESOLVING ANY PAYMENT OR OTHER DISPUTES THAT YOU HAVE WITH ANY OTHER USER WITH WHOM YOU SEND MONEY TO, OR RECEIVE OR REQUEST MONEY FROM, USING THE *ZELLE* SERVICE.

### k.   Limits

We limit the amount of funds that you may send using the *Zelle* Service and the number and type of transactions you may initiate, and we reserve the right to change limits at any time, in our sole discretion. We may reject any transfer request you make using the *Zelle* Service if it exceeds limits that we have set.  If we allow you to request or send money in excess of any limit we have set, the terms and conditions of this Addendum and the Agreement still apply; and, we will not be obligated to complete such a transaction again. We may change daily and transactional limits without notice to you. For information about transaction limits, please contact us at 800-440-1101.

### l.   Requesting Money

You may request money from another User. Each time you request money from another User, you represent that:
1. You understand and acknowledge that Users to whom you send payment requests may reject or ignore your request.
2. Requests for money must be sent to a User's mobile phone number or email address; neither we

nor *Zelle* guarantee that you will receive money from other Users by sending a payment request.

3. If a User ignores your request, we may decide or *Zelle* may decide, in our sole discretion, that we will not send a reminder or repeat request to that User. We are not obligated to notify you, nor do we have any knowledge, if a request you send has been received by another User.
4. If you request money from another User and are notified that the User does not wish to receive requests or that the User disputes or disclaims the obligation, you will not make repeat requests from that User.
5. You are not engaging in the business of debt collection by attempting to use the *Zelle* Service to request money for the payment or collection of an overdue or delinquent debt; to request money that is owed to another person; or to collect any amounts that are owed pursuant to a court order.
6. You will send requests for money only for legitimate and lawful purposes.

You agree to receive money requests from other Users. Requests for money are solely between the sender and recipient. Neither we nor *Zelle* will review or verify such requests.  Neither we nor *Zelle* assume responsibility for the accuracy or legality of such requests and do not act as a debt collector on your behalf or on behalf of the sender of a request for money.

We reserve the right, but assume no obligation, to terminate your ability to send requests for money in general, or to specific recipients, if we deem such requests to be potentially unlawful, abusive, offensive, or unwelcome by the recipient.

### m.  Receiving Requests for Money

Other Users may be able to send you a request for money. You are not required to respond to such a request. You authorize us to deliver requests from Users, which we reasonably believe are addressed to you, but we do not guarantee the accuracy or genuineness of any request sent to you.  We do not guarantee that you will receive requests sent through the *Zelle* Service.  You acknowledge that we do not control the frequency, content, or purposes of requests sent to you, and we may be unable to block requests being sent to you without terminating your enrollment in the *Zelle* Service.

### n.   Your Transaction Errors

When you initiate a transaction, you authorize us to rely on the information provided by you, and you authorize us to act on any instruction that has been or reasonably appears to have been sent by you, to submit fund transfer instructions on your behalf.  Other banks receiving this information may rely on such information also. We are not obligated to take additional steps to confirm or authenticate such instructions and may act without any further confirmation. You are solely responsible for losses resulting from your errors, duplication, ambiguities, or fraud in the information you provide. We reserve the right to recover from you any costs or losses incurred as the direct or indirect result of you providing inaccurate or incomplete information.

### o.   Electronic Funds Transfer Disclosures

See the Electronic Funds Transfer Disclosures above including important information regarding unauthorized transactions, lost or stolen devices, and error resolution procedures.

### p.  Liability for Failure to Complete Transfers

If we do not complete a transfer to or initiate a transfer from your Account within any applicable timeframes, or in the correct amount, we will be liable for your losses or damages. However, there are some exceptions.

We will not be liable, for instances, if through no fault of ours, you do not have sufficient funds in your Account to make the transfer; if the *Zelle* Service or the Monifi App were not working at the time you initiated the transaction, and you knew of the breakdown when you started the transaction; if the transaction is delayed or cancelled under other provisions of this Addendum or the Agreement; if there are circumstances beyond our control such as fire or flood that prevent the transfer; and any other exception stated in our Agreement with you.

