# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: MOVEIT CUSTOMER DATA SECURITY BREACH LITIGATION | MDL NO. 1:23-md-03083-ADB-PGL |
| This Document Relates To:<br><br>MEGAN SCHWARZ, CAMILLE BURGAN, AND EUGENE BURGAN, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>PROGRESS SOFTWARE CORPORATION, PENSION BENEFIT INFORMATION, LLC d/b/a PBI RESEARCH SERVICES, TEACHERS INSURANCE AND ANNUITY ASSOCIATION OF AMERICA, GENWORTH LIFE AND ANNUITY INSURANCE COMPANY, GENWORTH LIFE INSURANCE COMPANY, and GENWORTH FINANCIAL, INC.,<br><br>Defendants. | **AMENDED CLASS ACTION COMPLAINT**<br><br>CIVIL ACTION NO. 1:23-cv-12127 |

Plaintiffs Megan Schwarz, Camille Burgan, and Eugene Burgan (together, "Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned counsel, bring this class action complaint against Progress Software Corporation ("PSC"), Pension Benefit Information, LLC d/b/a PBI Research Services ("PBI"), Teachers Insurance and Annuity Association of America ("TIAA"), Genworth Life and Annuity Insurance Company, ("GLAIC"), Genworth Life Insurance Company ("GLIC"), and Genworth Financial, Inc.

("Genworth Financial" and collectively with GLAIC and GLIC, "Genworth") (collectively, "Defendants"). Plaintiffs allege the following upon information and belief based on the investigation of counsel, except as to those allegations that specifically pertain to Plaintiffs, which are alleged upon personal knowledge.

## INTRODUCTION

1.      Plaintiff incorporates the allegations contained in Plaintiffs' Omnibus Set of Additional Pleading Facts (ECF No. 908) in its entirety.

2.      Plaintiffs bring this class action against Defendants on behalf of themselves and all other individuals ("class members"), totaling more than 60 million people and nearly 1,000 organizations,[1] who had their sensitive personal identifiable information ("PII" or "Personal Information") accessed and hacked by malicious, unauthorized third parties that accessed and removed the Personal Information from Defendants' systems as early as May 27, 2023[2] (the "Data Breach" or the "Breach").

3.      PSC is a software company that offers software products and services to corporate and governmental entities, including cloud hosting and secure file transfer services such as MOVEit.

4.      PBI processes information about employees or individuals for insurers engaged by employers, or for companies acting on such insurers' behalf, in connection with certain employee benefit programs. PBI uses PSC's MOVEit file transfer services.

5.      The Data Breach included information maintained by TIAA, an insurance and financial service company that operates in all 50 states, and Genworth, a company that

---

[1] https://www.securityweek.com/nearly-1000-organizations-60-million-individuals-impacted-by-moveit-hack/.
[2] https://www.reuters.com/technology/hackers-use-flaw-popular-file-transfer-tool-steal-data-researchers-say-2023-06-02/; https://news.yahoo.com/another-calpers-retiree-sues-pbi-231108178.html.

markets mortgage, long-term care insurance, life insurance, and other insurance and financial products, primarily to individual consumers.

6.      Plaintiffs' claims arise from Defendants' failure to safeguard Plaintiffs' and Class members' PII. Plaintiffs' and Class members' PII was compromised due to Defendants' negligent and/or careless acts and the failure to protect their PII.

7.      In carrying out its services, PBI utilizes MOVEit, the file sharing application created and operated by PSC, to securely transmit files containing sensitive consumer information. On or about May 31, 2023, PBI received a notification from PSC that an unauthorized external party had exploited a vulnerability within the MOVEit software. PBI then initiated an inquiry and determined that the unauthorized party had gained entry to one of PBI's MOVEit Transfer servers on May 29, 2023 and May 30, 2023. During this time, the unauthorized party acquired data containing sensitive PII held by TIAA and provided to PBI.

8.      The hackers responsible for the Data Breach were subsequently identified as the Russian cyber gang, Clop.[3]

9.      Plaintiffs and members of the Class furnished sensitive and private PII directly or indirectly to Defendants, including their names, Social Security numbers, and birthdates.

10.     Defendants failed to properly secure and safeguard Plaintiffs' and the Class's PII that was stored within the MOVEit servers.

11.     Despite purporting to act as a safe container for sensitive information, Defendants failed to take precautions designed to keep that information secure.

---

[3] Onur Demirkol, *US Government Under Siege: MOVEit Breach Exposes Critical Data to Ruthless Clop Ransomware Attack*, DATA CONOMY (June 19, 2023), available at https://dataconomy.com/2023/06/19/moveit-breach-data-clop-ransomware/ (last visited September 11, 2023).

12.     The data that Defendants exposed was highly sensitive, including names, dates of birth, and Social Security numbers. The compromised data also allows individuals to infer that consumers were employed in certain sectors or use certain services offered by PBI, TIAA, and Genworth.

13.     The Data Breach affecting PSC's MOVEit file transfer tool impacted more than 15 million consumers in the United States.[4]

14.     The sensitive nature of the data exposed through the Data Breach, including Social Security numbers, substantiates that Plaintiffs and Class members have suffered irreparable harm. Plaintiffs and Class members have lost the ability to control their private information and are subject to an increased risk of identity theft.

15.     Defendants owed and owe a duty to Plaintiffs and Class members to maintain adequate security measures to safeguard the PII with which they were entrusted with. Defendants breached their duty by failing to implement and/or maintain adequate security practices.

16.     Defendants delayed acknowledging and giving notice of the Data Breach. Defendants did not notify their customers of the Data Breach until mid-July 2023 (the "Notice Letter"). *See e.g.,* Plaintiff Schwarz's Notice Letter, attached hereto as Exhibit A. Defendants waited despite knowing that hackers accessed account holders' and customers' information, and that sensitive PII was compromised.

17.     As a result of Defendants' inadequate digital security and notice process, Plaintiffs' and Class members' PII was exposed to criminals. Plaintiffs and the Class have

---

[4] *See* Carly Page, *Millions affected by MOVEit mass-hacks as list of casualties continues to grow*, TECHCRUNCH https://techcrunch.com/2023/06/29/millions-affected-moveit-mass-hacks/ (last visited September 11, 2023).

suffered and will continue to suffer injuries including: financial losses caused by misuse of PII; the loss or diminished value of their PII as a result of the Data Breach; lost time associated with detecting and preventing identity theft; and theft of personal, medical, and financial information.

18.     Plaintiffs brings this action individually and on behalf of similarly situated individuals against Defendants for: negligence; negligence per se; breach of implied contract; and unjust enrichment.

## JURISDICTION AND VENUE

19.     This case was originally filed in the United States District Court for the District of Massachusetts. This action has been transferred to this Court for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407 and Rule 7.1 of the Rules of Procedure of the United States Judicial Panel on Multidistrict Litigation.

20.     This Court has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. At least one member of the Class defined below is a citizen of a different state than Defendants, and there are more than 100 putative Class members.

21.     This Court has personal jurisdiction over Defendants because they conduct substantial business in this jurisdiction. Further, this Court has general jurisdiction over Defendant PSC because its corporate headquarters is located in this District.

22.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events giving rise to this action occurred in this District, Defendant PSC is based in this District, Defendant PSC interacted with Defendant PBI in this District, Defendant PSC designed, marketed, sold, and maintained the MOVEit transfer application in

this District, and the harm caused to Plaintiffs and Class Members emanated from this District.

## PARTIES

23.     Plaintiff Megan Schwarz is a citizen of New York, New York.

24.     Plaintiff Camille Burgan is a citizen of Sioux Falls, South Dakota and is a resident of San Ysidro, California.

25.     Plaintiff Eugene Burgan is a citizen of Sioux Falls, South Dakota and is a resident of San Ysidro, California.

26.     Defendant Progress Software Corporation is a corporation organized under the laws of the State of Delaware with its principal place of business located at 15 Wayside Road, Suite 4, Burlington, Massachusetts 01803.

