# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: MOVEIT CUSTOMER DATA SECURITY BREACH LITIGATION | MDL No. 1:23-md-03083-ADB-PGL |
| This Document Relates To: | **AMENDED CLASS ACTION COMPLAINT** |
| DANA JONES, individually and on behalf of all others similarly situated, | CIVIL ACTION NO. 1:23-cv-12484 |
| Plaintiff, | |
| v. | |
| MILLIMAN SOLUTIONS, LLC, MILLIMAN, INC. (d/b/a MILLIMAN INTELLISCRIPT, INC.), PENSION BENEFIT INFORMATION, LLC, CMFG LIFE INSURANCE COMPANY, and PROGRESS SOFTWARE CORPORATION, | |
| Defendants. | |

Plaintiff Dana Jones brings this Class Action Complaint, individually and on behalf of all others similarly situated (the "Class Members"), against Defendant Milliman Solutions, LLC ("Milliman Solutions"), Milliman, Inc. d/b/a Milliman Intelliscript, Inc. (together, "Milliman"), Pension Benefit Information, LLC ("PBI"), CMFG Life Insurance Company ("CMFG"), and Progress Software Corporation ("PSC") (collectively, "Defendants") alleging as follows based on information and belief, the investigation of her counsel, and her own personal knowledge.

## NATURE OF THE ACTION

1.    Plaintiff incorporates the allegations contained in Plaintiffs' Omnibus Set of Additional Pleading Facts (ECF No. 908) in its entirety.

2.     Plaintiff brings this class action on behalf of herself and all other individuals ("Class Members"), who had their sensitive personal identifiable information ("PII") accessed and hacked by malicious, unauthorized third parties that accessed Defendants' MOVEit Transfer servers and accessed and remove PII from the servers as early as May 27, 2023 (the "Data Breach").[1]

3.     Milliman operates an "independent risk management, benefits and technology firm"[2] that provides consulting services to business around the world, including insurance companies. Among Milliman's customers are CMFG.

4.     CMFG is an insurance company that offers services nationwide.

5.     Plaintiff and Class Members are current and former customers of CMFG.

6.     PBI provides audit and address research services for insurance companies and other organizations, including Milliman.

7.     PBI is a "sponsor, administrator, or record keeper" "for thousands of organizations" and pension plans, and one of the many companies that uses PSC's MOVEit service to transfer large amounts of data in the ordinary course of its business and the service it provides to organizations.

8.     As a condition of receiving services, Defendants require that consumers, including Plaintiff and Class Members, entrust them with highly sensitive PII, including but not limited to their names, dates of birth, addresses, and Social Security numbers.

9.     Plaintiff and Class Members provided their PII to Defendants, directly or indirectly, with the reasonable expectation and on the mutual understanding that Defendants

---

[1] https://www.pbinfo.com/ (last visited Aug. 1, 2023).
[2] *See* https://us.milliman.com/en/our-story.

would comply with their obligations to keep that information confidential and secure from unauthorized access.

10.    Defendants derive a substantial economic benefit from collecting Plaintiff's and Class Members' PII. Without it, Defendants could not perform their services.

11.    Defendants had a duty to adopt reasonable measures to protect the PII of Plaintiff and Class Members from involuntary disclosure to third parties and to audit, monitor, and verify the integrity of vendors and affiliates for their own cybersecurity. Defendants have a legal duty to keep consumers' PII safe and confidential.

12.    By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' PII, Defendants assumed legal and equitable duties to ensure the protection of that PII, and they knew or should have known that they were thus responsible for protecting Plaintiff's and Class Members' PII from disclosure.

13.    On or about July 21, 2023, PBI began sending Plaintiff and other Class Members notice (the "Notice Letter") informing them that their PII had been exposed as a result of a breach of one of PBI's tools to store and transfer PII.[3]

14.     Noticeably absent from the Notice Letter are details of the root cause of the Data Breach, the vulnerabilities that were exploited, and the remedial measures that Defendants undertook to ensure such a breach does not happen again. To date, these critical facts have not been explained or clarified to Plaintiff or the Class Members, who have a vested interest in ensuring that their PII remains protected.

---

[3] *See* https://agportal-s3bucket.s3.amazonaws.com/databreach/BreachM15351.pdf.

15.     In fact, the attacker accessed and acquired files containing unencrypted PII of Plaintiff and Class Members, including their Social Security numbers.

## JURISDICTION AND VENUE

16.     This case was originally filed in the United States District Court for the Western District of Washington. This action was transferred to this Court for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407 and Rule 7.1 of the Rules of Procedure of the United States Judicial Panel on Multidistrict Litigation.

17.     This Court has jurisdiction over this action under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because the aggregate amount in controversy exceeds $5,000,000, exclusive of interests and costs, there are more than 100 Class Members, and one or more members of the classes, including Plaintiff, are residents of a different state than the Defendants. The Court also has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

18.     The United States District Court for the Western District of Washington has personal jurisdiction over Defendants because Defendants conduct substantial business in Washington, Milliman is headquartered in that District and because Milliman's employees and members are citizens of that District.

19.     Venue is proper in the Western District of Washington pursuant to 28 U.S.C. §1391 because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in the State of Washington and because Defendants conduct a substantial part of their business within that District. Moreover, Milliman and Milliman Solutions maintain physical offices and principal places of business in that District.

## PARTIES

20.     Plaintiff Dana Jones is a resident of Chattanooga, Tennessee and is a customer of CMFG. Ms. Jones received a letter in the mail dated July 21, 2023, informing her that her PII—including her name, address, date of birth, and Social Security number—were involved in the Data Breach.

21.     Defendant Milliman Solutions LLC is a Delaware limited liability company with its principal place of business at 1301 5th Avenue, Suite 3800, Seattle, WA 98101. Milliman Solutions, LLC is a subsidiary of Milliman, Inc.

