**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE: MOVEIT CUSTOMER DATA SECURITY BREACH LITIGATION | MDL No. 1:23-md-03083-ADB-PGL |
| This Document Relates To: | |
| ROBERT CASEY, LAWRENCE MALONEY, and RUTH MALONEY individually and on behalf of all others similarly situated, | AMENDED CLASS ACTION COMPLAINT |
| Plaintiffs, | |
| v | CIVIL ACTION NO.: 1:23-cv-11913 |
| GENWORTH LIFE AND ANNUITY INSURANCE COMPANY, GENWORTH LIFE INSURANCE COMPANY, GENWORTH FINANCIAL, INC., PENSION BENEFIT INFORMATION LLC, AND PROGRESS SOFTWARE CORPORATION, | |
| Defendants. | |

Plaintiffs Robert Casey, Lawrence Maloney, and Ruth Maloney ("Plaintiffs"), individually and on behalf of all others similarly situated, hereby file this class action complaint against Genworth Life and Annuity Insurance Company, ("GLAIC"), Genworth Life Insurance Company ("GLIC"), and Genworth Financial, Inc. ("Genworth Financial" and collectively with GLAIC and GLIC, "Genworth"), Pension Benefit Information, LLC ("PBI"), and Progress Software Corporation ("PSC") (collectively, "Defendants"). The following allegations are based upon personal knowledge with respect to the Plaintiffs' own acts, upon the investigation of their counsel, and upon information and belief as to all other matters:

## **INTRODUCTION**

1.  Plaintiffs incorporate the allegations contained in Plaintiffs' Omnibus Statement of Additional Pleading Facts (ECF No. 908) in its entirety.

2.      Plaintiffs bring this class action against Defendants on behalf of themselves and all other individuals ("Class Members"), totaling more than 60 million people and nearly 1,000 organizations,[1] who had their sensitive personal identifiable information ("PII") accessed and hacked by malicious, unauthorized third parties that accessed and removed the PII from Defendants' systems as early as May 27, 2023 [2]  (the "Data Breach" or "Breach").

3.      PSC is a software company that offers software products and services to corporate and governmental entities, including cloud hosting and secure file transfer services such as MOVEit.

4.      PBI processes information about employees or individuals for insurers engaged by employers, or for companies acting on such insurers' behalf, in connection with certain employee benefit programs. PBI uses PSC's MOVEit file transfer services.

5.      The Data Breach included information maintained by Genworth, a company that markets mortgage, long-term care insurance, and other insurance and financial products to help customers "navigate caregiving options, protect and grow their retirement income, and prepare for the financial challenges that come as we age."[3]

6.      In carrying out its services, PBI utilizes MOVEit, the file sharing application created and operated by PSC, to securely transmit files containing sensitive consumer information. On or about May 31, 2023, PBI received a notification from PSC that an unauthorized external party had exploited a vulnerability within the MOVEit software. PBI then initiated an inquiry and

---

[1]  https://www.securityweek.com/nearly-1000-organizations-60-million-individuals-impacted-by-moveit-hack/.

[2] https://www.reuters.com/technology/hackers-use-flaw-popular-file-transfer-tool-steal-data-researchers-say-2023-06-02/; https://news.yahoo.com/another-calpers-retiree-sues-pbi-231108178.html.

[3] https://www.genworth.com/about-us.html.

determined that the unauthorized party had gained entry to one of PBI's MOVEit Transfer servers on May 29, 2023, and May 30, 2023. During this time, the unauthorized party acquired data containing sensitive PII held by Genworth and provided to PBI.

7.      During the Class Period, Defendants failed to properly secure and safeguard Plaintiffs' and Class Members' protected PII, including without limitation, full names, dates of birth, and Social Security numbers.[4]

8.      Plaintiffs bring this class action complaint to redress injuries related to the Data Breach, on behalf of themselves and similarly situated persons.

9.      As a direct and proximate result of Defendants' inadequate data security, and breach of their duty to handle PII with reasonable care, Plaintiffs' and Class Members' PII have been accessed by hackers and exposed to an untold number of unauthorized individuals. Plaintiffs, on behalf of themselves, and the Class as defined herein, bring claims for negligence, negligence per se and declaratory judgment, seeking actual and putative damages, with attorneys' fees, costs, and expenses, and appropriate injunctive and declaratory relief.

10.      Plaintiffs and Class Members are now at a significantly increased and certainly impending risk of fraud, identity theft, misappropriation of health insurance benefits, intrusion of their health privacy, and similar forms of criminal mischief, risk which may last for the rest of their lives.  Consequently, Plaintiffs and Class Members must devote substantially more time, money, and energy to protect themselves, to the extent possible, from these crimes.

11.      To recover from Defendants for these harms, Plaintiffs and the Class seek damages in an amount to be determined at trial, declaratory judgment, and injunctive relief requiring

---

[5] PROGRESS, https://investors.progress.com/? ga=2.130524045.306488999.1689141297-1144817577.1689141297& gl= Pklrbgt* ga*MTE0NDgxNzU3Ny4xNjg5MTQxMjk3* ga 9JSNBCSF54*MTY4OTE0MzY0MC4yLjAu MTY4OTE0MzY0NC41Ni4wLjA.

Defendants to: 1) disclose, expeditiously, the full nature of the Data Breach and the types of PII accessed, obtained, or exposed by the hackers; 2) implement improved data security practices to reasonably guard against future breaches of PII possessed by Defendants; and 3) provide, at their own expense, all impacted victims with lifetime identity theft protection services.

### PARTIES

12.     Plaintiff Robert Casey is a citizen of Wexford, Pennsylvania.

13.     Plaintiff Lawrence Maloney is a citizen of Allison Park, Pennsylvania.

14.     Plaintiff Ruth Maloney is a citizen of Allison Park, Pennsylvania.

15.     Defendant Genworth Financial is a publicly traded Fortune 500 company incorporated in Delaware and headquartered in Richmond, Virginia that trades on the New York Stock Exchange under the trading symbol "GNW." Genworth Financial operates its business through three operating segments: mortgage insurance, long-term care insurance, and life and annuity retirement solutions.

16.     Defendant GLIC is a subsidiary of Genworth Financial headquartered in Richmond, Virginia.

17.     Defendant GLAIC is a subsidiary of Genworth Financial headquartered in Richmond, Virginia.

18.     Unless specified otherwise, "Genworth" herein refers collectively to Genworth Financial, GLIC, and GLAIC.

19.     Defendant PSC is a Delaware corporation with its principal place of business located at 15 Wayside Rd. Suite 400, Burlington, Massachusetts 01803.

20.     Since receiving the Notice, Plaintiffs have been required to expend their valuable time and resources communicating with the credit bureaus to place a freeze on their credit in order

to prevent any misuses of their PII– time they would not have had to expend but for the Data Breach.

21.     Since receiving the Notice, Plaintiffs have also received a significant increase in spam calls as compared to prior to the Data Breach. Plaintiffs have also suffered emotional distress as a result of their PII being accessed and exposed to unauthorized persons.

22.     As a result of the Data Breach, Plaintiffs will continue to be at heightened and certainly impending risk for fraud and identity theft, and suffer accompanying damages for years to come.

## JURISDICTION & VENUE

23.     This case was originally filed in the United States District Court for the District of Massachusetts.  This action has been transferred to this Court for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407 and Rule 7.1 of the Rules of Procedure of the United States Judicial Panel on Multidistrict Litigation.

24.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least one member of the Class, as defined below, is a citizen of a different state than Defendants, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interests and costs.

25.     This Court has personal jurisdiction over Defendants because they conduct substantial business in Massachusetts. Further, this Court has general jurisdiction over Defendant PSC because its corporate headquarters are located in this District.

