**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE: MOVEIT CUSTOMER DATA SECURITY BREACH LITIGATION | MDL No. 1:23-md-03083-ADB |
| | Judge Allison D. Burroughs |

This Document Relates To:

*Cooper v. American Multi-Cinema, Inc. and AMC Entertainment Holdings, Inc., d/b/a AMC Theaters*,
No. 1:24-cv-11127-ADB

*Newman v. American Multi-Cinema, Inc. d/b/a AMC Theaters*,
No. 1:24-cv-11359-ADB

*Pratt v. Cadence Bank*,
No. 1:23-cv-12996-ADB

*Adams v. Cadence Bank*,
No. 1:23-cv-13071-ADB

*Triplett v. Cadence Bank*,
No. 1:24-cv-10657-ADB

*Thompson v. Franklin Mint Fed. Credit Union*,
No. 1:23-cv-12885-ADB

*Harris v. Franklin Mint Fed. Credit Union*,
No. 1:23-cv-12891-ADB

*Bronson v. Franklin Mint Fed. Credit Union*,
No. 1:23-cv-12893-ADB

*Brown v. Franklin Mint Fed. Credit Union*,
No. 1:23-cv-12894-ADB

*Liptock v. MasTec, Inc.*,
No. 1:23-cv-12985-ADB

*Dudurkaewa, et al. v. MidFirst Bank et al.*,
No. 1:24-cv-10186-ADB

011175-35/2668063 V1

*Strother v. MidFirst Bank*,
No. 1:23-cv-12898-ADB

*Strucke v. Midland Financial Co.*,
No. 1:23-cv-12771-ADB

*De Medicis v. MidFirst Bank*,
No. 1:23-cv-13057-ADB

*Cantrell v. Pathward, N.A. et al.*,
No. 1:23-cv-12554-ADB

*Kent v. Pathward, N.A. et al.*,
No. 1:23-cv-12764-ADB

*Fields v. Pathward, N.A. et al.*,
No. 1:23-cv-13058-ADB

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO
<u>COMPEL ARBITRATION AND STAY LITIGATION</u>**

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION .................................................................................................... 1

II.   SPECIFIC FACTS RELATED TO THE PLAINTIFFS ...................................... 2

     A.    American Multi-Cinema, Inc. and AMC Entertainment Holdings, Inc. (hereinafter, "AMC"). .................................................................. 2

     B.    Cadence Bank ................................................................................... 4

     C.    Franklin Mint Federal Credit Union ................................................ 4

     D.    MidFirst Bank and Midland First Financial Co. (hereinafter "MidFirst") ........................................................................................ 5

     E.    Pathward, N.A. .................................................................................. 6

III.  SEVERAL REASONS EXIST NOT TO ENFORCE THE ARBITRATION AGREEMENTS .......................................................................... 8

     A.    Several of the arbitration agreements lack a required "meeting of the minds" such that they may not be enforced. ........................ 9

          1.    AMC fails to demonstrate a "meeting of the minds" with Plaintiffs Newman and Cooper. ................................ 10

          2.    Issues related to contract formation exist related to Franklin Mint and Plaintiffs Bronson, Thompson, Harris, and Brown. ............................................................... 12

          3.    Additional contract formation issues persist for Plaintiffs Dudurkaewa, Rubenstein, Linman and child L.L., Strother, Struck, and De Medicis concerning MidFirst. ........................................ 18

          4.    There is no agreement to arbitrate between Pathward and Plaintiffs Alcott, Cantrell, Fields, and Kent. ................ 24

     B.    Two Defendants did not follow their own arbitration procedures to trigger arbitration. ................................................. 26

          1.    Cadence Bank waived its right to demand arbitration by ignoring the terms of its purported agreement. ........ 26

          2.    Pathward did not meet the requirements in its purported agreement to trigger arbitration, either. ................ 28

011175-35/2668063 V1

IV.    THE ARBITRATION CLAUSES ARE UNENFORCEABLE BECAUSE
       THEY ARE UNCONSCIONABLE ................................................................. 28

       A.    AMC's arbitration clause is limitless in scope and duration. ............................. 28

       B.    Franklin Mint's terms are unconscionable........................................................... 32

       C.    MidFirst's contracts are adhesive and unconscionable........................................ 33

       D.    Cadence Bank's contract of adhesion is unconscionable under
             Mississippi law................................................................................................... 34

       E.    Pathward's arbitration provision is unconscionable and
             unenforceable...................................................................................................... 35

V.     QUESTIONS RELATED TO ARBITRABILITY OF CLAIMS .................................... 37

       A.    The Court, not an arbitrator, decides the enforceability of the
             Cadence Bank arbitration clause.......................................................................... 37

       B.    It is undisputed that the equitable claims against AMC are not
             subject to arbitration. ......................................................................................... 38

       C.    The Court need not reach the question of arbitrability for the other
             Defendants given that Plaintiffs are contesting whether the Court
             may enforce the arbitration agreements................................................................ 41

VI.    PLAINTIFFS HAVE RAISED SUFFICIENT QUESTIONS TO
       WARRANT DISCOVERY INTO THE ENFORCEABILITY OF THE
       ARBITRATION AGREEMENTS.................................................................................. 42

VII.   CONCLUSION............................................................................................................. 44

011175-35/2668063 V1

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*A.T. Cross Co. v. Royal Selangor(s) PTE, Ltd.*,
217 F. Supp. 2d 229 (D.R.I. 2002)......................................................................................9

*Acad. Chi. Publishers v. Cheever*,
144 Ill.2d 24, 161 Ill. Dec. 335, 578 N.E.2d 981 (1991) .........................................24

*Adams v. Greenpoint Credit, LLC*,
943 So. 2d 703 (Miss. 2006)................................................................................27

*Aiken v. World Finance Corp.*,
644 S.E.2d 705 (S.C. 2007) ..............................................................................29, 30

*Air-Con, Inc. v. Daikin Applied Latin Am., LLC*,
21 F.4th 168 (1st Cir. 2021)...............................................................................9, 42

*Applebaum v. Lyft*,
No. 16-cv-07062 (JGK), 2017 WL 2774153 (S.D. N.Y. 2017) ..............................26

*Arnold v. Burger King*,
48 N.E.3d 69 (Ohio Ct. App. 2015)........................................................................29

*Attix v. Carrington Mortg. Servs., LLC*,
35 F.4th 1284 (11th Cir. 2022) ...............................................................................9

*B.C. Rogers Poultry, Inc. v. Wedgeworth*,
911 So.2d 483 (Miss. 2005)...................................................................................27

*Bank of Indiana, Nat'l Ass'n v. Holyfield*,
476 F. Supp. 104 (S.D. Miss. 1979)...................................................................27, 35

*Barnes v. Helfenbein*,
548 P.2d 1014 (Okla. 1976).................................................................................33, 34

*Berkson v. Gogo LLC*,
97 F. Supp. 3d 359 (E.D.N.Y. 2015) ......................................................................26

*Berman v. Freedom Fin. Network, LLC*,
30 F.4th 849 (9th Cir. 2022) ..................................................................................22

*Bracy v. Macy's Retail Holdings, Inc.*,
No. CV 19-3825, 2020 WL 1953647 (E.D. Pa. Apr. 23, 2020) ..............................14

*Chang v. Lin*,
824 F.2d 219 (2d Cir. 1987) .................................................................................38

*Checchia v. SoLo Funds*,
No. CV 23-444-KSM, 2023 WL 3868369 (E.D. Pa. June 7, 2023) ........................17

*Childs v. Fitness Int'l LLC*,
No. 2:22-CV-05196-JDW, 2023 WL 3594180 (E.D. Pa. May 22, 2023) ...............18

*Christensen v. Barclays Bank Delaware*,
No. 1:18-cv-12280-ADB, 2019 WL 1921710 (D. Mass. Apr. 30, 2019) ...............35

*Citrus Mktg. Bd. Of Israel v. J. Lauritzen A/S*,
843 F.2d 220 (2d Cir. 1991) .................................................................................40

*Covenant Health & Rehab. of Picayune, LP v. Est. of Moulds ex rel. Braddock*,
14 So. 3d 695 (Miss. 2009) .............................................................................34, 35

*Cullinane v. Uber Techs., Inc.*,
893 F.3d 53 (1st Cir. 2018) ..................................................................................22

*Davitashvii v. Grubhub Inc.*,
No. 20-cv-3000(LAK), 2023 WL 2537777 (S.D.N.Y. March 16, 2023) ...............41

*Duling v. Mid Am. Credit Union*,
530 P.3d 737 (Kan. Ct. App. 2022) ......................................................................10

*Eakins v. Whaleco Inc.*,
No. CIV-23-560-J, 2024 WL 1190766 (W.D. Okla. Mar. 5, 2024) .................21, 22

*Echols v. New Orleans, Jackson & Great N. R.R. Co.*,
52 Miss. 610 (1876) .............................................................................................32

*In re Ephedra Prod. Liab. Litig.*,
314 F. Supp. 2d 1373 (J.P.M.L. 2004) ..................................................................40

*In re Estate of Atkinson*,
231 A.3d 891 (Pa. Super. Ct. 2020) ......................................................................15

*Eubanks v. Gasbuddy, LLC*,
No. 22-cv-10334-ADB, 2022 WL 16963807 (D. Mass. Nov. 16, 2022) ...............21

*Gagne v. Stallion Express, LLC*,
No. 4:22-CV-40008-TSH, 2022 WL 17658121 (D. Mass. Sept. 15, 2022) ...........38

*Gingras v. Think Finance, Inc.*,
922 F.3d at 126 ....................................................................................................41

011175-35/2668063 V1

*Granite Rock Co. v. Int'l Bhd. of Teamsters*,
561 U.S. 287 (2010)..................................................................................................8, 9

*Guidotti v. Legal Helpers Debt Resolution, LLC*,
716 F.3d 764 (3d Cir. 2013)............................................................................................42

*Hancock v. Am. Tel. & Tel. Co.*,
701 F.3d 1248 (10th Cir. 2012) ................................................................................20, 23

*Henry Schein Inc. v. Archer and White Sales, Inc.*,
586 U.S. 63 (2019).......................................................................................................41

*Hine v. LendingClub Corp.*,
No. 2:22-CV-00362-CRE, 2022 WL 16950409 (W.D. Pa. Nov. 15, 2022)...........................42

*Hoffman v. Genpact*,
No. 3:22-CV-00009, 2022 WL 782322 (M.D. Pa. Mar. 14, 2022) ...................................12, 42

*In re Jiffy Lube Int'l, Inc.*,
847 F.Supp.2d 1253 (11th Cir. 2012) .................................................................................31

*Jones v. Halliburton*,
583 F.3d 228 (5th Cir. 2009) ......................................................................................30, 31

*Khath v. Midland Funding, LLC*,
334 F. Supp. 3d 499 (D. Mass. 2018) ........................................................................24, 25, 43

*Kindred Nursing Ctrs. Ltd. P'Ship v. Clark*,
581 U.S. 246 (2017)......................................................................................................18

*Kirleis v. Dickie, McCamey & Chilcote, P.C.*,
560 F.3d 156 (3d Cir. 2009)...........................................................................................14

*Kohlman v. Grane Healthcare Co.*,
2022 PA Super 118, 279 A.3d 42 (2022)............................................................................33

*Matthews v. Gucci*,
No. CV 21-434-KSM, 2022 WL 462406 (E.D. Pa. Feb. 15, 2022)........................................14

*McFarlane v. Altice USA*,
524 F. Supp. 3d 264 (S.D.N.Y. 2021)................................................................................29

*Mohr v. State Bank of Stanley*,
770 P.2d 466 (Kan. 1989)................................................................................................10

*Montauk Oil Transp. Corp. v. Steamship Mut. Underwriting Ass'n (Bermuda), Ltd.*,
859 F. Supp. 669 (S.D.N.Y. 1994) .....................................................................................40

011175-35/2668063 V1

*In re MOVEit Customer Data Sec. Breach Litig.*,
   No. MDL 3083, 2023 WL 6456749 (J.P.M.L. Oct. 4, 2023) ..................................................40

*Mullinix Const. Co. v. Myers*,
   1960 OK 241, 358 P.2d 187....................................................................................................18

*Nat'l Prod. Workers Union Ins. Tr. v. Cigna Corp.*,
   665 F.3d 897 (7th Cir. 2011) .................................................................................................24

*In re Neurontin Mktg., Sales Pracs., & Prod. Liab. Litig.*,
   245 F.R.D. 55 (D. Mass. 2007)..............................................................................................41

*Oyola v. Midland Funding, LLC*,
   295 F. Supp. 3d 14 (D. Mass. 2018) .....................................................................................8, 9

*Pompano-Windy City Partners, Ltd. v. Bears, Stearns & Co., Inc.*,
   698 F. Supp. 504 (S.D.N.Y. 1988) ........................................................................................38

*.Poore v. Simpson Paper Co.*,
   566 F.3d 922 (9th Cir. 2009) .................................................................................................32

*Presidio, Inc. v. Feeny*,
   384 So. 3d 209 (Fla. Dist. Ct. App. 2024) ............................................................................24

