# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

IN RE: MOVEIT CUSTOMER DATA

SECURITY BREACH LITIGATION

MDL No. 1:23-md-03083-ADB-PGL

**MEMORANDUM IN SUPPORT OF DEFENDANTS' OMNIBUS MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(1)**

This Document Relates To:

*All Cases*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

BACKGROUND ....................................................................................................................4

      A.      The MOVEit Software. ...................................................................................4

      B.      The MOVEit Incidents. ...................................................................................6

      C.      The Impacted Data. .......................................................................................10

      D.      Plaintiffs' Alleged Injuries...........................................................................10

ARGUMENT ........................................................................................................................12

I.     Plaintiffs fail to plead a particularized and concrete actual or imminent injury-in-fact. ...16

      A.      Certain Plaintiffs rely solely on implausible and conclusory allegations of harm, all of which must be disregarded. ..............................................................16

      B.      The vast majority of Plaintiffs fail to plausibly allege any actual data misuse. ..................................................................................................................19

      C.      Plaintiffs' alleged risk of future harm does not plead injury-in-fact. ...................20

      D.      Plaintiffs' prophylactic costs and mitigation measures do not confer standing. ................................................................................................................26

      E.      Plaintiffs' alleged lost value of PII does not support standing. .............................28

      F.      Plaintiffs' alleged loss of the "benefit of the bargain" does not support standing. ................................................................................................................30

      G.      Plaintiffs' attempts to allege other actual injuries likewise fail to support standing. ................................................................................................................31

II.    Plaintiffs' alleged injuries are not fairly traceable to Defendants' alleged conduct. .........35

      A.      Numerous Plaintiffs fail to plead a plausible connection between the types of data involved in the MOVEit Incidents and their alleged injuries. ..................37

      B.      No alleged injuries from before the date Plaintiffs allege information was posted on the dark web can be fairly traceable to the MOVEit Incidents. ............38

      C.      Plaintiffs do not allege facts making it plausible that their alleged injuries are traceable to any alleged conduct of VCE and VCEC Defendants. ..................41

i

D.      No alleged injury is fairly traceable to the MOVEit Incidents where
        Plaintiffs allege that the data was not published in a usable form. .......................44

E.      Plaintiffs' allegations of spam phone calls, text messages, and emails are
        not fairly traceable to the MOVEit Incidents..........................................................45

CONCLUSION....................................................................................................................................46

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                       **Page(s)**

*Am. Waterways Operators v. United States Coast Guard*,
   613 F. Supp. 3d 475 (D. Mass. 2020) ....................................................................................43

*Antman v. Uber Techs., Inc.*,
   No. 15-cv-01175, 2018 WL 2151231 (N.D. Cal. May 10, 2018)....................................37, 38

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)............................................................................................................43

*Baysal v. Midvale Indem. Co.*,
   78 F.4th 976 (7th Cir. 2023) ...............................................................................................34

*Beck v. McDonald*,
   848 F.3d 262 (4th Cir. 2017) .......................................................................................24, 25

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)............................................................................................................42

*Bland v. Urology of Greater Atlanta, LLC*,
   No. 1:23-cv-132-MLB, 2024 WL 3313348 (N.D. Ga. Mar. 14, 2024) ...........................25, 31

*Blood v. Labette Cnty. Med. Ctr.*,
   5:22-cv-04036, 2022 WL 11745549 (D. Kan. Oct. 20, 2022)..................................30, 31, 38

*Brown v. Brit. Parliament*,
   No. 22-cv-11221, 2023 WL 2898731 (D. Mass. Apr. 11, 2023)..........................................18

*Buchholz v. Meyer Njus Tanick, PA*,
   946 F.3d 855 (6th Cir. 2020) ..............................................................................................35

*Burger v. Healthcare Mgmt. Sols., LLC*,
   No. 23-cv-1215, 2024 WL 473735 (D. Md. Feb. 7, 2024)...............................................30, 37

*Burton v. MAPCO Exp., Inc.*,
   47 F. Supp. 3d 1279 (N.D. Ala. 2014) ................................................................................33

*C.C. v. Med-Data Inc.*,
   No. 21-cv-2301, 2022 WL 970862 (D. Kan. Mar. 31, 2022)...........................................25, 30

*Cal. Ass'n of Physically Handicapped, Inc. v. F.C.C.*,
   778 F.2d 823 (D.C. Cir. 1985)............................................................................................40

*Castro v. N.H. Sec'y of State*,
   ---F. Supp. 3d---, No. 23-cv-416, 2023 WL 7110390 (D.N.H. Oct. 27, 2023),
   *aff'd*, 86 F.4th 947 (1st Cir. 2023) ..................................................................................41

*Chambliss v. Carefirst, Inc.*,
   189 F. Supp. 3d 564 (D. Md. 2016) ...................................................................................30

*Cherny v. Emigrant Bank*,
   604 F. Supp. 2d 605 (S.D.N.Y. 2009).................................................................................31

*Clapper v. Amnesty Int'l USA*,
   586 U.S. 398 (2013)............................................................................................................26

*Dantzler, Inc. v. Empresas Berrios Inventory & Operations., Inc.*,
   958 F.3d 38 (1st Cir. 2020)...........................................................................35, 41, 44, 45

*Dugas v. Starwood Hotels & Resorts Worldwide, Inc.*,
   No: 3:16-cv-00014, 2016 WL 6523428 (S.D. Cal. Nov. 3, 2016) ........................................35

*Engl v. Nat'l Grocers by Vitamin Cottage, Inc.*,
   No. 15-cv-02129, 2016 WL 8578096 (D. Colo. June 20, 2016) ..........................................28

*Equal Means Equal v. Ferriero*,
   478 F. Supp. 3d 105 (D. Mass. 2020), *aff'd,* 3 F.4th 24 (1st Cir. 2021) .................................43

*U.S. ex rel. Est. of Cunningham v. Millennium Lab'ys of Cal., Inc.*,
   713 F.3d 662 (1st Cir. 2013)................................................................................................40

*Fernandez v. Leidos, Inc.*,
   127 F. Supp. 3d 1078 (E.D. Cal. 2015)........................................................................25, 37

*Fraga v. UKG, Inc.*,
   No. 2-cv-20105, 2022 WL 19486310 (S.D. Fla. May 10, 2022)....................................28, 29

*Fudge v. Penthouse Int'l, Ltd.*,
   840 F.2d 1012 (1st Cir. 1988) ..............................................................................................8

*Garland v. Orlans PC*,
   999 F.3d 432 (6th Cir. 2021) ..............................................................................................34

*Greenstein v. Noblr Reciprocal Exch.*,
   585 F. Supp. 3d 1220 (N.D. Cal. 2022) ..............................................................................28

*Greenstein v. Noblr Reciprocal Exch.*,
   No. 21-cv-04537, 2022 WL 17418972 (N.D. Cal. Dec. 5, 2022), *appeal*
   *docketed*, No. 22-17023 (9th Cir. Dec. 30, 2022)..................................................................38

*Gubala v. Time Warner Cable, Inc.*,
    846 F.3d 909 (7th Cir. 2017) ................................................29

*Hainey v. SAG-AFTRA Health Plan*,
    No. 21-cv-012618, 2023 WL 3645514 (D. Md. May 25, 2023), *appeal dismissed*, 2023 WL 7688384 (4th Cir. Nov. 15, 2023) ....................18

*Hammond v. Bank of N.Y. Mellon Corp.*,
    2010 WL 2643307 (S.D.N.Y. June 25, 2010) ..........................33

*Hartigan v. Macy's, Inc.*,
    501 F. Supp. 3d 1 (D. Mass. 2020) ................................27, 28

*Hochendoner v. Genzyme Corp.*,
    823 F.3d 724 (1st Cir. 2016) ........................16, 17, 18, 21, 27

*I.C. v. Zynga*,
    600 F. Supp. 3d 1034 (N.D. Cal. 2022) ..........................31, 32

*In re Illuminate Ed. Data Sec. Incident Litig.*,
    No. 22-cv-1164, 2023 WL 3158954 (C.D. Cal. April 19, 2023)...........31

*Jackson v. Loews Hotels, Inc.*,
    2019 WL 6721637 (C.D. Cal. July 24, 2019) ..........................31

*Katz v. Pershing, LLC*,
    672 F.3d 64 (1st Cir. 2012) ........................4, 27, 30, 35, 36

*Kilgore v. Easterseals-Goodwill N. Rocky Mountain, Inc.*,
    No. 2:22-cv-00728, 2023 WL 4599321 (D. Utah July 18, 2023)...........32

*Kylie S. v. Pearson PLC*,
    475 F. Supp. 3d 841 (N.D. Ill. 2020) ..............................29, 30

*Legg v. Leaders Life Ins. Co.*,
    574 F. Supp. 3d 985 (W.D. Okla. 2021) ..............................32

*Luce v. LVNV Funding LLC*,
    No. 21-cv-82143, 2023 WL 1472582 (S.D. Fla. Jan. 18, 2023)...........34

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)................................................35, 40

*McCombs v. Delta Grp. Elecs., Inc.*,
    676 F. Supp. 3d 1064 (D.N.M. 2023) ................................37

*In re MOVEit Customer Data Sec. Breach Litig.*,
    MDL No. 3083, --- F. Supp. 3d ---, 2023 WL 6456749 (J.P.M.L. Oct. 4, 2023)...........23

*Park v. Forest Serv. of U.S.*,
205 F.3d 1034 (8th Cir. 2000) ............................................................40

*Perry v. Village of Arlington Heights*,
186 F.3d 826 (7th Cir. 1999) ..............................................................40

*Phillips v. U.S. Customs & Border Protection*,
74 F.4th 986 (9th Cir. 2023) ...............................................................34

*Podroykin v. Am. Armed Forces Mut. Aid Ass'n*,
634 F. Supp. 3d 265 (E.D. Va. 2022) ..............................................29, 30

*In re Practicefirst Data Breach Litig.*,
No. 21-cv-00790, 2022 WL 354544 (N.D.N.Y. Mar. 20, 2023) ..............22, 32

*Quintero v. Metro Santruce, Inc.*,
No. 20-cv-01075, 2021 WL 5855752 (D.P.R. Dec. 9, 2021) .................22, 30

*Reilly v. Ceridian Corp.*,
664 F.3d 38 (3d Cir. 2011)...................................................................27

*Richards v. Duke Univ.*,
480 F. Supp. 2d 222 (D.D.C. 2007) ......................................................18

*Rivera-Marrero v. Banco Popular de Puerto Rico*,
No. 22-cv-1217, 2023 WL 2744683 (D.P.R. Mar. 31, 2023)..............23, 25, 34

*Sallen v. Corinthians Licenciamentos LTDA*,
273 F.3d 14 (1st Cir. 2001)..................................................................40

*In re Sci. Applications Int'l Corp. (SAIC) Backup Tape Data Theft Litig.*,
45 F. Supp. 3d 14 (D.D.C. 2014) ...............................................25, 31, 37, 45

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016)............................................................................12

*Taylor v. UKG, Inc.*,
693 F. Supp. 3d 87 (D. Mass. 2023) ............................................... *passim*

*Trans-Spec Truck Serv. v. Caterpillar, Inc.*,
524 F.3d 315 (1st Cir. 2008)..................................................................8

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)....................................................................12, 16, 24

*Travis v. Assured Imaging LLC*,
No. 20-cv-00390, 2021 WL 1862446 (D. Ariz. May 10, 2021)............24, 32

*In re Uber Techs, Inc., Data Sec. Breach Litig.*,
  No. 18-ML-2826, 2019 WL 6522843 (C.D. Cal. Aug. 19, 2019) .........................................37

*Watterson v. Page*,
  987 F.2d 1 (1st Cir. 1993) ...................................................................................................8

*Webb v. Injured Workers Pharm., LLC*,
  72 F.4th 365 (1st Cir. 2023)..........................................................12, 14, 16, 21, 22, 23, 24, 35

*Whalen v. Michaels Stores, Inc.*,
  689 F. App'x 89 (2d Cir. 2017) ..........................................................................................33

**Rules**

Fed. R. Civ. P. 12 ....................................................................................................4, 5, 8

Fed. R. Civ. P. 12(b)(1) .............................................................................................4, 5

Fed. R. Civ. P. 12(b)(2)..................................................................................................4

Fed. R. Civ. P. 12(b)(5)..................................................................................................4

Fed. R. Civ. P. 12(b)(6)..................................................................................................4

## INTRODUCTION

It has been more than a year since the various data-security incidents allegedly involving the MOVEit Transfer application (the "MOVEit Incidents").[1]  Plaintiffs have had ample time to craft and recraft their allegations—first in the several hundred complaints against Defendants; then again in the 100-plus-page "Common Complaint" filed at the end of May, *see* ECF No. 908; and yet again in the "amended" or new complaints largely filed against the Co-Leads' preferred Defendants and others in June and July.  Despite all of this ink, Plaintiffs still have not alleged facts showing that any of them suffered an "actual or imminent" harm, fairly traceable to any Defendant's conduct, as required to establish Article III standing.  *Taylor v. UKG, Inc.*, 693 F. Supp. 3d 87, 97 (D. Mass. 2023) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)).  Accordingly, all of the complaints in this MDL must be dismissed for lack of subject matter jurisdiction.

Defendants have submitted the following illustrative guides with this motion:

(1) A summary chart cataloguing each Plaintiff's allegations relevant to the Article III standing analysis.  *See* Appendix A ("Summary Chart");[2] and

(2) A flow chart, which outlines how Defendants, through this motion, have applied the legal framework this Court used in *Taylor* to the present proceeding.  *See* Appendix B ("Flow Chart").

