# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

IN RE: MOVEIT CUSTOMER DATA
SECURITY BREACH LITIGATION

This Document Relates To:

*ALL CASES*

MDL No. 1:23-md-03083-ADB-PGL

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' OMNIBUS
## MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(1)

## TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................................1

FACTUAL BACKGROUND .............................................................................................5

    I.    MOVEit Transfer and its role in safeguarding Private Information. ......................5

    II.    MOVEit Transfer suffered from critical vulnerabilities that could
have been easily defended against. Because the vulnerabilities
were not addressed, they were exploited. ................................................................6

    III.    How cybercriminals like Cl0p misuse Private Information. ....................................8

        A.    Threat actors identify, steal, and then ransom Private
Information. ................................................................................................8

        B.    Threat actors use the stolen data for nefarious purposes for
years to come. .............................................................................................9

    IV.    The Data Breach has caused significant harm to Plaintiffs. ..................................11

        A.    The harm already caused by this Data Breach demonstrates
that the risk of injury is not speculative or hypothetical............................11

        B.    The fraud Plaintiffs have already alleged demonstrates an
imminent, substantial risk of harm...........................................................13

        C.    It would be unreasonable for Plaintiffs to sit idle and *not*
protect themselves, given the substantial risk of harm they
face.............................................................................................................14

        D.    Plaintiffs have experienced other losses. ...................................................15

ARGUMENT ....................................................................................................................15

    I.    PLAINTIFFS PLEAD INJURY-IN-FACT .........................................................15

        A.    Plaintiffs adequately allege "actual" injuries-in-fact based
on misuse of the data for similarly situated consumers
caught in Cl0P's attack. .............................................................................16

            1.    Plaintiffs alleged actual or attempted fraud. ..................................17

            2.    The cybercriminals sold the stolen information on
the dark web. ..................................................................................21

            3.    Allegations of phishing and attempted fraud. ...............................22

B.    Plaintiffs adequately allege "imminent" injuries-in-fact. ........................23

    1.    Defendants do not dispute that information has already been misused. .....................................................24

    2.    Plaintiffs' information was stolen in a targeted attack. .................................................................24

    3.    Plaintiffs' stolen data is particularly sensitive. ..............................28

C.    Plaintiffs adequately allege separate, concrete harms...............................30

    1.    Plaintiffs have attempted to mitigate their losses, consistent with guidance from Defendants and the FTC. ....................................................................31

    2.    Plaintiffs have sufficiently alleged distress.....................................33

D.    Plaintiffs' injuries are particularized.........................................................34

E.    Defendants already admitted federal subject-matter jurisdiction when they removed 35 actions to federal court. .....................36

II.    PLAINTIFFS' INJURIES ARE TRACEABLE TO DEFENDANTS' CONDUCT...........................................................................37

A.    Defendants have not shown a "mismatch" between the type of data compromised and the harm alleged. ...............................................38

B.    Defendants' "disorganized data" argument is contrary to the well-pleaded facts of Plaintiffs' Complaint. .......................................40

C.    Plaintiffs' allegations of actual misuse suffered shortly after their data was stolen by a criminal organization are sufficient. .................................................................................42

D.    Defendants' VCE and VCEC tracing arguments are an attempted backdoor proximate cause analysis, which is expressly not required in the First Circuit...................................44

III.    PLAINTIFFS' INJURIES ARE REDRESSABLE................................................45

CONCLUSION...................................................................................................................46

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*In re 21st Century Oncology Customer Data Sec. Breach Litig.*,
　380 F. Supp. 3d 1243 (M.D. Fla. 2019)................................................................22, 26

*Anderson v. Hannaford Brothers Co.*,
　659 F.3d 151 (1st Cir. 2011)...............................................................................19, 20, 32

*Attias v. Carefirst, Inc.*,
　865 F.3d 620 (D.C. Cir. 2017), *cert. denied*, 138 S. Ct. 981 (2018) .........................28, 29, 45

*Bass v. Facebook, Inc.*,
　394 F. Supp. 3d 1024 (N.D. Cal. 2019) .................................................................23

*Bergquist v. Deutsche Bank Nat. Tr. Co.*,
　2012 WL 3288859 (D. Or. May 14, 2012) ..............................................................36

*Bohnak v. Marsh & McLennan Cos., Inc.*,
　79 F.4th 276 (2d Cir. 2023) ...............................................................................28, 29, 33

*Bowen v. Paxton Media Grp., LLC*,
　2022 WL 4110319 (W.D. Ky. Sept. 8, 2022) ...........................................................34

*In re Brinker Data Incident Litig.*,
　2019 WL 3502993 (M.D. Fla. Aug. 1, 2019) ...........................................................20

*Brooks v. Georgia Pac., L.L.C.*,
　2017 WL 1534219 (W.D. La. Mar. 21, 2017) ..........................................................36

*Brown v. Brit. Parliament*,
　2023 WL 2898731 (D. Mass. Apr. 11, 2023) ...........................................................35

*Clapper v. Amnesty Int'l USA*,
　568 U.S. 398 (2013)..........................................................................................23, 31

*Clemens v. ExecuPharm Inc.*,
　48 F.4th 146 (3d Cir. 2022) ...............................................................................16, 27, 34

*Dantzler, Inc. v. Empresas Berrios Inventory & Operations, Inc.*,
　958 F.3d 38 (1st Cir. 2020)................................................................................37, 42

*In re Equifax Inc. Customer Data Sec. Breach Litig.*,
　999 F.3d 1247 (11th Cir. 2021) ...........................................................................29, 33

*In re Equifax, Inc., Customer Data Sec. Breach Litig.*,
　362 F. Supp. 3d 1295 (N.D. Ga. 2019) ..................................................................31

*In re Evenflo Co., Mktg., Sales Pracs. & Prods. Liab. Litig.*,
54 F.4th 28 (1st Cir. 2022) ................................................................37, 46

*In re Facebook, Inc., Consumer Priv. User Profile Litig.*,
402 F. Supp. 3d 767 (N.D. Cal. 2019) .............................................31, 46

*Farley v. Eye Care Leaders Holdings, LLC*,
2023 WL 1353558 (M.D.N.C. Jan. 31, 2023) ........................................23

*Fero v. Excellus Health Plan, Inc.*,
236 F. Supp. 3d 735 (W.D.N.Y. 2017) ............................................38, 45

*Fleury v. Union Pac. R.R. Co.*,
2022 WL 1803357 (N.D. Ill. June 2, 2022) ...........................................36

*Fox v. Iowa Health Sys.*,
399 F. Supp. 3d 780 (W.D. Wis. 2019) ..................................................41

*Galaria v. Nationwide Mut. Ins. Co.*,
663 F. App'x 384 (6th Cir. 2016) ...........................................................28

*In re GE/CBPS Data Breach Litig.*,
2021 WL 3406374 (S.D.N.Y. Aug. 4, 2021) .....................................23, 32

*Green-Cooper v. Brinker Int'l, Inc.*,
73 F.4th 883 (11th Cir. 2023) ................................................................21

*Hochendoner v. Genzyme Corp.*,
823 F.3d 724 (1st Cir. 2016) ..................................................................35

*In re Horizon Healthcare Servs.*,
846 F.3d 625 (3d Cir. 2017) ...................................................................29

*Hutton v. Natl. Bd. of Examiners in Optometry, Inc.*,
892 F.3d 613 (4th Cir. 2018) ............................................................20, 33

*Krakauer v. Dish Network, L.L.C.*,
925 F.3d 643 (4th Cir. 2019) ..................................................................22

*Krottner v. Starbucks Corp.*,
628 F.3d 1139 (9th Cir. 2010) ................................................................29

*In re LastPass Data Sec. Incident Litig.*,
2024 WL 3580646 (D. Mass. July 30, 2024)................................. *passim*

*Lewert v. P.F. Chang's China Bistro, Inc.*,
819 F.3d 963 (7th Cir. 2016) ..................................................................28

*Lexmark Intern., Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014)...................................................................................................44

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992).............................................................................................36, 37

*Lyman v. Baker*,
    954 F.3d 351 (1st Cir. 2020).................................................................................34

*In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*,
    440 F. Supp. 3d 447 (D. Md. 2020)..........................................................29, 31, 33

*McFarlane v. Altice USA, Inc.*,
    2021 WL 860584 (S.D.N.Y. Mar. 8, 2021) ..........................................................29

*In re Mednax Servs., Inc., Customer Data Sec. Breach Litig.*,
    603 F. Supp. 3d 1183 (S.D. Fla. 2022) ............................................................34, 39

*Medoff v. Minka Lighting, LLC*,
    2023 WL 4291973 (C.D. Cal. May 8, 2023) .........................................................34

*In re Methyl Tertiary Butyl Ether Prod. Liab. Litig.*,
    510 F. Supp. 2d 299 (S.D.N.Y. 2007)...................................................................36

*Mey v. Got Warranty, Inc.*,
    193 F. Supp. 3d 641 (N.D. W. Va. 2016) .............................................................22

*Mocek v. Allsaints USA Ltd.*,
    220 F. Supp. 3d 910 (N.D. Ill. 2016) ....................................................................37

*Morgan v. Bank of Am., N.A.*,
    2020 WL 3979660 (E.D. Wash. July 14, 2020).....................................................37

*In re MOVEit Customer Data Sec. Breach Litig.*,
    699 F. Supp. 3d 1402 (J.P.M.L. 2023).....................................................................5

*Portier v. NEO Tech. Sols.*,
    2019 WL 7946103 (D. Mass. Dec. 31, 2019)............................................19, 20, 29

*Practicefirst Data Breach Litig.*,
    2022 WL 354544 (W.D.N.Y. Feb. 2, 2022) ..........................................................26

*Quintero v. Metro Santurce, Inc.*,
    2021 WL 5855752 (D.P.R. 2021) ..........................................................................26

*Reilly v. Ceridian Corp.*,
    664 F.3d 38 (3d Cir. 2011).....................................................................................27

*Remijas v. Neiman Marcus Grp., LLC,*
    794 F.3d 688 (7th Cir. 2015) ...........................................................20, 28

*Resnick v. AvMed, Inc.,*
    693 F.3d 1317 (11th Cir. 2012) .................................................................20

*Rivera-Marrero v. Banco Popular de Puerto Rico,*
    2023 WL 2744683 (D.P.R. Mar. 31, 2023) ...............................................15

*Rudolph v. Hudson's Bay Co.,*
    2019 WL 2023713 (S.D.N.Y. May 7, 2019) ..............................................33

*Savidge v. Pharm-Save, Inc.,*
    2024 WL 1366832 (W.D. Ky. Mar. 29, 2024) ...........................................27

*Shedd v. Sturdy Mem'l Hosp., Inc.,*
    2022 WL 1102524 (Mass. Super. Apr. 5, 2022).................................31, 32

*In re Shields Health Care Grp., Inc. Data Breach Litig.,*
    2024 WL 939219 (D. Mass. Mar. 5, 2024)..................................................34

*Solomon v. ECL Grp., LLC,*
    2023 WL 1359662 (M.D.N.C. Jan. 31, 2023) .............................................22

*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016)................................................................................15, 45

*Stasi v. Inmediata Health Grp. Corp.,*
    501 F. Supp. 3d 898 (S.D. Cal. 2020).........................................................23

*Sweet v. BJC Health Sys.,*
    2021 WL 2661569 (S.D. Ill. June 29, 2021)..........................................39, 40

*Taylor v. UKG, Inc.,*
    693 F. Supp. 3d 87 (D. Mass. 2023) ..................................................*passim*

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021)............................................................................*passim*

*In re U.S. Office of Personnel Mgmt. Data Sec. Breach Litig.* (*OPM*),
    928 F.3d 42 (D.C. Cir. 2019).............................................................*passim*

*In re USAA Data Sec. Litig.,*
    621 F. Supp. 3d 454 (S.D.N.Y. 2022)..........................................................33

*Uzuegbunam v. Preczewski,*
    141 S. Ct. 792 (2021)..................................................................................46

011175-35/2756927 V1

*Webb v. Injured Workers Pharmacy, LLC*,
    72 F.4th 365 (1st Cir. 2023)............................................................................. *passim*

*Weekes v. Cohen Cleary P.C.*,
    2024 WL 1159642 (D. Mass. Mar. 15, 2024)...........................................................15

*In re Yahoo! Inc. Customer Data Sec. Breach Litig.*,
    2017 WL 3727318 (N.D. Cal. Aug. 30, 2017) ........................................................21

## STATUTES

28 U.S.C. § 1447(c) ..........................................................................................................37

## OTHER AUTHORITIES

Fed. R. Civ. P. 12(b)(1)......................................................................................................5

011175-35/2756927 V1

## INTRODUCTION

Under binding First Circuit authority, the Plaintiffs here have standing and this Court has Article III jurisdiction to hear this case. Article III requires only that a plaintiff show that she has: (1) suffered an injury; (2) that is traceable to the defendant; and (3) that can be redressed by this Court. In the context of a data breach in which the personally identifiable information ("PII") and protected health information ("PHI") (collectively, "Private Information") of a multitude of individuals is compromised, the First Circuit has applied this test and held that, as here, a plaintiff can demonstrate a "concrete injury in fact based on the material risk of future misuse of [the plaintiff's] PII and a concrete harm caused by exposure to this risk." *Webb v. Injured Workers Pharmacy, LLC*, 72 F.4th 365, 374 (1st Cir. 2023).

According to the First Circuit, such material risk of future misuse of the PII can be established with allegations that: (1) the plaintiffs' information has been "deliberately taken by thieves intending to use the information to their financial advantage—i.e., exposed in a targeted attack rather than inadvertently"; and (2) there already has been "actual misuse of a portion of the stolen information." *Id.* at 375 (emphasis added). As explained by the First Circuit in a nearly identical fact pattern to this case: "[i]t stands to reason that data compromised in a targeted attack is more likely to be misused. That at least some information stolen in a data breach has already been misused also makes it likely that other portions of the stolen data will be similarly misused." *Id.* at 375-76 (citations omitted). As demonstrated herein, Plaintiffs' allegations in this case fit the holdings in *Webb* and establish the requisite material risk of future misuse of their PII.

