UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| | * | |
| IN RE: MOVEIT CUSTOMER DATA | * | MDL No. 23-md-3083-ADB-PGL |
| SECURITY BREACH LITIGATION | * | |
| | * | |
| This Order Relates to the Following Cases: | * | |
| | * | |
| **PROGRESS BELLWETHER CASES** | * | |
| **ONLY.** | | |

MDL Order No. 22
(Progress Motion to Dismiss for Failure to State a Claim)

BURROUGHS, D.J.

Defendant Progress Software Corporation ("Progress") moves to dismiss the allegations

against it contained in Chapters 1 and 2 of Plaintiffs' Corrected Bellwether Consolidated Class

Action Amended Complaint [ECF No. 1332 (the "Bellwether Complaint" or "CAC"), on the

ground that Plaintiffs have failed to state a claim under Rule 12(b)(6). Having reviewed the

Bellwether Complaint, Progress's memorandum in support of its motion, [ECF No. 1367-1

("Mem.")]; Plaintiff's opposition [ECF No. 1437 ("Opp.")]; Progress's reply [ECF No. 1469

("Reply")], and the exhibits accompanying the parties' filings, the Court hereby orders that

Progress's Motion is **GRANTED** on Counts 2, 5–7, 9–12, 14, 21, 24, 25, 27–30, **GRANTED IN**

**PART** and **DENIED IN PART** on Counts 1, 4, and 18, and otherwise **DENIED**. Plaintiffs'

allegations and claims against the other Bellwether Defendants will be the subject of MDL Order

No. 23, to follow.

I.    Background

a.  Key Facts

The following facts reflect the well-pleaded allegations set forth in the Bellwether

Complaint. See Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 5 (1st Cir. 2011).

### i. MOVEit Transfer and the Data Breach

MOVEit Transfer is an encrypted file-transfer software offered by Progress Software Corporation, based in Burlington, Massachusetts.  [CAC ¶¶ 6, 966].  The software applies encryption protocols to secure users' data both while it is both being transferred and stored.  [Id. ¶ 969].  These protocols are claimed to be "virtually unbreakable with existing technology," [id. ¶¶ 970–71], meaning that under ordinary circumstances, files encrypted by MOVEit "can only be read if the user has the appropriate encryption keys, even if the files are stolen," [id. ¶ 969].

The software "is licensed to customers on a subscription basis and installed by customers on their own servers."  [CAC ¶ 967].  Then, "users—such as the customer's employees—access the software through a MOVEit Transfer software client installed on a computer, phone, or website accessible over the Internet that connects to the customer's MOVEit Transfer server."[1] [Id. ¶ 973].  Progress provides security and software support, including "bug fixes, patches, upgrades, enhancements, new releases [and] technical support," to MOVEit Transfer customers. [Id. ¶ 972].

On May 27, 2023, a Russian ransomware group called Cl0p "deploy[ed] malware to public-facing MOVEit Transfer web portals" that allowed the hackers to decrypt and download data stored in the MOVEit software.  [CAC ¶ 14].  This enabled Cl0p to exfiltrate personally identifiable information ("PII") and, in some cases, protected health information ("PHI") from more than 2,600 entities, affecting more than 93 million individual records as of January 2024 (the "Data Breach").  [Id. ¶¶ 19, 1164, 1175].

---

[1] Customers "can also access MOVEit Transfer through a REST API, a programmatic means of interacting with the MOVEit Transfer server without using a graphical user interface such as a client or website."  [CAC ¶ 975].

Cl0p's malware exploited three vulnerabilities in MOVEit Transfer—SQL injection, .NETBinaryFormatted deserialization, and unencrypted encryption keys—which were endemic to the code of "[a]ll versions of MOVEit Transfer." [CAC ¶ 1112]. Progress's technical support teams began receiving reports of suspicious activity the next day. [Id. ¶ 1125]. On June 5, 2023, "multiple companies began coming forward to announce that their MOVEit Transfer servers [had been] compromised." [Id. ¶ 1132]. By that time, Microsoft had attributed the Data Breach to Cl0p. [Id. ¶ 1156]. Cl0p then claimed public credit for the Data Breach and, on June 6, 2023, "threatened to post stolen user data online unless the compromised organizations paid a ransom." [Id. ¶¶ 1157–59]. In the months that followed, Cl0p published the names of entities from which it had stolen data through the Data Breach, eventually naming more than 2,600 companies or other entities. [Id. ¶¶ 1161–64]. Plaintiffs also allege that Cl0p has made good on its threat to post users' information on the dark web and elsewhere, and that such disclosure has caused them to suffer an array of legally cognizable injuries, discussed further below. [Id. ¶¶ 1157, 1193, 1199–211].

### ii. Progress

Progress, as described above, is a public corporation based in Massachusetts and incorporated in Delaware. [CAC ¶ 918]. Plaintiffs allege that the company knew and intended that MOVEit Transfer would be used to move and store highly sensitive information, [id. ¶¶ 990–92, 1325–46], and understood that secure file transfer software was a likely target of hacking efforts, [id. ¶¶ 1347–55]. For example, in online marketing materials targeting the banking and financial clients, Progress explained that "[d]ata in motion is data at risk and particular attention must be paid to the security and compliance of . . . external file transfer process[es]." [Id. ¶ 1347 (first alteration in original)]. Progress published on its website that it

"guarantees the security of sensitive files both at-rest and in-transit." [Id. ¶ 994 (emphasis omitted)]; see also [id. ¶¶ 992–93 (describing security procedures)]. Therefore, the Plaintiffs allege, Progress had an obligation to design MOVEit in a manner that would promote security, and to identify and remediate software vulnerabilities in MOVEit, and that its failure to do so allowed Cl0p to access Plaintiffs' data, resulting in injuries. [Id. ¶¶ 995, 1358–72].

Plaintiffs further contend that once Cl0p infiltrated the MOVEit Transfer environments, Progress moved too slowly in patching the vulnerabilities that had allowed the breach and in notifying Plaintiffs concerning the breach, and that such delays led to additional injuries. [Id. ¶¶ 1373–85.

### b. Procedural History

After extensive negotiation among the parties, the Court ordered bellwether proceedings in this case, and permitted the Plaintiffs to consolidate and amend their allegations in the CAC. Plaintiffs filed an initial Bellwether Complaint on December 6, 2024, see [ECF No. 1297], which they corrected on January 9, 2025, with Defendants' stipulated consent, see [ECF No. 1331 (stipulation)]; [ECF No. 1332 (CAC)].[2] The CAC names Progress, as well as the PBI Bellwether Defendants, Delta Dental, Maximus, and the Welltok Defendants (together, the "non-Progress Defendants").

Progress moved to dismiss on February 4, 2025, [ECF No. 1367], Plaintiffs opposed on April 7, 2025, [Opp.], and Progress replied on April 28, 2025, [Reply]. The non-Progress Defendants moved for dismissal on the same timeline, and their motions are the subject of MDL Order No. 22, filed contemporaneously with this order. The Court held oral argument on May 12, 2025.

---

[2] References to the Bellwether Complaint or the CAC refer to the corrected version.

## II.    Legal Standard

### a.    Rule 12(b)(6) Motion to Dismiss

"Dismissal of a complaint pursuant to Rule 12(b)(6) is inappropriate if the complaint satisfies Rule 8(a)(2)'s requirement of a 'short and plain statement of the claim showing that the pleader is entitled to relief.'"  Ocasio-Hernández, 640 F.3d at 11 (quoting Fed. R. Civ. P. 8(a)(2)).  "A short and plain statement needs only enough detail to provide a defendant with fair notice of what the . . . claim is and the grounds upon which it rests."  Id. at 12 (internal quotation marks omitted) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  Still, "in order to 'show' an entitlement to relief a complaint must contain enough factual material 'to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact).'"  Id. (quoting Twombly, 550 U.S. at 555).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."  Id. (internal quotation marks omitted) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).

To apply these standards, the Court "employ[s] a two-pronged approach."  Ocasio-Hernández, 640 F.3d at 12.  To begin, it must "identify[] and disregard[] statements in the complaint that merely offer "legal conclusions[s] couched as . . . fact[]" or "[t]hreadbare recitals of the elements of a cause of action."  Id. (first and second alterations added) (quoting Iqbal, 556 U.S. at 678).  "Non-conclusory factual allegations in the complaint must then be treated as true, even if seemingly incredible."  Id. (quoting Iqbal, 556 U.S. at 681).  "If that factual content, so taken, 'allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged,' the claim has facial plausibility."  Id. (quoting Iqbal, 556 U.S. at 678).  The

resulting inquiry demands a "context-specific" approach, asking the Court "to draw on [its] judicial experience and common sense." Iqbal, 556 U.S. at 679.

### b. Rule 9(b) Heightened Pleading

For claims sounding in fraud, and, as relevant here, claims alleging fraudulent misrepresentation, Federal Rule of Civil Procedure 9(b)'s special pleading requirements apply. Rule 9(b) states that "a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The First Circuit interprets this standard as requiring parties to set out "the who, what, where, and when of the allegedly false or fraudulent representation," Alt. Sys. Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 29 (1st Cir. 2004), and specify "the basis for inferring scienter," Sterling Suffolk Racecourse, LLC v. Wynn Resorts, Ltd., 419 F. Supp. 3d 176, 189 (D. Mass. 2019) (quoting N. Am. Cath. Educ. Programming Found., Inc. v. Cardinale, 567 F.3d 8, 13 (1st Cir. 2009)). In misstatement cases, "the specificity requirement extends only to the particulars of the allegedly misleading statement itself. The other elements of fraud, such as intent and knowledge, may be averred in general terms." Rodi v. S. New Eng. Sch. of L., 389 F.3d 5, 15 (1st Cir. 2004) (citations omitted); see also Runyon v. Wellington Mgmt. Co., LLP, No. 13-cv-11236, 2015 WL 1276825, at *5 (D. Mass. Mar. 20, 2015) (noting that "reliance" is not subject to Rule 9(b)'s heightened pleading requirement).

## III.    Common Law Claims

In order to consider the sufficiency of the pleadings in this case, the Court must consider the elements of the various claims that are alleged. That, in turn, requires the Court to consider which jurisdiction's law applies, at least when there are material differences in legal standards between various jurisdictions. Hence, we must begin with a choice of law analysis. The Court

will then move on to the common law claims brought by Plaintiffs, and the statutory claims brought in the relevant jurisdictions.

### a. Conflict of Laws

Federal courts sitting in diversity apply the choice of law rules of the forum state to determine which state's law determines liability for common law claims. Cheng v. Neumann, 106 F.4th 19, 25 (1st Cir. 2024) ("[F]ederal courts sitting in diversity apply the substantive law of the forum state, . . . including its conflict of laws rules." (quoting Smith v. Prudential Ins. Co. of Am., 88 F.4th 40, 49 (1st Cir. 2023))). Due "to the complexities of MDL litigation,"[3] however, transferee courts in multidistrict litigation usually apply the conflict-of-law rules of the transferor court, rather than the MDL forum, to determine what law applies to common-law claims. In re Volkswagen & Audi Warranty Extension Litig., 692 F.3d 4, 14 (1st Cir. 2012) (citing cases). But see id. at 17 n.16 (noting that the First Circuit assumed but did not decide that the transferor court's law would determine conflict of law questions). "This approach is consistent with the Supreme Court's holding that 'where a case is transferred pursuant to 28 U.S.C. § 1404(a), [a

---

[3] Several of the Bellwether Cases were not transferred to this Court, but were instead filed directly in this Court for administrative efficiency, as allowed under MDL Order No. 12. See [ECF No. 836]. Pursuant to that stipulated order, direct-filing plaintiffs were required to "specifically allege the district court in which the plaintiff would have otherwise filed the case," [id. ¶ 3(d)], and told that the Court's conflict of law analysis would treat that district court "as if it were a transferor court," [id. ¶ 3(e)]. See also In re Fresenius Granuflo/NaturaLyte Dialysate Prod. Liab. Litig., 76 F. Supp. 3d 294, 304 (D. Mass. 2015) (adopting such an approach). When MDL Order No. 12 was under consideration, certain Defendants objected to the requirement of an alternate-forum designation. The Court overruled those objections, and the Bellwether Defendants now agree that the conflict-of-law rules of the alternate forum should apply here. See [Mem. 7 (citing Fresenius, 76 F. Supp. 3d at 304)]. For purposes of the instant motion, references to "Transferor Courts" will therefore include the alternate forums designated in direct-filing plaintiff's individual complaints.

court] must apply the choice-of-law rules of the State from which the case was transferred.'" Id. (alteration in original) (quoting Piper Aircraft Co. v. Reyno, 454 U.S. 235, 243 n.8 (1981)).

### i. True Conflicts

The First Circuit has long recognized that federal courts may "avoid a conflicts question if there is no reason to believe the contending states' laws differ in any relevant respect." Smith v. Prudential Ins. Co. of Am., 88 F.4th 40, 49 (1st Cir. 2023) (cleaned up) (quoting In re Pioneer Ford Sales, Inc., 729 F.2d 27, 31 (1st Cir. 1984) (Breyer, J.)). Though the Bellwether Parties dispute a variety of issues related to conflict of laws, they largely elide this "threshold step," Cheng, 106 F.4th at 25 (1st Cir. 2024), even though it is well embedded within the Erie doctrine and the applicable states' conflict of law rules, e.g., Chen v. L.A. Truck Ctrs., LLC, 444 P.3d 727, 730 (Cal. 2019) (explaining that at the "[f]irst" step of California's interest-weighing analysis, "the court [must] determine[] whether the relevant law of each of the potentially affected jurisdictions with regard to the particular issue in question is the same or different"). Instead, the parties jump to the question of whether transferor courts' conflict-of-law rules require the Court to apply the plaintiffs' home-state law or the law of the location of the defendants' headquarters, without examining whether those laws differ in material respects. Nonetheless, the briefing on the merits largely takes the position that the disposition of this case would be the same no matter which states' laws apply, suggesting there might not be any meaningful conflict. See Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 839 n.20 (1985) (Stevens. J., concurring) ("If the laws of both states relevant to the set of facts are the same, or would produce the same decision in the lawsuit, there is no real conflict between them.").

Upon questioning at oral argument, the parties acknowledged that there are few "true" conflicts between the relevant aspects of plaintiffs' and defendants' home state laws, with the

exception of questions about the application of the so-called economic-loss doctrine. Most of the claims here turn on principles that are common to the tort and contract laws of all of the contending states' laws. The Court will proceed to a conflict of law analysis only for those issues where it is necessary.

### ii. Ripeness

The parties dispute whether the conflict of law issues in this case are ripe for adjudication on the pleadings. Progress urges the Court to rule on the conflicts issues expeditiously, based on the pleadings, while Plaintiffs urge the Court to await further factual development and defer the issue until summary judgment.

There is no blanket rule for deciding when a conflict of law question is ripe for decision. "[T]he optimal timing for a choice-of-law determination is case-specific." Foisie v. Worcester Polytechnic Inst., 967 F.3d 27, 42 (1st Cir. 2020). After all, "choice-of-law determinations are fact-intensive inquiries," Bristol-Myers Squibb Co. v. Matrix Lab'ys Ltd., 655 F. App'x 9, 13 (2d Cir. 2016) (cited favorably in Foisie). Thus, if "the allegations in the plaintiff's complaint are insufficient to evaluate adequately the choice of law issues raised by the defendant's motion," the issues should be deferred for "'resolution on motions for summary judgment,' after an opportunity for discovery." Jones v. Lattimer, 29 F. Supp. 3d 5, 10 n.3 (D.D.C. 2014) (citation omitted).

The parties mainly argue over whether the current record is sufficient to permit the Court to apply the "most significant relationship test" (which governs claims originally filed in Illinois, Massachusetts, Minnesota, Nebraska, Texas, and Washington) and the lex loci delicti test (which governs claims originally filed in Virginia).

The "most significant relationship" test balances four categories of fact to determine the proper law to apply to tort claims: 1) "the place where the injury occurred," 2) "the place where the conduct causing the injury occurred," 3) "the domicile, residence, nationality, place of incorporation, and place of business of the parties," 4) "and the place where the relationship, if any, between the parties is centered."[4]  Restatement (Second) of Conflict of Laws § 145(2).  The Court must also weigh the considerations relevant to all conflict analyses under section 6 of the Restatement.

This analysis can be undertaken now, as the necessary information can be harvested from the thousand-page CAC.  For example, Plaintiffs have pleaded their states of residence, and the parties seem to agree that the Plaintiffs suffered their injuries in their states of residence.  E.g., [Opp. at 60 ("[T]he California Plaintiffs clearly allege their injuries occurred in California.")]; [Mem. at 37].  In addition, Plaintiffs plead that Progress is headquartered in Massachusetts and registered in Delaware, which also does not seem to be disputed.  And as the parties' merits briefing makes clear, because Plaintiffs and Progress shared only an indirect relationship, the fourth factor warrants little weight here.

