**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| IN RE: MOVEIT CUSTOMER DATA SECURITY BREACH LITIGATION<br><br>This Document Relates To:<br><br>ALL CASES | MDL No. 1:23-md-03083-ADB-PGL |

**MEMORANDUM OF LAW IN SUPPORT OF PBI & WELLTOK BELLWETHER
PLAINTIFFS' MOTION TO COMPEL DISCOVERY
<u>FROM VCE/VCEC BELLWETHER DEFENDANTS</u>**

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ........................................................................................................ 1

II. RELEVANT BACKGROUND ................................................................................... 3

    A. The VCE Defendants ...................................................................................... 3

    B. The Courts' Ruling on the Defendants' Motion to Dismiss ................................. 3

    C. The Defendant Fact Sheet already Includes Some Cyber Hygiene "Go-Gets" ..................................................................................................... 4

    D. The Discovery Requests Regard the VCEs' Internal Security .............................. 4

    E. The Discovery Responses ................................................................................. 5

        1. VCEs' Blanket Relevance Objections to Cyber Hygiene ........................... 5

        2. The Relevant Time Period Hearing and Cyber Hygiene Productions ..................................................................................... 8

III. LEGAL STANDARDS ............................................................................................... 9

IV. ARGUMENT ............................................................................................................. 10

    A. The Internal Cyber Security Health of the VCE is Relevant to Plaintiffs' Claims for Negligence and for Injunctive Relief ................................ 10

        1. Documents Regarding the Cyber Hygiene of the VCEs Can Support Plaintiffs' Claims Against the VCE and its Vendors ........................................................................................ 11

        2. The Cases Cited by the VCEs are Not Binding, Persuasive, or Applicable ............................................................................... 14

    B. Valuation of the Data by VCE is Relevant to Damages ..................................... 18

    C. Milliman & MLIC Responses Violate the Federal Rules .................................... 18

V. CONCLUSION ........................................................................................................... 20

011175-35/3538081 V1

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*In re Am. Med. Collection Agency, Inc. Customer Data Sec. Breach Litig.*,
No. 19-md-2904 (D.N.J.), ECF No. 231...................................................................................15

*Athridge v. Aetna Cas. & Sur. Co.*,
184 F.R.D. 181 (D.D.C. 1998).....................................................................................................13

*Best Buy Stores, L.P. v. Manteca Lifestyle Ctr., LLC*,
2011 WL 2433655 (E.D. Cal. June 14, 2011) .....................................................................10, 11

*Brown v. Wal-Mart Associates, Inc.*,
616 F. Supp. 3d 137 (D. Mass. 2022)...........................................................................................19

*Crowe v. Managed Healthcare of North America, Inc.*,
No. 23-cv-61605 (S.D. Fla.), 3/18/25 ....................................................................................15, 17

*Jiang v. Kobe Japanese Steakhouse, Inc.*,
No. CV 22-11867-FDS, 2024 WL 4872395 (D. Mass. Nov. 22, 2024) ...............................9, 10

*Kinetic Concepts, Inc. v. ConvaTec Inc.*,
268 F.R.D. 226 (M.D.N.C. 2010)..................................................................................................11

*In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*,
341 F.R.D. 128 (D. Md. 2022 ........................................................................................................18

*Smallman v. MGM Resorts Int'l*,
638 F. Supp. 3d 1175 (D. Nev. 2022)............................................................................................18

*Vasquez-Fernandez v. Cambridge College, Inc.*,
269 F.R.D. 150 (D.P.R. 2010) .......................................................................................................10

### OTHER AUTHORITIES

Fed. R. Civ. P. 33(b)(3)..................................................................................................................19

Fed. R. Civ. P. 34(b)(2)(B) ...........................................................................................................19

Fed. R. Civ. P. 34(b)(2)(C) ...........................................................................................................10

011175-35/3538081 V1

## I.    INTRODUCTION

Plaintiffs are stuck in discovery purgatory. *Eight* months ago, in mid-August 2025, Plaintiffs served discovery requests on the Bellwether Defendants whose systems were not breached, but who gave Plaintiffs' sensitive data to entities that were (i.e., the Vendor Contracting Entities ("VCEs"). The VCEs responded by categorically denying the relevance of requests directed to the cybersecurity health on their own computer networks.[1] However, many also produced some "go-get" documents in response to both the Defendant Fact Sheet ("DFS") and with their discovery responses relevant to their cyber hygiene. This belies the supposed lack of relevance the VCEs have relied on to refuse to respond to Plaintiffs' requests. Indeed, the DFS process already approved by the Court recognized the internal security of the VCEs (which included risk registers, tools used to enforce cybersecurity, etc.) was a proper subject of discovery. And when this Court discussed "cyber hygiene" at previous hearings related to the relevant time period, it noted that Defendants' cyber security at the time of the MOVEit data breach ("Data Breach") was germane—without distinction of the defendant. Similarly, Judge Burroughs rejected the VCEs' arguments that they owned no duty to the Plaintiffs for the breach because they did not use MOVEit. Judge Burroughs also sustained claims for injunctive relief correctly observing that the VCEs still possessed Plaintiffs' highly sensitive personally identifiable information ("PII") and protected health information ("PHI"). As such, the VCEs' relevance objections regarding the cyber security health of their networks are baseless, if not already rejected. But VCEs nonetheless rely on those objections to refuse to provide relevant discovery central to Plaintiffs' claims.