### q.  Fees

We do not currently charge fees in connection with the *Zelle* Service. If we assess fees in the future, we will notify you of such fees in accordance with Applicable Law.

### r.  *Zelle's* Disclaimer of Warranties

EXCEPT AS OTHERWISE PROVIDED HEREIN, AND SUBJECT TO APPLICABLE LAW, *ZELLE* MAKES NO EXPRESS OR IMPLIED WARRANTIES, REPRESENTATIONS OR ENDORSEMENTS WHATSOEVER WITH RESPECT TO THE SERVICE.  *ZELLE* EXPRESSLY DISCLAIMS ALL WARRANTIES OF ANY KIND, EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, INCLUDING, BUT NOT LIMITED TO, IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE AND NON-INFRINGEMENT, WITH REGARD TO THE SERVICE DESCRIBED OR PROVIDED.  *ZELLE* DOES NOT WARRANT THAT THE SERVICE WILL BE UNINTERRUPTED, TIMELY, SECURE OR ERROR-FREE, OR THAT DEFECTS WILL BE CORRECTED.  THE SERVICES ARE PROVIDED ON AN "AS IS" AND "AS AVAILABLE" BASIS.

### s.  *Zelle's* Limitation of Liability

EXCEPT AS OTHERWISE PROVIDED HEREIN AND SUBJECT TO APPLICABLE LAW, IN NO EVENT WILL *ZELLE*, ITS OWNERS, DIRECTORS, OFFICERS, AGENTS OR NETWORK BANKS BE LIABLE FOR ANY DAMAGES WHATSOEVER, INCLUDING, BUT NOT LIMITED TO ANY DIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL, EXEMPLARY OR OTHER INDIRECT DAMAGES ARISING OUT OF (I) ANY TRANSACTION CONDUCTED THROUGH OR FACILITATED BY THE SERVICE; (II) ANY CLAIM ATTRIBUTABLE TO ERRORS, OMISSIONS, OR OTHER INACCURACIES IN THE SERVICES DESCRIBED OR PROVIDED; (III) UNAUTHORIZED ACCESS TO OR ALTERATION OF YOUR TRANSMISSIONS OR DATA; OR (IV) ANY OTHER MATTER RELATING TO THE SERVICES DESCRIBED OR PROVIDED, EVEN IF *ZELLE* HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.  IF YOU ARE DISSATISFIED WITH *ZELLE'S* SERVICE OR WITH THE TERMS OF THIS ADDENDUM AND THE AGREEMENT, YOUR SOLE AND EXCLUSIVE REMEDY IS TO DISCONTINUE USING THE SERVICE.

IN THOSE STATES WHERE THE EXCLUSION OR LIMITATION OF LIABILITY FOR CONSEQUENTIAL OR INCIDENTAL DAMAGES MAY NOT APPLY, ANY LIABILITY OF *ZELLE*, ITS OWNERS, DIRECTORS, OFFICERS AND AGENTS OR THE NETWORK BANKS LIABILITY IN THOSE STATES IS LIMITED AND WARRANTIES ARE EXCLUDED TO THE GREATEST EXTENT PERMITTED BY LAW, BUT SHALL, IN NO EVENT, EXCEED ONE HUNDRED DOLLARS ($100.00).

### t.  Bank's Limitation of Liability

Bank incorporates by reference herein the liability limits and disclaimers of warranties contained in the Agreement.

### u.  Indemnification

You acknowledge and agree that you are personally responsible for your conduct while using the *Zelle* Service, and except as otherwise provided in this Addendum and the Agreement, you agree to indemnify, defend and

hold harmless *Zelle*, its owners, directors, officers, agents and Network Banks from and against all claims, losses, expenses, damages and costs (including, but not limited to, direct, incidental, consequential, exemplary and indirect damages), and reasonable attorneys' fees, resulting from or arising out of your use, misuse, errors, or inability to use the Service, or any violation by you of the terms of this Addendum and the Agreement.