27.     Defendant Pension Benefit Information, LLC is a Delaware limited liability corporation with its principal place of business located at 333 S. 7th Street, Suite 2400, Minneapolis, Minnesota 55402.

28.     PBI is a PSC Vendor. *See* Plaintiffs' Omnibus Set of Additional Pleading Facts, Appendix A.

29.     Defendant TIAA Services, Inc. is a corporation organized under the laws of New York, with its principal place of business located in New York.

30.     TIAA is a Vendor Contracting Entity of PBI. *See* Plaintiffs' Omnibus Set of Additional Pleading Facts, Appendix A.

31.     Defendant Genworth Financial is a publicly traded Fortune 500 company Delaware corporation with its principal place of business in Richmond, Virginia. Genworth

Financial markets mortgage, long-term care insurance, life insurance, and other insurance and financial products, primarily to individual consumers.

32.    Defendant GLAIC is a subsidiary of Genworth Financial with its principal place of business in Richmond, Virginia.

33.    Defendant GLIC is a subsidiary of Genworth Financial with its principal place of business in Richmond, Virginia.

34.    Genworth is a Vendor Contracting Entity of PBI. *See* Plaintiffs' Omnibus Set of Additional Pleading Facts, Appendix A.

## FACTUAL BACKGROUND

### *The Data Breach*

35.    On or about May 31, 2023, PSC, the creator of the MOVEit software, Progress Software, announced on its Progress Community website that it was subject to a Data Breach[5] which compromised highly sensitive personal information of those that utilize the MOVEit software including names, dates of birth, and Social Security numbers.

36.    PBI employs the MOVEit software, which is supplied by PSC. MOVEit's intended use is to safely move files as part of their routine operations. Within this process, PBI uploads, retains, shifts, or retrieves PII owned or held by various companies on whose behalf it provides its various services, including TIAA.

37.    TIAA shared data with PBI, including Plaintiff Schwarz's PII, who managed it using the MOVEit software.

---

[5] MOVEit Transfer Critical Vulnerability (May 2023) (CVE-2023-34362), Progress Community, https://community.progress.com/s/article/MOVEit-Transfer-Critical-Vulnerability-31May2023 (last accessed September 12, 2023).

38.     On or about May 31, 2023, PSC informed PBI of a vulnerability in the MOVEit software that was exploited by an unauthorized third party.

39.     PBI reportedly performed an internal investigation into the scope of the vulnerability in MOVEit's software and the impact on its systems.[6] PBI's investigation revealed that the third party accessed one of its MOVEit servers between May 29, 2023 and May 30, 2023 and subsequently downloaded data from its servers.[7] On June 16, 2023, PBI completed a manual review of its records, and confirmed the identities of individuals affected by the Data Breach.

40.     Individuals impacted by the Data Breach are, and remain, at risk that their data will be sold or listed on the dark web and, ultimately, illegally used in the future.

41.     Plaintiffs and Class members are or were PBI customers or account holders that entrusted Defendants with their PII.

### Defendants' Obligations and Responsibilities to Protect Plaintiffs and Class members' PII

42.     TIAA is a financial services and insurance company that services roughly 5 million clients from over 15,000 organizations across the United States.

43.     Upon information and belief, in the course of collecting PII from its clients, including Plaintiff, TIAA promised to provide confidentiality and adequate security for client data through its applicable privacy policy and through other disclosures in compliance with statutory privacy requirements.

44.     Indeed, TIAA's Privacy Notice provides that: "TIAA protects the personal information you provide against unauthorized access, disclosure, alteration, destruction, loss,

---

[6] *See* Exhibit A.
[7] *Id.*

or misuse. Your personal information is protected by physical, electronic, and procedural safeguards in accordance with federal and state standards. These safeguards include appropriate procedures for access and use of electronic data, provisions for the secure transmission of sensitive personal information on our website, and telephone system authentication procedures. Additionally, we limit access to your personal information to those TIAA employees and agents who need access in order to offer and provide products or services to you. We also require our service providers to protect your personal information by utilizing the privacy and security safeguards required by law."[8]

45.     In the course of their relationship, clients, including Plaintiff Schwarz and Class Members, provided TIAA, directly or indirectly, with at least the following PII:

        a.  names;

        b.  gender;

        c.  dates of birth;

        d.  Social Security numbers; and

        e.  addresses.

46.     In the course of its ordinary business operations, TIAA is entrusted with safeguarding the sensitive PII of its members.

47.     Defendant Genworth's website warrants to consumers that: As a condition to taking out long-term care or life insurance policies or annuity contracts with Genworth and receiving other services from Genworth, Plaintiffs and Class Members were required to give their sensitive and confidential PII to Genworth. According to its Online Privacy Policy, Genworth collects PII from its customers:

---

[8] /www.tiaa.org/public/support/privacy/privacy-notice (last visited Sept. 11, 2023).

- When you contact us:
    - To ask for general information
    - To apply for a new policy
    - To create an account so you can view information about your existing policy
- When we contact you:
    - To service your policy
    - To provide information you ask for
    - To provide information we believe you may be interested in
- When we contact others:
    - To obtain or confirm information about your (e.g. medical records).[9]

48.    Genworth, in turn, provided Plaintiffs' and Class Members' PII to PBI in connection with services that PBI rendered to Genworth. The Notice Letters that Plaintiffs received from Genworth reported that "PBI is a third-party vendor that Genworth uses to satisfy regulatory obligations to scan various databases to determine whether a customer may have passed and triggered death benefits under a life insurance policy or annuity contract. We also use PBI to identify deaths that have occurred across our other lines of insurance, as well as the deaths of insurance agents to whom we pay commissions."

49.    By obtaining, collecting, and storing Plaintiffs' and Class Members' PII, Genworth assumed legal and equitable duties and knew or should have known that it was responsible for protecting that PII from unauthorized disclosure.

50.    Genworth made repeat assurances to its customers that it was aware of the significant risk and harm associated with failing to safeguard their PII and it had adequate

---

[9] Online Privacy Policy, Genworth, https://www.genworth.com/online-privacy-policy.

security policies and practices in place to prevent that from happening. Notably, Genworth's Online Privacy Policy stated that "[w]hen you provide information to us on our websites, we use encryption and authentication tools to protect that information after it gets to us."[10] Additionally, "[o]nce we receive your information, we use procedures and technologies designed to prevent unauthorized access to your personal information and to protect against the loss, misuse, and alteration of information under our control. We maintain physical, electronic, and procedural protections to protect personal information in accordance with applicable standards."[11] Genworth further claims to "require that service providers who have access to your personal information implement similar standards. We require service providers to agree to keep your personal information confidential."[12]

51.     In a 2022 Sustainability Report issued by Genworth, the section entitled "Data Protection at Genworth" acknowledged the significant risk of failing to safeguard one's PII, stating that, "[i]n today's increasingly digital world, protecting our own data – and that of our customers and business partners – is essential. Genworth recognizes the significant operational risks, including risk of losses, from cyberattacks and the importance of a strong cybersecurity program for effective risk management."[13]

52.     In recognition of these security concerns, Genworth publicly claimed to have a robust data security system in place:

> Our program employs various controls and policies to secure our operations and information including monitoring, reporting, managing, and remediating cybersecurity threats. Key features of the program include access controls, security training, dedicated security personnel, security event monitoring, and when necessary, consultation with third-party data security

---

[10] *Id.*
[11] *Id.*
[12] *Id.*
[13] https://pro.genworth.com/riiproweb/productinfo/pdf/665101C.pdf

experts.