22.     Defendant Milliman, Inc. is a Washington corporation, with its principal place of business in Seattle, Washington.

23.     Milliman is a Vendor Contracting Entity of PBI. (*See* Plfs.' Omnibus Set of Addtl. Pleading Facts, App. A.)

24.     Defendant CMFG Life Insurance Company is headquartered in Madison, Wisconsin, and is a Vendor Contracting Entity Customer of Milliman. (*Id.*)

25.     Defendant PBI is a for-profit Delaware corporation with its principal place of business at 333 S 7th Street, Suite 2400, Minneapolis, MN 55402. PBI uses PSC's MOVEit service in the regular course of its business acting as a life insurance "sponsor, administrator, or record keeper" "for thousands of organizations."[4]

26.     PBI is a PSC Vendor. (*See* Plfs.' Omnibus Set of Addtl. Pleading Facts, App. A.)

27.     Defendant PSC is a Delaware corporation and maintains its headquarters and principal place of business at 15 Wayside Road, 4th Floor, Burlington, Massachusetts 01803.

---

[4] www.pbinfo.com (last visited Aug. 1, 2023).

PSC offers the service MOVEit, which experienced the Data Breach underlying Plaintiff's claims.

## FACTUAL ALLEGATIONS

### A.    The Data Breach

28.    Between May 29 to May 30, 2023, unauthorized third-party cybercriminals exploited a vulnerability in the file transfer protocol software PBI used to store and transfer Milliman's data.[5]

29.    The customer PII the hackers accessed include names, Social Security numbers, addresses, dates of birth, and Social Security numbers.[6]

30.    Defendants had obligations to Plaintiff and to Class Members to safeguard their PII and to protect that PII from unauthorized access and disclosure. Indeed, Plaintiff and Class Members provided their PII to their insurers with the reasonable expectation and mutual understanding that their insurers, and anyone their insurers contracted with, would comply with their obligations to keep such information confidential and secure from unauthorized access. Defendants' data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches of major companies before the Data Breach.

31.    Milliman also promises to keep the PII it collects secure. In its Privacy Policy, Milliman promises that it "has appropriate technical and organizational measures in place to

---

[3] *Id.*
[6] *Id.*

protect against unauthorized or unlawful processing of Personal Data and against accidental loss or destruction of, or damage to, Personal Data held or processed by Milliman."[7]

32.    It also promises that "If Milliman shares Personal Data with a third party, Milliman requires that those third parties agree to process Personal Data based on Milliman's instructions *and in compliance with this Privacy Policy*." (emphasis added).[8] It similarly promises that "If Milliman forwards Personal Data to any third party, Milliman requires that those third parties have appropriate technical and organizational measures in place to comply with this Privacy Policy and applicable laws."[9]

33.    PBI provides audit and address research services for insurance companies, pension funds, and other organizations, including Milliman and Milliman Solutions.

34.    PBI is a pension plan "sponsor, administrator, or record keeper" "for thousands of organizations", and one of the many companies that uses PSC's MOVEit service to transfer large amounts of data in the ordinary course of its business and the service it provides to pension plans and other organizations.

35.    According to the Notice Letter received by Plaintiff, PBI provides audit and address research services for CMFG.

36.    PBI's website also promises consumers that it has robust systems and processes in place to protect and secure their sensitive information:

---

[7] *See* Milliman Global Data Privacy Policy, Milliman, *available at* https://us.milliman.com/en/global-privacy-policy.
[8] *Id.*
[9] *Id.*





37.    PBI's website also tells consumers that it has systems and process in place to ensure the privacy of their sensitive information obtained over the internet and to prevent identity theft:

> **9. ONLINE PRIVACY**
>
> PBI strives to protect the privacy of personally identifiable information obtained over the Internet and strives to apply the Principles and evolving standards to the online environment.
>
> **10. IDENTITY THEFT**
>
> PBI strives to prevent the acquisition of information from our products and services for improper purposes, such as identity theft. PBI believes in the importance of notifying individuals who may have had their sensitive personally identifiable information acquired by an unauthorized individual, as appropriate.

38.    Furthermore, PBI acknowledges that it has a duty to safeguard Plaintiff's and class members' sensitive PII because, inter alia, PBI's website tells consumers that it has systems in place to protect consumers' sensitive information, and routinely audits those systems to ensure they are compliant with federal regulations and other legislation—as well as industry standards and practices— governing data privacy:

**8. ACCOUNTABILITY**

PBI supports accountability of information industry standards and practices, responsible and effective federal regulation of the data industry, and legislation governing the practices of all data providers. PBI also supports industry oversight and active engagement with the privacy community. PBI believes that strong privacy and information security protections are vital for an effective and trusted data industry.

**11. COMPLIANCE**

PBI will obtain assessments from an independent auditor, who uses procedures and standards generally accepted in the profession to assess PBI's controls relevant to security, availability, and confidentiality, as appropriate.

39.     Discovery will show that through their provision of the foregoing services, PBI obtains possession of customers'—including Plaintiff's and class members'—highly sensitive PII. Thus, in the regular course of their businesses, PBI collects and/or maintains the PII of consumers such as Plaintiff and class members. PBI stores this information digitally in the regular course of business.

40.     As evidenced by, inter alia, their receipt of the notice informing them that their PII were compromised in the Data Breach, Plaintiff's and class members' PII was transferred using PSC's MOVEit service and/or they otherwise entrusted to Defendants their PII, from which Defendants profited.

41.     Yet, contrary to PBI's website representations—by virtue of Defendants' admissions that they experienced the Data Breach—Defendants did not have adequate measures in place to protect and maintain sensitive PII entrusted to it. Instead, Defendants' websites wholly fail to disclose the truth: that Defendants lack sufficient processes to protect the PII that is entrusted to them.