26.     Pursuant to 28 U.S.C. §1391(b)(1) and (2), venue is proper in this District because a substantial part of the events or omissions giving rise to the claims occurred in this District, Defendant PSC is based in this District, Defendant PSC interacted with Defendant PBI in this

District, Defendant PSC designed, marketed, sold, and maintained the MOVEit transfer application in this District and the harm caused to Plaintiffs and Class members emanated from this district. Specifically, Defendants' failure to implement and maintain reasonable security procedures and practices with respect to the MOVEit product. In addition, Plaintiffs further alleges that upon information and belief members of the Class defined below reside in this District.

## FACTUAL BACKGROUND

### A.     Progress Software and the Services It Provides.

27.     Progress Software is a Massachusetts-based company that develops and sells a variety of software for businesses, including the secure file transfer application MOVEit. Defendant PSC advertises that more than 100,000 enterprises run business systems through its platforms, and 6 million business users work with apps running on Defendant PSC's technologies.[5]

28.     Defendant PSC's various business and government customers retain sensitive information including, but not limited to, bank account information, addresses, driver's license numbers, dates of birth, and social security numbers, and use Defendant PSC's MOVEit product to securely transfer files containing that sensitive information.

29.     While administering these services, PSC receives, handles, and collects consumer PII, which includes, *inter alia*, names, addresses, dates of birth, and Social Security numbers.

30.     By obtaining, collecting, and storing Plaintiffs' and the Class Members' PII, Defendants knew, or should have known, that they were a prime target for hackers given the significant amount of sensitive personal information processed through their customers' computer

---

[5] PROGRESS, https://investors.progress.com/? ga=2.130524045.306488999.1689141297-1144817577.1689141297& gl= Pklrbgt* ga*MTE0NDgxNzU3Ny4xNjg5MTQxMjk3* ga 9JSNBCSF54*MTY4OTE0MzY0MC4yLjAu MTY4OTE0MzY0NC41Ni4wLjA.

data and storage systems.  Defendants' knowledge is underscored by the massive number of data breaches that have occurred in recent years.

31.    Despite knowing the prevalence of data breaches, Defendants failed to prioritize data security by adopting reasonable data security measures to prevent and detect unauthorized access to their highly sensitive systems and databases.  Defendants have the resources to prevent a breach, but neglected to adequately invest in data security, despite the growing number of well-publicized breaches.  Defendants failed to undertake adequate analyses and testing of their systems, training of their personnel, and other data security measures as described herein to ensure vulnerabilities were avoided or remedied and that Plaintiffs' and Class Members' data were protected.

**B.    The Data Breach**

32.    PBI sent each Plaintiff a Notice, dated July 21, 2023, which stated:

> On or around May 31, 2023, Progress Software, the provider of MOVEit Transfer software disclosed a vulnerability in their software that had been exploited by an unauthorized third party.  PBI utilizes MOVEit in the regular course of our business operations to securely transfer files.  PBI promptly launched an investigation into the nature and scope of the MOVEit vulnerability's impact on our systems. Through the investigation, we learned that the third party accessed one of our MOVEit Transfer servers on May 29, 2023 and May 30, 2023 and downloaded your data.  We then conducted a manual review of our records to confirm the identities of individuals potentially affected by this event and their contact information to provide notifications.  We recently completed this review.

33.    According to the Notice, the breach resulted in the Plaintiffs' name, address, and social security number being compromised and acquired by unauthorized actors.[6]

34.    The Notice further confirmed that Plaintiffs' and Class Members' PII were exfiltrated by hackers.  Plaintiffs are informed and believe that all categories of PII they provided

---

[6]    An example of the Notice received by Plaintiffs and other Class Members can be found at: https://oag.ca.gov/system/files/Sample%20Notification%20Letter_0.pdf.

were further subject to unauthorized access, disclosure, theft, exfiltration, modification, use, or destruction.  Plaintiffs are informed and believe that criminals would have no purpose for hacking Defendants' software other than to exfiltrate, steal, destroy, use, or modify as part of their ransom attempts, the coveted personal information stored or processed by Defendants' customers.

35.    The PII exposed by Defendants as a result of their inadequate data security is highly valuable on the black market to phishers, hackers, identity thieves, and cybercriminals.  Stolen personal information is often trafficked on the "dark web," a heavily encrypted part of the Internet that is not accessible via traditional search engines.  Law enforcement has difficulty policing the dark web due to this encryption, which allows users and criminals to conceal identities and online activity.

36.    When malicious actors infiltrate companies and exfiltrate the personal information that those companies store, or have access to, that stolen information often ends up on the dark web because the malicious actors buy and sell that information for profit.

37.    The harm resulting from a data and privacy breach manifests in a number of ways, including identity theft and financial fraud, and the exposure of a person's PII through a data breach ensures that such person will be at a substantially increased and certainly impending risk of identity theft crimes compared to the rest of the population, potentially for the rest of their lives.  Mitigating that risk – to the extent it is even possible to do so – requires individuals to devote significant time and money to closely monitor their credit, financial accounts, health records, and email accounts, and to take a number of additional prophylactic measures.

38.    The information compromised in this unauthorized cybersecurity attack involves sensitive PII, which is significantly more valuable to consumers than the loss of, for example, credit card information in a retailer data breach because, there, consumer victims can cancel or

close credit and debit card accounts; whereas here, the information compromised such as social security numbers are difficult, if not impossible to change.

39.    Indeed, once PII is stolen, it is then sold to cybercriminals who use it to gain access to various areas of the victim's digital life, including bank accounts, social media, credit card, and tax details.  This can lead to additional personal information being harvested from the victim, as well as personal information from family, friends, and colleagues of the original victim.

40.    Unauthorized data breaches, such as these, facilitate identity theft as hackers obtain consumers' personal information and thereafter use it to siphon money from current accounts, open new accounts in the names of their victims, or sell consumers' personal information to others who do the same.

41.    The high value of PII to criminals is further evidenced by the prices they will pay through the dark web.  Numerous sources cite dark web pricing for stolen identity credentials.  For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[7]  Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[8]  Criminals can also purchase access to entire company data breaches from $999 to $4,995.[9]

42.    These criminal activities have and will result in devastating financial and personal losses to Plaintiffs and Class Members.  For example, it is believed that certain PII compromised

---

[7]    Anita George, *Your personal data is for sale on the dark web.  Here's how much it costs,* DIGITAL TRENDS, (Oct. 16, 2019), https://www.Digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.

[8]    Brian Stack, *Here's How Much Your Personal Information Is Selling for on the Dark Web,* EXPERIAN, (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/.

[9]    VPNOVERVIEW, *In the Dark,*   https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/.

in the 2017 Experian data breach was being used, three years later, by identity thieves to apply for COVID-19-related benefits in the state of Oklahoma.[10] Such fraud will be an omnipresent threat for Plaintiffs and Class Members for the rest of their lives. They will need to remain constantly vigilant.

43. The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."

44. Identity thieves can use PII, such as that of Plaintiffs and Class Members, which Defendants failed to keep secure, to perpetrate a variety of crimes that harm victims. For instance, identity thieves may commit various types of government fraud such as immigration fraud, obtaining a driver's license or identification card in the victim's name but with another's picture, using the victim's information to obtain government benefits, or filing a fraudulent tax return using the victim's information to obtain a fraudulent refund.