*Quazilbash v. Wells Fargo & Co.*,
   No. 09-CV-0652-CVE-FHM, 2010 WL 1643778 (N.D. Okla. Apr. 22, 2010) .....................23

*Rent-A-Ctr., W., Inc. v. Jackson*,
   561 U.S. 63 (2010)..................................................................................................................39

*Revitch v. DIRECTV, LLC*,
   977 F.3d 713 (9th Cir. 2020) .................................................................................................41

*Riley Mfg. Co., Inc. v. Anchor Glass Container Corp.*,
   157 F.3d 775 (10th Cir.1998) ................................................................................................18

*Rionda v. HSBC Bank U.S.A., N.A.*,
   No. 10-20654-CIV, 2010 WL 5476725 (S.D. Fla. Dec. 30, 2010)........................................24

*Rivera-Colón v. AT&T Mobility P.R., Inc.*,
   913 F.3d 200 (1st Cir. 2019)...................................................................................................9

*Sanderson Farms, Inc. v. Gatlin*,
   848 So. 2d 828 (Miss. 2003)..................................................................................................27

*Schuchmann v. Great Am. Power, LLC*,
   No. 3:23-CV-1604, 2024 WL 219267 (M.D. Pa. Jan. 19, 2024)...........................................14

011175-35/2668063 V1

*Sgouros v. TransUnion Corp.*,
   817 F.3d 1029 (7th Cir. 2016) ....................................................................................26

*Shalomayev .v Altice USA, Inc.*,
   No. 21-CV-5540, 2022 WL 2359406 (E.D.N.Y. June 30, 2022) ...........................................38

*Sierra Rutile Ltd. v. Katz*,
   937 F.2d 743 (2d Cir. 1991)..................................................................................39, 40

*Skirchak v. Dynamics Research Corp.*,
   508 F.3d 49 (1st Cir. 2007).................................................................................35, 36

*Smith v. Fed Ex*,
   No. CIV-22-440-D, 2022 WL 2819142 (W.D. Okla. July 19, 2022)....................................20

*Smith v. Steinkamp*,
   318 F.3d 775 (7th Cir. 2003) .....................................................................................32

*Soto-Fonalledas v. Ritz-Carlton San Juan Hotel Spa & Casino*,
   640 F.3d 471 (1st Cir. 2011).....................................................................................24

*Sw. Energy Production, Co. v. Forest Res., LLC*,
   83 A.3d 177 (Pa. Super. Ct. 2013)..............................................................................15

*Tedeschi v. Applied Concepts*,
   No. 1:06CV2411, 2007 WL 184734 (N.D. Ohio 2007) .......................................................38

*Telecom Italia, SPA v. Wholesale Telecom Corp.*,
   248 F.3d 1109 (11th Cir. 2001) ...................................................................................30

*Telum v. E.F. Hutton Credit Corp.*,
   856 F.2d 835 (10th Cir. 1988) ...................................................................................34

*Townsend v. Pinewood Social, LLC*,
   2024 WL 165790 (M.D. Tenn. April 16, 2024)....................................................................41

*Weichert Co. Realtors v. Ryan*,
   128 N.J. 427, 608 A.2d 280 (1992)..............................................................................24

*West Caldwell v. Caldwell*,
   26 N.J. 9, 138 A.2d 402 (1958)..................................................................................24

*Wille v. Southwestern Bell Tel. Co.*,
   549 P.2d 903 (Kan. 1976) ...................................................................................11, 28

## STATUTES

9 U.S.C. § 2.................................................................................................................9

011175-35/2668063 V1

9 U.S.C.A. § 3 ............................................................................................................39

Kan. Stat. Ann. § 5-429(g) .......................................................................................39

Okla. Stat. Ann. tit. 15, § 2 .....................................................................................18

## OTHER AUTHORITIES

D.Horton, *Infinite Arbitration Clauses*, 168 U. Pa. L. Rev. 633, 639 (2020) .........................29, 32

## I.    INTRODUCTION

Plaintiffs Melanie Newman, Nicholas Cooper, Calvin Adams, Tammy Pratt, Latrice Triplett, Tanya Bronson, Tina Thompson, Michael Harris, Steven Brown, Petimat Dudurkaewa, Chris Rubenstein, Sherry Linman (and her child, L.L.), Andrew Strother, Darryl Strucke, David De Medicis, Michelle Cantrell, Tracey Alcott, Jacob Kent, and Melissa Fields[1] are all victims of a widespread and preventable data breach which has exposed sensitive, personal data about them to criminals, subjecting them to potential fraud and identity theft for years to come. None of these Plaintiffs ever thought they would have to file suit to protect their private information, nor did any of these Plaintiffs fathom such a thing would one day become necessary when they started working at a movie theater, opened up a personal bank account, or agreed to accept a debit card for their tax return. When the parties began these relationships, cybersecurity and data minimization were the furthest from everyone's minds.

Now that Plaintiffs have taken the extraordinary step of protecting their rights as well as the rights of others through representative, class action litigation, Defendants[2] trot out a litany of lengthy contracts to which Plaintiffs purportedly agreed, some from years ago, together with declarations of individuals without actual knowledge about the circumstances surrounding Plaintiffs' alleged acceptance of the contracts' take-it-or-leave-it terms. These contracts contain provisions which prevent Plaintiffs from litigating their claims in a public forum and require them

---

[1] For purposes of this brief, referred to collectively as "Plaintiffs."

[2] For purposes of this brief only, "Defendants" refers to American Multi-Cinema, Inc., AMC Entertainment Holdings, Inc. d/b/a AMC Theatres, Cadence Bank, Franklin Mint Federal Credit Union, MidFirst Bank and Midland Financial Co., and Pathward, N.A. Plaintiff Joseph Liptock is stipulating to arbitrate his claims against MasTec, Inc. on the terms set forth in Plaintiffs' Response to Defendant MasTec, Inc.'s Motion to Compel Arbitration and Stay Litigation, filed herewith.

to incur unnecessary burdens and expenses associated with adjudicating their claims individually—eclipsing any potential recovery they could obtain—through binding arbitration.

There are a number of reasons why the Court should deny Defendants' motion to compel Plaintiffs' claims to arbitration. Certain of the Plaintiffs dispute that these terms were ever presented to them in order for them to have the requisite "meeting of the minds" necessary to grant a motion to compel. For others, the terms are either so onerous or one-sided as to render them unconscionable under their governing law.

Several of the Plaintiffs have provided declarations that their understanding of the facts is different than the one presented by Defendants.[3] While this information, combined with Plaintiffs' arguments, is sufficient to deny Defendants' motion with prejudice, to the extent the Court finds it helpful, limited and narrow discovery related to the arbitration clauses may be appropriate to develop the facts necessary for the Court to render its decision.

For these and the foregoing reasons, the Court should deny Defendants' motion.

## II.   SPECIFIC FACTS RELATED TO THE PLAINTIFFS

### A.   American Multi-Cinema, Inc. and AMC Entertainment Holdings, Inc. (hereinafter, "AMC").

Plaintiffs Newman and Cooper are both former employees of AMC—with Plaintiff Cooper having only worked as an AMC hourly employee for *four days* in 2022. Ex. 1, Decl. of Cooper ¶¶ 2. AMC included a declaration that purports to attach an arbitration agreement signed by former AMC employee Nicholas Cooper at or about the time he was hired. However, AMC's declaration does not explain AMC's employee onboarding process, including when and how the agreement was executed. Plaintiff Cooper has provided a declaration that calls into question whether he

---

[3] *See* Declaration of Kristen A. Johnson in Support of Opposition to Motion to Compel Arbitration and Stay Litigation, Exs. 1-9.

011175-35/2668063 V1

knowingly and voluntarily agreed to arbitrate claims against AMC. Plaintiff Cooper said that his employment onboarding time was "rushed." He was "not given the time to read through the forms and … was not given the opportunity to ask questions, nor did the person who gave [him] the forms to sign explain the content" of the documents. *Id.* ¶ 4. He was not given the opportunity to revise or negotiate any of the terms. *Id.* ¶ 6. Nor did he realize that AMC would continue to keep his information long after his employment. *Id.* ¶ 7. AMC has not alleged any facts that would contradict Mr. Cooper's claims, nor has AMC stated that Plaintiff Cooper's onboarding experience was different than that of any other AMC employee—like Plaintiff Newman—and Plaintiffs' counsel has no reason to believe otherwise.

AMC's arbitration agreement, itself, explicitly limits only certain claims to arbitration: "any claims or disputes *relating to* your employment or the termination of your employment." *See* Agreement to Arbitrate attached to Decl. of Natalie Martinez, ECF Nos. 929-1 and 929-2 (emphasis added). The arbitration clause gives a non-exclusive listing of the types of claims "relating to the Plaintiffs' employment" that the parties contemplated would be subject to arbitration, including:

> Claims of discrimination, harassment, hostile work environment, retaliation, wrongful discharge/termination, breach of (express or implied) contract, tort claims[4], claims related to pay or benefits (including any leave of absence), claims related to work hours or work time, and any other claims or disputes relating to your employment or the termination of your employment.

ECF No. 929 at 3-4. The arbitration clause specifically contemplates claims arising out of *employment*; however, AMC now argues that the agreement is much broader, covering pending data breach claims that are predicated on AMC's negligent failure to maintain adequate computer

---

[4] Construing "tort claims" in conjunction with the "relates to" requirement of the agreement, only tort claims that relate to employment or termination of employment are subject to arbitration.

security systems and the unrelated criminal activity of a third party. The fact that AMC believed that its arbitration agreement would require Plaintiffs to arbitrate the type of data breach claims at issue here—claims that bear, at best, a highly attenuated connection to their former employment with AMC and claims that appear to fall outside the plain language of the arbitration agreement itself—is evidence that there was no meeting of the minds regarding the scope of the arbitration agreement, and that therefore the agreement is invalid and unenforceable.

### B.    Cadence Bank

Plaintiffs Calvin Adams, Tammy Pratt, and Latrice Triplett each purportedly agreed to an "Account Agreement" when they opened their accounts with either BancorpSouth or Cadence. ECF No. 929 at 5-6. The agreements each contain a number of unusual and onerous hoops that customers must jump through before they are even permitted to arbitrate their claims.

*First*, Cadence Bank customers are required to attend an "in person settlement conference "prior to initiating arbitration."  Decl. of Brianna Sparks, ECF No. 929-3 at 3. There is no explanation of where the settlement conference will take place, within what time frame, who will attend or what the terms are.

*Second*, the Cadence agreement specifies that "[i]f the parties are unable to reach a resolution at a settlement conference, before you file a claim in an arbitration process or before you file a lawsuit, you also agree to make a second effort to try to resolve the dispute by attending a non-binding mediation." *Id.* at 39.

*Third*, even after having attended both the settlement conference and the non-binding mediation, a separate "written demand" must be made in order to initiate an arbitration. *Id.*

### C.    Franklin Mint Federal Credit Union

Plaintiffs Tanya Bronson and Tina Thompson are former members of the Wawa Employees Credit Union, becoming members of Franklin Mint Credit Union in late 2022, after

011175-35/2668063 V1

Wawa and Franklin Mint merged. ECF No. 929 at 8. Franklin Mint claims that it mailed Plaintiffs Bronson and Thompson a packet explaining the merger, along with "a new Membership and Account Agreement and Customer Disclosures" that they would be subject to because of the merger, which contains an arbitration clause. *Id.* at 9. Franklin Mint explains, in summary fashion, that because Plaintiffs Bronson and Thompson are still Franklin Mint members, who did not "opt out" of the new terms that were sent to them, they are thereby subject to the arbitration agreement. *Id.* at 9. But Plaintiffs Bronson and Thompson dispute that they received the mailings and further dispute that they manifested an intent to be bound to Franklin Mint's November 2020 Agreements and Disclosures that mention arbitration, because they were not even aware of the merger between their former credit union (Wawa) and Franklin Mint, let alone Franklin Mint's arbitration clause. Ex. 2, Decl. of Bronson ¶¶ 3-8; Ex. 3, Decl. of Thompson ¶¶ 3-9.

Plaintiff Harris signed up for an account in person and was allegedly provided with copies of agreements and disclosures which contained the arbitration clause at issue in Defendants' motion. ECF No. 929 at 10-11. But the proof that Franklin Mint provides does not mention arbitration and does not show that Plaintiff Harris agreed to arbitrate. Plaintiff Brown became a Franklin Mint member after he applied and was approved for a loan. *Id.* at 11. Plaintiff Brown was required to agree to an "eConsent Letter," and was provided with additional documents thereafter. *Id.* at 11-12. But Franklin Mint's evidence raises more questions than it answers, in particular, because the terms of the arbitration agreement cannot be found easily in the "browsewrap" sign-up process in which Plaintiff Brown took part and that courts disfavor.