---

[1] For purposes of the current Motion, Defendants' references to the MOVEit Incidents refer to the ransomware attacks experienced by certain Non-Progress Defendants.  These are the points at which data was allegedly exposed because, as Plaintiffs allege, Progress licensed an on-premise software solution where it did not hold user data.  Therefore, each unique MOVEit Incident occurred within certain Non-Progress Defendants' environments.

[2] Further demonstratives to assist the Court with its review of Appendix A will be forthcoming.

As shown in the Flow Chart, *see* Appendix B, Plaintiffs' allegations fail to establish standing for at least one of three reasons.

*First,* for at least approximately 90 Defendants, no named Plaintiff bringing claims against that Defendant has plausibly alleged actual misuse of their personal information.  *See* Appendix A, Summary Chart, Column J (showing that 366 of 396 Plaintiffs fail to allege any plausible actual misuse). This widespread failure to allege actual misuse, including from non-reimbursable charges or other fraud, is not surprising.  Rather, this failure flows directly from the facts Plaintiffs actually plead about the MOVEit Incidents.  Plaintiffs assert that the MOVEit Incidents were designed to withhold data from organizations until payment was made; the MOVEit Incidents were *not* designed to use the stolen data to commit identity theft; and the stolen data the threat actor allegedly attempted to post was unorganized and not even downloadable.  *See* Common Complaint ¶¶ 91-92, 177, 217, 225.  Indeed, as Plaintiffs acknowledge, "there is a strong probability that much of the information stolen in the Data Breach has not yet been made available on the black market in a coherent, organized fashion."  *Id.* ¶ 251.

Without plausible allegations of actual misuse against these Defendants, the Plaintiffs suing these roughly 90 Defendants cannot establish an imminent risk of future injury.  As this Court observed in *Taylor*, it was not aware of "any First Circuit caselaw in which a court had established standing [premised on an allegation of increased risk of future injury] without allegations of actual misuse."  693 F. Supp. 3d at 99.  *See* Appendix B, Flow Chart, Step Nos. 1 and 2.

These Plaintiffs' grab-bag of other supposed present injuries does not save their claims.  In *Taylor*, this Court addressed, and rejected, most of these asserted injuries—including lost time and costs of mitigation efforts, invasion of privacy, and loss of value of PII.  *See Taylor*, 693 F. Supp.

3d at 100-01.  Others—including loss of benefit of the bargain, increased spam, reimbursable payment card or bank transactions, and emotional distress—have been repeatedly rejected by courts across the country as insufficient to establish Article III standing.  *See* Appendix B, Flow Chart, Step No. 3.  Accordingly, the Defendants that face no plausible allegations of misuse should be dismissed entirely.

    **Second**, even if the Court finds that at least one named Plaintiff impacted by a particular Non-Progress Defendant's MOVEit Incident alleges plausible actual misuse,[3] the other named Plaintiffs (who do not allege plausible actual misuse) still lack standing.  Although some actual misuse alleged against the same Non-Progress Defendant makes a stronger case that other Plaintiffs impacted by the same Non-Progress Defendant's MOVEit Incident face an imminent risk of harm, other factors weigh against such a finding here.  *See Webb v. Injured Workers Pharm., LLC,* 72 F.4th 365, 375-76 (1st Cir. 2023) (describing three factors for assessing imminent risk of harm).  Specifically, Plaintiffs have not plausibly alleged that the threat actor here had a motive to misuse any individual's data.  *See id.*  Further, many of the MOVEit Incidents did not involve the type of information that may be used to commit actual misuse.  *See id.*  On balance, Plaintiffs who do not plausibly allege actual misuse have not plausibly alleged an imminent risk of future harm, either.  *See* Appendix B, Flow Chart, Step No. 4.  And, again, the grab-bag of other asserted present injuries do not establish standing.  *See id.* Step No. 3.

    **Third**, all Plaintiffs—even those who plausibly allege actual misuse—lack standing for another reason:  They fail to show that their alleged injuries are fairly traceable to a MOVEit Incident.  *See* Appendix B, Flow Chart, Step Nos. 1, 5; Appendix A, Summary Chart, Columns L-

---

[3] As explained below, while in some instances a Plaintiff alleges plausible actual misuse, none of the alleged actual misuse is fairly traceable to any Defendant's MOVEit Incident and should therefore be disregarded for purposes of the standing analysis.

O (summarizing traceability issues).  In many cases, the personal information allegedly exposed in a MOVEit Incident could not possibly have caused the alleged fraud.  In other cases, the alleged injury *predates* the alleged date that personal information may have been published or the complaint is silent on when the injury occurred.  Further, Plaintiffs cannot show that their alleged injuries were caused by the conduct of Defendants who are two or three steps removed from the MOVEit Incidents.  And finally, Plaintiffs do not allege which of the Defendants' data may have been published, when, or under what circumstances; to the contrary, Plaintiffs allege a "strong probability" that much of the stolen data has not been published, and the data that has been published was not made available in a coherent way.  Common Complaint ¶ 251.  Plaintiffs' allegations fall well short of showing "a sufficiently direct causal connection between the challenged action and the identified harm."  *Katz v. Pershing, LLC,* 672 F.3d 64, 71 (1st Cir. 2012).

Because Plaintiffs (1) fail to allege plausible injury-in-fact or (2) fail to show traceability, or both, Plaintiffs' claims should be dismissed for lack of standing.[4]

## BACKGROUND

### A.    The MOVEit Software.

Defendant Progress Software Corporation ("Progress") licenses the MOVEit Transfer application ("MOVEit Transfer"), which is "installed on customers' public-facing Internet servers, not Progress's servers."  Common Complaint ¶ 24.  MOVEit Transfer allows companies to send and receive data from their customers, vendors, and others as part of their day-to-day business

---

[4] This Motion addresses common facial standing challenges only. Consistent with this Court's orders, *see* MDL Order Nos. 1, 13, Defendants expressly reserve and do not waive any other Rule 12 challenges, including but not limited to: (1) arguments that Plaintiffs have not otherwise alleged facts or circumstances sufficient to state a claim for relief under Rule 12(b)(6); (2) arguments that Plaintiffs have not properly served all Defendants under 12(b)(5); (3) challenges to personal jurisdiction under Rule 12(b)(2); and (4) any factual Rule 12(b)(1) challenges.

operations.  *See id.* ¶¶ 11-12; 14-15.  Plaintiffs allege that Progress provides "bug fixes, patches, upgrades, enhancements, new releases [and] technical support" to its customers.  *Id.* ¶ 20 (*citing MOVEit and WS_FTP End User License Agreement,* Progress: Legal Info. (Nov. 2023), https://www.progress.com/legal/license-agreements/moveit-ws-ftp).

Plaintiffs[5] allege that all Defendants other than Progress ("the Non-Progress Defendants") either directly interacted with or were indirectly affected by the MOVEit Transfer software.  *See id.* ¶ 376.  The Non-Progress Defendants fall into the following categories,[6] as indicated in the Summary Chart attached as Appendix A:

- Direct Users – Defendants that contracted with Progress for the use of MOVEit Transfer.  These Direct Users used MOVEit Transfer primarily to transfer their own data or data of individuals with whom they have a direct relationship.  *See* ECF Nos. 742-1, 934 (describing Direct Users of MOVEit Transfer).

- Vendors – Defendants that also contracted with Progress, but that primarily used MOVEit Transfer to perform work on behalf of Vendor Contracting Entities (entities that received certain Plaintiffs' information in the first instance).  *See* ECF Nos. 742-1, 934 (describing Vendors that used MOVEit Transfer).

---

[5] For the purposes of this motion, the term "Plaintiffs" is defined as all named Plaintiffs listed in Appendix A.

[6] There is also a category of other Defendants that are not direct users, not vendors, not vendor contracting entities, and not vendor contracting entity customers.  This other category of Defendants includes Defendants that appear to have been named by Plaintiffs in an attempt to add seemingly related corporate parents, subsidiaries, affiliates, or related parties to certain cases. In many instances, these Defendants have been improperly named and bear no relationship to any Plaintiffs or the MOVEit Incidents.  Many of these Defendants have been meeting and conferring with Plaintiffs in an effort to have them voluntarily dismissed.  They will continue to do so.  While these Defendants (included in Appendix A) join this motion, they do not waive and expressly reserve all rights and defenses relating to their improper inclusion, which will be raised in the next round of Rule 12 briefing (should they survive Rule 12(b)(1) dismissal).

- <u>Vendor Contracting Entities</u> – Defendants that do not have a direct relationship with Progress, but contracted with a Vendor that, in turn, used MOVEit Transfer to send and/or receive data from these Defendants to perform certain services for Defendants. *See* ECF Nos. 742-1, 934 (describing Vendor Contracting Entities' relationship to MOVEit Transfer).

- <u>Vendor Contracting Entity Customers</u> – Defendants that contracted with, or otherwise had a relationship with, Vendor Contracting Entities, which in turn contracted with a Vendor that used MOVEit Transfer to send and/or receive data of the Defendants. *See* ECF Nos. 742-1, 934 (describing Vendor Contracting Entity Customers' relationship to MOVEit Transfer).

**B.     The MOVEit Incidents.**

Plaintiffs allege that MOVEit Transfer had a "zero-day" vulnerability that could "provide unauthorized users with administrative permissions within the MOVEit Transfer software." Common Complaint ¶ 131, 135-44.  As Plaintiffs explain in their Common Complaint, the vulnerability was considered a "zero-day" vulnerability because it was not known to Progress (much less the Direct Users and Vendors that used MOVEit Transfer, or the Vendor Contracting Entities and Vendor Contracting Entity Customers that did not select the software) prior to it being exploited.  *Id.* ¶ 143.

Plaintiffs allege that the Cl0p ransomware group of "Russian cybercriminal[s]" devoted years of planning to carry out the MOVEit Incidents, leveraging the zero-day vulnerability.  *Id.* ¶¶ 90, 137, 138.  Cl0p allegedly used the zero-day vulnerability to gain access to users' MOVEit Transfer environments and thereafter install Cl0p's LEMURLOOT web shell, which it had custom developed for these attacks to download files from customers' MOVEit Transfer environments.

*Id.* ¶ 123.  Plaintiffs allege that Cl0p's careful planning and strategizing allowed it to go undetected in gaining access to some customers' MOVEit Transfer environments.  *Id.* ¶ 139.

Cl0p began its attacks in late May 2023.  *Id.* ¶ 140.  The exact day that Cl0p allegedly attacked each impacted MOVEit Transfer environment varies, but Plaintiffs allege that the first known attacks occurred on May 27, 2023.  *Id.* ¶¶ 136, 140.  Once Cl0p allegedly began attacking a particular MOVEit user, it would attempt to then download data from that user's MOVEit Transfer environment.  *Id.* ¶ 144.  Plaintiffs allege that Cl0p was able to "simultaneously attack thousands of MOVEit Transfer servers."  *Id.*  As software users became aware of the attacks, they quickly moved to respond and defend against them.  On May 31, 2023, Progress released a patch for MOVEit Transfer, which remediated the underlying vulnerability.  *Id.* ¶¶ 161, ¶ 134 (citing John Hammond, *MOVEit Transfer Critical Vulnerability CVE-2023-34362 Rapid Response,* Huntress: Blog (June 1, 2023), https://www.huntress.com/blog/moveit-transfer-critical-vulnerability-rapid-response ("[F]rom [Huntress's] own testing, the [Progress] patch does effectively thwart [Huntress's] recreated exploit")).

Notwithstanding these efforts to defend against Cl0p's meticulously planned attacks, Plaintiffs allege that Cl0p was able to exfiltrate data from many MOVEit Transfer environments. Common Complaint ¶ 144.  On June 6, 2023, Cl0p announced that it had stolen data from numerous different MOVEit Transfer environments and, absent payment of a ransom demand, threatened to post some stolen data online  *Id.* ¶¶ 177-80.  On June 14, 2023, Cl0p then released the names of twelve affected organizations from which it claimed to have stolen data.  *Id.* ¶ 181. At this point, no stolen data had been published.  *Id.* ¶ 203 n.227 (citing Stefanie Schappert, *Cl0p names first batch of alleged MOVEit victims*, CyberNews (June 15, 2023), https://cybernews.com/news/cl0p-moveit-ransom-attack-victims-names/ (as of June 15, 2023,

"[s]o far, it seems none of the victims named on the Cl0p site, or any other suspected MOVEit victims, have had their data published")); *id.* ¶ 201 n.225 (citing Carly Page, *Ransomware gang lists first victims of MOVEit mass-hacks, including US banks and universities*, TECHCRUNCH (June 15, 2023), https://techcrunch.com/2023/06/15/moveit-clop-mass-hacks-banks-universities (as of June 15, 2023, "No stolen data has been published at the time of writing")).[7]  Cl0p then provided approximately 10 days for a response, allegedly to allow for price negotiations with the entities whose names it had published.  *Id.* ¶ 178.  Plaintiffs do not allege whether Cl0p delivered on its threats to publish the data from those 12 entities or from any of the entities that Cl0p may have named subsequently.  Plaintiffs allege only that "[t]his continued until August 15, 2023, when [Cl0p] published all of the information it had stolen from hundreds of Data Breach targets who refused to pay."  *Id.* ¶ 209.  Plaintiffs identify only three Defendants who were among the targets whose stolen information was allegedly published.  *Id.* ¶ 211.