Further, Plaintiffs have established a present and concrete harm given the material risk of future misuse of their data. In *Webb*, the First Circuit explicitly "joined other circuits in

concluding that time spent responding to a data breach can constitute a concrete injury sufficient to confer standing" and concluded that the plaintiffs' allegations of "lost time spent taking protective measures that would otherwise have been put to some productive use" established a present, concrete harm. *Webb*, 72 F.4th at 369. Although Plaintiffs here have made similar allegations to those found to confer standing in *Webb*, Defendants virtually ignore and misconstrue this important controlling precedent.

The facts surrounding the MOVEit data breach, and the underpinning allegations made in this case, satisfy (and far surpass) the First Circuit's test for Article III standing. The facts here are more egregious than those found in *Webb*. Here, Plaintiffs have not only identified the bad actor (Cl0p, an international, sophisticated, and renowned cybercriminal network that regularly engages in ransomware attacks, phishing, distribution of malware, and identity theft), but have also demonstrated that the same bad actor effectuated a multi-day concerted attack on thousands of companies who were all using the same shoddy software, and published highly sensitive information about class members on the dark web. This attack took *years* to plan and yielded one of the largest payloads of Private Information in world history. Of the hundreds of individuals who stepped forward to serve as class representatives, over *157* of them have alleged that they have *already* experienced some type of fraud or data misuse prior to filing their complaints against *82* different Defendants. Defendants misstate the facts when they claim that "only about 30" have alleged actual misuse "against roughly 25 Defendants." Mot. at 11, 19, 20. Nevertheless, the remaining Plaintiffs face significant risk of imminent harm, and all Plaintiffs have spent time and money to protect themselves from fraud and identity theft given the severity and breadth of the Data Breach. Every Plaintiff here has alleged a cognizable injury under First

Circuit law. But even if they did not, if even one Plaintiff alleged plausible misuse, all would still have standing under *Webb*.

Defendants' efforts to analogize this case to the distinguishable facts this Court previously considered in *Taylor* are misplaced. In *Taylor*, the Court's decision that the plaintiffs lacked standing turned on the fact that the plaintiffs had "alleged that their information . . . was *exposed* to hackers, but [had] not alleged any *misuse* of their or others' information resulting from the alleged data breach." *Taylor v. UKG, Inc.*, 693 F. Supp. 3d 87, 98 (D. Mass. 2023) (emphases added). This Court's recognition of the distinction between mere exposure of Private Information and actual misuse of at least a portion of the stolen data applies with equal force in this case. Here, not only was information "exposed" to hackers, but the information was stolen, held for ransom, and a portion of the stolen information has already been published on the dark web, with a large portion of Plaintiffs having alleged actual fraud and misuse as a result. In this case, as in *Webb*, the hackers have already demonstrated that they will exploit and capitalize on the information stolen in this attack. This Court's prior decision in *Taylor* is distinguishable and inapplicable here.

The fact that this is a "hub and spoke" data breach, with multiple Defendants' data being accessed by the same bad actor through the same coordinated attack, does not impact the rationale for the conclusion in *Webb* that a data thief's misuse of a portion of the stolen data makes it "likely that other portions of the stolen data will be similarly misused." *Webb*, 72 F.4th at 376. Article III does not require that the hackers misuse *all* of the stolen data prior to Plaintiffs filing suit (or portions of it from each Defendant); the relevant question for purposes of Article III is whether Plaintiffs face a sufficiently imminent risk of future harm such that they can seek redress without violating the Constitution. Accordingly, the constitutionality of this Court's

jurisdiction cannot possibly turn on the notion that Plaintiffs' relative levels of injury are meaningfully differentiated based on the identity of the Defendant who owned the particular server from which the data was stolen. For purposes of establishing the material future risk that the bad actor will misuse the stolen data, what matters is that all of the data stolen in the MOVEit Data Breach was stolen by the *same bad actors*, at the *same time* (exploiting the same vulnerability), and for the *same purpose*. Under these facts, applying the reasoning of *Webb*, the material risk of future misuse is shown for the entire repository of stolen data, regardless of which Defendant held the bit of data that was misused for any particular Plaintiff. The data was stolen from a separate repository for each Defendant, but it is all in one repository now—the one maintained by the bad actors—and that is what matters for purposes of assessing future risk of misuse.

Defendants' efforts to claim that millions of Plaintiffs and putative class members lack standing because not *all* of them have *yet* suffered financial or healthcare fraud defies logic and is contradicted by controlling First Circuit authority (and nearly every other Circuit to examine this issue). In order to find that Plaintiffs are not at a sufficiently imminent risk of harm to satisfy the low bar of Article III, this Court would be required to conclude that: (1) despite the *years*' worth of efforts that an internationally renowned criminal gang of cyberthieves invested in procuring Plaintiffs' PII; (2) the numerous already-identified instances of misuse, and (3) the fact that Plaintiffs have identified troves of data from the Data Breach available for free or sale on the dark web, there is no imminent risk that thieves will use the remaining stolen data in any nefarious way going forward. It would further require the Court to conclude that, despite being advised by the FTC *and the Defendants themselves* to take steps to protect their data, Plaintiffs

- 4 -

and class members are overreacting and should have done and should continue to do nothing. That is simply untenable. The Constitution, *Webb*, and *Taylor* all counsel otherwise.

Defendants' Motion to Dismiss Pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure should be denied.

## FACTUAL BACKGROUND

Hundreds of Plaintiffs brought lawsuits arising from the Russian hacker group Cl0p's precisely planned, highly coordinated, synchronized infiltration of thousands of organizations' servers through the exploitation of vulnerabilities in Progress's MOVEit Transfer software, which was installed on the organizations' servers (referred to herein as the "Data Breach"). *See generally* Plaintiffs' Omnibus Set of Additional Pleading Facts ("POSAPF"), ECF No. 908. This multidistrict litigation was created to resolve the pretrial issues of those lawsuits. *In re MOVEit Customer Data Sec. Breach Litig.*, 699 F. Supp. 3d 1402 (J.P.M.L. 2023).

I.    **MOVEit Transfer and its role in safeguarding Private Information.**

MOVEit Transfer is enterprise software that was first released in 2002 and is licensed to public and private organizations who then install it on their organizations' own servers to ostensibly provide secure file storage and transfer functions over the Internet. POSAPF ¶¶ 11-37. Defendants regularly handle, store, and transfer Private Information as part of their normal operations and use MOVEit Transfer to effectuate those transfers. *Id.* ¶¶ 314-36. Progress advertises and warrants MOVEit Transfer as capable of securely transferring highly sensitive information over the Internet and storing it on organizations' servers—i.e., security "at-rest and in-transit." *Id.* ¶¶ 38-43. Progress further touts MOVEit Transfer's compliance with

cybersecurity industry standards, laws, and regulations. *Id.* The Private Information[1] stored on

MOVEit Transfer servers was (and is) the kind of sensitive information Plaintiffs and class

members expected would be treated with utmost care and kept confidential. *Id.* ¶ 381. It includes

names; dates of birth; addresses; email addresses; telephone numbers; Social Security numbers;

subscriber/member ID numbers; driver's license numbers; state identification numbers; policy

numbers; group numbers; claim numbers; medical history and diagnoses; medical bills and

claims data; financial account and routing/ABA numbers; pension benefit account numbers;

health insurance ID numbers; and health insurance claims numbers. *Id.* ¶ 196.

## II.    MOVEit Transfer suffered from critical vulnerabilities that could have been easily defended against. Because the vulnerabilities were not addressed, they were exploited.

Unfortunately, MOVEit Transfer suffered from critical vulnerabilities that allowed

remote unauthorized users to gain access to, decrypt, and download files from any Internet-

connected server that was running MOVEit Transfer software. *Id.* ¶¶ 44-89. These

vulnerabilities—namely, SQL injection and binary deserialization—are not new or novel

strategies. *Id.* Rather, they have been known and understood for years before the Data Breach

and could have been easily protected against had Defendants followed standard industry security

practices. *Id.* These vulnerabilities existed in the same exact manner on every server running

MOVEit Transfer because the vulnerabilities were inherent in the MOVEit Transfer software

code, which was maintained by Progress. *Id.* ¶ 151.

In addition to Progress's own failure to ensure its software code was secure, every

Defendant knew:

---

[1] A term used throughout this briefing and in Plaintiffs' POSAPF to refer to both Personally Identifiable Information ("PII") and Protected Health Information ("PHI"). POSAPF ¶¶ 38, 191, 196,

(1)    that they had a duty to protect the Private Information with which they were entrusted (*id.* ¶¶ 376-81);

(2)    of the risks of data breaches and the harm that is caused by the theft of Private Information (*id.* ¶¶ 382-94);

(3)    of their obligation to safeguard Plaintiffs' and class members' Private Information and to vet and continuously monitor the software vendors used to transfer and store the Private Information (*id.* ¶¶ 395-402); and

(4)    that they failed to properly vet and continuously monitor the MOVEit Transfer software and implement it in a secure manner consistent with industry standards and instead chose to use MOVEit Transfer in a sub-standard fashion with Plaintiffs' and class members' Private Information. *Id.* ¶¶ 427-68.

Accordingly, every Defendant was responsible for, and failed to, keep Plaintiffs' Private Information safe.

Cl0p exploited the MOVEit Transfer vulnerabilities (and Defendants' failure to safeguard against them) in the exact same way and stole troves of Plaintiffs' and class members' highly sensitive Private Information from thousands of organizations in a single coordinated attack over the course of only a few days from May 27 to 31, 2023. *Id.* ¶¶ 90-155. The attack was possible because Cl0p spent years identifying potential targets by scanning the Internet for MOVEit Transfer access points, *id.* ¶¶ 136-38, and then developed and tested a malicious computer program that could be rapidly deployed to infiltrate any unprotected MOVEit Transfer server and exploit the uniform vulnerabilities. *Id.* ¶¶ 96-134. The success and huge scale of the attack also demanded that it be accomplished quickly and efficiently. To achieve these goals, Cl0p began the attack to coincide with the beginning of the long Memorial Day weekend. *Id.* ¶ 141. Within only a matter of hours and days, Cl0p's automated computer program automatically uploaded itself to thousands of MOVEit Transfer servers and exfiltrated the highly sensitive files from the organizations' servers. *Id.* ¶¶ 140-48.

With knowledge of the critical vulnerabilities affecting every MOVEit Transfer server, Cl0p knew that maximizing the success of its Data Breach depended on it being coordinated,

simultaneous, widespread, and streamlined, rather than individualized to each organization's server. *Id.* ¶ 135. Cl0p's coordinated attack was particularly efficient and successful because all unprotected MOVEit Transfer versions had the same exact vulnerabilities, *id.* ¶ 151, and due to Progress's years of failures to update, maintain, audit, or test its antiquated and unsecure code base. *Id.* ¶¶ 282-313.

Cl0p's strategy resulted in the compromise of over 2,600 organizations' (including those of Defendants) MOVEit Transfer servers during the short attack window, resulting in the targeted theft and exfiltration of millions of individuals' Private Information. *Id.* ¶ 184.

### III. How cybercriminals like Cl0p misuse Private Information.

After Cl0p compromised the MOVEit Transfer servers and stole Plaintiffs' and class members' Private Information, Cl0p proceeded to sift through the terabytes of Plaintiffs' and class members' Private Information and attempt to ransom the data back to the target organizations (else it would be published on the dark web). *Id.* ¶¶ 175-214. Cl0p's strategy was neither new nor novel; Cl0p is known for stealing information and ransoming it back to organizations or posting it on the dark web. *Id.* ¶ 200. The ways in which cybercriminal gangs misuse information have become well known to any organization which collects Private Information. First, cybercriminals identify valuable information, steal it, and then attempt to ransom the stolen data back. Then, regardless of whether a ransom is paid, the threat actors continue to misuse and exploit the data for years to come.

### A. Threat actors identify, steal, and then ransom Private Information.

Cl0p emerged in 2019 as a Russian cybercriminal ransomware gang which, like other cybercriminals, deployed ransomware that would encrypt an organization's information, only providing a key that would decrypt that information if a ransom were paid. *See, e.g.*, *id.* ¶ 91. But criminal enterprises like Cl0p have changed the way in which their organizations operate, using a

"double extortion" method in which they not only encrypt data, but steal it to gain another avenue for extortion: publication of the information on the dark web. *Id.* ¶¶ 91-92.[2] Put simply, if an organization does not pay, Cl0p would release the information it stole for sale to other criminals on the dark web or even for free. This "double extortion" technique is extremely useful because threat actors like Cl0p spend significant time investigating how to carry out attacks to ensure maximum impact. Cl0p, for example, had been developing its strategy to exploit the MOVEit vulnerability since 2021, in which it was able to gain access to files without detection. *Id.* ¶¶ 136-39.

    **B.**    **Threat actors use the stolen data for nefarious purposes for years to come.**

If cybercriminals like Cl0p do not receive a ransom payment, they often immediately publish stolen information, along with the name of the entity from which the data was stolen, to the dark web for free or for sale to other criminals. Those other criminals then use the dark web to obtain the Personal Information and use it to commit theft and fraud. *See, e.g.*, *id.* ¶¶ 226-28. The dark web is unlike the rest of the Internet, which can be readily indexed and searched via search engines (referred to as the "open" or "clear web"). *Id.* ¶ 226. Instead, individuals who wish to transact business or purchase things on the dark web must use a special browser to conceal users' identities and online activity. *Id.*

Once information is offered on the dark web, it can be purchased, sold, and re-sold by nefarious actors for long into the foreseeable future[3]—just as Cl0p published information on the dark web in this case. *Id.* ¶¶ 209-12. Private Information (distributed on the dark web or used

---

[2] *See also* Antonia M. Apps, Adam Fee, and Matthew Laroche, *What Companies Need to Know About Modern Ransomware Attacks and How to Respond*, Harvard L.S. Forum on Corp. Gov. (July 14, 2021), https://corpgov.law.harvard.edu/2021/07/14/what-companies-need-to-know-about-modern-ransomware-attacks-and-how-to-respond/.