It bears noting, moreover, that when determining whether factual holes in the pleadings require that a choice of law analysis be deferred, what matters is whether the gaps in the record are material to the particular type of claim and dispute at issue.  E.g., Foisie, 967 F.3d at 42 (explaining that, in fraudulent conveyance cases, conflict-determinative facts "include the character and site of the conveyed assets, the state (or states) from which the assets were

---

[4] For contract claims, the significant-relationship inquiry examines the principle stated in § 6 of the Restatement, along with "the place of contracting," "the place of negotiation of the contract," "the place of performance," "the location of the subject matter of the contract, and "the domicile, residence, nationality, place of incorporation and place of business of the parties."  Restatement (Second) of Conflict of Laws § 188(2).

transferred, and the whereabouts of the debtor, creditor, and transferee"). This is consistent with the general conflicts principle that relevant contacts "are to be evaluated" not mechanistically, but "according to their relative importance with respect to the particular issue." Restatement (Second) of Conflict of Laws § 145(2). Here, Plaintiffs point to several areas where—they contend—additional factual development (i.e. discovery) would be needed to determine the place where the conduct causing the injury occurred in the context of a data breach. Plaintiffs list several such areas that they believe are relevant to the choice of law and require discovery. [Opp. at 28]. These include where the "data breach occurred," where the "servers housing the compromised information were located," where the "hackers were able to access the compromised information," where "defendant implemented its data security," and where "defendant's employees received their inadequate training." [Id.] Plaintiffs point to two decisions to support their contention that more factual development is needed regarding these topics. See [Opp. at 33 n.21]; In re Premera Blue Cross Customer Data Sec. Breach Litig., No. 15-md-2633, 2019 WL 3410382, at *14 (D. Or. July 29, 2019) ("Washington is where the servers housing Plaintiffs' Sensitive Information resided, [where the defendant] implemented its data security, [where the defendant] employees received their allegedly inadequate training, . . . and [where] the hackers were able to access the Sensitive Information."); Haney v. Charter Foods N., LLC, 747 F. Supp. 3d 1093, 1107 (E.D. Tenn. 2024) ("While . . . Plaintiffs' domiciles vary and . . . the alleged injuries occurred in different states, the remaining factors point to Tennessee being the state with the most significant relationship [because] [t]he data breach occurred in Tennessee, and Defendants, whose conduct is the common denominator among the proposed class, are based in Tennessee.").

While the two cases that Plaintiffs cite do indeed list a variety of factors that might weigh in the analysis, Plaintiffs themselves acknowledge that, in data breach MDLs, the factors that typically prove dispositive in significant-relationship analyses are the locations of "the breached servers" and of the defendant. [Opp. at 33 & n.21]. In fact, even the location of the affected server or servers matters only to the extent that the server location would alter the conflicts analysis. See Foisie, 967 F.3d at 42 (requiring that courts only defer conflicts analyses for development of "critical aspects of the pertinent facts"). In this case, the location of the compromised servers should be afforded little weight; where data was physically stored is largely a matter of fortuity that has scant bearing on the standards and/or expectations that govern companies' handling of sensitive data. Cf., e.g., Matter of Warrant to Search a Certain E-Mail Acct. Controlled & Maintained by Microsoft Corp., 855 F.3d 53, 59 (2d Cir. 2016) (Carney, J., concurring in the denial of rehearing en banc) (discussing "the ease with which . . . data can be subdivided or moved"). Notably, in every case Plaintiffs cite, the location of a server happened to coincide with the plaintiff's or defendant's domicile. Premera, 2019 WL 3410382, at *14; Haney, LLC, 747 F. Supp. 3d at 1107. Even when that is not the case, it is hard to see why the location of servers should displace the plaintiff's or defendant's domicile, or the place of injury, in determining the forum with the "most significant relationship" to a dispute. Plaintiffs cite no case, nor has the Court found one where choice of law was based on the location of servers. Indeed, at least one court has concluded that choice of law was amenable to resolution at the pleading stage even when "the place of the breach" could not "be determined without further discovery." In re Blackbaud, Inc., Customer Data Breach Litig., 567 F. Supp. 3d 667, 676 (D.S.C. 2021).

In sum, the Court sees little reason to defer determining which law would apply under a "most significant relationship" analysis.

Plaintiffs further contend that the Court cannot apply lex loci delicti principles to the claims governed by Virginia choice-of-law rules without knowing the location of the affected servers.  See [Opp. at 11 n.25 (suggesting, based on a case applying North Carolina conflict rules, that lex loci delicti principles point to the law of state where breached "servers were located" and the "situs of Defendant's headquarters and principal place of business" (quoting Lamie v. LendingTree, LLC, No. 22-cv-00307, 2023 WL 1868198, at *3 (W.D.N.C. Feb. 9, 2023)))].  But, as explained further below, the dispositive contact under Virginia's lex loci delicti test for tort claims is "the site of the injury," Hazelwood v. Law. Garage, LLC, 904 S.E.2d 322, 328 (Va. Ct. App. 2024), and as noted above, the parties agree that the CAC supplies that information.

Finally, Plaintiffs suggest that the weight of authority shows that MDLs routinely defer choice of law determinations for further factual development in data breach cases. But nearly every case Plaintiffs cite involved a failure of the parties to "fully brief" the issues, rather than deficient factual allegations in the CAC.  In re Am. Med. Collection Agency Customer Data Sec. Breach Litig. (In re Am. Med I), No. 19-md-2904, 2021 WL 5937742, at *13–14 (D.N.J. Dec. 16, 2021); In re Progressive Leasing Breach Litig., No. 23-cv-00783, 2025 WL 213744, at *18–19 (D. Utah Jan. 16, 2025) (deferring because parties "ha[d] not made any serious attempt to brief [the conflicts] issue); In re 21st Century Oncology Customer Data Sec. Breach Litig., 380 F. Supp. 3d 1243, 1259–60 (M.D. Fla. 2019) (same, where parties addressed conflicts issue only "in a passing footnote"); In re Brinker Data Incident Litig., No. 18-cv-00686, 2020 WL 691848, at *3 (M.D. Fla. Jan. 27, 2020) ("[T]he parties briefing on the motion to dismiss did not address

choice of law.").  Here, the parties' briefing adequately addresses the necessary considerations

for the Court to decide choice of law.

### iii.   Applicable Law

The transferor or direct-file designation forums in this case are located in California,

Illinois, Massachusetts, Michigan, Minnesota, Nebraska, New York, Texas, Virginia, and

Washington, which apply the following conflict-of-law tests.

### 1.   Most Significant Relationship Test (Illinois, Massachusetts, Minnesota Nebraska, Texas, and Washington-Filed Tort Claims)

Illinois, Massachusetts, Minnesota, Nebraska, Texas, and Washington apply the "most

significant relationship" test to tort claims.[5]  Progress contends this means that the Plaintiffs'

home states' law should apply, because their domiciles and the places where they were injured

are the key considerations under the "most significant relationship" analysis in the relevant

states.  [Mem. at 33 ("Under the significant relationship test, 'the law of the place of injury

controls unless some other jurisdiction has a more significant relationship with the occurrence

---

[5] See Perdue v. Hy-Vee, Inc., 455 F. Supp. 3d 749, 759 (C.D. Ill. 2020); Johnson v. U.S. Fid. & Guar. Co., 696 N.W.2d 431, 436 (Neb. 2005); DTEX, LLC v. BBVA Bancomer, S.A., 508 F.3d 785, 802 (5th Cir. 2007); Tilden-Coil Constructors, Inc. v. Landmark Am. Ins. Co., 721 F. Supp. 2d 1007, 1013, 1016 (W.D. Wash. 2010).  Progress suggests in its brief that Massachusetts applies the test only to contract claims, when in fact it also governs tort claims. See Burleigh v. Alfa Laval, Inc., 313 F. Supp. 343, 352 (D. Mass. 2018) (tort claims).  Progress also argues that Minnesota applies a significant-relationship analysis, but its own citation says otherwise.  See Perry, Tr. for Sherrell v. Beltrami Cnty., 520 F. Supp. 3d 1115, 1120 (D. Minn. 2021) (explaining Minnesota law looks to "five choice influencing factors to determine which state's law should apply: (1) predictability of result; (2) maintenance of interstate and international order; (3) simplification of the judicial task; (4) advancement of the forum's governmental interest; and (5) application of the better rule of law" (internal quotation marks and citations omitted)).  Neither party posits that there are significant differences in states' application of the significant-relationship test, and both cite precedent from within and outside the transferor courts' jurisdictions to support their respective positions.  The Court thus relies on these precedents interchangeably, as the parties do.

and with the parties.'" (citations omitted))].  Plaintiffs argue, by contrast, that courts often conclude that the place of the defendant's domicile "becomes more important" than the place of injury in data breach cases when, as here, the breach causes injuries across many states, so that "the location[s] of the alleged harm" are largely "fortuitous."  See, e.g., Premera, 2019 WL 3410382, at *13–14 (explaining, under significant-relationship test, that "Washington is where the servers housing Plaintiffs' Sensitive Information resided, [defendant] implemented its data security, [defendant] employees received their allegedly inadequate training, . . . and [where] the hackers were able to access the Sensitive Information."); Restatement (Second) of Conflict of Laws § 145 cmt. e ("Situations do arise . . . where the place of injury will not play an important role in the selection of the state of the applicable law.  This will be so, for example, when the place of injury can be said to be fortuitous . . . [or] where the defendant had little, or no, reason to foresee that his act would result in injury in the particular state.").  Here, Plaintiffs' position would point to the application of Massachusetts law, as the place of Progress's domicile.

Plaintiffs' position is better aligned with the general policy concerns that drive conflict of laws considerations under section 6 of the Restatement. Massachusetts's interest in having Progress comply with its own tort principles governing cybersecurity is greater than the interest of each Plaintiff's home state in seeing their residents compensated for injuries allegedly caused by a foreign corporation's misconduct.  Premera, 2013 WL 440702, at *15; see also Cosme v. Whitin Mach. Works, Inc., 632 N.E.2d 832, 836 (Mass. 1994) (discussing section 6 factors). This is particularly so when the alternative would be to fragment the liability analysis among dozens of competing jurisdictions. The Court concludes that the "most significant relationship" test points to application of Massachusetts law for the common-law claims raised by: Jose Soto,

Margaret Phelan, Katharine Uhrich, Camille Burgan, Eugene Burgan, Sherrie Rodda, Diamond Roberts and Barbara Cruciata.

### 2. Virginia-filed tort claims

For the tort claims governed by Virginia choice of law rules, Virginia's lex loci delicti test applies.  See Hazelwood v. Law. Garage, LLC, 904 S.E.2d 322, 328 (Va. Ct. App. 2024).  In Virginia, "the law of the place of the wrong determines the substantive rights of the parties," id. at 329 (internal quotation marks omitted) (quoting McMillan v. McMillan, 253 S.E.2d 662, 663 (Va. 1979)), and the "wrongful act" is the "injury," id. at 328 (quoting Tingler v. Graystone Homes, Inc., 834 S.E.2d 244, 254 (Va. 2019)).  Thus "when determining the place of the wrong in a tort matter, we must consider the site of the injury as the location where the tort is completed."  Id.  Here, the parties agree that the location in question is the Plaintiff's home state.  Thus, the tort claims originally filed in Virginia (or the direct-filed claims that would have been filed in Virginia) shall be governed by the laws of the place of injury and the relevant Plaintiffs' respective home states.  Those states are:

- California (Shellie McCaskell);

- Florida (Plaintiffs Patrice Hauser, Keith Bailey, Aunali Khaku, and Gregory Bloch);

- Illinois (Rob Plotke);

- Indiana (Alexys Taylor);

- New York (Plaintiffs Gilbert and Lynda Hale);

- North Carolina (Ben Dieck);

- Ohio (Elaine McCoy);

- Pennsylvania (Victor DiLuigi); and

- Texas (Jvanne Rhodes and Aldreamer Smith).

### 3. Michigan-filed tort claims

In tort claims, "Michigan courts recognize a presumption in favor of <u>lex fori</u> and apply Michigan law 'unless a "rational reason" to do otherwise exists.'" <u>Standard Fire Ins. Co. v. Ford Motor Co.</u>, 723 F.3d 690, 693 (6th Cir. 2013) (quoting <u>Sutherland v. Kennington Truck Serv., Ltd.</u>, 562 N.W.2d 466, 471 (Mich. 1997)). Michigan applies a two-part test for "determining whether such a rational reason exists." <u>Id.</u> First, a Court must decide whether "any foreign state has an interest in having its law applied," and if not, then "the presumption that Michigan law will apply cannot be overcome." <u>Id.</u> (quoting <u>Sutherland</u>, 562 N.W.2d at 471). "If a foreign state does have an interest in having its law applied," the Court proceeds to examine whether "Michigan's interests mandate that Michigan law be applied, despite the foreign interests."

Parties have given the Court no convincing reason to overcome the presumption in favor of Michigan law. Progress offers no argument at all concerning Michigan choice of law rules for tort claims, <u>see</u> [Mem. at 34–36], and has identified no state that could purportedly overcome the lex fori presumption. Plaintiffs, by contrast, contend that in this case, Michigan's rules favor application of the breached defendant's state law, here Massachusetts, <u>see</u> [Opp. at 34–35 & n.29], and proffer two data breach cases in support, <u>see</u> <u>Hummel v. Teijin Auto. Techs., Inc.</u>, No. 23-CV-10341, 2023 WL 6149059, at *4 (E.D. Mich. Sept. 20, 2023); <u>Kingen v. Warner Norcross & Judd LLP</u>, No. 22-cv-01126, 2023 WL 11960672, at *6 (W.D. Mich. Oct. 5, 2023). In both cases, however, the defendant's domicile was Michigan, so the defendant's home state <u>reinforced</u> the lex fori presumption. <u>See</u> <u>Hummel</u>, 2023 WL 6149059, at *4 ("Defendant's principal place of business is in Michigan and the leaked PII was collected and stored in Michigan," so "Michigan law govern[ed] th[e] action."); <u>Kingen</u>, 2023 WL 1195363, at *6 ("The data breach occurred in Michigan, and the Defendant linking the entire proposed class of plaintiffs is in Michigan. The Court will apply Michigan law."). Here, Plaintiffs invite the court to override the

lex fori presumption and apply Massachusetts law instead, but do not offer any developed argument as to why it should. This effectively leaves the Court with no "rational reason" to displace the presumption favoring Michigan law and so Michigan law will govern the tort claims asserted by Plaintiffs Williams and Weaver.

### 4. New York-filed claims

New York applies an "interest analysis" to choice of law analyses involving tort claims. See Toretto v. Donnelley Fin. Sols., Inc., 583 F. Supp. 3d 570, 589 (S.D.N.Y. 2022); Innovative BioDefense, Inc. v. VSP Techs., Inc., No. 12-cv-03710, 2013 WL 3389008, at *6 (S.D.N.Y. July 3, 2013). The nature of the analysis depends on the particular tort claim asserted.[6] For conduct-regulating causes of action, New York law applies the law of "the place of the allegedly wrongful conduct." Toretto, 583 F. Supp. 3d at 589; see also id. (explaining that such location "has the greatest interest in regulating behavior within its borders" and a "superior interest[] in protecting the reasonable expectations of the parties who relied on the laws of that place to govern their primary conduct and in the admonitory effect that applying its law will have on similar conduct in the future"). Here, such considerations point to Massachusetts, Progress's principal place of business. See id. (applying Illinois law based on the inference that alleged negligent cybersecurity practices occurred in the state where defendant was "headquartered"). Accordingly, Massachusetts law governs the common-law tort claims asserted by Steven Checchia and Patricia Marshall.

---

[6] Progress relies on the conflicts analysis in Innovative BioDefense for the proposition that the Court should apply the law of "the place where the injury was afflicted," which "is usually where the plaintiff is located." 2013 WL 3389008, at *6. That case is wholly inapposite, as its analysis pertained only to "fraud claims." Id.

### 5. California-filed claims

Like Michigan, California courts apply a presumption in favor of applying its law to California-filed claims. California's "governmental interest" test has three parts. "First, the court determines whether the relevant law of each of the potentially affected jurisdictions with regard to the particular issue in question is the same or different." Chen, 444 P.3d at 730.

"Second, if there is a difference, the court examines each jurisdiction's interest in the application of its own law under the circumstances of the particular case to determine whether a true conflict exists." Chen, 444 P.3d at 730–31. Third, "if the court finds that there is a true conflict, it carefully evaluates and compares the nature and strength of the interest of each jurisdiction in the application of its own law to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state, and then ultimately applies the law of the state whose interest would be the more impaired if its law were not applied." Id. at 731.

As the Ninth Circuit has explained, and as Plaintiffs note in their separately filed opposition to Delta Dental, if objectors to the application of California law "fail to meet their burden at any step in the analysis, the district court may properly find California law applicable without proceeding to the rest of the analysis." In re Hyundai & Kia Fuel Econ. Litig., 926 F.3d 539, 562 (9th Cir. 2019); [ECF No. 1440 at 20]. Here, both sides object to the application of California law, at least as to certain of the claims. Plaintiffs urge that Massachusetts law, not California law, should apply to all California-filed tort claims, but they support their position only with a citation to a single case involving the separate question of extraterritorial invocation of California consumer protection statutes for non-resident Plaintiffs. See Schmitt v. SN

Servicing Corp., No. 21-cv-03355, 2021 WL 3493754, at *3 (N.D. Cal. Aug. 9, 2021). That is not enough to carry Plaintiffs' burden.

Progress, by contrast, asserts that California law should not apply to the claims raised against it by non-California defendants because the Complaint does not allege that Progress engaged in conduct in California.[7]  [Mem. at 13 (citing Cassirer v. Thyssen-Bornemisza Collection Found., 89 F.4th 1226, 1239–42 (9th Cir. 2024)), vacated and remanded 145 S.Ct. 1331 (2025)].  Yet this bare assertion gives short shrift to the "comparative impairment" analysis required under California law, which asks whether the relevant conduct occurred in California, but also asks "in light of the question at issue and the relevant state interests at stake[,] which jurisdiction should be allocated the predominating lawmaking power under the circumstances of the present case."  Cassirer, 89 F.4th at 1237 (quoting McCann v. Foster Wheeler LLC, 225 P.3d 516, 534 (Cal. 2010)).  That inquiry involves a multifactor balancing that Progress largely ignores and which the Court declines to perform on its behalf.

In sum, because neither party has carried its burden under California conflict of law rules, In re Hyundai, 926 F.3d at 562, the Court will apply California law to the claims asserted by Denise Meyer, Amanda Copans, Ricardo Moralez, Manuel Mendoza, Terrill Mendler, Michelle Gonsalves, Marvin Dovberg, Deanna Duarte, Taneisha Robertson, Doris Cadet, Margaret Kavanagh, Diamond Roberts, Karen Boginski, John Meeks, Yvette Tillman, and Hannah Polikowsky.