Plaintiffs seek an order overruling the VCEs' objections on relevance grounds as to several

---

[1] Defendant MLIC collected certain PBI Plaintiffs' and class members' PII and transferred it to its respective VCE, Milliman, who then transferred it to its Vendor, PBI, where it was compromised in the Data Breach. It has been referred to as a VCEC and is part of this motion. For brevity, it is included in the VCE abbreviation.

011175-35/3538081 V1

requests for production ("RFPs") and interrogatories ("Rogs") on their own internal cybersecurity at the time of the MOVEit Data Breach in 2023, as well as changes made in response to the Breach. Plaintiffs also seek an order compelling (where objected to) responses from the VCEs regarding if and how the VCEs derived value from the Plaintiffs' data shared with their Vendors. Finally, Plaintiffs seek that the Court overrule all the boilerplate objections in the responses of Defendants MLIC and Milliman as violative of the Federal Rules. Because the VCEs have refused to respond to these requests, they also refused to propose search terms to identify documents/information responsive to them, despite Plaintiffs' repeated requests that they do so. As such, Plaintiffs seek an order compelling VCEs to provide search terms sufficient to identify all documents responsive to these requests (and identify any additional custodians necessary to do so).

The requests at issue focus on how the VCEs' computer systems transferred PII and PHI to their Vendors' systems where it was compromised; their policies for retaining/destroying such PII/PHI from their own systems and Vendors' systems; their cybersecurity hygiene and the tools they use to keep that PII/PHI safe; and other data breaches/incidents involving the same characteristics of the Data Breach. *See* Appendix ("App.") (for the pertinent responses).

VCEs have made only scant productions of "go-gets" containing policies, and promises of future documents based upon inadequate proposed search terms, but the VCEs have maintained their relevance objections. Plaintiffs move the Court to end this "we don't think Plaintiffs should get anything but here is something" posture, resolve that the information sought is relevant, and require the VCEs to update their responses to remove boilerplate relevance objections and confirm whether they are producing responsive documents.[2]

---

[2] Plaintiffs seek an order to resolve Defendants' relevance objections, and reserve all rights to bring additional disputes regarding Defendants' discovery responses to the Court.

011175-35/3538081 V1

## II.    RELEVANT BACKGROUND

### A.    The VCE Defendants

The VCE Defendants at issue include:

- "Genworth," which consists of Genworth Life and Annuity Insurance Company, Genworth Life Insurance Company, Genworth Financial, Inc., and Genworth North America Corporation;

- "Milliman," which consists of Milliman Inc. (d/b/a Milliman Intelliscript, Inc.) and Milliman Solutions, LLC;

- "MLIC," which is MEMBERS Life Insurance Company;

- "TIAA," which is Teachers Insurance and Annuity Association of America;

- "Sutter," which is Sutter Health;

- "OSF," which is OSF Healthcare System;

- "Corewell," which is Corewell Health East;

- "VM," which is Virginia Mason Franciscan Health; and

- "CHI," which is CHI Health – NE.

Genworth, TIAA, Milliman (and MLIC, through Milliman, who share the same counsel) (collectively, "PBI VCEs") collected PBI Plaintiffs' and class members' PII and transferred it to PBI, where it was compromised in the Data Breach. *See* ECF No. 1517 (MTD Or.) at 16 (recapping Plaintiffs' allegations against VCEs). The Welltok VCEs include Sutter and Corewell and OSF, VM, and CHI (who share the same counsel) ("Welltok VCEs"). They collected Welltok Plaintiffs' and class members' PII and PHI and transferred it to Welltok, where it was compromised in the Data Breach. *Id.* (same).

### B.    The Courts' Ruling on the Defendants' Motion to Dismiss

The VCEs collectively argued that they had no duty that was violated due to the MOVEit breach because none used MOVEit or had their systems compromised during the attack. ECF Nos. 1360 (PBI VCEs) at 9–18; 1377 (Welltok VCEs) at 7–12. Judge Burroughs rejected dismissal, finding that Plaintiffs pled that the VCE Defendants owed a duty to users from whom they

-3-

collected data, as well as to vet the direct users of MOVEit. *See* MDL Order No. 23, ECF No. 1517, at 18. Furthermore, the Court sustained Plaintiffs' declaratory and injunctive relief claims against all VCEs, which seek prospective injunctive relief requiring they "employ adequate security protocols consistent with law and industry standards to protect consumers' Private Information." *See, e.g.*, ECF No. 1543 ¶ 3602.

### C.    The Defendant Fact Sheet already Includes Some Cyber Hygiene "Go-Gets"

In December of 2024, Judge Levenson issued an order requiring that Defendants provide a Fact Sheet. It required that all Defendants (including the VCEs) produce several "go get" items before electronic discovery started in earnest per Rule 26. ECF No. 1334. The pertinent items included:

6. Identify and produce any Incident Reports related to the Data Breach.
7. Identify and produce Your Policies and Procedures including by identifying any tools used to enforce Your Policies and Procedures (i.e., antivirus software; Cybersecurity Logs; Firewalls; IDS; IPS; and MFA).
8. Identify and produce Your Risk Assessments from 2021 to present.
9. Identify and produce Your Annual Security Certifications from 2021 to present.