You further acknowledge and agree to indemnify, defend and hold harmless MidFirst Bank, its divisions, owners, directors, officers, agents from and against all claims, losses, expenses, damages and costs (including, but not limited to, direct, incidental, consequential, exemplary and indirect damages), and reasonable attorneys' fees, resulting from or arising out of your use, misuse, errors, or inability to use the Service, or any violation by you of the terms of this Addendum and the Agreement.

### v.   Trademark Disclosures

*Zelle* and the *Zelle*-related marks are wholly owned by Early Warning Services, LLC and are used herein under license.

### w.  Cancellation of the Service

You may cancel your access to the *Zelle* Service at any time by calling us at 800-440-1101. Once we receive your request to cancel access, we will have a reasonable time to act on your request.

### x.   Right to Terminate Access

We reserve the right to terminate access to the *Zelle* Service at any time, subject to Applicable Law.

### y.   Definitions

Unless otherwise defined below, capitalized terms shall have the meanings assigned to them in the Agreement.

1. **"Network Operator"** means Early Warning Systems, LLC. 2.
2. "**P2P Account"** means the Bank demand deposit account that you designate to send and receive funds using the Service.
3. **"P2P Transaction"** means a transaction initiated through the Service to transfer funds from your P2P Account to another User or to receive funds in your P2P Account from another User, including messages sent through various payment networks as necessary to complete the transaction.
4. **"Participating Financial Institution" or "Network Bank"** means a financial institution that has elected to participate in the *Zelle* Payment Network.
5. "**User"** means an individual enrolled in the Service directly through *Zelle* or through another financial institution or through the Bank. For purposes of the Service provided by Bank, a user includes individuals that you authorize to access your Account or to use the Service on your behalf or who you have provided with your personal information, including but not limited to your User ID and password. Anyone you give your personal information, User ID or password to, will be deemed to be authorized by you to use the Service and make P2P Transactions.

## 7.  Legal

### a.  Authorization to Obtain Information

You agree that we may obtain, collect, and review information regarding you and your Relationship and Relationship Accounts, including, but not limited to checking your credit information with an authorized credit bureau in order to process your Account and Service application(s) and enrollment in the Services, as necessary. You agree to provide us written permission to access your credit history, in addition to the consent herein, upon any request. Furthermore, you agree and grant us permission to obtain information from your Payees, billers, and other third parties necessary to complete your requests for the Services and to complete payments and transactions in connection with this Agreement.

### b.  Privacy

We take the privacy of your information seriously. You can access our Privacy Policies at monifi.com/privacy. We will disclose information about your Relationship Accounts to third parties as provided elsewhere in this Agreement. You authorize us to disclose information to third parties about your Relationship Accounts or the transfers you make or request, as necessary for completing the transfers, Services, or in order to verify the existence and condition of your Account(s) for a third party, such as to a credit bureau, merchant, biller, or other person necessary for the transaction to be completed as instructed by you.

We may use data about your transactions or information you provide to us, such as goals, in an aggregated and anonymized format to make decisions about products and services we may provide now or in the future or to market such products and services.

### c.  Termination of Services

You may terminate your use of the Services by closing your Relationship and deleting the Monifi App. If you withdraw your consent to receive Electronic Communications, we may exercise our right to close your Monifi Relationship and Accounts.

We may terminate your use of the Services, in whole or in part, at any time with or without prior notice for any reason. We may immediately terminate your access to the Services if either of your Relationship Accounts are closed, or access to either of your Relationship Accounts is restricted for any reason. Furthermore, we reserve the right to terminate your access to the Services, if you do not access the Services during any ninety (90) day period. Any termination of this Agreement or any of the Services, in whole or in part, will not affect your liability or obligations under this Agreement for pending or outstanding payments and transactions you have requested for processing or for any fees owed to us. We may access, charge, or make a withdrawal on any Account held at the Bank by you for fees or charges owed to us by you in connection with your use of the Services, transactions, payments, or any termination of the Services. For purposes of this section an Account held at the Bank includes Accounts you may hold with MidFirst Bank or any of its divisions, including but not limited Vio Bank.