Our IT security program, which is regularly updated to align with best practices and industry guidelines, includes:

• Written IT policies and standards designed to guard the integrity of our institutional, commercial, and private consumers' personal information

• Regular external and internal reviews of our data protection practices

• A robust suite of IT security products that enable us to manage cybersecurity risk within the organization and alternate sites where business is conducted[14]

53.     Throughout its website, Genworth reiterates these assurances of security, repeatedly stating that it is aware of data privacy risks and has adequate procedures and process in place to prevent them, such as its statements below:

• "Working to protect your personal information is one of our promises that enables us to help millions of policyholders secure their financial lives, families, and futures."[15]

• "At Genworth, we have implemented technical, physical, and process safeguards to maintain the confidentiality of your information."[16]

• "Genworth uses reasonable administrative, physical and electronic security measures to protect against possible loss, misuse or alteration of Permitted Information or content posted on Bulletin Boards."[17]

• "Once we receive your information, we use procedures and technologies designed to prevent unauthorized access to your personal information and to protect against the loss, misuse, and alteration of information under our control. We maintain physical, electronic, and procedural protections to protect personal information in accordance with applicable standards."[18]

• "We require that service providers who have access to your personal information implement similar standards. We require service providers to agree to keep your personal information confidential. Service providers who violate our

---

[14] *Id.*

[15] https://www.genworth.com/fraud-and-information-protection

[16] *Id.*

[17] https://www.genworth.com/terms-of-use

[18] *Id.*

privacy terms are subject to having their contract terminated."[19]

54.     PBI provides audit and address research services for insurance companies,

pension funds, and other organizations.[20]

55.     PBI's Privacy Policy highlights its protection of PII, stating that:

PBI recognizes the importance of protecting personal information. We use a variety
of administrative, physical and technical security measures intended to safeguard
your personal information.[21]

56.     PBI further notes the "PBI Advantages" on its website, stating that consumers

should have "Confidence Your Data is Secure," explaining that:

Protecting and securing your information is our highest priority. Our formalized
security program follows industry-recognized security frameworks and undergoes an
annual SSAE 18 SOC 2, Type II audit.[22]

57.     As a pension management business that handles consumers' personal information,

PBI is legally required to protect personal information from unauthorized disclosure.

### *Defendants' Failure to Prevent, Identify and Timely Report the Data Breach*

58.     Defendants failed to take adequate measures to protect their computer systems

and internal network against unauthorized access.

59.     Defendants also failed to properly select their information security partners that

they relied upon to keep the personal information they held safe and secure.

---

[19] *Id.*
[20] *See About PBI Research Services,* PBI https://www.pbinfo.com/who-we-are/ (last visited
September 11, 2023).
[21] *See Privacy Policy,* PBI https://www.pbinfo.com/privacy-policy/ (last visited September 11,
2023).
[22] *See About PBI Research Services,* PBI https://www.pbinfo.com/who-we-are/ (last visited
September 11, 2023).

60.    Defendants were not only aware of the importance of protecting the PII that they maintain, but also touted their capability to do so. The PII that was exposed in the Data Breach is the type of private information that Defendants knew or should have known would be the target of cyberattacks.

61.    Despite their knowledge and supposed expertise on the subject of cybersecurity, and notwithstanding the FTC's data security principles and practices,[23] Defendants failed to disclose that their systems and security practices were inadequate to reasonably safeguard sensitive personal information.

62.    The FTC directs businesses to use an intrusion detection system to expose a breach as soon as it occurs, monitor activity for attempted hacks, and have an immediate response plan if a breach occurs.[24] Immediate notification of a Data Breach is critical so that those impacted can take measures to protect themselves. Despite this guidance, Defendants delayed the notification of the Data Breach.

### The Current and Future Harms Caused by the Data Breach

63.    Victims of data breaches are susceptible to becoming victims of identity theft.

64.    Plaintiffs and Class Members face a lifetime of constant surveillance of their financial and personal records, monitoring, and loss of rights. Plaintiffs and the Class are incurring and will continue to incur such damage in addition to any fraudulent use of their PII.

---

[23] *Protecting Personal Information: A Guide for Business*, FEDERAL TRADE COMMISSION (Oct. 2016), https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last visited September 11, 2023).
[24] *Id*.

65.     The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority," 17 C.F.R. § 248.201(9), and when "identity thieves have your personal information, they can drain your bank account, run up charges on your credit cards, open new utility accounts, or get medical treatment on your health insurance.

66.     PII is very valuable to criminals, as evidenced by the prices they will pay for it on the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information is sold at prices ranging from $40 to $200, and bank details have a price range of $50 to $200.[25]

67.     Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[26]

68.     Social Security numbers are among the most sensitive kind of personal information and, when stolen, may be put to a variety of fraudulent uses. The Social Security Administration stresses that the loss of an individual's Social Security number, as occurred in the Data Breach here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[27]

---

[25] *Your Personal Data Is for Sale on the Dark Web. Here's How Much It Costs,* DIGITAL TRENDS (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on- the-dark-web-how-much-it-costs.

[26] *Here's How Much Your Personal Information Is Selling for on the Dark Web,* EXPERIAN (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your- personal-information-is-selling-for-on-the-dark-web/.

[27] *Identity Theft and Your Social Security Number*, SOCIAL SECURITY ADMINISTRATION,

69.     Additionally, changing or canceling a stolen Social Security number is no easy task. An individual cannot obtain a new Social Security number without significant paperwork and evidence of misuse. An individual cannot prevent potential misuse of a Social Security number by simply changing their number. Instead, the individual must show evidence of actual, ongoing fraud to obtain a new Social Security number.

70.     Even then, obtaining a new Social Security number may not work. According to the Identity Theft Resource Center, "The credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[28]

71.     Thus, consumers place a high value on the privacy of that data, as they should. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[29]

72.     The information compromised in the Data Breach is significantly more valuable than the loss of, for example, payment card information in a retailer data breach because, in that situation, victims can cancel or close payment card accounts. The information

---

https://www.ssa.gov/pubs/EN-05-10064.pdf.

[28] *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015.), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s- hackers-has-millions-worrying-about-identity-theft.

[29] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior, An Experimental Study*, 22(2) INFO. SYS. RSCH. 254 (June 2011) https://www.jstor.org/stable/23015560?seq=1.

compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—name, birthdate, and Social Security number.

73.    This data commands a much higher price on the black market. "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[30]

74.    All-inclusive health insurance dossiers containing sensitive health insurance information, names, addresses, telephone numbers, email addresses, SSNs, and bank account information, complete with account and routing numbers, can fetch up to $1,200 to $1,300 each on the black market.[31] According to a report released by the Federal Bureau of Investigation's ("FBI") Cyber Division, criminals can sell healthcare records for 50 times the price of a stolen Social Security or credit card number.[32]

75.    Identity thieves may use stolen data to commit bank fraud, credit card fraud, employer or tax-related fraud, government documents or benefits fraud, loan or lease fraud, phone or utilities fraud, among other forms of fraud.[33]

76.    Criminals can use stolen PII to extort a financial payment by "leveraging details specific to a disease or terminal illness."[34] Quoting Carbon Black's Chief Cybersecurity

---

[30] *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT WORLD (Feb. 6, 2015), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x- price-of-stolen-credit-card-numbers.html.

[31] *See* SC Staff, *Health Insurance Credentials Fetch High Prices in the Online Black Market*, SC MAG (July 16, 2013), https://www.scmagazine.com/news/breach/health-insurance-credentialsfetch- high-prices-in-the-online-black-market.

[32] *See* Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain* (Apr. 8, 2014), https://www.illuminweb.com/wp-content/uploads/ill-mo-uploads/103/2418/health-systemscyber- intrusions.pdf.

[33] FTC Consumer Sentinel Network, Compare Identity Theft Report Types, https://public.tableau.com/app/profile/federal.trade.commission/viz/IdentityTheftReports/TheftTypesOverTime (last visited July 9, 2023).

[34] *See* Andrew Steager, *What Happens to Stolen Healthcare Data*, HEALTHTECH MAGAZINE

Officer, one recent article explained: "Traditional criminals understand the power of coercion and extortion…By having healthcare information—specifically, regarding a sexually transmitted disease or terminal illness—that information can be used to extort or coerce someone to do what you want them to do."[35]

77.     Cybercriminals took the PII of Plaintiffs and Class Members to engage in identity theft and/or to sell it to other criminals who will purchase the PII for that purpose. The fraudulent activities resulting from the Data Breach may not come to light for years.