42.     In the course of their relationship, clients, including Plaintiff and class members, provided Defendants, directly or indirectly, with at least the following PII:

names;

dates of birth;

Social Security numbers; and

addresses.

43.     In the course of its ordinary business operations, Defendants are entrusted with safeguarding the sensitive PII of customers.

44.     Plaintiff and class members are current or former CMFG customers who provided their PII to Defendants.

45.     As a result of the Data Breach, Defendants are urging affected consumers to monitor their accounts for suspicious activity and to safeguard themselves against possible fraud.[10] Furthermore, numerous data security experts are also suggesting that affected consumers take steps to protect their identities.

**B.     Plaintiff Expected Defendants to Keep Her Information Secure.**

46.     Plaintiff Dana Jones is a customer of CMFG, which, in turn, was a client of Milliman.

47.     As a condition of receiving products and services from CMFG, Ms. Jones provided her PII to CMFG, which CMFG then gave to Milliman, which Milliman then gave to PBI, who stored and maintained it with PSC.

---

[10] *See* https://agportal-s3bucket.s3.amazonaws.com/databreach/BreachM15351.pdf.

48.     Ms. Jones places significant value on the security of her PII, especially when receiving health and life insurance services. She entrusted her sensitive PII to CMFG with the understanding that CMFG and those with whom CMFG contracted would keep her information secure and employ reasonable and adequate security measures to ensure that it would not be compromised.

49.     Additionally, Plaintiff is very careful about sharing her PII. She has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

50.     Ms. Jones received a letter dated July 21, 2023, informing her that her PII was compromised in the Data Breach.

51.     As a result of the exposure of Ms. Jones's PII, she will have to spend hours attempting to mitigate the affects of the Data Breach, including monitoring financial and other important accounts for fraudulent activity.

52.     Ms. Jones has already experienced fraudulent activity on her checking account, and had to put forth her own time to review the suspicious activity and work to get unauthorized charges to be reversed. On information and belief, the fraudulent activity was caused by the Data Breach.

53.     She has also seen an increase in spam and phishing calls, emails, and text messages, and received notification that her PII was found on the dark web. On information and belief, the increase and publication of Plaintiff's data on the dark web were caused by the Data Breach

54.     Given the highly sensitive nature of the information that was compromised, Ms. Jones has clearly already suffered injury and remains at a substantial and imminent risk of

future harm. In fact, because her Social Security number is impacted, Ms. Jones faces this risk for her lifetime. She has experienced anxiety concerning whether the bad actors that accessed and exfiltrated her PII will continue to use it to commit identity theft or other financial crimes.

55.     In addition, Ms. Jones has a continuing interest in ensuring that her PII, which, upon information and belief, remains in Defendants' possession, is protected, and safeguarded from future breaches.

**C.     FTC Security Guidelines Concerning PII**

56.     The Federal Trade Commission ("FTC") has established security guidelines and recommendations to help entities protect PII and reduce the likelihood of data breaches.

57.     Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, failing to use reasonable measures to protect PII by companies like Defendant. Several publications by the FTC outline the importance of implementing reasonable security systems to protect data. The FTC has made clear that protecting sensitive customer data should factor into virtually all business decisions.

58.     In 2016, the FTC provided updated security guidelines in a publication titled *Protecting Personal Information: A Guide for Business*. Under these guidelines, companies should protect consumer information they keep; limit the sensitive consumer information they keep; encrypt sensitive information sent to third parties or stored on computer networks; identify and understand network vulnerabilities; regularly run up-to-date anti-malware programs; and pay particular attention to the security of web applications—the software used to inform visitors to a company's website and to retrieve information from the visitors.

59.     The FTC recommends that businesses do not maintain payment card information beyond the time needed to process a transaction; restrict employee access to sensitive customer information; require strong passwords be used by employees with access to sensitive customer information; apply security measures that have proven successful in the industry; and verify that third parties with access to sensitive information use reasonable security measures.

60.     The FTC also recommends that companies use an intrusion detection system to immediately expose a data breach; monitor incoming traffic for suspicious activity that indicates a hacker is trying to penetrate the system; monitor for the transmission of large amounts of data from the system; and develop a plan to respond effectively to a data breach in the event one occurs.

61.     The FTC has brought several actions to enforce Section 5 of the FTC Act. According to its website:

When companies tell consumers they will safeguard their personal information, the FTC can and does take law enforcement action to make sure that companies live up these promises. The FTC has brought legal actions against organizations that have violated consumers' privacy rights or misled them by failing to maintain security for sensitive consumer information or caused substantial consumer injury. In many of these cases, the FTC has charged the defendants with violating Section 5 of the FTC Act, which bars unfair and deceptive acts and practices in or

affecting commerce. In addition to the FTC Act, the agency also enforces other federal laws relating to consumers' privacy and security.[11]

62.     Defendants are aware or should have been aware of their obligations to protect consumers' PII and privacy before and during the Data Breach yet failed to take reasonable steps to protect customers from unauthorized access. Among other violations, Defendants violated their obligations under Section 5 of the FTC Act.

**D.     Defendants were on Notice of Data Threats and the Inadequacy of their Data Security.**

63.     Defendants were on notice that companies maintaining large amounts of PII during their regular course of business are prime targets for criminals looking to gain unauthorized access to sensitive and valuable information, such as the type of data at issue in this case. Indeed, Milliman bills itself as an expert in "risk management" specifically for "leading insurers, healthcare organizations, and employers."[12]

64.     At all relevant times, Defendants knew, or should have known, that the PII that they collected was a target for malicious actors. Despite such knowledge, and well-publicized cyberattacks on similar companies, Defendants failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiff's and Class Members' PII from cyber-attacks that Defendants should have anticipated and guarded against.