45. The ramifications of Defendants' failure to keep secure Plaintiffs' and Class Members' PII are long lasting and severe. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years. Indeed, Plaintiffs' and Class Members' PII was

---

[10] *See* Jon Fingas, *Fraud ring uses stolen data to scam unemployment insurance programs*, ENGADGET, (May 17, 2020), https://www.engadget.com/stolen-data-used-for-unemployment-fraud-ring-174618050.html, *see also* Lily Hay Newman, *The Nigerian Fraudsters Ripping Off the Unemployment System*, WIRED, (May 19, 2020), https://www.wired.com/story/nigerian-scammers-unemployment-system-scattered-canary/.

taken by hackers to engage in identity theft or to sell it to other criminals who will purchase the PII for that purpose. The fraudulent activity resulting from the Data Breach may not come to light for years.

46.     There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[11]

47.     When cyber criminals access financial information and other PII—as they did here—there is no limit to the amount of fraud to which Defendants may have exposed Plaintiffs and Class Members.

48.     Federal and state governments have established security standards and have issued recommendations to minimize unauthorized data disclosures and the resulting harm to individuals and financial institutions. Indeed, the FTC has issued guidance for businesses that highlight the importance of reasonable data security practices.

49.     According to the FTC, the need for data security should be factored into all business decision-making.[12] In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established guidelines for fundamental data security principles and

---

[11] U.S. Gen. Accounting Office, *GAO-07-737, Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, at 29 (2007), http://www.gao.gov/new.items/d07737.pdf .

[12] *See* Federal Trade Commission, *Start with Security: A Guide For Business* (2015), https://www.ftc.gov/business-guidance/resources/start-security-guide-business.

practices for business.[13]  Among other things, the guidelines note businesses should properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct security problems.  The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone is attempting to hack the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of the breach.

50.    Also, the FTC recommends that companies limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor for suspicious activity on the network, and verify that third-party service providers have implemented reasonable security measures.[14]

51.    Highlighting the importance of protecting against unauthorized data disclosures, the FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect personal information, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §45.

52.    Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

---

[13] *See* Federal Trade Commission, *Protecting Personal Information: A Guide for Business* (2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

[14] *See id*.

53.     Defendants' failure to safeguard against a cybersecurity attack is exacerbated by the repeated warnings and alerts from public and private institutions, including the federal government, directed to protecting and securing sensitive data.  Experts studying cybersecurity routinely identify companies such as Defendants' that collect, process, and store massive amounts of data on cloud-based systems as being particularly vulnerable to cyberattacks because of the value of the personal information that they collect and maintain.  Accordingly, Defendants knew or should have known that they were a prime target for hackers.

54.     The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities in the United States.  In 2021, there were 4,145 publicly disclosed data breaches, exposing 22 billion records.  The United States specifically saw a 10% increase in the total number of data breaches.[15]

55.     In tandem with the increase in data breaches, the rate of identity theft complaints has also increased over the past few years.  For instance, in 2017, 2.9 million people reported some form of identity fraud as compared to 5.7 million people in 2021.[16]

56.     According to the 2021 Thales Global Cloud Security Study, more than 40% of organizations experienced a cloud-based data breach in the previous 12 months.  Yet, despite these

---

[15] FLASHPOINT, *2021 Year End Report – Data Breach*, RISK BASED SEC. (Feb. 4, 2022), https://flashpoint.io/resources/research/2021-year-end-report-data-breach-quickview/.

[16] *Facts + Statistics: Identity theft and cybercrime,* INS. INFO. INST., https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime#Identity%20Theft%20And%20Fraud%20Reports,%202015-2019%20..

incidents, the study found that nearly 83% of cloud-based businesses still fail to encrypt half of the sensitive data they store in the cloud.[17]

57.    Upon information and belief, Defendants did not encrypt Plaintiffs' and Class Members' personal information involved in the Data Breach.

58.    As detailed above, Defendants are large, sophisticated companies with the resources to deploy robust cybersecurity protocols.  They knew, or should have known, that the development and use of such protocols were necessary to fulfill their statutory and common law duties to Plaintiffs and Class Members.  Their failure to do so is, therefore, intentional, willful, reckless and/or grossly negligent.

59.    Defendants disregarded the rights of Plaintiffs and Class Members by, *inter alia,* (i) intentionally, willfully, recklessly, and/or negligently failing to take adequate and reasonable measures to ensure that their network servers were protected against unauthorized intrusions when using the MOVEit program; (ii) failing to disclose that they did not have adequately robust security protocols and training practices in place to safeguard Plaintiffs' and Class Members' PII; (iii) failing to take standard and reasonably available steps to prevent the Data Breach; and (iv) failing to provide Plaintiffs and Class members with prompt and accurate notice of the Data Breach.

## C.    Defendants Collected, Stored, and Were Responsible for Protecting Plaintiffs' and Class Members' PII

60.    As a condition to taking out long-term care or life insurance policies or annuity contracts with Genworth and receiving other services from Genworth, Plaintiffs and Class

---

[17]    Maria Henriquez, *40% of organizations have suffered a cloud-based data breach,* SECURITY (Oct. 29, 2021), https://www.securitymagazine.com/articles/96412-40-of-organizations-have-suffered-a-cloud-based-data-breach.

Members were required to give their sensitive and confidential PII to Genworth. According to its

Online Privacy Policy, Genworth collects PII from its customers:

- When you contact us:

    o To ask for general information

    o To apply for a new policy

    o To create an account so you can view information about your existing policy

- When we contact you:

    o To service your policy

    o To provide information you ask for

    o To provide information we believe you may be interested in

- When we contact others:

    o To obtain or confirm information about your (e.g. medical records).[18]

61.    Genworth, in turn, provided Plaintiffs' and Class Members' PII to PBI in connection

with services that PBI rendered to Genworth. PBI provides audit and address research services for

insurance companies, pension funds, and other organizations, including Genworth.

62.    By obtaining, collecting, and storing Plaintiffs' and Class Members' PII, Genworth

assumed legal and equitable duties and knew or should have known that it was responsible for

protecting that PII from unauthorized disclosure.

63.    Genworth made repeat assurances to its customers that it was aware of the

significant risk and harm associated with failing to safeguard their PII and it had adequate security

policies and practices in place to prevent that from happening. Notably, Genworth's Online Privacy

Policy stated that "[w]hen you provide information to us on our websites, we use encryption and

---

[18] Online Privacy Policy, Genworth, https://www.genworth.com/online-privacy-policy.

authentication tools to protect that information after it gets to us."[19] Additionally, "[o]nce we receive your information, we use procedures and technologies designed to prevent unauthorized access to your personal information and to protect against the loss, misuse, and alteration of information under our control. We maintain physical, electronic, and procedural protections to protect personal information in accordance with applicable standards."[20] Genworth further claims to "require that service providers who have access to your personal information implement similar standards. We require service providers to agree to keep your personal information confidential."[21]

64.    In a 2022 Sustainability Report issued by Genworth, the section entitled "Data Protection at Genworth" acknowledged the significant risk of failing to safeguard one's PII, stating that, "[i]n today's increasingly digital world, protecting our own data – and that of our customers and business partners – is essential. Genworth recognizes the significant operational risks, including risk of losses, from cyberattacks and the importance of a strong cybersecurity program for effective risk management."[22]

65.    In recognition of these security concerns, Genworth publicly claimed to have a robust data security system in place:

> Our program employs various controls and policies to secure our operations and information including monitoring, reporting, managing, and remediating cybersecurity threats. Key features of the program include access controls, security training, dedicated security personnel, security event monitoring, and when necessary, consultation with third-party data security experts.
>
> Our IT security program, which is regularly updated to align with best practices and industry guidelines, includes:
>
> • Written IT policies and standards designed to guard the integrity of our

---

[19] *Id.*

[20] *Id.*

[21] *Id.*

[22] https://pro.genworth.com/riiproweb/productinfo/pdf/665101C.pdf.