### D.    MidFirst Bank and Midland First Financial Co. (hereinafter "MidFirst")

Plaintiffs Chris Rubenstein, Andrew Strother, Darryl Strucke and Petimat Dudurkaewa purportedly signed an Account Agreement and Disclosure Privacy Notice and Truth in Savings Disclosure ("AAD") when they became members of MidFirst or Vio Bank. ECF No. 929-6 at 4-

5. MidFirst alleges that each Plaintiff agreed to the AAD, which contained an arbitration agreement, yet the Plaintiffs were never aware of, nor knowingly agreed to, any provision containing both an arbitration agreement and class action waiver. Ex. 4, Decl. of Strucke ¶¶ 5-6. The inconspicuous placement of any hyperlinked material calls into question whether the Plaintiffs manifested intent to be bound by MidFirst/Vio Bank's AAD.

Plaintiff David De Medicis is a former member of MidFirst's Monifi division, which has since been discontinued. ECF No. 929-6 at 6. MidFirst alleges that Plaintiff De Medicis agreed to arbitration via Monifi's online portal, but akin to Plaintiffs Rubenstein, Strother, Strucke and Dudurkaewa, Mr. De Medicis was never aware of, nor knowingly agreed to, any provision containing both an arbitration agreement and class action waiver. Ex. 5, Decl. of De Medicis ¶¶ 5-6.

Plaintiff Sherry Linman (and her child, L.L.) signed up for an account in person and was allegedly provided with copies of agreements and disclosures which contained the arbitration clause at issue in Defendants' motion. ECF No. 929-6 at 53-57. But the proof that MidFirst provides does not mention arbitration and does not show that Plaintiff Linman (and her child, L.L.) agreed to arbitrate.

### E.     Pathward, N.A.

Defendant Pathward, N.A. issues H&R Block Prepaid Emerald Mastercards for individuals to receive their tax refunds. Pathward provided a declaration but it attached only "exemplar" language (not the actual agreements); the declaration refers to business records but does not provide them. For several years, Plaintiff Tracey Alcott went to her H&R Block branch annually to obtain a tax refund advance loan loaded on an Emerald Card in New Jersey. Ex. 6, Decl. of Alcott ¶ 2. The branch employee handed her a signature pad and stylist pen to provide her signature, without providing a document or any text to read prior to signing. *Id.* ¶ 3. She was not

informed of the terms of the agreement beyond that she had to sign documentation regarding the repayment of the advance to obtain the funds. *Id.* ¶¶ 2-3. She typically accessed her account through an app on her iPhone using her username and password, but also set up fingerprint and face id on her iPhone. *Id.* ¶¶ 4-5. She does not recall agreeing to an Online and Mobile Banking Agreement, an Electronic Communications Consent, or an Online Services Agreement. *Id.* ¶¶ 6-8. She does not recall any pop-up screen to review or check box to get into her account. *Id.* ¶ 10. She does not recall opting in or out of a contract or its terms or reviewing any contract with an arbitration provision. *Id.* ¶¶ 10-11.

For several years, Plaintiff Michelle Cantrell went to her H&R Block branch annually to obtain a tax refund advance loan loaded on an Emerald Card in Illinois. Ex. 7, Decl. of Cantrell ¶ 2. The branch employee handed her a signature pad and stylist pen to provide her signature, without providing a document or any text to read prior to signing. *Id.* ¶ 3. She typically accessed her account through an app on her Android phone using her username and password, and often had to enter a verification code when using the app on her phone. *Id.* ¶¶ 4-5. She does not recall agreeing to an Online and Mobile Banking Agreement. *Id.* ¶ 7. She remembers being told to download the app and follow the instructions to set it up and access her account online. *Id.* ¶ 8. She does not recall any pop-up screen to review or check box to get into her account. *Id.* ¶ 9. She does not recall opting in or out of a contract or its terms or reviewing any contract with an arbitration provision. *Id.* ¶¶ 10-11.

Plaintiff Melissa Fields opened her Emerald Card several years ago and used the account for a tax refund advance loan in Florida. Ex. 8, Decl. of Fields ¶¶ 2-3. She typically accessed her account through an app on her Samsung Galaxy phone using her username and password, and occasionally used a fingerprint id to login. *Id.* ¶¶ 4-6. She does not recall agreeing to an Online

-7-

and Mobile Banking Agreement or an Online Services Agreement. *Id.* ¶¶ 7-8. She does not recall any pop-up screen to review or check box to get into her account. *Id.* ¶ 9. She does not recall opting in or out of a contract or its terms, reviewing any contract with an arbitration provision, or reviewing or agreeing to any language about arbitration to access her account. *Id.* ¶¶ 10-12.

Plaintiff Jacob Kent opened his Emerald Card account roughly a decade ago in Illinois. Ex. 9, Decl. of Kent ¶ 2. This account was his primary account for obtaining payment for his employment. *Id.* ¶ 3. He usually accessed his account through an app on his Galaxy A12 phone using his username and password. *Id.* ¶¶ 4-5. He tried to set up the fingerprint ID, but it did not work well for him and he preferred to use his username and password. *Id.* ¶ 7. Sometimes the app still required him to enter a verification code from email or text message when using the app on his phone. *Id.* ¶ 6. He does not recall agreeing to an Online and Mobile Banking Agreement, an Electronic Communications Consent, or an Online Services Agreement. *Id.* ¶¶ 8-10. He does not recall any pop-up screen to review or check box to get into his account. *Id.* ¶ 11. He does not recall opting in or out of a contract or its terms or reviewing any contract with an arbitration provision. *Id.* ¶¶ 12-13.

## III. SEVERAL REASONS EXIST NOT TO ENFORCE THE ARBITRATION AGREEMENTS

The party seeking to compel arbitration bears the burden of proving that a valid agreement to arbitrate exists, that the movant has a right to enforce it, that the other party is bound by it, and that the claim asserted falls within the scope of the arbitration agreement. *Oyola v. Midland Funding, LLC*, 295 F. Supp. 3d 14, 16-17 (D. Mass. 2018). "[A] court may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate that dispute." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 297 (2010) (emphasis in original). "To satisfy itself that such agreement exists, the court must resolve any issue that calls into question

the formation or applicability of the specific arbitration clause that a party seeks to have the court enforce." *Id.*

### A. Several of the arbitration agreements lack a required "meeting of the minds" such that they may not be enforced.

The FAA provides that a "written provision in … a contract … to settle by arbitration a controversy thereafter arising out of such contract … shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2. But arbitration under the FAA "is only triggered when the parties actually agree[] to arbitrate." *Rivera-Colón v. AT&T Mobility P.R., Inc.*, 913 F.3d 200, 207 (1st Cir. 2019). Arbitration agreements may be found to be invalid *ab initio* when there is no "meeting of the minds." *See, e.g., Attix v. Carrington Mortg. Servs., LLC*, 35 F.4th 1284, 1299 n.9 (11th Cir. 2022) (noting the "subtle, but material, distinction between the two concepts" of "[v]alidity … [or] what it takes to enter into a legally operative arbitration agreement … at the contract formation stage" and "enforceability [which] is about whether the law allows for the enforcement of a validly formed arbitration agreement." (citations omitted)).

The First Circuit recently joined the majority of circuit courts in concluding district courts should apply the summary judgment standard to evaluate motions to compel arbitration under the FAA. *Air-Con, Inc. v. Daikin Applied Latin Am., LLC*, 21 F.4th 168, 175 (1st Cir. 2021). Pursuant to this standard, the court "must construe the record in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.* at 175 (quoting *Taite v. Bridgewater State Univ., Bd. of Trs.*, 999 F.3d 86, 92 (1st Cir. 2021)).

Ultimately, the party moving to compel arbitration must show that a valid agreement to arbitrate exists. *Oyola*, 295 F. Supp. 3d at 16-17; *see also A.T. Cross Co. v. Royal Selangor(s) PTE, Ltd.*, 217 F. Supp. 2d 229, 233 (D.R.I. 2002) ("[t]he party seeking arbitration, therefore, must

-9-

demonstrate at a bare minimum, that the protagonists have agreed to arbitrate some claims.") (cleaned up). Several Defendants' arguments miss that mark.

### 1. AMC fails to demonstrate a "meeting of the minds" with Plaintiffs Newman and Cooper.

AMC's recitation of the *procedural* steps leading to the execution of the arbitration agreement does not address if there was an actual agreement between AMC and Plaintiffs Newman and Cooper regarding the *terms* contained in the arbitration agreement contract. "Kansas contract law [which applies, here] defines the assent necessary to form a contract as a 'meeting of the minds', [and] '[t]o constitute a meeting of the minds there must be a fair understanding between the parties which normally accompanies mutual consent and the evidence must show with reasonable definiteness that the minds of the parties met upon the same matter and agreed upon the terms of the contract.'" *Duling v. Mid Am. Credit Union*, 530 P.3d 737, 745 (Kan. Ct. App. 2022). *See also Mohr v. State Bank of Stanley*, 770 P.2d 466, 480 (Kan. 1989) ("where the purported contract is so vague and indefinite that the intentions of the parties cannot be ascertained, it is unenforceable.").

The question here is whether the Plaintiffs understood *at the time that they executed the arbitration agreement* that it covered the types of post-employment, non-employment claims at issue here because to establish a meeting of the minds, the terms of the parties' agreement must be complete and definite enough that each party reasonably understands the rights and obligations created. *Duling*, 530 P.3d at 745. AMC's argument is predicated on the implicit assumption that the language of the agreement was clear and unambiguous enough so that AMC and Plaintiffs agreed at the time that they executed the arbitration agreement that virtually any claim Plaintiffs ever would have against AMC would be subject to arbitration, including claims such as the post-employment data breach claims at issue here. The implausibility of AMC's argument collapses

011175-35/2668063 V1

under its own weight when compared to the language of the agreement itself. Plaintiffs' reasonable interpretation of the language contained in the arbitration agreement was that it would only require arbitration of claims that "related to" their employment relationship with AMC (though claims relating to the employment relationship would be subject to arbitration even if the claim was brought after the termination of employment). Plaintiffs did not (and do not) believe that this arbitration agreement was so broad as to require arbitration of claims such as the data breach claims at issue here. AMC's overbroad interpretation of the scope of the arbitration agreement is *res ipsa loquitor* proof that there was never a "meeting of the minds" regarding the rights and obligations that would have been created by the agreement.[5] The fact that the parties did not reach a mutual understanding regarding the terms and conditions of the agreement makes the agreement itself void and unenforceable.

In support of its motion to compel arbitration, AMC included a declaration that purports to attach an arbitration agreement signed by former AMC employee Nicholas Cooper at or about the time he was hired. However, AMC's declaration does not explain AMC's employee onboarding process, including when and how the agreement was executed. Plaintiff Nicholas Cooper has provided a declaration that calls into question whether he knowingly and voluntarily agreed to arbitrate claims against AMC. Ex. 1, Decl. of Cooper. Mr. Cooper's declaration suggests that AMC

---

[5] Alternatively, if AMC's interpretation of the agreement is correct, then the Court can find that "the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract." *See Wille v. Southwestern Bell Tel. Co.*, 549 P.2d 903, 906 (Kan. 1976) (quoting Kan. Stat. Ann. § 84-2-302). *Wille* further elaborated on two situations that may apply here where unconscionable contract terms evidence that there was no "meaningful bargain" and therefore, no contract: first where "a party whose circumstances, perhaps his inexperience or ignorance, when compared with the circumstances of the other party, make his knowing assent to the fine print terms fictional"; and second "where, although there has been actual assent, the agreement, surrounding facts, and relative bargaining positions of the parties indicate the possibility of gross over-reaching on the part of either party." *Id.* (citations omitted).

-11-

never explained to him the meaning of the arbitration agreement. *Id.* ¶ 5. Mr. Cooper's declaration also suggests that AMC may have led him to believe that the forms he executed were related to pay and hours (not to whether he would be required to arbitrate disputes with AMC) and may have rushed him to complete the paperwork. In sum, Mr. Cooper's declaration calls into question the formation and the enforceability of the purported arbitration agreement.

**2.      Issues related to contract formation exist related to Franklin Mint and Plaintiffs Bronson, Thompson, Harris, and Brown.**

Bronson, Thompson, Harris, and Brown agree with Franklin Mint that to determine whether there is a valid arbitration agreement, courts turn to the relevant state law on the formation of contracts. For these Plaintiffs, Pennsylvania law on contract formation—which applies to Franklin Mint—requires (1) a mutual manifestation of an intention to be bound, (2) terms sufficiently definite to be enforced, and (3) consideration. ECF No. 929 at 29. For all four Franklin Mint Plaintiffs, disputed facts exist as to contract formation. "When the issue of arbitrability is not apparent on the fac[e] of the complaint, 'the motion to compel arbitration *must* be denied pending further development of the factual record.'" *See Hoffman v. Genpact*, No. 3:22-CV-00009, 2022 WL 782322, at *2 (M.D. Pa. Mar. 14, 2022) (collecting cases that have denied motions to compel arbitration and ordered limited discovery) (quoting *Guidotti v. Legal Helpers Debt Resolution, LLC*, 716 F.3d 764, 774 (3d Cir. 2013)).