Plaintiffs rely on articles reporting that "Cl0p's technical limitations seemed to be negatively impacting the gang's ability to actually deliver on its threats successfully."  Common Complaint ¶ 251 n.268,[8] (quoting Stefanie Schappert, *Cl0p dumps all MOVEit victim data on Clearnet, threat insiders talk ransom strategy*, CYBERNEWS (November 15, 2023) https://cybernews.com/security/clop-publish-all-moveit-victim-ransom-data-clearweb/).  And Plaintiffs acknowledge that Cl0p has not published successfully much of the information it

---

[7] On a Rule 12 motion the Court may properly consider "documents that are part of or incorporated into the complaint."  *See  Trans-Spec Truck Serv. v. Caterpillar, Inc*., 524 F.3d 315 (1st Cir. 2008); *see also Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993); *Fudge v. Penthouse Int'l, Ltd.*, 840 F.2d 1012, 1015 (1st Cir. 1988).

[8] While footnote 268 includes a *supra* cite to a June 15, 2023 article from Stefanie Schappert of CyberNews, it actually quotes another Schappert article (whose URL appears above in text) from November 15, 2023.

acquired.  *See id.* ¶ 251 ("[T]here is a strong probability that much of the information stolen in the Data Breach has not yet been made available on the black market in a coherent, organized fashion").  Plaintiffs also acknowledge that much of the data that was posted was difficult to access or extract in a coherent manner.  *See, e.g.*, *id.* ¶ 251 n.268 (quoting Stefanie Schappert, *Cl0p dumps all MOVEit victim data on Clearnet, threat insiders talk ransom strategy,* CYBERNEWS (November 15, 2023) https://cybernews.com/security/clop-publish-all-moveit-victim-ransom-data-clearweb ("To extract it all, these are multi-part ZIP files that they are splitting into a hundred different pieces. And, you have to combine them all back together. And that means you have to have every single piece of those 100 parts downloaded; otherwise, it won't extract properly")).  Indeed, even "fairly sophisticated threat intelligence company[ies]" found it difficult to access the data.  *See, e.g.*, *id.* ("There have been significant challenges associated with actually downloading incomplete files, and I think that inherently lowers a little bit of the risk for the victims [. . .] We're a fairly sophisticated threat intelligence company, and it's a challenge for us to download these things, extract the data, and then search through them, just because it's all unstructured data").

In addition to the difficulties of accessing the data that Cl0p claimed to have posted, Plaintiffs acknowledge that at least some, if not all, of the data that Cl0p allegedly took may have been deleted by Cl0p.  The Common Complaint alleges that some Defendants paid a ransom to Cl0p; in exchange, Cl0p deleted the data and committed it would not be released.  *See, e.g.*, Common Complaint ¶ 182 (citing Riam Kim-Mcleod, *Clop Leaks: First Wave of Victims Named,* RELIAQUEST: BLOG (Jul. 28, 2023, 10:00 AM), https://www.reliaquest.com/blog/clop-leaks-first-victims/) (noting that the threat actor had removed the names of some victims from its ransom list, potentially because they had "engaged in ransom negotiations")).  Plaintiffs do not allege that any data from Defendants that paid Cl0p's requested ransom have been released.

### C. The Impacted Data.

By design, MOVEit Transfer could be used to store and move virtually any type of digital file. Therefore, the particular kinds of data and data elements impacted across the MOVEit Incidents varied by user and, if applicable, a vendor and its particular customers or customers of customers. *See id.* ¶¶ 196-97. For example, Plaintiffs allege that certain healthcare-related Defendants used MOVEit Transfer to store and move protected health information, *see, e.g.*, Appendix A, Row 162 (alleged PHI impacted in Defendant CareSource's MOVEit Incident), while other Defendants in other industries had no healthcare information, *see, e.g.*, Appendix A, Row 90 (no allegation that PHI impacted in Defendant MidFirst Bank's MOVEit Incident). Similarly, some MOVEit Incidents are alleged to have impacted Social Security Numbers and/or financial information while others did not, *see, e.g.*, Appendix A, Row 148 (alleged Social Security Number impacted in Defendant University of Rochester MOVEit Incident).

### D. Plaintiffs' Alleged Injuries.

As soon as news of the MOVEit Incidents was made public, Plaintiffs began to file hundreds of lawsuits across the country, in both federal and state courts. Plaintiffs variously seek damages and injunctive relief. In general, those lawsuits allege a litany of boilerplate, inchoate harms, primarily based on an allegation that the MOVEit Incidents *may* lead to a risk of some future harm. *See, e.g.*, *Anastasio v. Progress Software Corp. et al.*, No. 23-cv-11442 (D. Mass. June 28, 2023) ¶ 17 ("Plaintiff and Class Members now face a current and ongoing risk of identity theft").

Some, but not all, Plaintiffs also plead a grab-bag of other purported harms, including: (1) that that they spent time or money mitigating the effects of the MOVEit Incidents (Common

Complaint  ¶ 279(d)) (collectively, "Mitigation Measures");[9] (2) that they lost the value of their PII (though they do not allege that they intended to sell their PII, or could do so) (*Id*. ¶ 279(b)); (3) that they did not receive the benefit of the bargain that they reached with Defendants, which allegedly included certain data-security standards, *id*. ¶ 279(a); (4) that they have received increased spam phone calls, emails, and text messages after the MOVEit Incidents occurred, *see, e.g.*, *Bloch v. Progress Software Corp.*, No. 1:23-md-030830-ADB (D. Mass. June 17, 2024), ECF No. 913 ¶ 57 (Plaintiff Burke alleging a "large uptick in fraudulent spam"); (5) and that they have experienced emotional distress and anxiety resulting from the knowledge that their personal information may be available on the dark web, Common Complaint ¶ 276.  Only about 30 Plaintiffs—out of 396—specifically allege that they have experienced actual misuse.  Most allegations of actual misuse are boilerplate, conclusory, and lacking in the requisite factual support.  The specific categories of allegations made by each Plaintiff are set forth in Appendix A.

Plaintiffs have continued to file lawsuits, including as recently as this month.  *See* ECF No. 1019 (discussing Plaintiffs' flurry of new and amended complaints filed over nine months after the beginning of the above-captioned MDL).  But even a year after the MOVEit Incidents allegedly occurred, roughly 90 Defendants still face no plausible allegations of actual misuse.

---

[9] The Common Complaint alleges generically that all Plaintiffs in this MDL have suffered "injuries" in the form of "time and expenses that were reasonably spent to mitigate the impact of the breach."  Common Complaint ¶ 279(d).  When Plaintiffs' individual complaints are examined more closely, these mitigation measures fall generally into three categories: (i) time spent by Plaintiffs monitoring or protecting their accounts (*e.g.*, monitoring account activity, resetting passwords, requesting a credit freeze); (ii) lost wages or lost opportunity costs resulting from time spent monitoring or protecting accounts; and/or (iii) the cost of purchasing credit monitoring or identity protection services. *See* Appendix A, Columns X-Z.

## ARGUMENT

Plaintiffs have not established the "'irreducible constitutional minimum' of standing [to sue]." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quoting *Lujan*, 504 U.S. at 560). Standing requires three elements: "(i) that [each] suffered an injury in fact that is concrete, particularized and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). At the motion to dismiss stage, Plaintiffs "bear[ ] the burden of establishing sufficient factual matter to plausibly demonstrate [their] standing to bring the action . . . taking all of the facts (and any inferences that follow) in the [Plaintiffs'] favor." *Taylor*, 693 F. Supp. 3d at 97 (internal citations and quotation marks omitted).

With respect to claims for damages, "the risk of future harm on its own does not support Article III standing." *TransUnion*, 594 U.S. at 441. Rather, Plaintiffs must allege a separate concrete harm caused by their exposure to the risk itself," which in the data-breach context *may* be pled via "plausible allegations of actual misuse of [plaintiff's] stolen PII [personally identifying information]." *See Webb* 72 F.4th at 372.

With respect to claims for injunctive relief, a Plaintiff must, at the very least, plead facts sufficient to show the existence of an "imminent and substantial risk of harm." *See id.* at 375 (citing *TransUnion*, 594 U.S. 434-35). In the data-breach context, this Court in *Taylor* and the First Circuit in *Webb,* considered three factors to determine whether Plaintiffs allege a sufficiently imminent and substantial risk of harm: (1) whether the information was "deliberately taken by thieves"; (2) whether there was "actual misuse" of the information; and (3) whether "the compromised data is particularly sensitive." *Taylor*, 693 F. Supp. 3d at 98.

Allegations of actual misuse are the linchpin of the risk-of-harm analysis. As this Court noted in *Taylor*, "although, in *Webb*, the First Circuit explained that [the actual misuse] factor, like

the others, is not necessarily determinative, Plaintiffs have not identified any First Circuit caselaw in which a court has found plaintiffs had established standing in a similar context, without allegations of actual misuse." *Taylor*, 693 F. Supp. 3d at 98-99 (citations and quotations omitted). Like many Plaintiffs here, the plaintiffs in *Taylor* alleged that "their information, including, potentially, their Social Security numbers, was exposed to hackers." *Id.* at 98. Nonetheless, this Court determined "that without any allegations of actual misuse of information from the [particular] data breach, Plaintiffs' alleged risk of future misuse is not sufficiently imminent or substantial to support standing." *Id.* at 99.

Here, setting aside Plaintiffs' conclusory allegations, *see infra* Section I.A., the overwhelming majority of Plaintiffs fail to plausibly allege any actual misuse of their data. Indeed, roughly 90 Non-Progress Defendants do not face any plausible allegations of actual misuse allegedly arising from their respective MOVEit Incidents. And, as explained below, each Non-Progress Defendants' MOVEit Incident must be analyzed separately for purposes of the risk of harm analysis.

The claims against these roughly 90 Non-Progress Defendants that face no actual misuse allegations must be dismissed for lack of Article III standing. *See infra* Sections I.A.-C. Without actual misuse, "Plaintiffs' alleged risk of future misuse is not sufficiently imminent or substantial to support standing," *Taylor*, 693 F. Supp. 3d at 99, meaning the Plaintiffs cannot rely on a potential future harm theory to support standing. *See id*. And these Plaintiffs likewise fail to allege any other cognizable injury-in-fact. *See infra* Sections I.D.-G. Accordingly, for these 90 or so

Defendants, all claims against them should be dismissed on standing grounds.[10]  *See* Appendix B, Flow Chart, Step Nos. 1-3.

For the other approximately 25 Non-Progress Defendants that face plausible allegations of actual misuse from one or more Plaintiffs, those actual misuse allegations fail on traceability. *See infra* Section II; *see* Appendix B, Flow Chart, Step Nos. 1, 5. And, for Plaintiffs who do not allege misuse, but bring claims against a Non-Progress Defendant that is facing plausible misuse allegations (the "Non-Misuse Plaintiffs")—these Non-Misuse Plaintiffs cannot show an imminent risk of future harm when considering all three *Webb* factors.  *See infra* Section I.C; Appendix B, Flow Chart, Step Nos. 1, 2, 4.  Thus, the complaints against these Defendants must also be dismissed on standing grounds.

As to Progress specifically, where it is named in a complaint, and the Plaintiffs lack standing under the above framework to assert claims against the Non-Progress Defendants, these Plaintiffs' claims must likewise be dismissed against Progress because these Plaintiffs have not suffered an injury in fact and/or have not shown traceability.  Additionally, there are 28 complaints in this MDL that name only Progress.  Of these complaints, 27 contain no plausible allegations of misuse that are traceable to the specific MOVEit Incidents.[11]  Moreover, none of the Vendors or Direct Users referenced in these complaints that are currently parties is this MDL face plausible misuse allegations traceable to their alleged MOVEit Incidents.[12]  The claims in these 27

---

[10] To be clear, these Plaintiffs' claims must also be dismissed against Progress because these Plaintiffs have not suffered an injury in fact, meaning they cannot remain in federal court.

[11] Of these 27 complaints, one alleges misuse, *Allen et al v. Progress Software Corp*., No. 1:23-cv-11984, but the misuse is not traceable to the alleged incident because the Plaintiff do not allege when the alleged misuse occurred in relation to the incident.  *See infra* Section II.B.

[12] Of these 27 complaints, six reference a Vendor or Direct User named as a current Defendant in this MDL: *Brida v. Progress Software Corp. et al*, No. 1:23-cv-12202 (University of Massachusetts Chan Medical School); *Glass et al v. Progress Software Corp.*, No. 1:23-cv-12790

complaints must be dismissed because there are no plausible misuse allegations and Plaintiffs'

other present alleged harms do not support standing.[13]  *See* Appendix B, Flow Chart, Step Nos. 1-

3. The one remaining complaint contains a mix of Plaintiffs who do allege misuse and others who

do not.[14] The Plaintiffs in this complaint likewise do not have standing:  For those Plaintiffs who

allege misuse, their claims fail on traceability grounds. *See* Appendix B, Flow Chart, Step Nos. 1,

---

(Sovos Compliance LLC); *Harris v. Progress Software Corp.*, No. 1:23-cv-12486 (The Vitality Group, LLC); *Young et al v. Progress Software Corp.*, No. 1:23-12342 (Allegheny County, Pension Benefit Information); *Harris v. Progress Software Corp.*, No. 1:23-cv-11816 (Franklin Mint Federal Credit Union); *Gilson v. Progress Software Corp.*, No. 1:23-cv-11552 (Vitality Group, LLC). Sovos Compliance LLC, The Vitality Group, LLC, Franklin Mint Federal Credit Union, and Allegheny County face no misuse allegations. *See* Appendix A.  The University of Massachusetts Chan Medical School and Pension Benefit Information do face arguably plausible misuse allegations, but they are not traceable to the alleged MOVEit Incident because the timing of the alleged exposure is not adequately alleged and/or the information exposed does not match the alleged harms. *See* Appendix A.