[3] *See* Bart Lenaerts-Bergmans, *What is the Dark Web?*, Crowdstrike (Sept. 20, 2022), https://www.crowdstrike.com/cybersecurity-101/the-dark-web-explained/.

directly by the thieves who stole it) can be used to commit many different kinds of fraud. It can be used to commit wholesale identity theft, incur charges on existing accounts, steal account funds, or even create fraudulent new accounts. *Id.* ¶¶ 224-28. It can also be used to change billing addresses, open new utilities or wireless phone lines, obtain a driver's license or other identification, or avoid incarceration by using the victim's information in the event of an arrest or court action. *Id.* ¶ 229. Thieves can even use Private Information to obtain government benefits, file a fraudulent tax return to steal a victim's tax refund, be hired for a job, rent a house, or receive medical services. *Id.* ¶ 230. Even stolen contact information such as emails can expose victims to phishing or malware scams. *Id.* ¶ 246. And information can be combined with information from other data breaches to further victimize individuals, exposing them to fraud and scams for years into the future. *See, e.g.*, *id.* ¶¶ 233, 246. Once Private Information is used to commit any of these crimes, it may take a victim years to resolve the problem. *Id.* ¶ 231.

Even if class members did not have their information made immediately available on the dark web by Cl0p, that does not mean that the information is secure. First, even if a Defendant paid a ransom, that does not guarantee that Cl0p destroyed the data. Cl0p could have sold that information to other criminals before "destruction," or could even be keeping that data to offer for sale in the future to other criminals. *Id.* ¶¶ 215-22. The FBI recognizes the likelihood that cybercriminals will renege on promises to destroy data once a ransom is paid, explaining that it does not support paying a ransom in response to a ransomware attack. *Id.* ¶ 220.[4] No one can verify that Cl0p destroyed the stolen data (or whether it was transferred or sold to someone else), and there is no rational reason to trust that a criminal organization like Cl0p would ever delete

---

[4] The FBI has even recently said that paying a ransom "encourages perpetrators to target more victims and offers an incentive for others to get involved in this type of illegal activity." *Ransomware*, Federal Bureau of Investigation, https://www.fbi.gov/how-we-can-help-you/scams-and-safety/common-frauds-and-scams/ransomware (last accessed Sept. 2, 2024).

this data. *Id.* Indeed, all paying a ransom seems to offer is sparing the Defendant the embarrassment (and litigation risk) of making its breach (and the identities of all the victims) easily known.

Second, class members still face risk even if they have not yet suffered misuse of their data because there is often a lag between when sensitive Private Information is stolen, when it is misused, and when a person discovers it has been misused. According to the Government Accountability Office, data may be held for several years before being used to commit identity theft and can be misused for years to come. *Id.* ¶ 241. On average, it takes approximately three months for a consumer to discover their identity has been stolen and used, and it can take far longer—even up to three years or longer, depending on the type of fraud. *Id.* ¶ 250. Plaintiffs and class members will remain at an increased risk of fraud and identity theft for many years into the future.

**IV.    The Data Breach has caused significant harm to Plaintiffs.**

> **A.    The harm already caused by this Data Breach demonstrates that the risk of injury is not speculative or hypothetical.**

The harm caused by this massive Data Breach is *not* hypothetical or speculative, as evidenced by some of the presently known injuries that have already happened to Plaintiffs. *Id.* ¶ 280. As Exhibit A demonstrates, 157 Plaintiffs have alleged misuse of their Private Information—beyond its sale on the dark web—that has *already* occurred as a result of the Data Breach. Some examples include:

- Brianna Leet suffered fraudulent charges of $150 and $170 to her bank account following the Data Breach, yet Defendants say she has not suffered any misuse of her Private Information (Exhibit A at Row 197, Column AL; *Leet v. Members Life Ins. Co.*, No. 1:23-cv-12435-ADB (D. Mass.), ECF No. 1 (Complaint) ¶ 28);

- Bassam Zaafan was the victim of an unauthorized third party who used his information to open a new credit card in his name. Another unauthorized third party withdrew $300 from his bank account. Yet Defendants say he has not

suffered any misuse of his Private Information (Exhibit A at Row 397, Column AL; *Zaafan v. Umpqua Bank*, No. 1:23-cv-13029-ADB (D. Mass.), ECF No. 1-1 (Complaint) ¶ 32);

- Dawn Brida suffered fraudulent charges on her debit card, requiring her to pay out of pocket for credit monitoring services as a result of the Data Breach, yet Defendants assert she has not suffered any misuse of her Private Information (Exhibit A at Row 44, Column AL; *Brida v. Progress Software Corporation, et al.*, No. 1:23-cv-12202-ADB (D. Mass.), ECF No. 24 (Amended Complaint) ¶¶ 60, 64-65);

- Jeremy Nunz and Francis Grande were notified by Experian that their Private Information had been found on the dark web following the Data Breach, yet Defendants assert their information was not disseminated on the dark web (Exhibit A at Row 261, Column AL (Nunz); *Nunz v. The Standard Life Ins. Co. of New York*, No. 1:23-cv-12669-ADB (D. Mass.), ECF No. 1 (Complaint) ¶ 139); Exhibit A at Row 135, Column AL (Grande); *Grande v. TD Ameritrade, Inc.*, No. 1:23-cv-12592-ADB (D. Mass.), ECF No. 1 (Complaint) ¶ 62);

- Darlene Kennedy's compromised Private Information enabled a fraudulent actor to successfully impersonate her and withdraw $4,000 from her bank account yet Defendants assert that there is a mismatch between the information compromised and the information that was misused (Exhibit A at Row 184, Column AL; *Kennedy v. Genworth Financial, Inc.*, No. 1:23-cv-12501-ADB (D. Mass.), ECF No. 1 (Complaint) ¶¶ 105, 121);

- Fannie Colay's Social Security number was compromised and she was a victim of unauthorized actors who opened a financial account in her name yet Defendants assert that there is a mismatch between the information compromised and the information that was misused (Exhibit A at Row 73, Column AL; *Oneal, et al. v. Lumico Life Ins. Co.*, ECF No. 1:24-cv-10078-ADB (D. Mass.), ECF No. 1 (Complaint) ¶¶ 165-67);

- Leo Wilt suffered fraudulent charges to his bank account requiring multiple debit card replacements *after* the Data Breach yet Defendants assert that his injuries pre-date the Data breach (Exhibit A at Row 391, Column AL; *Wilt v. Maximus, Inc.*, No. 1:23-cv-12445-ADB (D. Mass.), ECF No. 1 (Complaint) ¶¶ 93-97);

- Following the Data Breach, unauthorized individuals attempted to take out bank loans in Petimat Dudurkaewa's name, resulting in hard inquires on her credit report, and her credit score dropping close to 100 points, yet Defendants assert her injuries are not traceable to the Data Breach (Exhibit A at Row 102, Column AL; *Dudurkaewa, et al. v. Midfirst Bank, et al.*, No. 1:24-cv-10186-ADB (D. Mass.), ECF No. 26 (Amended Complaint) ¶¶ 115-17);

- Lisa Kurtz received a Data Breach Notification informing her that her name and Social Security number were compromised in the Data Breach, yet Defendants

assert that her Social Security number was not impacted in the Data Breach (Exhibit A at Row 194, Column AL; *Kurtz v. Progress Software Corporation, et al.*, No. 1:23-cv-12156-ADB (D. Mass.), ECF No. 1 (Complaint) ¶¶ 4, 40).

To contradict Plaintiffs' detailed and well-pleaded allegations, Defendants provided a purported "summary chart" in an attempt to cabin Plaintiffs' allegations of harm into discrete boxes of Defendants' choosing, which often completely mischaracterizes the nature of Plaintiffs' allegations, the information impacted, and the harm they suffered. Even more concerning than these mischaracterizations is the "summary chart's" tendency to confuse the applicable standard for Article III standing, which does not turn on the distinctions Defendants are trying to peddle. Relying on this skewed summary chart, Defendants then assert that *all* Plaintiffs lack standing. A review of Defendants' summary chart when compared to the underlying complaints' actual allegations, however, demonstrates a self-serving depiction of Plaintiffs' allegations riddled with inaccuracies and errors. Indeed, although 157 Plaintiffs alleged misuse of their data had already occurred related to information maintained by 82 Defendants, Defendants argue that only 30 Plaintiffs have made such allegations. *See* Exhibit A. Defendants' error-laden summary chart is a brazen effort to minimize the number of Plaintiffs who have already suffered, and discovered, that they are victims of fraud that is traceable to the Data Breach.[5] Defendants' chart is unreliable and inapt.

**B.    The fraud Plaintiffs have already alleged demonstrates an imminent, substantial risk of harm.**

Given that 157 Plaintiffs allege that fraud has already occurred as a result of the Data Breach, the remaining Plaintiffs are at a significantly increased risk of harm in the immediate

---

[5]    Putting aside the lack of candor to the Court, Defendants' blatantly inaccurate characterizations (when compared to the enclosed Exhibit A), show that Defendants' summary chart is not a straightforward accounting of the facts as pleaded. Instead, it is an improper attempt to have Plaintiffs' allegations viewed in Defendants' favor at the Rule 12 stage.

future. The U.S. Government Accountability Office notes that "studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm." *Id.* ¶ 241. Data breaches like the one at issue in this case directly and materially increase the chance that class members are targeted by scams in the future, placing them at high risk of identity theft, fraud, and extortion. *Id.* ¶ 246. Even if data has not *yet* been made available in an organized fashion, it can be combined with information from other breaches, sold and repackaged with information from other sources, and enriched to place individuals at risk of fraud for years to come. *Id.* ¶ 251.

     C.    **It would be unreasonable for Plaintiffs to sit idle and *not* protect themselves, given the substantial risk of harm they face.**

Given the harm that has already occurred, and the significant risk of harm that Plaintiffs and class members face as a result of the breach, it is entirely reasonable for them to take steps to protect themselves. *Id.* ¶¶ 234-51. Aside from Defendants' own recommendations to Plaintiffs and class members, the FTC recommends that identity theft victims take several steps to protect their personal health and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (and to consider an extended fraud alert that lasts for seven years if identity theft occurs), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports. *Id.* ¶ 236.

Plaintiffs should not wait idly by to be victims of identity theft before holding Defendants accountable for the Data Breach. As a direct result of the Data Breach, Plaintiffs and class members have spent significant time, and will continue to spend even more time, monitoring their accounts, changing login credentials, and taking other steps to protect themselves—directly

in response to the data breach and based upon the recommendations of Defendants. *Id.* ¶ 275; Exhibit A.

### D.    Plaintiffs have experienced other losses.

Finally, Plaintiffs have experienced other losses as a result of the Data Breach. For Defendants with whom Plaintiffs negotiated a bargain which contemplated the protection of their data, they did not receive that benefit, because Defendants did not take reasonable steps to protect their Private Information. *Id.* ¶¶ 277, 279. Additionally, Plaintiffs' Private Information has value—as demonstrated by the fact that it can be sold on the dark web for negotiated prices. *Id.* ¶ 226. But Plaintiffs did not get the benefit of those negotiated prices, because the data was misused for purposes for which they did not consent, and they have not been compensated for their stolen information which Defendants promised to protect. *Id.* ¶ 279.  Plaintiffs have also alleged distress related to the breach, including the distress caused by an invasion of their privacy because of the disclosure of Sensitive Information.  *Id.* ¶ 276.

## ARGUMENT

## I.    PLAINTIFFS PLEAD INJURY-IN-FACT

An injury confers standing if it constitutes "an invasion of a legally protected interest" that is "concrete and particularized" and "actual, or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)); *see also TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). "An injury is 'actual' when it has already been suffered and 'imminent' when it has yet to be suffered." *Rivera-Marrero v. Banco Popular de Puerto Rico*, 2023 WL 2744683, at *7 (D.P.R. Mar. 31, 2023) (quoting *Katz v. Pershing, LLC*, 672 F.3d 64, 71 (1st Cir. 2012)); *see also Weekes v. Cohen Cleary P.C.*, 2024 WL 1159642, at *3 (D. Mass. Mar. 15, 2024) (in data breach cases, "both (1) actual identity theft . . . and (2) risk of future identity theft . . . are independent bases to

establish an Article III injury") (citing *Webb*, 72 F.4th at 376); *see also Clemens v. ExecuPharm Inc.*, 48 F.4th 146, 152 (3d Cir. 2022) ("That 'actual or imminent' is disjunctive is critical: it indicates that a plaintiff need not wait until [they have] *actually* sustained the feared harm in order to seek judicial redress, but can file suit when the risk of harm becomes imminent.") (emphasis in original).

Here, Plaintiffs plausibly allege actual and concrete injuries-in-fact flowing from the exposure of their Private Information in the Data Breach, including specific instances of actual and attempted fraud and identity theft. Plaintiffs also plausibly allege concrete injuries-in-fact based on an imminent and substantial risk of future harm, as well as present and concrete harms resulting from the exposure to that risk. *See Webb*, 72 F.4th at 369.

### A.    Plaintiffs adequately allege "actual" injuries-in-fact based on misuse of the data for similarly situated consumers caught in Cl0P's attack.