---

[7] Progress does not assert lack of personal jurisdiction as a basis for dismissing these claims.

### b. Count 1: Negligence

Progress contends that Plaintiffs (1) fail to plead a recognized common law duty, (2) plead purely economic losses, and (3) have not alleged cognizable damages. On this basis, Progress asks the Court to dismiss Plaintiffs' common-law negligence claims.

### i. Duty

Plaintiffs allege that Progress owed a duty to implement reasonable safeguards "to protect [them] from theft and misuse by unauthorized third parties." [Opp. at 39]. Progress responds that it owed "no general duty of care . . . to prevent injury caused by a third-party tortfeasor" like Cl0p. [Mem. at 53 & n.44].

As Plaintiffs correctly observe, when it comes to liability for injuries involving a third-party tort-feasor, black-letter law paints a more nuanced picture than Progress's broad-brush disclaimer of liability. To begin with, a person "who undertakes to render services in the practice of a profession or trade is required to exercise the skill and knowledge normally possessed by members of that profession or trade in good standing in similar communities." Restatement (Second) of Torts § 299A (A.L.I. 1965). In this context, a defendant may be liable for negligence when the defendant's act or omission creates "an unreasonable risk of harm to another" by the foreseeable conduct of a third party, even if the third party's conduct is, as here, "criminal." Id. § 302(b). Third-party conduct is foreseeable if the "actor at the time of his negligent conduct realized or should have realized the likelihood that such a situation might be created, and that a third person might avail himself of the opportunity to commit such a . . . crime." Id. § 448.

Here, Plaintiffs allege that Progress touted the quality and security of the code in the MOVEit Software, [CAC ¶ 972], "kn[ew] and intend[ed] that its customers use MOVEit software to transfer highly sensitive personally identifiable and protected health information"

and "market[ed], advertise[d], and warrant[ed] the MOVEit software as having industry-leading robust data security," [id. at ¶ 990–91]. Although Plaintiffs do not allege that Progress ever possessed their data, which was housed on servers that were controlled by (as relevant to the Bellwether Complaint) PBI, Delta Dental Maximus, and Welltok, [Mem. at 3 n.4], Plaintiffs contend that Progress owed them a duty "to exercise reasonable care to ensure that its MOVEit software would secure and safeguard their Private Information and keep it from being compromised, lost, stolen, accessed, and misused by unauthorized persons" and to "provide data security consistent with industry standards." [CAC ¶¶ 1402–03].

The state laws applicable here have recognized an array of duties consistent with Plaintiffs' allegations against Progress. Several jurisdictions recognize that a software provider may assume a duty to prevent foreseeable software vulnerabilities. See Weekes v. Cohen Cleary P.C., 723 F. Supp. 3d 97, 103 (D. Mass. 2024); In re Sony Gaming Networks and Customer Data Sec. Breach Litig., 996 F. Supp. 2d 942, 966 (S.D. Cal. 2014) (California law); In re Mednax Servs., Inc., v. Customer Data Sec. Breach Litig., 603 F. Supp. 3d 1183, 1222 (S.D. Fla. 2022) (under Florida Law, "by handing over their personal information, Plaintiffs placed their data in a foreseeable zone of risk that Defendants had a duty to mitigate"); Hummel v. Teijin Auto. Techs., Inc., No. 23-cv-10341, 2023 WL 6149059, at *7 (E.D. Mich. Sept. 20, 2023) (finding that under Michigan law, "specific factual allegation" that defendant failed to encrypt data adequately stated negligence claim). Other states recognize a duty to adhere to industry standards for cybersecurity. Webb v. Injured Workers Pharmacy, LLC, No.23-cv-10341, 2023 WL 5938606, at *2 (D. Mass. Sept. 12, 2023) (Massachusetts law); Fischer v. CentralSquare Techs., LLC, No. 21-cv-60856, 2021 WL 10558134, at *1 (S.D. Fla. Sept. 16, 2021) (Florida law); Koeller v. Numrich Gun Pts. Corp., 675 F. Supp. 3d 260, 269–70 (N.D.N.Y. 2023) (New York law).

Similarly, a failure to implement basic cybersecurity precautions has been recognized as "conduct [that may] create[] a foreseeable risk of harm" to a plaintiff.  Hummel, 2023 WL 6149059, at *7.  Here, the allegation of a persistent SQL injection vulnerability, among others, clears that hurdle at the pleading stage.

Progress argues that in Illinois, Indiana, and Michigan, "there is no duty to safeguard personal information" at all.[8]  [Mem. at 54 & n.45].

Plaintiffs have no answer to Progress's argument or citations concerning Indiana law. See Aspen Am. Ins. Co. v. Blackbaud, Inc., No. 22-cv-00044, 2023 WL 3737050, at *5 (N.D. Ind. May 31, 2023) ("[T]he Court predicts that the Indiana Supreme Court would hold there is no common law duty to safeguard the public from the risk of data exposure.").

With regard to Michigan, Progress points to a Michigan case where the court found the absence of a duty "to act, install safeguards, and protect Plaintiff and its data from a third-party ransomware attack."  Grifo & Co. v. Cloud X Partners Holdings, 485 F. Supp. 3d 885, 895 (E.D. Mich. 2020) (alteration and citation omitted) (applying Michigan law).  That case, however, as well as the cases it cites, see, e.g., Hart v. Ludwig, 79 N.W.2d 895, 897 (Mich. 1956), are about actions brought between vendors and their customers, where the conduct at issue is contemplated by the contract.  Grifo, 485 F. Supp. 3d at 896.  It is therefore not applicable to Plaintiffs' claims. See Fultz v. Union Com. Assocs., 683 N.W.2d 587, 466 (Mich. 2004) ("We have held that a tort action will not lie when based solely on the nonperformance of a contractual duty." (emphasis added)); see also Grifo, 485 F. Supp. 3d at 895 (citing Fultz).

---

[8] Progress makes the same assertion concerning Texas law, but points only to a docket entry in the Western District of Texas without providing this Court (or Plaintiffs, for that matter) with so much as the relevant case number.  [Mem. at 54 & n.45].  That falls short of any conceivable definition of developed argumentation.

As for Illinois, Progress relies on <u>Cmty. Bank of Trenton v. Schnuck Markets</u>, 210

F. Supp. 3d 1022 (S.D. Ill. 2016), to show that there is no recognized duty related to data security

under Illinois law.  In that case the Southern District of Illinois declined to recognize a state-law

duty to safeguard private personal information from foreseeable data breaches, following state-

court rulings that had "specifically declined" to do so pending state legislation.  <u>Id.</u> (citing

<u>Cooney v. Chi. Pub. Schs.</u>, 943 N.E.2d 23, 28 (Ill. Ct. App. 2010) <u>superseded by statute as stated

in</u> <u>Flores v. Aon Corp.</u>, 242 N.E.3d 340 (Ill. Ct. App. 2023)).  After those cases were decided, the

Illinois "legislature has [since] created a duty to maintain reasonable security measures,"

clarifying that "the reasoning of the <u>Cooney</u> court no longer applies." <u>Flores</u>, 242 N.E.3d at 353;

<u>see also</u> <u>id.</u> at 354 ("[I]t is foreseeable that a failure to maintain reasonable security measures

would allow unauthorized third parties to gain access to stored personal information, and it is

likely that a data breach of this information would cause injury to the individuals that the

personal information belongs to.").  In short, Progress relies on Illinois cases that are outdated

and inapplicable.

Progress also suggests that, in certain jurisdictions, it must share a "special relationship"

to Plaintiffs before it can be held liable for a failure to protect Plaintiffs from Cl0p's criminal

activities. [Mem. at 54]. At this stage of the case, the allegations in the CAC sufficiently meet

that standard.  Read broadly, the CAC adequately alleges that Progress was the critical actor

tasked with securing MOVEit Transfer on behalf of its clients as well as on behalf of those

whose data would be entrusted to those clients, and further alleges that Progress reaped

pecuniary benefits from doing so. [CAC ¶ 972].  In this light, the CAC adequately alleges that

Progress was uniquely well-situated to prevent the harm allegedly visited upon Plaintiffs through

the Data Breach.  <u>See</u> <u>In re Accellion, Inc. Data Breach Litig.</u>, 713 F. Supp. 3d 623, 632–33

(N.D. Cal. 2024) (California law); Portier v. NEO Tech. Sols., No. 17-cv-30111, 2019 WL 7946103, at *11 (D. Mass. Dec. 31, 2019) (Massachusetts law); In re Rutter's Inc. Data Sec. Breach Litig., 511 F. Supp. 3d 529–30 (M.D. Pa. 2021) (Pennsylvania law).  In short, the fact that "third-party cybercriminals caused the [Plaintiffs'] harm" does not relieve Progress of liability for "play[ing] a central role in permitting that harm to occur."  In re: Netgain Tech., LLC, No. 21-cv-1210, 2022 WL 1810606, at *11 (D. Minn. June 2, 2022).

### ii. Economic loss

Progress contends that the economic-loss doctrine should bar Plaintiffs' negligence claims arising under the laws of Massachusetts, California, Indiana, North Carolina, Ohio, Pennsylvania, and Texas.

The economic loss doctrine is a complex and esoteric common law principle of relatively recent vintage, which purports to limit remedies for tort claims that "seek[]to recover for a commercial loss rather than damage to person, property, or reputation."  See generally Miller v. U.S. Steel Corp., 902 F.2d 573, 574 (7th Cir. 1990).  Despite the doctrine's complexity, the parties spill very little ink on the issue; indeed, the considerable variations in how particular states apply the doctrine are addressed only in string citations contained in footnotes.  [Mem. at 57 n.49–50]; [Opp. at 42 n.42].  The takeaway is this: Plaintiffs point to data breach cases (i) applying the laws of each jurisdiction Progress invokes, (ii) in which courts have held that the economic-loss doctrine did not bar claims for damages either identical to or otherwise encompassing those alleged here.  Progress offers no real response. See [Opp. at 42 n.42]; [Reply at 19].

The current state of the record does not really equip the Court to venture an Erie guess as to how the relevant states would apply their various iterations of the economic-loss doctrine in

this case. Accordingly, the Court declines to dismiss Plaintiffs' negligence claims based on the economic-loss doctrine, but will permit Progress to brief the issue anew at a later stage.

### iii.  Cognizable damages

Finally, Progress contends that the negligence claims must fail because Plaintiffs have not alleged cognizable harm.  These arguments are also not well developed,[9] but in any case, the Court concludes that Plaintiffs have alleged sufficient damages against Progress to survive dismissal at the pleading stage.  First, several Plaintiffs allege that they have already experienced identity theft or other forms of misuse, which are obviously cognizable (and Progress does not contend otherwise).  See, e.g., Weekes, 723 F. Supp. 3d at 103; In re Accellion, 713 F. Supp. 3d at 637; Bohnak v. Marsh & McLennan Cos., 79 F.4th 276, 289–90 (2d Cir. 2023).  Second, Plaintiffs allege an increased risk of future misuse.  Although Progress dismisses this theory as "speculative," see [Mem. at 58 & n.51], the cases it cites in support are distinguishable as the operative complaints in those cases involved no "allegations of actual misuse or other concrete harm," Bonewit v. New-Indy Containerboard, LLC, No. 24-cv-11338, 2024 WL 4932186, at *4 (D. Mass. Dec. 2, 2024), unlike the allegations in the CAC.  Third, many Plaintiffs allege that they have spent either time, money, or both addressing the fallout from the Data Breach.  Such allegations are non-speculative in light of the Plaintiffs' properly pled allegations of a risk of future harm.  See, e.g., Bohnak, 79 F.4th at 290; Webb, 2023 WL 5938606, at *2.  Fourth, Progress's argument that the CAC suffers from an "absence of any factual allegation . . . specify[ing] genuine injury" related to emotional distress, is inaccurate.  At this stage, many Plaintiffs have adequately pleaded specific manifestations of their emotional distress to survive a

---

[9] Progress identifies several categories of purportedly inadequate damages, but does so only in bullet points unaccompanied by substantive argument.

motion to dismiss, [CAC ¶¶ 237–38, 278, 299, 318], and Progress has failed to identify which particular Plaintiffs' allegations are inadequate.  Fifth, Progress offers only conjecture as to why Plaintiffs' allegations that their PII lost value do not plausibly allege that "their PII is a valuable commodity, that a market exists for Plaintiffs' PII, that Plaintiffs' PII is being sold by hackers on the dark web, and that Plaintiffs have lost the value of their PII as a result," and therefore "plausibly allege injury arising from the Data Breach[]" based on lost value.  In re Marriott Int'l Inc., 440 F. Supp. 3d 447, 461 (D. Md. 2020) (quoting In re Yahoo! Inc. Customer Data Sec. Breach Litig., No. 16-md-02752, 2017 WL 3727318, at *14 (N.D. Cal. Aug. 30, 2017)).

Finally, the parties address the question of loss of privacy only briefly, with each side offering no more than one citation in support of their respective positions.  Although the Court is skeptical that loss of privacy constitutes a cognizable harm in a negligence action separate from the "impairment of value of [Plaintiffs'] PII," [Opp. at 44 (quoting Smallman v. MGM Resorts Int'l, 638 F. Supp. 3d 1175, 1188 (D. Nev. 2022))], the Court reserves on that question for now.  Plaintiffs have alleged several facially adequate types of harm and there is no reason to expect that deciding the issue on an under-developed record will meaningfully streamline the litigation of the next phases of this case.

The motion to dismiss Count 1 is **GRANTED** as to the Indiana law claims and otherwise **DENIED**.

### c.  Count 2: Negligence Per Se

Plaintiffs allege that Progress is liable for negligence per se because it violated several statutes or regulations that establish duties of care, in particular, the Federal Trade Commission Act ("FTC Act"), the Health Insurance Portability and Accountability Act ("HIPAA"), the HIPAA Privacy Rule and Security Rule, and the Health Information Technology for Economic

and Clinical Health Act ("HITECH").  Progress urges dismissal on two grounds: (1) seven of the relevant jurisdictions (California, Illinois, Massachusetts, Michigan, Ohio, Pennsylvania and Texas) do not recognize negligence per se as a cause of action, and (2) three others (Florida, North Carolina, and New York) do not allow negligence per se actions unless the underlying statute confers a private right of action.[10]  Plaintiffs offer no response to the latter contention,[11] and the motion is therefore **<u>GRANTED</u>** as to the cases governed by Florida, North Carolina, and New York law.

As to the first point, Plaintiffs do not contest that negligence per se is not a standalone cause of action in the states Progress identifies.  <u>Tolen v. Honeywell Int'l, Inc.</u>, No. 05-cv-04220, 2006 WL 3333754, at *4 (S.D. Ill. Nov. 16, 2006) (holding, under Illinois law, that "negligence <u>per se</u> is not a cause of action in itself."); <u>Jones v. Awad</u>, 252 Cal. Rptr. 3d 596, 605 (Cal. Ct. App. 2019) (same under California law); <u>Juliano v. Simpson</u>, 962 N.E.2d 175, 179–180 (Mass. 2012) (same under Massachusetts law); <u>Abnet v. Coca-Cola Co.</u>, 786 F. Supp. 2d 1341, 1345 (W.D. Mich. 2011) (same under Michigan law); <u>Merritt v. BASF Corp.</u>, No. 21-cv-00067, 2023 WL 3230983, at *6 (S.D. Ohio May 3, 2023) (same under Ohio law); <u>In re Wawa, Inc. Data Sec. Litig.</u>, No. 19-cv-06019, 2021 WL 1818494, at *7 (E.D. Pa. May 6, 2021) (same under Pennsylvania law); <u>Johnson v. Enriquez</u>, 460 S.W.3d 669, 673 (Tex. App. 2015) (same under Texas law).  As other courts have recognized, Count 2 is therefore "subject to dismissal as a

---

[10] Progress raises no basis for dismissing the cases governed by Indiana law.

[11] Progress's argument is well-supported by cases interpreting the applicable states' laws.  <u>E.g.</u>, <u>Gilbert v. BioPlus Specialty Pharmacy Servs., LLC</u>, No. 21-cv-2158, 2023 WL 3555006, at *2 (M.D. Fla. Mar. 3, 2023) (dismissing negligence per se claim under Florida law asserting violations of the FTC Act or HIPAA, because those statutes lack "a private right of action" and "so . . . cannot support a negligence <u>per se</u> claim"); <u>Cohen v. Ne. Radiology, P.C.</u>, No. 20-cv-01202, 2021 WL 293123, at *7 (S.D.N.Y. Jan. 28, 2021) (same under New York law); <u>In re Am. Med. I</u>, 2021 WL 5937742, at *17 n.32 (same under North Carolina law).

matter of law" under the laws of those jurisdictions.  See, e.g., In re Accellion, 713 F. Supp. 3d at 639.

Plaintiffs request leave to amend their primary negligence claims to incorporate negligence per se theories as to the foregoing states, which Progress does not oppose.  That request is **GRANTED**.

### d.  Count 3: Breach of Contract/Third-Party Beneficiary

Progress asks the Court to dismiss Count 3, which alleges a breach of contractual duties owed to Plaintiffs as intended third-party beneficiaries of Progress's agreements with PBI, Delta Dental, Maximus, and Welltok.[12]  Progress argues dismissal is appropriate because (1) Plaintiffs have not identified specific contracts of which they are intended third-party beneficiaries, and (2) Progress's End-User License Agreement ("EULA") disclaims any intent to create third-party beneficiaries.

First, Progress argues that because the CAC does not specifically identify the contracts of which Plaintiffs are allegedly intended to be third-party beneficiaries, the CAC does not satisfy the requirements of notice pleading.  [Mem. at 41].  Plaintiffs, though they acknowledge that some of the relevant contracts have been produced in discovery, respond that more discovery is needed, and argue that it is enough that they allege on information and belief that they are intended third-party beneficiaries of Progress's MOVEit-related contracts with the Bellwether Defendants. [Opp. at 51 & n.49].