ECF No. 1334-1 at 3-4. Judge Levenson recognized the relevance of examining all the Defendants' cyber hygiene at the time of the Data Breach—even for those who were not using MOVEit:

> The assessments of the broad risk environment may be relevant even against a suggestion that, well, we didn't maintain our own data or we didn't have an agreement with Progress, so they weren't one of the vendors we were worried about. It does strike me, broadly speaking, that these kind of things are useful in assessing what was known and what was knowable to the parties at the time.

12/18/24 Hrg. Tr., ECF No. 1324 at 51.

### D.    The Discovery Requests Regard the VCEs' Internal Security

Plaintiffs served RFPs and Rogs on the VCEs in the beginning of August 2025, who served their responses between October 14–22, 2025. The pertinent requests are summarized (and genericized) in Exhibit A. In summary, they seek a diagram of the VCE's network for system (RFP

-4-

B); policies and communications regarding the retention/destruction of PHI/PII (RFP C); RFPs and Rogs regarding the VCEs' data security (and standards used) at the time of the breach and changes made thereafter (RFP D, E, Rog A); a Rog regarding prior breaches (Rog B), and documents regarding any value the VCEs received for the Plaintiffs' data (RFP N).[3]

### E.    The Discovery Responses

#### 1.    VCEs' Blanket Relevance Objections to Cyber Hygiene

Pertinent here, requests for information about the VCE's own cyber security health at the time of the Data Breach or after were met with flat refusals to do any ESI searches. *See, e.g.,* App. at 19 (Genworth Response to RFP 7) (since the data breach "did not occur with the systems of or on software license or used by Genworth" [it] "will not search for or produce documents responsive to this request" for documents identifying how Genworth enforces its cybersecurity policy and procedures.").

Some VCEs initially offered to talk more about certain requests, but then backed off. For example, TIAA initially responded to RFP 7 concerning "Data Security in place prior to, during, and after the Data Breach" that – while not relevant – it would "produce documents responsive to this Request identified after a diligent and reasonable search [.]" App. at 33–34. However, it later decided (as did all VCEs) that internal data/cyber security programs and systems were not to be produced. Ex. B (4/8/26 Shapiro email). Some VCEs fully objected but produced some policy and procedure documents.

Regarding how the VCEs value the data, ***RFP N***, most objected on relevance. *See*

---

[3] The incongruent letter grouping of the requests reflects that a wider group of requests have been discussed by Plaintiffs and the VCEs but omitted from this motion. The requests have also been genericized in the public filing. Each request often included specific vendors or third-party entities that Plaintiffs learned from research or from the DFS. That information is sealed so it may not be used by future attackers. The responses of the VCEs to requests and any confidential documents are attached at the sealed **Appendix.**

Responses of Sutter RFP 22, OSF/CHI/VM RFP 23. App. at 81, 101–02, 116, and 131. TIAA agreed to look for documents, App. at 40 (TIAA Response to RFP 19), while others responded no such documents existed. *See, e.g.*, App. at 88 (Corewell Response to RFP 21) (objecting on relevance while saying no responsive documents).

The most strident responses came from Milliman and MLIC. They both refused to answer any interrogatories on grounds that their systems were not breached. See App. at 199–219, 271–91. Yet, both still produced some documents (including some policies). Ex. C, 4/8/26 Dailey Email and 4/9 McNamara Response.

Within two weeks of receiving those responses, Plaintiffs promptly began sending letters raising numerous deficiencies therein. *See, e.g.*, Exhibit D at 8 (Plaintiffs' Oct. 27, 2025 letters raising deficiencies in Genworth's, Milliman's, and MLIC's RFP and Rog responses, including the subject of this motion: their improper refusal to produce responsive information on the basis that there systems "purportedly w[ere] not breached (rather, PBI was) such that responsive documents are not relevant").

In the weeks thereafter, Plaintiffs promptly scheduled and conducted individual conferrals with various Defendants on a defendant-specific basis, as early as the first week in November 2025, so Plaintiffs could endeavor to resolve any disputes before seeking judicial relief. During those conferrals, Plaintiffs requested that Defendants craft search terms to identify documents and information responsive to *all* of Plaintiffs' RFPs and Rogs and also made clear that they were seeking modifications to the *default* relevant time period for certain requests seeking information that predates that period (i.e., Plaintiffs' proposed "carve outs"). *See, e.g.*, Exhibit E at 1 (Plaintiffs stating, "it is Milliman's and MLIC's obligation to craft search terms to identify documents in their possession, custody, or control responsive to Plaintiffs' requests").

011175-35/3538081 V1

A month into those defendant-specific conferrals, the VCEs sent an email (purportedly on behalf of all VCEs), making a global proposal on the *only* search terms they would apply "to identify documents responsive to Plaintiffs' Requests for Production." *See* Exhibit F at 1. When Plaintiffs attempted to conduct follow-up defendant-specific conferrals, multiple VCEs claimed they could not continue to confer on their discovery responses due to the global search term proposal. *See, e.g.*, Exhibit E at 2, 4 (Milliman and MLIC counsel reneging prior promise to provide supplemental responses based on Defendants' global search term proposal). Their proposed global search terms consisted of only six search terms for all of Plaintiffs' RFPs and Rogs, and were not applicable to the internal cybersecurity requests they deemed irrelevant. Exhibit. F at 1. While some of these terms might result in some documents responsive to the objected to requests, the objections remained.