### d.  Limitations of Services

Some Services may have qualification requirements. We reserve the right to change any qualification requirements at any time without prior notice.

### e.  Entire Agreement

This Agreement shall constitute the complete and exclusive agreement between you and us related to the Services and your Relationship Accounts, and this Agreement shall supplement any other documentation, disclosures, or agreements related to the Services and your Accounts. In the event of a conflict between this Agreement and any other documentation relating to your Accounts or the Services, this Agreement shall control. In the event this Agreement conflicts with the terms and conditions posted on our website or in the Monifi App, from time to time, the terms and conditions on our website or in the Monifi App shall control, provided such are posted later in time to this Agreement.

### f.  Waivers

No waiver shall be valid, unless expressly we expressly agree to it in writing. Our delay or omission in exercising any rights or remedies set forth in this Agreement shall impair such right or remedy or be construed as a waiver of any such right or remedy. Any single or partial exercise of a right or remedy shall not preclude further exercise of that or any other right or remedy.

### g.  Assignment

You may not assign or transfer this Agreement to any other party under any circumstance; this Agreement will automatically terminate in the event of an unauthorized assignment or transfer. We may assign this Agreement or delegate any or all of our rights and responsibilities under this Agreement to any third party with or without notice to you and without your consent.

### h.  ARBITRATION PROVISION.

**PLEASE REVIEW AND READ THIS ARBITRATION PROVISION CAREFULLY. IF YOU DO NOT REJECT THIS ARBITRATION PROVISION IN ACCORDANCE WITH SUBPARAGRAPH (1) BELOW, IT WILL BE PART OF THIS AGREEMENT AND WILL HAVE A SUBSTANTIAL IMPACT ON THE WAY YOU OR WE WILL RESOLVE ANY CLAIM THAT YOU OR WE HAVE AGAINST EACH OTHER, NOW OR IN THE FUTURE. Arbitration is the process for settling disputes where the determination is made by an impartial third party. Arbitration binds the parties to a type of resolution outside of the courts.**

1.  Your Right to Reject Arbitration Provision: If you do not want this Arbitration Provision to apply, you may reject it by mailing us a written rejection notice which gives your name(s) and Account number(s) and contains a statement that you, both or all of the Account owners, if more than one) reject the Arbitration Provision in this Agreement which governs your Account. The rejection notice must be sent to us at MidFirst Bank, 501 N.W. Grand Boulevard, Oklahoma City, Oklahoma 73118, Attn: Bank Operations Arbitration Rejection. A rejection notice is effective only if it is signed by you (including both or all of the Account owners), and such notice is received within thirty (30) days after the day you open your Account (the "Rejection Deadline").

2.  Parties Subject to Arbitration: As used in this Arbitration Provision, the terms "we," "us" and "our" mean (a) MidFirst Bank, its divisions, including but not limited to Monifi, any parent, subsidiary or affiliate of MidFirst Bank and the employees, officers and directors of such companies    ("Bank Parties"); and (b) any other person or company that provides any services in connection with this Agreement or your Account(s) if you assert a Claim against such other person or company at the same time you assert a Claim against any Bank Party.

3.  Covered Claims: "Claim" means any claim, dispute or controversy between you and us that in any way arises from or relates to this Agreement, your Account, any products or services offered by us, including but not limited to, any debit card provided to you, the Services, Balance Protect, Goals, and the advertising and disclosures related to the foregoing, if such Claim, dispute or controversy cannot be resolved without a lawsuit or arbitration proceeding. "Claim" includes disputes arising from actions or omissions prior to the effective date of this Agreement (or prior to the time this Arbitration Provision becomes part of this Agreement). "Claim" has the broadest reasonable meaning, and includes initial claims, counterclaims, cross-claims and third-party claims, inclusive of any damages or other remedies claimed It includes disputes based upon contract, tort, consumer rights, fraud and other intentional torts, constitution, statute, regulation, ordinance, common law and equity (including any claim for injunctive or declaratory relief). However, it does not include any dispute about the validity, enforceability, coverage or scope of this Arbitration Provision or any part thereof (including, without limitation, subparagraph (7), captioned "Prohibition Against Certain Proceedings" (the "Class Action Waiver"), the final sentence in subparagraph (13), captioned "Severability," and/or this sentence); all such disputes are for a court and not an arbitrator to decide. Notwithstanding the foregoing, the term "Claim" includes any dispute about the validity or enforceability of this Agreement as a whole.