78.     Theft of PII is serious. The Federal Trade Commission ("FTC") warns consumers that identity thieves use PII to exhaust financial accounts, receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[36]

79.     While some identity theft victims can resolve their problems quickly, others spend hundreds of dollars and many days repairing damage to their good name and credit record. Some consumers victimized by identity theft may lose job opportunities or be denied loans for education, housing, or cars because of negative information on their credit reports. In rare cases, they may even be arrested for crimes they did not commit.

80.     Identity theft, which costs Americans billions of dollars annually, occurs when an individual's PII is used without consent to commit fraud or other crimes. Victims of identity theft typically lose hundreds of hours dealing with the crime and hundreds, if not thousands, of dollars.

---

(Oct. 20, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcaredata-perfcon ("What Happens to Stolen Healthcare Data") (quoting Tom Kellermann, Chief Cybersecurity Officer, Carbon Black, stating "Health information is a treasure trove for criminals.").
[35] *Id.*
[36] *See* Federal Trade Commission, *What to Know About Identity Theft*, FED. TRADE COMM'N CONSUMER INFO.

81.     According to Javelin Strategy & Research, in 2018 alone, identity theft affected over 16.7 million individuals, causing a loss of over $16.8 billion.

82.     Recent FTC data reveals that identify theft remains the top category of fraud reports received by the agency.[37] The FTC received over 1,100,000 reports of identity theft in 2022, and over 280,000 for the first quarter of 2023 alone.[38]

83.     Identity thieves use personal information for various crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.[39] According to Experian, one of the largest credit reporting companies in the world, "[t]he research shows that personal information is valuable to identity thieves, and if they can get access to it, they will use it" to, among other things: open a new credit card or loan; change a billing address so the victim no longer receives bills; open new utilities; obtain a mobile phone; open a bank account and write bad checks; use a debit card number to withdraw funds; obtain a new driver's license or ID; or use the victim's information in the event of arrest or court action.[40]

84.     With access to an individual's PII, criminals can do more than just empty a victim's bank account. They can also commit all manner of fraud, including (i) obtaining a

---

[37] FTC Consumer Sentinel Network, Federal Trade Commission, https://public.tableau.com/app/profile/federal.trade.commission/viz/FraudandIDTheftMaps/AllR eportsbyState, (Last visited July 9, 2023).

[38] *Id*.

[39] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 12 C.F.R. § 1022.3(h). The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 12 C.F.R. § 1022.3(g).

[40] *See* Susan Henson, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself*, EXPERIAN, https://www.experian.com/blogs/ask-experian/what-canidentity- thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/ (last accessed Mar. 21, 2022).

driver's license or official identification card in the victim's name but with the thief's picture;

(ii) using the victim's name and SSN to obtain government benefits; or (iii) filing a

fraudulent tax return using the victim's information. In addition, identity thieves may even

give the victim's personal information to police during an arrest.[41]

85.     Consumers place a high value not only on their personal information but also on

the privacy of that data. They do so because identity theft causes "significant negative

financial impact on victims" in addition to severe distress and other strong emotional and

physical reactions.

86.     The United States Government Accountability Office ("GAO") explains that

"[t]he term 'identity theft' is broad and encompasses many types of criminal activities,

including fraud on existing accounts—such as unauthorized use of a stolen credit card

number—or fraudulent creation of new accounts—such as using stolen data to open a credit

card account in someone else's name."[42] The GAO Report notes that victims of identity theft

will face "substantial costs and time to repair the damage to their good name and credit

record."[43]

87.     Further, as noted, there is the likelihood of a lapse in time between when the harm

occurs to a victim of identity theft and when that harm is discovered, as well as a lapse

---

[41] *See* Federal Trade Commission, *Warning Signs of Identity Theft*, IDENTITYTHEFT.GOV
https://www.identitytheft.gov/Warning-Signs-of-Identity-Theft (last accessed Mar. 21, 2023);
*See* Identity Theft Resource Center, *2021 Consumer Aftermath Report*, IDENTITY THEFT RES.
[42] *See* Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited;
However, the Full Extent Is Unknown, U.S. Government Accountability Office Report to
Congressional Requesters ("GAO Report") at 2 (June 2007),
https://www.gao.gov/new.items/d07737.pdf, (Last visited July 10, 2023).
[43] *Id.*

between when the PII is stolen and when it is actually used. According to the GAO, which

conducted a study regarding the growing number of data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up
> to a year or more before being used to commit identity theft. Further, once stolen data
> have been sold or posted on the Web, fraudulent use of that information may continue
> for years. As a result, studies that attempt to measure the harm resulting from data
> breaches cannot necessarily rule out all future harm.[44]

88.    A compromised or stolen Social Security number cannot be addressed as simply

as, perhaps, a stolen credit card. An individual cannot obtain a new Social Security number

without significant work. Preventive action to defend against the possibility of misuse of a

Social Security number is not permitted; rather, an individual must show evidence of actual,

ongoing fraud activity to obtain a new number. Even then, however, obtaining a new Social

Security number may not suffice. According to Julie Ferguson of the Identity Theft Resource

Center, "The credit bureaus and banks are able to link the new number very quickly to the

old number, so all of that old bad information is quickly inherited into the new Social

Security number."[45]

89.    The PII compromised in the Data Breach demands a much higher price on the

black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained:

"Compared to credit card information, personally identifiable information and Social

Security numbers are worth more than 10 times on the black market."[46]

90.    According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet

Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar

---

[44] *See* GAO Report, at p.29.
[45] *Id*.
[46] *Experts advise compliance not same as security*, RELIAS MEDIA (Mar. 1, 2015)
https://www.reliasmedia.com/articles/134827-experts-advise-compliance-not-same-as-security
(Last visited September 11, 2023).

losses in 2019, resulting in more than $3.5 billion in losses to individuals and business victims.[47]

91.     Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good."[48] Defendants did not rapidly or timely report to Plaintiffs and Class members that their PII had been stolen.

92.     In the Notice Letter, Defendants offered victims twelve months of complimentary credit monitoring and identity restoration services through Kroll. The service offered by Defendants is inadequate. Identity thieves often hold onto personal information in order to commit fraud years after such free programs expire.

93.     As a result of the Data Breach, Plaintiffs and Class members' PII has been exposed to criminals for misuse. The injuries suffered by Plaintiffs and Class members, or likely to be suffered thereby as a direct result of Defendants' Data Breach, include:

    a.   unauthorized use of their PII;

    b.   theft of their personal and financial information;

    c.   costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;

    d.   damages arising from the inability to use their PII;

    e.   Improper disclosure of their PII;

    f.   loss of privacy, and embarrassment;

    g.   trespass and damage their personal property, including PII;

    h.   the imminent and certainly impending risk of having their confidential medical information used against them by spam callers and/or hackers targeting them with phishing schemes to defraud them;

---

[47] *2019 Internet Crime Report Released*, FBI, https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120#:~:text=IC3%20received%20467%2C361%20complaints%20in,%2Ddelivery%20scams%2C%20and%20extortion. (Last visited September 11, 2023).

[48] *Id*.

    i.   costs associated with time spent and the loss of productivity or the enjoyment of one's life from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach, including finding fraudulent charges, purchasing credit monitoring and identity theft protection services, and the stress, nuisance, and annoyance of dealing with all issues resulting from the Data Breach;

    j.   the imminent and certainly impending injury flowing from potential fraud and identify theft posed by their PII being placed in the hands of criminals and already misused via the sale of Plaintiffs' and Class members' information on the Internet black market; and

    k.   damages to and diminution in value of their PII entrusted to Defendants.

94.    In addition to a remedy for economic harm, Plaintiffs and Class members maintain an interest in ensuring that their PII is secure, remains secure, and is not subject to further misappropriation and theft.