65.     It is well known among companies that store PII that sensitive information—such as the Social Security numbers accessed in the Data Breach—is valuable and frequently targeted

---

[11] *Privacy and Security Enforcement*, Fed. Trade Comm'n, https://www.ftc.gov/news-events/topics/protecting-consumer-privacy-security/privacy-security-enforcement.
[12] *See* https://us.milliman.com/en/our-story.

by criminals. In a recent article, *Business Insider* noted that "[d]ata breaches are on the rise for all kinds of businesses, including retailers . . . . Many of them were caused by flaws in . . . systems either online or in stores."[13]

66.    In light of recent high profile data breaches, including Microsoft (250 million records, December 2019), T-Mobile (110 million records, August 2021), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), Milliman knew or should have known that its electronic records would be targeted by cybercriminals.

67.    Indeed, cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets so they are aware of, take appropriate measures to prepare for, and are able to thwart such an attack.

**E.    The Data Breach Harmed Plaintiff and Class Members**

68.    Plaintiff and Class Members have suffered and will continue to suffer harm because of the Data Breach.

69.    Plaintiff and Class Members face a present and imminent and substantial risk of injury of identity theft and related cyber crimes due to the Data Breach for their respective lifetimes. Once data is stolen, malicious actors will either exploit the data for profit themselves or sell the data on the dark web to someone who intends to exploit the data for profit. Hackers

---

[13] Dennis Green, Mary Hanbury & Aine Cain, *If you bought anything from these 19 companies recently, your data may have been stolen*, BUSINESS INSIDER (Nov. 19, 2019, 8:05 A.M.), https://www.businessinsider.com/data-breaches-retailers-consumer-companies-2019-1 (last visited Feb. 16, 2023).

would not incur the time and effort to steal PII—thereby risking prosecution by listing it for sale on the dark web—if the PII was not valuable to malicious actors.

70.     The dark web helps ensure users' privacy by effectively hiding server or IP details from the public. Users need special software to access the dark web. Most websites on the dark web are not directly accessible via traditional searches on common search engines and are therefore accessible only by users who know the addresses for those websites.

71.     Malicious actors use PII to gain access to Class Members' digital life, including bank accounts, social media, and credit card details. During that process, hackers can harvest other sensitive data from the victim's accounts, including personal information of family, friends, and colleagues.

72.     Consumers are injured every time their data is stolen and placed on the dark web, even if they have been victims of previous data breaches. Not only is the likelihood of identity theft increased, but the dark web is not like Google or eBay. It is comprised of multiple discrete repositories of stolen information. Each data breach puts victims at risk of having their information uploaded to different dark web databases and viewed and used by different criminal actors.

73.     Defendants issued misleading public statements about the Data Breach, including in PBI's data breach notification letters,[14] in which it attempts to downplay the seriousness of the Data Breach by stating that there is "no indication of identity theft of fraud in relation to this event" and suggesting that Class Members should take prophylactic steps to protect their data only if they "feel it appropriate to do so."

---

[14] *Available at* https://agportal-s3bucket.s3.amazonaws.com/databreach/BreachM15351.pdf

74.    Defendants' intentionally misleading public statements ignore the serious harm its security flaws caused to the Class Members. Even worse, those statements could convince Class Members that they do not need to take steps to protect themselves.

75.    The data security community agrees that the PII compromised in the Data Breach greatly increases Class Members' risk of identity theft and fraud.

76.    As Justin Fier, senior vice president for AI security company Darktrace, observed following a recent data breach at T-Mobile, "[t]here are dozens of ways that the information that was stolen could be weaponized." He added that such a massive treasure trove of consumer profiles could be of use to everyone from nation-state hackers to criminal syndicates.[15]

77.    Criminals can use the PII Defendants lost to target Class Members for imposter scams, a type of fraud initiated by a person who pretends to be someone the victim can trust in order to steal sensitive data or money.[16]

78.    The PII accessed in the Data Breach therefore has significant value to the hackers that have already sold or attempted to sell that information and may do so again.

79.    Malicious actors can also use Class Members' PII to open new financial accounts, open new utility accounts, file fraudulent tax returns, obtain government benefits, obtain government IDs, or create "synthetic identities."

80.    As established above, the PII accessed in the Data Breach is also very valuable to Defendants. Defendants collect, retain, and use this information to increase their profits. Defendants' customers value the privacy of this information and expect Defendants to allocate

---

[15] https://www.cnet.com/tech/services-and-software/t-mobile-gets-hacked-again-is-the-un-carrier-un-safe/.
[16] *See* https://consumer.ftc.gov/features/imposter-scams.

enough resources to ensure it is adequately protected. Customers would not have done business with Defendants, provided the PII, and/or paid the same prices for Defendants' goods and services had they known Defendants did not implement reasonable security measures to protect PII. Milliman states that its mission is to "protect the health and financial well-being of people everywhere."[17] Customers expect that the payments they make to Defendants to incorporate the costs to implement reasonable security measures to protect customers' PII as part of protecting their "health and financial well-being."

81.     Indeed, "[f]irms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[18] American companies are estimated to have spent over $19 billion on acquiring personal data of consumers in 2018.[19] It is so valuable to identity thieves that once PII has been disclosed, criminals often trade it on the "cyber black-market" or the "dark web" for many years.

82.     As a result of their real and significant value, identity thieves and other cyber criminals have openly posted credit card numbers, Social Security numbers, PII, and other sensitive information directly on various Internet websites, making the information publicly available. This information from various breaches, including the information exposed in the Data

---

[17] *See* https://us.milliman.com/en/our-story.

[18] OECD, *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD Digital Economy Papers, No. 220, Apr. 2, 2013, https://doi.org/10.1787/5k486qtxldmq-en.

[19] IAB Data Center of Excellence, *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, IAB.Com (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

Breach, can be readily aggregated, and it can become more valuable to thieves and more damaging to victims.