institutional, commercial, and private consumers' personal information

• Regular external and internal reviews of our data protection practices

• A robust suite of IT security products that enable us to manage cybersecurity risk within the organization and alternate sites where business is conducted[23]

66.    Throughout its website, Genworth reiterates these assurances of security, repeatedly stating that it is aware of data privacy risks and has adequate procedures and process in place to prevent them, such as its statements below:

• "Working to protect your personal information is one of our promises that enables us to help millions of policyholders secure their financial lives, families, and futures."[24]

• "At Genworth, we have implemented technical, physical, and process safeguards to maintain the confidentiality of your information."[25]

• "Genworth uses reasonable administrative, physical and electronic security measures to protect against possible loss, misuse or alteration of Permitted Information or content posted on Bulletin Boards."[26]

• "Once we receive your information, we use procedures and technologies designed to prevent unauthorized access to your personal information and to protect against the loss, misuse, and alteration of information under our control. We maintain physical, electronic, and procedural protections to protect personal information in accordance with applicable standards."[27]

• "We require that service providers who have access to your personal information implement similar standards. We require service providers to agree to keep your personal information confidential. Service providers who violate our privacy terms are subject to having their contract terminated."[28]

---

[23] *Id.*

[24] https://www.genworth.com/fraud-and-information-protection.

[25] *Id.*

[26] https://www.genworth.com/terms-of-use.

[27] *Id.*

[28] *Id.*

67.    PBI provides audit and address research services for insurance companies, pension funds, and other organizations.[29]

68.    PBI's Privacy Policy highlights its protection of PII, stating that:

> PBI recognizes the importance of protecting personal information. We use a variety of administrative, physical and technical security measures intended to safeguard your personal information.[30]

69.    PBI further notes the "PBI Advantages" on its website, stating that consumers should have "Confidence Your Data is Secure," explaining that:

> Protecting and securing your information is our highest priority. Our formalized security program follows industry-recognized security frameworks and undergoes an annual SSAE 18 SOC 2, Type II audit.[31]

70.    As a pension management business that handles consumers' personal information, PBI is legally required to protect personal information from unauthorized disclosure.

71.    PBI's website also promises consumers that it has robust systems and processes in place to protect and secure their sensitive information:

---

[29] *See About PBI Research Services,* PBI https://www.pbinfo.com/who-we-are/.

[30] *See Privacy Policy,* PBI https://www.pbinfo.com/privacy-policy/.

[31] *See About PBI Research Services,* PBI https://www.pbinfo.com/who-we-are/ (last visited September 11, 2023).





PBI uses a multi-layered approach to protect data securely that includes, but is not limited to the following: implementing secure development practices, including annual training for our IT team, real time scanning of code changes for vulnerabilities, web application firewalls, n-tier application architecture, required security awareness training program for all employees at onboarding and on a regular basis, data loss prevention tools to alert and block transfers of sensitive data, and a consolidated SIEM solution that correlates alerts and events across multiple environments. PBI's data security team manages this multi-layered security architecture by performing over 30 security reviews of quarterly audit checks to test compliance against security policies.

PBI's formalized security program follows the industry-recognized security policy frameworks from the National Institute of Science & Technology (NIST) SP 800-53 and NIST Cybersecurity Framework.

**SOC2 Audit and Third-party Security Testing**
PBI undergoes an annual SSAE 18 SOC 2, Type II audit by an independent third-party to audit our controls over data confidentiality, integrity, security, and availability.

PBI regularly uses third parties to test and audit our security controls. We conduct monthly and quarterly vulnerability assessments and penetration tests of PBI's internal and external network and application security, and conduct annual application penetration tests.

Protecting and securing the information of our clients and our company is of critical importance to PBI. We recognize that all relationships with current and prospective clients are based upon integrity and trust, and we take our role as custodians of confidential information very seriously.

72.     PBI's website also tells consumers that it has systems and process in place to ensure the privacy of their sensitive information obtained over the internet and to prevent identity theft:

> **9. ONLINE PRIVACY**
>
> PBI strives to protect the privacy of personally identifiable information obtained over the Internet and strives to apply the Principles and evolving standards to the online environment.
>
> **10. IDENTITY THEFT**
>
> PBI strives to prevent the acquisition of information from our products and services for improper purposes, such as identity theft. PBI believes in the importance of notifying individuals who may have had their sensitive personally identifiable information acquired by an unauthorized individual, as appropriate.

73.     Furthermore, PBI acknowledges that it has a duty to safeguard Plaintiffs' and class members' sensitive PII because, inter alia, PBI's website tells consumers that it has systems in place to protect consumers' sensitive information, and routinely audits those systems to ensure they are compliant with federal regulations and other legislation—as well as industry standards and practices— governing data privacy:

**8. ACCOUNTABILITY**

PBI supports accountability of information industry standards and practices, responsible and effective federal regulation of the data industry, and legislation governing the practices of all data providers. PBI also supports industry oversight and active engagement with the privacy community. PBI believes that strong privacy and information security protections are vital for an effective and trusted data industry.

**11. COMPLIANCE**

PBI will obtain assessments from an independent auditor, who uses procedures and standards generally accepted in the profession to assess PBI's controls relevant to security, availability, and confidentiality, as appropriate.

74. Discovery will show that through their provision of the foregoing services, PBI obtains possession of customers'—including Plaintiffs' and Class Members'—highly sensitive PII. Thus, in the regular course of their businesses, PBI collects and/or maintains the PII of consumers such as Plaintiff and class members. PBI stores this information digitally in the regular course of business.

75. As evidenced by, *inter alia*, their receipt of the notice informing them that their PII were compromised in the Data Breach, Plaintiffs' and Class Members' PII was transferred using PSC's MOVEit service and/or they otherwise entrusted to Defendants their PII, from which Defendants profited.

76. Yet, contrary to PBI's website representations—by virtue of Defendants' admissions that they experienced the Data Breach—Defendants did not have adequate measures in place to protect and maintain sensitive PII entrusted to it. Instead, Defendants' websites wholly fail to disclose the truth: that Defendants lack sufficient processes to protect the PII that is entrusted to them.

/

/

/

*Plaintiffs' Specific Experiences and Harm*

   *Plaintiff Robert Casey*

77.    Plaintiff Casey received a Notice Letter by U.S. mail addressed to him directly from Defendant PBI, dated July 21, 2023, which reported that "PBI is providing notice of a third-party software event that affected the security of some of your information."

78.    In order to obtain a long-term care insurance policy from GLIC, Plaintiff Casey was required to provide his PII, directly or indirectly, to Genworth, including his name, date of birth, Social Security number, and other sensitive information.

79.    At the time that PSC disclosed the Data Breach—on or around May 31, 2023—Defendants retained Plaintiff Casey's PII in their computer systems.

80.    Plaintiff Casey is very careful about sharing his sensitive PII.  He stores any documents containing his PII in a safe and secure location.  He has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.  He would not have entrusted his PII to Defendants had he known of Defendants' lax data security policies.

81.    According to his Notice Letter, Plaintiff Casey's PII was improperly accessed and obtained by unauthorized third parties, including his "name, Social Security number, date of birth, zip code, state of residence, role in policy/account (e.g., Annuitant, Joint Insured, Owner, etc.), general product type, and policy/account number."

82.    Although PBI became aware of the Data Breach on or around May 31, 2023, it took Genworth several months to notify Plaintiff Casey and other Class Members of the Data Breach's occurrence.  To date, critical details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure such a breach does not occur again

have not been explained or clarified to Plaintiff Casey and Class Members, who retain a vested interest in ensuring that their PII remains protected.