Franklin Mint contends that Plaintiffs Bronson and Thompson are subject to arbitration, because Franklin Mint supposedly mailed to them—and additional former members of Wawa Employees Credit Union—letters advising them of a merger between Wawa and Franklin Mint, along with a notice that they would be subject to a new Membership and Account Agreement and Agreements and Disclosures from November 2020 that mention arbitration. ECF No. 929 at 8-9. Conspicuously absent from the situation that Franklin Mint describes—the validity of which

-12-

Plaintiffs Bronson and Thompson do not concede—is any fact showing manifestation of Plaintiffs' intent to be bound to a supposed mailing from a new credit union (Franklin Mint) to which they had never belonged, let alone intent to be bound to an arbitration agreement contained in a document from November 2020 (*i.e.* about 1.5 years before the Wawa and Franklin Mint merger that precipitated the supposed mailing). Notably, the mailed notices attached as Franklin Mint's Exhibits A and C are from Franklin Mint—with Franklin Mint headers at the top. Franklin Mint assumes without any factual basis that Plaintiffs Bronson and Thompson actually received and manifested assent to supposed mailings and a November 2020 document containing an arbitration clause from an entity (Franklin Mint) with which Plaintiffs *had no business*. Franklin Mint assumes that Plaintiffs received the documents, because Franklin Mint claims that the documents were not returned to it as undeliverable. ECF No. 929 at 8. But that's not sufficient to establish an intent to be bound. Plaintiffs Bronson and Thompson dispute that they received the mailings and further dispute that they manifested an intent to be bound to Franklin Mint's November 2020 Agreements and Disclosures that mention arbitration. For example, they never signed a document acknowledging or agreeing to Franklin Mint's November 2020 document containing an arbitration clause, and Franklin Mint provides no such evidence. Ex. 2, Decl. of Bronson ¶¶ 2-8; Ex. 3, Decl. of Thompson ¶¶ 2-9.

In such circumstances, Franklin Mint fails to establish Plaintiffs Bronson and Thompson manifested their mutual intent to be bound to the arbitration clause (even if Franklin Mint manifested its own intent via the mailing). In other words, there was no meeting of the minds with respect to Franklin Mint's November 2020 arbitration clause. Indeed, even assuming that the mailings were sent to Plaintiffs Bronson and Thompson, it is entirely reasonable and plausible that they discarded mail sent to them by a third-party entity with which they had *no relationship*

-13-

(because at the time their Wawa Employees Credit Union accounts had not yet been converted to Franklin Mint).[6] Ex. 3, Decl. of Thompson ¶¶ 3-4. Simply mailing documents to people and assuming intent to be bound without signature or some other manifestation was insufficient to bind Plaintiffs Bronson and Thompson to Franklin Mint's November 2020 arbitration clause. *See Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 161 (3d Cir. 2009) (circumstances rendered formation of an arbitration agreement impossible, because plaintiff swore she was not provided with a copy of the By-Laws and never signed an agreement or document with the arbitration provision); *Schuchmann v. Great Am. Power, LLC*, No. 3:23-CV-1604, 2024 WL 219267, at *4 (M.D. Pa. Jan. 19, 2024) ("[t]he record as developed so far does not indicate that Plaintiff had been informed of the arbitration clause when she enrolled during the August 25th call. So like the plaintiffs in *Quiles* and *Kirleis*, she could not have then explicitly agreed to that clause."; "the record here lacks evidence that Plaintiff had been put on notice of or given the opportunity to review the arbitration clause *and then* demonstrated her assent to it").[7]

Franklin Mint contends that Plaintiff Harris filled out a paper application at a Franklin Mint branch and was provided a hard copy of the November 2020 Agreements and Disclosures containing the arbitration clause. ECF No. 929 at 31-32. Franklin Mint quotes language referring to an acknowledgement of receiving "the Agreements and Disclosures related to Your Account(s)

---

[6] *See* Franklin Mint's May 20, 2022, letter specifying that Wawa customers' accounts were converting and would not be available at Franklin Mint until June 2, 2022. ECF No. 929-4 at 25-29.

[7] Franklin Mint's reliance on *Matthews v. Gucci*, No. CV 21-434-KSM, 2022 WL 462406, at *4 (E.D. Pa. Feb. 15, 2022) is inapposite, because there the plaintiff merely *did not recall* whether she signed the document at issue, not that she didn't receive nor sign the agreement at all. Also distinguishable is *Bracy v. Macy's Retail Holdings, Inc.*, No. CV 19-3825, 2020 WL 1953647, at *5–6 (E.D. Pa. Apr. 23, 2020), because the plaintiff there attended a store meeting at which the arbitration program was introduced and explained (she did not recall the meeting but conceded that she signed the sign-in sheet).

-14-

…" (*id.*); however, that language is buried in the middle of a large, single-spaced block of text within the Application, amongst other language regarding applying for membership with Franklin Mint and there is *no mention* of arbitration. *See* ECF No. 929-4 at 30, 32. Likewise, the signature cards in Franklin Mint's Exhibit E contain large, single-spaced blocks of text in small font that refer—among many other acknowledgements like an account agreement related to overdraft lines of credit—to receiving a copy of "the Agreements and Disclosures related to Your Account(s)" but there is *no mention* of arbitration.[8] ECF No. 929-4 at 33-35. Franklin Mint baldly asserts that it "was standard practice" to provide a copy of its Agreements and Disclosures in effect at the time. ECF No. 929-4 at 4. Nonetheless, Franklin Mint provides no evidence or facts regarding its "standard practice" such as: to what extent, if any, Franklin Mint's University City branch (where Plaintiff Harris applied) follows the standard practice or deviates at all; whether Franklin Mint gives customers an opportunity to review the Agreements and Disclosures containing an arbitration clause; how much time new customers are given to review and sign the documents; and whether Franklin Mint branch employees ever show new customers the arbitration clause in the Agreements and Disclosures or otherwise mention arbitration at all during the application process. Franklin Mint tries to bind Plaintiff Harris to an arbitration clause in a *separate* document that is vaguely referred to in an application and signature card, among other fine-print boilerplate text.

---

[8] The lack of a reference to arbitration here makes Franklin Mint's authority distinguishable. *See In re Estate of Atkinson*, 231 A.3d 891, 895 (Pa. Super. Ct. 2020) (the application stated immediately above the Trustee's signature, in bold font and all capital letters: "THE CAP AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE. BY SIGNING THIS APPLICATION, I ACKNOLWEDGE RECEIPT OF A COPY OF THE AGREEMENT CONTAINING SUCH CLAUSE"). Also, Franklin Mint cites *Sw. Energy Production, Co. v. Forest Res., LLC*, 83 A.3d 177, 187–88 (Pa. Super. Ct. 2013), but that case does not even address arbitration; rather, the opinion addressed a declaratory judgment action involving lease and letter agreements.

That is insufficient to demonstrate Plaintiff Harris's manifestation of intent to be bound to the arbitration clause.

Franklin Mint contends that Plaintiff Brown somehow agreed to arbitration by applying for a loan online through a third-party entity called Upgrade that then assigned to the loan Franklin Mint as his partner credit union. ECF No. 929-4 at 4-5. Franklin Mint says that for Plaintiff Brown to complete his application, he was required to navigate a webpage called "Membership Authorization" that supposedly provided access to an "eConsent" document, the Account Agreements and Disclosures/Privacy Notice, and Account Disclosure Schedule of Fees and Charges. *Id*. at 6. *Nowhere* on the "Membership Authorization" page does it mention arbitration. Notably, Franklin Mint contends that Plaintiff Brown somehow reviewed and acknowledged that webpage by "clicking past it to complete his Upgrade Loan Application." *Id*. Franklin Mint fails to provide any facts or evidence that Plaintiff Brown reviewed, acknowledged, signed, or otherwise manifested intent to be bound by the arbitration clause supposedly contained in a *separate* Account Agreements and Disclosures/Privacy Notice. Indeed, Franklin Mint merely mentions in a footnote that Plaintiff Brown supposedly acknowledged the Membership Authorization webpage by checking a box that provided an e-signature. *Id*. Franklin Mint provides zero facts or evidence concerning whether the Membership Authorization webpage provided hyperlinked access to the eConsent document, Account Agreements and Disclosures/Privacy Notice, and Account Disclosure Schedule of fees and Charges.[9] Indeed, Franklin Mint's declaration does not even mention hyperlinks. ECF No. 929-4.

---

[9] Franklin Mint's declaration merely shows a screen grab of the Membership Authorization webpage, but the text mentioning the three documents is not underlined and is not in blue or green color like most hyperlinks. ECF No. 929-4 at 6.

011175-35/2668063 V1

Such circumstances are insufficient to demonstrate Plaintiff Brown's manifestation of intent to be bound to the arbitration clause supposedly contained in the Account Agreements and Disclosures/Privacy Notice. In *Checchia v. SoLo Funds*, No. CV 23-444-KSM, 2023 WL 3868369, at *7-8 (E.D. Pa. June 7, 2023), the court denied a motion to compel arbitration in a similar situation. Crucially, the court there differentiated between two primary types of Internet-based contracts—"clickwrap" and "browsewrap" agreements—the latter which involve terms and conditions of use that are generally posted on a website via hyperlinks at the bottom of a screen and which courts are more reluctant to enforce. *Id*. In *Checchia*, the plaintiff had to click an "I agree to SoLo's Terms & Conditions" button to create an account, but the hyperlinked terms of service were not in close proximity to the "I agree" checkbox on the webpage, and the terms of service were the same font size and color as other links such as "Privacy Policy" and "E-Sign Disclosure." *Id*. at *8-10. The court recognized that the terms of service was devoid of features to set it apart from the surrounding text and was confusingly labeled compared to the other hyperlinks; therefore, notice to the plaintiff "was not reasonably conspicuous and [the plaintiff] did not manifest assent to the arbitration agreement." *Id*. at *10.

The same is true here, because the "Membership Authorization" webpage provided by Franklin Mint reveals that three documents are mentioned at the bottom of the screen devoid of features such as underlining or different text color (*e.g.* blue or green) to set them apart from the surrounding text. There is zero indication on the webpage that the "Account Agreements and Disclosures/Privacy Notice" contains an arbitration clause. To add to the confusion, Franklin Mint says that Plaintiff Brown had the ability during the application process to print a copy of Franklin Mint's November 2020 Agreements and Disclosures, but it is unclear whether that supposed ability was through the Membership Authorization webpage or some other step in the application process.

-17-

As in *Checchia*, this Court should be reluctant to enforce such a "browsewrap" agreement. *See also Childs v. Fitness Int'l LLC*, No. 2:22-CV-05196-JDW, 2023 WL 3594180, at \*3 (E.D. Pa. May 22, 2023) (finding the arbitration clause in LA Fitness's Terms and Conditions is unenforceable browsewrap, because, among other things, LA Fitness did not tell plaintiff that the Terms and Conditions contained an arbitration provision, and using a website is not sufficient to form a contract under Pennsylvania law).

> **3.     Additional contract formation issues persist for Plaintiffs Dudurkaewa, Rubenstein, Linman and child L.L., Strother, Struck, and De Medicis concerning MidFirst.**

MidFirst contends that Plaintiffs Dudurkaewa, Rubenstein, Linman and child L.L., Strother, Strucke, and De Medicis are subject to Oklahoma law on contact formation, which requires "competent parties, their consent, a lawful object and sufficient cause for consideration[.]" *Mullinix Const. Co. v. Myers*, 1960 OK 241, 358 P.2d 187, 191; *see* Okla. Stat. Ann. tit. 15, § 2 ("It is essential to the existence of a contract that there should be: (1) Parties capable for contracting[;] (2) Their consent[;] (3) A lawful object; and, (4) Sufficient cause or consideration."). While a prerequisite to compelling arbitration is the existence of a valid arbitration agreement, disputed facts exist as to contract formation for all seven MidFirst Plaintiffs such that any presumption of arbitrability is rendered obsolete. *See Kindred Nursing Ctrs. Ltd. P'Ship v. Clark*, 581 U.S. 246, 247 (2017) ("A court may invalidate an arbitration agreement based on 'generally applicable contract defenses[]'"); *Riley Mfg. Co., Inc. v. Anchor Glass Container Corp.*, 157 F.3d 775, 779 (10th Cir.1998) ("[W]hen the dispute is whether there is a valid and enforceable arbitration agreement in the first place, the presumption of arbitrability falls away.").

MidFirst suggests Plaintiffs Dudurkaewa, Strucke, Strother, and Rubenstein all agreed to arbitration by way of clicking through the respective online application webpages.[10] *See* ECF No. 929-6 at ¶¶ 8–13. MidFirst explains that to open an online account at MidFirst Bank, Vio Bank, or on Monifi, an applicant must "input his/her information," and "affirmatively agree to having read and accepted the relevant Account Agreements." *Id.* at ¶ 9. Plaintiffs, according to MidFirst, would then be prompted to navigate—on both MidFirst and Vio Bank's webpages—the "Accept Disclosures" screen, which includes three call outs to the 'Consent of Electronic Records,' the 'TIN and Backup Withholdings Certification,' and the 'Account Agreement and Disclosure Privacy Notice and Truth in Savings Disclosure (AAD).' *Id.* at ¶¶ 10-13. *Nowhere* on the "Accept Disclosures" screen does it mention arbitration. Moreover, MidFirst contends that "majority of MidFirst Plaintiffs entered into the AADs through an online sign-up process," ECF No. 929 at 37, yet MidFirst fails to provide any facts or evidence that any of the Plaintiffs reviewed, acknowledged, signed, or otherwise manifested intent to be bound by the arbitration clause supposedly contained in a separate AAD webpage. While the Declaration goes on to explain that "The 'Account Agreement and Disclosure' hyperlink would bring the applicant to the relevant account agreement containing the arbitration provision," No. 929-6 at ¶¶ 8–13, no such evidence is presented by MidFirst in support of the assertion that Plaintiffs accessed the link. Specifically, it is unclear whether Plaintiffs, who signed up online with either MidFirst or Vio Bank, were required to click through the linked documents—such as the AAD—in order to proceed, or whether the Plaintiffs were able to hit "Continue" without first being stopped by any of the prompts.