[13] The 27 complaints naming only Progress that contain no allegations of misuse are: *Baker v. Progress Software Corp.*, No. 1:23-cv-11777; *Berry v. Progress Software Corp.*, No. 1:23-cv-12343; *Brida v. Progress Software Corp. et al*, No. 1:23-cv-12202; *Dickmeyer et al v. Progress Software Corp.*, No. 1:23-cv-12450; *Diggs et al v. Progress Software Corp.*, No. 1:23-cv-11370; *Doe v. Progress Software Corp. et al*, No. 1:23-cv-12496; *Deutsch v. Progress Software Corp.*, No. 1:23-cv-11547; *Glass et al v. Progress Software Corp.*, No. 1:23-cv-12790; *Guillory-Caillier et al v. Progress Software Corp.*, No. 1:23-cv-11417; *Harris v. Progress Software Corp.*, No. 1:23-cv-12486; *Harris v. Progress Software Corp.*, No. 1:23-cv-12891; *McAdam v. Progress Software Corp.*, No. 1:23-cv-12350; *Meyer v. Progress Software Corp.*, No. 1:23-cv-11543; *Moore et al v. Progress Software Corp.*, No. 1:23-cv-11669; *Paynter et al v. Progress Software Corp. et al*, No. 1:23-cv-12524; *Pipes v. Ipswitch, Inc. et al*, No. 1:23-cv-11394; *Pulignani v. Progress Software Corp. et al*, No. 1:23-cv-12495; *Saunders v. Progress Software Corp.*, No. 4:24-cv-00350; *Shahbazian et al v. Progress Software Corp.*, No. 1:23-cv-12903; *Tenner v. Progress Software Corp.*, No. 1:23-11412; *Truesdale v. Progress Software Corp. et al*, No. 1:23-cv-12497; *Tucker v. Progress Software Corp.*, No. 1:23-cv-12610; *Young et al v. Progress Software Corp.*, No. 1:23-12342; *Harris v. Progress Software Corp.*, No. 1:23-cv-11816; *Gilson v. Progress Software Corp.* No. 1:23-cv-11552; *Swekoski v. Progress Software Corp. et al*, No. 1:23-cv-13077; *Hayden v. Progress Software Corp. et al*, No. 1:23-cv-12736.

[14] The complaint naming only Progress, which contains allegations of misuse by some Plaintiffs is *Allen et al v. Progress Software Corp.*, No. 1:23-cv-11984.

5. For the Plaintiffs in this complaint who not allege misuse, they cannot show an imminent risk of future harm under the three *Webb* factors. *See* Appendix B, Flow Chart, Step Nos. 1, 2, 4.

## I. **Plaintiffs fail to plead a particularized and concrete actual or imminent injury-in-fact.**

### A. **Certain Plaintiffs rely solely on implausible and conclusory allegations of harm, all of which must be disregarded.**

The *Twombly/Iqbal* plausibility standard applies to Article III standing determinations. *Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 730-31 (1st Cir. 2016). Thus, each Plaintiff "bears the burden of establishing sufficient factual matter to plausibly demonstrate [their] standing to bring the action." *Id.* at 731. Because "'standing is not dispensed in gross,'" *id.*; *accord TransUnion,* 594 U.S. at 431, Plaintiffs must establish standing "plaintiff-by-plaintiff and claim-by-claim" through "allegations linking each plaintiff to each [injury]," *Hochendoner*, 823 F.3d at 733.

A prevailing feature of both the individual complaints and the Common Complaint is reliance on boilerplate claims and conclusory allegations of injury. For example, both species of complaints generally allege that Plaintiffs "and [putative] class members" experienced a laundry list of certain alleged harms. *See*, *e.g.*, Common Complaint ¶ 235 ("Plaintiffs and Class Members face a substantially increased risk of identity theft and fraud."); *Bailey v. Genworth Fin., Inc.*, No. 1:23-cv-12500-ADB (Oct. 2, 2023), ECF No. 1 ¶ 86 ("Plaintiffs and Class members have suffered emotional distress as a result of the Data Breach."); *Eyester v. Nuance Commc'ns, Inc.*, 1:23-cv-12281-ADB (D. Mass. Oct. 3, 2023), ECF No. 1 ¶ 19 ("Plaintiff and Class Members may also incur out-of-pocket costs for purchasing credit monitoring services . . . .").

The First Circuit has made clear that such generalized allegations do not suffice to establish standing. They both (1) fall short of showing particularized injury, *i.e.*, that each named Plaintiff "has been affected in a personal and individual way by the injurious conduct," and (2) are

impermissibly conclusory. *Hochendoner*, 823 F.3d at 731-32 (quotation marks and citation omitted).

First, as to particularized injury, in *Hochendoner*, the district court dismissed on standing grounds claims that plaintiffs were injured by market shortages of defendant's medication, and the First Circuit affirmed. The First Circuit held that plaintiffs could not plead standing by alleging "every named . . . patient" suffered the same "generalized harms" as a result of a shortage of the medication in question. *See id.* at 732-33 (listing specific examples of those generalized harms). Instead, plaintiffs are required to plead facts "linking the alleged . . . injuries to a[] specific plaintiff." *Id.* at 732.

The same failing exists here.  As the First Circuit held in *Hoechendoner*, "standing is not dispensed in gross"; thus, generic, categorial allegations that "Plaintiffs and class members" experienced a list of harms are insufficient to link the alleged generalized categories of injury to any particular Plaintiff. *Id.* at 733.

Second, many of Plaintiffs' allegations are impermissibly conclusory.  Plaintiffs' attempts to rely on laundry lists of injuries that are virtually identical from complaint-to-complaint—which have no more than brief and generalized descriptions such as "invasion of privacy" and "anxiety, annoyance and nuisance"—are not sufficient.[15]  *See Hochendoner*, 823 F.3d at 732 (discussing

---

[15] *See, e.g.*, *King v. Genworth Fin., Inc.*, No. 1:23-cv-12448-ADB. (D.Mass. June 30, 2023), ECF No. 1 ¶ 14 ("Plaintiff and Class Members are at a current and ongoing risk of identity theft and have suffered numerous actual and concrete injuries and damages, including: (a) invasion of privacy; (b) financial "out of pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft; (c) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (d) financial "out of pocket" costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) loss of time due to increased spam and targeted marketing emails; (g) the loss of benefit of the bargain (price premium damages); (h) diminution of value of their Private Information; (i) anxiety, annoyance and nuisance, and (j) the continued risk to their Private Information[.]").

complaints alleging "'a return of symptoms, accelerated disease development, injury, and otherwise preventable disease progression' or 'have died from these injuries'").  Such allegations fail to establish standing because "no specific information is provided regarding the harm, if any, that has befallen each individual plaintiff."  *Id.*; *see Brown v. Brit. Parliament*, No. 22-cv-11221, 2023 WL 2898731, at *3 (D. Mass. Apr. 11, 2023) (dismissing complaint for lack of subject-matter jurisdiction where it "lists various harms [but] does not allege that plaintiff herself suffered any of those harms").[16]   In short, Plaintiffs' "scattered descriptions of generalized harms" and "state[ments], in nearly identical language that '[a]s a direct result' of [Defendant's conduct] 'Plaintiffs have sustained, or are at imminent risk of sustaining . . . [a] list of horribles," are insufficient.  *Hochendoner*, 823 F.3d at 732.  Plaintiffs' complaints consistently violate these principles.

Thus, Plaintiffs' pervasive generalized allegations across the individual complaints and the Common Complaint cannot support standing.  And, without those boilerplate allegations, Plaintiffs fail to demonstrate standing because, as shown below, the specific allegations and theories advanced by some of the individual Plaintiffs fail to allege cognizable injuries.  *See infra* § I.B-G.

---

[16] *See also Richards v. Duke Univ.*, 480 F. Supp. 2d 222, 233 (D.D.C. 2007) (dismissing complaint on 12(b)(1) grounds where plaintiff "only offered a laundry list of wrongful acts and conclusory allegations" to support her claims) (citation and quotation marks omitted); *Hainey v. SAG-AFTRA Health Plan*, No. 21-cv-012618, 2023 WL 3645514, at *13 (D. Md. May 25, 2023)  (dismissing claim on 12(b)(1) grounds based on "generalized" and "nondescript" allegations), *appeal dismissed*, 2023 WL 7688384 (4th Cir. Nov. 15, 2023).

**B.    The vast majority of Plaintiffs fail to plausibly allege any actual data misuse.**

As noted above, Plaintiffs overwhelmingly fail to allege the type of actual misuse claims that this Court has found necessary to support standing in the data-breach context. *Taylor*, 693 F. Supp. 3d at 98-99.

Of the 396 Plaintiffs here, only about 30 allege arguably *plausible* claims of actual misuse against roughly 25 Defendants. *See* Appendix A, Summary Chart. *See, e.g.*, Compl., *Devis v. Progress Software Corp.*, No. 1:24-cv-11541-ADB (D. Mass. June 12, 2024), ECF No. 1 ¶ 343 ("Plaintiff Cadet received a notice that a loan she applied to was denied, but neither she nor anyone in her family had applied for a car loan"); Compl., *Bloch v. Progress Software Corp.*, No. 1:24-cv-11567-ADB (D. Mass. June 17, 2024), ECF No. 1 ¶ 57 ("[S]omone accessed her Medicaid benefits account and changed her information."); Compl. *Allman v. Int'l Bus. Machd. Corp.*, No. 1:24-cv-11126-ADB, ECF No. 4 ¶ 73 ("Plaintiff has had unknown persons open or attempt to open seventeen (17) accounts in his name across three difference credit bureaus. The fraudulent activity on Plaintiffs account has significantly affected his credit, including dropping his credit score from 746 to 484.").  That leaves roughly 90 Non-Progress Defendants facing no allegations of actual misuse relating to their MOVEit Incident.  Indeed, as the Common Complaint admitted, only "several Plaintiffs have already experienced actual or attempted fraud."  Common Complaint ¶ 280.  The absence of any plausibly alleged misuse in the vast majority complaints is no surprise. Plaintiffs do not allege for each specific Defendant whether that Defendant's data was published after the MOVEit Incidents—if any.  And, to the extent that it may have been, even Plaintiffs acknowledge that "much of the information stolen in the [MOVEit Incidents] has not yet been made available on the black market in a coherent, organized fashion." *Id.* ¶ 251; *see also id.* ¶ 251 n.268.  Moreover, publication aside, much of the information allegedly impacted cannot on its own be used to commit actual misuse, let alone the types of fraud the individual Plaintiffs allege. *See*

*infra* Section II (showing that many of the Plaintiffs alleging future harm cannot demonstrate traceability).

### C.     Plaintiffs' alleged risk of future harm does not plead injury-in-fact.

Plaintiffs who do not plausibly allege actual data misuse (which is almost all of them) claim an increased risk of future harm. *See, e.g.*, Common Complaint ¶ 188. They allege that an elevated risk of harm will remain "for many years into the future," regardless of which Non-Progress Defendant held their data and what information related to the individual was allegedly exposed. *Id.* ¶ 251; *see also, e.g.*, *id.* ¶¶ 226; 230; 393 (repeatedly alleging what "can" be done with an individual's personal information, not what has actually occurred). But this theory of harm likewise fails.

Many Non-Progress Defendants do not face claims from any Plaintiffs alleging actual data misuse. These Plaintiffs have not suffered an actual injury nor have an imminent risk of future injury arising from a MOVEit Incident and cannot rely on a future-harm theory to support standing. *See Taylor*, 693 F. Supp. 3d at 98. And, as explained below, in Sections I.D.–G., these Plaintiffs also fail to allege any other form of cognizable injury-in-fact. *See* Appendix B, Flow Chart, Step Nos. 1-3. The claims against these Defendants must be dismissed.[17]

For the remaining roughly 25 Defendants, they face a mix of complaints from (1) a smattering of Plaintiffs who plausibly allege actual misuse and (2) Plaintiffs who do not. As to the first category of Plaintiffs, *i.e.*, the smattering who plausibly allege actual misuse, they still fail to establish standing because the alleged misuse is not fairly traceable to any Defendant's MOVEit

---

[17] Again, the Plaintiffs bringing claims against these Defendants likewise do not have standing to bring claims against Progress because these Plaintiffs have not suffered an injury in fact.

Incident.  *See infra,* Section II; Appendix B, Flow Chart, Step Nos. 1, 5.  All claims against these Defendants should be dismissed.

Regarding the second category, *i.e.*, the "Non-Misuse Plaintiffs" who did not plausibly plead misuse, but bring claims against a Non-Progress Defendant that is facing misuse allegations from another Plaintiff, these Non-Misuse Plaintiffs must still establish an imminent risk of future harm under the *Webb* factors—allegations of misuse; a targeted attack on plaintiff's personal information; and the sensitivity of the personal information.   *See* Appendix B, Flow Chart, Step Nos. 1, 2, 4. For the reasons explained below, they cannot do so.

**(1)  Misuse:** Non-Misuse Plaintiffs must establish standing "plaintiff-by-plaintiff and claim-by-claim" through "allegations linking each plaintiff to each [injury]," *Hochendoner*, 823 F.3d at 733.  The First Circuit has held in the context of the same data breach involving the same defendant "[t]hat at least some information stolen in a data breach that has already been misused also makes it likely that other portions of the stolen data will be similarly misused."  *Webb*, 72 F.4th at 376.  "[I]n light of the plausible allegations of some actual misuse," against the same Non-Progress Defendant related to its MOVEit Incident, this first factor relevant to imminence may be met as to these Non-Misuse Plaintiffs, *id.* at 374; although, as the First Circuit acknowledged, it is a "difficult" call. *Id.*  In any event, actual misuse is only one factor in the analysis.