Allegations of actual misuse of Private Information flowing from a data breach, on their own, are sufficient to confer Article III standing. *Webb*, 72 F.4th at 374 ("[A]ctual misuse of a plaintiff's [Private Information] resulting from a data breach" is "*itself* [ ] a concrete injury.") (emphasis added) (citing *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247, 1262 (11th Cir. 2021), and *Attias v. Carefirst, Inc.*, 865 F.3d 620, 627 (D.C. Cir. 2017), *cert. denied*, 138 S. Ct. 981 (2018)).

In *Webb*, a former and current patient of the defendant complained they suffered injury when hackers stole their PII. As to plaintiff Webb, she claimed that shortly after the breach, an unauthorized third-party filed a fraudulent tax return. *Webb*, 72 F.4th at 373. That sufficed for the Court. *Id.* at 374. As to the other plaintiff in *Webb*, Charley, the court found her "standing to pursue damages is more difficult. The complaint does not allege actual misuse of Charley's PII." *Id.* "Nonetheless, we conclude that, in light of the plausible allegations of some actual misuse,

the complaint plausibly alleges a concrete injury in fact based on the material risk of future misuse of Charley's PII and a concrete harm caused by exposure to this risk." *Id*. Not only did this support Charley's standing but provided "an independent basis for our conclusion that the complaint plausibly demonstrates standing as to Webb." *Id.*

Here, Defendants wrongly state that "only about 30" Plaintiffs allege actual misuse "against roughly 25 Defendants." Mot. at 19. As explained herein, the actual number is far higher. In fact, numerous Plaintiffs have alleged: (1) actual financial fraud; (2) publication of the stolen data on the dark web; and (3) allegations of phishing and attempted fraud. *See also* I.B., *infra*. But even assuming 30 Plaintiffs alleged misuse, Defendants have already conceded their motion lacks merit. In *Webb*, Charley's standing was found because her data was stolen by the same criminals who allegedly misused Webb's data to file a false tax return. All Plaintiffs have standing here because their data was stolen by the same criminals who misused other Plaintiffs' data to perpetrate fraud. Whether that number is "only about 30," or is instead correctly calculated at 157, Defendants' 12(b)(1) motion fails under *Webb*.

All 396 Plaintiffs allege that their Private Information was accessed and stolen in the same highly coordinated and sophisticated attack by Cl0p.  Numerous Plaintiffs allege a variety of actual misuse of their data, including identity fraud, publication to the dark web, and targeted phishing attacks, which under *Webb* creates a plausible inference of an increased risk of harm sufficient to confer Article III standing for all Plaintiffs.

### 1. Plaintiffs alleged actual or attempted fraud.

At least 157 Plaintiffs specifically plead actual fraudulent or attempted misuse of their Private Information after it was accessed and stolen in the Data Breach. *Compare* Exhibit A *with* Mot. at 19. Many Plaintiffs have already been victimized by financial fraud and identity theft in the form of unauthorized debit and credit card charges, fraudulent withdrawals from bank

accounts,[6] fraudulent attempts to open financial accounts or take out loans,[7] and instances of

government benefits fraud (including Social Security, Medicaid, and unemployment benefits

fraud).[8] Plaintiffs further allege pecuniary losses resulting from these instances of actual and

attempted fraud, including unreimbursed fraudulent charges on payment cards and bank

accounts, as well as damage to their credit scores. *Id.* In addition to financial fraud and identity

---

[6] *See, e.g.*, Plaintiff Leo Wilt (fraudulent charges to bank account requiring multiple debit card replacements, identity theft, PII found on dark web, scam phone call threatening him with arrest warrant and demanding money) (Exhibit A at Row 391, Column AL; *Wilt v. Maximus, Inc*., No. 1:23-cv-12445-ADB (D. Mass.), ECF No. 1 (Complaint) ¶¶ 93-97); Plaintiff Darlene Kennedy ($4,000.00 stolen from bank account) (Exhibit A at Row 184, Column AL; *Kennedy v. Genworth Financial, Inc.*, No. 1:23-cv-12501-ADB (D. Mass.), ECF No. 1 (Complaint) ¶¶ 105, 121); Plaintiff Jvanne Rhodes (continuous fraudulent charges on debit cards and attempts to open new accounts, fraudulent attempt to obtain unemployment benefits in her name) (Exhibit A at Row 294, Column AL; *Bloch, et al. v. Progress Software Corporation, et al*., No. 1:24-cv-11567-ADB (D. Mass.), ECF No. 1 (Complaint) ¶¶ 126-27).

[7] *See, e.g.*, Plaintiff Jvanne Rhodes (continuous fraudulent charges on debit cards and attempts to open new accounts, fraudulent attempt to obtain unemployment benefits in her name) (Exhibit A at Row 294, Column AL; *Bloch, et al. v. Progress Software Corporation, et al*., No. 1:24-cv-11567-ADB (D. Mass.), ECF No. 1 (Complaint) ¶¶ 125-27); Plaintiff Frederick Allman (fraudulent attempts to open seventeen (17) accounts under his name, leading to a credit score drop of >280 points) (Exhibit A at Row 12, Column AL; *Allman, et al. v. International Business Machines Corp., et al*., No. 1:24-cv-11126-ADB (D. Mass.), ECF No. 6 (Complaint) ¶¶ 73-78); Plaintiff Petimat Dudurkaewa (fraudulent attempts to take out loans, hard inquiries on credit score, credit score drop of nearly 100 points) (Exhibit A at Row 102, Column AL; *Dudurkaewa, et al. v. Midfirst Bank, et al*., No. 1:24-cv-10186-ADB (D. Mass.), ECF No. 26 (Amended Complaint) ¶¶ 115-17); Plaintiff Doris Cadet ("Plaintiff Cadet received a notice that a loan she applied to was denied, but neither she nor anyone in her family had applied for a car loan.") (Exhibit A at Row 54, Column AL, *Devis, et al. v. Progress Software Corp., et al.*, No. 1:24-cv-11541-ADB (D. Mass.), ECF No. 1 (Complaint) ¶ 343); Plaintiff Frederick Allman ("Plaintiff has had unknown persons open or attempt to open seventeen (17) accounts in his name across three different credit bureaus. The fraudulent activity on Plaintiff's account has significantly affected his credit, including dropping his credit score from 746 to 484.") (Exhibit A at Row 12, Column AL; *Allman, et al. v. International Business Machines Corp., et al*., No. 1:24-cv-11126-ADB (D. Mass.), ECF No. 6 (Complaint) ¶ 74).

[8] *See, e.g.*, Plaintiff Jerry McDaniel (social security fraud) (Exhibit A at Row 229, Column AL; *McDaniel, et al. v. Progress Software Corporation, et al*., No. 1:23-cv-11939-ADB (D. Mass.), ECF No. 1 (Complaint) ¶ 54); Plaintiff Jvanne Rhodes (continuous fraudulent charges on debit cards and attempts to open new accounts, fraudulent attempt to obtain unemployment benefits in her name) (Exhibit A at Row 294, Column AL; *Bloch, et al. v. Progress Software Corporation, et al*., No. 1:24-cv-11567-ADB (D. Mass.), ECF No. 1 (Complaint) ¶¶ 126-27); Plaintiff Holly Burke ("[S]omeone accessed her Medicaid benefits account and changed her information.") (Exhibit A at Row 51, Column AL; *Bloch, et al. v. Progress Software Corporation, et al*., No. 1:24-cv-11567-ADB (D. Mass.), ECF No. 1 (Complaint) ¶ 57).

theft, many Plaintiffs have received alerts that their stolen information has been published for sale on the dark web. *Id.* Numerous Plaintiffs also allege other indicia of identity theft and fraud in the form of spam calls, texts, and emails, including attempts to "phish" additional sensitive information from Plaintiffs after their contact and other information was accessed and stolen by cybercriminals in the Data Breach.[9] As a result, Plaintiffs have spent time and incurred out-of-pocket costs to protect themselves, including credit and identity theft monitoring fees. *Id.* These allegations plead actual harm sufficient to confer Article III standing. *See TransUnion*, 594 U.S. at 423; *Portier v. NEO Tech. Sols.*, 2019 WL 7946103, at *4 (D. Mass. Dec. 31, 2019), *report and recommendation adopted*, 2020 WL 877035 (D. Mass. Jan. 30, 2020).

Defendants wrongly contend that Plaintiffs' detailed allegations of actual and attempted financial fraud—in the form of unauthorized charges on payment cards and bank accounts—fail to plead "concrete" injuries-in-fact, because "Plaintiffs must plausibly allege that they had to pay for the unauthorized charges, rather than being reimbursed by their credit card company or bank." Mot. at 32-33. First, on a motion to dismiss, it is axiomatic that the Court must take Plaintiffs' factual allegations as true and draw all reasonable inferences in Plaintiffs' favor. *See Webb*, 72 F.4th at 371, 373-74. Thus, at this stage of the proceedings, the Court cannot simply assume (as Defendants wrongly suggest it should) that Plaintiffs have been compensated for the fraudulent charges and resulting fees that Plaintiffs allegedly incurred. *See Anderson v. Hannaford Brothers Co.*, 659 F.3d 151, 164 n.8 (1st Cir. 2011). Thus, Defendants' argument is unavailing at the pleadings stage.

---

[9] *See, e.g.*, Plaintiff Dawn Brida (50-100 spam calls a day, 10-50 spam emails a day) (Exhibit A at Row 44, Column AL; *Brida v. Progress Software Corporation, et al.*, No. 1:23-cv-12202-ADB (D. Mass.), ECF No. 24 (Amended Complaint) ¶ 62).

Second, Defendants' invented "unreimbursed" requirement is not present in the law. "Standing is not confined to those who can show economic harm." *Portier*, 2019 WL 7946103, at *5; *see also Hutton v. Natl. Bd. of Examiners in Optometry, Inc.*, 892 F.3d 613, 622 (4th Cir. 2018) ("[T]he Supreme Court long ago made clear that '[i]n interpreting injury in fact . . . standing [is] not confined to those who [can] show economic harm.'") (quoting *United States v. Students Challenging Regul. Agency Proc.*, 412 U.S. 669, 686 (1973)). Contrary to Defendants' argument, Plaintiffs are *not* required to suffer actual monetary harm to satisfy the injury-in-fact element of Article III standing. Plaintiffs' detailed factual allegations regarding misuse of their Private Information, including instances of actual and attempted financial fraud and identity theft, are more than sufficient to plead injuries-in-fact. *See, e.g.*, *Webb*, 72 F.4th at 370, 372-73 (stolen name and Social Security number used to file fraudulent tax return); *Anderson*, 659 F.3d at 154-55 (stolen credit and debit card numbers resulted in fraudulent and attempted unauthorized charges); *see also In re LastPass Data Sec. Incident Litig.*, 2024 WL 3580646, at *5 (D. Mass. July 30, 2024) ("Plaintiffs plausibly allege actual and attempted misuse of their compromised data, including theft from online wallets, fraudulent credit card charges, unauthorized applications for loans and credit cards, sale of information on the 'dark web,' and increased phishing attempts and spam messages.").[10]

---

[10] *Accord Remijas v. Neiman Marcus Grp., LLC*, 794 F.3d 688, 692-93 (7th Cir. 2015) (reversing district court's decision that victims of identity theft whose credit cards were compromised had suffered no injury in fact sufficient for standing because they had been reimbursed for the unauthorized charges); *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1324 (11th Cir. 2012) (rejecting defendants' contention that plaintiffs failed to plead a cognizable injury because "the [c]omplaint allege[d] only 'losses,' not 'unreimbursed losses'" as "a specious argument"); *In re U.S. Office of Personnel Mgmt. Data Sec. Breach Litig.* (*OPM*), 928 F.3d 42, 65 (D.C. Cir. 2019) (district court erred in requiring allegations that fraudulent costs went unreimbursed, because "[a]t this stage of the litigation, all facts and reasonable inferences must be drawn in favor of [plaintiffs], and the complaint provides no basis for disregarding the claimed financial losses based on [defendant's] speculation that [plaintiffs] were indemnified."); *In re Brinker Data Incident Litig.*, 2019 WL 3502993, at *4-5 (M.D. Fla. Aug. 1, 2019) ("At this stage of the proceeding, the Court can infer that the charges were not reimbursed, and thus the

Defendants rely upon out-of-circuit, non-binding authority to argue that monetary losses are required to demonstrate Article III standing. *See* Mot. at 33. Setting aside their limited precedential value, the cases are also distinguishable because several Plaintiffs here have alleged actual pecuniary losses.[11]

### 2. The cybercriminals sold the stolen information on the dark web.

Following the Data Breach, at least 90 Plaintiffs received alerts that their Private Information—including Social Security numbers, protected health information, and financial account information—had been published for sale on the dark web. *See* Exhibit A, Column AN. Under settled law, these allegations alone plead injuries-in-fact sufficient to confer Article III standing. *See, e.g.*, *LastPass*, 2024 WL 3580646, at *5 (allegations of "sale of information on the 'dark web'" following a data breach "plausibly allege[d] actual and attempted misuse of [plaintiffs'] compromised data"); *Green-Cooper v. Brinker Int'l, Inc.*, 73 F.4th 883, 889-90 (11th Cir. 2023) ("The fact that hackers took credit card data and corresponding personal information from [defendant's] systems and affirmatively posted that information for sale on [the dark web] is [ ] misuse for standing purposes[.]"); *id.* at 890 (finding allegations that stolen data had been published on the dark web to be "critical," in that it "establishes both a present injury—credit

---

injury—the fraudulent charges—can be redressed by a favorable decision by this Court."); *In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, 2017 WL 3727318, at *15 (N.D. Cal. Aug. 30, 2017) (rejecting defendants' argument that plaintiffs failed to adequately plead Article III standing because the complaint did not allege that fraudulent fees and charges went "unreimbursed").