Given Plaintiffs' allegations that Progress was responsible for maintaining secure code for the MOVEit Transfer software on behalf of its customers—and particularly given that

---

[12] Although the Court reserved ruling on choice of law as to contract claims, the parties do not argue that the disposition of Count 3 turns on any state-specific requirements. Rather they assert that the disposition turns on pleading requirements.

MOVEit Transfer is a product whose very purpose is to provide for secure data storage and transfer—the Court can infer (favorably to Plaintiffs) that Progress entered into agreements with its customers, and that the purpose of those agreements was to provide software that could securely transfer files containing sensitive information, including Plaintiffs' PII.  Cf. Carr v. Okla. Student Loan Auth., 699 F. Supp. 3d 1241, 1250 (W.D. Okla. 2023) (weighing fact that alleged contracts related to provision of "secure customer website portal" in favor of third-party beneficiary status at pleading stage, despite lack of direct reference to particular agreements in the complaint).

It bears noting that the caselaw on which Plaintiffs rely appears to rest on a presupposition that the defendant(s) in question had exclusive access to the relevant agreements. In this light it would seem unfair—at the pleading stage—to require Plaintiffs to allege facts known only to the defendants in order to make out a third-party beneficiary claim. See, e.g., Stasi v. Inmediata Health Grp. Corp., 501 F. Supp. 3d 898, 906 (S.D. Cal. 2020) ("[W]ithout discovery, it is not clear what more Plaintiffs could plead, or what more [the defendant] would need to be able to defend against Plaintiffs' claims that they are third party beneficiaries of [the defendant's] contracts . . . ."); Carr, 699 F. Supp. 3d at 1250.  But see Kroeck v. UKG, Inc., No. 22-cv-00066, 2022 WL 4367348, at *5 (W.D. Pa. Sept. 21, 2022) (declining to dismiss a third-party beneficiary contract claim where "the contract between Defendants and the hospital is not yet part of the record," without explaining whether contract was in the defendants' exclusive possession).

It is not clear whether such access-to-information considerations fully apply in this case. Plaintiffs acknowledge that they have obtained some (but seemingly not all) of the relevant contracts through discovery.  Given that the Court nevertheless concludes Plaintiffs have plead

sufficient factual matter to give Progress "fair notice" of the relevant agreements (e.g., by identifying the presumed parties to such agreements), Stasi, 501 F. Supp. 3d at 920, the Court declines to dismiss Count 3 for failure to plead specific agreements.

Second, Progress offers a copy of the EULA in effect as of February 1, 2025, which disclaims any intent to recognize unnamed third-party beneficiaries, and argues that this agreement requires dismissal.  See [ECF No. 1367-3].  Progress, however, offers little factual basis, even in the declaration accompanying the exhibit, from which the Court can conclude that this EULA is the agreement that Progress actually entered into with PBI, Welltok, Delta Dental, and Maximus.  See [ECF No. 1367-2 ("Torrey Decl.")].[13]  In fact, the contents of the EULA suggest otherwise.  The last line of the agreement contains version information which reads "TMPLT26MAY2023MOVEit-WS_FTP1NOV2023."  [Ex. 1 at 16].  Drawing reasonable inferences in Plaintiff's' favor, this suggests that the agreement was revised, at the earliest, in late-May 2023, the precise timeframe of the Data Breach.  Although it may be the case that the specific agreements that Progress and the other Bellwether Defendants entered contain similar language, the Court declines to dismiss Count 3 on the basis of a purported exemplar contract, especially where, on its face, the proffered agreement appears to post-date the Data Breach.

The motion to dismiss Count 3 is **DENIED**.

### e.  Count 4: Unjust Enrichment

Progress argues that Plaintiffs' unjust enrichment claim must be dismissed for a variety of reasons, and the Court agrees. In California, Illinois, and Texas, unjust enrichment does not

---

[13] The Torrey Declaration states that "Attached as Exhibit 1 is a true and correct copy of the MOVEit and WS_FTP End User License Agreement, last accessed February 1, 2025, and publicly available at https://www.progress.com/legal/license-agreements/moveit-ws-ftp." [Torrey Decl. ¶ 3].  "WS_FTP" refers to technology related to Progress's file-transfer products.

afford an independent cause of action, a point on which Plaintiffs offer no response.  See Cleary v. Philip Morris Inc., 656 F.3d 511, 517 n.2 (7th Cir. 2011) ("The term 'unjust enrichment' is not descriptive of conduct that, standing alone, will justify an action for recovery." (quoting Alliance Acceptance Co. v. Yale Ins. Agency, 648 N.E.2d 971, 977 (Ill. Ct. App. 1995))); Juan Antonio Sanchez, PC v. Bank of S. Texas, 494 F. Supp. 3d 421, 440 & n.135 (S.D. Tex. 2020) (similar under Texas law); Durell v. Sharp Healthcare, 108 Cal. Rptr. 3d 682, 699 (Cal. Ct. App. 2010) ("There is no cause of action in California for unjust enrichment.  Unjust enrichment is synonymous with restitution." (citations omitted)). Similarly, in Florida and New York, an unjust enrichment claim cannot be separately pleaded with a breach of third-party beneficiary claim. Alfaro v. Bank of Am., N.A., No. 21-10948, 2024 WL 1110945, at *8 (11th Cir. Mar. 14, 2024), (affirming dismissal of claim under Florida law because plaintiffs alleging "an express contract . . . are not entitled to an unjust enrichment remedy under Florida law"); Corsello v. Verizon N.Y., Inc., 967 N.E.2d 1177, 1185 (N.Y. 2012) (dismissing unjust enrichment claim under New York law because "[a]n unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim").  And in Massachusetts and other relevant jurisdictions, the fact that a third-party beneficiary claim, among other potential legal remedies, is available requires dismissal of the unjust enrichment claim.  See In re LastPass Data Sec. Incident Litig., 742 F. Supp. 3d 109, 129 (D. Mass. 2024); Jones Cooling & Heating, Inc. v. Booth, 394 S.E.2d 292, 294 (N.C. Ct. App. 1990) (same, under North Carolina law).  In Michigan, the fact that the benefit was not "received directly from the [P]laintiff[s]" defeats an unjust enrichment claim.  Lochridge v. Quality Temporary Servs., Inc., No. 22-cv-12086, 2023 WL 4303577, at *7 (E.D. Mich. June 30, 2023).

As to the remaining jurisdictions (Pennsylvania and Ohio), the Court agrees with Plaintiffs that the unjust enrichment claims live on.  Progress invites the Court to analogize to In re NCB Mgmt. Servs., Inc. Data Breach Litig., 748 F. Supp. 3d 262 (E.D. Pa. 2024) (analyzing Pennsylvania law), and to similar cases under Ohio and Michigan law, see Brooks v. Peoples Bank, 732 F. Supp. 3d 765, 782 (S.D. Ohio 2024).  In NCB, the plaintiffs had provided their PII to various banks in exchange for lending services, and the banks in turn shared their data with NBC, a debt collector that suffered a data breach.  748 F. Supp. 3d at 278.  The Court reasoned that the unjust enrichment claims failed because the plaintiffs had not alleged "that NCB commoditized their PII or otherwise received an independent pecuniary benefit from holding it, [and therefore] plaintiffs ha[d] failed to plead that their PII was valuable to NCB," id.; see also Brooks, 732 F. Supp. 3d at 782 (similar); Kingen v. Warner Norcross + Judd LLP, No. 22-cv-01126, 2023 WL 11965363, at *5 (W.D. Mich. Oct. 5, 2023) (similar), and Progress contends the same is true here.

The Court disagrees.  Plaintiffs allege that Progress was in the business of designing software for the very purpose of protecting sensitive information, including PII, and thus their business depended on the receipt of such information.  In other words, drawing reasonable inferences for the Plaintiffs, they allege the design and ongoing maintenance of MOVEit was the commodification of their PII.  See In re Ambry Genetics Data Breach Litig., 567 F. Supp. 3d 1130, 1145 (C.D. Cal. 2021) (allowing unjust enrichment claim where "a defendant has accepted the benefits accompanying plaintiff's data, but does so at the plaintiff's expense by not implementing adequate safeguards, thus making it inequitable and unconscionable to permit defendant to retain funds that it saved by shirking data-security and leaving the plaintiff to suffer the consequences."); cf. Brooks, 732 F. Supp. 3d at 782 ("Plaintiffs fail to plausibly allege that

the banking fees Plaintiffs paid were in exchange for PII protection.").  The Court is also unconvinced that these precedents foreclose Plaintiffs' indirect-benefit theory in the relevant jurisdictions.[14]  Thus, at this stage, Plaintiffs have sufficiently alleged a conferred benefit.

Consequently, the motion to dismiss Count 4 is **GRANTED IN PART** as to the California, Illinois, Texas, Florida, New York, Massachusetts, and North Carolina law claims and **DENIED IN PART** as to the Michigan, Ohio, and Pennsylvania law claims.

### f.   Count 5: Bailment

Because Plaintiffs have abandoned their bailment claim, see [Opp. at 36 n.32], the motion to dismiss Count 5 is **GRANTED**.

### g.   Counts 6 and 7: Invasion of Privacy

#### i.   Count 6: Intrusion Upon Seclusion

Generally, to prevail on an intrusion-upon-seclusion claim, "a plaintiff must show '(1) an intentional intrusion by the defendant, (2) into a matter the plaintiff has a right to keep private, (3) which is highly offensive to a reasonable person.'"  Savidge v. Pharm-Save, Inc., No. 17-cv-186, 2023 WL 2755305, at *9 (W.D. Ky. Mar. 31, 2023) (quoting Wells v. Craig & Landreth Cars, Inc., No. 10-cv-376, 2012 WL 6487392, at *5 (W.D. Ky. Dec. 13, 2012)); Restatement (Second) of Torts § 652B cmts. a–d (A.L.I. 1977) (laying out the requirements for an intrusion-upon-seclusion claim).  Progress contends that the Plaintiffs allegations falter for failure to (1) plead intent, (2) allege that the information was wrongfully obtained, and (3) allege an actual physical intrusion by Progress.  The Court agrees that the claim should be dismissed on the first ground and declines to reach the latter.

---

[14] Under Pennsylvania law, a plaintiff is "not required to plead that they directly conferred a benefit on" the defendant.  In re NCB, 748 F. Supp. 3d at 279.  Progress cites no cases suggesting a direct conferral is required under Ohio law.

Intrusion upon seclusion is an intentional tort, see, e.g., Nelson v. Salem State Coll., 845

N.E.2d 338, 348 (Mass. 2006), and Progress contends that Plaintiffs do not allege conduct that

satisfies the intent element.  Plaintiffs respond by suggesting that Progress "intentionally misused

and/or disclosed Plaintiffs' Private Information to unauthorized parties through their purposeful

unwillingness to take proper security steps" and thereby "intentionally and substantially intruded

into Plaintiffs [sic] private affairs."  [Opp. at 54 (citing CAC ¶¶ 1251, 1264–65, 1477, 1479)].

That characterization, however, overstates the factual allegations contained in the CAC.

Whether or not Progress maintained the code for MOVEit Transfer in a manner that satisfied its

legal duties to its clients and downstream customers, no allegation in the CAC supports a

conclusion that Progress acted with knowing intent and "misused" Plaintiffs' data, particularly

where there is no allegation that Progress actually possessed such data.  Nor does the Court find

any allegations in the CAC that Progress intruded into Plaintiffs' private affairs.  In all relevant

jurisdictions, liability for intrusion upon seclusion requires that the "intrusion . . . be intentional."

E.g., Roma v. Prospect Med. Holdings, Inc., No. 23-cv-3216, 2024 WL 3678984, at *12 (E.D.

Pa. Aug. 6, 2024) (emphasis added) (quoting O'Donnell v. United States, 891 F.2d 1079, 1083

(3d Cir. 1989) (collecting cases under various state laws and dismissing all claims)).  No

allegation supports a finding that Progress, rather than Cl0p, intentionally intruded upon

Plaintiffs' privacy.  The motion to dismiss Count 6 is **GRANTED**.

### ii.  Count 7: Public Disclosure of Private Facts

For the tort of public disclosure of private facts, plaintiffs must allege "(1) public

disclosure, (2) of a private fact, (3) which would be offensive and objectionable to the reasonable

person, and (4) which is not of legitimate public concern."  E.g., Opperman v. Path, Inc., 87

F. Supp. 3d 1018, 1061–62 (N.D. Cal. 2014) (quoting Taus v. Loftus, 151 P.3d 1185, 1207 (Cal. 2007)).

Progress contends that the theft of Plaintiffs' information from within the MOVEit Transfer software is not a "public disclosure" within the meaning of the tort, as required by the first element under the applicable states' laws. Public disclosure "means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." Opperman, 87 F. Supp. 3d at 1062 (quoting Restatement (Second) of Torts § 652D cmt. a (A.L.I. 1977)). Assuming for the sake of argument that Cl0p's theft constituted a communication, Progress maintains that because the communication was to Cl0p, not to the public, Progress cannot be held liable under this theory of the law of any relevant jurisdiction.

Plaintiffs offer several responses. First, they maintain that this contention "merely repackages the same substantive argument regarding the intentionality" that Progress offered to support dismissal of its intrusion-upon seclusion argument "and should accordingly be rejected for the same reasons." [Opp. at 55]. But as explained above, Plaintiffs' arguments on that point are unavailing. Plaintiffs also argue, with little elaboration, that the "allegations that CL0P posted stolen data on the clear and dark web" should alter the analysis. [Opp. at 55]. Those allegations, however, fit better with Progress's contention that it was Cl0p (not Progress) that disclosed Plaintiffs' data to the public.[15] Finally, Plaintiffs also briefly cite case law to the effect that the publicity element can be "satisfied by disclosure to a limited number of people if those people have a special relationship with the plaintiff that makes the disclosure as devastating as

---

[15] To the extent Plaintiffs' mean to argue that Cl0p's prior hack-and-dump operations targeting file-transfer software should have made public disclosure foreseeable, they cite no authority under any relevant state law supporting that theory.

disclosure to the public at large," <u>Karraker v. Rent-A-Ctr., Inc.</u>, 411 F.3d 831, 838 (7th Cir. 2005), and suggest that Cl0p's disclosure here was sufficiently "devastating" under that standard, [Opp. at 55]. This shoe doesn't fit. Plaintiffs develop no argument for why Cl0p "ha[s] a special relationship with the [P]laintiff[s]." <u>Id.</u> Thus, because Plaintiffs' have not properly alleged publication, the motion to dismiss Count 7 is **<u>GRANTED</u>**.

## IV.    Statutory Claims

### a.    Count 8: Massachusetts General Laws Chapter 93A

Plaintiffs allege that Progress's failure to protect its data, which resulted in the Data Breach, constitutes a violation of the Massachusetts consumer protection law.  [CAC ¶¶ 1495–1509].  In Massachusetts, "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" are forbidden, Mass. Gen. Laws ch. 93A, § 2(a), and state law confers a private right of action on consumers injured by such conduct, <u>see id.</u> at § 9.  To state a claim under § 9, "a plaintiff must show that the defendant engaged in trade or business and committed an unfair or deceptive practice, causing economic injury to the plaintiff." <u>Hanrahran v. Specialized Loan Servicing, LLC</u>, 54 F. Supp. 3d 149, 153 (D. Mass. 2014).  Here, Plaintiffs argue this standard is met because "Progress engaged in unfair acts by failing to implement and maintain adequate security measures to protect Plaintiffs' Private Information, [and] as a direct and proximate result of these unfair acts, Plaintiffs have suffered identity theft, fraud, spam, mitigation costs, and more." [Opp. at 33 (citing CAC ¶¶ 1499–1505)].

Progress raises two arguments in reply.  First, Progress contends that "the center of gravity of Plaintiffs' claims is <u>not</u> Massachusetts."  [Mem. at 84].  It is true, as this Court has held in other cases, that Chapter 93A § 11 requires that the "center of gravity" of "the unfair and

deceptive conduct" be "primarily and substantially within the Commonwealth." HC&D, LLC v. Precision NDT & Consulting LLC, No. 22-cv-10224, 2024 WL 4626223, at *7 (D. Mass. Oct. 30, 2024) (first quoting Sonoran Scanners, Inc. v. PerkinElmer, Inc., 585 F.3d 535, 546 (1st Cir. 2009), then quoting Arthur D. Little v. Dooyang, Corp., 147 F.3d 57, 52 (1st Cir. 1998), and then quoting Sonoran, 585 F.3d at 546). But actions under § 11 are "[u]nlike actions pursuant to section 9" in this respect. Iron Workers Dist. Council of New England Health & Welfare Fund v. Teva Pharm. Inc., 734 F. Supp. 3d. 145, 162 (D. Mass. 2024). Section 9 provides a private right of action to "individual consumers who have suffered a loss due to an unfair trade practice whereas section 11 pertains to persons acting in a business context." Id. Plaintiffs here "allege Progress committed unfair business acts and/or practices in violation of M.G.L. ch. 93A §§ 2 and 9," [CAC ¶ 1498], so the "center of gravity" requirement plays no role here.