Plaintiffs responded to Defendants' improper global search term proposal by explaining that the mere *six* proposed terms were grossly inadequate. *See* Exhibit G at 1. Plaintiffs also made clear that they had a "fundamental disagreement with all VCE/VCEC Defendants as to the scope of relevant discovery, which will require motion practice and a ruling from the Court …. [t]hat directly impacts the parties' search term conferrals" (*id*. at 3), and therefore requested that the VCEs provide proposed search terms "for all of Plaintiffs' discovery requests" while that dispute remained "pending*." Id.* at 1, 3.

The VCEs responded by suggesting the parties reach agreement on a *subset* of search terms for their improperly narrowed scope of discovery while Plaintiffs brought the broader dispute over the scope of relevance to the Court:

> Even if Plaintiffs are intent upon asking the Court to allow for discovery into the VCE/VCECs' cybersecurity programs generally, we see no reason why the parties cannot proceed with negotiating what we all agree is within scope: the VCE/VCECs' vendor management programs.

011175-35/3538081 V1

*Id*. at 2. To keep discovery moving and "prevent any further delay while [the parties] continue to confer over search terms for *all* of Plaintiffs' discovery requests and obtain a ruling on the inadequacy of [] Defendants' discovery responses," Plaintiffs agreed to an initial *subset* of only *five* search terms (the "12/19 Subset Terms"). *Id*. at 1.

Thereafter, Plaintiffs continued to send defendant-specific deficiency letters and conduct defendant-specific conferrals, during which Plaintiffs made clear that they were seeking carve-out time periods for certain requests, and made defendant-specific carve-out proposals to certain Defendants. *See* Exhibit H at 2 (Plaintiffs' second deficiency letter to Genworth making carve out proposals for certain RFPs and Rogs). The motion practice regarding a default relevant time period then led to inactivity on the production of electronic discovery from the VCEs through the present.

### 2.      The Relevant Time Period Hearing and Cyber Hygiene Productions

On February 26, 2027, Judge Levenson heard a dispute regarding the default relevant time period for ESI discovery. He noted that

> [I]f I'm thinking about proportionality under Rule 26, a case where I would be looking at what are the events, what's the nature of the evidence that would shed light on the relevant considerations, what were the -- you know, to what degree were there precautions in place as of the date of the exploit, to what degree was there cyber hygiene in place at the relevant time -- at the time of the exploit, and naturally, that can't be a snapshot on a single day to make sense of that.

ECF No. 1733-1 at 15. Later, he asked about the sensibility of using a 2022 to 2023 time period regarding the cyber security health of the defendant:

> If the topic under discussion is what were the various defendants doing about their cyber security in the lead-up to the breach, and if we say, well, maybe they didn't do everything, Mr. McNamara, I've got to say that's quite a visual. Does it make sense perhaps to think not in terms of, okay, exactly one year and perhaps think in terms of beginning of 2022 as a cutoff that is fairly easily administered and might capture, as Ms. Baxter-Kauf pointed out, a cycle that could otherwise elude the one-year period prior to the breach? Is that something defendants think is sensible?

*Id.* at 27. Judge Levenson again coupled the cyber hygiene of the defendants at the time of the

011175-35/3538081 V1

breach – without distinction of the defendants:

> Doesn't that give you at least some room to work around the risk of that, you know, you just barely miss on one side or the other, hygiene or testing or other efforts that you might be looking to see what happened? And I take it you're also interested in, and this may be the more important point, you're interested in reports of problems that may have come in in that given time period.

*Id.* at 28

Meanwhile, the VCEs (even where some production occurred) maintained their relevance objections on the pertinent requests. In response to a last-ditch email attempting to isolate the impasse, TIAA, Genworth, TIAA, MLIC/Milliman, and Sutter Health reasserted that requests regarding their own computer systems lacked relevance. *See, e.g.,* Ex. I (4/8/26 Sultanian email), Ex. B (4/8/26 Shapiro email); Ex. C (4/8/26 Dailey Email and 4/9/26 McNamara Response), and Ex. J (4/8/26 Haut email). At an April 8, 2026 meet and confer, counsel for OSF, VM and CHI maintained that the requests as stated were overbroad and sought information that was not relevant.

## III.    LEGAL STANDARDS

The following standard governs motions to compel discovery in this District:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

*Jiang v. Kobe Japanese Steakhouse, Inc.*, No. CV 22-11867-FDS, 2024 WL 4872395, at *8 (D. Mass. Nov. 22, 2024) (citing Fed. R. Civ. P. 26(b)(1)). While Plaintiffs have the initial burden—as the moving party—to show that their discovery requests seek relevant information, "relevance should be broadly construed, and information should be deemed discoverable if there is any possibility it might be relevant to the subject matter of the action." *Id.* (quoting *Nosalek v. MLS Prop. Info. Network, Inc.*, 2022 WL 4815961, at *4 (D. Mass. Oct. 3, 2022); *Cherkaoui v. City of*

*Quincy*, 2015 WL 4504937, at \*1 (D. Mass. July 23, 2015)).

This District has consistently explained that, "[b]ecause discovery itself is designed to help define and clarify the issues, the limits set forth in Rule 26 must be construed broadly to encompass any matter that bears on, or that reasonably could lead to other matters that could bear on, any issue that is or may be in the case." *Id.* (quoting *In re New England Compounding Pharmacy, Inc. Prod. Liab. Litig.*, 2013 WL 6058483, at \*3 (D. Mass. Nov. 13, 2013); *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978)). "Once a showing of relevance is made, the party opposing disclosure bears the burden of showing that the requested discovery is improper." *Id.* (quoting *Controlled Kinematics*, *Inc. v. Novanta Corp.*, 2019 WL 3082354, at \*2 (D. Mass. July 15, 2019)).