4.  Starting an Arbitration: To the extent permitted by the Federal Arbitration Act (the "FAA") and any other applicable federal law, arbitration may be elected by either party with respect to any Claim, even if that party has already initiated a lawsuit with respect to a different Claim. Arbitration is elected by giving a written demand for arbitration to the other party, by filing a motion to compel arbitration in court or by initiating an arbitration against the other party. We will not demand to arbitrate an individual Claim that you bring against us in small claims court or your state's equivalent court, if any. If that Claim is transferred, removed or appealed to a different court, we then have the right to demand arbitration.

5.  Choosing the Administrator: "Administrator" means the American Arbitration Association ("AAA"), 1633 Broadway, 10th Floor, New York, NY 10019, www.adr.org; JAMS, 620 Eighth Avenue, 34th Floor, New York, NY 10018, www.jamsadr.org; or any other company selected by mutual agreement of the parties. If both AAA and JAMS cannot or will not serve and the parties are unable to select an Administrator by mutual consent, the Administrator will be selected by a court. The arbitrator will be appointed by the Administrator in accordance with the rules of the Administrator. However, the arbitrator must be a retired or former judge or a lawyer with at least ten (10) years of experience in handling banking disputes. you get to select the Administrator if you give us written notice of your selection with your notice that you are demanding to arbitrate any Claim or within twenty (20) days after we give you notice that we are demanding to arbitrate any Claim (or, if you dispute our right to require arbitration of the Claim, within twenty (20) days after that dispute is finally resolved). If you do not select the Administrator within the time specified, we may select the Administrator. Notwithstanding any language in this Arbitration Provision to the contrary, no arbitration may be administered, without the consent of all parties to the arbitration, by any Administrator that has in place a formal or informal policy that is inconsistent with the Class Action Waiver.

6.  Court and Jury Trials Prohibited; Other Limitations on Legal Rights: FOR CLAIMS SUBJECT TO ARBITRATION YOU WILL NOT HAVE THE RIGHT TO PURSUE THAT CLAIM IN COURT OR HAVE A JURY DECIDE THE CLAIM. YOUR ABILITY TO OBTAIN INFORMATION AND SEEK DISCOVERY WILL BE MORE LIMITED IN ARBITRATION THAN IN A LAWSUIT. OTHER RIGHTS THAT YOU WOULD HAVE IF YOU WENT TO COURT MAY ALSO NOT BE AVAILABLE IN ARBITRATION.

7.  Prohibition Against Certain Proceedings: FOR CLAIMS SUBJECT TO ARBITRATION: (1) YOU MAY NOT PARTICIPATE IN A CLASS ACTION IN COURT OR IN A CLASS-WIDE ARBITRATION, EITHER AS A PLAINTIFF, CLASS REPRESENTATIVE OR CLASS MEMBER; (2) YOU MAY NOT ACT AS A PRIVATE ATTORNEY GENERAL IN COURT OR IN ARBITRATION; (3) CLAIMS BROUGHT BY OR AGAINST YOU MAY NOT BE JOINED OR CONSOLIDATED WITH CLAIMS BROUGHT BY OR AGAINST ANY OTHER PERSON; AND (4) THE ARBITRATOR SHALL HAVE NO POWER OR AUTHORITY TO CONDUCT A CLASS-WIDE ARBITRATION, PRIVATE ATTORNEY GENERAL ARBITRATION OR MULTIPLE-PARTY ARBITRATION. Collectively, this Section (7) is referred to as the Class Action Waiver.