95.    Defendants disregarded the rights of Plaintiffs and Class members by (i) intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure that their network servers were protected against unauthorized intrusions; (ii) failing to disclose that Defendants did not have adequately robust security protocols and training practices in place to adequately safeguard Plaintiffs' and Class members' PII; (iii) failing to take standard and reasonably available steps to prevent the Data Breach; and (iv) failing to provide Plaintiffs and Class members prompt notice of the Data Breach.

96.    The actual and adverse effects to Plaintiffs and Class members, including the imminent, immediate and continuing increased risk of harm for identity theft, identity fraud and/or medical fraud directly and/or proximately caused by Defendants' wrongful actions and/or inaction and the resulting Data Breach require Plaintiffs and Class members to take affirmative acts to recover their peace of mind and personal security including, without

limitation, purchasing credit reporting services, purchasing credit monitoring and/or internet monitoring services, frequently obtaining, purchasing and reviewing credit reports, bank statements, and other similar information, instituting and/or removing credit freezes and/or closing or modifying financial accounts, for which there is a financial and temporal cost. Plaintiffs and other Class members have suffered, and will continue to suffer, such damages for the foreseeable future.

### Plaintiffs' Specific Experiences and Harm

97.     Plaintiff Schwarz received the Notice Letter dated July 14, 2023, notifying her that her information shared with TIAA was part of the Data Breach.

98.     At the time that Progress Software disclosed the Data Breach—on or around May 31, 2023—Defendants retained Plaintiff Schwarz's PII in their computer systems.

99.     Plaintiff Schwarz is very careful about sharing her sensitive PII. She stores any documents containing her PII in a safe and secure location. She has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. She would not have entrusted her PII to Defendants had she known of Defendants' lax data security policies.

100.     Plaintiff Schwarz has and will spend considerable time and effort monitoring her accounts to protect herself from identity theft—valuable time she otherwise would have spent on other activities, including but not limited to work and/or recreation. Plaintiff Schwarz fears for her personal financial security and uncertainty over what PII was exposed in the Data Breach.

101.     Moreover, following the Data Breach, Plaintiff Schwarz has experienced an increase in suspicious spam phone calls. Upon information and belief, the increase in spam phone calls has been caused by the Data Breach and only began following the Data Breach.

102.     The Data Breach has caused Plaintiff Schwarz to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants have still not fully informed her of key details about the Data Breach's occurrence.

103.     As a result of the Data Breach, Plaintiff Schwarz is at present risk and will continue to be at increased risk of identity theft and fraudulent activity for years to come.

104.     Plaintiff Camille Burgan received the Notice Letter dated July 21, 2023, notifying her that her information was part of the Data Breach.

105.     In order to obtain life insurance from GLIC, Plaintiff Camille Burgan was required to provide her PII, directly or indirectly, to Genworth, including her name, Social Security number, date of birth, zip code, state of residence, and other sensitive information.

106.     At the time that Progress Software disclosed the Data Breach—on or around May 31, 2023—Defendants retained Plaintiff Camille Burgan's PII in their computer systems.

107.     Plaintiff Camille Burgan is very careful about sharing her sensitive PII. She stores any documents containing her PII in a safe and secure location. She has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. She would not have entrusted her PII to Defendants had she known of Defendants' lax data security policies.

108.     Plaintiff Camille Burgan has and will spend considerable time and effort monitoring her accounts to protect herself from identity theft—valuable time she otherwise would have spent on other activities, including but not limited to work and/or recreation.

109.     As a consequence of the Data Breach, Plaintiff Camille Burgan enrolled in identity monitoring services with Identity Guard at an out-of-pocket cost of $192 per year.

110.    Plaintiff Camille Burgan further suffered actual injury in the form of experiencing an increase in spam calls, texts, and/or emails, which, upon information and belief, was caused by the Data Breach.

111.    Moreover, the Data Breach has caused Plaintiff Camille Burgan to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants have still not fully informed her of key details about the Data Breach's occurrence.

112.    As a result of the Data Breach, Plaintiff Camille Burgan is at present risk and will continue to be at increased risk of identity theft and fraudulent activity for years to come.

113.    Plaintiff Eugene Burgan received the Notice Letter dated July 21, 2023, notifying him that his information was part of the Data Breach.

114.    Plaintiff Eugene Burgan has and will spend considerable time and effort monitoring his accounts to protect himself from identity theft—valuable time she otherwise would have spent on other activities, including but not limited to work and/or recreation.

115.    Moreover, the Data Breach has caused Plaintiff Eugene Burgan to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants have still not fully informed her of key details about the Data Breach's occurrence.

116.    As a result of the Data Breach, Plaintiff Eugene Burgan is at present risk and will continue to be at increased risk of identity theft and fraudulent activity for years to come.

## CLASS ACTION ALLEGATIONS

117.    Plaintiffs bring this action on behalf of themselves and the following classes (collectively, the "Class"):

(1) <u>PSC Nationwide Class</u>: All persons whose PII was compromised in the MOVEit data breach.

   (a) <u>PSC New York Class</u>: All residents of New York whose PII was compromised in the MOVEit data breach.

       (b) <u>PSC California Class</u>: All residents of California whose PII was compromised in the MOVEit data breach.

The foregoing state-specific PSC classes are collectively referred to as the "PSC State Classes."

    (2) <u>PBI Nationwide Class</u>: All persons whose PII was compromised on PBI's platform and/or systems in the MOVEit data breach.

       (a) <u>PBI New York Class</u>: All residents of New York whose PII was compromised on PBI's platform and/or systems in the MOVEit data breach.

       (b) <u>PBI California Class</u>: All residents of California whose PII was compromised on PBI's platform and/or systems in the MOVEit data breach.

 The foregoing state-specific PBI classes are collectively referred to as the "PBI State Classes."

    (3) <u>Genworth Nationwide Class</u>: All persons whose PII was compromised in the MOVEit data breach where such PII was obtained from or hosted by Genworth.

       (a) <u>Genworth California Class</u>: All residents of California whose PII was compromised in the MOVEit data breach where such PII was obtained from or hosted by Genworth.

The foregoing state-specific Genworth classes are collectively referred to as the "Genworth State Classes."

    (4) <u>TIAA Nationwide Class</u>: All persons whose PII was compromised in the MOVEit data breach where such PII was obtained from or hosted by TIAA.

       (a) <u>TIAA New York Class</u>: All residents of New York whose PII was compromised in the MOVEit data breach where such PII was obtained from or hosted by TIAA.

The foregoing state-specific TIAA classes are collectively referred to as the "TIAA State Classes."

118.    Specifically excluded from the Class are Defendants, their officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint venturers, or entities controlled by Defendants, and their heirs,

successors, assigns, or other persons or entities related to or affiliated with Defendants and/or

their officers and/or directors, the judge assigned to this action, and any member of the

judge's immediate family.

119.     Plaintiffs reserve the right to amend the Class definitions above if further

investigation and/or discovery reveals that the Class or Subclass should be expanded,

narrowed, divided into further subclasses, or otherwise modified in any way.

120.     This action may be certified as a class action under Federal Rule of Civil

Procedure 23 because it satisfies the numerosity, commonality, typicality, adequacy, and

superiority requirements therein.

121.     <u>Numerosity (Rule 23(a)(1))</u>: The Class is so numerous that joinder of all Class

members is impracticable. Although the precise number of such persons is unknown, and the

facts are presently within the sole knowledge of Defendants, Plaintiffs estimates that the

Class is comprised of millions of Class members. The Class is sufficiently numerous to

warrant certification.

122.     <u>Typicality of Claims (Rule 23(a)(3))</u>: Plaintiffs' claims are typical of those of

other Class members because they all had their PII compromised as a result of the Data

Breach. Plaintiffs are members of the Class and their claims are typical of the claims of the

members of the Class. The harm suffered by Plaintiffs is similar to that suffered by all other

Class members that was caused by the same misconduct by Defendants.

123.     <u>Adequacy of Representation (Rule 23(a)(4))</u>: Plaintiffs will fairly and adequately

represent and protect the interests of the Class. Plaintiffs have no interest antagonistic to, nor

in conflict with, the Class. Plaintiffs have retained competent counsel who are experienced in

consumer and commercial class action litigation, including data breach class actions, and who will prosecute this action vigorously.