83.     The PII accessed in the Data Breach is also very valuable to Plaintiff and Class Members. Consumers often exchange personal information for goods and services. For example, consumers often exchange their personal information for access to wifi in places like airports and coffee shops. Likewise, consumers often trade their names and email addresses for special discounts (*e.g.*, sign-up coupons exchanged for email addresses). Consumers use their unique and valuable PII to access the financial sector, including when obtaining a mortgage, credit card, or business loan. As a result of the Data Breach, Plaintiff and Class Members' PII has been compromised and lost significant value.

84.     Consumers place a high value on the privacy of that data, as they should. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[20]

85.     Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' PII has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

86.     Due to the immutable nature of the PII impacted here, Plaintiff and Class Members will face a risk of injury due to the Data Breach for their respective lifetimes.

---

[20] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior*, *An Experimental Study*, 22(2) INFO. SYS. RES. 254 (June 2011) https://www.jstor.org/stable/23015560?seq=1.

Malicious actors often wait months or years to use the PII obtained in data breaches, as victims often become complacent and less diligent in monitoring their accounts after a significant period has passed. These bad actors will also re-use stolen PII, meaning individuals can be the victim of several cyber crimes stemming from a single data breach. Finally, there is often significant lag time between when a person suffers harm due to theft of their PII and when they discover the harm. For example, victims rarely know that certain accounts have been opened in their name until contacted by collections agencies. Plaintiff and Class Members will therefore need to continuously monitor their accounts for years to ensure their PII obtained in the Data Breach is not used to harm them.

87.    Even when reimbursed for money stolen due to a data breach, consumers are not made whole because the reimbursement fails to compensate for the significant time and money required to repair the impact of the fraud.

88.    Victims of identity theft also experience harm beyond economic effects. According to a 2018 study by the Identity Theft Resource Center, 32% of identity theft victims experienced negative effects at work (either with their boss or coworkers) and 8% experienced negative effects at school (either with school officials or other students).

89.    The U.S. Government Accountability Office likewise determined that "stolen data may be held for up to a year or more before being used to commit identity theft," and that "once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years."[21]

---

[21] *See* https://www.gao.gov/assets/gao-07-737.pdf.

90.     Plaintiff and Class Members have failed to receive the value of the services for which their insurance companies paid.

**F.      Defendants Failed to Take Reasonable Steps to Protect Customers' PII**

91.     Defendants require customers to provide a significant amount of highly personal and confidential PII to purchase services. Defendants collect, store, and use this data to maximize profits while failing to encrypt or protect it properly.

92.     Defendants have legal duties to protect customers' PII by implementing reasonable security features. This duty is further defined by federal and state guidelines and laws, including the FTC Act, as well as industry norms.

93.     Defendants breached their duties by failing to implement reasonable safeguards to ensure Plaintiff's and Class Members' PII was adequately protected. As a direct and proximate result of this breach of duty, the Data Breach occurred, and Plaintiff and Class Members were harmed.

94.     Defendants could have prevented this Data Breach by properly securing and encrypting the systems containing the PII of Plaintiff and Class Members.

95.     Defendants' negligence in safeguarding the PII of Plaintiff and Class Members is exacerbated by the repeated warnings and alerts directed to companies like Defendants to protect and secure sensitive data they possess.

96.     Experts have identified several best practices that business like Milliman should implement at a minimum, including, but not limited to: educating all employees; requiring strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software;

encryption, making data unreadable without a key; multi-factor authentication; backup data; and limiting which employees can access sensitive data.

97.    Other best cybersecurity practices include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

98.    When using a file transfer protocol, moreover, best cybersecurity practices include not storing data or information longer than necessary to accomplish the transfer. By storing Plaintiff's and Class Members' PII in its file transfer protocol longer than was necessary to accomplish the transfer Defendants left Plaintiff's and Class Members' PII vulnerable to access and theft, which is what ultimately happened.

99.    The Data Breach was a reasonably foreseeable consequence of Defendants' failure to ensure that they used adequate security systems. Defendants certainly have the resources to implement reasonable security systems to prevent or limit damage from data breaches. Even so, Defendants failed to properly invest in that data security. Had Defendants implemented reasonable data security systems and procedures (*i.e.*, followed guidelines from industry experts and state and federal governments), then they likely could have prevented hackers from accessing customers' PII.

100.    Defendants' failure to implement reasonable security systems has caused Plaintiff and Class Members to suffer and continue to suffer harm that adversely impact Plaintiff and Class Members economically, emotionally, and/or socially. As discussed above, Plaintiff and

Class Members now face a substantial, imminent, and ongoing threat of identity theft, scams, and resulting harm, and Plaintiff herself has already experienced actual resulting fraud. These individuals now must spend significant time and money to continuously monitor their accounts and credit scores and diligently sift out phishing communications to limit potential adverse effects of the Data Breach, regardless of whether any Class Member ultimately falls victim to identity theft.

101.    In sum, Plaintiff and Class Members were injured as follows: (i) theft of their PII and the resulting loss of privacy rights in that information; (ii) improper disclosure of their PII; (iii) diminution in value of their PII; (iv) the certain, ongoing, and imminent  threat of fraud and identity theft, including the economic and non-economic impacts that flow therefrom; (v) ascertainable out-of-pocket expenses and the value of their time allocated to fixing or mitigating the effects of the Data Breach; and/or (vi) nominal damages.

102.    Even though PBI has decided to offer free credit monitoring for one year to affected individuals, this is insufficient to protect Plaintiff and Class Members. As discussed above, the threat of identity theft and fraud from the Data Breach will extend for many years and cost Plaintiff and the Class Members significant time and effort.

103.     Plaintiff and Class Members therefore have a significant and cognizable interest in obtaining injunctive and equitable relief (in addition to any monetary damages) that protects them from these long-term threats. Accordingly, this action represents the enforcement of an important right affecting the public interest and will confer a significant benefit on the general public or a large class of persons.