83.     This "disclosure" amounts to no real disclosure at all, as it fails to inform, with any degree of specificity, Plaintiffs and Class Members of the Data Breach's critical facts. Without these details, Plaintiffs' and Class Members' ability to mitigate the harms resulting from the Data Breach is severely diminished.

84.     As a result of the Data Breach, and at the direction of the Notice Letter, Plaintiff Casey has spent significant time on making reasonable efforts to mitigate the impact of the Data Breach—valuable time he otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured. Specifically, in response to the Data Breach, Plaintiff Casey has spent significant time on efforts, including but not limited, to: taking action in response to fraudulent activity occurring with his AMEX credit card, including getting a replacement card, researching and verifying the legitimacy of the Data Breach upon receiving the Notice Letter, changing passwords as a result of the Data Breach, monitoring his financial accounts for any indication of additional fraudulent activity, which may take years to detect, and researching notifications he has received about his PII being detected on the Dark Web.

85.     Plaintiff Casey has suffered actual injury in the form of fraudulent charges made on one of his AMEX accounts, resulting in AMEX notifying him of the unusual charges and his credit card needing to be replaced.

86.     Plaintiff Casey has also received alerts about his PII being detected on the Dark Web.

87. Plaintiff Casey further suffered actual injury in the form of experiencing an increase in spam calls, texts, and/or emails, which, upon information and belief, was caused by the Data Breach.

88. Plaintiff Casey suffered additional injury from having his PII compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of his PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to his PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII.

89. Moreover, the Data Breach has caused Plaintiff Casey to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants have still not fully informed him of key details about the Data Breach's occurrence.

90. As a result of the Data Breach, Plaintiff Casey is at present risk and will continue to be at increased risk of identity theft and fraudulent activity for years to come.

91. As a result of the Data Breach, Plaintiff Casey anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the harm already caused and continue to be caused by the Data Breach.

92.    Plaintiff Casey has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

**Plaintiff Lawrence Maloney**

93.    Plaintiff Lawrence Maloney purchased a long-term care insurance policy from GLIC.

94.    Plaintiff Lawrence Maloney received a Notice Letter by U.S. mail addressed to him directly from PBI, dated July 21, 2023, which reported that "PBI is providing notice of a third-party software event that affected the security of some of your information."

95.    In order to obtain a long-term care policy from GLIC, Plaintiff Lawrence Maloney was required to provide his PII, directly or indirectly, to Genworth, including his name, date of birth, Social Security number, and other sensitive information.

96.    At the time that PSC disclosed the Data Breach—on or around May 31, 2023—Defendants retained Plaintiff Lawrence Maloney's PII in their computer systems.

97.    Plaintiff Lawrence Maloney is very careful about sharing his sensitive PII.  He stores any documents containing his PII in a safe and secure location.  He has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.  He would not have entrusted his PII to Defendants had he known of Defendants' lax data security policies.

98.    According to his Notice Letter, Plaintiff Lawrence Maloney's PII was improperly accessed and obtained by unauthorized third parties, including his "name, Social Security number, date of birth, zip code, state of residence, role in policy/account (eg., Annuitant, Joint Insured, Owner, etc.), general product type, and policy/account number."

99.     Although PBI became aware of the Data Breach on or around May 31, 2023, it took Genworth several months to notify Plaintiff Lawrence Maloney and other Class Members of the Data Breach's occurrence.  To date, critical details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure such a breach does not occur again have not been explained or clarified to Plaintiff Lawrence Maloney and Class Members, who retain a vested interest in ensuring that their PII remains protected.

100.     This "disclosure" amounts to no real disclosure at all, as it fails to inform, with any degree of specificity, Plaintiffs and Class Members of the Data Breach's critical facts. Without these details, Plaintiffs' and Class Members' ability to mitigate the harms resulting from the Data Breach is severely diminished.

101.     As a result of the Data Breach, and at the direction of the Notice Letter, Plaintiff Lawrence Maloney has spent significant time on making reasonable efforts to mitigate the impact of the Data Breach—valuable time he otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured. Specifically, in response to the Data Breach, Plaintiff Lawrence Money has spent significant time on efforts, including but not limited, to: researching and verifying the legitimacy of the Data Breach upon receiving the Notice Letter, changing passwords as a result of the Data Breach, monitoring his financial accounts for any indication of fraudulent activity, which may take years to detect, and registering for credit monitoring.

102.     Plaintiff Lawrence Maloney suffered additional injury from having his PII compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of his PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of

benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to his PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII.

103.    Moreover, the Data Breach has caused Plaintiff Lawrence Maloney to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants have still not fully informed him of key details about the Data Breach's occurrence.

104.    As a result of the Data Breach, Plaintiff Lawrence Maloney is at present risk and will continue to be at increased risk of identity theft and fraudulent activity for years to come.

105.    As a result of the Data Breach, Plaintiff Lawrence Maloney anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the harm already caused and continue to be caused by the Data Breach.

106.    Plaintiff Lawrence Maloney has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

### *Plaintiff Ruth Maloney*

107.    Plaintiff Ruth Maloney purchased a long-term care policy from GLIC.

108.    Plaintiff Ruth Maloney received a Notice Letter by U.S. mail addressed to her directly from Defendant PBI, dated July 21, 2023, which reported that "PBI is providing notice of a third-party software event that affected the security of some of your information."

109.    In order to obtain a long-term care policy from GLIC, Plaintiff Ruth Maloney was required to provide her PII, directly or indirectly, to Genworth, including her name, date of birth, Social Security number, and other sensitive information.

110.    At the time that PSC disclosed the Data Breach—on or around May 31, 2023—Defendants retained Plaintiff Ruth Maloney's PII in their computer systems.

111.    Plaintiff Ruth Maloney is very careful about sharing her sensitive PII.  She stores any documents containing her PII in a safe and secure location.  She has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.  She would not have entrusted her PII to Defendants had she known of Defendants' lax data security policies.

112.    According to her Notice Letter, Plaintiff Ruth Maloney's PII was improperly accessed and obtained by unauthorized third parties, including her "name, Social Security number, date of birth, zip code, state of residence, role in policy/account (eg., Annuitant, Joint Insured, Owner, etc.), general product type, and policy/account number."

113.    Although PBI became aware of the Data Breach on or around May 31, 2023, it took Genworth several months to notify Plaintiff Ruth Maloney and other Class Members of the Data Breach's occurrence.  To date, critical details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure such a breach does not occur again have not been explained or clarified to Plaintiff Ruth Maloney and Class Members, who retain a vested interest in ensuring that their PII remains protected.

114.    This "disclosure" amounts to no real disclosure at all, as it fails to inform, with any degree of specificity, Plaintiffs and Class Members of the Data Breach's critical facts.  Without these details, Plaintiffs' and Class Members' ability to mitigate the harms resulting from the Data Breach is severely diminished.

115.    As a result of the Data Breach, and at the direction of the Notice Letter, Plaintiff Ruth Maloney has spent significant time on making reasonable efforts to mitigate the impact of the Data Breach—valuable time she otherwise would have spent on other activities, including but not limited to work and/or recreation.  This time has been lost forever and cannot be recaptured. Specifically, in response to the Data Breach, Plaintiff Ruth Maloney has spent significant time on efforts, including but not limited, to: researching and verifying the legitimacy of the Data Breach upon receiving the Notice Letter, changing passwords as a result of the Data Breach, monitoring her financial accounts for any indication of fraudulent activity, which may take years to detect, and registering for credit monitoring.

116.    Plaintiff Ruth Maloney suffered additional injury from having her PII compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of her PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to her PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII.