---

[10] Each of the Plaintiffs applied online through Vio Bank, except for Dudurkaewa, who applied online through MidFirst Bank.

011175-35/2668063 V1

MidFirst relies on *Hancock v. American Telephone & Telephone Co.* and *Smith v. Fed Ex* for the propositions that Plaintiffs should be bound to the AAD, however both cases are distinguishable. In *Hancock v. American Telephone & Telephone Co.*, technicians provided plaintiffs with both physical copies of the terms of service and allowed plaintiffs to review the terms of service on their laptops before the plaintiffs were prompted to click either "I Agree" or "I Reject" [to the terms of service] to proceed with the registration process. 701 F.3d 1248, 1254 (10th Cir. 2012). Here, MidFirst does not explain whether Plaintiffs received and/or reviewed the AAD before they clicked the "Continue" button, which, in and of itself, is less conspicuous than Hancock's "I Agree" button. Moreover, the operative language replied upon by MidFirst in *Hancock* says that "*if* a clickwrap agreement gives a consumer reasonable notice of its terms and the consumer affirmatively manifests assent to the terms, the consumer is bound by the terms." *Id.* at 1256 (emphasis added). In the present case, MidFirst failed to give Plaintiffs reasonable notice of its terms, as any mention to an arbitration provision was neither overt nor conspicuous.

MidFirst's reliance on *Smith v. Fed Ex* is similarly distinguishable, as the plaintiff introduced "no genuine dispute of material fact regarding the existence of an arbitration agreement or Plaintiff's failure to comply with the agreement." No. CIV-22-440-D, 2022 WL 2819142, at *5 (W.D. Okla. July 19, 2022). By contrast, the Plaintiffs before this Court contest the validity of the arbitration agreement given their lack of proper notice, which is required in order to manifest assent to the AAD and be bound by its terms. *See, e.g.*, Ex. 4, Decl. of Strucke ¶¶ 3-6.

011175-35/2668063 V1

Simply put, MidFirst's "Accept Disclosures" screen failed to adequately notify Plaintiffs, in an objectively clear and conspicuous manner, that by clicking the "Continue" button they were agreeing to be bound by the AAD and any corresponding arbitration provision.[11]

MidFirst similarly contends that Plaintiff De Medicis agreed to arbitration via Monifi's online portal (a now discontinued division of MidFirst Bank). ECF No. 929 at 38-39. Again, MidFirst explains that Plaintiff De Medicis would have had to input his information and then navigate the "Disclosures" screen, which instructs users to click on three different buttons in order to proceed to the next screen. ECF No. 929-6 at ¶¶ 14-16. *Nowhere* on the "Disclosures" screen does it mention arbitration. MidFirst contends, similar to its contentions for Plaintiffs Dudurkaewa, Strucke, Strother, and Rubenstein, that the "'Terms and Conditions & Privacy Notice' hyperlink would bring the applicant to the relevant account agreement containing the arbitration provision," ECF No. 929-6 at ¶¶ 16, however, MidFirst fails to provide support evidencing that Plaintiff De Medicis accessed the links, which, while underlined, were in the same font color and size as the preceding text. *Id.* at Ex. C. Without any meaningfully distinguishable features, the hyperlinks presented by MidFirst may not have stood out to Plaintiff De Medicis. Similar circumstances arose in *Eakins v. Whaleco Inc.*, where the court found that defendant's "Terms of Use" hyperlink, which "appear[ed] in grey font against a white backdrop … [were] neither remarkable nor present[ed] with the traditional hallmarks of hyperlinked text." No. CIV-23-560-J, 2024 WL 1190766, at *4 (W.D. Okla. Mar. 5, 2024). In calling upon language from the First, Seventh, and Ninth Circuits, the court in *Eakins* noted that the placement and lack of distinguishability of the hyperlink led to

---

[11] Defendants also cite to *Eubanks v. Gasbuddy, LLC*, No. 22-cv-10334-ADB, 2022 WL 16963807, at *2 (D. Mass. Nov. 16, 2022) (Burroughs, J.), which is distinguishable because while there was a hyperlinked under the text, MidFirst failed to demonstrate that Plaintiffs were able to proceed past the screen if they failed to click the links.

011175-35/2668063 V1

defendants failing the conspicuous test. *See id.*; *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 857 (9th Cir. 2022) ("A web designer must do more than simply underscore the hyperlinked text in order to ensure that it is sufficiently set apart from the surrounding text. Customary design elements denoting the existence of a hyperlink include the use of a contrasting font color (typically blue) and the use of all capital letters, both of which can alert a user that the particular text differs from other plain text in that it provides a clickable pathway to another webpage." (internal citation and quotation marks omitted)); *Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 63 (1st Cir. 2018) ("While not all hyperlinks need to have the same characteristics, they are commonly blue and underlined." (internal quotation marks omitted)).

The same reasoning should apply here, as MidFirst's hyperlinked language was grey—not brightly colored—against a white backdrop, appeared in standard lettering—not all capitalized letters—and was dwarfed by MidFirst's bright orange "CONTINUE" button at the bottom of the screen. ECF No. 929-6, Ex. C. Without clear indication as to the importance of the AAD, including any mention of an arbitration agreement, MidFirst failed to bind Plaintiff De Medicis to the arbitration agreement, as he lacked proper intent to enter into such an agreement.

Finally, MidFirst claims that Plaintiffs Linman and child L.L. filled out paper applications at a MidFirst Bank location and were provided a copy of MidFirst Bank's Account Agreement and Disclosures. ECF No. 929 at 39-40. MidFirst quotes language referring to an acknowledgement that "[Plaintiffs] have received a copy of MidFirst Bank's Account Agreement and Disclosure," (*id.*); however, that language is buried in the middle of a large, single-spaced block of small text on the MidFirst Bank Account Signature Card, amongst other language regarding applying for

membership with MidFirst, and there is no mention of arbitration. *See* ECF No. 929-6 at 149-50.[12]

MidFirst further asserts that "consistent with MidFirst Bank's ordinary and routine business practices, [the Plaintiffs] would have received such a copy [of the Bank's AAD]." ECF No. 929 at 40. Nevertheless, MidFirst fails to provide evidence or facts regarding its "ordinary and routine business practices" such as: to what extent, if any, MidFirst's Surprise, Arizona location (where Plaintiff Linman and child L.L. applied) follows the standard practice or deviates at all; whether MidFirst gives customers an opportunity to review the Agreements and Disclosures containing an arbitration clause; how much time new customers are given to review and sign the documents, and whether MidFirst branch employees ever show new customers the arbitration clause in the Agreements and Disclosures or otherwise mention arbitration during the application process. MidFirst attempts to bind Plaintiff Linman and child L.L. to an arbitration clause in a separate document that is vaguely referred to in a signature card, among other boilerplate, miniature text.

This is insufficient to demonstrate either Plaintiff Linman or child L.L.'s manifestation of intent to be bound to the arbitration clause, especially without the benefit of limited discovery into MidFirst's "ordinary and routine business practices" at the Surprise, Arizona location. *See Quazilbash v. Wells Fargo & Co.*, No. 09-CV-0652-CVE-FHM, 2010 WL 1643778, at *2 (N.D. Okla. Apr. 22, 2010) (denying motion to compel arbitration where a genuine dispute of material fact "regarding whether the plaintiff entered into the account agreement" was at issue).

---

[12] Unlike the plaintiffs in *Hancock* who had both physical and electronic copies provided to them in order to register for the service, it is unclear whether Plaintiffs Linman and child L.L. received physical copies of the AAD when they signed up for MidFirst Bank. *See* 701 F.3d at 1257 (noting that defendants would provide customers with a printed copy of the terms *and* give customers an opportunity to review the terms before requiring plaintiffs to click "I Acknowledge" on the web application). MidFirst does not provide a clear enough explanation of its "ordinary" business practices to satisfy *Hancock*.

011175-35/2668063 V1

### 4.    There is no agreement to arbitrate between Pathward and Plaintiffs Alcott, Cantrell, Fields, and Kent.

Federal courts apply state law principles to determine whether an arbitration agreement is valid. An enforceable contract under the laws of Illinois, for Plaintiffs Cantrell and Kent, Florida for Plaintiff Fields, and New Jersey for Plaintiff Alcott, follow basic contract formation principles of offer, acceptance, consideration.[13] Here, there was no meeting of the minds or mutual assent to the terms of the contract as required by each states' law. *Acad. Chi. Publishers v. Cheever*, 144 Ill.2d 24, 161 Ill. Dec. 335, 578 N.E.2d 981, 984 (1991); *Rionda v. HSBC Bank U.S.A., N.A.*, No. 10-20654-CIV, 2010 WL 5476725, at *8 (S.D. Fla. Dec. 30, 2010); *West Caldwell v. Caldwell*, 26 N.J. 9, 24–25, 138 A.2d 402 (1958).

The party seeking to compel arbitration bears the burden of production to demonstrate a written agreement for arbitration exists. *Soto-Fonalledas v. Ritz-Carlton San Juan Hotel Spa & Casino*, 640 F.3d 471, 474 (1st Cir. 2011); *see also Khath v. Midland Funding, LLC*, 334 F. Supp. 3d 499, 518 (D. Mass. 2018) (criticizing company's use of "exemplar" evidence to demonstrate an agreement to arbitrate).

Here, Defendant Pathward did not meet its burden to prove a valid agreement to arbitrate exists. Defendant Pathward provides no evidentiary support showing the Plaintiffs were aware of

---

[13] An enforceable contract under Illinois law, applicable to Plaintiffs Cantrell and Kent, requires "an offer, acceptance, consideration, and mutual assent." *Nat'l Prod. Workers Union Ins. Tr. v. Cigna Corp.*, 665 F.3d 897, 901 (7th Cir. 2011). For Plaintiff Fields, the elements of a contract under Florida law include "(1) [an] offer; (2) acceptance; (3) consideration; and (4) sufficient specification of the essential terms." *Presidio, Inc. v. Feen*y, 384 So. 3d 209, 211 (Fla. Dist. Ct. App. 2024). Additionally, "the parties' purported agreement must evidence a meeting of the minds regarding the essential terms of the contract." Finally, for Plaintiff Alcott a contract in New Jersey requires an offer, acceptance, and must be sufficiently definite "that the performance to be rendered by each party can be ascertained with reasonable certainty." *Weichert Co. Realtors v. Ryan*, 128 N.J. 427, 435, 608 A.2d 280, 284 (1992) (quoting *West Caldwell v. Caldwell*, 26 N.J. 9, 24-25, 138 A.2d 402 (1958)).

011175-35/2668063 V1

a contract or agreed to terms including an arbitration provision. Defendant Pathward provides two declarations to support its Motion to Compel Arbitration and Stay Litigation. *See* Decl. of Nathan Rigney, ECF No. 929-7, and Decl. of Bobbie Crew, ECF No. 929-8. The Rigney Declaration includes five exhibits of purported "exemplar screenshots" that Pathward claims Plaintiffs viewed at various times under different log in scenarios when logging into either their MyBlock mobile application or the *www.hrblock.com* website and a copy of the "Online and Mobile Banking Agreement" while the Crew Declaration includes zero exhibits. Pathward also claims "according to business records" all four Plaintiffs accepted an "Online and Mobile Banking Agreement." ECF No. 929-7, Decl. of Rigney at ¶ 8. Instead of producing the referenced business records or any evidence showing Plaintiffs did in fact agree to any arbitration provision or class action waiver, Defendant seeks to rely on screenshots with no actual connection to Plaintiffs. *See Khath*, 334 F. Supp. 3d at 518 (finding exemplar agreement "insufficient evidence" of an agreement to arbitrate). Defendant Pathward also alleges Plaintiffs "agreed to arbitration on numerous other occasions…" in a footnote, but again did not provide any evidence or documentation to support this claim. ECF No. 929 at 21, n.11; ECF No. 929-7 ¶ 9, n. 1.

Plaintiffs, on the other hand, do not recall reviewing or agreeing to the "Online and Mobile Banking Agreement" Defendant relies on. *See* Ex. 6, Decl. of Alcott ¶ 6; Ex. 7, Decl. of Cantrell ¶ 7; Ex. 8, Decl. of Fields ¶ 7; Ex. 9, Decl. of Kent ¶ 8. Plaintiffs' declarations create a genuine issue of material fact such that ruling on the issue pursuant to the evidentiary standard would be inappropriate, now.