**(2) Targeted Attempt to Misuse  Personal Information:** Plaintiffs' allegations regarding the threat actor, Cl0p, only nominally resemble those involving the "targeted attack" the First Circuit identified as supporting standing in *Webb*. *See id.* at 375-76. Specifically, Plaintiffs do not

plausibly allege that Cl0p's motive was to misuse any individual's data, which was the case in *Webb* and in other decisions on which the First Circuit relied. *See id.* at 375-76 (collecting cases).

Rather, Plaintiffs allege that Cl0p was engaged in a ransomware scheme to encrypt and withhold data from victim organizations until payment is made. Common Complaint ¶¶ 91-92, 177, 217, 225. Cl0p's motive was not to use individuals' data itself to engage in identify theft or other fraud or even to post individuals' data for sale, but rather to turn a profit by threatening victim organizations with ransom demands. And the motive for a ransomware attack—"an exchange of money for return of access to data"—does not by itself establish that there is "certainly impending harm." *Quintero v. Metro Santruce, Inc.*, No. 20-cv-01075, 2021 WL 5855752, at *5 (D.P.R. Dec. 9, 2021) (citation omitted); *see also In re Practicefirst Data Breach Litig.*, No. 21-cv-00790, 2022 WL 354544, at *5 (N.D.N.Y. Mar. 20, 2023) (collecting cases).

As a result, Plaintiffs generally speculate that information obtained in the MOVEit Incidents might be available on the dark web. That is not sufficient. *See Taylor*, 693 F.Supp.3d, at 93, 98 n.8 (dismissing claims, notwithstanding allegations that "[t]he cybercriminals . . . may also exploit the PII they obtained by selling the data in the so-called 'dark markets'"); *Quintero*, 2021 WL 5855752, at *7 (dismissing claims, notwithstanding allegations that hackers "can be expected to have sold the data on the dark web"); *see also infra* pp. 21-23 (detailing Plaintiffs' allegations undercutting the notion that individuals' data could be obtained).

**(3) Sensitivity of Information**: The sensitivity of the impacted data elements varied by Defendant. *See* Common Complaint ¶ 198 ("[V]arious Defendants used MOVEit servers to move different kinds of PHI and PII . . ."). Numerous Plaintiffs do not allege that any sensitive personal information was affected. Even for those Non-Misuse Plaintiffs who allege that their more sensitive personal data (*e.g.*, Social Security numbers) was accessed, that does not necessarily

confer standing. *Taylor*, 693 F. Supp. 3d at 97-99 (no standing despite alleged disclosure of Social Security numbers); *Rivera-Marrero v. Banco Popular de Puerto Rico*, No. 22-cv-1217, 2023 WL 2744683, at *10 (D.P.R. Mar. 31, 2023) (same).

When viewing these factors in total, these Non-Misuse Plaintiffs do not allege sufficient facts to establish an imminent risk of harm.

Finally, just because some individual MOVEit Incidents involving certain Defendants resulted in claims of misuse does not mean those misuse claims can be imputed to all of the MOVEit Incidents that were allegedly related to the MOVEit vulnerability. Put differently, the misuse claims of a distinct minority of Plaintiffs, which are confined to certain MOVEit Incidents and Defendants, does not mean that every Plaintiff in this MDL automatically has satisfied *Taylor's* misuse requirement.

As Plaintiffs have pointed out throughout this litigation, this MDL does not involve a single breach of a particular defendant—unlike in *Webb* and *Taylor* alike—but instead numerous individual infiltrations of different entities, which must be assessed on a plaintiff-by-plaintiff and defendant-by-defendant basis. *See, e.g.*, Common Complaint ¶¶ 136-37; *In re MOVEit Customer Data Sec. Breach Litig.*, MDL No. 3083, --- F. Supp. 3d ---, 2023 WL 6456749 at *2 (J.P.M.L. Oct. 4, 2023) ("Plaintiffs opposing transfer argue that, instead of a singular breach, there have been numerous successive intrusions into different servers [.]").  And by Plaintiffs' own account, Cl0p treated different entities differently post-infiltration of the software.  *See* Common Complaint ¶¶ 181-84, 201-02, 207-12.  The MOVEit Incidents involved different sets of data, different interactions between Defendant and Cl0p (if any), and different timelines, among other differences.  That the outcome of one MOVEit Incident allegedly resulted in actual misuse of data says nothing about the risk to Plaintiffs impacted by a totally separate MOVEit Incident.

Thus, to find injunctive relief standing for all Plaintiffs based on the misuse factor would explode the First Circuit's language "caution[ing] that it was not 'holding that individuals face an imminent and substantial future risk in every case in which their information is compromised in a data breach.'" *Taylor*, 693 F. Supp. 3d at 98 (quoting *Webb*, 72 F.4th at 376). Instead, it would convert generic allegations of breaches of multiple entities that used MOVEit into particularized, concrete, imminent injury for every individual whose data was potentially implicated by those many different users of the software.[18]

Fundamentally, for those Plaintiffs without purported data misuse, their allegations that they "remain at an increased risk of fraud and identity theft for many years into the future," Common Complaint ¶ 251, or that "there may also be a substantial time lag—measured in years— between when harm occurs versus when it is discovered," *id.* ¶ 241, are insufficient. *See, e.g.*, *Beck v. McDonald*, 848 F.3d 262, 275 (4th Cir. 2017) ("'[A]s the breaches fade further into the past,' the Plaintiffs' threatened injuries become more and more speculative."); *Travis v. Assured Imaging LLC*, No. 20-cv-00390, 2021 WL 1862446, at *11 (D. Ariz. May 10, 2021) (allegation that "there may be a substantial lag [—] measured in years [—] between when harm occurs versus when it is discovered" not imminent); *see also TransUnion*, 594 U.S. at 436 ("[T]ime will eventually reveal whether the risk materializes in the form of actual harm.").

---

[18] To the extent that Plaintiffs attempt to rely on a few discrete MOVEit Incidents to assert a purportedly global risk of imminent injury, it is not clear that Plaintiffs' theory has any meaningful stopping point. For example, Cl0p has breached other entities in the past entirely unrelated to MOVEit. But neither case law nor common sense would suggest that the facts that Cl0p has done so, that Cl0p may have posted those entities' data, and that misuse may have resulted from those incidents would speak to what may occur, let alone is imminent, as a result of a different incident. Absent further factual allegations, Plaintiffs' attempts to extrapolate from one MOVEit Incident to another one is similarly attenuated.

Not only do courts reject as speculative, not imminent, claims of harms premised on what *might* happen years in the future, but the harms Plaintiffs allege here are the antithesis of imminent. Plaintiffs plead that some data (not necessarily theirs) from some impacted entities was posted in August 2023, that this data was apparently incoherent, and that the kinds of platforms on which the data was hosted are ephemeral. And Plaintiffs overwhelmingly fail to plausibly allege data misuse that has befallen them, let alone misuse allegedly occurring broadly across the individual MOVEit Incidents. Given the facts alleged here, this case should not break new ground in expanding the viability of imminent harm-based theories of standing. *See Rivera-Marrero*, 2023 WL 2744683 at *11 ("[N]o court in this circuit has found standing in a case premised on an allegation of an increased risk of future injury . . . where the plaintiff does not allege any actual misuse of their PII.").[19]

_____

[19] Plaintiffs' allegations that they are at risk of future misuse of their medical information fail for the same reasons:  As courts have made clear, the mere risk that exposed information—of any type, including medical information—will be misused is too speculative standing alone to constitute a legally cognizable injury. *See, e.g.*, *Beck*, 848 F.3d at 275 (allegation that "33% of health-related data breaches result in identity theft" insufficient to establish concrete harm for Article III standing purposes); *C.C. v. Med-Data Inc*., No. 21-cv-2301, 2022 WL 970862, at *7 (D. Kan. Mar. 31, 2022) ("allegations of 'imminent, immediate and continuing risk of identity theft, identity fraud and/or medical fraud' don't provide a concrete injury"); *Fernandez v. Leidos, Inc.*, 127 F. Supp. 3d 1078, 1087 (E.D. Cal. 2015) (rejecting standing based on risk of future medical fraud as too speculative because "[t]here is simply no way to know whether identity theft, identity fraud and/or medical fraud will occur until either the thief is apprehended or the data is actually used"); *In re Sci. Applications Int'l Corp. (SAIC) Backup Tape Data Theft Litig*., 45 F. Supp. 3d 14, 28 (D.D.C. 2014) ("increased risk of identity theft, identity fraud, medical fraud or phishing is not itself an injury-in-fact"); *Bland v. Urology of Greater Atlanta, LLC*, No. 1:23-cv-132-MLB, 2024 WL 3313348, at *4 (N.D. Ga. Mar. 14, 2024) (rejecting alleged injury of future identity theft where plaintiff did not "plausibly allege that anyone misused his or the class members' stolen PII/PHI.").  And that is all that Plaintiffs offer here—generic allegations that they are at risk of future medical fraud; they do not claim to have actually suffered such fraud, nor do they supply any allegations indicating that such harm is imminent.  *See, e.g.*, Case No. 1:23-cv-12524-ADB, ECF 1 ¶ 66; Case No. 1:23-cv-13077-ADB, ECF 1 ¶ 139; Case No. 1:23-cv-12736-ADB, ECF 1 ¶ 139; Case No. 1:23-cv-13025-ADB, ECF 1 ¶ 86; Case No. 1:23-cv-13072-ABD, ECF 1 ¶¶ 112, 134; Case No. 1:23-cv-12438-ABD, ECF 1 ¶¶ 36-38.  Plaintiffs' vague invocation

**D.      Plaintiffs' prophylactic costs and mitigation measures do not confer standing.**

Without an imminent risk of future harm, Plaintiffs' purported Mitigation Measures fail to confer standing for damages. This Court has previously held that where Plaintiffs have not alleged an imminent risk of future harm, "prophylactic costs to mitigate such a risk do not constitute an independent injury sufficient to support standing." *Taylor* 693 F. Supp. 3d at 100.  Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending."  *Clapper v. Amnesty Int'l USA*, 586 U.S. 398, 409, 416 (2013).  But that is precisely what Plaintiffs have attempted (unsuccessfully) to do here.

Plaintiffs contend that—when examined against the backdrop of the common allegations of future risk of harm and the allegations of "several" Plaintiffs claiming actual or attempted fraud—their Mitigation Measures are sufficient present "injuries" in and of themselves to confer standing. *See* Common Complaint ¶ 247 ("it is not necessary for a victim of a data breach to have their identity stolen, or to suffer actual fraud, for it to be reasonable for a data breach victim to take steps to protect themselves"); *id.* ¶¶ 280-81.  They are not.

First, discussed in Sections I.A. and C. above, Plaintiffs have offered nothing more than speculative, conclusory, and non-imminent allegations of potential future harm. *See* Section I.A. and C. *supra*.  These common allegations of a generic, hypothetical future risk of harm cannot transmute Plaintiffs' self-imposed Mitigation Measures into injury-in-fact.

Plaintiffs do not confer standing on themselves by purchasing credit monitoring and identity theft protection services, or by spending time spent monitoring their accounts.  Without a

---

of the specter of medical fraud thus does nothing to change the analysis on whether they have pleaded Article III injury in fact.

non-speculative imminent threat of future harm, the "time and expenses . . . spent to mitigate the impact of the breach," Common Complaint ¶ 279(d), do not give rise to standing. *See Taylor*, 693 F. Supp. 3d at 100 (rejecting as injury-in-fact the "prophylactic costs" incurred by Plaintiff "to protect their credit" without imminent risk of identity theft); *see also Hartigan v. Macy's, Inc.*, 501 F. Supp. 3d 1, 5-6 (D. Mass. 2020) (holding purchase of credit monitoring services "was not 'premised on a reasonably impending threat' and does not constitute injury-in-fact," because plaintiff alleged no misuse of his data or plausible risk of future harm); *Reilly v. Ceridian Corp.*, 664 F.3d 38, 46 (3d Cir. 2011) ("[T]ime and money expenditures to monitor . . . financial information do not establish standing, because costs incurred to watch for a speculative chain of future events based on hypothetical future criminal acts are no more 'actual' injuries than the alleged 'increased risk of injury' which forms the basis for [Plaintiffs'] claims.").

Second, the allegation that "[s]everal Plaintiffs have already experienced actual or attempted fraud," Common Complaint ¶ 280, provides no greater justification for Plaintiffs' Mitigation Measures. As already discussed, the few isolated instances of alleged actual or attempted misuse by only "several" Plaintiffs—out of 396—does not permit the larger population of Plaintiffs to retroactively convert their Mitigation Measures into concrete injuries in fact. As the first Circuit has held, "[t]o achieve standing, plaintiffs 'must allege and show that ***they personally*** have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'" *Katz*, 672 F.3d at 79 (quoting *Warth v. Seldin*, 422 U.S. 490, 502 (1975)) (emphasis added); *see also Hochendoner*, 823 F.3d at 730-32. In this case, the vast majority of Plaintiffs allege no present "injuries" other than the costs incurred or time spent on Mitigation Measures—*i.e.*, these Plaintiffs make no allegation of actual or attempted misuse of their personal information. *See* Appendix A, Columns X-Z (identifying

Plaintiffs who have alleged no present "injuries" other than prophylactic costs incurred or measures taken to mitigate the impact of the breach). *See Hartigan*, 501 F. Supp. 3d at 5-6; *see also Engl v. Nat'l Grocers by Vitamin Cottage, Inc.*, No. 15-cv-02129, 2016 WL 8578096, at *6 (D. Colo. June 20, 2016) (finding no standing where the plaintiff identified no injury "other than his own remedial efforts").  As such, their Mitigation Measures cannot establish injury-in-fact.