[11] *See, e.g.*,  Plaintiff Jvanne Rhodes (fraudulent charges on two debit cards, some of which have not been reimbursed by her bank, as well as overdraft and late fees caused by the fraudulent charges on her accounts) (Exhibit A at Row 294, Column AL, *Bloch, et al. v. Progress Software Corp., et al.*, No. 1:24-cv-11567 (D. Mass.), ECF No. 1 (Complaint) ¶ 127); Plaintiff Victor Diluigi (unreimbursed fraudulent credit card charges) (Exhibit A at Row 95, Column AL, *Bloch, et al. v. Progress Software Corp., et al.*, No. 1:24-cv-11567 (D. Mass.), ECF No. 1 (Complaint) ¶ 72).

card data and personal information floating around on the dark web—and a substantial risk of future injury.").

But Defendants again misconstrue Plaintiffs' allegations. *See* Mot. at 22 ("Plaintiffs generally speculate that information obtained in the MOVEit Incidents might be available on the dark web."). Here, Plaintiffs' claims are not based on speculation, they specifically allege that they received alerts that their information was for sale on the dark web after the Data Breach, and Defendants cannot—nor do they—dispute that Cl0p has already published information from the breach on the dark web. *See In re 21st Century Oncology Customer Data Sec. Breach Litig.*, 380 F. Supp. 3d 1243, 1255 (M.D. Fla. 2019) ("Plaintiffs do not merely allege that they fear that their compromised information *may* be advertised and sold on the dark web, Plaintiffs allege that it has *already happened*.") (emphasis in original).

### 3.    Allegations of phishing and attempted fraud.

Numerous Plaintiffs also allege a specific increase in spam and phishing attempts following the Data Breach. *See* Exhibit A, Column AN. Contrary to Defendants' argument that "an alleged increase in spam does not rise to the level of Article III injury-in-fact" (Mot. at 31-32), numerous courts have recognized that targeted phishing attempts after a data breach—such as phishing spam emails, texts, and phone calls—constitute actual misuse sufficient to plead actual and concrete harm. *See, e.g.*, *LastPass*, 2024 WL 3580646, at *5 ("Plaintiffs plausibly allege actual and attempted misuse of their compromised data, including . . . increased phishing attempts and spam messages."); *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 653 (4th Cir. 2019) ("Cognizable intrusions include intrusions made via phone calls.") (citing Restatement (Second) of Torts, § 652B)); *Mey v. Got Warranty, Inc.*, 193 F. Supp. 3d 641, 644-45 (N.D. W. Va. 2016) ("[U]nwanted phone calls cause concrete harm."); *Solomon v. ECL Grp., LLC*, 2023 WL 1359662, at *4 (M.D.N.C. Jan. 31, 2023) (finding plaintiff "alleges actual misuse of her

information; at some unidentified time after receiving notice of the data breach, she 'noticed an increase in spam texts, spam calls, and spam emails.' The spam calls were so frequent that [plaintiff] changed her phone numbers. This injury is sufficient to satisfy Article III standing.") (internal citations omitted); *Farley v. Eye Care Leaders Holdings, LLC*, 2023 WL 1353558, at *3-4 (M.D.N.C. Jan. 31, 2023) (finding allegations of credit card fraud and "receiving a significantly higher number of spam emails and texts" constituted "injuries [] sufficient to satisfy Article III standing.") (internal citations omitted); *In re GE/CBPS Data Breach Litig.*, 2021 WL 3406374, at *6 (S.D.N.Y. Aug. 4, 2021) (plaintiff who alleged that "he has received phishing and scam emails to his personal email address and phishing and scam phone calls to his personal phone number" sufficiently alleged injury-in-fact); *Stasi v. Inmediata Health Grp. Corp.*, 501 F. Supp. 3d 898, 913 (S.D. Cal. 2020) (finding standing where "Plaintiffs allege they noticed an increase in spam/phishing and scam emails and/or calls"); *Bass v. Facebook, Inc.*, 394 F. Supp. 3d 1024, 1033–34 (N.D. Cal. 2019) (finding standing where the plaintiff had been "bombarded" with phishing emails and text messages).

In sum, Plaintiffs plausibly allege actual and concrete injuries-in-fact flowing from the exposure of their Private Information in the Data Breach, including specific instances of actual and attempted fraud and identity theft, publication of their stolen information for sale on the dark web, and a notable uptick in spam and phishing.

### B.    Plaintiffs adequately allege "imminent" injuries-in-fact.

The injury-in-fact requirement for Article III standing is also satisfied where, as here, Plaintiffs allege an "imminent" risk of future harm. *See TransUnion*, 594 U.S. at 435-37; *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 415 (2013). Allegations of future injury satisfy the imminence requirement "if the threatened injury is certainly impending, or [if] there is a

substantial risk that the harm will occur." *Taylor*, 693 F. Supp. 3d at 97 (quoting *Reddy v. Foster*, 845 F.3d 493, 500 (1st Cir. 2017)).

In data breach cases, the First Circuit employs three non-exhaustive guiding factors to determine if a risk of future harm satisfies the imminence requirement: (1) whether "at least some information stolen in [the] data breach has already been misused"; (2) whether the information was "exposed in a targeted attack rather than inadvertently"; and (3) the sensitivity of the compromised data. *See Webb*, 72 F.4th at 375-76 ("We stress that these considerations are neither exclusive nor necessarily determinative, but they do provide guidance.") (citation omitted).

### 1.    Defendants do not dispute that information has already been misused.

Defendants do not dispute "[t]hat at least some information stolen in a data breach that has already been misused [ ] makes it likely that other portions of the stolen data will be similarly misused." Mot. at 21 (quoting *Webb*, 72 F.4th at 376). Instead, Defendants argue that the highly coordinated attack by one cybercriminal organization is somehow numerous, mini data breaches, with each individual Defendant experiencing their own distinct and separate attack. Defendants assert that "just because some individual MOVEit Incidents involving certain Defendants resulted in claims of misuse does not mean those misuse claims can be imputed to all of the MOVEit Incidents that were allegedly related to the MOVEit vulnerability." Mot. at 23.

### 2.    Plaintiffs' information was stolen in a targeted attack.

Defendants' argument ignores reality and Plaintiffs' well-pleaded allegations. Every non-Progress Defendant is named in this action because they used Progress's MOVEit Transfer software, which "had a known defect and vulnerability that was exploited by [Cl0p] in and around May 2023." POSAPF ¶ 2. Cl0p's attack was designed to and did execute simultaneously across thousands of MOVEit Transfer servers, which was possible because all MOVEit Transfer

servers were susceptible to the same attack vector, and therefore, Cl0p was able to employ a single well-designed malicious program to infiltrate each non-Progress Defendants' MOVEit Transfer server. *Id.* ¶ 135. Thus, the Data Breach resulted in the exfiltration of millions of individuals' Private Information by one threat actor, at one time—Cl0p. *Id.* ¶ 144. All of the stolen data was improperly accessed in the same manner, by the same threat actor. And all of the stolen data is now in the custody and control of that same threat actor—Cl0p. Plaintiffs' stolen Private Information was compromised in the *same* Data Breach. This is further reflected in Defendants' own representations. *See, e.g.*, Delta Dental Data Breach Notice (referring to "*a global data security incident*") (emphasis added).[12] There were not hundreds of "totally-separate MOVEit Incident[s]" as Defendants claim (Mot. at 23), but rather one, massive attack that implicated hundreds of Defendants across the globe. Most importantly, there is now only one repository of stolen information in the hands of Cl0p, and it is this repository from which the risk of future misuse emanates.

    With regard to targeting the data, Defendants speculate that "Cl0p's motive was not to use individuals' data itself to engage in identity theft or other fraud or even to post individuals' data for sale." Mot. at 22. Defendants' conjecture about the "motive" of Cl0p is inappropriate

---

[12] Delta Dental, Data Breach Notice, Exhibit C ("*What Happened?* Progress Software announced a previously unknown vulnerability within their widely used MOVEit file-transfer software program. This vulnerability led to *a global data security incident* that is reported to have impacted thousands of organizations, including corporations, government agencies, insurance providers, pension funds, financial institutions, state education systems and more.") (emphasis added); *see also* Welltok Inc., Data Breach Notice, Exhibit D ("an unauthorized actor exploited software vulnerabilities, accessed the MOVEit Transfer server on May 30, 2023, and exfiltrated certain data from the MOVEit Transfer server during that time"); Maximus, Inc., SEC Form 8-K (July 26, 2023), Exhibit E ("It appears that a significant number of commercial and government customers worldwide were affected by [the MOVEit] vulnerability. . . . [Maximus] believes that the personal information of a significant number of individuals was accessed by an unauthorized third party by exploiting this MOVEit vulnerability."); Maximus, Data Breach Notice, Exhibit F ("The incident involved an unauthorized party exploiting a vulnerability in MOVEit Transfer, a third-party software provided by [Progress], to gain access to files that contained [ ] personal information. Maximus is among the many organizations in the United States and globally that have been impacted by the MOVEit vulnerability.").

and contradicted by Plaintiffs' well-pleaded allegations, which the Court must accept as true at this stage of the litigation. *Webb*, 72 F.4th at 371. Plaintiffs specifically allege that their stolen Private Information has already been detected as available and *for sale* on the dark web. *See, e.g.*, POSAPF ¶ 4; Exhibit A. Where, as here, Plaintiffs allege that the unauthorized third-party advertised or published the stolen information for sale on the internet, such allegations "demonstrate[] that the interception of the Plaintiffs' data was not merely incidental or accidental[.]" *In re 21st Century Oncology*, 380 F. Supp. 3d at 1255.

The fact that Plaintiffs plausibly allege actual misuse of their Private Information following the Data Breach also distinguishes this case from the authorities Defendants rely on. *See* Mot. at 22 (citing *Taylor*, 693 F. Supp. 3d at 93; *Quintero v. Metro Santurce, Inc.*, 2021 WL 5855752 (D.P.R. 2021); and *Practicefirst Data Breach Litig.*, 2022 WL 354544 (W.D.N.Y. Feb. 2, 2022)). In *Taylor*, the plaintiffs "alleged that their information . . . was exposed to hackers, but [did] not allege[] any misuse of their or others' information resulting from the alleged data breach." 693 F. Supp. 3d at 98. Likewise, the *Quintero* plaintiffs also did not allege their compromised data was actually misused. 2021 WL 5855752, at *5-6. Indeed, data breach notice letters referenced in the *Quintero* complaint stated there was no evidence to suggest that the information was "viewed, accessed or disclosed" as a result of the ransomware attack. *Id.* at *2. The *Quintero* court therefore found that "[a]bsent plausible allegations that the information itself was accessed and misused the named [plaintiffs] lack constitutional standing to sue the [defendant] because the injury is not actual or imminent, but rather is merely conjectural or hypothetical." *Id.* at *8. In *Practicefirst*, the Western District of New York also relied heavily on the fact that there had been *no* actual misuse of the compromised data. 2022 WL 354544, at *5-6 ("In fact, the complaint is devoid of allegations that class members have experienced any type of

fraud because of the breach, or even that attempts have been made to use their personal information for nefarious purposes."); *see also Savidge v. Pharm-Save, Inc.*, 2024 WL 1366832, at *16 (W.D. Ky. Mar. 29, 2024) (distinguishing *Practicefirst* on the same basis). Unlike their counterparts in *Taylor*, *Quintero*, and *Practicefirst*, it is undisputed that Plaintiffs' Private Information was accessed and exfiltrated by Cl0p in the Data Breach, and numerous named Plaintiffs allege actual misuse of their Private Information after it was stolen in the Data Breach. *See supra* I.A; *see also* Exhibit A.

In addition to *Webb*, the facts here resemble those underlying the Third Circuit's recent decision in *Clemens*, 48 F.4th at 146. In that case, the court distinguished cases involving "*unknown* hacker[s] who *potentially* gained access to sensitive information" from the data breach at issue in that case, which like the present Data Breach, was *also* perpetrated by the same bad actor: Cl0p. *See id.* at 156-57 (distinguishing *Reilly v. Ceridian Corp.*, 664 F.3d 38, 41-42 (3d Cir. 2011), and concluding "the alleged injury-in-fact is far more imminent" because "here, a known hacker group named CLOP accessed [plaintiff's] sensitive information"); *id.* at 157 ("Adopting and applying the factors that our Sister Circuits consider in determining imminence in the data breach context confirms" that "[t]his set of facts clearly presents a more imminent injury[.]"). Just as here, the *Clemens* court noted that Cl0p "launched a sophisticated phishing attack to install malware, encrypted the data, held it for ransom, and published it" to the dark web. *Id.* (citations omitted). Also as here, the *Clemens* plaintiffs alleged that "CLOP [had] already published [the plaintiff's] data on the Dark Web[.]" *Id.* ("Because we can reasonably assume that many of those who visit the Dark Web, and especially those who seek out and access CLOP's posts, do so with nefarious intent, it follows that [plaintiff] faces a substantial risk of

identity theft or fraud by virtue of her personal information being made available on underground websites.").