Second, Progress disputes that the alleged conduct satisfies the meaning that the SJC and First Circuit have assigned to the word "unfair" under Chapter 93A, [Mem. at 85]. "[A]n act or practice is unfair if it falls 'within at least the penumbra of some common-law, statutory, or other established concept of unfairness'; 'is immoral, unethical, oppressive or unscrupulous'; and 'causes substantial injury to consumers.'" Tomasella v. Nestlé USA, Inc., 962 F.3d 60, 70 (1st Cir. 2020) (quoting PMP Assocs. v. Globe Newspaper Co., 321 N.E.2d 915, 917 (Mass. 1975)). "'[M]ere negligence,' standing alone, is not sufficient for a violation of ch. 93A"; rather, a plaintiff must allege "'extreme or egregious' negligence." Baker v. Goldman, Sachs & Co., 771 F.3d 37, 51 (1st Cir. 2014) (first quoting Klairmont v. Gainsboro Rest., Inc., 987 N.E.2d 1247, 1257 (Mass. 2013), and then quoting Marram v. Kobrick Offshore Fund, Ltd., 809 N.E.2d 1017, 1032 (Mass. 2004)). Progress contends that Plaintiffs' allegations "boil down to [Progress's] alleged 'fail[ure] to maintain adequate systems and processes for keeping Plaintiffs' . . . Private

- 38 -

Information safe and secure,' and failure 'to recognize in a timely manner,' and notify Plaintiffs 'in a timely manner that their Private Information was accessed,'" and that this is insufficient. [Mem. at 85 (quoting CAC ¶¶ 1499, 1503)].

Progress's high-level characterization glosses over concrete allegations in the CAC—which the Court must accept as fact at this stage—that plausibly allege at least some actions that fit within the state-law meaning of "egregious." See Tomasella, 962 F.3d at 71 (deciding Chapter 93A liability is a "fact-specific . . . inquiry" (quoting Arthur D. Little, 174 F.3d at 55)). Specifically, Plaintiffs allege that Cl0p was able to steal their data because MOVEit Transfer was rife with specific cybersecurity defects that should have been obvious to Progress and timely resolved. To pluck perhaps the clearest example from the CAC, Plaintiffs allege that Progress allowed SQL injection vulnerabilities to go undiscovered and unresolved—in some cases, for several years. See, e.g., [CAC ¶¶ 1113, 1136–46]. Plaintiffs allege SQL injection vulnerabilities are "low-hanging fruit," [CAC ¶ 1024(b)], and have "been documented, understood, and easy to prevent since 1998," [id. ¶ 1023]. See also In re Yahoo!, 2017 WL 3727318, at *2 ("[T]he Federal Trade Commission found as early as 2003 that 'SQL injection attacks' were a known and preventable data security threat."). It is well understood that leaving consumers' data vulnerable to theft due to "unreasonably weak internal and external cybersecurity protocols" constitutes an unfair practice under Chapter 93A, In re LastPass, 742 F. Supp. 3d at 131, and Plaintiffs plausibly allege that Progress did that here. The motion to dismiss Count 8 is **DENIED**.

### b. Count 9: California Consumer Privacy Act ("CCPA")

The CCPA provides a limited civil cause of action for "[a]ny consumer whose nonencrypted and nonredacted personal information . . . is subject to an unauthorized access and exfiltration, theft, or disclosure as a result of [a] business's violation of the duty to implement and

maintain reasonable security procedures." In re Accellion, 713 F. Supp. 3d at 640 (second

alteration added) (emphasis omitted) (quoting Cal. Civ. Code § 1798.150(a)(1)).  Progress

contends that it is not a "business" within the meaning of the statute because it neither

"collect[ed] PII" nor "determine[d] why and how . . . the PII should be processed," as required

by the statutory definition.  In re Accellion, 713 F. Supp. 3d at 640; see also Cal. Civ. Code

§ 1798.140(d)(1).

The Court agrees that the CAC does not allege that Progress collected PII.  Accordingly,

the Court need not reach the question of whether Progress could be said to have determined how

such data would be processed.  To be sure, the CCPA "adopts a broad understanding of

'collects,'" In re Accellion, 713 F. Supp. 3d at 641, but Plaintiffs have not alleged that Progress

"collect[s]" data even within that broad scope.  Rather, Progress's customers "transfer and

receive highly sensitive Private Information" using MOVEit Transfer, [CAC ¶ 1325], and

MOVEit Transfer gives those customers "complete control over . . . file transfers by

consolidating them in one system on [the customers'] own premises," [id. ¶ 968].  Plaintiffs'

passing analogy to Accellion is inapposite.  The Accellion breach affected cloud-based file-

transfer software, and the plaintiffs alleged that consumers' data was "transferred by Accellion."

In re Accellion, 713 F. Supp. 3d at 629.  On those facts, plaintiffs could plausibly (though

"barely") allege that Accellion had "receiv[ed]" consumer data within the meaning of the CCPA,

id. at 640–41, whereas here, Plaintiffs concede that the PII "at issue here was not taken from

MOVEit Cloud," [Opp. at 58].[16]  Progress's motion to dismiss Count 9 is **<u>GRANTED</u>**.

---

[16] In addressing the second step of the statutory definition of "business"—whether Progress
"makes data processing decisions"—Plaintiffs contend that Progress is subject to CCPA liability
because it "provides cloud services that collect and process data," even though they concede that
"the Private Information at issue here was not taken from MOVEit Cloud."  [Opp. at 58].

### c. Count 10: California Consumer Legal Remedies Act

Plaintiffs allege a violation of the California Consumer Legal Remedies Act ("CLRA"), which prohibits "unfair methods of competition and unfair or deceptive acts or practices . . . undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer." Cal. Civ. Code § 1770(a). Claims under the CLRA that "sound in fraud" are subject to Rule 9(b)'s heightened pleading requirements even though "fraud is not a necessary element of a claim" under the statute. Kearns v. Ford Motor Co., 567 F.3d 1120, 1125 (9th Cir. 2009).[17] Plaintiffs' CLRA claim, which sounds in fraudulent misrepresentation and inducement,[18] alleges that:

- "Progress violated California Civil Code section 1770(a)(5), by the use of untrue or misleading statements and omissions and representing that its MOVEit software had characteristics or benefits that it knew to be untrue," [CAC ¶ 1527];

- "Progress violated California Civil Code section 1770(a)(14), by representing to its clients and the public at large that its MOVEit software employed the highest level of data security and would protect and safeguard Private Information from

---

Plaintiffs, however, do not suggest that operating MOVEit Cloud makes Progress a "collect[or]" of data at the first step.

[17] The Court disagrees with Plaintiffs' cited cases to the contrary, whose holdings and reasoning are overbroad, unpersuasive, and directly at odds with the holding and reasoning in Kearns. Compare, e.g., Villalobos v. Carmax Auto Superstore Cal., No. 12-cv-2626, 2014 WL 1600413, at *3 (S.D. Cal. Apr. 17, 2014) ("Rule 9(b) does not apply to CLRA pleadings because, most importantly, the CLRA makes no mention of any scienter or knowledge requirements. This is the primary difference between claims brought under the CLRA and fraud."), with Kearns, 567 F.3d at 1125 (CLRA claims alleging a "unified course of fraudulent conduct" are subject to Rule 9(b)'s heightened pleading requirements even though "fraud is not a necessary element of a claim" under the statute).

[18] See also [Opp. at 62 ("[T]he California Plaintiffs allege material misrepresentations and omissions by Progress . . . .")].

unauthorized [access], knowing and intending that its clients would pass these representations along to the Progress California Plaintiffs and California Class Members, when in fact Progress knew such benefits were not conferred," [id. ¶ 1528]; and

- "Progress knew, or should have known, that its representations and advertisements about the nature of its data security and its promise to maintain and update the ability of its MOVEit software to securely store and transfer Private Information were false or misleading and were likely to deceive a reasonable consumer. No reasonable consumer would use Progress's services if they knew that Progress was not taking reasonable measures to safeguard their Private Information," [id. ¶ 1529].

As such, Plaintiffs have alleged "a unified course of fraudulent conduct and rely entirely on that course of conduct as the basis of [their CLRA] claim," making the claim subject to Rule 9(b). Kearns, 567 F.3d at 1125; see also In re LastPass, 742 F. Supp. 3d at 131.

Apart from contesting the adequacy of pleading, Progress advances five separate arguments for dismissal of which the last (the absence of adequate allegations of reliance) is persuasive.

First, the parties bicker about pre-suit notice. The CLRA requires plaintiffs to give "at least 30 days' notice to the alleged wrongdoer prior to filing an action for damages," Allen v. Similasan Corp., No. 12-cv-0376, 2013 WL 5436648, at *2 (S.D. Cal. Sept. 27, 2013) (citing Cal. Civ. Code § 1782). Progress says Plaintiffs failed to do this because they gave notice of their damages claims on November 11, 2024, see [CAC ¶ 1531], only twenty-five days before the filing of the CAC, see [ECF No. 1297]. Plaintiffs rebuff this argument by noting that they

filed the corrected Amended Complaint on January 9, 2025, [ECF No. 1332], which would

satisfy pre-suit notice.  Although Plaintiffs point to case law stating that the date of the operative

complaint is what matters for CLRA pre-suit notice, see, e.g., In re LastPass, 742 F. Supp. 3d at

132, it is not lost on the Court that the January 9 CAC was filed to correct technical errors on the

Plaintiffs' part in its original pleading.  [ECF No. 1331].  The Court is wary of Plaintiffs'

invitation to let the date of the CAC cure their apparent notice defects under the guise of

correcting typos.  On the other hand, Progress's own cited cases show that the purpose of CLRA

pre-suit notice is to "facilitate . . . settlements," Allen, 2013 WL 5436648 at *2, and particularly

where, as with Progress here, it is clear a defendant has been "aware of the relevant allegations

for far more than the 30 days required," courts often excuse otherwise insufficient CLRA notice.

In re Am. Med. Collection Agency, Inc. Customer Data Breach Litig. (In re Am. Med. II), No.

19-md-2904, 2023 WL 8540911, at *9 n.24 (D.N.J. May 5, 2023); see also Weeks v. Google

LLC, No. 18-cv-00801, 2018 WL 3933398, at *13 (N.D. Cal. Aug. 16, 2018) (same).

Particularly in the context of bellwether litigation, the Court sees little value in a pro forma

dismissal without prejudice for insufficient notice in lieu of evaluating Plaintiffs' claims on the

merits.  See Morgan v. AT&T Wireless Servs., Inc., 177 Cal. App. 4th 1235, 1261 (Cal. Ct. App.

2009) (explaining that such dismissal must be without prejudice).

     Second, Progress contends that its alleged misconduct is immune from CLRA liability

because such conduct did not occur in California.  This argument is perplexing as the parties

agree that the Plaintiffs' injuries did in fact occur in California, [Mem. at 33 ( "[T]he injuries

each Plaintiff alleges occurred in their home states . . . .")]; [Opp. at 60 ("[T]he California

Plaintiffs clearly allege their injuries occurred in California.")], which is enough to let a litigant

"avail herself of the[] [CLRA]" on her own behalf and on behalf of a statewide class, which is all they seek.[19]  Cooper v. Simpson Strong-Tie Co., 460 F. Supp. 3d 894, 911 (N.D. Cal. 2020).

Third, Progress says that Plaintiffs do not allege that Progress transacted in goods or services with the California Plaintiffs, but as its own case citation acknowledges, a "consumer transaction" may be "indirect" and still be subject to CLRA liability without direct privity between the Plaintiff and Defendant.  [Mem. at 69 (quoting In re NCB, 748 F. Supp. 3d at 286)]; see also In re Am. Med. II, 2023 WL 8540911, at *9 (finding that allegations that "Plaintiffs received services in exchange for the promise to pay for those services" was sufficient to sustain a CLRA claim).

Fourth, Progress says "the CLRA also does not apply to the MOVEit Transfer software," which is an "intangible good[]."  [Mem. at 69 (quoting Woulfe v. Universal City Studios LLC, No. 22-cv-00459, 2022 WL 18216089, at *15 (C.D. Cal. Dec. 20, 2022))].  As Plaintiffs correctly point out, however, the question of whether software qualifies as a good or service under the CLRA is fact-intensive, see In re Yahoo! Inc. Customer Data Sec. Breach Litig., 313 F. Supp. 3d 1113, 1141–42 (N.D. Cal. 2018), and Progress offers no more than a conclusory assertion that MOVEit Transfer software falls outside the CLRA's scope.

Fifth, Progress says that Plaintiffs have not pleaded reliance, because they have not "allege[d] any direct interaction" between Progress and the Plaintiffs, [Mem. at 69 (quoting Miller v. NextGen Healthcare, Inc., No. 23-cv-02043, 2024 WL 3543433, at *10 (N.D. Georgia July 25, 2024))], and have not alleged that Plaintiffs "were even aware of Progress's alleged

---

[19] Although the CAC purports to represent a "Progress Nationwide Class, or in the alternative, the Progress California class," [CAC ¶ 1524], their motion now abandons the nationwide class request: "the California plaintiffs seek only a California class for those who experienced the results of Progress's misfeasance in California," [Opp. at 61].

representations about MOVEit Transfer prior to this lawsuit, let alone that they actually relied on them," [id. at 69–70].  As Plaintiffs point out, however, under California law, "[a] misrepresentation is judged to be 'material' if 'a reasonable [person] would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question.'" In re Tobacco II Cases, 207 P.3d 20, 39 (Cal. 2009) (quoting Engalla v. Parmanente Med. Grp., Inc., 938 P.2d 903, 919 (Cal. 1997)).  Further, "a rebuttable presumption of reliance arises" once a misrepresentation has been shown to be material.  Orshan v. Apple Inc., No. 14-cv-05659, 2024 WL 4353034, at *15 (N.D. Cal. Sept. 30, 2024).

In reply, Progress convincingly argues that any rebuttable presumption of reliance is overcome by the fact that Plaintiffs do not allege that they ever interacted with Progress, or even knew Progress existed, [Reply at 28], such that they could have relied on any misrepresentation by the company, Miller, 742 F. Supp. 3d at 1324–26.  "[P]laintiffs asserting CLRA claims sounding in fraud must establish that they actually relied on the relevant representations or omissions," id. at 1326, and cannot plausibly allege they did so where they "do[] not allege any direct interaction between [themselves]" and Progress.  Id. at 1324.

The motion is therefore **GRANTED** as to Count 10.

### d.  Claim 11: California Confidentiality of Medical Information Act ("CMIA")

The California Plaintiffs also allege that Progress has violated the CMIA, a healthcare privacy statute prohibiting any "provider of health care, health care service plan, pharmaceutical company, or contractor" from negligently releasing an individual's medical information except as specifically allowed.  Cal. Civ. Code § 56.101.  A "provider of healthcare" includes an entity that " offers software or hardware to consumers . . . designed to maintain medical information."  Id. § 56.06(b).  Progress does not dispute that MOVEit Transfer is "designed to maintain medical

information," but contends Plaintiffs have not alleged that Progress offers MOVEit Transfer "to consumers," as required by § 56.06(b).  Citing In re Accellion, Progress argues that "[t]o fall within this definition, a plaintiff must allege that the defendant offers software or hardware directly to individuals."  [Mem. at 63 (emphasis added)].  Accellion, as Plaintiffs acknowledge, did adopt this view. Plaintiffs, however, cite another MDL data breach decision that points in the opposite direction.  See In re Blackbaud, Inc., Customer Data Sec. Breach Litig., No. 20-mn-02972, 2021 WL 3568394, at *7 (D.S.C. Aug. 12, 2021) (concluding that the "statute does not require a business to offer software or hardware directly to a plaintiff in order to qualify as a 'provider of health care'"); see also id. (invoking anti-surplusage canon, and explaining that § 56.06(b) "suggests that the definition of 'consumers' is not limited to 'individuals' because it uses both terms," implying that they must carry distinct meanings).

On this Court's own review of § 56.06 and its surrounding sections Progress has the better of this argument.  Plaintiffs' reading does not take full account of § 56.06's "context," "statutory purpose," and other "statutory sections relating to the same subject."  Dyna-Med, Inc. v. Fair Emp. & Hous. Comm'n, 743 P.3d 1323, 1326 (Cal. 1987).  First, the purpose of § 56.06, as disclosed in its title and reflected in its contents, is to identify "[b]usinesses deemed to be provider[s] of health care," and the ordinary recipients of health care are individual persons, not corporations.[20]  Moreover, this purpose is borne out by the use of the word "consumer" synonymously with "individual" throughout the statute.  For example, just two subsections

---

[20] To be sure, the Court in Blackbaud explained that the California State Assembly sought "to ensure that the CMIA would apply to all businesses that maintain medical information 'whether or not the business was organized for that purpose.'"  2021 WL 3568394, at *8 (quoting Joseph R. Tiffany et al., The Doctor is in, but your Medical Information is Out, 24 J. Antitrust & Unfair Comp. L. Sec. St. B. Cal. 206, 225 (2015)).  Even so, the Court is skeptical that Progress, rather than downstream health-tech users, were the "providers of health care" that the legislature intended to bring within the scope of the CMIA.

below, "provider of health care" is further defined as "any business that offers a mental health digital service to <u>a consumer</u> for the purpose of allowing <u>the individual</u> to manage <u>the individual's</u> information." Cal. Civ. Code § 56.06(d) (emphases added). So too for "[a]ny business that offers a reproductive or sexual health digital service to <u>a consumer</u> for the purpose of allowing <u>the individual</u> to manage <u>the individual's</u> information." <u>Id.</u> § 56.06(e) (emphases added). As the <u>In re Accellion</u> court noted, "Plaintiffs' expansion of 'consumers' to include business entities would be inconsistent with the CMIA's usage of 'consumers' in other contexts, which often concern the consumer's 'diagnosed mental health or substance use disorder' or 'mental health application information' collected from a consumer." 713 F. Supp. 3d at 644 (citing Cal. Civ. Code § 56.05(j), (k)).

Progress's motion to dismiss Count 11 is **<u>GRANTED</u>**.