## IV.   ARGUMENT

### A.   The Internal Cyber Security Health of the VCE is Relevant to Plaintiffs' Claims for Negligence and for Injunctive Relief

The VCEs have refused to provide responsive information and documents to the RFPs and Rogs included in the Appendix based on their improper unilateral determination that nothing related to their cybersecurity practices is relevant because "the Data Breach did not occur within the systems of or on software licensed or used by [Defendants]." *See, e.g.*, Genworth's RFP Response, App. at 7. The VCEs have used that position to avoid proposing search terms or custodians for those requests, instead providing only sporadic documents despite their objections. Defendants' practice of maintaining objections without disclosing if information or documents are ultimately being withheld based on those objections violates Rule 34. *See* Fed. R. Civ. P. 34(b)(2)(C) (requiring that objections to requests for production of documents state whether any responsive materials are being withheld on the basis of the objections); *see also Vasquez-Fernandez v. Cambridge College, Inc.*, 269 F.R.D. 150, 161–62 (D.P.R. 2010) (citing Fed. R. Civ. P. 34(b)(2)(C)); *Best Buy Stores, L.P. v. Manteca Lifestyle Ctr., LLC*, 2011 WL 2433655, at \*11

(E.D. Cal. June 14, 2011) (granting motion to compel and overruling objection where defendant had "already produced some documents responsive" to the RFP, citing Fed. R. Civ. P. 34(b)(2)(C)); *Kinetic Concepts, Inc. v. ConvaTec Inc.*, 268 F.R.D. 226, 252–53 (M.D.N.C. 2010) (granting motion to compel where opposing party had identified responsive documents after motion filed, recognizing that moving party "cannot know whether [opposing party is] still withholding other relevant and responsive documents"). The VCEs should be required to amend their responses to comply with Rule 34 by clearly stating—in response to each request—whether responsive information exists and, if so, whether (and to what extent) it is being withheld based on their objections, so that Plaintiffs can readily identify the scope of their responses and productions.

### 1. Documents Regarding the Cyber Hygiene of the VCEs Can Support Plaintiffs' Claims Against the VCE and its Vendors

In its April 10 electronic order, the Court directed the parties "to address the question of how to differentiate between truly 'local' cybersecurity measures (e.g. configuration of a firewall on a particular server) and cybersecurity practices that may be implemented locally but that bear on more general risks (e.g. practices regarding encryption of sensitive information)." ECF No. 1770. The Plaintiffs understand the Court to ask how a Direct User's or Vendor's or VCE's general disregard for cybersecurity industry standards, i.e., poor cybersecurity hygiene, leads to specific failures to maintain cybersecurity controls that contributed to the MOVEit Data Breach.

For example, TIAA inquired as to PBI's use of a Web Application Firewall ("WAF") as far back as 2018. *See* TIAA_000196, App. at 292. If TIAA failed to deploy a WAF on its own web application servers, it may indicate that it does not follow cybersecurity industry standards. If TIAA failed to ensure that PBI employed a WAF on its web application servers, that could show that it does not force its vendors to follow cybersecurity industry standards. - or maybe that it doesn't understand those standards that simply appear on a checklist. If TIAA, now knowing that

-11-

properly configured WAFs can prevent Data Breaches involving zero-day SQL Injection attacks but still does not ensure that its own web applications servers are protected by WAFs, then Plaintiffs' and Class Members' PII/PHI is still at heightened risk, as alleged in Plaintiffs' claims for injunctive relief. Plaintiffs' unanswered discovery requests are aimed at answering similar questions.

But suppose TIAA did meet industry standards, while their Vendors did not. That is also relevant in multiple ways: as a failure to carry over those practices to Vendor vetting; as evidence of the establishing industry standards; and to support liability against the Vendor.

Plaintiffs seek internal cyber hygiene documents that can answer key questions:

- How did the VCE protect the data before they transmitted it?

- How did they ensure they had no more data than necessary?

- How did they ensure the least number of their personnel transmitted their data to their vendors through MOVEit?

- What were their controls for transmitting data to 3rd party apps or over the internet, and were their controls adequate?

- Did they test and enforce their controls?

The discovery requests in the Appendix attempt to answer these questions. ***RFP B*** simply requests a diagram of the VCEs network. It would yield information about the VCEs' originating systems (where the PII/PHI was sent to the Vendor). It can reveal whether the VCEs included a WAF between their public facing web applications that could've prevented the type of data breach that their Vendors suffered –leading to the theft of the PII/PHI of the VCE's customers. Plaintiffs have alleged this. ECF No. 1543, ¶¶ 1261 (citing Akamai Security Intelligence Group's successful thwarting of the MOVEit attack via its WAF). As with the TIAA example, if the VCEs are not

-12-

using WAFs, they likely did not ensure Welltok or PBI did, and it bodes poorly for the continued safety of the Plaintiffs' data which the VCEs still possess.

TIAA has agreed to produce such a diagram. Ex. B. But partial production despite objection leaves Plaintiffs in the dark. *See, e.g.*, *Athridge v. Aetna Cas. & Sur. Co.*, 184 F.R.D. 181, 190 (D.D.C. 1998) (finding that asserting a relevance objection while agreeing to produce some documents "without waiving that objection, serves only to obscure potentially discoverable information and provides no mechanism for either plaintiffs or the Court to review defendant's decisions") (cleaned up).