8.  Location and Costs of Arbitration: Any arbitration hearing that you attend must take place at a location reasonably convenient to you. We will pay any and all fees of the Administrator and/or the arbitrator (i) if applicable law requires us to, (ii) if you prevail in the arbitration, which means the arbitrator rules in your favor on the Claim or (iii) if you make a written request for us to pay such fees and we believe you are acting in good faith. If you demand an arbitration, we will pay your reasonable attorneys' and experts' fees if you prevail or if we must bear such fees in order for this Arbitration Provision to be enforced. Also, we will bear any fees required by applicable law.

9.  Governing Law: This Arbitration Provision involves interstate commerce and is governed by the FAA and not by any state arbitration law. The arbitrator must apply applicable substantive law consistent with the FAA and applicable statutes of limitations and claims of privilege recognized at law. The arbitrator may award any remedy provided by the substantive law that would apply if the action were pending in court (including, without limitation, punitive damages, which shall be governed by the Constitutional standards employed by the courts). At the timely request of either party, the arbitrator must provide a brief written explanation of the basis for the award.

10. Right to Discovery: In addition to the parties' rights to obtain information or discovery pursuant to the arbitration rules of the Administrator, either party may submit a written request to the arbitrator to expand the scope of discovery normally allowable under such rules.

11. Arbitration Result and Right of Appeal: Judgment upon the arbitrator's award may be entered by any court having jurisdiction. The arbitrator's decision is final and binding, except for any right of appeal provided by the FAA. However, if the amount of the Claim exceeds $50,000.00 or involves a request for injunctive or declaratory relief that could foreseeably involve a cost or benefit to either party exceeding $50,000.00, any party can, within thirty (30) days after the entry of the award by the arbitrator, appeal the award to a three-arbitrator panel administered by the Administrator. The panel shall reconsider anew any aspect of the initial award requested by the appealing party. The decision of the panel shall be by majority vote. Reference in this Arbitration Provision to "the arbitrator" shall

mean the panel if an appeal of the arbitrator's decision has been taken. The costs of such an appeal will be borne in accordance with subparagraph (h) above, captioned "Location and Costs of Arbitration."

12. Rules of Interpretation: This Arbitration Provision shall survive the repayment of all amounts owed under this Agreement, the closing of your Account, any legal proceeding and any bankruptcy to the extent consistent with applicable bankruptcy law. In the event of a conflict or inconsistency between this Arbitration Provision, on the one hand, and the applicable arbitration rules or the other provisions of this Agreement, on the other hand, this Arbitration Provision shall govern.

13. Severability: If any portion of this Arbitration Provision, other than the Class Action Waiver, is deemed invalid or unenforceable, the remaining portions shall nevertheless remain in force. If a determination is made that the Class Action Waiver is unenforceable, only this sentence of the Arbitration Agreement will remain in force and the remaining provisions shall be null and void, provided that the determination concerning the Class Action Waiver shall be subject to appeal.

14. Special Payment: If (a) you submit a Claim Notice in accordance with this paragraph on your own behalf (and not on behalf of any other party); (b) we refuse to provide you with the relief you request; and (c) an arbitrator subsequently determines that you were entitled to such relief (or greater relief), the arbitrator shall award you at least $7,500.00 and any fees and costs to which you are entitled.

### i.  Governing Law

This Agreement, the Services, and your Relationship Accounts are governed by the laws of the State of Oklahoma and applicable federal law.

### j.  Trademark

As a visual convenience to you, we may display logos or other graphic images representing merchants you have done business with in your transaction history. Registered trademarks belong to the entity or person holding the trademark registration, and those merchants whose registered marks are displayed are not, in most instances, affiliates of MidFirst Bank and its Monifi division.  Logos and other graphic transactional images are shown for your convenience only to help you quickly identify merchants and do not determine parties to the transaction. You may provide feedback regarding accuracy of merchant logos through the Monifi App.

Monifi is a registered trademark of MidFirst Bank.