124.    Superiority (Rule 23(b)(3)): A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the monetary damages suffered by individual Class members is relatively small, the expense and burden of individual litigation make it impossible for individual Class members to seek redress for the wrongful conduct asserted herein. If Class treatment of these claims is not available, Defendants will likely continue their wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for their wrongdoing as asserted herein.

125.    Predominant Common Questions (Rule 23(a)(2)): The claims of all Class members present common questions of law or fact, which predominate over any questions affecting only individual Class members, including:

    a.  Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

    b.  Whether Defendants' data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

    c.  Whether Defendants' storage of Class Member's PII was done in a negligent manner;

    d.  Whether Defendants had a duty to protect and safeguard Plaintiffs' and Class members' PII;

    e.  Whether Defendants' conduct was negligent;

    f.  Whether Defendants' conduct violated Plaintiffs' and Class members' privacy;

    g.  Whether Defendants took sufficient steps to secure their customers' PII;

    h.  Whether Defendants were unjustly enriched;

    i.  The nature of relief, including damages and equitable relief, to which Plaintiffs and members of the Class are entitled.

126.     Information concerning Defendants' policies is available from Defendants' records.

127.     Plaintiffs know of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

128.     The prosecution of separate actions by individual members of the Class would run the risk of inconsistent or varying adjudications and establish incompatible standards of conduct for Defendants. Prosecution as a class action will eliminate the possibility of repetitious and inefficient litigation.

129.     Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief and/or corresponding declaratory relief with respect to the Class as a whole.

130.     Given that Defendants have not indicated any changes to their conduct or security measures, monetary damages are insufficient and there is no complete and adequate remedy at law.

## CAUSES OF ACTION
### COUNT I
### NEGLIGENCE

131.     Plaintiffs repeat and re-allege each and every factual allegation contained in all previous paragraphs as if fully set forth herein.

132.     All Plaintiffs bring this claim against PSC and PBI on behalf of the PSC and PBI Nationwide Classes or, in the alternative, the PSC State Classes and PBI State Classes. In addition, Plaintiffs Burgan and Burgan bring this claim against Genworth on behalf of the Genworth Nationwide Class or, in the alternative, the Genworth State Classes. Plaintiff Schwarz brings this claim against TIAA on behalf of the TIAA Nationwide Class or, in the alternative, the TIAA State Classes.

133.    Defendants knowingly collected, came into possession of, and maintained Plaintiffs' and Class members' PII, and had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties.

134.    Defendants had a duty to have procedures in place to detect and prevent the loss or unauthorized dissemination of Plaintiffs' and Class members' PII.

135.    Defendants had, and continue to have, a duty to timely disclose that Plaintiffs' and Class members' PII within their possession was compromised and precisely the type(s) of information that were compromised.

136.    Defendants owed a duty of care to Plaintiffs and Class members to provide data security consistent with industry standards, applicable standards of care from statutory authority like Section 5 of the FTC Act, and other requirements discussed herein, and to ensure that their systems and networks, and the personnel responsible for them, adequately protected their customers' PII.

137.    Defendants' duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendants and their customers. Defendants were in a position to ensure that their systems were sufficient to protect against the foreseeable risk of harm to Class members from a data breach.

138.    Defendants' duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendants are bound by industry standards to protect confidential PII.

139.    Defendants breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class members' PII.

140.    The specific negligent acts and omissions committed by Defendants include, but are not limited to, the following:

      a.    Failing to adopt, implement, and maintain adequate security measures to safeguard Class members' PII;

      b.    Failing to adequately monitor the security of their networks and systems;

      c.    Failing to adequately and timely notify impacted consumers of the Data Breach; and

      d.    Failing to periodically ensure that their computer systems and networks had plans in place to maintain reasonable data security safeguards.

141.    Defendants, through their actions and/or omissions, unlawfully breached their duties to Plaintiffs and Class members by failing to exercise reasonable care in protecting and safeguarding Plaintiffs' and Class members' PII within Defendant's possession.

142.    Defendants, through their actions and/or omissions, unlawfully breached their duty to Plaintiffs and Class members by failing to have appropriate procedures in place to detect and prevent dissemination of Plaintiffs' and Class members' PII.

143.    Defendants, through their actions and/or omissions, unlawfully breached their duty to timely disclose to Plaintiffs and Class members that the PII within Defendant's possession might have been compromised and precisely the type of information compromised.

144.    It was foreseeable that Defendants' failure to use reasonable measures to protect Plaintiffs' and Class members' PII would result in injury to Plaintiffs and Class members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches.

145.     It was foreseeable that the failure to adequately safeguard Plaintiffs' and Class members' PII would result in injuries to Plaintiffs and Class members.

146.     Defendants' breaches of duties owed to Plaintiffs and Class members caused Plaintiffs' and Class members' PII to be compromised.

147.     But for Defendants' negligent conduct and breach of the above-described duties owed to Plaintiffs and Class members, their PII would not have been compromised.

148.     As a result of Defendants' failure to timely notify Plaintiffs and Class members that their PII had been compromised, Plaintiffs and Class members are unable to take the necessary precautions to mitigate damages by preventing future fraud.

149.     As a result of Defendants' negligence and breach of duties, Plaintiffs and Class members are in danger of imminent harm in that their PII, which is still in the possession of third parties, will be used for fraudulent purposes, and Plaintiffs and Class members have and will suffer damages including: a substantial increase in the likelihood of identity theft; the compromise, publication, and theft of their personal information; loss of time and costs associated with the prevention, detection, and recovery from unauthorized use of their personal information; the continued risk to their personal information; future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the personal information compromised as a result of the Data Breach; and overpayment for the services or products that were received without adequate data security.

## COUNT II
### Negligence *Per Se*

150.     Plaintiffs re-allege and incorporate by reference herein all the allegations contained above.

151.     All Plaintiffs bring this claim against PSC and PBI on behalf of the PSC and PBI

Nationwide Classes or, in the alternative, the PSC State Classes and PBI State Classes. In

addition, Plaintiffs Burgan and Burgan bring this claim against Genworth on behalf of the

Genworth Nationwide Class or, in the alternative, the Genworth State Classes. Plaintiff

Schwarz brings this claim against TIAA on behalf of the TIAA Nationwide Class or, in the

alternative, the TIAA State Classes.

152.     Section 5 of the FTC Act, 15 U.S.C. 45, prohibits "unfair . . . practices in or

affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or

practice by Defendants of failing to use reasonable measures to protect Plaintiffs' and Class

members' PII. Various FTC publications and orders also form the basis of Defendants' duty.

153.     Defendants violated Section 5 of the FTC Act (and similar state statutes) by

failing to use reasonable measures to protect Plaintiffs' and Class members' PII and not

complying with industry standards.

154.     Defendants' conduct was particularly unreasonable given the nature and amount

of PII obtained and stored and the foreseeable consequences of a data breach.

155.     Defendants' violation of Section 5 of the FTC Act (and similar state statutes)

constitutes negligence per se.

156.     Class members are consumers within the class of persons Section 5 of the FTC

Act (and similar state statutes) were intended to protect.

157.     Moreover, the harm that has occurred is the type of harm the FTC Act (and

similar state statutes) was intended to guard against. Indeed, the FTC has pursued over fifty

enforcement actions against businesses which, as a result of their failure to employ

reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiffs and Class members.

158.    As a result of Defendants' negligence, Plaintiffs and the other Class members have been harmed and have suffered damages including, but not limited to: damages arising from identity theft and fraud; out-of-pocket expenses associated with procuring identity protection and restoration services; increased risk of future identity theft and fraud, and the costs associated therewith; and time spent monitoring, addressing and correcting the current and future consequences of the Data Breach.

## COUNT III
## BREACH OF IMPLIED CONTRACT

159.    Plaintiffs repeat and re-allege each and every factual allegation contained in all previous paragraphs as if fully set forth herein.