## CLASS ACTION ALLEGATIONS

104.    Plaintiff brings this nationwide class action on behalf of herself and on behalf of all others similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

105.    Specifically, Plaintiff proposes the following classes:

(1) PSC Nationwide Class: All persons whose PII was compromised in the MOVEit data breach.

    (a) PSC Tennessee Class: All residents of Tennessee whose PII was compromised in the MOVEit data breach.

(2) PBI Nationwide Class: All persons whose PII was compromised on PBI's platform and/or systems in the MOVEit data breach.

    (a) PBI Tennessee Class: All residents of Tennessee whose PII was compromised on PBI's platform and/or systems in the MOVEit data breach.

(3) Milliman Nationwide Class: All persons whose PII was compromised in the MOVEit data breach where such PII was obtained from or hosted by Milliman and/or Milliman Solutions.

    (a)   Milliman Tennessee Class: All residents of Tennessee whose PII was compromised in the MOVEit data breach where such PII was obtained from or hosted by Milliman and/or Milliman Solutions.

(4) CMFG Nationwide Class: All persons whose PII was compromised in the MOVEit data breach where such PII was obtained from or hosted by CMFG.

    (b) CMFG Tennessee Class: All residents of Tennessee whose PII was compromised in the MOVEit data breach where such PII was obtained from or hosted by CMFG.

The foregoing nationwide classes are referred to as the "Nationwide Classes" and the state classes are referred to as the "Tennessee Classes."

106.    Specifically excluded from the Classes are Defendants; their officers, directors, or employees; any entity in which Defendants have a controlling interest; and any affiliate, legal

representative, heir, or assign of Defendants. Also excluded from the Classes are any federal, state, or local governmental entities, any judicial officer presiding over this action and the members of their immediate family and judicial staff, and any juror assigned to this action.

107.    <u>Class Identity</u>: The members of the Classes are readily identifiable and ascertainable. Defendants and/or their affiliates, among others, possess the information to identify and contact Class Members.

108.    <u>Numerosity</u>: The members of the Classes are so numerous that joinder of all of them is impracticable. While the exact number of Class Members is unknown to Plaintiff at this time, based on information and belief, the Nationwide Classes of millions of individuals whose data was compromised in the Data Breach, and the Tennessee Classes consists of thousands of customers whose data was compromised in the Data Breach.

109.    <u>Typicality</u>: Plaintiff's claims are typical of the claims of the members of the Classes because all Class Members had their PII accessed in the Data Breach and were harmed as a result.

110.    <u>Adequacy</u>: Plaintiff will fairly and adequately protect the interests of the Classes. Plaintiff has no interest antagonistic to those of the Classes and is aligned with Class Members' interests because Plaintiff was subject to the same Data Breach as Class Members and faces similar threats due to the Data Breach as Class Members. Plaintiff has also retained competent counsel with significant experience litigating complex class actions, including Data Breach cases involving multiple classes.

111.    <u>Commonality and Predominance</u>: There are questions of law and fact common to the Classes. These common questions predominate over any questions affecting only individual Class Members. The common questions of law and fact include, without limitation:

a.  Whether Defendants owed Plaintiff and Class Members a duty to implement and maintain reasonable security procedures and practices to protect their PII;

b.  Whether Defendants acted negligently in connection with the monitoring and/or protection of Plaintiff's and Class Members' PII;

c.  Whether Defendants breached their duty to implement reasonable security systems to protect Plaintiff's and Class Members' PII;

d.  Whether Defendants breached their contractual obligations to their customers to protect Plaintiff's and Class Members' PII;

e.  Whether Plaintiff and Class Members were intended third party beneficiaries of Defendants' contracts with their customers;

f.  Whether Defendants' breach of their duty to implement reasonable security systems, directly and/or proximately caused damages to Plaintiff and Class Members;

g.  Whether Defendants adequately addressed and fixed the vulnerabilities that enabled the Data Breach;

h.  When Defendants learned of the Data Breach and whether their response was adequate;

i.  Whether Plaintiff and other Class Members are entitled to credit monitoring and other injunctive relief; and,

j.    Whether Class Members are entitled to compensatory damages, punitive

damages, and/or statutory or civil penalties as a result of the Data Breach.

112.    Defendants have engaged in a common course of conduct, and Class Members

have been similarly impacted by Defendants' failure to maintain reasonable security procedures

and practices to protect consumers' PII.

113.    <u>Superiority</u>: A class action is superior to other available methods for the fair and

efficient adjudication of the controversy. Class treatment of common questions of law and fact is

superior to multiple individual actions or piecemeal litigation. Absent a class action, most if not

all Class Members would find the cost of litigating their individual claims prohibitively high and

have no effective remedy. The prosecution of separate actions by individual Class Members

would create a risk of inconsistent or varying adjudications with respect to individual Class

Members and risk inconsistent treatment of claims arising from the same set of facts and

occurrences.

114.    Plaintiff knows of no difficulty likely to be encountered in the maintenance of this

action as a class action under Federal Rule of Civil Procedure 23.

**CLAIMS FOR RELIEF**

**COUNT I**
**NEGLIGENCE**
**(On Behalf of Plaintiff and the Nationwide Classes, or Alternatively the Tennessee Classes,**
**Against All Defendants)**

115.    Plaintiff repeats and realleges every allegation set forth in the preceding

paragraphs.

116.    Defendants owed Plaintiff and Class Members a duty to exercise reasonable care

in protecting their PII from unauthorized disclosure or access. Defendants breached their duty of

care by failing to implement reasonable security procedures and practices to protect Plaintiff's and Class Members' PII. Among other things, Defendants failed to: (i) implement security systems and practices consistent with federal and state laws and guidelines; and (ii) implement security systems and practices consistent with industry norms.