117.    Moreover, the Data Breach has caused Plaintiff Ruth Maloney to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants have still not fully informed her of key details about the Data Breach's occurrence.

118.    As a result of the Data Breach, Plaintiff Ruth Maloney is at present risk and will continue to be at increased risk of identity theft and fraudulent activity for years to come.

119.    As a result of the Data Breach, Plaintiff Ruth Maloney anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the harm already caused and continue to be caused by the Data Breach.

120.    Plaintiff Ruth Maloney has a continuing interest in ensuring that her PII, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

121.    Plaintiffs and Class Members are especially concerned about the misappropriation of their Social Security numbers.  Social Security numbers are among the most sensitive kinds of personal information to have been stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change.

122.    Even when such numbers are replaced, the process of doing so results in a major inconvenience to the subject person, requiring a wholesale review of the person's relationships with government agencies and any number of private companies in order to update the person's accounts with those entities.

123.    The Social Security Administration even warns that the process of replacing a Social Security number is a difficult one that creates other types of problems, and that it will not be a panacea for the affected person:

> Keep in mind that a new number probably will not solve all your problems.  This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) likely will have records under your old number.  Along with other personal information, credit reporting companies use the number to identify your credit record.  So using a new number will not guarantee you a fresh start.  This is especially true if your other personal information, such as your name and address, remains the same.

> If you receive a new Social Security Number, you should not be able to use the old number anymore.
>
> For some victims of identity theft, a new number actually creates new problems. If the old credit information is not associated with your new number, the absence of any credit history under the new number may make more difficult for you to get credit.[32]

124.    Social Security numbers allow individuals to apply for credit cards, student loans, mortgages, and other lines of credit – among other services. Often, Social Security numbers can be used to obtain medical goods or services, including prescriptions. They are also used to apply for a host of government benefits. Access to such a wide range of assets makes social security numbers a prime target for cybercriminals and a particularly attractive form of PII to steal and then sell.

125.    The Social Security Administration further stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[33]

126.    Plaintiffs and Class Members are well aware that their sensitive PII, which includes their Social Security numbers and potentially banking information, are at risk of being available to other cybercriminals on the dark web. Accordingly, Plaintiffs and Class Members have suffered harm in the form of increased stress, fear, and risk of identity theft and fraud resulting from the

---

[32] *Identify Theft and Your Social Security Numbers*, SOCIAL SEC. ADMIN. (July 2021), https://www.ssa.gov/pubs/EN-05-10064.pdf .

[33] U.S. SOCIAL SEC. ADMIN., *Identify Theft and Your Social Security Numbers*, (2021), https://www.ssa.gov/pubs/EN-05-10064.pdf.

Data Breach.  Additionally, Plaintiffs and Class Members have incurred, and/or will incur, out-of-pocket expenses related to credit monitoring and identify theft prevention to address these concerns.

## **CLASS ACTION ALLEGATIONS**

127.    Plaintiffs bring this action on behalf of themselves and the following classes (collectively, the "Class"):

(1) <u>PSC Nationwide Class</u>: All persons whose PII was compromised in the MOVEit data breach.

    (a) <u>PSC Pennsylvania</u>: All residents of Pennsylvania whose PII was compromised in the MOVEit data breach.

(2) <u>PBI Nationwide Class</u>: All persons whose PII was compromised on PBI's platform and/or systems in the MOVEit data breach.

    (a) <u>PBI Pennsylvania Class</u>: All residents of Pennsylvania whose PII was compromised on PBI's platform and/or systems in the MOVEit data breach.

(3) <u>Genworth Nationwide Class</u>: All persons whose PII was compromised in the MOVEit data breach where such PII was obtained from or hosted by Genworth.

    (a) <u>Genworth Pennsylvania Class</u>: All residents of Pennsylvania whose PII was compromised in the MOVEit data breach where such PII was obtained from or hosted by Genworth.

The foregoing nationwide classes are referred to as the "Nationwide Classes" and the state-specific classes are referred to as the "Pennsylvania Classes."

128.    Excluded from the Class are: Defendants and their parents, subsidiaries, affiliates, officers, directors, or employees, and any entity in which Defendants have a controlling interest; all individuals who make a timely request to be excluded from this proceeding using the correct protocol for opting out; and the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

129.    Plaintiffs reserve the right to amend or modify the Class definitions above with greater particularity or further division into subclasses or limitation to particular issues.

130.    This action has been brought and may be maintained as a class action under Rule 23 because there is a well-defined community of interest in the litigation and the proposed classes are ascertainable, as described further below.

131.    <u>Numerosity:</u> The potential members of the Class as defined are so numerous that the joinder of all members of the Class is impracticable.  While the precise number of Class Members at issue has not been determined, Plaintiffs believe the cybersecurity breach affected millions of thousands of individuals nationwide.

132.    <u>Commonality:</u> There are questions of law and fact common to Plaintiffs and the Class that predominate over any questions affecting only the individual members of the Class.  The common questions of law and fact include, but are not limited to, the following:

    a)    Whether Defendants had a duty to protect the PII of Plaintiffs and Class Members;

    b)    Whether Defendants were negligent in collecting and storing Plaintiffs' and Class Members' PII, and breached their duties thereby;

    c)    Whether Plaintiffs and Class Members are entitled to damages as a result of Defendants' wrongful conduct;

    d)    Whether Plaintiffs and Class Members are entitled to restitution as a result of Defendants' wrongful conduct;

    e)    Whether Defendants owed a duty to Plaintiffs and Class Members to exercise due care in collecting, storing, processing, and safeguarding their personal information being transferred through the MOVEit program;

f)    Whether Defendants implemented and maintained reasonable security procedures and practices appropriate to the nature of personal information of Class Members being transferred through the MOVEit program;

g)    Whether Defendants acted negligently in connection with the vulnerabilities in the MOVEit program that allowed unauthorized access to Plaintiffs' and Class Members' personal information;

h)    Whether Defendants knew or should have known that it did not employ reasonable measures to keep Plaintiffs' and Class Members' personal information secure and prevent loss or misuse of that personal information;

i)    Whether Defendants adequately addressed and fixed the vulnerabilities in the MOVEit program which permitted the Data Breach to occur;

j)    Whether Plaintiffs and Class Members are entitled to credit monitoring and other monetary relief;

k)    Whether Defendants' failure to implement and maintain reasonable security procedures and practices constitutes a violation of the Federal Trade Commission Act, 15 U.S.C. §45(a).

133.    Typicality.  The claims of the named Plaintiffs are typical of the claims of the Class Members because all had their personal information compromised as a result of Defendants' failure to implement and maintain reasonable security measures and the consequent Data Breach.

134.    Adequacy of Representation.  Plaintiffs will fairly and adequately represent the interests of the Class.  Counsel for Plaintiffs are experienced and competent in consumer and employment class actions, as well as various other types of complex and class litigation.

135.    <u>Superiority and Manageability</u>.  A class action is superior to other available means for the fair and efficient adjudication of this controversy.  Individual joinder of all Plaintiffs is not practicable, and questions of law and fact common to Plaintiffs predominate over any questions affecting only Plaintiffs.  Plaintiffs have been damaged and are entitled to recovery by reason of Defendants' unlawful failure to adequately safeguard their data.  Class action treatment will allow those similarly situated persons to litigate their claims in the manner that is most efficient and economical for the parties and the judicial system.  As any civil penalty awarded to any individual class member may be small, the expense and burden of individual litigation make it impracticable for most class members to seek redress individually.  It is also unlikely that any individual consumer would bring an action solely on their own behalf pursuant to the theories asserted herein.  Additionally, the proper measure of civil penalties for each wrongful act will be answered in a consistent and uniform manner.  Furthermore, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudication of the asserted claims.  There will be no difficulty in the management of this action as a class action, as Defendants' records will readily enable the Court and Parties to ascertain affected companies and their employees.