Additionally, Defendant Pathward's alleged clickwrap contract of adhesion is not valid to compel arbitration. To assess clickwrap agreements courts look to the design, for example how a button or check box is labeled, the use of color or formatting such as all caps or bold to call

-25-

attention to terms, and what a "reasonable internet user" would conclude are the terms of the agreement. *See Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 403 (E.D.N.Y. 2015) (Defendant did not "make an effort to draw [the consumer's] attention to its 'terms of use'", by failing to (i) inform the consumer that the terms were a contract, (ii) use all caps, (iii) refer to the terms of use as "important" and (iv) ask the consumer to "please read" the terms); *see also Applebaum v. Lyft*, No. 16-cv-07062 (JGK), 2017 WL 2774153, at *7-8 (S.D.N.Y. 2017) ("… [T]he classification of an online agreement does not conclude the inquiry, nor does the fact a consumer may have clicked a box … A reasonable consumer would not have understood that the light blue 'Terms of Service' hyperlinked to a contract for review…Courts have required more than mere coloring to indicate the existence of a hyperlink to a contract."). The alleged "exemplar screenshots" provided showed Defendant Pathward's pop up screen design did not put Plaintiffs on reasonable notice regarding the terms of service and arbitration provision. The pop-up did not display the terms and conditions, and instead only provided the name of the alleged agreement in a different color. ECF 929-7, Exs. 2-6. The existence of the terms were not reasonably communicated to the user and reasonable users may not have realized the terms were available to review via hyperlink. *See Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1035 (7th Cir. 2016) ("Where the terms are not displayed but must be brought up by using a hyperlink, courts ... have looked for a clear prompt directing the user to read them"). Therefore, the court should find this contract unenforceable.

> **B.    Two Defendants did not follow their own arbitration procedures to trigger arbitration.**

>> **1.    Cadence Bank waived its right to demand arbitration by ignoring the terms of its purported agreement.**

As a threshold matter, the Cadence Arbitration Agreement does not actually mandate arbitration. Instead, it states that "either you or the Company ***can choose*** to have that dispute resolved by binding arbitration." ECF No. 929-3, Decl. of Sparks, Ex. B at 3 (emphasis added). In

other words, arbitration is not mandatory, and it is not self-executing. Moreover, a party must "choose" to arbitrate in a specific way—"by giving written notice of the intention to arbitrate to the other party" through a "written demand." *Id.*; *Adams v. Greenpoint Credit, LLC*, 943 So. 2d 703, 708 (Miss. 2006) ("[A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.") (quotations omitted).

Plaintiffs Calvin Adams, Tammy Pratt, and Latrice Triplett elected to proceed against Cadence in federal court, and Cadence has not followed its own arbitration procedure to deprive this Court of jurisdiction to hear Plaintiffs' claims. Cadence never gave written notice of its intention to arbitrate Plaintiffs' claims, or served any written demand, prior to filing its motion. Under Mississippi law, a party can waive the right to enforce an arbitration provision by failing to adhere to the terms set forth in the provision. *Sanderson Farms, Inc. v. Gatlin*, 848 So. 2d 828, 837 (Miss. 2003). "[W]aiver may be express or it may be implied when the party actively participates in litigation or acts inconsistently with its rights to proceed with arbitration." *Id*. Particularly when viewed in light of the onerous prerequisites that Cadence Bank requires of its customers prior to arbitration, it would be perverse to allow Cadence to invoke mandatory arbitration without adhering to those same terms. *See Bank of Indiana, Nat'l Ass'n v. Holyfield*, 476 F. Supp. 104, 110 (S.D. Miss. 1979) (A "one-sided agreement whereby one party is deprived of all the benefits of the agreement or left without a remedy" is an unenforceable arbitration agreement). Cadence's failure to choose arbitration constitutes a waiver. *B.C. Rogers Poultry, Inc. v. Wedgeworth*, 911 So.2d 483, 487-88 (Miss. 2005) ("The Supreme Court has also said that, "section 4 of the FAA does not confer a right to compel arbitration of any dispute at any time; it confers only the right to obtain an order directing that '*arbitration proceed in the manner provided*

*for in [the parties'] agreement.*') (emphasis in original) (quoting *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986)).

### 2. Pathward did not meet the requirements in its purported agreement to trigger arbitration, either.

In addition to the fact that Pathward has not provided any evidence that a valid agreement exists, Pathward further did not meet the requirements set by the "Online and Mobile Banking Agreement" agreement to trigger arbitration. Specifically, per the "Online and Mobile Banking Agreement" Section 6.2 (A)-(B), Defendant Pathward was required to: (1) send a pre-arbitration notice of dispute and (2) hold an informal settlement conference prior to any arbitration proceeding. This did not happen. *See* Ex. 6, Decl. of Alcott ¶¶ 12-13; Ex. 7, Decl. of Cantrell ¶¶ 12-13; Ex. 8, Decl. of Fields ¶¶ 13-14; Ex. 9, Decl. of Kent ¶¶ 14-15.

### IV. THE ARBITRATION CLAUSES ARE UNENFORCEABLE BECAUSE THEY ARE UNCONSCIONABLE

Each of the purported arbitration contracts at issue here present serious problems related to unconscionability, which also prevent their enforcement.

### A. AMC's arbitration clause is limitless in scope and duration.

First, if the Court were to find that AMC's interpretation of the effect of its arbitration agreement's terms are correct regarding the nearly unlimited scope and infinite duration of the agreement (*i.e.,* if the Court finds that there was a "meeting of the minds"), then the agreement should be found to be unenforceable because it is unconscionable. *See Wille v. Southwestern Bell Tel. Co.*, 549 P.2d 903, 906 (Kan. 1976) ("If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract" quoting Kan. Stat. Ann. § 84-2-302). "Traditionally, companies only attempted to mandate arbitration of disputes that were connected to the contract that included the arbitration provision (the 'container contract')… . Now, however, drafters have become more

-28-

ambitious. In rising numbers they have started to experiment with what [can be called] 'infinite' arbitration agreements" that do not contain any substantive or temporal limitations. *See* D.Horton, *Infinite Arbitration Clauses*, 168 U. Pa. L. Rev. 633, 639 (2020). *See also McFarlane v. Altice USA, Inc.*, 524 F. Supp. 3d 264, 275 (S.D.N.Y. 2021) (noting that most of the case law addressing infinite arbitration clauses "has taken a jaundiced view of the argument that they should be enforced according to their terms."). AMC appears to be arguing here that plaintiffs agreed to an "infinite arbitration agreement."

Adopting AMC's argument—that the employment arbitration agreement should cover the conduct alleged here—demonstrates why the agreement is unconscionable. In *Aiken v. World Finance Corp.*, 644 S.E.2d 705 (S.C. 2007), the South Carolina Supreme Court considered an analogous argument and refused to compel arbitration. In *Aiken*, the plaintiff borrowed money from World Finance and the loan agreement included an arbitration contract that covered claims "arising out of any prior or future dealings between lender and borrower." *Id.* at 707. Two years after the debt was paid off, World Finance personnel used the plaintiff's social security number to take out loans in his name and steal the proceeds. When Mr. Aiken sued World Finance, it argued that Akin's lawsuit "aros[e] out of" the parties "prior dealings" because his finance application gave the World Finance employees "access to [his] information in order to carry out their crimes." *Id.* at 708. Without denying that the plain language of the arbitration clause would have covered Mr. Aiken's complaint, the South Carolina Supreme Court refused to send the case to arbitration. Instead, the court held that "even the most broadly-worded arbitration agreements" do not govern conduct that is so extreme that it is "unforeseeable to a reasonable consumer in the context of normal business dealings." *Id.* at 709. *See also Arnold v. Burger King*, 48 N.E.3d 69, 72 and 78 (Ohio Ct. App. 2015) (court refused to compel arbitration of workplace rape claim even though

-29-

employment arbitration agreement covered "events outside the scope of [the plaintiff's] employment" (emphasis omitted)); *Telecom Italia, SPA v. Wholesale Telecom Corp*., 248 F.3d 1109, 1115 (11th Cir. 2001) (court denied motion to compel arbitration based on fact that claim at issue was not an immediate, foreseeable result of the performance of contractual duties).

Analogous to Plaintiffs' claims against AMC, the claim in *Aiken* was that the defendant failed to properly protect the Plaintiff's personal information, allowing for it to be misappropriated after the relationship between the parties ended, by criminal actors (the principal difference being who were the actors – in *Aiken* it was rogue employees, here it was an outside group of cyber-criminals). As in *Aiken*, *Arnold*, and *Telecom Italia*, the arbitration agreement here should not be applied because it was unforeseeable to a reasonable employee at the time of contracting that the conduct of AMC at issue here (AMC's failure to secure the personal information of former employees and the intervening criminal activity of a Russian hacker collaborative) would require the employee to arbitrate a claim relating to AMC's failure to protect their personal information after their employment relationship ended.

Another instructive case is *Jones v. Halliburton*, 583 F.3d 228 (5th Cir. 2009), where the Fifth Circuit affirmed that an employment contract that contained an arbitration agreement could not be applied to compel arbitration of criminal conduct outside the bounds of the employment relationship. In that case, the employee had executed an employment contract that included an arbitration clause requiring arbitration of claims "related to [her] employment" including personal injury claims "arising in the workplace." *Id*. at 230. The plaintiff alleged that she had been sexually assaulted by her co-workers and then falsely imprisoned by her employer. When she sued, the defendant employer moved to compel arbitration. *Id*. at 240. The court denied the motion to compel for several claims, noting that "what allegedly occurred would not be 'related to' Jones'

-30-

employment" and " d[id] not 'touch matters' related to her employment, let alone have a 'significant relationship' to her employment contract." *Id*. at 241. As in *Jones*, the criminal hacking of AMC's computer systems and the misappropriation of former employees' personal information from AMC's computer system is not "related to" their status as employees who had worked at AMC movie theaters, nor does the criminal data breach here have a "significant relationship" to their former employment status.

As noted above, it would be unconscionable to interpret the contract requiring arbitration of claims *related to the employment relationship* so broadly that it would require arbitration of claims due to post-employment criminal activity directed at AMC's inadequate computer security systems. In *In re Jiffy Lube Int'l, Inc.*, 847 F. Supp. 2d 1253, 1262 (11th Cir. 2012) the Eleventh Circuit explained that such a broad interpretation of an arbitration agreement would result in an unconscionable (and therefore unenforceable) contract. In that case, the plaintiffs had entered into a contract requiring arbitration of "any and all disputes, controversies or claims between [the defendant] and you." *Id*. at 1262. Defendant had violated the TCPA by harvesting phone numbers of customers and then sending them spam messages. The Court refused to compel arbitration based on the fact that the claim at issue regarding the misappropriation of the plaintiff's personal information had so little in common with the contractual services. The Court noted that the arbitration agreement was so broad that it was likely unconscionable, observing that the defendant was asking the court to "construe this agreement narrowly enough to avoid invalidation, but broadly enough to encompass the claims at issue in this case." *Id*. at 1263. AMC appears to be trying to thread the same needle by arguing that Plaintiffs' data breach claims are subject to arbitration. However, in actuality AMC is confronted with a Hobson's choice – either the arbitration agreement does not apply to Plaintiffs data breach claims because they have nothing in

-31-

common with the employment relationship, or AMC's interpretation of the scope of the arbitration agreement is so overbroad that it is unconscionable and invalid. Under either analysis, the result is the same: Plaintiffs' data breach claims against AMC are not subject to arbitration.

Setting aside the overbroad substance of the AMC arbitration agreement, the fact that the agreement provides that it will remain in effect even after the employment relationship ends without any expiration date makes it "less a contractual provision and more a kind of arbitration servitude." Horton, 168 U. Pa. L. Rev. at 640. Allowing a single clause in a contract where Plaintiffs had no ability to negotiate or vary the terms in AMC's take-it-or-leave-it employment contract to waive Plaintiffs' right to access the courts forever would do violence to the tenet that arbitration is consensual. As early as 1876, the Mississippi Supreme Court held that "[C]ontracts … will not be enforced as imposing an eternal and never-ending burden." *Echols v. New Orleans, Jackson & Great N. R.R. Co.*, 52 Miss. 610, 614 (1876). Here, at a minimum, the arbitration agreement should be interpreted to allow for continuing arbitration of claims that arise from conduct occurring during (and in connection with) plaintiffs' employment but it should not be interpreted to cover a post-employment data breach claim that arises post-employment from AMC's negligence and the criminal activity of third parties. *See, e.g., Poore v. Simpson Paper Co.*, 566 F.3d 922, 927 (9th Cir. 2009) ("[W]here the contract at issue has expired, the parties are 'released … from their respective contractual obligations' and any dispute between them cannot be said to arise under the contract" (citation omitted)); *Smith v. Steinkamp*, 318 F.3d 775, 778 (7th Cir. 2003) ("an agreement requiring [parties] to arbitrate disputes arising out of future agreements … might be thought unconscionable.").