### E.   Plaintiffs' alleged lost value of PII does not support standing.

Plaintiffs claim that they have suffered a "loss of value" because their personal information "has considerable market value that is diminished when it is compromised."  Common Complaint, ¶ 240; *id.* ¶ 279(b) (alleging that plaintiffs have not been "properly compensated" for alleged misuse of their personal information).

But courts, including this one, "have consistently rejected allegations that the diminution in value of personal information can support standing, particularly where, as here, the Plaintiffs have not alleged that they attempted to sell their personal information or that, if they have, the data breach forced them to accept a decreased price for that information." *Taylor,* 693 F. Supp. 3d at 101 (collecting cases) (cleaned up); *Cooper,* 2022 WL 170622, at *5 (same); *see also Greenstein v. Noblr Reciprocal Exch.*, 585 F. Supp. 3d 1220, 1229 (N.D. Cal. 2022) ("[T]o successfully demonstrate injury in fact by diminution in value of PI, Plaintiffs must establish both the existence of a market for her personal information and an impairment of her ability to participate in that market.") (cleaned up); *Fraga v. UKG, Inc*., No. 2-cv-20105, 2022 WL 19486310, at *11 (S.D. Fla. May 10, 2022) ("Plaintiffs *do not* allege that there exists a legitimate market for consumer PII. Nor, wisely, do they allege that they ever intended to sell their PII to criminals on the black market.").  Indeed, many Plaintiffs expressly allege the opposite—that they would *never* share personal information like Social Security numbers with others, let alone sell it. *See e.g.,* Compl., *Behrens. v. Genworth Life Ins. Co.*, No. 1:23-cv-12451-ADB (D. Mass. Aug. 15, 2023), ECF No.

1 ¶ 97 ("Plaintiff is very careful about sharing his sensitive Private Information. Plaintiff stores any documents containing his Private Information in a safe and secure location.").

This loss-of-value theory should be rejected again here because allegations like Plaintiffs'—which do not plausibly allege loss of actual value *to Plaintiffs*—are "gibberish." *Gubala v. Time Warner Cable, Inc*., 846 F.3d 909, 913 (7th Cir. 2017) ("Time Warner did not take the plaintiff's personal information away from him; he still has it …; he hasn't been deprived of anything; and he isn't asking Time Warner to return his personal information in its files to him."); *Fraga*, 2022 WL 19486310, at *11-12 (finding no standing based on loss of value because "even assuming a legitimate market for their PII exists," the complaint "does not plausibly explain how the ransomware attack could have harmed Plaintiffs' abilities to sell their PII"); *Kylie S. v. Pearson PLC*, 475 F. Supp. 3d 841, 849 (N.D. Ill. 2020) (rejecting theory because plaintiffs did not plead they sold their data or would consider doing so).

Rather than allege any actual value to Plaintiffs that was lost, Plaintiffs point to the purported generic value of "Big Data" to "corporations in America" and to criminals.  Common Complaint ¶¶ 223-26.  But most of the information individuals put at issue is the antithesis of "Big Data" (namely, publicly available addresses and telephone numbers, and non-marketable Social Security numbers), meaning Plaintiffs' claims are nonsensical.  Corporations and criminals are not part of Plaintiffs' putative classes—only individuals are.  And Plaintiffs do not allege *any* impact to the value of personal information to those individuals.  *See Fraga*, 2022 WL 19486310, at *10-12 (rejecting loss-of-value theory premised on value of PII to companies because there was no alleged loss of value *to the plaintiffs*) (collecting cases); *Podroykin v. Am. Armed Forces Mut. Aid Ass'n*, 634 F. Supp. 3d 265, 272 (E.D. Va. 2022) (courts have "routinely rejected the proposition

that an individual's personal identifying information has an independent monetary value") (citation omitted).

### F.     Plaintiffs' alleged loss of the "benefit of the bargain" does not support standing.

Plaintiffs claim they suffered a loss of "the benefit of their bargain" when they "interacted with Defendants."  Common Complaint ¶¶ 277, 279(a).

This theory, dubious in any data-breach context, makes no sense here.  Plaintiffs never had any bargain with (and never "interacted with") many of the Defendants and never paid them anything,[20] much less overpaid.  *See Katz v. Pershing, LLC*, 672 F.3d at 77 (plaintiff "has no bargain with the defendant and, therefore, no entitlement to any benefit from the defendant"); *Burger v. Healthcare Mgmt. Sols., LLC*, No. 23-cv-1215, 2024 WL 473735, at *6 (D. Md. Feb. 7, 2024) ("[C]ourts have consistently rejected [this] overpayment theory, which is particularly appropriate here given the lack of any alleged facts plausibly supporting a conclusion that [plaintiff] paid anything to the defendants."); *Kylie*, 475 F. Supp. 3d at 846 n.3 (benefit-of-bargain theory inapplicable where "[p]laintiffs never paid for [defendant's services]" and thus could not show "products they received were worth less than the products they were promised").

Even where a Plaintiff did deal directly with a Defendant, courts "consistently reject" the benefit-of-the-bargain theory in data breach cases where, as here, Plaintiffs have not plausibly alleged "that the value of the goods or services they purchased was diminished as a result of the data breach."  *Chambliss v. Carefirst, Inc.*, 189 F. Supp. 3d 564, 572 (D. Md. 2016) (cleaned up); *Quintero*, 2021 WL 5855752, at *7-8; *Podroykin*, 634 F. Supp. 3d at 272-73; *Blood v. Labette Cnty. Med. Ctr.*, 2022 WL 11745549, at *6 (D. Kan. Oct. 20, 2022); *Med-Data Inc.*, 2022 WL

---

[20] Specifically, as to Progress, Plaintiffs do not allege—nor can they—that they purchased any product from Progress because Progress did not sell products/services to Plaintiffs.

970862, at *9 (all similar); *see also In re Sci. Applications Int'l*, 45 F. Supp. 3d at 30 ("Such a claim is too flimsy to support standing."); *Bland*, 2024 WL 3313348, at *7-8 (holding a "plaintiff's alleged injury is far too speculative and conjectural to establish an injury in fact" where plaintiff "does not say he planned to sell his PII/PHI on the black market" or "why he can no longer provide his PII/PHI to legitimate companies in exchange for whatever benefits those companies offer.").

### G.   Plaintiffs' attempts to allege other actual injuries likewise fail to support standing.

Plaintiffs' other miscellaneous alleged harms likewise fall short of a concrete, particularized, actual injury sufficient to confer standing.

*First*, some Plaintiffs allege that since the MOVEit Incidents, they have experienced an increase in spam calls, text messages, emails, or other targeted advertising or requests.  *See* Appendix A, Column S; *see also, e.g.*, Compl., *Bloch,* No. 1:23-md-030830-ABD-PGL, ECF No. 913 ¶ 57 (Plaintiff Burke alleging "large uptick in fraudulent spam").  Spam communications are a fact of life for everyone.  While inconvenient, and annoying, an alleged increase in spam does not rise to the level of an Article III injury-in-fact.  *Cooper*, 2022 WL 170622 at *5 ("Courts have generally rejected the theory that unsolicited calls or emails constitute an injury in fact."); *see also, e.g.*, *Cherny v. Emigrant Bank*, 604 F. Supp. 2d 605, 609 (S.D.N.Y. 2009) ("The receipt of spam by itself . . . does not constitute a sufficient injury entitling [the plaintiff] to compensable relief."); *Jackson v. Loews Hotels, Inc.*, 2019 WL 6721637, at *4 (C.D. Cal. July 24, 2019) ("[R]eceiving spam or mass mail does not constitute an injury.").[21] The same is true when the alleged spam may

---

[21] *See also, e.g.*, *In re Illuminate Ed. Data Sec. Incident Litig.*, No. 22-cv-1164, 2023 WL 3158954, at *3 (C.D. Cal. April 19, 2023) ("Receipt of spam, absent any other injury, is insufficient to establish an injury for the purposes of standing."); *Blood*, 2022 WL 11745549, at *6("the alleged inconvenient disruptions (such as spam calls, texts, and emails) do not constitute an injury in fact); *I.C. v. Zynga*, 600 F. Supp. 3d 1034, 1051 (N.D. Cal. 2022) ("First, with respect to credential stuffing, phishing attacks, and the various forms of spam, the Court views these tactics as targeted attempts to commit identity theft . . . the Court finds these attempts fall short of actual identity

be characterized as a phishing attempt.  *See, e.g.*, Compl., *Romine v. Progress Software Corp.*, No. 1:24-cv-11511 (D. Mass. June 10, 2024), ECF No. 1 ¶ 140 ("In or about November and December 2023, Plaintiff Mendez received multiple fraudulent PayPal requests that she transfer $400 and $1,000 to unknown individuals.").[22]  Phishing communications do not constitute an injury-in-fact. *See, e.g.*, *Legg v. Leaders Life Ins. Co.*, 574 F. Supp. 3d 985, 993 (W.D. Okla. 2021) ("[T]he receipt of phishing emails, while perhaps consistent with data misuse, does not plausibly suggest that any actual misuse of Plaintiff's personal identifying information has occurred.") (internal quotation marks omitted).[23]

   ***Second***, certain Plaintiffs allege that they discovered unauthorized charges on payment cards or in bank accounts.  *See* Appendix A, Column T; *see also, e.g.*, Compl., *Bloch*, No. 1:23-md-030830-ABD-PGL, ECF No. 931 ¶ 41 (Plaintiff Bloch alleging "fraudulent charges on his

---

theft."); *In re PracticeFirst Data Breach Litig.*, 2022 WL 354544, at *5 n.8 ("[E]ven if plaintiffs had shown that they received an increase in spam because of this data breach, the Court would still find these allegations insufficient to allege injury in fact."); *Travis*, 2021 WL 1862446, at *8-9 ("Her claim that she has received mass mailing materials does not help her because receiving spam or mass mail does not constitute an injury.").

[22] Many Plaintiffs themselves recognize in their complaints that phishing is categorically indistinguishable from spam phone calls, text messages, and emails. *See, e.g.*, Compl., *Zahara v. CBIZ, Inc., et al.*, No. 1:23-cv-12725-ADB (D. Mass. Nov. 10, 2023), ECF No. 1, ¶ 104 ("through means such as spam phone calls and text messages or phishing emails"); Compl., *Romine*, No. 1:24-cv-11511-ADB, ECF No. 1, ¶ 189 ("Plaintiff Romine has experienced a significant increase in the number of received spam and phishing emails").

[23] *See also Zynga, Inc.*, 600 F. Supp. 3d at 1051 (finding that plaintiffs' allegations of "phishing emails from purported banks and brokerage companies . . . lur[ing] them with personal emails" was insufficient to achieve standing).  Phishing attempts to solicit direct online payments are also insufficient where, as here in *Romine*, there are no allegations that payment was made or money was lost;  tellingly, there are no federal cases in any circuit finding standing solely on the basis of allegations of fraudulent money requests through online payment platforms such as PayPal.  *See Kilgore v. Easterseals-Goodwill N. Rocky Mountain, Inc.*, No. 2:22-cv-00728, 2023 WL 4599321, at *4 (D. Utah July 18, 2023) (holding that plaintiffs failed to demonstrate an injury in fact sufficient for Article III standing based on plaintiff's allegations that she experienced fraudulent attempts to make purchases using her PayPal account as a result of a data breach).

debit card").  For such charges to constitute a concrete injury, however, Plaintiffs must plausibly allege that they actually had to pay for the unauthorized charges, rather than being reimbursed by their credit card company or bank.  *See, e.g.*, *Whalen v. Michaels Stores, Inc.*, 689 F. App'x 89, 90 (2d Cir. 2017) (no injury-in-fact where plaintiff's credit card information was "used twice in attempted fraudulent purchases," but "she never was either asked to pay, nor did pay, any fraudulent charge"); *Hammond v. Bank of N.Y. Mellon Corp.*, 2010 WL 2643307, at *8-9 (S.D.N.Y. June 25, 2010) (unauthorized credit card charge for which plaintiff is not held financially responsible is not an Article III "injury"); *Burton v. MAPCO Exp., Inc.*, 47 F. Supp. 3d 1279, 1285 (N.D. Ala. 2014) (dismissing for lack of standing because plaintiff did not "plausibly allege . . . actual damages (for example, an allegation that the charges on his account were not forgiven, and he had to pay for the charges").  Here, Plaintiffs claiming unauthorized charges who fail to plausibly allege that they were required to pay, and did pay, for any unauthorized charge cannot establish standing on this basis.  *See, e.g.*, Compl., *Cater v. Hartford Life and Accident Ins. Co.*, No. 1:23-cv-12875-ADB  (D. Mass. Sept. 1, 2023).

    ***Third***, many Plaintiffs appear to allege they were injured through an invasion of privacy.  But as this Court previously held, such an allegation is insufficient absent "factual support that any third parties actually viewed or will imminently view [Plaintiff's] data."  *Taylor,* 693 F. Supp. 3d at 100.  Plaintiffs fail to plead any plausible, particularized allegation that the threat actor responsible for the MOVEit Incidents, or any other unauthorized individual, has actually viewed *their* personal information—or that any particular Defendant's data was published for others to view.  Even if a Defendant's data was published, moreover, Plaintiffs allegations repeatedly state that it was not published in a useable way.  *See, e.g.*, Common Complaint ¶ 251 ("There is a strong probability that much of the information stolen in the Data Breach has not yet been made available

on the black market in a coherent, organized fashion."); *id.* ¶ 251 n.268 (data posted by threat actor was unstructured and incomplete).  Plaintiffs' conclusory assertion of invasion of privacy thus does not support Article III standing.