Given the targeted nature of the Data Breach here, and the fact that numerous Plaintiffs have already experienced actual misuse of their Private Information following the Data Breach, it is *more* than plausible that Plaintiffs run a substantial risk of falling victim to other incidents of identity theft and fraud in the future. *See Webb*, 72 F.4th at 97-98. At a minimum, however, on the facts alleged here, Plaintiffs have plausibly demonstrated an imminent and substantial future risk of injury sufficient to confer Article III standing.[13]

### 3.    Plaintiffs' stolen data is particularly sensitive.

Finally, when determining whether Article III standing is met for "imminent" harm, courts next consider "whether the type of data that has been exposed is sensitive such that there is a high risk of identity theft or fraud." *Webb*, 72 F.4th at 375 (quoting *McMorris v. Carlos Lopez & Associates, LLC*, 995 F.3d 295, 303 (2d Cir. 2021)); *see also Bonac v. Marsh & McLennan Cos., Inc.*, 79 F.4th 276, 288 (2d Cir. 2023) (considering "the type of data at issue,

---

[13] This conclusion accords with the law in other circuits. *See, e.g.*, *Remijas*, 794 F.3d at 693 ("customers should not have to wait until hackers commit identity theft or credit-card fraud in order to give the class standing, because there is an 'objectively reasonable likelihood' that such an injury will occur.") (quoting *Clapper*, 568 U.S. at 410)); *Lewert v. P.F. Chang's China Bistro, Inc.*, 819 F.3d 963, 967 (7th Cir. 2016) (plaintiffs established Article III standing based on "the increased risk of fraudulent charges and identity theft they face because their data has already been stolen"); *Galaria v. Nationwide Mut. Ins. Co.*, 663 F. App'x 384, 388 (6th Cir. 2016) (finding allegations of a risk of future harm were sufficient for Article III standing, noting: "[w]here a data breach targets personal information, a reasonable inference can be drawn that the hackers will use the victims' data for the fraudulent purposes alleged in Plaintiffs' complaints."); *OPM*, 928 F.3d at 54-55 ("[G]iven plaintiffs' allegations [defendants'] continued failure to adequately secure its databases, it [was] reasonable to infer that there remain[ed] a substantial risk that their personal information would be stolen from [defendants] again in the future."); *Attias v. CareFirst, Inc.*, 865 F.3d 620, 622 (D.C. Cir. 2017), *cert. denied*, 138 S. Ct. 981 (2018) (victims of cyberattack on health insurance company "cleared the low bar to establish their standing at the pleading stage" by plausibly alleging that they faced a substantial risk of identity theft as a result of the company's negligent failure to thwart the attack); *id.* at 629 ("a substantial risk of harm exists already, simply by virtue of the hack and the nature of the data that the plaintiffs allege was taken").

and whether that type of data is more or less likely to subject plaintiffs to a perpetual risk of identity theft or fraud once it has been exposed[.]") (citation omitted). When, as here, "*at least some* stolen data was highly sensitive," courts have found that standing is met. *LastPass*, 2024 WL 3580646, at *5 (emphasis added, finding standing met where plaintiffs alleged that some stolen "vaults" contained a variety of sensitive information, including Social Security numbers, driver's license numbers, login credentials, and unencrypted copies of names, billing addresses, email addresses, and "other metadata."). *See also In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 454 (D. Md. 2020) (finding Article III standing when hackers stole names, mailing addresses, phone numbers, email addresses, passport numbers, account information, dates of birth, gender, arrival and departure information, reservation dates, communication preferences, payment card numbers, payment card expiration dates, and tools needed to decrypt cardholder data).

Although Social Security numbers are not the only type of sensitive information stolen in the breach, 381 Plaintiffs allege their Social Security numbers, financial information, and/or PHI (along with other personally identifiable information) was compromised.[14] *See* Exhibit A,

---

[14] *Bohnak*, 79 F.4th at 288 (citing *McMorris*, 995 F.3d at 302); *Portier*, 2019 WL 7946103, at *12 ("Because Social Security numbers are the gold standard for identity theft, their theft is significant. . . . . Access to Social Security numbers causes long-lasting jeopardy[.]"). *Accord Attias*, 865 F.3d at 622, 628 (finding plaintiffs "cleared the low bar to establish their standing at the pleading stage," as "plaintiffs would face a substantial risk of identity theft if their social security and credit card numbers were accessed by a network intruder"); *In re Equifax*, 999 F.3d at 1274 (recognizing the "unique risks associated with stolen Social Security numbers"); *Krottner v. Starbucks Corp.*, 628 F.3d 1139, 1140 (9th Cir. 2010) (finding standing when "names, addresses, and social security numbers" were stolen); *McFarlane v. Altice USA, Inc.*, 2021 WL 860584, at *4 (S.D.N.Y. Mar. 8, 2021) (noting Social Security numbers are arguably "the most dangerous type of personal information in the hands of identity thieves" because they are immutable and can be used to "impersonat[e] [the victim] to get medical services, government benefits, . . . tax refunds, [and] employment"); *In re Horizon Healthcare Servs.*, 846 F.3d 625, 639 n.19 (3d Cir. 2017) (noting, in dicta, that a data breach compromising individuals' names, addresses, member identification numbers, dates of birth, Social Security numbers, and limited clinical information created a material risk of harm because "the information that was stolen was highly personal and could be used to steal one's identity").

Column AJ. Although the type of stolen information varies by Defendant, "*at least some* stolen data was highly sensitive." *LastPass*, 2024 WL 3580646, at *5 (emphasis added).

In light of the three non-exhaustive guiding factors employed by the First Circuit, the Court should find that the risk of future harm to Plaintiffs here is sufficiently imminent for Article III standing purposes. Plaintiffs plausibly allege that the Data Breach resulted from an intentional and targeted attack, the compromised Private Information has already been misused on numerous occasions, and the stolen Private Information included highly sensitive information that can be used to commit identity theft or fraud. Together, these factors show there is a substantial risk that future harm will occur, and this is sufficient to establish an "imminent" injury.

### C.    Plaintiffs adequately allege separate, concrete harms.

To satisfy the "concreteness" requirement, present and future harms must have a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts. *TransUnion*, 594 U.S. at 424; *see also Webb*, 72 F.4th at 372 ("'[T]raditional tangible harms, such as physical harms and monetary harms' are 'obvious[ly]' concrete. Intangible harms can also be concrete . . . such as 'reputational harms, disclosure of private information, and intrusion upon seclusion.'") (quoting *TransUnion*, 594 U.S. at 424). "[A] material risk of future harm can [also] satisfy the concrete-harm requirement," as to injunctive relief. *Webb*, 72 F.4th at 372 (quoting *TransUnion*, 594 U.S. at 424). "To have standing to pursue damages based on a risk of future harm, plaintiffs must demonstrate a *separate* concrete harm caused 'by their exposure to the risk itself.'" *Webb*, 72 F.4th at 372 (emphasis in original) (quoting *TransUnion*, 594 U.S. at 424). Here, Plaintiffs allege "separate concrete harm[s]" in the form of mitigation

expenses, lost time, and emotional damages caused by their exposure to the imminent risk of future harm (i.e., the risk of future identity theft or fraud). *See Webb*, 72 F.4th at 372.[15]

### 1. Plaintiffs have attempted to mitigate their losses, consistent with guidance from Defendants and the FTC.

Because Plaintiffs adequately allege an imminent and substantial risk of future harm, any expenses they reasonably incur to mitigate that risk likewise constitute Article III injuries-in-fact. In other words, the two theories of injury-in-fact "rise and fall together." *Clapper*, 568 U.S. at 402; *see also Webb*, 72 F.4th at 377 ("We join other circuits in concluding that time spent responding to a data breach can constitute a concrete injury sufficient to confer standing, at least when that time would otherwise have been put to profitable use.") (citing *Clemens*, 48 F.4th at 158; *Hutton*, 892 F.3d at 622; *Galaria v. Nationwide Mut. Ins. Co.*, 663 F. App'x 384, 388-89 (6th Cir. 2016); *Lewert*, 819 F.3d at 967; and *Equifax*, 999 F.3d at 1262); *see also LastPass*, 2024 WL 3580646, at *4 ("'[T]ime spent responding to a data breach can constitute a concrete injury sufficient to confer standing' where the 'time would otherwise have been put to profitable use' and it was spent in 'response to a substantial and imminent risk of harm.'") (quoting *Clapper*, 568 U.S. at 422). *See also Shedd v. Sturdy Mem'l Hosp., Inc*., 2022 WL 1102524, at *6

---

[15]    Plaintiffs have also alleged other injuries including loss of value of personal information and loss of benefit of the bargain, which have been held to confer standing by other courts examining those issues. *See In re Marriott*, 440 F. Supp. 3d at 495 ("They have adequately alleged injury-in-fact in the form of losses from identity theft, imminent threat of identity theft, costs spent mitigating the harms from the data breach, loss of the benefit-of-their-bargain, and loss of value of their personal information. These injuries are fairly traceable to [d]efendants' conduct."); *In re Facebook, Inc., Consumer Priv. User Profile Litig*., 402 F. Supp. 3d 767, 776-77 (N.D. Cal. 2019) (addressing invasion of privacy).  It is unnecessary for the Court to reach a decision on those issues given that all of the Plaintiffs have alleged actual or attempted fraud or significant and imminent risk of future harm, which is sufficient to demonstrate standing under current First Circuit law.  *See Webb*, 72 F.4th at 374.  *See also In re Equifax, Inc., Customer Data Sec. Breach Litig*., 362 F. Supp. 3d 1295, 1317 (N.D. Ga. 2019) ("Many of the [p]laintiffs have also already suffered forms of identity theft. Moreover, the [p]laintiffs here have sufficiently alleged a substantial and imminent risk of impending identity fraud due to the vast amount of information that was obtained in the Data Breach. The Court concludes that these allegations are sufficient.").

(Mass. Super. Apr. 5, 2022) ("Massachusetts has, unlike other jurisdictions, held that costs incurred to mitigate or prevent a substantial risk of harm are recoverable as damages in certain circumstances.").

Here, Plaintiffs' mitigation efforts are predicated on both actual, present misuse of their stolen Private Information, and a non-speculative and imminent risk of future injury, as discussed above. As such, in taking those measures, Plaintiffs "incurred concrete damages as a proximate result of the Data Breach." *In re GE/CBPS*, 2021 WL 3406374, at *9 (collecting cases); *see also Webb*, 72 F.4th at 377.

Defendants accuse Plaintiffs of "manufactur[ing] standing merely by inflicting harm on themselves[.]" Mot. at 26 (quoting *Clapper*, 586 U.S. at 409, 416). This assertion is specious. First, it was *Defendants* who suggested that Plaintiffs remain "vigilant" and monitor their credit reports as a result of Defendants' failures to protect Plaintiffs' data, making it ironic for Defendants to now argue that Plaintiffs inflicted harm on themselves. Regardless, Defendants' argument also fails because it necessarily turns on a finding that the risk of future harm is not imminent. As explained above, however, Plaintiffs have been exposed to a substantial and imminent risk of future harm. Accordingly, the lost time and mitigation costs that Plaintiffs incurred as a result of that substantial and imminent risk of future harm are separate, concrete and present injuries that satisfy the "some other injury" inquiry. *See, e.g.*, *Webb*, 72 F.4th at 377 ("Because this alleged injury was a response to a substantial and imminent risk of harm, this is not a case where the plaintiffs seek to 'manufacture standing by incurring costs in anticipation of non-imminent harm.'") (quoting *Clapper*, 568 U.S. at 422, and citing *McMorris*, 995 F.3d at 303, and *Hutton*, 892 F.3d at 622); *Anderson*, 659 F.3d at 164 (under circumstances where plaintiffs alleged (1) actual misuse of stolen financial information in the form of unauthorized

charges resulting from (2) a targeted data breach, it was entirely reasonable for customers to attempt to mitigate harm to themselves).[16]

Plaintiffs have alleged a concrete harm, having pleaded an injury in fact due to an imminent and substantial risk of future identity theft and the cost of mitigation efforts undertaken to minimize that risk.

### 2. Plaintiffs have sufficiently alleged distress.

Plaintiffs have also alleged a concrete harm based on the emotional damages caused by the substantial and imminent risk that cybercriminals will misuse their data. In *TransUnion*, the Supreme Court suggested that "emotional injury" resulting "from the mere risk that [the plaintiffs'] credit reports would be provided to third-party businesses" would qualify as "some other injury." *TransUnion*, 594 U.S. at 436 n.7 ("A plaintiff's knowledge that he or she is exposed to a risk of future physical, monetary or reputational harm could cause its own current emotional or psychological harm."). "Following *TransUnion*, courts across the country have recognized that harms that result as a consequence of a plaintiff's knowledge of a substantial risk of identity theft, including time and money spent responding to a data breach or emotion[al]

---

[16] *Accord Bohnak*, 79 F.4th at 286 (finding the plaintiff's mitigation costs, lost time, and "other 'opportunity costs' associated with attempting to mitigate the consequences of the data breach" satisfied the "some other injury" inquiry); *Equifax*, 999 F.3d at 1262 ("[W]hen a plaintiff faces a sufficient risk of harm, the time, money, and effort spent mitigating that risk are also concrete injuries."); *OPM*, 928 F.3d at 59 ("Because [plaintiffs] adequately allege a substantial risk of future identity theft, any expenses they have reasonably incurred to mitigate that risk likewise qualify as injury in fact."); *Marriott*, 440 F. Supp. 3d at 460 (time and money spent to mitigate harms from data breach established injury-in-fact because plaintiffs' allegations of threatened harm were sufficiently non-speculative to constitute an injury-in-fact); *Hutton*, 892 F.3d at 622 ("[T]he [Supreme] Court has recognized standing to sue on the basis of costs incurred to mitigate or avoid harm when a substantial risk of harm actually exists.") (citing *Clapper*, 568 U.S. at 414 n.5)); *In re USAA Data Sec. Litig.*, 621 F. Supp. 3d 454, 464 (S.D.N.Y. 2022) ("In the data-breach context, the time and money spent to respond to a data breach may satisfy the injury-in-fact requirement.") (internal citation omitted); *Rudolph v. Hudson's Bay Co.*, 2019 WL 2023713, at *6-7 (S.D.N.Y. May 7, 2019) (plaintiff's alleged time and expenses incurred in obtaining a new debit card following a data breach constituted injury-in-fact, in part because "the value of one's own time needed to set things straight is a loss from an opportunity-cost perspective").

distress can satisfy concreteness." *Medoff v. Minka Lighting, LLC*, 2023 WL 4291973, at *4 (C.D. Cal. May 8, 2023); *Webb*, 72 F.4th at 374 (collecting cases); *In re Shields Health Care Grp., Inc. Data Breach Litig.*, 2024 WL 939219, at *3 n.5 (D. Mass. Mar. 5, 2024) (holding that "garden-variety emotional distress and lost time" are "harms sufficient for Article III standing") (citing *Webb*, 72 F.4th at 376-78); *see also Clemens*, 48 F.4th at 158 (explaining that the plaintiff's emotional distress and related therapy costs and the time and money involved in mitigating the fallout of a data breach satisfied the "some other injury" inquiry); *Bowen v. Paxton Media Grp., LLC*, 2022 WL 4110319, at *5 (W.D. Ky. Sept. 8, 2022) (finding that the "some other injury" inquiry was satisfied by mitigation costs, lost time, and emotional damages); *In re Mednax Servs., Inc., Customer Data Sec. Breach Litig.*, 603 F. Supp. 3d 1183, 1203-04 (S.D. Fla. 2022) (finding that the "some other injury" inquiry was satisfied by allegations of emotional distress and lost time).