### e. Counts 12, 17, 20, 26, 31: State Data-Breach Notification Statutes

Plaintiffs assert that Progress failed to comply with state data-breach notification statutes in California, Illinois, Michigan, North Carolina, and Washington state. <u>See</u> [CAC Counts 12, 17, 20, 26 and 31]. Progress summarily contends it is not covered by those statutes because the notification requirements extend only to entities that "own[]," "license[]," or "maintain[]" their data, and Plaintiffs have not pleaded that Progress does any of these things. <u>See</u> Cal. Civ. Code § 1798.82(a)-(b); 815 Ill. Comp. Stat. Ann. § 530/10(a)–(b); Mich. Comp. Laws Ann. § 445.72(1)–(2); N.C. Gen. Stat. Ann. § 75-65(a)–(b); Wash. Rev. Code § 19.255.010(1)–(2); [Mem. at 61 n.61]. The statutes at issue, however, make clear that an entity may "maintain" data without owning or licensing it,[21] so merely disclaiming a property interest in the data is not

---

[21] <u>See</u> Cal. Civ. Code § 1798.82(b) ) ("A person or business that <u>maintains</u> computerized data that includes personal information <u>that the person or business does not own</u> shall notify the

enough to avoid liability under the statues.  Moreover, Plaintiffs' allegations that Progress was responsible for maintaining secure code for MOVEit Transfer are sufficient.  Specifically, Plaintiffs allege that "Progress manufacture[d], maintain[ed], and s[old] its MOVEit software," which stored and transferred Plaintiffs' data, e.g., [CAC ¶ 1559], and that its maintenance included "providing 'bug fixes, patches, upgrades, enhancements, new release [and] technical support' to customers," presumably to protect that data.  [CAC ¶ 972].

Progress also argues that Plaintiffs are not "customers" under the California Consumer Records Act.  "Any customer injured by a violation of [the CCRA] may institute a civil action to recover damages," Cal. Civ. Code § 1798.84(b), and "customer" is defined under the statute as "an individual who provides personal information to a business for the purpose of purchasing or leasing a product or obtaining a service from the business," id. § 1798.80(c).  The allegations make clear that the Plaintiffs asserting this claim are customers of Genworth and Sutter Health and provided their data to those companies in connection with purchases made from them, not Progress.  See, e.g., Miller, 742 F. Supp. 3d at 1321 (dismissing claim where "[p]laintiffs did not provide their private information to Nextgen in exchange for Nextgen's software or services,"

---

owner or licensee of the information of the breach of the security of the data immediately following discovery" (emphases added)); 815 Ill. Comp. Stat. Ann. § 530/10(b) (defining scope to include businesses that "maintain[] or store[], but do[] not own or license, computerized data" (emphasis added)); Mich. Comp. Laws Ann. § 445.72(2) ("[A] person or agency that maintains a database that includes data that the person or agency does not own or license that discovers a breach of the security of the database shall provide a notice to the owner or licensor of the information of the security breach"); N.C. Gen. Stat. Ann. § 75-65(b) ("Any business that maintains or possesses records or data containing personal information of residents of North Carolina that the business does not own or license, . . . shall notify the owner or licensee of the information of any security breach immediately following discovery of the breach . . . ."); Wash. Rev. Code Ann. § 19.255.010(2) ("Any person or business that maintains or possesses data that may include personal information that the person or business does not own or license shall notify the owner or licensee of the information of any breach of the security of the data immediately following discovery . . . .").

but rather "were required to do so as patients of their healthcare providers"); In re Accellion, 713 F. Supp. 3d at 645 ("Plaintiffs' interpretation of 'customers' under the CCRA is untenable" because "[t]he Complaint contains no allegation that Plaintiffs intended to obtain any services from Accellion").

Plaintiffs do not dispute this characterization of the Bellwether Complaint.  Instead, they argue that a recent California Appeals Court ruling provides a better analogy.  See J.M. v. Illuminate Educ., Inc., 323 Cal. Rptr. 3d 605, 613 (Cal. Ct. App. 2024) cert granted sub nom., M. v. Illuminate Educ., 557 P.3d 735 (Cal. 2024).  In J.M., a middle-school student sued Illuminate, "an education consulting business" that had contracted with his school to "evaluate his educational progress," including by receiving from the school J.M.'s personal and medical information, which was later accessed by hackers.  Id. at 608.  The Court held that although "Illuminate had a contract with the school district," J.M "was an intended beneficiary under the CRA" and fell within the definition of "customer," which the Court "interpreted broadly."  Id. at 613.  The California Supreme Court has acknowledged, however, that J.M. creates a split of authority on the proper scope of the CCRA and has granted review in that case, which remains pending as of the issuance of this order, M., 557 P.3d 735.  In the meantime, this Court may "choose between sides of any such conflict."  Id.  The Court concludes that J.M.'s interpretation of "customer" strays unpersuasively from the statutory definition.  Accordingly, the motion to dismiss Count 12 is **GRANTED**.

### f.  Count 13: California Unfair Competition Law ("UCL")

Progress urges dismissal of Count 13 on the grounds that (1) California Plaintiffs have "fail[ed] to allege a lack of an adequate remedy at law," (2) "no relevant conduct by Progress is

alleged to have occurred in California," and (3) "the California Plaintiffs have not alleged loss of money or property."  [Mem. at 65].

Progress cites cases indicating that federal common law supplies the equitable rules for awarding restitution under the UCL, see Sonner v. Premier Nutrition Corp., 971 F.3d 834, 841 (9th Cir. 2020), and include a requirement that Plaintiffs "must establish that [they] lack[] an adequate remedy at law before securing equitable restitution for past harm under the UCL," id. at 844.  A complaint seeking equitable relief should be dismissed if it fails to plead "the basic requisites of the issuance of equitable relief," including the "inadequacy of remedies at law."  Id. (quoting O'Shea v. Littleton, 414 U.S. 488, 502 (1974)).  Here, Plaintiffs "seek restitution and an injunction" requiring Progress to modify its security practices, [CAC ¶ 1579], and Progress offers no explanation for why this proposed injunctive relief would be supplanted by a legal remedy.

As for Plaintiffs' demand for restitution, they plead that their request is "in the alternative to any adequate remedy at law they may have."  [CAC ¶ 1580].  This comports with the decisions of California Courts applying Sonner, which have "allow[ed] the pursuit of alternative remedies at the pleadings stage."  Collyer v. Catalina Snacks Inc., 712 F. Supp. 3d 1276, 1289 (N.D. Cal. 2024) (collecting cases).  Unlike in Sonner, the record here discloses no grounds on which the Court could conclude, at this stage, that Plaintiffs seek "the same sum in equitable restitution . . . as [they] request[] in damages to compensate [them] for the same past harm."  Id. (quoting Sonner, 971 F.3d at 844).  Dismissal on this ground would be premature.

Nor does Progress's extraterritoriality argument carry the day.  California's extraterritoriality test asks whether a statute discloses "that it was designed or intended to regulate claims of non-residents arising from conduct occurring entirely outside of California."

Norwest Mortg., Inc. v. Superior Ct., 85 Cal. Rptr. 2d 18, 23 (Cal. Ct. App. 1999) (emphasis

added).  Thus, the test is inapposite as to claims brought by California plaintiffs: "a UCL claim

may be brought by a plaintiff who is a resident of California, regardless of where the alleged

misconduct occurred."  Adobe Sys. Inc. v. Blue Source Grp., Inc., 125 F. Supp. 3d 945, 972

(N.D. Cal. 2015).  Progress focuses on the location of the defendant's alleged misconduct,

drawing on cases that cite Sullivan v. Oracle Corp., 254 P.3d 237 (Cal. 2011), to argue that it

cannot be held liable because its alleged misconduct occurred in Massachusetts, not California.

[Mem. at 66].  To be sure, Sullivan dismissed UCL claims premised on violations of federal

labor law because it was undisputed that Oracle's alleged "failure to pay overtime when due"

occurred "in other states."  Id. at 248.  But unlike the California Plaintiffs in this case, the

plaintiffs in Sullivan were "[n]onresidents" of California and performed their work in "states

other than California."  Id. at 247 & n.7.  In short, California precedent indicates that allowing

claims brought by California residents against a non-resident defendant does not offend, or even

implicate, that state's extraterritoriality principles.  The Court finds unpersuasive Progress's cases

from federal and out-of-state courts interpreting California law to the contrary.

Finally, Progress contends that Plaintiffs have not alleged "lost money or property" as

required for UCL standing.  [Mem. at 66].  The California Supreme Court has explained that a

plaintiff can show "economic injury from unfair competition" in "innumerable ways," and

although California Proposition 64 sought to bar non-economic injuries from giving rise to UCL

standing, "[n]either the text of [the] Proposition . . . nor the ballot arguments in support of it

purported to define or limit the concept of 'lost money or property.'"  Kwikset Corp. v. Superior

Ct., 246 P.3d 877, 885–86 (Cal. 2011).  Here, Plaintiffs have alleged that they suffered concrete

monetary and property losses from, for example, the loss of the benefit of their bargain,

"monetary damages from fraud and identity theft," and "time and expenses related to monitoring their financial accounts for fraudulent activity." [CAC ¶ 1576]. Although the actual dollar amounts of such losses may ultimately prove hard to establish or quantify, at the pleading stage, Plaintiffs' allegations satisfy the letter of California law. See Kwikset, 246 P.3d at 885–86 (explaining that economic losses occur when a plaintiff "surrender[s] in a transaction more, or acquire[s] in a transaction less, than he or she otherwise would have," or is "required to enter into a transaction, costing money or property, that would otherwise have been unnecessary"). In this regard, the state law is consistent with federal decisions applying these principles to data breaches, see, e.g., In re Anthem, Inc. Data Breach Litig., 162 F. Supp. 3d 953, 985 (N.D. Cal. 2016). The motion to dismiss Count 13 is **DENIED**.

### g.  Count 14: California Constitution's Right to Privacy

The California Plaintiffs' privacy claim under the California Constitution fails for the same reasons as their common law privacy claims, which are "functionally identical" under California law. Prutsman v. Nonstop Admin. & Ins. Servs., Inc., No. 23-cv-01131, 2023 WL 5257696, at *1 (N.D. Cal. Aug. 16, 2023) (dismissing claim); see also In re Accellion, 713 F. Supp. 3d at 623, 645–47 (considering claims under intrusion upon seclusion and the California Constitution's right to privacy together). Because Plaintiffs fail to plead an intentional intrusion-upon-seclusion claim (Count 6), the motion to dismiss Count 14 is **GRANTED**.

### h.  Count 15: Connecticut Unfair Trade Practices Act ("CUPTA")

Plaintiff Karen Boginski alleges that Progress violated the CUTPA by failing to adequately protect her PII, and that of other Connecticut Plaintiffs, thereby causing damages. Progress does not dispute that these allegations satisfy the elements of CUTPA. Hernandez v. Apple Auto Wholesalers of Waterbury, 460 F. Supp. 3d 164, 182 (D. Conn. 2020) (requiring

plaintiffs to establish (1) "conduct that constitutes an unfair or deceptive trade practice," and (2) "a basis for a reasonable estimate of damages"). Instead, Progress challenges Boginski's standing under the CUTPA, which "requires that the plaintiff have 'some sort of business' relationship with the defendant business 'such that he suffers injury as either a consumer or competitor of the defendant or as some other businessperson affected by its unfair or deceptive acts.'" Aviles v. Wayside Auto Body, Inc., 49 F. Supp. 3d 216, 232 (D. Conn. 2014) (quoting Gersich v. Enter. Rent a Car, No. 95–cv–01053, 1995 WL 904917, at *5 (D.Conn. Nov. 20, 1995)). Progress contends that Boginski "was a customer of [Delta Dental]," not Progress, "and that she provided her information to Delta Dental, with which she had a relationship," not to Progress with which she did not have a relationship. [Mem. at 74].

The problem with Progress's argument on this score is that the broad wording of the statute cannot fairly be read to require the sort of privity suggested by Progress. It does not follow that requiring Boginski to "have some sort of business relationship" with Progress requires a direct business or consumer relationship. Aviles, 49 F. Supp. 3d at 232 (quoting Gersich, 1995 WL 904917 at *5 ). Indeed, the Connecticut Supreme Court has long recognized, and has "stated in no uncertain terms," that statutory standing under CUTPA "imposes no requirement of a consumer relationship." Larsen Chelsey Realty Co. v. Larsen, 656 A.2d 1009, 1019 (Conn. 1995). In a careful analysis of the applicable state cases, the late Judge Meyer explained that although "CUTPA's reach is not 'limitless,'" it has been "the Connecticut Supreme Court's consistent view that CUTPA should be broadly construed to protect against unfair business practices in many shapes and forms." Flynn v. DIRECTV, LLC, No. 15-cv-1053, 2016 WL 4467885, at *4 (D. Conn. 2016) (quoting Ganim v. Smith and Wesson Corp., 780 A.2d 98, 133 (Conn. 2001)); see id. at *4–5 (citing cases and rejecting argument that CUTPA

"require[s] a direct business relationship between a plaintiff and a defendant").  Thus, he

reasoned that a landlord could state a CUTPA claim against companies that installed satellite

dishes on their properties without their consent, notwithstanding the "lack of [a] direct business

relationship" between the companies and the "property owners."  Id. at *4 (emphasis omitted).

Nothing in his decision suggested that the ruling turned on the fact that the landlord could be

deemed a "business person," as Progress suggests in its Reply.  [Reply at 32 (arguing Flynn

"held that a plaintiff who was not a consumer could sue where they were a 'competitor or other

business person'")].  Rather, Flynn was squarely focused on addressing the argument that a

CUTPA claim needed to be dismissed "because plaintiffs [did] not plausibly allege the existence

of a business relationship between themselves and defendant." Id. at *3.

     Attempting to salvage the point, Progress suggests in its Reply that Boginski's allegations

effectively convey that there is "no relationship" between Boginski and Progress.  [Reply at 32

(emphasis added)].  But this slices it too thin. Drawing all reasonable inferences in Boginski's

favor, as the Court must, the allegations describe a relationship, albeit an indirect one,[22] between

Boginski and Progress that flows through Delta Dental.  That is enough for the Court to conclude

that the "any business relationship" requirement for a CUTPA claim has been adequately alleged.

Id.  The motion to dismiss Count 15 is **DENIED**.

### i.  Count 16: Georgia Uniform Deceptive Trade Practices Act ("GUDPTA")

     Progress contends that Plaintiffs Doris Cadet and Taneisha Robertson (the "Georgia

Plaintiffs") fail to state a claim under the GUDPTA because they (1) "fail to plead reliance" and

(2) "are not entitled to injunctive relief."  [Mem. at 74].  On reliance, Progress cites to

---

[22] CUTPA claims are "subject to the remoteness doctrine" under Connecticut law, Ganim, 780
A.2d at 134, but Progress has not raised or briefed that issue to the Court as a ground for
dismissal.  See also Flynn, 2016 WL 4467885, at *4 n.2.

Willingham v. Global Payments, Inc., No 12-cv-01157, 2013 WL 440702, at *16 (N.D. Ga. Feb. 5, 2013), and other cases relying thereon, see Doe v. Kaiser Found. Health Plan, Inc., No. 23-cv-02865, 2024 WL 1589982, at *29 (N.D. Cal. Apr. 11, 2024), for the proposition that a plaintiff must plead that they "reli[ed] on a defendant's purportedly deceptive conduct." [Mem. at 74].

The passage that Progress cites reads in full:

> A plaintiff who demonstrates past harm, but does not allege ongoing or future harm, has not shown that he is likely to be damaged within the meaning of section 10-1-373(a). Plaintiffs have not pled that they read, relied upon and, thus, were harmed by Defendant's "representations" and, even if they could replead such facts, Plaintiffs could, at most, demonstrate only past harm which is not a basis for injunctive relief under the [G]UDTPA.

Willingham, 2013 WL 440702, at *16. Taken literally, this reading of the GUDPTA poses something of a Catch-22: by alleging reliance a plaintiff necessarily points to a past harm, which precludes injunctive relief for ongoing or future harms.

Plaintiffs urge the Court to join more recent Georgia decisions finding Willingham unpersuasive. See, e.g., Miller v. NexGen Healthcare, 742 F. Supp. 3d 1304, 1320–21 (N.D. Ga. 2024) (noting that Willingham should not be read as "requiring all GUDTPA plaintiffs to plausibly allege reliance"). The Court agrees. Because forward-looking "[i]njunctive relief is the sole remedy under the [G]UDTPA," Willingham, 2013 WL 440702, at *16; accord Moore-Davis Motors, Inc., 556 S.E.2d 137, 140 (Ga. Ct. App. 2001), it makes little sense to require the Georgia Plaintiffs to plead "past reliance," as opposed to a reasonable likelihood they will "be damaged by a deceptive trade practice in the future." Miller, 742 F. Supp. 3d at 1321.

Even without following Willingham, Plaintiffs' claims hang by a thin thread. The CAC is scant on allegations that Plaintiffs face a "likelihood of future harm" due to "a deceptive trade practice." Id. at 1319 (quoting Ga. Code Ann. § 10-1-373). To be sure, Plaintiffs contend that they face a risk of future harm from Cl0p or others misusing the data already stolen, but those

future risks stem from past events, not from a <u>future</u> "deceptive trade practice" by Progress.  <u>Id.</u> Beyond that, they merely allege that they face "ongoing risks of future harms insofar as [Progress has] yet to implement the necessary policies, practices, and measures to adequately safeguard their Private Information in compliance with laws and industry standards."  [CAC ¶ 1627].

Although the path is narrow and factual development may be challenging, the allegation of ongoing risk is sufficiently well-pled in light of the extensive allegations concerning Progress's past security deficiencies, to support a finding that Plaintiffs may be entitled to injunctive relief.  The motion to dismiss Count 16 is **<u>DENIED</u>**.

### j.  Count 18: Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA")

Progress urges dismissal of the ICFA claims brought by Rob Plotke, Christopher Rehm, and Katherine Uhrich (the "Illinois Plaintiffs"). Progress advances four reasons for dismissal. Three of these are unpersuasive, at least at the pleading stage. The last argument, however, warrants dismissal of Rehm's and Uhrich's claims, but not Ploke's.