Another issue is data retention and destruction. **RFP C** concerns document retention and destruction policies of the VCEs. Plaintiffs alleged the Welltok Bellwether Defendants failed to comply with FTC guidelines, by retaining PII no longer needed which the attackers obtained on MOVEit servers. ECF No. 1543 at ¶¶ 3390-3393. The data retention guidelines of the VCEs – whether they followed them or required their Vendors to do so – is relevant to this allegation. While Virginia Mason produced a Business Associates Privacy policy covering how CommonSpirit entities may disclose PHI to vendors with HIPAA Business Associates Agreements, while only sharing the minimum amount of PHI necessary, VM_CONFIDENTIAL_000101, App. at 303, Virginia Mason has not produced a data retention and destruction policy indicating how long it may, itself maintain and use PHI before destroying it, for example, after an individual is no longer a patient. Plaintiffs ask for each VCE to produce such a policy.

**RFP D, RFP E, and Rog A** seek documents and information about the cybersecurity tools and standards employed by the VCEs. VCEs have a duty to protect class members' personal data, and Plaintiffs must prove that the VCEs were negligent in their duty. For example, a common

-13-

access management tool is to "Limit[ ] access by employing a 'least privileges' policy" which "can limit an attacker who exploits a vulnerability form accessing large volumes of data." *Id.,* ¶¶3446, 3447.

Some of the VCEs have responded, despite their categorical objections. OSF Healthcare has produced a number of its internal policies and procedures concerning its controls over personal data including its Device and Media Controls policy, OSF_CONFIDENTIAL_000150, App. at 315; Accountability of Movement of Hardware and ePHI, OSF_CONFIDENTIAL_000157, App. at 318. That is in addition to production of OSF's vendor management policies, such as its policy concerning Business Associate Contracts, OSF_CONFIDENTIAL_000163, App. at 321. Plaintiffs seek these policies and standards from the other VCEs as well.

***Rog B*** concerns prior breaches suffered by the VCE. Plaintiffs refined the Rog to include only data breaches with similar characteristics as the MOVEit Data Breach. Information responsive to Rog B is relevant for establishing Plaintiffs' claims that the VCE knew (or should have known) that they lacked adequate processes for vetting/monitoring third parties to ensure that they were safe against the type of attack methodologies used in the Data Breach. For example, Corewell subsidiary Priority Health had a third-party data breach in 2020 where personal information was accessed by an unauthorized individual.[4] Plaintiffs simply ask whether Corewell Health and the other VCE Defendants were subject to any other data breaches where they provided personal information to third-parties, and thus were on notice to being a target and requiring vigilance.

### 2.   The Cases Cited by the VCEs are Not Binding, Persuasive, or Applicable

The VCEs have previously directed the Court to arguments made in the prior "default

---

[4] *See* https://www.priorityhealth.com/about-us/for-the-media/eyemed-incident.

011175-35/3538081 V1

relevant time period" briefing to support their relevance objections. *See* ECF No. 1733 at 11 (citing 12/4/25 Min. Order, *Cheng v. Cal. Pub. Emps' Ret. Sys.*, No. 23-cv-010718 (Cal. Super.), at 1) ("CalPERS' [a VCE whose vendor used MOVEit] cybersecurity measures regarding its own systems are not relevant."); *Crowe v. Managed Healthcare of North America, Inc.*, No. 23-cv-61605 (S.D. Fla.), 3/18/25 Discovery Hr'g Tr., at 70, 72 (prohibiting discovery into internal cybersecurity programs of defendants whose "systems were not breached" because such discovery "is not proportional as a result and not relevant"); *In re Am. Med. Collection Agency, Inc. Customer Data Sec. Breach Litig.*, No. 19-md-2904 (D.N.J.), ECF No. 231 at 9.

But these cases are distinguishable, should be disregarded, and/or actually *support* Plaintiffs' arguments. In *Cheng*, Defendants' referenced authority is a minute order from an informal discovery conference with essentially no reasoning or citations to authority, and the Court should accordingly not rely on it as persuasive authority. *See* ECF No. 1733-7. Further, the court there recognized that several categories of information Plaintiffs seek from the VCE Defendants are relevant. *Id.* at 1 (recognizing the VCE defendant's internal "measures [] to protect [PII] such as policies, procedures, and training are relevant," that "information regarding [the VCE's] vendor management and vender oversight with regard to those venders who [it] entrusted with its members' PII is also discoverable," and that, "to the extent [the VCE] made changes as a result of the MOVEit data breach, this is also discoverable").

In *In re Am. Med. Collection Agency, Inc. Customer Data Sec. Breach Litig.* ("*AMCA*"), the court was ruling on a motion to compel 17 months *before* the motion to dismiss was decided, in a preliminary discovery phase. *See* ECF No. 1733-9 at 3–6 (describing procedural posture of case); *AMCA*, No. 19-md-2904 (D.N.J.), ECF Nos. 226 (7/16/2020 Or. Denying Mot. to Compel), 283 (12/16/2021 Or. Denying in Part and Granting in Part Mot. to Dismiss). Accordingly, the

011175-35/3538081 V1

magistrate judge there was deciding the issue without knowing whether the case would proceed and without the benefit of the court's order on the motion to dismiss, unlike in this case. Furthermore, the magistrate judge explained that the requests there were disproportionate because plaintiffs 1) sought documents over a continuous, eight-year span 2) without any "detail regarding the manner or method by which the AMCA data breach was executed," such that Plaintiffs had not narrowed their requests about the VCEs' cyber hygiene to practices related to the dispute. ECF No. 1733-9 at 10–11. By contrast, Plaintiffs have clearly alleged how the breach occurred, *see generally* ECF No. 1543 (Amended Corrected Bellwether Consolidated Class Action Complaint), and the requests at issue here are specifically geared towards assessing how VCE Defendants addressed similar cybersecurity issues to the MOVEit breach.