### k.  License

1. We provide you with the Monifi Mobile App and online banking. You acknowledge and agree that we are the owner of all right, title and interest in and to the Monifi App and online banking and the computer programs contained therein in machine readable object code form as well as any accompanying user documentation along with all subsequent copies, updates or versions thereof which are made available to you (if any), regardless of the media or form in which they may exist (collectively the "Software"), all subject to the our agreements with our third party service provider(s) who may own some right, title and interest in and to portions of the Software.

2.  Subject to the terms and conditions herein, you are hereby granted a limited, nonexclusive license to use the Software in accordance with the terms of this Agreement. All rights not expressly granted to you by this Agreement are hereby reserved by us and/or the owner of the Software. Nothing in this license will entitle you to receive hard-copy documentation, technical support, telephone assistance, or updates to the Software. This License Agreement may be terminated at any time, for any reason or no reason. Upon termination, you agree to immediately destroy all copies of the Software in your possession or control.

3.  You shall not: (i) modify, revise or create any derivative works of the Software; (ii) decompile, reverse engineer or otherwise attempt to derive the source code for the Software; (iii) redistribute, sell, rent, lease, sublicense, or otherwise transfer rights to the Software; or (iv) remove or alter any proprietary notices, legends, symbols or labels in the Software, including, but not limited to, any trademark, logo or copyright.

4.  THE SOFTWARE IS PROVIDED ON AN "AS IS" AND "AS AVAILABLE" BASIS WITHOUT WARRANTIES OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NON-INFRINGMENT. NO WARRANTY IS PROVIDED THAT THE SOFTWARE WILL BE FREE FROM DEFECTS OR VIRUSES OR THAT OPERATION OF THE SOFTWARE WILL BE UNINTERRUPTED. YOUR USE OF THE SOFTWARE AND ANY OTHER MATERIAL OR SERVICES DOWNLOADED OR MADE AVAILABLE TO YOU THROUGH THE SOFTWARE IS AT YOUR OWN DISCRETION AND RISK, AND YOU ARE SOLELY RESPONSIBLE FOR ANY DAMAGE RESULTING FROM THEIR USE.

5.  TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, IN NO EVENT WILL WE OR ANY OF OUR CONTRACTORS OR PROVIDERS OR ANY AFFILIATES OF OURS OR OUR CONTRACTORS OR PROVIDERS BE LIABLE FOR ANY DAMAGES ARISING OUT OF THE USE OR INABILITY TO USE THE SOFTWARE, INCLUDING BUT NOT LIMITED TO ANY GENERAL, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, EVEN IF ADVISED OF THE POSSIBILITY THEREOF, AND REGARDLESS OF THE LEGAL OR EQUITABLE THEORY (CONTRACT, TORT OR OTHERWISE) UPON WHICH ANY CLAIM IS BASED. IN ANY CASE, LIABILITY OF LICENSOR OR ANY OF THE OTHER PERSONS OR ENTITIES DESCRIBED IN THE PRECEDING SENTENCE ARISING OUT OF THE USE OR INABILITY TO USE THE SOFTWARE SHALL NOT EXCEED IN THE AGGREGATE THE LESSER OF TEN DOLLARS ($10.00) OR THE SUM OF THE FEES PAID BY YOU FOR THIS LICENSE.

### l.   Information to Third Parties

You authorize us to disclose information to third parties about your Relationship Accounts or the transfers you make or request, as necessary for completing transfers, for Services, or in order to verify the existence and condition of your Account for a third party, such as to a credit bureau, merchant, or other person necessary for the transaction to be completed as instructed by you.

### m.  Representations

You represent and warrant to us that you will use the Services and your Relationship Accounts only for the intended purposes outlined in these Terms and Conditions and in accordance with Applicable Law. You agree to comply with the terms for the Services in which you enroll. Further, you represent and warrant that you will use the Services for legal purposes only and that you will comply with all Applicable Laws with respect to your Account and the Services.