160.    All Plaintiffs bring this claim against PSC and PBI on behalf of the PSC and PBI Nationwide Classes or, in the alternative, the PSC State Classes and PBI State Classes. In addition, Plaintiffs Burgan and Burgan bring this claim against Genworth on behalf of the Genworth Nationwide Class or, in the alternative, the Genworth State Classes. Plaintiff Schwarz brings this claim against TIAA on behalf of the TIAA Nationwide Class or, in the alternative, the TIAA State Classes.

161.    Plaintiffs and the Class provided and entrusted their PII to Defendants. Plaintiffs and the Class provided their PII to Defendants as part of Defendants' regular business practices.

162.    Defendants should have been aware that they had a minimum duty to alert Plaintiffs and Class embers that their data was compromised "without unreasonable delay."

163.     Thus, when Defendants took Plaintiffs' and Class members' PII, they entered into implied contracts with Plaintiffs and Class members by which Defendants agreed to safeguard and protect such information and to keep such information secure and confidential. Implied in these exchanges was a promise by Defendants to ensure that the PII of Plaintiffs and Class members in its possession was secure.

164.     Pursuant to these implied contracts, Plaintiffs and Class members provided Defendants with their PII in order for Defendants to provide their services, for which Defendants are compensated. In exchange, Plaintiffs understood, and Defendants agreed, among other things, that Defendants would: (1) provide services to Plaintiffs and Class members; (2) take reasonable measures to protect the security and confidentiality of Plaintiffs' and Class members' PII; (3) protect Plaintiffs' and Class members PII in compliance with federal and state laws and regulations and industry standards; and (4) notify Plaintiffs and Class members in compliance with state laws and regulations.

165.     Implied in these exchanges was a promise by Defendants to take adequate measures to protect Plaintiffs' and Class members' PII, and notify Plaintiffs and Class members where data safeguards failed.

166.     A material term of this contract is a covenant by Defendants that they would take reasonable efforts to adequately secure that information. Defendants breached this covenant by allowing Plaintiffs' and Class members' PII to be accessed in the Data Breach.

167.     Indeed, implicit in the agreement between Defendants and their customers was the obligation that both parties would maintain information securely and respond accordingly if that information was compromised.

168.    These exchanges constituted an agreement and meeting of the minds between the parties: Plaintiffs and Class members would provide their PII in exchange for services by Defendants. These agreements were made by Plaintiffs and Class members as Defendants' customers.

169.    When the parties entered into an agreement, mutual assent occurred. Plaintiffs and Class members would not have disclosed their PII to Defendants but for the prospect of utilizing Defendants' services. Conversely, Defendants presumably would not have obtained Plaintiffs' and Class members' PII if they did not intend to provide Plaintiffs and Class members with their services.

170.    Defendants were therefore required to reasonably safeguard and protect the PII of Plaintiffs and Class members from unauthorized disclosure and/or use and, as promptly as reasonable, notify Plaintiffs and Class members when it failed in that duty.

171.    Plaintiffs and Class members accepted Defendants' offer of services and fully performed their obligations under the implied contract with Defendants by providing their PII, directly or indirectly, to Defendants, among other obligations.

172.    Plaintiffs and Class members would not have entrusted their PII to Defendants in the absence of their implied contracts with Defendants and would have instead retained the opportunity to control their PII.

173.    Defendants breached the implied contracts with Plaintiffs and Class members by failing to reasonably safeguard and protect Plaintiffs' and Class members' PII.

174.    Defendants' failure to implement adequate measures to protect the PII of Plaintiffs and Class members violated the purpose of the agreement between the parties.

175.    Defendants further failed to adequately and promptly notify Plaintiffs and Class members that their PII had been compromised.

176.    Instead of spending adequate financial resources to safeguard Plaintiffs' and Class members' PII, which Plaintiffs and Class members were required to provide to Defendants, Defendants instead used that money for other purposes, thereby breaching their implied contracts with Plaintiffs and Class members.

177.    As a proximate and direct result of Defendants' breaches of their implied contracts with Plaintiffs and Class members, Plaintiffs and the Class members suffered damages as described in detail above.

## COUNT IV
## BREACH OF IMPLIED COVENANT OF
## GOOD FAITH AND FAIR DEALING

178.    Plaintiffs reallege and reincorporate every allegation set forth in the preceding paragraphs as though fully set forth herein.

179.    All Plaintiffs bring this claim against PSC and PBI on behalf of the PSC and PBI Nationwide Classes or, in the alternative, the PSC State Classes and PBI State Classes. In addition, Plaintiffs Burgan and Burgan bring this claim against Genworth on behalf of the Genworth Nationwide Class or, in the alternative, the Genworth State Classes. Plaintiff Schwarz brings this claim against TIAA on behalf of the TIAA Nationwide Class or, in the alternative, the TIAA State Classes.

180.    Every contract has an implied covenant of good faith and fair dealing between the parties to it, which is an independent duty requiring every party in a contract to implement the agreement as intended, without using means to undercut the purpose of the transaction.

This duty may be breached even when there is no breach of a contract's actual and/or express terms.

181.     Plaintiffs and Class Members have complied with and performed all conditions of their contracts with Defendants.

182.     Defendants breached the implied covenant of good faith and fair dealing by failing to maintain adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' PII and failing to timely and accurately disclose the Data Breach to Plaintiffs and Class Members.

183.     Defendants acted in bad faith in denying Plaintiffs and Class Members the full benefit of their bargains as originally intended by the parties, thereby causing them compensable injury in an amount to be determined at trial.

## COUNT V
## BREACH OF FIDUCIARY DUTY

184.     Plaintiffs reallege and reincorporate all previous paragraphs as if fully set forth below.

185.     All Plaintiffs bring this claim against PSC and PBI on behalf of the PSC and PBI Nationwide Classes or, in the alternative, the PSC State Classes and PBI State Classes. In addition, Plaintiffs Burgan and Burgan bring this claim against Genworth on behalf of the Genworth Nationwide Class or, in the alternative, the Genworth State Classes. Plaintiff Schwarz brings this claim against TIAA on behalf of the TIAA Nationwide Class or, in the alternative, the TIAA State Classes.

186.     As a condition of obtaining services from Defendants, Plaintiffs and Class Members gave Defendants their PII in confidence, believing that Defendants would protect that information. Plaintiffs and Class members would not have provided Defendants with this

information had they known it would not be adequately protected. Defendants' acceptance and storage of Plaintiffs' and Class members' PII created a fiduciary relationship between Defendants and Plaintiffs and Class Members. In light of this relationship, Defendants were and are required to act primarily for the benefit of their customers, which includes safeguarding and protecting Plaintiffs' and Class members' PII.

187.    Defendants had and continue to have a fiduciary duty to act for the benefit of Plaintiffs and Class Members upon matters within the scope of their relationship. Defendants breached that duty by failing to properly protect the integrity of the systems containing Plaintiffs' and Class members' PII, failing to comply with minimum data security practices, and otherwise failing to safeguard Plaintiffs' and Class members' PII that they collected.

188.    As a direct and proximate result of Defendants' breach of their fiduciary duties, Plaintiffs and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the compromise, publication, and theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII compromised as a result of the Data Breach; and/or (vii) overpayment for the services that were received without adequate data security.

## COUNT VI
## UNJUST ENRICHMENT

189.    Plaintiffs incorporate the above allegations as if fully set forth herein.

190.    All Plaintiffs bring this claim against PSC and PBI on behalf of the PSC and PBI
Nationwide Classes or, in the alternative, the PSC State Classes and PBI State Classes. In
addition, Plaintiffs Burgan and Burgan bring this claim against Genworth on behalf of the
Genworth Nationwide Class or, in the alternative, the Genworth State Classes. Plaintiff
Schwarz brings this claim against TIAA on behalf of the TIAA Nationwide Class or, in the
alternative, the TIAA State Classes.