117.    Defendants knew or should have known that Plaintiff's and Class Members' PII was highly sought after by cyber criminals and that Plaintiff and Class Members would suffer significant harm if their PII was compromised by hackers.

118.    Defendants also knew or should have known that timely detection and disclosure of the Data Breach was required and necessary to allow Plaintiff and Class Members to take appropriate actions to mitigate the resulting harm. These efforts include, but are not limited to, freezing accounts, changing passwords, monitoring credit scores/profiles for fraudulent charges, contacting financial institutions, and cancelling or monitoring government-issued IDs such as passports and driver's licenses.

119.    Defendants have a special relationship with Plaintiff and Class Members. Defendants were entrusted with several pieces of Plaintiff's and Class Members' PII so that Defendants would provide services. Plaintiff and Class Members were led to believe Defendants would take reasonable precautions to protect their PII and would timely inform them if their PII was compromised, which Defendants failed to do.

120.    The harm that Plaintiff and Class Members suffered (and continue to suffer) was the reasonably foreseeable product of Defendants' breach of their duty of care. Defendants failed to enact reasonable security procedures and practices, and Plaintiff and Class Members were the foreseeable victims of data theft that exploited the inadequate security measures. The PII

accessed in the Data Breach is precisely the type of information that cyber criminals seek and use to commit cyber crimes.

121.    But-for Defendants' breach of its duty of care, the Data Breach would not have occurred and Plaintiff's and Class Members' PII would not have been accessed by an unauthorized and malicious party.

122.    As a direct and proximate result of the Defendants' negligence, Plaintiff and Class Members have been injured and are entitled to damages in an amount to be proven at trial. Plaintiff and Class Members have suffered, and will continue to suffer, economic damages and other injury and actual harm in the form of, among other things, (1) a present and imminent, immediate and the continuing increased risk of identity theft and identity fraud—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (2) invasion of privacy; (3) breach of the confidentiality of their PII; (5) deprivation of the value of their Private Information, for which there is a well-established national and international market; and/or (6) the financial and temporal cost of monitoring credit, monitoring financial accounts, and mitigating damages.

## COUNT II
### VIOLATION OF THE WASHINGTON CONSUMER PROTECTION ACT
RCW 19.86.010, *et seq.*,
**(On behalf of Plaintiff and the Milliman Nationwide Class, against Milliman)**

123.    Plaintiff incorporates by reference the foregoing allegations of fact as if fully set forth herein.

124.    The Washington State Consumer Protection Act, RCW 19.86.020 (the "CPA") prohibits any "unfair or deceptive acts or practices" in the conduct of any trade or commerce as those terms are described by the CPA and relevant case law.

125.    Milliman are "person[s]" as described in RWC 19.86.010(1).

126.    Milliman engage in "trade" and "commerce" as described in RWC 19.86.010(2) in that they engage in the sale of services and commerce directly and indirectly affecting the people of the State of Washington.

127.    By virtue of the above-described wrongful actions, inaction, omissions, and want of ordinary care that directly and proximately caused the Data Breach, the Milliman engaged in unlawful, unfair and fraudulent practices within the meaning, and in violation of, the CPA, in that Defendants' practices were injurious to the public interest because they injured other persons, had the capacity to injure other persons, and have the capacity to injure other persons.

128.    In the course of conducting their business, the Milliman committed "unfair or deceptive acts or practices" by, among other things, knowingly failing to ensure the safeguarding and protection of Plaintiff's and Class Members' PII by the entities to whom it provided that PII, and by violating the common law alleged herein in the process. Plaintiff and Class Members reserve the right to allege other violations of law by Milliman constituting other unlawful business acts or practices. As described above, Milliman's wrongful actions, inaction, omissions, and want of ordinary care are ongoing and continue to this date.

129.    Milliman also violated the CPA by concealing from Plaintiff and Class Members information regarding the unauthorized release and disclosure of their PII. If Plaintiff and Class Members had been notified in an appropriate fashion, and had the information not been hidden from them, they could have taken precautions to safeguard and protect their PII and identities.

130.    Milliman's above-described wrongful actions, inaction, omissions, want of ordinary care, misrepresentations, practices, and non-disclosures also constitute "unfair or

deceptive acts or practices" in violation of the CPA in that Milliman's wrongful conduct is substantially injurious to other persons, had the capacity to injure other persons, and has the capacity to injure other persons.

131.    The gravity of Milliman's wrongful conduct outweighs any alleged benefits attributable to such conduct. There were reasonably available alternatives to further the Milliman' legitimate business interests other than engaging in the above-described wrongful conduct.

132.    As a direct and proximate result of Milliman's above-described wrongful actions, inaction, omissions, and want of ordinary care that directly and proximately caused the Data Breach and their violations of the CPA, Plaintiff and Class Members have suffered, and will continue to suffer, economic damages and other injury and actual harm in the form of, among other things, (1) a present and imminent, immediate and the continuing increased risk of identity theft and identity fraud—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (2) invasion of privacy; (3) breach of the confidentiality of their PII; (5) deprivation of the value of their PII, for which there is a well-established national and international market; and/or (6) the financial and temporal cost of monitoring credit, monitoring financial accounts, and mitigating damages.

133.    Unless restrained and enjoined, Milliman will continue to engage in the above-described wrongful conduct and more data breaches will occur. Plaintiff, therefore, on behalf of herself and the Milliman Nationwide Class, seek restitution and an injunction prohibiting Milliman from continuing such wrongful conduct, and requiring Milliman to ensure the

safeguarding and protection of Plaintiff's and Class Members' PII by the entities to whom they provide that PII.

134.    Plaintiff, on behalf of herself and Milliman Nationwide Class Members, also seeks to recover actual damages sustained by each Class Member together with the costs of the suit, including reasonable attorneys' fees. In addition, Plaintiff, on behalf of herself and Milliman Nationwide Class Members, requests that this Court use its discretion, pursuant to RCW 19.86.090, to increase the damages award for each Class Member by three times the actual damages sustained, not to exceed $25,000.00 per Class Member.