136.    <u>Predominance.</u>  Common questions of law and fact predominate over any questions affecting only individual Class Members.  Similar or identical violations, business practices, and injuries are involved.  Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action.  For example, Defendants' liability and the fact of damages is common to Plaintiffs and each member of the Class.  If Defendants breached their duty to Plaintiffs and Class Members, then Plaintiffs and each Class member suffered damages by that conduct.

137.    <u>Injunctive Relief.</u>  Defendants have acted and/or refused to act on grounds that apply generally to the Class, making injunctive and/or declaratory relief appropriate with respect to the Class under Fed. Civ. P. 23(b)(2).

138.    <u>Ascertainability.</u>  Members of the Class are ascertainable.  Class membership is defined using objective criteria and Class Members may be readily identified through Defendants' books and records.

139.    Class certification is also appropriate under Fed. R. Civ. P. 23(a) and (b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate as to the Class as a whole.

140.    Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of the matters and the parties' interests therein.  Such particular issues include, but are not limited to:

(a)    Whether Defendants owed a legal duty to Plaintiffs and Class Members to maintain security in the transfer of their personal information;

(a)    Whether Defendants breached that legal duty to Plaintiffs and Class Members to exercise due care in maintaining security in the transfer of their personal information;

(b)    Whether Defendants failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

(c)    Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature of the personal information compromised in the breach; and

(d)    Whether Class Members are entitled to actual damages, credit monitoring, injunctive relief, and/or statutory damages, as a result of Defendants' wrongful conduct as alleged herein.

**CAUSES OF ACTION**

**COUNT I**
**Negligence**
**(On Behalf of Plaintiffs and the Nationwide Classes, or In the Alternative, the Pennsylvania Classes, Against All Defendants)**

141.    Plaintiffs reallege and incorporate by reference the preceding factual allegations as if fully set forth herein.

142.    Defendants owed a duty under common law to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting their PII, including securing the data being transferred through the MOVEit product from being compromised, stolen, accessed, and/or misused by unauthorized persons.

143.    Defendants have a common law duty to prevent foreseeable harm to others.  That duty includes a duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the personal information that were compliant with and/or better than industry-standard practices.

144.    Defendants' duties included a duty to design, maintain, and test its security systems to ensure that Plaintiffs' and Class Members' personal information was adequately secured and protected, to implement processes that would detect a breach of its security system in a timely manner, to timely act upon warnings and alerts, including those generated by its own security systems regarding intrusions to its networks, and to promptly, properly, and fully notify its clients, Plaintiffs, and Class Members of any data breach.

145.    Defendants' duties to use reasonable care arose from several sources, including but not limited to those described below.

146.    Defendants' duty existed because Plaintiffs and Class Members were the foreseeable and probable victims of any inadequate security practices.  In fact, not only was it foreseeable that Plaintiffs and Class Members would be harmed by the failure to protect their PII because hackers routinely attempt to steal such information and use it for nefarious purposes, but Defendants also knew that it was more likely than not that Plaintiffs and other Class Members would be harmed.

147.    By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' PII, Defendants assumed legal and equitable duties and knew or should have known that they were responsible for protecting Plaintiffs' and Class Members' PII from disclosure.

148.    Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their PII.

149.    Defendants breached the duties they owed to Plaintiffs and Class Members described above and thus was negligent.  Defendants breached these duties by, among other things, failing to: (a) exercise reasonable care and implement adequate security systems, protocols, and practices sufficient to protect the PII of Plaintiffs and Class Members; (b) prevent the breach; (c) timely detect the breach; (d) maintain security systems consistent with industry standards; (e) timely disclose that Plaintiffs' and Class Members' PII in Defendants' possession had been or was reasonably believed to have been stolen or compromised; (f) failing to comply fully even with their own purported security practices.

150.    Defendants knew or should have known of the risks of transferring PII through their products and the importance of maintaining secure systems, especially in light of the increasing

frequency of ransomware attacks. The sheer scope of Defendants' operations further shows that Defendants knew or should have known of the risks and possible harm that could result from their failure to implement and maintain reasonable security measures. Upon information and belief, this is but one of the several vulnerabilities that plagued Defendants' systems and led to the Data Breach.

151. Through Defendants' acts and omissions described in this complaint, including Defendants' failure to provide adequate security and their failure to protect the PII of Plaintiffs and Class Members from being foreseeably captured, accessed, exfiltrated, stolen, disclosed, accessed, and misused, Defendants unlawfully breached their duty to use reasonable care to adequately protect and secure Plaintiffs' and Class Members' PII.

152. Defendants further failed to timely and accurately disclose to Plaintiffs and Class Members that their PII had been improperly acquired or accessed and/or was available for sale to criminals on the dark web. Plaintiffs' and Class Members could have taken action to protect their PII if they were provided timely notice.

153. But for Defendants' wrongful and negligent breach of its duties owed to Plaintiffs and Class Members, their PII would not have been compromised.

154. Plaintiffs and Class Members relied on Defendants to keep their PII confidential and securely maintained, and to use this information for business purposes only, and to make only authorized disclosures of this information.

155. As a direct and proximate result of Defendants' negligence, Plaintiffs and Class Members have been injured as described herein, and are entitled to damages, including compensatory and nominal damages, in an amount to be proven at trial. As a result of Defendants'

failure to protect PII, Plaintiffs' and Class Members' PII has been accessed by malicious cybercriminals. Plaintiffs' and the Class Members' injuries include:

(a)    theft of their PII;

(b)    costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;

(c)    costs associated with time spent and loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach, including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

(d)    the imminent and certainly impending injury flowing from potential fraud and identity theft posed by their PII being placed in the hands of criminals;

(e)    damages to and diminution of value of the PII entrusted, directly or indirectly, to Defendants with the mutual understanding that Defendants would safeguard Plaintiffs' and the Class Members' data against theft and not allow access and misuse of their data by others;

(f)    continued risk of exposure to hackers and thieves of their PII, which remains in Defendants' possession and is subject to further breaches so long as Defendants fail to undertake appropriate and adequate measures to protect Plaintiffs and Class Members, along with damages stemming from the stress, fear, and anxiety of an increased risk of identity theft and fraud stemming from the Data Breach;

(g)    emotional distress from the unauthorized disclosure of PII to strangers who likely have nefarious intentions and now have prime opportunities to commit identity theft, fraud, and other types of attacks on Plaintiffs and Class members;

(h)    loss of the inherent value of their PII;

(i)    the loss of the opportunity to determine for themselves how their PII is used; and,

(j)    other significant additional risk of identity theft, financial fraud, and other identity-related fraud in the indefinite future.

156.    In connection with the conduct described above, Defendants acted wantonly, recklessly, and with complete disregard for the consequences Plaintiffs and Class Members would suffer if their highly-sensitive and confidential PII, including but not limited to name, address, and Social Security numbers, was accessed by unauthorized third parties.

## COUNT II
### Negligence Per Se
**(On Behalf of Plaintiffs and the Nationwide Classes, or In the Alternative, the Pennsylvania Classes, Against All Defendants)**

157.    Plaintiffs restate and reallege the preceding factual allegations set forth above as if fully alleged herein.

158.    Section 5 of the Federal Trade Commission Act, 15 U.S.C. §45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect PII by companies such as Defendants. Various FTC publications and data security breach orders further form the basis of Defendants' duty. In addition, individual states have enacted statutes based on the FTC Act that also create a duty.