### B.    Franklin Mint's terms are unconscionable.

To invalidate or bar enforcement of a contract based on unconscionability under Pennsylvania law, the party challenging the contract must show both an absence of meaningful

-32-

choice, also referred to as procedural unconscionability, and contract terms that are unreasonably favorable to the other party, known as substantive unconscionability. *Kohlman v. Grane Healthcare Co.*, 2022 PA Super 118, 279 A.3d 42, 48 (2022). Unconscionability is assessed under a sliding-scale approach, with a *lesser* degree of substantive unconscionability required where the procedural unconscionability is very high. *Id*.

For all the reasons discussed in Section III.A.2., *infra*, Plaintiffs Bronson, Thompson, Harris, and Brown lacked a meaningful choice regarding Franklin Mint's arbitration clause when it was forced upon Plaintiffs through supposed mailings and account creation situations devoid of a meaningful opportunity to review, understand, and negotiate the arbitration clause. Franklin Mint tries to force upon them classic adhesion terms. Franklin Mint's arbitration clause is also substantively unconscionable because it imposes unfavorable terms, including: (1) the costs and expenses of the arbitration proceeding, including the arbitrator's fees, shall be borne by the nonprevailing party, unless otherwise required by law; and (2) waivers of the right to a jury trial and class action procedures. The prospect of increased costs for the consumer is sufficient for a substantive unconscionability finding. *See id*. at 51 ("imposing that further expense for litigation by an individual is sufficiently unreasonably favorable to the nursing home to satisfy the requirement of substantive unconscionability when coupled with the high degree of procedural unconscionability that is present here").

## C.    MidFirst's contracts are adhesive and unconscionable.

In *Barnes v. Helfenbein*, the Supreme Court of Oklahoma held that "[t]he basic test of unconscionability of a contract is whether under the circumstances existing at the time of making of the contract, and in light of the general commercial background and commercial needs of a particular case, clauses are so one-sided as to oppress or unfairly surprise one of the parties." 548 P.2d 1014, 1020 (Okla. 1976). "Unconscionability has generally been recognized to include an

absence of meaningful choice on the part of one of the parties, together with contractual terms which are unreasonably favorable to the other party." *Id.*

As previously detailed above in Section III.A.3., *infra*, the inconspicuous inclusion of MidFirst's arbitration clause in the AAD is both oppressive and unfairly binds Plaintiffs to an agreement in which they were never aware of, nor knowingly agreed to, in the first place. MidFirst failed to afford Plaintiffs Dudurkaewa, Rubenstein, Linman and child L.L., Strother, Strucke, and De Medicis a meaningful opportunity to opt out of the agreement, by requiring that Plaintiffs to mail a written notice of their intent within thirty (30) days of opening the account. Any mention of the opt-out language is buried deeply within the agreement and would be difficult to ascertain by a reasonable individual. Furthermore, MidFirst's arbitration clause is also substantively unconscionable because it waives jury trials and class claims, and ultimately leaves Plaintiffs defenseless in any instance of MidFirst's wrongdoing. *See Telum v. E.F. Hutton Credit Corp.*, 856 F.2d 835, 837 (10th Cir. 1988) (noting that "[b]oth the United States Supreme Court and [the Tenth Circuit Court of Appeals] have held that allegations of fraud in the inducement relating specifically to an arbitration provision may suspend application of [jury waiver provisions].").

### D.    Cadence Bank's contract of adhesion is unconscionable under Mississippi law.

Additionally, as an unconscionable contract of adhesion, the facially oppressive terms of the Cadence Arbitration are presumptively invalid under Mississippi law. Contracts of adhesion are those that are "drafted unilaterally by the dominant party and then presented on a 'take-it-or-leave-it' basis to the weaker party who has no real opportunity to bargain about its terms … usually prepared in printed form.'" *Covenant Health & Rehab. of Picayune, LP v. Est. of Moulds ex rel. Braddock*, 14 So. 3d 695, 701 (Miss. 2009) (quoting *East Ford, Inc. v. Taylor*, 826 So.2d 709, 716 (Miss. 2002)). A finding that arbitration was presented in a contract of adhesion "makes an argument targeting a provision for a substantive unconscionability review easier to prove" and

-34-

"can make a facially oppressive term presumptively invalid." *Id*. The Supreme Court of Mississippi further explained the standard for substantive unconscionability:

> Under "substantive unconscionability, we look within the four corners of an agreement in order to discover any abuses relating to the specific terms which violate the expectations of, or cause gross disparity between, the contracting parties." *Stephens*, 911 So.2d at 521. Substantive unconscionability is proven by oppressive contract terms such that "there is a one-sided agreement whereby one party is deprived of all the benefits of the agreement or left without a remedy for another party's nonperformance or breach...." *Holyfield*, 476 F. Supp. at 110.

*Covenant Health*, 14 So. 3d 695, 699–700 (Miss. 2009).

Here, the excessive hurdles Cadence Bank requires its customers to clear before even *commencing* an arbitration materially prevents their ability to have their claims adjudicated in any forum. The highly unusual three-step process required before a customer can even file an arbitration, including an indefinite time period for Cadence to schedule an in-person settlement conference, provides significant opportunities for Cadence to exhibit undue pressure and avoid any adjudication of the claim by a neutral, in or out of court. Effectively leaving customers "without a remedy for [Cadence]'s nonperformance or breach" fits precisely within the definition of unconscionability used by the Mississippi Supreme Court. *Id.* at 700. The fact that Cadence Bank did not even bother to fulfill these same requirements itself, is even further evidence that they are unconscionable. *Holyfield*, 476 F. Supp. at 110.

### E.    Pathward's arbitration provision is unconscionable and unenforceable.

Class action waivers may be unenforceable as unconscionable "where their inclusion in an agreement was obscured by conduct of the party seeking to obtain the class action waiver…" *Christensen v. Barclays Bank Delaware*, No. 1:18-cv-12280-ADB, 2019 WL 1921710, at *6 (D. Mass. Apr. 30, 2019) (Burroughs, J.) (citing *Skirchak v. Dynamics Research Corp.*, 508 F.3d 49, 60 (1st Cir. 2007)).

011175-35/2668063 V1

Pathward only drops a footnote about the "prior agreements" to arbitrate allegedly entered into with Plaintiffs, which is telling given the circumstances and business practices at issue. Plaintiffs Alcott, Cantrell, and Fields used their Emerald Cards for tax refund advance loans, which they obtained to pay essential bills such as their cell phone, car payments, and other necessities to live and work. *See* Ex. 6, Alcott Decl. ¶ 2; Ex. 7, Cantrell Decl. ¶ 2; Ex. 8, Fields Decl. ¶ 3. Plaintiff Kent used his Emerald Card to obtain his payment from his employment. Ex. 9, Kent Decl. ¶ 3. The Emerald Card was necessary for these Plaintiffs' lives. They had no choice but to sign in order to receive the funds they needed to relieve financial pressure and pay necessary bills.

When Plaintiffs Alcott and Cantrell went to their local H&R Block, the employee handed them a signature pad and stylist pen to provide their signature to obtain the necessary tax refund advance loans, without being provided a document or any text to read prior to signing. *See* Ex. 6, Alcott Decl. ¶ 3; Ex. 7, Cantrell Decl. ¶ 3. The class action waiver and arbitration provisions were concealed from Plaintiffs during these high-pressure situations. Buried in documents the Plaintiffs did not see until after they signed, if at all, plaintiffs did not receive fair notice and the waiver was hidden from them. *See Skirchak*, 508 F.3d at 60-61 (1st Cir. 2007). No Plaintiff recalls reviewing any contract with an arbitration provision, or reviewing or agreeing to any language about arbitration to access their Emerald Card account. Given the necessity of obtaining the funds and the business practice of providing only a signature pad and stylus pen with no information or contract to review prior to signing, the in-person agreements between Plaintiffs and Pathward were unconscionable. Further, as discussed above, any clickwrap agreements containing arbitration provisions were similarly concealed from Plaintiffs and unconscionable.

## V.    QUESTIONS RELATED TO ARBITRABILITY OF CLAIMS

While Plaintiffs can demonstrate issues related to contract formation for each Defendant, issues related to arbitrability also exist for several Defendants.[14]

### A.    The Court, not an arbitrator, decides the enforceability of the Cadence Bank arbitration clause.

Defendant Cadence Bank argues that as to "the enforceability of the … arbitration provisions, those questions are for the arbitrators." ECF No. 929 at 46. Cadence specifically argues that "the Cadence Arbitration Agreement has a clear and unmistakable provision delegating issues regarding the 'validity, interpretation, scope or enforceability of this Agreement or the interpretation or scope of the Arbitration Clause' to the arbitrator." ECF No. 929 at 47 (citing Sparks Decl. Exs. B at 3, D at 3, F at 3). And while that language does appear in the Cadence Arbitration Agreement, the issue is not "clear and unmistakable," because Cadence omits entirely from its discussion the language which appears only two paragraphs later and which says *exactly the opposite*.

The language conveniently omitted from Defendants' brief, but which appears on the following page of the Cadence Arbitration Agreement, reads "*Notwithstanding anything to the contrary in this Agreement*, *any dispute regarding* the prohibitions in this paragraph or *about the enforceability of the arbitration clause shall be resolved by a court and <u>not</u> by the arbitrator(s).*" Sparks Decl. Exs. B at 4, D at 4, F at 4 (emphasis added). Therefore, at best, the Cadence Arbitration Agreement is ambiguous about who determines arbitrability, and it cannot therefore

---

[14] For Pathward, if there are binding and enforceable agreements, the Court decides "issues relating to the arbitrability of disputes and the validity, enforceability, and scope of this Arbitration Agreement, including the interpretation of and compliance with Sections 6.2, 6.4, and 6.6 below," not the arbitrator.  *See* Section 6.1.

011175-35/2668063 V1

be said that there was a "clear" agreement for the arbitrator to decide enforceability. Alternatively, the only way to read the two clauses as consistent is to give life to the "Notwithstanding anything to the contrary in this Agreement" language that directly precedes the second clause, and thereby render the agreement that "the enforceability of the arbitration clause shall be resolved by a court and not by the arbitrator(s)" controlling over the contrary language that Defendants cite in their brief. Either way, the result is the same—Cadence's argument that the parties agreed arbitrability would be determined by the arbitrator fails.

### B.       It is undisputed that the equitable claims against AMC are not subject to arbitration.

Setting aside the validity and scope of the arbitration agreements, AMC's request for a broad stay of all litigation against it should be denied because it is undisputed that even if the arbitration agreement is valid, Plaintiffs' equitable claims are not subject to arbitration. When a district court is confronted with the issue of whether or not to grant a discretionary stay with respect to non-arbitrable claims, "arbitration and federal litigation should proceed simultaneously absent compelling reasons to stay the litigation." *See Chang v. Lin*, 824 F.2d 219, 223 (2d Cir. 1987); *Tedeschi v. Applied Concepts*, No. 1:06CV2411, 2007 WL 184734 (N.D. Ohio 2007) (discretionary stay denied where non-arbitrable claims were outside the scope of the applicable arbitration clause); *cf. Shalomayev .v Altice USA, Inc.*, No. 21-CV-5540, 2022 WL 2359406, at *9 (E.D.N.Y. June 30, 2022) (noting that court must grant a request for a stay where "*all* claims have been referred to arbitration." (emphasis added)). Stated another way, there is a "heavy presumption" against the deferral of non-arbitrable claims. *Chang*, 824 F.3d at 2223. *See also Pompano-Windy City Partners, Ltd. v. Bears, Stearns & Co., Inc.*, 698 F. Supp. 504, 520 (S.D.N.Y. 1988).

011175-35/2668063 V1

The AMC arbitration agreement includes a section titled "What claims are not subject to mandatory arbitration," wherein it states that "this Agreement does not apply to claims for equitable relief." Accordingly, by its own explicit terms, AMC's Agreement to Arbitrate does not cover Plaintiffs claims seeking equitable relief and, without a contractual provision, AMC cannot assert that Plaintiffs' equitable claims are subject to arbitration. *See Gagne v. Stallion Express, LLC*, No. 4:22-CV-40008-TSH, 2022 WL 17658121, at *2 (D. Mass. Sept. 15, 2022) ("In spite of the strong federal policy favoring arbitration, the Supreme Court has made clear that 'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" (quoting *AT&T Techs., Inc. v. Communs. Workers of Am.*, 475 U.S. 643, 648 (1986) and *United Steelworkers v. Warrior & Gulf Navig. Co.*, 363 U.S. 574, 582 (1960)); *see also Sierra Rutile Ltd. v. Katz*, 937 F.2d 743, 748 (2d Cir. 1991) (noting that FAA rules do not apply to issues that are not referrable to arbitration under an agreement).

Assuming, *arguendo*, that Plaintiffs' non-equitable claims should be referred to arbitration and that, accordingly, trial proceedings as to those claims should be stayed pursuant to FAA Rule 3[15], AMC has not presented the court with any justification (let alone a compelling justification) for why the Court should also stay plaintiffs' non-arbitrable equitable claims pending resolution of the claims subject to arbitration. *See* Kan. Stat. Ann. § 5-429(g) ("If a claim subject to arbitration is severable, the Court may limit the stay to that claim."). Accordingly, because AMC lacks the ability to compel arbitration of Plaintiffs' equitable claims, those claims should be allowed to proceed without undue delay. While AMC has failed to satisfy its burden to justify a stay, Plaintiffs

---

[15] "Under § 3 [of the FAA (9 U.S.C.A. § 3)], a party may apply to a federal court for a stay of the trial of an action "upon any issue *referable* to arbitration under an agreement in writing for such arbitration." *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68 (2010) (emphasis added). Notably, the FAA does not require that a stay be entered with regard to any issues that are *not* referrable to arbitration.