Moreover, many of the types of records allegedly exposed in the MOVEit Incidents— including social security numbers, names, birthdays, and addresses—are not sufficiently private or sensitive to support an invasion of privacy harm.  *See Phillips v. U.S. Customs & Border Protection*, 74 F.4th 986, 995-96 (9th Cir. 2023) ("Plaintiffs do not show that the type of information contained in the records—names, birthdays, social security numbers, occupations, addresses, social media profiles, and political views and associations—is so sensitive that another's access to that information 'would be highly offensive to a reasonable person,' or otherwise gives rise to reputational harm or injury to privacy interests.") (citing Restatement (Second) of Torts § 652B (intrusion upon seclusion)).

***Fourth***, some Plaintiffs allege anxiety or other emotional distress purportedly associated with the MOVEit Incidents.  Courts roundly reject anxiety-based theories of standing regardless of the risks at issue.  *See, e.g.*, *Baysal v. Midvale Indem. Co.*, 78 F.4th 976, 977 (7th Cir. 2023) (Easterbrook, J.) ("[W]orry and anxiety are not the kind of concrete injury essential to standing. If they were, almost everyone could litigate about almost anything, because just about everything anyone does causes some other people to fret.") (internal citations omitted); *Garland v. Orlans PC*, 999 F.3d 432, 439 (6th Cir. 2021) ("[A] bare allegation of anxiety is not a cognizable, concrete injury."); *Luce v. LVNV Funding LLC*, No. 21-cv-82143, 2023 WL 1472582, at *5 (S.D. Fla. Jan. 18, 2023) (same).  In all events, such allegations do not establish standing where, as here, Plaintiffs fail to allege actual misuse of their personal information or an imminent and substantial risk of harm.  *See, e.g.*, *Rivera-Marrero*, 2023 WL 2744683, at *12 (holding Plaintiffs lack Article III

standing where alleged "annoyance, interference, inconvenience, anxiety, and increased concerns for the loss of [their] privacy" are all "premised on a speculative risk of harm that is too abstract to constitute an injury in fact."); *Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 865-66 (6th Cir. 2020) (rejecting standing because risk that allegedly caused anxiety was a "fear of something that may or may not occur in the future").  This is especially true where, as here, such allegations are generalized without factual allegations describing the emotional harm or anxiety.  *See, e.g.*, Common Complaint ¶ 276 ("Similarly, Defendants have offered no compensation for the aggravation, agitation, anxiety, and emotional distress that Plaintiffs and the Class have suffered, and will continue to suffer, as a result of the Data Breach: the knowledge that their information is out in the open, available for sale and exploitation at any time in the future is a real harm that also deserves compensation.").

In sum, none of these miscellaneous injury allegations can establish Article III standing.

## II.    Plaintiffs' alleged injuries are not fairly traceable to Defendants' alleged conduct.[24]

To establish standing, Plaintiffs must also allege sufficient facts to plausibly suggest that "the injury [is] fairly traceable to the challenged action of the defendant." *Lujan*, 504 U.S. at 560 (cleaned up).  The traceability element "requires the plaintiff to show a sufficiently direct causal connection between the challenged action and the identified harm." *Dantzler, Inc. v. Empresas Berrios Inventory & Operations., Inc.*, 958 F.3d 38, 47 (1st Cir. 2020).  This causal connection must be demonstrable; in other words, it "cannot be overly attenuated." *Katz, LLC*, 672 F.3d at

---

[24] Plaintiffs also cannot establish redressability as to the injunctive relief sought.  "[A]n injunction requiring [Defendants] to improve their cybersecurity systems cannot protect the [P]laintiffs from future misuse of their PII by the individuals they allege now possess it. Any such relief would safeguard only against a future breach." *Webb*, 72 F.4th at 378. Injunctive relief would accordingly amount to no more than "'psychic satisfaction'" for Plaintiffs. *Dugas v. Starwood Hotels & Resorts Worldwide, Inc.*, No: 3:16-cv-00014, 2016 WL 6523428, at *8 (S.D. Cal. Nov. 3, 2016) (citation omitted).

71 (internal quotation marks and citation omitted).  Moreover, "[b]ecause the opposing party must be the source of the harm, causation is absent if the injury stems from the independent action of a third party." *Id.* at 71-72.

The various individual complaints, as supplemented by the Common Complaint, fail to allege that any of the asserted injuries are fairly traceable to any Defendant for multiple independent reasons.  ***First***, many Plaintiffs' alleged injuries are not fairly traceable to the MOVEit Incidents because the data that they claim was compromised in those Incidents could not have caused the alleged harm of which they complain (i.e., there is a mismatch between the data allegedly impacted and the injury alleged).  ***Second***, several Plaintiffs attempt to rely on allegations that their personal information was misused before the date Plaintiffs allege their information was published on the dark web (August 15, 2023) or fail to allege when their personal information was supposedly misused.  Any misuse that occurred before Plaintiffs allege their information was made available by the threat actor is not fairly traceable to the MOVEit Incidents.  Likewise, Plaintiffs cannot plausibly allege that an alleged injury is traceable to the MOVEit Incidents, let alone the conduct of any Defendant, without an allegation of *when* it occurred.  ***Third***, Plaintiffs do not and cannot allege that their injuries are traceable to the alleged negligence or other conduct of the Vendor Contracting Entities (VCE) and those Vendor Contracting Entities' customers (VCEC).  These Defendants are multiple rungs removed from the MOVEit Incidents, did not operate or control any instance of the MOVEit software that was breached, and none of the malicious activity occurred on their networks.  As a result, the data security deficiencies Plaintiffs allege could not have led to any of Plaintiffs' supposed injuries.  ***Fourth***, Plaintiffs themselves acknowledge that much of the data allegedly breached in the MOVEit Incidents has not been published in any usable way, which means that none of Plaintiffs' alleged injuries is fairly traceable to the MOVEit

Incidents, as opposed to hundreds of other data breaches (among several other potential reasons, including their own actions).  Each fatal deficiency is discussed below.

### A.    Numerous Plaintiffs fail to plead a plausible connection between the types of data involved in the MOVEit Incidents and their alleged injuries.

Many Plaintiffs' alleged injuries are not fairly traceable to the MOVEit Incidents because Plaintiffs have failed to plead a connection between the data that was allegedly stolen in the incident and the harm that Plaintiff claims to have suffered.  *See, e.g.*, *Burger, LLC*, 2024 WL 473735, at *6 (finding claims of "unauthorized charges on [plaintiff's] credit card" failed on traceability grounds because plaintiff "does not allege that her credit card information itself was disclosed"); *In re Sci. Applications Int'l*, 45 F. Supp. 3d at 31-32 (plaintiffs could not establish standing where their alleged injury – identity theft – was caused by theft of financial information and the only information stolen was unrelated medical data); *Antman v. Uber Techs., Inc.*, No. 15-cv-01175, 2018 WL 2151231, at *10 (N.D. Cal. May 10, 2018) ("allegat[ion] that [plaintiff's] Social Security number and other PII have been made available for sale on the 'dark web'" was not fairly traceable to defendant absent a corresponding allegation that the same information was "*disclosed in the Data Breach*").[25]

Here, about 96 Plaintiffs allege that they experienced purported injuries that bear no connection to the limited data elements they allege were involved in the Incidents that form the

---

[25] *See also In re Uber Techs, Inc., Data Sec. Breach Litig.*, No. 18-ML-2826, 2019 WL 6522843, at *4 (C.D. Cal. Aug. 19, 2019) ("[T]he Court cannot discern, and Plaintiff does not sufficiently explain, how the hackers could use one's contact information and driver's license number to gain access to additional personal information" necessary to cause their alleged injuries.); *Fernandez*, 127 F. Supp. 3d at 1086 ("Plaintiff's allegations that someone attempted to open a bank account in his name, attempted to log in to his email accounts, and that he received an increased number of email advertisements targeting his medical conditions do not allege injuries in fact fairly traceable to the Data Breach, since Plaintiff has not alleged that bank account information or email addresses were on the stolen backup data tapes."); *McCombs v. Delta Grp. Elecs., Inc.*, 676 F. Supp. 3d 1064, 1067, 1074 (D.N.M. 2023) (finding plaintiff "failed to allege that she has suffered an injury in fact that is fairly traceable" to defendant and lacks standing to pursue claims because,

basis of their claims.  *See* Appendix A, Column L.    Indeed, this is endemic to the individual Plaintiffs who seek to eke out claims of actual misuse of their data.  Generally, these mismatch problems fall into two categories.  In the first category, certain Plaintiffs allege that they received an increase in spam phone calls, text messages, or emails after the MOVEit Incidents but make no allegations that their phone numbers or email addresses were among the information that was involved.  In the second category, certain Plaintiffs allege that they experienced fraudulent charges on existing accounts or other misuse of their financial information, but they do not allege that the account information required to commit this alleged fraud was compromised in the MOVEit Incidents.  *See id.*  As a result, given the mismatch between the data allegedly involved in the Incidents and that was necessary to cause the harm for which Plaintiffs seek relief, a direct causal connection between the Incidents and their alleged harm is not just unlikely, it is implausible.  *See Greenstein v. Noblr Reciprocal Exch.*, No. 21-cv-04537, 2022 WL 17418972, at *4-5 (N.D. Cal. Dec. 5, 2022) (holding that the plaintiffs did not establish Article III standing because, among other reasons, none of the alleged injury could be traced to the defendant's alleged conduct and explaining that any potential harm could not be fairly traced to the data impacted in the incident at issue), *appeal docketed*, No. 22-17023 (9th Cir. Dec. 30, 2022).

**B.    No alleged injuries from before the date Plaintiffs allege information was posted on the dark web can be fairly traceable to the MOVEit Incidents.**

For the few individual Plaintiffs who attempt to allege that their individual data has been actually misused, Plaintiffs' theory appears to be that Cl0p published individuals' data and other actors were able to successfully download that data and then use it for improper purposes.  But the

---

*inter alia*, plaintiff "has not provided a nexus between the data breach and the listed unwanted communications"); *Blood*, 2022 WL 11745549, at 5 (plaintiffs lacked standing based on unauthorized charges to bank account where there was no allegation that plaintiffs' bank account number or debit card number was accessed in breach).

Common Complaint pleads many of these individual Plaintiffs out of any plausible inference of traceability given *when* the individual Plaintiffs contend they experienced misuse. Specifically, Plaintiffs allege multiple steps occurred between each compromise of the MOVEit software used by a particular entity and Cl0p publishing data obtained through that user's software:

- **First**, Cl0p threatened to publish the names of compromised organizations if they did not contact Cl0p by June 14, 2023. Common Complaint ¶ 178, Figure 6 ("IF WE DO NOT HEAR FROM YOU UNTIL JUNE 14, 2023 WE WILL POST YOUR NAME ON THIS PAGE").

- **Second**, Cl0p began to post the names of certain organizations it claimed were compromised. For example, on June 14, 2023, "Cl0p released a list of 12 organizations that had data compromised in the Data Breach on their dark website." *Id.* ¶ 181. At this point, and as noted in several sources Plaintiffs rely on, no stolen data had been published. *Id.* ¶ 203 n.227, Stefanie Schappert, *Cl0p names first batch of alleged MOVEit victims*, CyberNews (June 15, 2023), https://cybernews.com/news/cl0p-moveit-ransom-attack-victims-names/ (as of June 15, 2023, "none of the victims named on the Cl0p site, or any other suspected MOVEit victims, have had their data published"); *id.* ¶ 201 n.225, Carly Page, *Ransomware gang lists first victims of MOVEit mass-hacks, including US banks and universities*, TechCrunch (June 15, 2023), https://techcrunch.com/2023/06/15/moveit-clop-mass-hacks-banks-universities (as of June 15, 2023, "No stolen data has been published at the time of writing").

- **Third**, Cl0p would permit about 10 days for price negotiations with the organizations whose names it published. *Id.* ¶ 178, Figure 6.

- **Finally**, "AFTER 10 NOT PRODUCTIVE DAY[S]" Cl0p would publish the data. *Id.*

Plaintiffs, however, fail to allege when Cl0p named each Defendant, and thus when the 10-day clock to Cl0p publishing their data began to run. Instead, Plaintiffs allege that "on June 14, 2023, Cl0p released a list of 12 organizations," *id.* ¶ 181, and "[b]y July 28, 2023, Cl0p had named over 250 organizations," *id.* ¶ 183. Plaintiffs do not allege when or if Cl0p delivered on its threats and actually published the data for either the first 12 organizations it named or any subsequently named organization. Plaintiffs only allege that "[t]his continued until August 15, 2023, when Cl0p

published all of the information it had stolen from hundreds of Data Breach targets who refused to pay." *Id.* ¶ 209.