Here, Plaintiffs allege emotional damages caused by their exposure to the imminent risk of future identity theft or fraud, and the emotional damages pleaded by Plaintiffs are proportional to the actual likelihood of the future harm occurring. Plaintiffs plead particularized facts that corroborate their fear of identity theft, as such the harm is not too speculative for standing purposes.

### D. Plaintiffs' injuries are particularized.

Plaintiffs' specific and detailed allegations of actual misuse refute Defendants' argument that Plaintiffs' individual complaints "fall short of showing particularized injury[.]" Mot. at 16. For an injury to be "particularized," it must go beyond a "generalized grievance," to manifestly "affect the plaintiff in a personal and individual way." *Lyman v. Baker*, 954 F.3d 351, 360-61 (1st Cir. 2020) (internal quotation marks and citations omitted). Defendants mischaracterize the allegations of all Plaintiffs as "virtually identical from complaint-to-complaint[,]" cherry-picking

one paragraph from a single individual complaint and concluding, without analysis, that it is "impermissibly conclusory." *See* Mot. at 17 n.15. Defendants' example does nothing to diminish Plaintiffs' well-pled allegations and ignores the realities of class action pleading, in which plaintiffs necessarily bring claims based on nearly identical factual predicates. Instead, Defendants rely on a single pharmaceutical product liability case to support their specious argument that Plaintiffs' allegations fail to plead particularized injuries. *See* Mot. at 16-18 (citing *Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 730-31 (1st Cir. 2016)).[17] In *Hochendoner*, the First Circuit explained that "[a]n individual's plausible allegations of a personal injury will generally suffice to plead an injury in fact, even if the claim is ultimately lacking on the merits." *Hochendoner*, 823 F.3d at 734-35. The *Hochendoner* court vacated the district court's dismissal of two named plaintiffs' claims based on an alleged injury of anaphylactic reaction suffered after taking an allegedly defective pharmaceutical drug, finding those plaintiffs "plausibly alleged facts sufficient to demonstrate Article III standing[,]" but dismissed the claims of plaintiffs whose complaints "offer[ed] only scattered descriptions of generalized harms." Here, Plaintiffs' specific and detailed allegations of actual misuse refute Defendants' argument.

---

[17] Without analysis, Defendants also cite *Brown v. Brit. Parliament*, 2023 WL 2898731, at *3 (D. Mass. Apr. 11, 2023). *See* Mot. at 18. In that case, the *pro se* complaint alleged damages for harm against "the British Parliament, the Commonwealth of Massachusetts, the City of Boston, and the estates of four individuals who allegedly participated and benefited from the slave trade during the American colonial era, seeking what amounts to reparations." *Id.* at *1. The court found the plaintiff lacked standing because "[t]he complaint lists various harms which were suffered by plaintiff's enslaved ancestors . . . [b]ut . . . [did] not allege that plaintiff herself suffered any of those harms[.]" *Id.* at *3 ("The complaint does not identify any individual ancestors who were enslaved by any of the defendants, nor does it trace defendants' specific past behavior to specific harms or disadvantages suffered by plaintiff today.").

In a footnote, Defendants also cite two out-of-circuit cases, neither of which involved a data breach. *See* Mot. at 18 n.16 (citing *Richards v. Duke Univ.*, 480 F. Supp. 2d 222, 233 (D.D.C. 2007) and *Hainey v. SAG-AFTRA Health Plan*, 2023 WL 3645514, at *13 (D. Md. May 25, 2023), *appeal dismissed*, 2023 WL 7688384 (4th Cir. Nov. 15, 2023)).

### E.     Defendants already admitted federal subject-matter jurisdiction when they removed 35 actions to federal court.

As the attached Exhibit B demonstrates, Defendants have removed 35 actions from state to federal court, and—by their motion—are now seeking to dismiss 25 of them based upon lack of federal subject-matter jurisdiction before this Court.[18] The irony of Defendants' motion is that, by removing the cases to federal court, *they* invoked federal jurisdiction themselves. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992); *Brooks v. Georgia Pac., L.L.C.*, 2017 WL 1534219, at *2 (W.D. La. Mar. 21, 2017) ("Paradoxically, however, as the party invoking federal jurisdiction in this removed case, [defendant] bears the burden of establishing standing."); *Bergquist v. Deutsche Bank Nat. Tr. Co.*, 2012 WL 3288859, at *4 (D. Or. May 14, 2012) ("When a defendant removes a case to federal court, the defendant has the burden of proving the plaintiff has standing."); *Fleury v. Union Pac. R.R. Co.*, 2022 WL 1803357, at *2 (N.D. Ill. June 2, 2022) ("The party invoking federal jurisdiction, which in this case is Union Pacific as the removing party, bears the burden of establishing Article III standing."). Defendants removed 35 cases to federal court on the basis of the cases having federal subject matter jurisdiction, and now Defendants are arguing that the remainder of those cases suddenly *do not* have federal subject-matter jurisdiction. This contradictory jockeying between jurisdictions is a waste of judicial resources and should be rejected.

Such procedural gamesmanship across jurisdictions should not be looked upon favorably by this Court. *See In re Methyl Tertiary Butyl Ether Prod. Liab. Litig.*, 510 F. Supp. 2d 299, 330 (S.D.N.Y. 2007) (noting "gamesmanship in its purest form" where defendants asked the court to reconsider "whether the very claims they removed to federal court should remain [in federal

---

[18] The remainder were previously voluntarily dismissed or did not form part of Defendants' Motion.

court]"); *Mocek v. Allsaints USA Ltd.*, 220 F. Supp. 3d 910, 915 (N.D. Ill. 2016) (awarding attorneys' fees pursuant to 28 U.S.C. § 1447(c) where defendant argued against federal jurisdiction on a motion to dismiss after having removed the action to federal court); *Morgan v. Bank of Am., N.A.*, 2020 WL 3979660, at *3 (E.D. Wash. July 14, 2020), *reconsideration denied*, 2020 WL 5026857 (E.D. Wash. Aug. 25, 2020) (awarding attorneys' fees, following *Mocek*, where defendant removed action and subsequently moved to dismiss for lack of federal jurisdiction). Removing cases to various, different federal courts on the basis that Article III is satisfied, and then seeking to dismiss many of those cases on a purported lack of jurisdiction, demonstrates yet another reason why Defendants' bad faith motion should be denied.

## II.    PLAINTIFFS' INJURIES ARE TRACEABLE TO DEFENDANTS' CONDUCT

Defendants also mischaracterize and misapply the second part of the standing analysis, whether "the injury [is] fairly traceable to the challenged action of the defendant." *Lujan*, 504 U.S. at 560. "Injuries are 'fairly traceable' to a defendant's conduct for the purposes of Article III standing if plaintiffs plausibly allege the defendant's 'actions led to the exposure and actual or potential misuse of the plaintiffs'' personal information." *LastPass*, 2024 WL 3580646, at *5 (quoting *Webb*, 72 F.4th at 377) (citing *In re Evenflo Co., Mktg., Sales Pracs. & Prods. Liab. Litig.*, 54 F.4th 28, 41 (1st Cir. 2022)). Plaintiffs are not required to prove the entirety of their claims at the pleading stage when no discovery has taken place.

The Supreme Court emphasized in *Lujan* that "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." 504 U.S. at 561; *see also Dantzler, Inc. v. Empresas Berrios Inventory & Operations, Inc.*, 958 F.3d 38, 46-47 (1st Cir. 2020) (defendants' "challenge of [plaintiff's] standing arises in the pleading stage, so this Court takes all well-pleaded facts in the complaint as

true and indulges all reasonable inferences in [plaintiff's] favor to determine whether it plausibly pleaded facts necessary to demonstrate standing to bring the action.") (cleaned up). The circuit courts have called this a "relatively modest burden." *OPM*, 928 F.3d at 60-61; *see also Fero v. Excellus Health Plan, Inc.*, 236 F. Supp. 3d 735, 758 (W.D.N.Y. 2017) (finding the "alleged chains of events are plausible, and, given that the causation element of standing is not an onerous hurdle, the Court finds that the Plaintiffs have sufficiently alleged this requirement and need not rule out alternative sources of their injuries").

Plaintiffs easily meet this burden by pleading injuries sustained close in time to the preventable breach of Defendants' systems using information that was available to criminals because of the Data Breach. Any assertions that the data is disorganized or that the risks are different depending upon which Defendant was impacted ignore and misconstrue Plaintiffs' well-pleaded allegations.

### A.    Defendants have not shown a "mismatch" between the type of data compromised and the harm alleged.

Defendants argue that, for certain Plaintiffs, the type of data allegedly stolen could not have caused the type of harm alleged. Mot. at 36-38. First, Defendants mischaracterize Plaintiffs' allegations. As described above, their Appendix A (and by extension their brief, which relies on their appendix) is replete with demonstrable errors and misrepresentations. For example:

- Jose Vargas was the victim of an identity thief who used his Private Information to submit a loan application without his consent, after his Social Security number was exposed in the Data Breach (Exhibit A at Row 365, Column AL; *Walles, et al. v. Autozone, Inc., et al.*, No. 1:23-cv-12889-ADB (D. Mass.), ECF No. 6 (Amended Complaint) ¶¶ 143-44), yet Defendants contend that there is a mismatch between the data exposed and his alleged injury.

- Bassam Zaafan suffered fraudulent activity when an unauthorized third party attempted to open a credit card in his name after his Social Security number was exposed in the Data Breach (Exhibit A at Row 397, Column AL; *Zaafan v. Umpqua Bank*, No. 1:23-cv-13029-ADB (D. Mass.), ECF No. 1-1 (Complaint) ¶

32), yet Defendants contend that there is a mismatch between the data exposed and his alleged injury.

- Ricky Feagins received emails regarding loan approvals he never applied for after his Social Security number was exposed in the Data Breach (Exhibit A at Row 115, Column AL; *Feagins v. Progress Software Corporation, et al.*, No. 1:23-cv-13030-ADB (D. Mass.), ECF No. 1 (Complaint) ¶ 55), yet Defendants contend that there is a mismatch between the data exposed and his alleged injury.

- Justin Okeke discovered an unrecognized person listed as a resident and possible driver at his home after his Social Security number and PHI were exposed in the Data Breach (Exhibit A at Row 265, Column AL; *Okeke v. Progress Software Corporation, et al.*, No. 1:24-cv-11523-ADB (D. Mass.), ECF No. 1 (Complaint) ¶ 86), yet Defendants contend that there is a mismatch between the data exposed and his alleged injury.

Second, even if Defendants' characterizations of the complaints were accurate, their argument requires illogical inferences that are improper at the motion to dismiss stage. In addition, Defendants' "analysis" contains no actual discussion or assessment. It cites to Column L of their Appendix A. That column is simply titled "Mismatch between Data Elements and Alleged Injury," and for each case, lists nothing more than "Y" or "N." That is the definition of conclusory.

Nor does Defendants' brief fare better. The brief states that "generally, these mismatch problems fall into two categories." Mot. at 38. But the brief does not specify which complaints "generally" fall into which of the two categories. Even if it had, both categories require speculative inferences. For example, Defendants' first category wrongly assumes that a data breach cannot lead to an increase in spam or phishing attacks unless phone numbers or emails were stolen. But once additional Private Information is stolen that can be linked to easily searched email addresses or phone numbers, it makes it easy for an attacker to leverage that information to commit spam and fraud. *See, e.g.*, *Mednax*, 603 F. Supp. 3d at 1206 ("Even if the data accessed in the Data Breaches did not provide all the information necessary to inflict these harms, they very well could have been enough to aid therein."); *Sweet v. BJC Health Sys.*, 2021

WL 2661569, at *4 (S.D. Ill. June 29, 2021) ("[W]hile credit card information may not have been exposed, information such as dates of birth, Social Security numbers, and addresses would likely be sufficient to permit identity theft.").

Defendants also broadly state in conclusory fashion that certain of the complaints alleging fraudulent charges "do not allege that the account information required to commit this alleged fraud was compromised in the MOVEit Incidents." Mot. at 38. Plaintiffs and the Court are left to guess which complaints Defendants refer to, as it is not made clear in Column L of their appendix. But more importantly, Defendants make no effort to explain what kind of account information they suppose was "required" to commit the type of fraud alleged. Indeed, the types of scams and schemes that cybercriminals employ to commit fraud are as numerous as they are complex, which is why this is a fact-specific issue that cannot be resolved at this stage. *See Webb*, 72 F.4th at 377 ("The complaint alleges that [defendant's] actions led to the exposure and actual or potential misuse of the plaintiffs' PII, making their injuries fairly traceable to [defendant's] conduct.").