First, Progress argues that the Illinois Plaintiffs lack an adequate nexus to Illinois, such that application of the ICFA here would violate Illinois extraterritoriality rules.  [Mem. at 71]. The ICFA does not "apply to fraudulent transactions which take place outside Illinois," but in a modern economy, "it can be difficult to identify the situs of a consumer transaction when . . .  the transaction is made up of components that occur in more than one state."  <u>Avery v. State Farm Mut. Auto. Ins. Co.</u>, 835 N.E.2d 801, 853 (Ill. 2005).  In such circumstances, a transaction falls within the territorial reach of the ICFA "if the circumstances relating to the transaction occur primarily and substantially within [Illinois]."  <u>Id.</u>

"To determine whether a transaction occurred primarily and substantially in Illinois . . . , courts consider the totality of the circumstances surrounding the transaction, focusing on at least the following four factors: (1) [the] plaintiff's residence, (2) where the unfair, unlawful, or deceptive conduct occurred, (3) where the damage to the plaintiff occurred, and (4) whether [the] plaintiff communicated with the defendant or its agents in [Illinois]." In re Marriott Int'l, Inc., 626 F. Supp. 3d 814, 842 & n.29 (D. Md. 2022) (citing cases including Avery). "Mere residence" in Illinois is insufficient. In re LastPass, 42 F. Supp. 3d. at 130. "[E]ach case must be decided on its own facts." Avery, 835 N.E.2d at 854.

Here, the first and third factors weigh in favor of allowing the ICFA claim to proceed. Plaintiffs' residences are in Illinois and the parties, as discussed in the choice-of-law analysis, agree that their injuries occurred there. On the other hand, even drawing factual inferences in favor of Plaintiffs, relevant aspects of the alleged deceptive conduct likely occurred out of state, given the domiciles of Progress and the non-Progress Defendants, so the second factor weighs against the ICFA claim. There is no allegation that the Illinois Plaintiffs communicated with Progress in Illinois, but they do allege that their data ended up in the MOVEit environment based on transactions with Progress's customers or downstream contracting parties that occurred in Illinois. Cf. Sweet v. BJC Health Sys., No. 20-cv-00947, 2021 WL 2661569, at *6 (S.D. Ill. June 29, 2021) ("Plaintiff Taylor represents that his contact with Defendants was through medical treatment that occurred wholly within Illinois.").

These facts bear a close resemblance to Sweet, where "in-state plaintiffs" sued an "out of state defendant" over a data breach that "occurred in Missouri" and for which "decisions relevant to Defendants' internal data security occurred" outside of Illinois. Sweet, 2021 WL 2661569, at *6. The court in Sweet concluded that "the bulk of the 'transaction' as it relates to [the Illinois

Plaintiffs] and presumably most of the members of the proposed class will have occurred in Illinois." Id.

Although it is a close call, for present purposes, the allegations suffice to establish an adequate nexus to Illinois for the ICFA. The same is true for Progress's nexus challenge to Plaintiffs' Illinois Uniform Deceptive Trade Practices Act ("IUDTPA") claim (Count 19.) Perdue, 455 F. Supp. 3d at 774 (ICFA and IUDTPA share the same nexus requirement).

Second, Progress challenges whether Plaintiffs have pled reliance, but the ICFA only requires allegations of materiality at the pleading stage and "does not require actual reliance," Ash v. PSP Distrib., LLC, 226 N.E.3d 748, 754 (Ill. App. Ct. 2023), and the Illinois Plaintiffs' allegations suffice, at this stage, to show that "a reasonable consumer would have acted differently had the consumer known the omitted fact," id. (citation omitted); see [CAC ¶¶ 1648–54].

Third, Progress contends that Plaintiffs have failed to allege a misleading representation made by the company and directed toward the Plaintiffs. According to Progress, " [a] plaintiff cannot maintain an action under the ICFA for a deceptive practice sans a communication from the defendant containing either a deceptive misrepresentation or omission." [Mem. at 71 (quoting Schwebe v. AGC Flat Glass N. Am., Inc., No. 12-c-9871, 2013 WL 2151551, at *2 (N.D. Ill. May 16, 2013))]. Because Progress's relationship with the Illinois Plaintiffs was mediated by third parties, there was no direct communication. See [id. ("If there has been no communication with the plaintiff, there have been no statements and no omissions.") (quoting De Bouse v. Bayer, 922 N.E.2d 309, 316 (Ill. 2009))].

Plaintiffs' respond to this argument by pointing to language in DeBouse that appears to contemplate circumstances in which a Plaintiff may receive information through "indirect

deception"; Plaintiffs assert, as an example, that the flow of services from Progress, through TIAA, and ultimately to Uhrich, implies an "indirect" communication. De Bouse, 922 N.E.2d at 316–17; [CAC ¶ 905]. As a matter of pleading, this suffices. "[I]t is enough that [a] statement[] by the defendant be made with the intention that it reach the plaintiff and influence his action and that it does reach him and that he does rely upon it, to his damage." Id. at 316 (quoting Shannon v. Boise Cascade Corp., 805 N.E.2d 213, 218 (Ill. 2004)). Where an intermediary stands in between the deceiver and the deceived, the Plaintiff must allege that the intermediary was "actually deceived" by the statement provided to them. Id. at 319.

Plaintiffs allege that Progress made misrepresentations to intermediaries, like TIAA, that stood between Plaintiffs and Progress. See, e.g., [CAC ¶ 1330 ("Progress markets, advertises, guarantees, and warrants to all its customers that the MOVEit Transfer software will keep Private Information safe and secure from unauthorized access.")]. To the extent Rule 9(b) applies, they also identify specific statements Progress made targeting the healthcare and financial services industries, presumably including customers like TIAA and OSF Healthcare. See [CAC ¶ 1341 & n.430 ("Progress promises its customers in the financial industry that MOVEit will 'help[] your organization meet cybersecurity compliance standards such as PCI-DSS, HIPAA, GDPR, SOC2 and more.'" (alteration in original))]; [id. ¶ 1344 & n.433 ("Progress likewise promises its clients in the healthcare industry that 'MOVEit provides the features and deployment flexibility required to help healthcare agencies comply with HIPAA, PCI-DSS, GDPR and other leading cybersecurity standards.'")]; In re Porsche Cars N. Am., 880 F. Supp. 2d 801, 847 (S.D. Ohio 2012) ("[C]laims for 'deceptive practices' must meet the heightened pleading standard of Rule 9(b)."). The CAC's allegations suffice to state an ICFA claim against Progress based on a theory of indirect misrepresentation.

Fourth and finally, Progress contends that the ICFA claims should be dismissed for failure to plead actual damages. "A claim under ICFA requires the plaintiff to have suffered 'actual damage' as a result of the defendant's conduct." In re Supervalu, Inc., 925 F.3d 955, 964 (8th Cir. 2019) (quoting 815 Ill. Comp. Stat. 505/10a(a)). "The actual damage element of a private ICFA action requires that the plaintiff suffer 'actual pecuniary loss.'" Id. (citation omitted) (quoting Kim v. Carter's Inc., 598 F.3d 362, 365 (7th Cir. 2010)). To meet the requirement, a complaint must allege "a 'real and measurable' out-of-pocket loss." Id. (citation omitted) (quoting Dieffenbach v. Barnes & Noble, Inc., 887 F.3d 826, 830 (7th Cir. 2018)). "Where the mere possibility of harm exists or damages are otherwise speculative, actual damages are absent." Id. (quoting N. Ill. Emergency Physicians v. Landau, Omahana & Kopka, Ltd., 837 N.E.2d 99, 107 (Ill. 2005)).

Here, all three Illinois Plaintiffs allege an increase in spam, a risk of future identity theft, lost time spent monitoring accounts or otherwise seeking to avoid identity fraud, and emotional distress. [CAC ¶¶ 161–67, 316–21, 910–16]. Plotke allegedly incurred out-of-pocket costs for postage to dispute fraudulent charges incurred as a result of the Data Breach. [Id. ¶ 161]. The latter injury is "a 'real and measurable' out-of-pocket loss," albeit a modest one, while the other alleged injuries are not. In re Supervalu, 925 F.3d at 964; see also id. ("The time Holmes spent protecting himself against the threat of future identity theft does not amount to an out-of-pocket loss."). Rehm and Ulrich attempt to bootstrap their risk of future pecuniary injury to Plotke's present pecuniary injury, [Opp. at 74–75], by invoking the logic of Webb v. Injured Workers Pharmacy, LLC, where the First Circuit held that "actual misuse of a portion of . . . stolen information increases the risk that other information will be misused in the future," such that a plaintiff who only faced a risk of future harm could still invoke Article III standing based on the

actual misuse of another plaintiff's data.  72 F.4th 365, 375 (1st Cir. 2023).  These assertions do

not carry the day.  Irrespective of what allegations sufficed for Plaintiffs to keep a foot in the

federal courtroom door with respect to Article III standing, under the ICFA, "[a] purely

speculative injury is by definition not 'real and measurable' and cannot constitute actual

damage."  Supervalu, 925 F.3d at 964 (citing N. Ill. Emergency Physicians, 837 N.E.2d at 107).

On the other hand, with regard to the amount of Plotke's out-of-pocket losses, Progress cites

neither logic nor precedent to support its assertion that Plotke was required to allege "how much

he spent or why it was necessary to mail a letter" in order to submit a charge dispute.  [Mem. at

72].  Nor does Progress explain why Plotke's allegation is otherwise insufficient.  [Id.]  The

Court finds that Ploke's alleged expenditure for postage suffices, if barely, to state a claim for

actual damages under the ICFA.  The motion to dismiss Count 18 is therefore **<u>GRANTED</u>** as to

Ulrich and Rehm and **<u>DENIED</u>** as to Plotke.

### k.  Count 19: Illinois Unfair and Deceptive Trade Practices Act ("IUDTPA")

The IUDTPA permits a "person likely to be damaged by a deceptive trade practice" to

obtain "injunctive relief" against the offender.  815 Ill. Comp. Stat. 510/3; see also Darne v. Ford

Motor Co., No. 13-cv-03594, 2015 WL 9259455, at *12 (N.D. Ill. Dec. 18, 2015) ("The IUDTPA

'provides injunctive relief for a plaintiff who can demonstrate that a defendant engaged in any of

the 12 enumerated types of conduct' listed in 815 ILCS 510/2(a).").

Progress says Plotke's, Rehm's, and Uhrich's claims for injunctive relief under the

IUDPTA must be dismissed for the same reasons discussed in this Court's decision on standing,

namely, that the injunctive relief requested at that stage would not have redressed the risk of

future harm caused by the data breach.  [ECF No. 1304 at 6 n.3].  But there's a disconnect. As

the Court explained at the time, the focus then was on the inadequacy of injunctive relief against

- 61 -

Progress and other defendants to protect Plaintiffs from the future misuse of data Cl0p had

already stolen.  [Id.].  In crude terms, locking the barn door won't bring back the cows once they

have already headed out. That is different from the request for injunctive relief that Plaintiffs

assert here, which addresses the risk of a separate, future data breach, based on Plaintiffs'

allegations that Progress still has not implemented adequate code and cybersecurity procedures,

and that Plaintiffs cannot independently protect themselves "by refusing to do business" with

Progress because they cannot regain control of data already stored within MOVEit Transfer

servers (and indeed, never chose to do business with Progress in the first place).  To extend the

metaphor, locking the barn door can prevent additional cows from getting out.  See Power Cell

LLC v. Spring Window Fashions, LLC, No. 17-cv-4382, 2018 WL 1911765, at *3–4 (N.D. Ill.

Apr. 23, 2018) (denying a motion to dismiss IUDPTA claim where the plaintiff cannot avoid

future harm simply by refusing to do business with defendant); In re Forta File Transfer Software

Data Sec. Breach Litig., 749 F. Supp. 3d 1240, 1273 (S.D. Fla. 2024) (finding on a motion to

dismiss that plaintiffs' allegation of a "risk of another data breach occurring, as [Defendant] still

possesse[d] their data while maintaining inadequate security" satisfied future harm requirement

on an IUDPTA claim).  The motion to dismiss is **DENIED** as to Count 19.

**l.  Count 21: Michigan Consumer Protection Act ("MCPA")**

Plaintiffs allege that Progress violated the MCPA, which prohibits "[u]nfair,

unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce."

Mich. Comp. Laws § 445.903(1).  To state a claim under the MCPA, Plaintiffs must allege (1)

"that the defendant made a material misrepresentation that was false"; (2) "the defendant

knowingly made the false representation with the intent that the plaintiff would act upon it"; (3)

"that the plaintiff acted in reliance upon it"; and (4) "resulting damages."  In re OnStar Cont.

Litig., 278 F.R.D. 352, 376 (E.D. Mich. 2011).  The statute further defines "trade or commerce"

as "the conduct of a business providing goods, property, or service primarily for personal, family,

or household purposes."  Zine v. Chrysler Corp., 600 N.W.2d 384, 392 (Mich. Ct. App. 1999)

(quoting Mich. Comp. Laws. § 445.902(d)).

      Progress argues that MOVEit was "purchased primarily for business or commercial rather

than personal purposes" and "therefore outside the MCPA's scope."  [Mem. at 75–76 (quoting

Dusseau Farms LLC v. Wilbur-Ellis Co., No. 12-cv-12581, 2013 WL 3895829, at *6 (E.D. Mich.

July 29, 2013))].  Plaintiffs respond that their transactions for healthcare services from Corewell

Health (a Welltok VCE) were purchases for personal use.  [Opp. at 76].  But the relevant

statutory language asks whether the claim implicates "the conduct of a business providing goods,

property, or service primarily for personal, family, or household purposes."  Mich. Comp. Laws

§ 445.902(1)(g).  Here, the "good[] . . . or service" Progress "provid[es]" is the MOVEit Transfer

software, which Plaintiffs allege was "primarily for" commercial, not personal use:  Id.; [CAC

¶¶ 1679–82]  As Plaintiffs assert, MOVEit Transfer was purchased and used by "financial

services companies, government agencies, pension funds, hospitals, universities, banks, health

systems, energy and technology companies, and a wide variety of other institutions."  [CAC

¶ 964].  The allegations of the CAC reflect that those purchasers "did not act as a mere conduit or

intermediary," but rather, purchased MOVEit "so that [each entity] could engage in its own

business or commercial enterprise."  Slobin v. Henry Ford Health Care, 666 N.W. 632, 635

(Mich. 2003) (holding that law firm's collection of client's medical records fell outside scope of

MCPA).  Thus, even if it could be said that Plaintiffs' purchase of health insurance was for

personal use, "the activities in question here," i.e., Welltok's purchase of MOVEit Transfer, is

"too indirectly related to [P]laintiff[s'] 'personal, family, or household' use" of Corewell's healthcare services "to fall within the act."  Id.

Because the Court finds this claim falls outside the scope of the MCPA, there is no need to reach Progress's asserted second ground for dismissal, i.e., whether the Plaintiffs sufficiently allege that any misrepresentations or omissions were directed at them.  The motion to dismiss is **GRANTED** as to Count 21.

### m.  Count 22: Nebraska Consumer Protection Act ("NCPA")

Plaintiff Laquesha George, on behalf of the Progress Nebraska Class (together, "the Nebraska Plaintiffs"), alleges that through the Data Breach, Progress violated the NCPA. Progress contends that the NCPA claim must be dismissed because the Nebraska Plaintiffs have failed to allege "actual damages."  [Mem. at 83].  The parties' briefing of this issue is sparse, relies entirely on cases addressing very different scenarios, and fails to identify relevant legal standards for determining the adequacy of George's damages allegations. Progress cites cases involving the NCPA's antitrust provisions to suggest that George's damages are too "derivative and remote" to state a claim.  Kanne v. Visa U.S.A. Inc., 723 N.W.2d 293, 302 (Neb. 2006).  As a cursory review of the case relied upon by Progress reveals, the NCPA's antitrust provisions specifically incorporate federal antitrust law, id. at 301–02 (quoting Neb. Rev. Stat. § 59-829), and the Nebraska Supreme Court held that the cardholders lack of federal antitrust standing was fatal to their NCPA antitrust claims, id. at 297–99, 301.  Progress offers no reason why those antitrust principles, which arise under different statutory provisions, should govern here, compare Neb. Rev. Stat. § 59-1602 (defining liability for unfair practices) with id. § 59-1603 (defining liability for illegal restraints of trade) and id. § 59-1604 (defining liability for monopolistic conduct), particularly when Nebraska law appears to import the federal

"remoteness" doctrine only to the extent that a plaintiff's theory of NCPA liability arises under an NCPA provision that mirrors "federal antitrust law.," id. § 59-829.  In any case, the Court declines to dismiss a claim based on an argument "adverted to" only "in a perfunctory manner." United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990)).

For her part, rather than engage with Kanne, George cites a similarly inapposite case involving an appeal challenging a directed verdict and damages instructions given to a jury in a non-NCPA case.  Lesiak v. Cent. Valley Ag Coop., Inc., 808 N.W.2d 67, 76 (Neb. 2012). Although this does not advance George's position, the fact remains that Progress has not given the Court a valid ground for dismissal.

In any case, George's alleged damages appear to pass muster under Nebraska case law. Although it does not appear that George has suffered a direct financial loss, the NCPA's damages provision does not seem to require a measurable pecuniary injury.  To the contrary, the statute allows "actual damages sustained" or an award of damages "not susceptible of measurement by ordinary pecuniary standards" up to $1,000.  Neb. Rev. Stat. § 59-1609.  George's allegations of threatening phone calls, [CAC ¶ 356], seem roughly in line with other allegations of harm admitted in NCPA cases.  See Pauly v. Oliver Wright & Assocs., No. 21-cv-156, 2023 WL 6046318, at *4 (D. Neb. Jan. 6, 2023) (awarding $1,000 based on harassing debt-collection practices even though Plaintiff "failed to sufficiently prove the existence of any actual damages").  The motion to dismiss Count 22 is therefore **DENIED**.