Finally, the magistrate judge only denied the requests without prejudice until "the parties gain[ed] greater insight into the specifics of the AMCA breach" so they could "tailor their discovery requests accordingly." ECF No. 1733-9 at 19. Since Plaintiffs have already done so here, the *AMCA* order is distinguishable.

In fact, after the motion to dismiss was decided, the results for the non-breached defendants were quite different. Though not cited by the Defendants, the special master in AMCA later sided with the plaintiffs to require the non-breached defendants to respond to requests similar to the ones made here. *See* Ex. K (*AMCA*, No. 19-md-2904 (D.N.J.), ECF No. 631 (Special Disc. Master Or.); *see also* Ex. L (summarizing the discovery requests). The special master ordered the VCE defendants to produce documents and information responsive to requests concerning their own internal cybersecurity polices and procedures and the protection of personal data. *See* Ex. K at 2, 11-16 (citing Hearing Tr. 27:4-28:6, 31:18-32:24, 35:2-13; 37:12-38:16). There, the VCE defendants already produced 30,000 documents and plaintiffs deposed their witnesses. *See id.* at 8

011175-35/3538081 V1

(Tr. 12:19-25). The Special Master noted that Judge Hammer's opinion was without prejudice, that broad requests for documents regarding breaches in defendants' systems could be more easily done with requests for admission or interrogatories, but plaintiffs were alleging negligence in terms of how the defendants handled PHI and PII, and documents and information on that is discoverable. *See id.* at 10 (Tr. 19:24-25

Nor does *Crowe* control. First, the *Crowe* court relied almost entirely on the *pre-motion* to *dismiss decision* in *AMCA* to justify its decision. *See* ECF No. 1733-8 at 45, 70, 72 and 76. Furthermore, the plaintiffs in *Crowe* case also did not clearly allege that ineffective vetting was part of the reason that Healthplex was negligent. *See* ECF No. 1733-8 at 30–31 ("THE COURT: You just mentioned this obligation to vet. Is that anywhere in your second amended complaint? I know you listed 19 examples -- I was looking at the complaint before -- in paragraph 170. Do you have anything about that obligation to vet? MR. STREISFELD: I can't say specifically that we've alleged an obligation to vet."); *see also id.* at 51 (defendant pointing out that plaintiffs had not alleged deficient vetting by defendant). Here, by contrast, ineffective vetting was not only pled but recognized by Judge Burroughs as a basis to deny the motion to dismiss by the VCEs. ECF No. 1517 at 18–19.

Finally, the defendants in *Crowe agreed* to produce internal cyber hygiene policies that the VCEs here (at least in their discovery responses) refuse to produce. *See* ECF No. 1733-8 at 47 (defendant's counsel explaining that it was producing "policies as they relate to, for example, destruction or deletion of sensitive data," including "any post-breach changes to those policies").

Aside from relevance, VCEs also raised in the RTP briefing that producing documents regarding their own cyber hygiene could be unduly burdensome. ECF No. 1733 at 11 (noting 500,000 hits for "Plaintiffs' proposed terms for internal cybersecurity"). But burden may be

-17-

addressed by further limiting the terms used. For example, several of these requests are for policies and standards (RFP C) or a diagram of the network (RFP B), or don't include ESI but simply a Rog response about prior breaches that may amount to "lessons learned" or a forensic report. It is premature to rule on burden before the VCEs have even agreed to look for responsive information.

### B.    Valuation of the Data by VCE is Relevant to Damages

*RFP N* concerns what if any value the VCEs derive from the data they provided to their Vendors that was stolen. Plaintiffs allege that their PII/PHI has value the MOVEit breach deprived the Plaintiffs of their rights to control that property. ECF No. 1543 at ¶ 1272. *Smallman v. MGM Resorts Int'l*, 638 F. Supp. 3d 1175, 1191 (D. Nev. 2022). To the extent the VCEs receive some economic benefit from its exchange with the Vendor –who failed to protect it—that value could be used to determine how much should be returned to the Plaintiffs. *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 341 F.R.D. 128, 154 (D. Md. 2022), *reversed on other grounds,* 78 F.4th 677 (4th Cir. 2023) (noting the valuation that Marriott provided on rewards' members PII could be used for a damages model but denying without prejudice a "market value theory" to support negligence damages.). Such revenues are the proper subject of discovery, even where the defendant who transferred the data was not directly breached. *See* Ex. K (ordering defendants to produce documents related to compensation paid by defendants to AMA and revenue received AMCA's services).

TIAA has agreed to search for such documents. App. at 40. Other VCEs have refused. *Id.* at 101. Damages are a necessary component of the negligence claims, and the VCEs may not foreclose this valuation theory by refusing to look for responsive documents.