# Exhibit K

# ⩗ MIDFIRST BANK®

**Account Signature Card**

| | |
|---|---|
| **Account Title/Address** | **Account Number** ▮▮▮ |
| L▮▮▮ ▮▮▮ | **Date Opened** 05/13/2019 |
| Sherry L Linman | **Account Type Name** Arizona iSave Account |
| ▮▮▮ | **Account Category** Savings |
| Surprise AZ 85388 | **Ownership Type** Joint Tenancy with Right of Survivorship |
| | **Replacement Card** |

**Banking Center Address**

MidFirst Bank

16976 W Bell Rd

Surprise, AZ 85374-8946

**Opened By**   Zach Brewer

| | Primary Signer | Signer 2 | Signer 3 | Signer 4 |
|---|---|---|---|---|
| **Title or Name** | L▮▮▮ L▮▮▮ | Sherry L Linman | | |
| **Relationship Type** | Joint Owner | Joint Owner | | |
| **Address** | ▮▮▮ | ▮▮▮ | | |
| **City, State, Zip** | Surprise, AZ 85388 | Sun City West, AZ 85375 | | |
| **Tax ID Number** | ▮▮▮ | ▮▮▮ | | |
| **Date of Birth** | ▮▮▮ | ▮▮▮ | | |
| **Primary Phone** | ▮▮▮ | ▮▮▮ | | |

**TAXPAYER IDENTIFICATION NUMBER CERTIFICATION**

I certify under penalty of perjury that the information provided on this Signature Card, including the taxpayer identification number ("TIN") is true and correct; that I am a U.S. citizen or other U.S. person; and that I am not subject to backup tax withholding because (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service ("IRS") that I am subject to backup withholding as a result of a failure to report all interest or dividends; or (c) the IRS has notified me that I am no longer subject to backup withholding. Alternatively, the foregoing is true with the exception that (check all that apply):

☐ I am subject to backup withholding because of underreported interest and dividends.

☐ I have applied or will soon apply for a TIN. If one is not provided to this institution within 60 days from today, I will be subject to backup withholding.

☐ I am a Foreign Recipient and have provided this institution with the appropriate Form W-8 certification.

Signature ▮▮▮        Date 5/13/19        Taxpayer Identification Number ▮▮▮

**IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT.** To help the government fight the funding of terrorism and money laundering activities, federal law requires all financial instructions to obtain, verify and record information that identifies each person who opens an account. What this means for you: When you open an account, we will ask for your name, address, date of birth, and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents.

**ACKNOWLEDGEMENT** - By signing this Signature Card, I acknowledge that I am opening the MidFirst Bank deposit account shown above. I certify that the information contained in this form is correct, and I authorize MidFirst Bank, in its discretion, to obtain information relating to my credit and banking history, including but not limited to credit reports and employment verifications in connection with this account. I acknowledge that I have received a copy of MidFirst Bank's Account Agreement and Disclosure ("AA&D"), Privacy Policy, and the account disclosure specific to this account type (collectively the "Account Documents"), and I agree that I am bound by the terms and conditions contained therein as may be amended from time to time. I understand I may view the current AA&D and Privacy Policy online at midfirst.com/account agreement, and that I may request a copy of the Account Documents at any banking center. If this is an interest-bearing account, I acknowledge that the rate of interest and the annual percentage yield ("APY") has been provided to me, and I understand that this rate of interest and APY will apply to the account shown above. If this account is opened in the name of a business entity, I certify that all persons signing this Signature Card are authorized to act on behalf of the business entity. The undersigned hereby acknowledges and agrees that this original document will be scanned into MidFirst Bank's electronic document retention system, and the electronic image of this document will then become the original document going forward. The undersigned hereby waives any claims based on the production of, or the existence of, the hard-copy, original document.

**ADDITIONAL TERMS**

| | | |
|---|---|---|
| ▮▮▮ | Date 5/13/19 | Sherry L Linman  Date 5/13/19 |
| L▮▮▮ L▮▮▮ | | Sherry L Linman |
| | Date | Date |

Card 1 of