191.    This claim is pleaded in the alternative to the breach of implied contractual duty
claim.

192.    Plaintiffs conferred a benefit upon Defendants by using Defendants' services.

193.    Defendants appreciated or had knowledge of the benefits conferred upon
themselves by Plaintiffs and Class members. Defendants also benefited from the receipt of
Plaintiffs' PII as this was used for Defendants to administer their services to Plaintiffs and
the Class.

194.    Under principles of equity and good conscience, Defendants should not be
permitted to retain the full value of Plaintiffs' services because Defendants failed to
adequately protect their PII. Plaintiffs and the proposed Class would not have provided their
PII to Defendants or utilized their services had they known Defendants would not adequately
protect their PII.

195.    Defendants should be compelled to disgorge into a common fund for the benefit
of Plaintiffs all unlawful or inequitable proceeds received by them because of their
misconduct and Data Breach.

## COUNT VII
## DECLARATORY JUDGMENT

196.    Plaintiffs reallege and reincorporate every allegation set forth in the preceding paragraphs as though fully set forth herein.

197.    All Plaintiffs bring this claim against PSC and PBI on behalf of the PSC and PBI Nationwide Classes or, in the alternative, the PSC State Classes and PBI State Classes. In addition, Plaintiffs Burgan and Burgan bring this claim against Genworth on behalf of the Genworth Nationwide Class or, in the alternative, the Genworth State Classes. Plaintiff Schwarz brings this claim against TIAA on behalf of the TIAA Nationwide Class or, in the alternative, the TIAA State Classes.

198.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

199.    An actual controversy has arisen in the wake of the Data Breach regarding Plaintiffs' and Class Members' PII and whether Defendants are currently maintaining data security measures adequate to protect Plaintiffs and Class Members from further data breaches that compromise their PII. Plaintiffs allege that Defendants' data security measures remain inadequate. Furthermore, Plaintiffs continue to suffer injury due to the compromise of their PII and remain at imminent risk that further compromises of their PII will occur in the future.

200.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a.  Defendants owe a legal duty to secure consumers' PII and to timely notify consumers of a data breach under the common law and Section 5 of the FTC Act;

b.  Defendants have breached their duty to Plaintiffs and the Class by allowing the Data Breach to occur;

c.  Defendants continue to breach this legal duty by failing to employ reasonable measures to secure consumers' PII. This Court also should issue corresponding prospective injunctive relief requiring Defendants to employ adequate security protocols consistent with law and industry standards to protect consumers' PII; and

d.  Defendants' ongoing breaches of said duty continue to cause harm to Plaintiffs and the Class.

201.    If an injunction is not issued, Plaintiffs and Class Members will suffer irreparable injury and lack an adequate legal remedy in the event of another data breach with Defendants. The risk of another such breach is real, immediate, and substantial. If Defendants allow another data breach, Plaintiffs and Class Members will not have an adequate remedy at law because many of the resulting injuries are not readily quantified, and they will be forced to bring multiple lawsuits to rectify the same conduct.

202.    Plaintiffs and the Class, therefore, seek a declaration that (1) each of Defendants' existing security measures do not comply with their obligations and duties of care to provide reasonable security procedures and practices appropriate to the nature of the information to protect consumers' PII, and (2) to comply with their duties of care, Defendants must implement and maintain reasonable security measures, including, but not limited to:

a.  Engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis, and ordering

Defendants to promptly correct any problems or issues detected by such third-party security auditors;

b. Engaging third-party security auditors and internal personnel to run automated security monitoring;

c. Auditing, testing, and training their security personnel regarding any new or modified procedures;

d. Segmenting user applications by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of Defendants' systems;

e. Conducting regular database scanning and security checks;

f. Routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

g. Purchasing credit monitoring services for Plaintiffs and Class Members for their respective lifetimes; and

h. Meaningfully educating Plaintiffs and Class Members about the threats they face as a result of the loss of their PII to third parties, as well as the steps they must take to protect themselves.

203. The Court should issue corresponding prospective injunctive relief requiring Defendants to employ adequate security protocols consistent with the law and industry standards to protect Plaintiffs and Class Members' PII.

204. The hardship to Plaintiffs and Class Members if an injunction were not issued exceeds the hardship to Defendants if an injunction were issued. Plaintiffs and Class Members will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Defendants of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendants have a pre-existing legal obligation to employ such measures.

205. Issuance of the requested injunction would not disserve the public interest. On the contrary, such an injunction would benefit the public by preventing another data breach of Defendants' systems, thus eliminating the additional injuries that would result to Plaintiffs and Class Members whose PII would be further compromised.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Defendants, as follows:

(a) For an order determining that this action is properly brought as a class action and certifying Plaintiffs as the representatives of the Class and their counsel as Class Counsel;

(b) For an order declaring the Defendants' conduct violates the laws referenced herein;

(c) For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

(d) For damages in amounts to be determined by the Court and/or jury;

(e) An award of statutory damages or penalties to the extent available;

(f) For pre-judgment interest on all amounts awarded;

(g) For an order of restitution and all other forms of monetary relief;

(h) For declaratory and/or injunctive relief, as set forth herein; and

(i) Such other and further relief as the Court deems necessary and appropriate.

## **DEMAND FOR TRIAL BY JURY**

Plaintiffs demand a trial by jury of all issues so triable.

Dated: June 12, 2024                    Respectfully submitted,


                                        */s/ Kristen A. Johnson*
                                        Kristen A. Johnson (BBO# 667261)
                                        HAGENS BERMAN SOBOL SHAPIRO LLP
                                        1 Faneuil Hall Square, 5th Fl.
                                        Boston, MA 02109
                                        Tel:  (617) 482-3700
                                        Fax:  (617) 482-3003
                                        kristenj@hbsslaw.com

                                        *Plaintiffs' Liaison & Coordinating Counsel*

                                        Edward F. Haber (BBO# 215620)
                                        Ian J. McLoughlin (BBO# 647203)
                                        Shapiro Haber & Urmy LLP
                                        One Boston Place, Suite 2600
                                        Boston, MA 02108
                                        Tel: (617) 439-3939
                                        Fax: (617) 439-0134
                                        ehaber@shulaw.com
                                        imcloughlin@shulaw.com

                                        Robert C. Schubert
                                        Amber L. Schubert
                                        Schubert Jonckheer & Kolbe LLP
                                        2001 Union Street, Suite 200
                                        San Francisco, California 94123
                                        Tel: (415) 788-4220
                                        Fax: (415) 788-0161
                                        rschubert@sjk.law
                                        aschubert@sjk.law

                                        *Counsel for Plaintiffs and the Putative Class*

                                        E. Michelle Drake
                                        BERGER MONTAGUE, PC
                                        1229 Tyler St., NE, Ste. 205
                                        Minneapolis, MN 55413
                                        Tel:  (612) 594-5933
                                        Fax:  (612) 584-4470
                                        emdrake@bm.net

                                        Gary F. Lynch
                                        LYNCH CARPENTER, LLP
                                        1133 Penn Ave., 5th Fl.

Pittsburgh, PA 15222
Tel: (412) 322-9243
Fax: (412) 231-0246
Gary@lcllp.com

Douglas J. McNamara
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave. NW, 5th Fl.
Washington, DC 20005
Tel: (202) 408-4600
dmcnamara@cohenmilstein.com

Karen H. Riebel
LOCKRIDGE GRINDAL NAUEN PLLP
100 Washington Ave. S., Ste. 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 612-339-0981
khriebel@locklaw.com

Charles E. Schaffer
LEVIN SEDRAN & BERMAN LLP
510 Walnut Street, Ste. 500
Philadelphia, PA 19106
Tel: (215) 592-1500
Fax: (215) 592-4663
cshaffer@lfsblaw.com

*Plaintiffs' Lead Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this date, the foregoing document was served by filing it on the Court's CM/ECF system, which will automatically send a notification of such filing to all counsel of record via electronic mail.

Dated: June 12, 2024                  */s/ Kristen Johnson*
                                       Kristen Johnson