## COUNT III
## BREACH OF THIRD-PARTY BENEFICIARY CONTRACT
### (On Behalf of Plaintiff and the Nationwide Classes, or Alternatively the Tennessee Classes, Against All Defendants)

135.    Plaintiff incorporates by reference the foregoing allegations of fact as if fully set forth herein.

136.    In connection with providing their services, Defendants agreed, in part, to implement adequate security measures to safeguard the PII of Plaintiff and the Class Members and to timely and adequately notify them of the Data Breach. Indeed, Milliman's Privacy Policy states that "Milliman has appropriate technical and organizational measures in place to protect against unauthorized or unlawful processing of Personal Data and against accidental loss or destruction of, or damage to, Personal Data held or processed by Milliman. If Milliman forwards Personal Data to any third party, Milliman requires that those third parties have appropriate

technical and organizational measures in place to comply with this Privacy Policy and applicable laws."[22]

137.    These contracts for services were made expressly for the benefit of Plaintiff and the Class Members, as Plaintiff and Class Members were the intended third-party beneficiaries of the services contracted for.  Defendants knew that, if they were to breach these contracts, consumers—Plaintiff and Class Members—would be harmed.

138.    Defendants breached the contracts by, among other things, failing to (i) use reasonable data security measures, (ii) implement adequate protocols and employee training sufficient to protect PII from unauthorized disclosure to third parties, (iii) failing to perform due diligence and to verify, audit, or monitor the integrity of third party networks on which they shared PII, and (iv) failing to promptly and adequately notify Plaintiff and Class Members of the Data Breach.

139.    Plaintiff and Class Members were harmed by Defendants' breach of contract, as such breach is alleged herein, and are entitled to the losses and damages they have sustained as a direct and proximate result thereof.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and Class Members, requests judgment against Defendants and that the Court grant the following:

(a)    That the Court determine that Plaintiff's claims are suitable for class treatment and certify the proposed Classes pursuant to Fed. R. Civ. P. 23;

(b)    That the Court appoint Plaintiff as representative of the Classes;

---

[22] *See* https://us.milliman.com/en/privacy-policy-us.

(c)    That Plaintiff's counsel be appointed as counsel for the Classes;

(d)    That the Court award compensatory, statutory, and exemplary damages, including treble damages under RCW 19.86.090;

(e)    In the alternative, that the Court award nominal damages as permitted by law;

(f)    That the Court award injunctive or other equitable relief that directs Defendants to provide Plaintiff and the Classes with free identity theft protection and credit monitoring for their respective lifetimes, and to implement reasonable security procedures and practices to protect customers' PII that conform to relevant federal and state guidelines and industry norms;

(g)    That the Court award reasonable costs and expenses incurred in prosecuting this action, including attorneys' fees and expert fees; and

(i)    Such other relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury of all issues properly triable to a jury in this case.

Dated: June 12, 2024                    By: /s/ *Kristen A. Johnson*
                                        Kristen A. Johnson (BBO# 667261)
                                        HAGENS BERMAN SOBOL SHAPIRO LLP
                                        1 Faneuil Hall Square, 5th Fl.
                                        Boston, MA 02109
                                        Tel:  (617) 482-3700
                                        Fax:  (617) 482-3003
                                        kristenj@hbsslaw.com

                                        *Plaintiffs' Liaison & Coordinating Counsel*

                                        Kaleigh N. Boyd, WSBA #52684
                                        TOUSLEY BRAIN STEPHENS PLLC
                                        1200 Fifth Avenue, Suite 1700

Seattle, WA 98101
Tel: (206) 682-5600/Fax: (206) 682-2992
kboyd@tousley.com

M. Anderson Berry
aberry@justice4you.com
Gregory Haroutunian
gharoutunian@justice4you.com
Brandon P. Jack
bjack@justice4you.com

CLAYEO C. ARNOLD
A PROFESSIONAL CORPORATION
865 Howe Avenue
Sacramento, CA 95825
Telephone: (916) 239-4778
Fax: (916) 924-1829

*Attorneys for Plaintiff and the Proposed Class*

E. Michelle Drake
BERGER MONTAGUE, PC
1229 Tyler St., NE, Ste. 205
Minneapolis, MN 55413
Tel:  (612) 594-5933
Fax:  (612) 584-4470
emdrake@bm.net

Gary F. Lynch
LYNCH CARPENTER, LLP
1133 Penn Ave., 5th Fl.
Pittsburgh, PA 15222
Tel:  (412) 322-9243
Fax:  (412) 231-0246
Gary@lcllp.com

Douglas J. McNamara
COHEN MILSTEIN SELLERS & TOLL
PLLC
1100 New York Ave. NW, 5th Fl.
Washington, DC  20005
Tel:  (202) 408-4600
dmcnamara@cohenmilstein.com

Karen H. Riebel
LOCKRIDGE GRINDAL NAUEN PLLP
100 Washington Ave. S., Ste. 2200
Minneapolis, MN  55401
Tel:  (612) 339-6900
Fax:  (612) 612-339-0981
khriebel@locklaw.com

Charles E. Schaffer
LEVIN SEDRAN & BERMAN LLP
510 Walnut Street, Ste. 500
Philadelphia, PA  19106
Tel:  (215) 592-1500
Fax:  (215) 592-4663
cshaffer@lfsblaw.com

*Plaintiffs' Lead Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that, on this date, the foregoing document was served by filing it on the Court's CM/ECF system, which will automatically send a notification of such filing to all counsel of record via electronic mail.

Dated:  June 12, 2024                                    */s/ Kristen Johnson*
                                                         Kristen Johnson