159.    Defendants violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with industry standards.  Defendants' conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of a data breach.

160.    Defendants' violation of Section 5 of the FTC Act constitutes negligence *per se*.

161.    Plaintiffs and Class Members are consumers within the class of persons Section 5 of the FTC Act was meant to protect.

162.    Moreover, the harm that has occurred is the type of harm that the FTC Act was intended to guard against.  Indeed, the FTC has pursued over fifty enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiffs and the Class.

163.    As a direct and proximate result of Defendants' negligence, Plaintiffs and Class Members have suffered injuries, including:

a.    Theft of their PII;

b.    Costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;

c.    Costs associated with purchasing credit monitoring and identity theft protection services;

d.    Lowered credit scores resulting from credit inquiries following fraudulent activities;

e.    Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach – including finding fraudulent

charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

f.    The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their PII being placed in the hands of criminals;

g.    Damages to and diminution in value of their PII entrusted, directly or indirectly, to Defendants with the mutual understanding that Defendants would safeguard Plaintiffs' and Class Members' data against theft and not allow access and misuse of their data by unauthorized persons;

h.    Continued risk of exposure to hackers and thieves of their PII, which remains in Defendants' possession and is subject to further breaches so long as Defendants fail to undertake appropriate and adequate measures to protect Plaintiffs' and Class Members' data; and,

i.    Emotional distress from the unauthorized disclosure of PII to strangers who likely have nefarious intentions and now have prime opportunities to commit identity theft, fraud, and other types of attacks on Plaintiffs and Class members.

164.    As a direct and proximate result of Defendants' negligence, Plaintiffs and Class Members have been injured as described herein, and are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

## COUNT III
**Declaratory Judgment**
**(On Behalf of Plaintiffs and the Nationwide Classes, or In the Alternative, the Pennsylvania Classes, Against All Defendants)**

165.    Plaintiffs restate and reallege the preceding factual allegations set forth above as if fully alleged herein.

166.    Under the Declaratory Judgment Act, 28 U.S.C. §§2201 *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief.  Furthermore, the Court has broad authority to restrain acts, such as the ones alleged here, that are tortious and violate the terms of the federal and state statutes described in this complaint.

167.    An actual controversy has arisen in the wake of the Data Breach regarding Defendants' present and prospective common law and other duties to reasonably safeguard consumers' personal identifying information, and regarding whether Defendants are currently maintaining data security measures adequate to protect Plaintiffs and Class Members from further data breaches that compromise their PII.  Plaintiffs and Class Members continue to suffer an injury as a result of the compromise of their PII and remain at imminent risk that further compromises of their PII will occur in the future.

168.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

(a)    Defendants continue to owe a legal duty to secure consumers' PII, including Plaintiffs' and Class Members' PII, and to timely notify them of a data breach under the common law, Section 5 of the FTC Act; and,

(b)    Defendants continue to breach this legal duty by failing to employ reasonable measures to secure Plaintiffs' and Class Members' PII.

169.    The Court should issue corresponding prospective injunctive relief requiring Defendants to employ adequate security protocols consistent with law and industry standards to protect Plaintiffs' and Class Members' PII.

170.    If an injunction is not issued, Plaintiffs will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach of Defendants.  The risk of another such breach is real, immediate, and substantial.  If another breach of Defendants occurs, Plaintiffs will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

171.    The hardship to Plaintiffs if an injunction is not issued exceeds the hardship to Defendants if an injunction is issued.  Among other things, if another massive data breach occurs, Plaintiffs and Class Members will likely be subjected to substantial identity theft and other damage.  On the other hand, the cost to Defendants of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendants have a pre-existing legal obligation to employ such measures.

172.    Issuance of the requested injunction will not disserve the public interest.  To the contrary, such an injunction would benefit the public by preventing another data breach, thus eliminating the additional injuries that would result to Plaintiffs and the thousands of Class Members whose confidential information would be further compromised.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves, and the Class, pray for the following relief:

A.    An order certifying the Class as defined above pursuant to Fed. R. Civ. P. 23 and declaring that Plaintiffs are proper class representatives and appointing Plaintiffs' counsel as class counsel;

B.  An order finding in favor of Plaintiffs and the Class on all counts asserted herein;

C.  Permanent injunctive relief to prohibit Defendants from continuing to engage in the unlawful acts, omissions, and practices described herein;

D.  Compensatory, consequential, general, and nominal damages in an amount to be proven at trial, in excess of $5,000,000;

E.  Disgorgement and restitution of all earnings, profits, compensation, and benefits received as a result of the unlawful acts, omissions, and practices described herein;

F.  Awarding Plaintiffs' reasonable attorneys' fees, costs, and expenses;

G.  Awarding pre- and post-judgment interest on any amounts awarded; and,

H.  Awarding such other and further relief as may be just and proper.

## JURY TRIAL DEMANDED

Plaintiffs, on behalf of themselves and the putative Class, hereby demand a trial by jury on all issues of fact or law so triable.

DATED: June 12, 2024                      Respectfully submitted,


*/s/    Kristen A. Johnson*
Kristen A. Johnson (BBO# 667261)
HAGENS BERMAN SOBOL SHAPIRO LLP
1 Faneuil Hall Square, 5th Fl.
Boston, MA 02109
Tel:  (617) 482-3700
Fax:  (617) 482-3003
kristenj@hbsslaw.com

*Plaintiffs' Liaison & Coordinating Counsel*

Joseph P. Guglielmo (Bar No. 671410)
Amanda M. Rolon (*pro hac vice forthcoming*)
SCOTT+SCOTT
ATTORNEYS AT LAW LLP
230 Park Avenue, 17th Floor

45

New York, NY 10169
Telephone: 212-223-6444
Facsimile: 212-223-6334
jguglielmo@scott-scott.com
arolon@scott-scott.com

LAW OFFICE OF
ALFRED G. YATES, JR., P.C.
Alfred G. Yates, Jr. (*pro hac vice forthcoming*)
1575 McFarland Road, Suite 305
Pittsburgh, PA 15216
Phone: (412) 391-5164
Fax: (412) 471-1033
e-mail: yateslaw@aol.com

*Counsel for Plaintiffs and the Putative Class*

E. Michelle Drake
BERGER MONTAGUE, PC
1229 Tyler St., NE, Ste. 205
Minneapolis, MN 55413
Tel:  (612) 594-5933
Fax:  (612) 584-4470
emdrake@bm.net

Gary F. Lynch
LYNCH CARPENTER, LLP
1133 Penn Ave., 5th Fl.
Pittsburgh, PA 15222
Tel:  (412) 322-9243
Fax:  (412) 231-0246
Gary@lcllp.com

Douglas J. McNamara
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave. NW, 5th Fl.
Washington, DC  20005
Tel:  (202) 408-4600
dmcnamara@cohenmilstein.com

Karen H. Riebel
LOCKRIDGE GRINDAL NAUEN PLLP
100 Washington Ave. S., Ste. 2200
Minneapolis, MN  55401
Tel:  (612) 339-6900
Fax:  (612) 612-339-0981
khriebel@locklaw.com

Charles E. Schaffer
LEVIN SEDRAN & BERMAN LLP
510 Walnut Street, Ste. 500
Philadelphia, PA  19106
Tel:  (215) 592-1500
Fax:  (215) 592-4663
cshaffer@lfsblaw.com

*Plaintiffs' Lead Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this date, the foregoing document was served by filing it on the Court's CM/ECF system, which will automatically send a notification of such filing to all counsel of record via electronic mail.

Dated:  June 12, 2024                              <u>*/s/ Kristen Johnson*          </u>
                                                   Kristen Johnson