011175-35/2668063 V1

(and the other defendants present in the MDL proceedings) may be prejudiced if the Court does not allow for discovery to proceed because a stay means that discovery and pretrial briefing as to AMC cannot be coordinated with discovery and pretrial proceedings against the other defendants, requiring Plaintiffs and potentially others to engage in duplicative discovery with regard to AMC once the stay is inevitably lifted.

Conversely, because Plaintiffs' equitable claims are non-arbitrable and because they are not "dependent" in any way whatsoever on the outcome of the claims that may be subject to arbitration, whatever the outcome of the arbitration, AMC is not in any way prejudiced by allowing Plaintiffs to pursue their equitable claims against AMC now. Allowing Plaintiffs to go forward with their claims against AMC now will not implicate the needless expenditure of time, resources and costs by the parties or by the Court. *See Sierra Rutile*, 937 F.2d at 750 (noting even when resolutions of issues in arbitration may be "determinative of issues in the case, the court is required to tailor its stay so as not to prejudice the non-moving litigant unduly."); *Citrus Mktg. Bd. Of Israel v. J. Lauritzen A/S*, 843 F.2d 220, 225 (2d Cir. 1991); *Montauk Oil Transp. Corp. v. Steamship Mut. Underwriting Ass'n (Bermuda), Ltd.*, 859 F. Supp. 669, 679 (S.D.N.Y. 1994).

The fact that Plaintiffs' equitable claims against AMC have been transferred to this court for consolidated proceedings further supports allowing for those claims to proceed. "[T]he goals of economy and efficiency … are hallmarks of" Section 1407 consolidation. *In re Ephedra Prod. Liab. Litig.*, 314 F. Supp. 2d 1373, 1376 (J.P.M.L. 2004). The JPML created this MDL proceeding because it believed that "[c]entralization offers substantial opportunities to streamline pretrial proceedings; reduce duplicative discovery and conflicting pretrial obligations; prevent inconsistent rulings on common *Daubert* challenges and summary judgment motions." *In re MOVEit Customer Data Sec. Breach Litig.*, No. MDL 3083, 2023 WL 6456749, at *2 (J.P.M.L. Oct. 4, 2023). *See*

*also In re Neurontin Mktg., Sales Pracs., & Prod. Liab. Litig.*, 245 F.R.D. 55, 57 (D. Mass. 2007) ("The purpose of a multidistrict litigation consolidation is to avoid duplicative discovery, prevent inconsistent pretrial rulings and conserve judicial resources." Citation omitted). Staying Plaintiffs' equitable claims against AMC will frustrate all of these goals. Accordingly, at a minimum, AMC's request to stay litigation of Plaintiffs' equitable claims should be denied.

**C.     The Court need not reach the question of arbitrability for the other Defendants given that Plaintiffs are contesting whether the Court may enforce the arbitration agreements.**

For the other Defendants, because plaintiffs are challenging the validity of the arbitration agreement itself, the delegation provision contained in the arbitration agreement is not operative and this Court (rather than the arbitrator) is empowered to make the initial determination regarding the legal effect of the arbitration clause. *See Davitashvii v. Grubhub Inc.*, No. 20-cv-3000(LAK), 2023 WL 2537777 (S.D.N.Y. March 16, 2023) (Where a plaintiff challenges the validity of an arbitration clause itself, the issue of arbitrability is decided by the federal court notwithstanding the presence of a delegation clause in the arbitration agreement); *see also Gingras v. Think Finance, Inc.*, 922 F.3d at 126; *Townsend v. Pinewood Social, LLC*, 2024 WL 165790 (M.D. Tenn. April 16, 2024) (court will not compel arbitration where the making of the arbitration contract is at issue); *Revitch v. DIRECTV, LLC*, 977 F.3d 713, 724 (9th Cir. 2020) ("[W]hen the dispute is wholly unrelated to the contract, the FAA is silent; federal courts have no power to compel arbitration." "A party can hardly be said to consent to arbitrate disputes that have nothing at all to do with the subject of the contract the party signed or the [employer-employee] relationship the contract creates."); *Henry Schein Inc. v. Archer and White Sales, Inc.*, 586 U.S. 63, 69 (2019) (noting that "before referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists.").

-41-

## VI.   PLAINTIFFS HAVE RAISED SUFFICIENT QUESTIONS TO WARRANT DISCOVERY INTO THE ENFORCEABILITY OF THE ARBITRATION AGREEMENTS

As demonstrated above, there is ample cause to question the existence and enforceability of Defendants' agreements to arbitrate. Denying Defendants' motion outright would thus be appropriate. Alternatively, given the summary judgment standard required to adjudicate Defendants' motion, Plaintiffs are entitled—at the very least—to targeted discovery related to the contract formation issues Plaintiffs have raised. *See Air-Con, LLC*, 21 F.4th at 176 (holding that "the district court should not rule on the motion to compel arbitration until it resolves any factual disputes that require resolution before it can be determined whether the parties agreed to arbitrate"); *see also Guidotti v. Legal Helpers Debt Resol., L.L.C.*, 716 F.3d 764, 772 (3d Cir. 2013) (finding that "because summary judgment can be supported or defeated by citing a developed record, courts must give the parties adequate time for discovery.") (cleaned up).

Plaintiffs have raised a number of issues related to certain Defendants' "standard practices" related to communication of terms of service, given the vague descriptions provided by Defendants to suggest that Plaintiffs had not only received contractual terms, but had agreed to them. "A restricted inquiry into the factual issues is necessary to properly evaluate whether there was a meeting of the minds on the agreement to arbitrate, and the non-movant *must* be given the opportunity to conduct limited discovery on the narrow issue concerning the validity of the arbitration agreement." *Hoffman*, 2022 WL 782322, at *3 (denying motion to compel arbitration without prejudice and allowing discovery into defendant's arbitration-related assertions, because although plaintiff signed the employment agreement, she avers that she was only allowed minutes to sign without an explanation of the arbitration agreement); *Hine v. LendingClub Corp.*, No. 2:22-CV-00362-CRE, 2022 WL 16950409, at *5 (W.D. Pa. Nov. 15, 2022) (denying motion to compel arbitration without prejudice and allowing discovery into defendant's arbitration-related

011175-35/2668063 V1

assertions, because notice of the arbitration agreement was not reasonably conspicuous and plaintiff's manifestation of assent deemed unambiguous where the agreement was contained in nondescript hyperlinks to the membership agreement and the main webpage with the material terms of plaintiff's loan did not mention arbitration).

First, as to all Defendants, to the extent that the *actual* contracts bearing Plaintiffs' signatures have not been produced, they should be. The production of hypothetical, "exemplar" agreements or screen grabs does not demonstrate that Plaintiffs agreed to arbitrate. *Khath*, 334 F. Supp. 3d at 518. To the extent such agreements cannot be produced, then Plaintiffs should be able to ask the Defendants questions regarding how the records are stored, and how they determined that Plaintiffs allegedly agreed to arbitrate their claims.

Concerning AMC, limited discovery concerning AMC's onboarding process, how much time it provides employees to review agreements and forms, the training that AMC provided its employees to explain the terms of the forms, whether employees could negotiate the terms of their contracts, whether AMC's practice was to not provide copies of any employment agreements, and what policies governed its data minimization and cybersecurity practices for employee data not only addresses the issues from Plaintiff Cooper's Declaration, Ex. 1, but also would assist the factfinder in determining whether AMC actively prevented its employees from understanding the terms of their agreements.

Limited discovery would also be appropriate pertaining to Cadence Bank, such as whether anyone has been able to complete the multiple "hoops" individuals must jump through to begin arbitration, whether Cadence or any of its customers have successfully begun the arbitration process, and the results of those arbitrations would address Plaintiffs' arguments concerning the adhesiveness and unconscionability of the arbitration clause.

-43-

Similarly, limited discovery of Franklin Mint's practices for communicating new terms—including after the purchase of or merger with another institution, how it trains employees to field questions about new terms, whether its mailers were designed to ensure that customers opened them or ignored them, the difficulty of the opt-out process for arbitration, the use of hyperlinks and whether the arbitration clause was easily accessible to users, and how customers would know whether to and where to find Franklin Mint's arbitration clause addresses the concerns Plaintiffs have raised in this brief.

As to MidFirst, understanding how it communicates new terms to customers, its use of hyperlinks and their ease of use and readability, and how customers would know whether to and where to find MidFirst's arbitration clause would address the issues Plaintiffs raise.

Finally, pertaining to Pathward, again, no actual agreements or business records reflecting execution have been produced, just "exemplars." Further understanding the process by which Pathward communicates new policies, including its sign-up practices for new customers, how customers would know whether to and where to find Pathward's arbitration clause, whether Pathward has initiated arbitrations or followed the provisions laid out in its contract with customers, and the results of those arbitrations would also address Plaintiffs' concerns.

These topics of discovery are narrowly-tailored, going directly to the arbitration issues at point in this case. Such discovery is appropriate, and the Court should order it to create a fulsome evidentiary record.

## VII.    CONCLUSION

For the foregoing reasons, the motion of Defendants American Multi-Cinema, Inc. and AMC Entertainment Holdings, Inc. d/b/a AMC Theatres, Cadence Bank, Franklin Mint Federal Credit Union, MidFirst Bank and Midland Financial Co., and Pathward, N.A. to compel arbitration and stay litigation should be denied. In the alternative, Plaintiffs have presented sufficient

-44-

questions of fact to warrant limited discovery into the enforceability of Defendants' arbitration clauses.

Dated: July 3, 2024                                              Respectfully submitted,


                                                                 By: */s/ Kristen A. Johnson*
                                                                      Kristen A. Johnson (BBO# 667261)
                                                                 HAGENS BERMAN SOBOL SHAPIRO LLP
                                                                 1 Faneuil Hall Square, 5th Floor
                                                                 Boston, MA 02109
                                                                 Tel:  (617) 482-3700
                                                                 Fax: (617) 482-3003
                                                                 kristenj@hbsslaw.com

                                                                 *Plaintiffs' Liaison & Coordinating Counsel*

                                                                 By: */s/ E. Michelle Drake*
                                                                      E. Michelle Drake
                                                                 BERGER MONTAGUE, PC
                                                                 1229 Tyler Street, NE, Suite 205
                                                                 Minneapolis, MN 55413
                                                                 Tel:  (612) 594-5933
                                                                 Fax: (612) 584-4470
                                                                 emdrake@bm.net

                                                                 By: */s/ Gary F. Lynch*
                                                                      Gary F. Lynch
                                                                 LYNCH CARPENTER, LLP
                                                                 1133 Penn Avenue, 5th Floor
                                                                 Pittsburgh, PA 15222
                                                                 Tel: ( 412) 322-9243
                                                                 Fax: (412) 231-0246
                                                                 Gary@lcllp.com

                                                                 By: */s/ Douglas J. McNamara*
                                                                      Douglas J. McNamara
                                                                 COHEN MILSTEIN SELLERS & TOLL PLLC
                                                                 1100 New York Avenue NW, 5th Floor
                                                                 Washington, DC 20005
                                                                 Tel: (202) 408-4600
                                                                 dmcnamara@cohenmilstein.com


-45-

011175-35/2668063 V1

By: */s/ Karen H. Riebel*
        Karen H. Riebel
LOCKRIDGE GRINDAL NAUEN PLLP
100 Washington Avenue S, Suite 2200
Minneapolis, MN 55401
Tel:  (612) 339-6900
Fax: (612) 612-339-0981
khriebel@locklaw.com

By: */s/  Charles E. Schaffer*
        Charles E. Schaffer
LEVIN SEDRAN & BERMAN LLP
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Tel:  (215) 592-1500
Fax: (215) 592-4663
cshaffer@lfsblaw.com

*Plaintiffs' Lead Counsel*

By: */s/  Amy E. Keller*
Amy E. Keller
Dicello Levitt
Ten North Dearborn Street, Sixth Floor
Chicago, IL 60602
Tel: (312) 214-7900
akeller@dicellolevitt.com

By: */s/  James J. Pizzirusso*
James J. Pizzirusso
Hausfeld LLP
888 16th Street NW, Suite 300
Washington, DC 20006
Tel: (202) 540-7154
jpizzirusso@hausfeld.com

*Plaintiffs' Law and Briefing Committee Co-Chairs*

-46-

-47-

## CERTIFICATE OF SERVICE

I hereby certify that, on this date, the foregoing document was filed electronically via the

Court's CM/ECF system, which will send notice of the filing to all counsel of record.


Dated: July 3, 2024                              */s/ Kristen A. Johnson*
                                                  Kristen A. Johnson

-47-

011175-35/2668063 V1