Taking Plaintiffs' allegations as true, and without more information, Plaintiffs show that the data at issue was published at the earliest as of August 15, 2023. *Id.* Traceability, along with the other elements of Article III standing, is determined at the time a plaintiff's complaint is filed. *U.S. ex rel. Est. of Cunningham v. Millennium Lab'ys of Cal., Inc.*, 713 F.3d 662, 664 (1st Cir. 2013); *Sallen v. Corinthians Licenciamentos LTDA*, 273 F.3d 14, 23 (1st Cir. 2001) ("Jurisdiction depends upon the facts as they existed when the complaint was brought."). Later events may not create subject matter jurisdiction where none existed at the time of filing. *See Lujan*, 504 U.S. at 571 n.4 (explaining that actions taken after the complaint's filing cannot "retroactively create[]" jurisdiction "that did not exist at the outset"). Any individual Plaintiff who alleges that they experienced actual misuse before August 15, 2023 or filed a complaint before August 15, 2023 in which actual misuse is alleged, such harm cannot fairly be traceable to the incidents, let alone to any specific Defendant. *See, e.g.*, *Park v. Forest Serv. of U.S.,* 205 F.3d 1034, 1037-38 (8th Cir. 2000) (holding that injury-in-fact cannot be based on events subsequent to the filing of the original complaint); *Perry v. Village of Arlington Heights*, 186 F.3d 826, 830 (7th Cir. 1999) (concluding that plaintiff, who established residency in municipality after initiating suit, did not have standing to challenge the constitutionality of articles of the municipal code because he was not a resident when he filed his complaint); *Cal. Ass'n of Physically Handicapped, Inc. v. F.C.C.*, 778 F.2d 823, 827 (D.C. Cir. 1985) (R.B. Ginsburg, J.) (dismissing complaint because plaintiff failed to establish "injury in fact *caused* by the action at issue" where the injury "occurred before, existed at the time of, and continued unchanged after the challenged" action and thus "cannot [be] tenably trace[d]" to "the asserted injury"). These Plaintiffs have therefore pleaded themselves out of court by

pleading facts affirmatively showing that their alleged injury is not fairly traceable to the MOVEit Incidents.

Likewise, Plaintiffs fail to plausibly plead "a sufficiently direct causal connection between the challenged action and the identified harm," *Dantzler, Inc.*, 958 F.3d at 47, where the complaint is silent about when a supposed injury occurred. Without any allegation as to timing, there can be no factual basis to infer that the alleged injury was the result of a MOVEit Incident, much less the conduct of any Defendant, as opposed to other unrelated events or events that occurred long before or well after the MOVEit Incidents.

### C.    Plaintiffs do not allege facts making it plausible that their alleged injuries are traceable to any alleged conduct of VCE and VCEC Defendants.

Plaintiffs bear the burden of establishing that their alleged injuries are fairly traceable to "*each defendant*." *Castro v. N.H. Sec'y of State*, ---F. Supp. 3d--- , No. 23-cv-416, 2023 WL 7110390, at *3 (D.N.H. Oct. 27, 2023) (emphasis added), *aff'd*, 86 F.4th 947 (1st Cir. 2023). But they do not plead facts making it plausible that any of their claimed injuries are fairly traceable to any alleged negligence or other wrongdoing of the VCE or VCEC Defendants.[26] These Defendants did not have a direct relationship with Progress—they are multiple steps removed. VCEs are *two steps removed* because these Defendants contracted with a vendor that, in turn, contracted with Progress. And VCECs are *three steps removed* because these Defendants were customers of, or otherwise had a relationship with, VCEs. Put differently, Progress is a vendor of a vendor in the

---

[26] Plaintiffs' insistence on bringing claims against these Defendants who are several steps removed from Progress is a large part of the reason this MDL is so unwieldy.

case of VCEs, and a vendor of a vendor's vendor in the case of VCECs. A chart illustrating this relationship is set forth below:



Plaintiffs do not allege any of the malicious activity occurred on the VCEs or VCECs' networks, and therefore, no amount of cybersecurity by these Defendants—even perfect cybersecurity—could have prevented the MOVEit Incidents from occurring. As a result, none of Plaintiffs' allegations that Defendants' purported failures to implement certain cybersecurity measures on their systems—such as alleged failures to implement 24/7 intrusion detection, log monitoring, whitelisting, etc.—could have led to Plaintiffs' alleged injuries.

Plaintiffs' remaining allegations of alleged wrongful conduct also fail to establish the fairly traceable requirement of Article III standing for these Plaintiffs. For instance, Plaintiffs allege Defendants failed to implement reasonable data security measures and otherwise failed to act reasonably. Common Complaint ¶ 394 (alleging Defendants "failed to take adequate security measures"); *see id.* ¶ 271 (alleging Defendants "chose not to take" reasonable security steps). But these allegations are nothing more than unsupported "labels and conclusions," *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 555 (2007), and do not plausibly link Plaintiffs' alleged injuries to these Defendants, which did not use MOVEit Transfer.  In many cases involving VCE or VCEC Defendants, Plaintiffs make no allegations (or no non-conclusory factual allegations) about failure to provide adequate oversight of Vendors.  And where Plaintiffs do allege inadequate oversight, Plaintiffs fail to link Plaintiffs' alleged harm to these Defendants because Progress was *not* their vendor.  The lack of a causal connection is even more apparent for VCEC Defendants, which Plaintiffs do not allege had any insight into the involvement of any upstream vendors, much less the details of the software they use or their cybersecurity practices.  To accept Plaintiffs' claim that an alleged failure to exercise reasonable vendor oversight by a Defendant that is two steps removed from Progress—and in the case of a VCEC Defendant, three steps removed from Progress—led to Plaintiffs' injuries defies commonsense and logic and must be rejected.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 663-64 (2009) (explaining that the plausibility analysis "is context specific, requiring the reviewing court to draw on its experience and common sense"); *Equal Means Equal v. Ferriero*, 478 F. Supp. 3d 105, 117 (D. Mass. 2020) ("Injuries that stem from independent acts of third parties are ordinarily not cognizable because they are neither fairly traceable to the defendant nor likely to be redressed by the requested relief."), *aff'd,* 3 F.4th 24 (1st Cir. 2021); *Am. Waterways Operators v. United States Coast Guard*, 613 F. Supp. 3d 475, 485 (D. Mass. 2020) (finding that plaintiff's injury was not fairly traceable to the defendant because the purported injury "involves multiple levels of attenuation to the [defendant's] action and thus cannot confer Article III standing.").  Indeed, glaringly absent are any allegations even attempting to explain how vendor oversight by VCE and VCECs Defendants could have prevented the MOVEit Incidents—all of which exploited a "zero-day" software vulnerability unknown even to Progress.

### D. No alleged injury is fairly traceable to the MOVEit Incidents where Plaintiffs allege that the data was not published in a usable form.

None of Plaintiffs' alleged injuries—regardless of data type and timing—are fairly traceable to the MOVEit Incidents, because Plaintiffs fail to allege that the data was published in a useable form. The Common Complaint states that "there is a strong probability that much of the information stolen in the Data Breach has not yet been made available on the black market in a coherent, organized fashion." Common Complaint ¶ 251. Plaintiffs further acknowledge that even if some data were published on the dark web in an unusable form, sites in that environment "appear and disappear quickly." *Id.* ¶ 226. Put differently, Plaintiffs allege that it is "strong[ly] probab[le]" that a necessary link to their alleged misuse injuries has not materialized for "much of the information stolen in the Data Breach." *Id.* ¶ 251. In so doing, Plaintiffs undermine the traceability of any such injuries.[27] *See Dantzler, Inc.*, 958 F.3d at 48 ("The Supreme Court has cautioned against courts finding that a plaintiff's injury is fairly traceable to a defendant's conduct where the plaintiff alleges a causal chain dependent on actions of third parties."). By alleging that the published data was **not** available "in a coherent, organized fashion" after its alleged posting by Cl0p roughly a year ago, Plaintiffs raise yet additional steps required of any third party that might have sought to exploit Cl0p's work, including, for example, recognizing the stolen data for what it is, acquiring the software necessary to download the data, successfully downloading the data (despite the difficulties that Plaintiffs admitted accomplished data security professionals had in

---

[27] Even beyond the deficiencies in Plaintiffs' dark web allegations as to usability, Plaintiffs dark web allegations additionally fail because of the lack of traceability between the data alleged to be on the dark web and the MOVEit Incidents. *See e.g.,* Amended Class Action Compl., *Sweeney v. Corebridge Fin., Inc.*, No. 1:23-cv-126656 (D. Mass. June 11, 2024), ECF No. 35 ¶ 150 (alleging "notice from identity theft and credit monitoring services that his personal information is available on the dark web" but failing to allege with particularity *what* personal information is available, whether that personal information was exposed in the data breach and when, other than the generic "only began following the data breach," that information became available.).

trying to do so), extracting the data once downloaded, acquiring familiarity with the database format(s), and finally choosing to either misuse a particular Plaintiffs' data or sell that Plaintiff's data to a willing buyer who would then abuse it.  *See* Common Complaint ¶ 251 n.268 (quoting https://cybernews.com/security/clop-publish-all-moveit-victim-ransom-data-clearweb/)  ("To extract it all, these are multi-part ZIP files that they are splitting into a hundred different pieces. And, you have to combine them all back together. And that means you have to have every single piece of those 100 parts downloaded; otherwise, it won't extract properly").  Given the uncertainty surrounding the decisions of such third parties, the links in the chain of causation are "far too weak for the chain as a whole to sustain . . . standing."  *Dantzler, Inc.*, 958 F.3d at 48 (quoting *Allen v. Wright*, 468 U.S. 737, 757-59 (1984)).

     **E.**    **Plaintiffs' allegations of spam phone calls, text messages, and emails are not fairly traceable to the MOVEit Incidents.**

The Complaints' fair traceability problems are even more acute with respect to Plaintiffs' allegations that they have suffered an injury-in-fact based on allegations that they received spam emails and phone calls after the Incidents.  *See* Appendix A, Column S.  Multiple courts have held that conclusory and generic allegations just like the ones Plaintiffs make here fail to make it plausible that the spam communications are fairly traceable to a data breach.  *See, e.g.*, *Cooper*, 2022 WL 170622, at *5 (holding that alleged increase in spam communications was not injury-in-fact and even if it were, plaintiff failed to plausibly allege those spam communications were fairly traceable to defendant's alleged conduct); *In re Sci. Applications Int'l*, 45 F. Supp. 3d at 33 (generalized allegations of unsolicited calls are insufficient to plausibly allege fair traceability). This is especially true here given the absence of any facts plausibly suggesting a link between Cl0p and individuals who place spam phone calls or send spam emails or text messages, as well as the

absence of any facts plausibly suggesting that spammers rely on dark web postings to obtain information about who to spam.

Because Plaintiffs cannot plausibly allege a link between the MOVEit Incidents and any alleged injury, they lack standing.

## **CONCLUSION**

For the foregoing reasons, the Court should grant Defendants' omnibus motion to dismiss Plaintiffs' complaints for lack of Article III standing.


Dated: July 23, 2024                                Respectfully submitted,

                                                    By:  */s/ Jack W. Pirozzolo*
                                                    Jack W. Pirozzolo (BBO # 564879)
                                                    SIDLEY AUSTIN LLP
                                                    60 State Street, 36th Floor
                                                    Boston, MA 02109
                                                    Tel:  (617) 223-0304
                                                    jpirozzolo@sidley.com

                                                    By:  */s/ Aravind Swaminathan*
                                                    Aravind Swaminathan (*pro hac vice*)
                                                    ORRICK HERRINGTON & SUTCLIFFE LLP
                                                    401 Union Street, Suite 3300
                                                    Seattle, WA 98101
                                                    Tel:  (206) 839-4340
                                                    aswaminathan@orrick.com

                                                    By:  */s/Allison M. Holt Ryan*
                                                    Allison M. Holt Ryan (*pro hac vice*)
                                                    HOGAN LOVELLS LLP
                                                    555 13th Street NW
                                                    Washington, D.C. 20004
                                                    Tel:  (202) 637-5600
                                                    allison.holt-ryan@hoganlovells.com

By: */s/ Nathaniel R. Mendell*
Nathaniel R. Mendell (BBO # 645283)
MORRISON & FOERSTER LLP
200 Clarendon Street
Boston, MA 02116
Tel:  617-648-4700
nmendell@mofo.com

By: */s/ Paulyne Gardner*
Paulyne Gardner (*pro hac vice*)
MULLEN COUGHLIN LLC
426 W. Lancaster Avenue,  Suite 200
Devon, PA 19333
Tel:  (267) 930-4770
pgardner@mullen.law

By: */s/ Gilbert S. Keteltas*
Gilbert S. Keteltas (*pro hac vice*)
BAKERHOSTETLER LLP
1050 Connecticut Avenue, NW
Washington, DC  20026
Tel:  (202) 861-1530
gketeltas@bakerlaw.com

By: */s/ Jeff Tsai*
Jeff Tsai (*pro hac vice*)
DLA PIPER LLP
555 Mission Street, Suite 2400
San Francisco, CA 94105-2933
Tel:  (415) 615-6055
jeff.tsai@dlapiper.com

By: */s/ Kristine McAlister Brown*
Kristine McAlister Brown (*pro hac vice*)
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street, Suite 4900
Atlanta, GA 30309
Tel:  (404) 881-7584
kristy.brown@alston.com

47

By: */s/Edward P. Boyle*
Edward P. Boyle (*pro hac vice*)
VENABLE LLP
151 West 42nd Street, 49th Floor
New York, NY 10036
Tel:  (212) 808-5675
epboyle@venable.com

By: */s/Kari M. Rollins*
Kari M. Rollins (*pro hac vice*)
SHEPPARD MULLIN RICHTER &
HAMPTON LLP
30 Rockefeller Plaza
New York, NY 10112
Tel:  (212) 634-3077
Krollins@sheppardmullin.com

By: */s/Felicia H. Ellsworth*
Felicia H. Ellsworth (*pro hac vice*)
WILMER CUTLER PICKERING HALE & DORR
LLP
60 State Street
Boston, MA  02109
Tel: (617) 526-6687
Felicia.ellsworth@wilmerhale.com

*Defendants' Liaison Committee*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 23, 2024, this document, filed through the CM/ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

Dated: July 23, 2024                    */s/ Jack W. Pirozzolo*
                                         Jack W. Pirozzolo