**B.      Defendants' "disorganized data" argument is contrary to the well-pleaded facts of Plaintiffs' Complaint.**

In their Omnibus Set of Additional Pleading Facts, Plaintiffs noted that fraud was likely to continue to occur, because "there is a strong probability that much of the information stolen in the Data Breach has not yet been made available on the black market in a coherent, organized fashion." POSAPF ¶ 251. Defendants took that allegation to mean that, because the data was difficult to find and download, it was too disorganized to use, and thus posed little threat of any future harm. Mot. at 8-9. Nowhere in the Common Complaint, or in any of the complaints filed in this MDL, have Plaintiffs alleged that the data stolen by Cl0P was "unusable," as Defendants

claim. *See* Mot. at 44. That is yet another improper and prejudicial inference that Defendants have drawn based on a gross mischaracterization of Plaintiffs' allegations.

Plaintiffs did not, as Defendants claim, allege that "the published data was not available 'in a coherent, organized fashion' after its alleged posting by Cl0p." *Id.* What Plaintiffs alleged is that there is often "a time lag between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used." POSAPF ¶ 250. Plaintiffs explained that it is likely that for many class members, their data may not yet have "been made available on the black market in a coherent, organized fashion," meaning simply that some class members may not be able to know for certain what information was stolen and published, and therefore must "vigilantly monitor their financial accounts for many years to come." *Id.* ¶ 251.

Aside from misrepresenting Plaintiffs' allegations, Defendants ignore the life cycle of data after a breach. Cybercriminals have ample time to organize data after a breach, including enriching the data with information from other breaches to create complete dossiers about individuals for sale on the dark web for years into the future. *Fox v. Iowa Health Sys.*, 399 F. Supp. 3d 780, 789 (W.D. Wis. 2019) ("The threat of identity theft is exacerbated by what hackers refer to as 'fullz packages.' A fullz package is a dossier that compiles information about a victim from a variety of legal and illegal sources. Hackers can take information obtained in one data breach and cross-reference it against information obtained in other hacks and data breaches. So, for example, if a hacker obtains a victim's Social Security number and health information from [a defendant], the hacker can combine it with the same victim's Social Security number and phone number from a different data breach. This allows the hacker to compile a full record of information about the individual, which the hacker then sells to others as a package.") (citations omitted).

Any analysis of the data and its ability to be misused is an issue for discovery; not a topic that is appropriate to resolve on a motion to dismiss when the facts are disputed. Defendants' attempt to distort that simple point into a supposed concession that Plaintiffs' data that was published and has been identified on the dark web is "unusable" bears no relation to Plaintiffs' actual allegations. Defendants have raised a disputed factual issue that contradicts the well-pleaded allegations in the complaint and must be rejected at the motion to dismiss stage. *See Dantzler*, 958 F.3d at 46-47 (holding that at "the pleading stage . . . this Court takes all well-pleaded facts in the complaint as true and indulges all reasonable inferences in [Plaintiff's] favor to determine whether it plausibly pleaded facts necessary to demonstrate standing to bring the action.").

Defendants fail to cast doubt on the plausibility of Plaintiffs' allegations that the cognizable injury may be traced to the Data Breach.

### C.    Plaintiffs' allegations of actual misuse suffered shortly after their data was stolen by a criminal organization are sufficient.

Defendants do not cite a single case supporting their view that the traceability analysis begins on August 15, 2023, nearly 4 months *after* the Data Breach occurred. Mot. at 35. That is because both common sense and established law dictate that there is a plausible inference that the injury is connected to the breach where the injury occurred shortly after the breach. *See In re LastPass*, 2024 WL 3580646, at *5 ("Plaintiffs have shown an 'obvious temporal connection' between the data breach and actual misuse of some of their data.") (quoting *Webb*, 72 F.4th at 374). Here, the Data Breach began on May 27, 2023. To be clear, none of the Plaintiffs have

alleged that their injuries occurred before the Data Breach.[19] Appendix A. That is the end of the analysis at this stage.

Defendants argue instead that the Court should ignore the breach date and focus instead on August 15, 2024—a date that appears nowhere in the complaints and is relevant only according to Defendants' internal calculations and assumptions about criminal behavior. Defendants somehow presume that Cl0p could not have caused the alleged injuries soon after they stole the data because they were waiting for ransoms, and that the injury could only have been perpetrated by *different* criminals after publication. But this requires the Court to assume: (1) that criminals always do what they say they will do; (2) that shadowy international criminal networks have the ability to control rogue actors within their ranks who have access to the data as of the date of the breach; and (3) that the close temporal proximity between the breach and the alleged injury is merely a coincidence. Plaintiffs' omnibus allegations set forth many of the reasons why these are not appropriate inferences. PSOAPF ¶¶ 215-22 (explaining why the FBI and other law enforcement agencies consistently warn that "cybercriminals cannot be trusted to do what they promise they will do in exchange for a ransom"). Defendants are free to support their assumptions about criminal behavior *with evidence* in front of a jury. But at the motion to dismiss stage, such self-serving assumptions, requiring many unfounded inferences contrary to the well-pleaded allegations of the Complaints to be drawn in Defendants' favor, must be rejected.

Nor do Plaintiffs have the burden of pleading exactly when an alleged injury occurred. This is especially true because identity theft is, by its nature, a clandestine activity intended to go

---

[19] One Plaintiff incorrectly stated that his injury occurred in 2023. *Romine, et al. v. Progress Software Corporation, et al.*, No. 1:24-cv-11511-ADB (D. Mass.), ECF No. 1 (Complaint) ¶ 152. That has been corrected via an errata filing. *See* ECF No. 1186.

undetected, so the victim may not know all the details at the time of pleading. As one court explained, quoting the Supreme Court:

> Nor are we troubled … by certain [plaintiffs'] failure to specify exactly when, in relation to the data breaches, fraudsters first misused their data. The Supreme Court has explained that "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Lujan*, 504 U.S. at 561 (formatting altered).

*OPM*, 928 F.3d at 60-61. So too here, Plaintiffs have pleaded all that is required for traceability purposes.

### D.     Defendants' VCE and VCEC tracing arguments are an attempted backdoor proximate cause analysis, which is expressly not required in the First Circuit.

The Supreme Court made clear in *Lexmark* that "Proximate causation is not a requirement of Article III standing, which only requires that the plaintiff's injury be fairly traceable to the defendant's conduct." *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 118 n.6 (2014). Yet, Defendants have dressed up a proximate causation argument under the guise of traceability. In particular, Defendants argue that the Vendor Contracting Entities ("VCEs") and Vendor Contracting Entities' customers ("VCECs") are "multiple steps removed" from the Data Breach. Mot. at 41. In other words, they are not sufficiently "proximate" to the injury. But Plaintiffs have pleaded these Defendants failed to fulfill their obligations to protect their customers' data, supporting their liability. *See, e.g.*, POSAPF ¶¶ 376, *et seq*.

Defendants continue that because none "of the malicious activity occurred on the VCEs or VCECs' networks . . . no amount of cybersecurity by these Defendants . . . could have prevented the MOVEit Incidents from occurring." Mot. at 41-42. Again, Defendants appear to argue that the VCE and VCEC Defendants' role was too attenuated for them to have caused Plaintiffs' injuries. But "Article III standing does not require that the defendant be the most

immediate cause, or even a proximate cause, of the plaintiffs' injuries; it requires only that those injuries be 'fairly traceable' to the defendant." *Attias*, 865 F.3d at 628-29; *see also Fero*, 236 F. Supp. 3d at 757 ("BCBSA contracted to ensure that federal employees, like Mottern, benefitted from reasonable data security, that BCBSA, as agent for Excellus, failed to provide that security in certain respects, and that the failures led to identity theft, fraud, and the imminent risk of future harm. These alleged chains of events are plausible, and, given that the causation element of standing is not an onerous hurdle, the Court finds that the Plaintiffs have sufficiently alleged this requirement and need not rule out alternative sources of their injuries.") (internal citations omitted).

Defendants do not deny that VCEs or VCECs participated in the chain of events leading to Plaintiffs' injuries. Plaintiffs' POSAPF explains how industry standard vetting and auditing procedures could and should have been employed by the VCEs or VCECs to remove themselves from that chain of events. *See, e.g.*, POSAPF ¶¶ 376-457. Plaintiffs' injuries are therefore "fairly traceable" to the VCEs and VCECs, and questions of how proximate or attenuated their role was must be left for another day.

## III.    PLAINTIFFS' INJURIES ARE REDRESSABLE

Article III jurisdiction also requires that the injury be redressable by the federal court. *Webb*, 72 F.4th at 377; *see also Spokeo*, 578 U.S. at 330 (noting that the Article III inquiry requires that the injury is "likely to be redressed by a favorable judicial decision"). There appears to be no dispute "that monetary relief would compensate [the plaintiffs] for their injur[ies], rendering the injur[ies] redressable." *Id.* (citations omitted).

Nevertheless, Defendants prematurely argue about whether and which damages models Plaintiffs may pursue. Mot. at 28-31 (conflating damages models with Article III harm). The pleading stage is not the time and place for these arguments:

> Evenflo also faults the plaintiffs for "offer[ing] no theories of how damages could be measured"; although it concedes that "[a] precise amount of damages need not be pleaded," it asserts that the plaintiffs must at least offer "the formula" for measuring damages. But at the pleading stage, to demonstrate Article III standing, plaintiffs need not quantify or offer a formula for quantifying their injury.

*In re Evenflo*, 54 F.4th at 40. Plaintiffs all raise a number of legally-cognizable interests (including, but not limited to, the protection of Private Information, economic loss, or remediation of fraud), which can be redressed through damages methodologies that will be later developed to match their theories of injury and liability. *See In re Facebook, Inc.*, 402 F. Supp. 3d at 776-77 (noting that "the law has long recognized that a privacy invasion itself [is] the kind of injury that can be redressed in federal court," denying a motion to dismiss for lack of Article III standing). Moreover, many of Plaintiffs' claims carry nominal damages, making them redressable without need for further analysis. *See Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 802 (2021) ("'Because every violation [of a right] imports damage,' nominal damages can redress [plaintiff's] injury even if he cannot or chooses not to quantify that harm in economic terms."). Therefore, this Court has jurisdiction over Plaintiffs' claims, and this case should proceed.

## CONCLUSION

Defendants' Motion to Dismiss misrepresents the applicable law, misconstrues Plaintiffs' allegations, and presents an inappropriate counterfactual narrative for which Defendants seek inferences to be drawn in *their* favor. Plaintiffs, not Defendants, are "masters of their complaint." Plaintiffs' actual allegations show a notorious criminal group targeted Plaintiffs' sensitive Private Information, stole it, already misused it to varying levels, and still possess it for future mischief, or provided it to others who may do so. Defendants' hope from this Court for a magic wand wave to vanquish one of the biggest data breaches in history fails. Defendants 12(b)(1)

Motion should be denied in its entirety. In the alternative, Plaintiffs should be granted leave to replead their allegations.

DATED this 5th day of September, 2024.          Respectfully submitted,

By: _____ */s/ Kristen A. Johnson* _____
    Kristen A. Johnson (BBO# 667261)
HAGENS BERMAN SOBOL SHAPIRO LLP
1 Faneuil Hall Square, 5th Fl.
Boston, MA 02109
Tel:  (617) 482-3700
Fax: (617) 482-3003
kristenj@hbsslaw.com

*Liaison & Coordinating Counsel*

By: _____ */s/ E. Michelle Drake* _____
    E. Michelle Drake
BERGER MONTAGUE, PC
1229 Tyler St., NE, Ste. 205
Minneapolis, MN 55413
Tel:  (612) 594-5933
Fax: (612) 584-4470
emdrake@bm.net

By: _____ */s/ Gary F. Lynch* _____
    Gary F. Lynch
LYNCH CARPENTER, LLP
1133 Penn Ave., 5th Fl.
Pittsburgh, PA 15222
Tel:  (412) 322-9243
Fax: (412) 231-0246
Gary@lcllp.com

By: _____ */s/ Douglas J. McNamara* _____
    Douglas J. McNamara
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave. NW, 5th Fl.
Washington, DC 20005
Tel:  (202) 408-4600
dmcnamara@cohenmilstein.com

By: _____ */s/ Karen H. Riebel* _____
      Karen H. Riebel
LOCKRIDGE GRINDAL NAUEN PLLP
100 Washington Ave. S., Ste. 2200
Minneapolis, MN 55401
Tel: ( 612) 339-6900
Fax: (612) 339-0981
khriebel@locklaw.com


By: _____ */s/ Charles E. Schaffer* _____
      Charles E. Schaffer
LEVIN SEDRAN & BERMAN LLP
510 Walnut Street, Ste. 500
Philadelphia, PA 19106
Tel: (215) 592-1500
Fax: (215) 592-4663
cshaffer@lfsblaw.com

*Lead Counsel*


By: _____ */s/ Amy Keller* _____
      Amy Keller
DICELLO LEVITT LLP
Ten North Dearborn Street, Sixth Floor
Chicago, IL 60602
Tel:  (312) 214-7900
akeller@dicellolevitt.com

*Co-Chair, Law and Briefing*


By: _____ */s/ James J. Pizzirusso* _____
      James J. Pizzirusso
HAUSFELD LLP
888 16th Street N.W.
Suite 300
Washington, D.C. 20006
Tel:  (202) 540-7200
jpizzirusso@hausfeld.com

*Co-Chair, Law and Briefing*

011175-35/2756927 V1

## CERTIFICATE OF SERVICE

I hereby certify that, on this date, the foregoing document was filed electronically via the Court's CM/ECF system, which will send notice of the filing to all counsel of record.

Dated:  September 5, 2024                              */s/ Kristen A. Johnson*
                                                     Kristen A. Johnson (BBO# 667261)

011175-35/2756927 V1