### n.   Count 23: Nebraska Uniform Deceptive Trade Practices Act ("NUDTPA")

Progress contends that the Nebraska Plaintiffs' claim falls outside the scope of the Nebraska Uniform Deceptive Trade Practices Act.  The NUDTPA applies to "deceptive trade practices" even if the practices are "conducted outside of Nebraska against residents" of

Nebraska so long as "there is a direct connection to any deceptive trade practices conducted in whole or in part within this state."  Neb. Rev. Stat. § 87-304(c).  Neither party cites case law interpreting the foregoing provision, and instead each draws conclusory arguments solely from the plain text of the statute.  In the absence of developed argumentation,[23] the Court declines to dismiss the NUDTPA claim at this stage.  The motion is **DENIED** as to Count 23.

### o.  Count 24: New Jersey Consumer Fraud Act ("NJCFA")

Progress argues that Plaintiff Margaret Phelan's claim under the NJCFA on behalf of the Progress New Jersey Class (together, the "New Jersey Plaintiffs"), must be dismissed because Phelan is not a "consumer" within the meaning of the statute.  [Mem. at 76].  To state a claim under the NJCFA, "a 'consumer' must allege sufficient facts to demonstrate (1) unlawful conduct by the defendant that violates the NJCFA; (2) an ascertainable loss by the plaintiff; and (3) a causal relationship between the unlawful conduct and the ascertainable loss."  In re Forta, 749 F. Supp. 3d at 1276 (quoting Gonzalez v. Wilshire Credit Corp., 25 A.3d 1103, 1115 (N.J. 2011)).  "The NJCFA is intended to protect consumers who purchase goods or services generally sold to the public at large."  Id. at 1277 (cleaned up) (quoting Arc Networks Inc. v. Gold Phone Card Co., 756 A.2d 636, 637–38 (N.J. Super. Ct. Law Div. 2000)).  A "plaintiff does not qualify as a consumer if they do not purchase a product for consumption."  Id. (quoting In re Blackbaud, 2021 WL 3568394, at *11 (citing Arc Networks, 756 A.2d at 637–38)).  A plaintiff "must be a consumer vis-à-vis the defendants."  Id. (quoting Speciality Ins. Agency v. Walter Kaye Assocs., Inc., No. 89-cv-01708, 1989 WL 120752, at *5 (D.N.J. Oct. 2, 1989)).

---

[23] Progress also suggests in a footnote that George has not alleged a future harm for which injunctive relief is an appropriate remedy, but this argument fails for the same reason as under the IUDTPA.  See supra.

Progress contends Phelan is not a "consumer" of MOVEit because she did not purchase a good or service from Progress, PBI, or TIAA at all, but rather inherited her TIAA account. [Mem. At 77].  Phelan replies that Progress overlooks decades of precedent reaffirming that "privity is not a condition precedent to recovery under the [NJ]CFA." Gonzalez v. Wilshire Credit Corp., 988 A.2d 567, 574 n.9 (N.J. Super. Ct. App. Div. 2010) (citing Neveroski v. Blair, 358 A.2d 473, 479 (N.J. Super. Ct. App. Div. 1976)).  Rather, the statute "encompass[es] the acts of remote suppliers," Perth Amboy Iron Works, Inc. v. Am. Home Assurance Co., 543 A.2d 1020, 1026 (N.J. Super. Ct. App. Div. 1988), and does not require "that the claimant have a direct contractual relationship with the seller of the product or service," Katz v. Schachter, 598 A.2d 923, 926 (N.J. Super. Ct. App. Div. 1991).

Phelan's argument overstates the reach of the principle on which she relies. In each of the cited privity cases, the plaintiff was a downstream purchaser of a product or service, whereas here, Phelan does not allege that Progress is a "remote supplier" of the financial services Phelan obtained from TIAA, nor do her allegations naturally support such an inference.  In any case, Phelan, as the inheritor of an insurance policy, is not a "consumer vis a vis" Progress. Accordingly, the motion to dismiss is **<u>GRANTED</u>** as to Count 24.

### p.  Count 25: New York General Business Law ("GBL")

Progress urges dismissal of Gilbert and Lynda Hale's New York General Business Law claim on three grounds.  First, the GBL requires a "sufficient nexus" to New York, which Progress says is absent from the Plaintiffs' allegations.  MacNaughton v. Young Living Essential Oils, LC, 67 F.4th 89, 99 (2d Cir. 2023).

A claim "falls within the territorial reach" of the GBL when the plaintiff alleges "a sufficient nexus between [the plaintiff's] transactions with [the defendant] and New York."  In re

NCB, 748 F. Supp. 3d at 289 (quoting MacNaughton, 67 F.4th at 99).  An allegation that the Plaintiff purchased a product from the defendant will typically suffice to satisfy the nexus requirement.  MacNaughton, 67 F.4th at 99.  Here, however, Plaintiffs concede they did not purchase anything from Progress, and, as in In re NCB, they do "not allege that [they] had any direct interaction with [Progress], or [were] even aware of [Progress]'s existence before the data breach."  In re NCB, 748 F. Supp. 3d at 290.

Progress has the better of the argument on this point; the claims here lack a sufficient nexus to New York.  The motion to dismiss Count 25 is therefore **GRANTED**.

### q.  Count 27: North Carolina Unfair and Deceptive Trade Practices Act ("NCUDTPA")

Progress argues that Plaintiff Ben Dieck, suing on behalf of the Progress North Carolina Class, fails to state a claim under the NCUDTPA "because []he does not adequately allege unfair or deceptive conduct by Progress or actual damages."  [Mem. at 86].

To state an NCUDTPA claim, a plaintiff must allege (1) a prohibited unfair or deceptive act, (2) "in or affecting commerce," that (3) "proximately cause[s] an injury to the plaintiff."  See Darne, 2015 WL 9259455, at *11 (quoting Bumpers v. Cmty. Bank of N. Virginia, 747 S.E.2d 220, 226 (N.C. 2013)).  Showing proximate cause on a deceptiveness claim usually involves pleading reliance on the Defendant's misrepresentation.  City of High Point v. Suez Treatment Sols. Inc., 485 F. Supp. 3d 608, 633 (M.D.N.C. 2020).

Progress convincingly argues that Dieck has not alleged any facts that would support an inference of reliance.  [Mem. at 86].  Not only did Dieck lack a direct relationship with Progress, but he also concedes that he "ha[d] no known relationship" with Maximus or the Colorado Department of Human Services, the government entity through which Maximus obtained Dieck's information.  [CAC ¶ 61].  Because Dieck acknowledges that he has no idea as to how

his information ended up on Maximus's MOVEit interface, he cannot plausibly allege that Progress's misrepresentations and omissions proximately caused his injuries.  Cf., e.g., In re Forta, 749 F. Supp. 3d at 1279 (denying a motion to dismiss NCUDTPA claim where plaintiff alleged that defendant made misrepresentations and omissions that gave rise to a duty to disclose because plaintiffs and defendants had direct relationship).

The motion to dismiss Count 27 is **GRANTED**.

### r.  Count 28: Ohio Consumer Sales Practices Act ("OCSPA")

Progress contends that Plaintiff Elaine McCoy, suing on behalf of the Progress Ohio Class, fails to state a claim under the OCSPA because she does not allege a "consumer transaction" within the meaning of the statute.  [Mem. at 79–80].

The OCSPA prohibits "supplier[s]" from engaging in "unfair or deceptive act[s] or practice[s] in connection with a consumer transaction."  Ohio Rev. Code Ann. § 1345.02(A).  A "consumer transaction" is "a sale, lease, assignment, award by chance, or other transfer of an item of goods, a service, a franchise, or an intangible, to an individual for purposes that are primarily personal, family, or household, or solicitation to supply any of these things."  Id. § 1345.01(A).

Progress contends that McCoy has failed to allege (1) a transaction with Progress or (2) that MOVEit Transfer is used primarily for "personal, family, or household purposes."  [Mem. at 80].  McCoy convincingly rebuts Progress's first contention, since the statute provides that a "supplier" under the statute need not "deal[] directly with the consumer."  Ohio Rev. Code § 1345.01(C).  But McCoy makes no argument as to how MOVEit can be deemed a product sold for "primarily personal, family, or household" use.  Cf. [CAC ¶¶ 964, 973 (alleging that MOVEit

was used by corporate consumers for commercial and institutional purposes)].  Consequently, the motion to dismiss Count 28 is **GRANTED**.

### s.  Count 29: Pennsylvania Unfair Trade Practices and Consumer Protection Law ("PUTPCPL")

Progress contends that Plaintiffs Steven Checchia, Marvin Dovberg, and Victor Diluigi, suing on behalf of the Progress Pennsylvania Class, have failed to state a claim under the Pennsylvania PUTPCPL for failure to plead an "ascertainable loss" and or to allege reliance.  In re Rutter's, 511 F. Supp. 3d at 541.  Progress's argument is persuasive to the extent that Dovberg's and Diluigi's claims fail to surmount the "ascertainable loss" threshold, while Checchia's claim flounders for lack of reliance.

"To allege an ascertainable loss, the plaintiff 'must be able to point to money or property that he would have had but for the defendant's fraudulent actions.'"  Id. (quoting Riviello v. Chase Bank USA, N.A., No. 19-cv-00510, 2020 WL 1129956, at *3 (M.D. Pa. Mar. 4, 2020)).  "These damages must be identifiable and 'cannot be speculative.'"  Id. (quoting Jarzyna v. Home Props., L.P., 185 F. Supp. 3d 612, 626 (E.D. Pa. 2016) aff'd 783 Fed. Appx. 223 (3d Cir. 2019)).  Dovberg claims he "expended time and effort checking his credit and financial accounts," has "suffered lost time, annoyance, interference, and inconvenience," and "anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the harms caused by the Data Breach."  [CAC ¶¶ 439, 441–42].  Plaintiff DiLuigi also alleges that he incurred various fraudulent charges, but he admits that he was reimbursed for those costs.  [CAC ¶ 88]; In re Rutter's, 511 F. Supp. 3d at 541 (holding injuries based on expenses that "were ultimately reimbursed by their banks" not cognizable).  Plaintiffs Dovberg and DiLuigi both fall short of alleging ascertainable damages or a "tangible loss of money," as required to show a cognizable injury.  Id.

Plaintiff Checchia, however, alleges a panoply of fraudulent charges on his account, as well as expenses incurred for credit monitoring.  See [CAC ¶ 841–42].  Although he does not allege that his bank "failed to reimburse" him for the fraudulent charges, In re Rutter's, 511 F. Supp. 3d at 541 (holding plaintiff failed to satisfy damages element of PUTPCPL claim where Plaintiff was actually reimbursed), his out-of-pocket monetary loss is ascertainable and non-speculative.

Checchia nonetheless fails to plead justifiable reliance on any omission or misrepresentation.  To state a claim under the PUTPCPL, "a plaintiff must [allege] that he justifiably relied on the defendant's wrongful conduct or representation and that he suffered harm as a result of that reliance."  Yocca v. Pittsburgh Steelers Sports, Inc., 854 A.2d 425, 438 (Pa. 2004).  Here, the Court cannot reasonably infer that Checchia even "knew that [Progress] existed," let alone that he would not have transacted with TIAA but for Progress's alleged misrepresentations and omissions.  In re Blackbaud, 2021 WL 3568394, at *14.  Justifiable reliance cannot be presumed.  Hunt v. U.S. Tobacco Co., 538 F.3d 217, 227 (3d Cir. 2008).  Thus, the motion to dismiss Count 29 is **GRANTED**.

### t.   Count 30: Vermont Consumer Protection Act ("VCPA")

Progress also contends Plaintiff Patricia Marshall, on behalf of the Progress Vermont Class (collectively, the "Vermont Plaintiffs"), has failed to state a claim under the VCPA because she does not allege that she is a "consumer" within the meaning of the statute.  [Mem. at 82].  The VCPA defines "consumer" as "a person who purchases . . . goods or services . . . for the person's use or benefit or the use or benefit of a member of the person's household."  9 Vt. Stat. § 2451a(1).  Marshall alleges she is a consumer because "[she] agree[d] to pay for products and services from users of MOVEit software," meaning TIAA, who in turn contracted with PBI, in

part "for data security protection they did not receive from Progress." [CAC ¶ 1773]; see also [id. ¶ 851–52 (explaining that Marshall paid for financial services from TIAA, who in turn contracted with PBI, which processed her PII through MOVEit)]. Progress asserts that this allegation is inadequate because Marshall "does not allege that she purchased any good/service from Progress or that she otherwise had any relationship with Progress." [Mem. at 82].

The VCPA has been "liberally construed" to "include direct and indirect purchasers with no privity requirement." Mongeon v. KPH Healthcare Servs., Inc., No. 21-cv-00195, 2022 WL 1978674, at *3 (D. Vt. June 6, 2022) (internal quotation marks omitted) (quoting Elkins v. Microsoft Corp., 817 A.2d 9, 13 (Vt. 2002)); see also Madowitz v. Woods at Killington Owners' Ass'n, 93 A.3d 571, 581 (Vt. 2014) (explaining that broad reading of VCPA effectuates statutory purpose of "allow[ing] the consumer to reach the person who committed the consumer fraud"). Although Vermont law only requires "some relationship," and not "strict privity,' Bellwether Cmty. Credit Union v. Chipotle Mexican Grill, Inc., 353 F. Supp. 3d 1070, 1097 (D. Colo. 2018)), the relationship must still be "akin to that of buyer and seller," Maurise v. Fed. Ins. Co., No. 08-cv-00013, 2009 WL 10679101, at *3 (D. Vt. Jan. 23, 2009). Here, Marshall cannot plausibly be construed as an indirect buyer of Progress's services where he bought insurance from TIAA, which contracted with PBI for auditing services, which in turn contracted with MOVEit. Progress's motion to dismiss Count 30 is **GRANTED**.

### u.   Count 32: Washington Consumer Protection Act ("WCPA")

Progress alleges that Plaintiff Megan McClendon, on behalf of the Progress Washington Class (collectively, the "Washington Plaintiffs"), fails to adequately allege a deceptive or unfair act under the WCPA, arguing McClendon has not alleged reliance or privity. [Mem. at 87]. With regards to reliance, Progress cites no state law and the Washington Supreme Court has, in fact,

"rejected the principle that reliance is necessarily an element of [a] plaintiff's CPA claim."

Thornell v. Seattle Serv. Bureau, Inc., 363 P.3d 587, 592 (Wash. 2015).  Furthermore, although

Progress cites a handful of cases in which privity was present, [Mem. at 87 n.84], it cites no

authority to support that privity is a necessary condition for a WCPA claim.  To the contrary, the

Washington Supreme Court has "rejected the argument that the [W]CPA applies only to

consumer or business' transaction disputes and that only a consumer or someone in a business

relationship with the defendant can bring a private [W]CPA claim."  Thornell, 184 363 P.3d at

592.  Moreover, McClendon partly alleges liability based on material omissions in Progress's

public statements, see [CAC ¶¶ 1802(g)–(h)], and, under the WCPA, "[w]hen a plaintiff alleges

deception through omission of a material fact, a rebuttable presumption of reliance applies."  Eng

v. Specialized Loan Servicing, 500 P.3d 171, 181 (Wash. Ct. App. 2021).  The motion to dismiss

Count 32 is **DENIED**.

### v.  Count 33: Declaratory Judgment

Progress argues for dismissal of Plaintiffs' request for declaratory relief primarily on the

ground that it is duplicative of their negligence and contract claims.  [Mem. at 87–88].  Plaintiff's

tort and contract claims, however, seek only retrospective relief.  Their request for declaratory

judgment, by contrast, is premised on allegations that the "security measures on [the] MOVEit

software remain inadequate," and that, as a result, "the risk remains that further compromises of

[Plaintiffs'] Private information will occur in the future." [CAC ¶¶ 1813–14].  An allegation of

"continued inadequacy of [a] Defendant['s] security measures" substantiates a claim for

declaratory judgment in a data breach case.  In re Unite Here Data Sec. Incident Litig., 740

F. Supp. 3d 364, 388 (S.D.N.Y. 2024) (quoting In re Cap. One Consumer Data Sec. Breach

Litig., 488 F. Supp. 3d 374, 414–15 (E.D. Va. 2020)).[24]  Accordingly, the motion to dismiss Count 33 is **DENIED**.

## V.    CONCLUSION

For the foregoing reasons, the Motion is **GRANTED** on Counts 2, 5–7, 9–12, 14, 21, 24, 25, 27–30, **GRANTED IN PART** and **DENIED IN PART** on Counts 1, 4, and 18, and otherwise **DENIED**.


July 31, 2025                                        /s/ Allison D. Burroughs
                                                     ALLISON D. BURROUGHS
                                                     U.S. DISTRICT JUDGE

---

[24] As discussed supra, to the extent Progress invokes this Court's standing ruling regarding injunctive relief as a ground for rejecting their declaratory judgment claim, [Mem. at 88]; see also [ECF No. 1304 at 6 n.3], that ruling was limited to the adequacy of injunctive relief against Progress and other defendants here to protect Plaintiffs from the future misuse of data that Cl0p has already stolen.  That is different from the request for declaratory and injunctive relief that Plaintiffs assert here, which addresses the risk of a separate, future data breach due to ongoing security deficiencies endemic to Progress's software.  The Court declines to foreclose declaratory relief at this stage.  See, e.g., In re Arby's. Rest. Grp. Inc. Litig., No. 17-cv-0514, 2018 WL 2128441, at *15 (N.D. Ga. Mar. 5, 2018) ("Arby's arguments are premature at this stage. Plaintiffs made specific allegations that they would be harmed without declaratory relief because Arby's has not taken steps to address their allegedly inadequate security system.  This is enough to survive a motion to dismiss.").