### C.    Milliman & MLIC Responses Violate the Federal Rules

Milliman's and MLIC's Rog responses fail to provide substantive responses to every single Rog. *See* Milliman's and MLIC's Rog responses, App. at 199–219, 271–91.Those responses

violate Rule 33, which requires that "[e]ach interrogatory must … be answered separately and fully

…." Fed. R. Civ. P. 33(b)(3). Moreover, because their objections fail to state whether responsive

information exists for each Rog, they have left Plaintiffs at a dead end, unable to meaningfully

confer.

Their RFP responses also violate Rule 34, and are full of identical boilerplate objections.

App. at 41–74, 135–67. Milliman refused to produce documents in response to 19 out of 23 RFPs,

and for the remaining four RFPs, Milliman merely referred Plaintiffs to a batch of ~250 go-get

documents. Ex. C, 4/9/26 McNamara Email. MLIC declined to produce documents in response to

any of Plaintiffs' 23 RFPs, referenced no documents in 21 of its responses, and referred Plaintiffs

to documents produced in response to its DFS for the remaining 2 responses. App. at 135–67.

MLIC's and Milliman's responses violate Rule 34 because they fail to state "for each [Request]"

whether they are withholding responsive documents based on their objections. Fed. R. Civ. P.

34(b)(2)(B). They should be ordered to provide responsive documents and information for every

one of Plaintiffs' Rogs and RFPs. *See, e.g.*, *Brown v. Wal-Mart Associates, Inc.,* 616 F. Supp. 3d

137, 142 (D. Mass. 2022) ("When responding to [p]laintiff's requests for discovery, [defendant]

has listed nearly every possible objection to nearly every one of [p]laintiff's requests at issue on

this motion, resulting in responses that contain lengthy paragraphs of identical, boilerplate

language and very little in the way of genuinely responsive information. […] the pervasiveness of

such irrelevant, boilerplate objections throughout [defendant's] responses are indicative of

stonewalling tactics that only frustrate the processes of discovery and litigation, while further

illustrating [p]laintiff's need to file this motion.").

On December 22, 2025, counsel for Milliman and MLIC sent an email promising to serve

supplemental responses "after the holidays" to identify "those requests on which [they] are

-19-

standing on their objections." Ex. M. (12/22/25 Email). But, to date (i.e., over three months after the holidays) both have failed to do so. That same email states that Milliman and MLIC are purportedly applying the 12/19 Subset Terms, but Plaintiffs have received no productions from Milliman or MLIC from those 12/19 Subset Terms, or otherwise. On April 8th, there was another offer to supplement, noting that Milliman and MLIC had already produced a vendor management policy, despite its objections to Rog A. Ex. C (4/8/26 Dailey email). And even if Milliman and MLIC do eventually provide responsive information, they have failed to identify for each request if responsive documents exist and are being withheld (as required by Rules 33 and 34). An order overruling objections and requiring Milliman and MLIC to supplement responses is necessary.

## V.      CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court grant the instant motion and enter an order overruling the VCEs relevance objection and ordering them to supplement their responses.

DATED: April 13, 2026

By: */s/ Daniel J. Kurowski*
Daniel J. Kurowski (*pro hac vice*)
Whitney K. Siehl (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
455 N. Cityfront Plaza Drive, Suite 2410
Chicago, IL 60611
Tel: (708) 628-4949
Fax: (708) 628-4950
dank@hbsslaw.com
whitneys@hbsslaw.com

Kristen A. Johnson (BBO# 667261)
HAGENS BERMAN SOBOL SHAPIRO LLP
1 Faneuil Hall Square, 5th Floor
Boston, MA 02109
Tel:  (617) 482-3700
Fax: (617) 482-3003
kristenj@hbsslaw.com

*Plaintiffs' Liaison & Coordinating Counsel*

011175-35/3538081 V1

By: */s/E. Michelle Drake*
E. Michelle Drake
BERGER MONTAGUE, PC
1229 Tyler Street, NE, Suite 205
Minneapolis, MN 55413
Tel:  (612) 594-5933
Fax: (612) 584-4470
emdrake@bm.net

By:  */s/ Gary F. Lynch*
Gary F. Lynch
LYNCH CARPENTER, LLP
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Tel:  (412) 322-9243
Fax: (412) 231-0246
Gary@lcllp.com

By:  */s/ Douglas J. McNamara*
Douglas J. McNamara
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue NW, 8th Floor
Washington, DC 20005
Tel:  (202) 408-4600
dmcnamara@cohenmilstein.com

By:  */s/Karen H. Riebel*
Karen H. Riebel
LOCKRIDGE GRINDAL NAUEN PLLP
100 Washington Avenue S, Suite 2200
Minneapolis, MN 55401
Tel:  (612) 339-6900
Fax: (612) 612-339-0981
khriebel@locklaw.com

By:  */s/ Charles E. Schaffer*
Charles E. Schaffer
LEVIN SEDRAN & BERMAN LLP
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Tel:  (215) 592-1500
Fax: (215) 592-4663
cshaffer@lfsblaw.com

*Plaintiffs' Lead Counsel*

-21-

## **CERTIFICATE OF SERVICE**

I hereby certify that, on this date, the foregoing document was filed electronically via the

Court's CM/ECF system, which will send notice of the filing to all counsel of record.

Dated: April 13, 2026          */s/ Daniel J. Kurowski*
                                Daniel J. Kurowski (*pro*

-22-

011175-35/3538081 V1