**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE: MOVEIT CUSTOMER DATA SECURITY BREACH LITIGATION | MDL No. 1:23-md-03083-ADB-PGL |
| This Document Relates To: | |
| ALL CASES | |

**THE VCE AND VCEC BELLWETHER DEFENDANTS' OPPOSITION TO
MOTION TO COMPEL INTERNAL CYBERSECURITY SYSTEMS DISCOVERY**

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................... 1

STATEMENT OF FACTS ................................................................................................. 2

I.     Plaintiffs Have Advanced Vetting-Based Claims Against the VCEs. .............................. 2

II.    Plaintiffs Threaten to Upend the Case Schedule by Waiting Six Months—and Three Weeks Before the Substantial Completion Deadline—to Raise This Dispute With the Court. ................................................................................................................................. 3

       A.     Plaintiffs Were on Notice of the VCE/VCECs' Position in October 2025 ............ 3

       B.     Plaintiffs' Motion Pertains to Search Terms Despite a Court-Imposed Deadline to Raise Such Disputes by December 18, 2025. ....................................... 5

III.    Plaintiffs Seek to Compel Responses to Seven Requests. ................................................. 5

LEGAL STANDARD ......................................................................................................... 5

ARGUMENT ...................................................................................................................... 6

I.     Discovery Into The VCE/VCECs' Internal Cybersecurity Systems Is Irrelevant, Disproportionate and Prejudicial. ...................................................................................... 6

       A.     Internal Cybersecurity Systems Discovery Is Irrelevant to Plaintiffs' Claims Against the VCE/VCECs. ................................................................................. 6

            i.     Discovery Regarding VCEs' Internal Cybersecurity Is Irrelevant to Plaintiffs' Vetting-Based Claims. ............................................................. 7

            ii.     No Other Court Has Permitted Expansive Discovery Into Non-Breached Defendants' Cybersecurity. ......................................................... 9

            iii.    Prior Discovery and Court Rulings Did Not Address This Issue. ............ 11

       B.     Internal Cybersecurity Discovery Is Disproportionate to the Needs of This Case. .................................................................................................................. 12

       C.     Plaintiffs' Discovery Requests Also Fail When Examined Individually .............. 15

II.    Data Valuation Discovery Is Irrelevant. ........................................................................... 18

III.    Milliman and MLIC's Discovery Responses Are Proper and Plaintiffs' Complaints Are a Red Herring. ........................................................................................................... 19

CONCLUSION ................................................................................................................. 20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adkins v. Facebook, Inc.*,
424 F. Supp. 3d 686 (N.D. Cal. 2019) ........................................................................................18

*AMAG Pharms., Inc. v. Am. Guarantee & Liab. Ins. Co.*,
No. 21-CV-10618-LTS, 2022 WL 16950437 (D. Mass. Nov. 15, 2022) ...................................6

*In re American Medical Collection Agency, Inc. Customer Data Sec. Breach Litig*,
No. CV 19-MD-2904 (D.N.J.) .........................................................................................10, 11, 19

*Cates v. Zeltiq Asethetics, Inc.*,
No. 20-MC-91234-NMG, 2020 WL 5517457 (D. Mass. Sept. 14, 2020) ...............................8

*Coleman v. Quaker Oats Co.*,
232 F.3d 1271 (9th Cir. 2000) ........................................................................................................8

*Controlled Kinematics, Inc. v. Novanta Corp.*,
No. 17-CV-11029-ADB, 2019 WL 3082354 (D. Mass. July 15, 2019) ...................................6

*Crowe v. Managed Care of North America, Inc.*,
No. 23-61605-CIV-SINGHA (S.D. Fla.) ..............................................................................10, 11, 14

*Gubala v. Time Warner Cable, Inc.*,
846 F.3d 909 (7th Cir. 2017) ........................................................................................................18

*Haviland v. Cath. Health Initiatives-Iowa, Corp.*,
692 F. Supp. 2d 1040 (S.D. Iowa 2010) ....................................................................................15

*Katz v. Liberty Power Corp., LLC*,
No. 18-CV-10506-ADB, 2020 WL 3492469 (D. Mass. June 26, 2020) ...................................6

*In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*,
341 F.R.D. 128 (D. Md. 2022), *class cert. vacated* 78 F.4th 677 (4th Cir. 2023)...................18

*In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*,
602 F. Supp. 3d 767 (D. Md. 2022)..............................................................................................18

*Ocean Semiconductors LLC v. Analog Devices Inc.*,
No. 24-CV-11759-PBS, 2025 WL 3114358 (D. Mass. Nov. 6, 2025)...................................14

*Osidi v. Assurance IQ, LLC*,
No. 21-CV-11320-ADB, 2022 WL 623733 (D. Mass. Mar. 3, 2022)...................................14

*Smallman v. MGM Resorts International*,
  638 F. Supp. 3d 1175 (D. Nev. 2022)......................................................................................18

*Universitas Educ., LLC v. Granderson*,
  No. 15-CV-11848-DJC, 2025 WL 889377 (D. Mass. Mar. 21, 2025) ....................................14

**Other Authorities**

Fed. R. Civ. P. 26.............................................................................................................5, 6, 8, 20

**INTRODUCTION**

Plaintiffs ask this Court to compel extensive custodial and go-get discovery into "the cybersecurity health" of the Vendor Contracting Entities' ("VCEs") "own computer networks." ECF 1775 ("Mot.") at 1. But as Plaintiffs themselves admit, those "systems were not breached." *Id.* And Plaintiffs have no live claim premised on the notion that the security of the VCEs' internal cybersecurity systems was inadequate in any way. Instead, the Court allowed Plaintiffs to proceed to discovery on a theory that the VCEs failed "to vet the direct users' security practices before contracting with them and . . . to audit the direct users periodically" after doing so. ECF 1517 (MDL Order No. 23) at 16. Accordingly, the salient question is not whether the security of the VCEs' "own computer networks" was adequate, but rather whether the VCEs "adequately vet[ted] their vendors." *Id.* at 21.

Nevertheless, Plaintiffs insist they are entitled to discovery on all aspects of the VCEs' internal cybersecurity systems (and now customers of VCEs, *i.e.*, VCECs, like MLIC).[1] Plaintiffs reason that if a VCE "does not follow cybersecurity industry standards" on its own networks, that could indicate that "it does not force its vendors to follow cybersecurity industry standards" either. Mot. at 11. But as tenuous as that theory is on its face, it collapses here where the VCEs have already provided Plaintiffs with extensive discovery about their vetting and auditing procedures showing exactly which cybersecurity standards they imposed on their Vendors. Said otherwise, there is no reason to **speculate** as to what the robustness of the VCEs' internal cybersecurity systems might or might not reveal about their vendor vetting and auditing processes, as Plaintiffs already have evidence that directly **reveals** those processes.

Unsurprisingly, Plaintiffs are unable to marshal any authority holding that where a defendant's vendor vetting procedures are challenged, the security of that defendant's unrelated

---

[1] Plaintiffs claim in their motion that they should be allowed to identify Defendant MLIC as a "VCE," but that is not only factually incorrect, it is deliberately misleading. MLIC is not a VCE who contracted with a vendor who used the MOVEit program. Instead, it was a Vendor Contracting Entity Customer ("VCEC"), and Plaintiffs' attempt to simply lump MLIC in with differently situated VCEs illustrates that there is absolutely no argument in support of compelling any of the requested discovery from MLIC. Plaintiffs make no attempt to argue in their motion why any of MLIC's internal cybersecurity systems are relevant, and therefore their motion as to MLIC should be summarily denied.

internal cybersecurity systems is fair game for discovery. Nor did this Court (despite Plaintiffs assertions otherwise) purport to hold as much at any prior point. On the contrary, both this Court's prior orders and broader case law confirm that Plaintiffs are not entitled to the discovery they seek here. And their attacks on a few ancillary requests and the objections asserted by certain Defendants fare no better. Plaintiffs' motion to compel should be denied in its entirety.

## STATEMENT OF FACTS

### I.    Plaintiffs Have Advanced Vetting-Based Claims Against the VCEs.

Plaintiffs do not allege any VCEs (or VCECs) used MOVEit. *See, e.g.*, ECF 1535 ("CAC") ¶¶ 1838–39, 3316 (alleging VCEs "provided" PII to vendors who used MOVEit). Nor do they allege the VCEs' internal systems were compromised in the MOVEit breach. *Id*. ¶¶ 1885–1925, 3307. Instead, Plaintiffs allege that the VCEs' *Vendors* (PBI and Welltok) used MOVEit and the VCEs are liable for failing to vet properly those Vendors. *Id*. ¶¶ 1838, 2020, 3305, 3464.

This Court's motion to dismiss ruling confirmed this understanding of Plaintiffs' vetting theory. *See* MDL Order No. 23 at 15–21. As the Court explained in the context of discussing duty, "[b]roadly speaking, Plaintiffs contend that the VCEs/VCECs had a duty to vet the direct users' security practices before contracting with them and a duty thereafter to audit the direct users periodically." *Id*. at 16.[2] Likewise, in addressing causation, the Court held: "Even though Defendants did not know about this particular vulnerability prior to the attack, if they failed to take proper precautionary measures or failed to adequately vet their vendors, that is sufficient for proximate causation." *Id*. at 21. In short, the Court allowed Plaintiffs to move forward against the VCEs and VCECs on a vetting-based theory, not based on their internal cyber security systems.

---

[2] The Court also clarified in its ruling on MLIC's motion for reconsideration of MDL Order No. 23 that the prior Order had to "accept[] as true Plaintiffs' allegations that 'all PBI-Contracting Defendants used PBI as their vendor . . . ,'" which served as the basis for denying the negligence claims against MLIC. ECF No. 1671 at 1. MLIC has repeatedly indicated that it did not have a contract with PBI as its vendor, and so this "vetting" argument is even more absurd as it relates to MLIC because there is no caselaw to suggest that a customer must also vet vendors of its vendors.

II.    **Plaintiffs Threaten to Upend the Case Schedule by Waiting Six Months—and Three Weeks Before the Substantial Completion Deadline—to Raise This Dispute With the Court.**

Plaintiffs have been on notice since October 2025 that the VCEs and MLIC (the sole bellwether VCEC) would not produce discovery concerning their internal cybersecurity systems. The VCEs reiterated this position over the course of months—both in negotiations concerning the scope of Plaintiffs' requests and in the context of search term negotiations. Plaintiffs nonetheless waited until the eve of substantial completion to bring this issue before the Court.

A.    **Plaintiffs Were on Notice of the VCE/VCECs' Position in October 2025.**

In October 2025, the VCEs and MLIC served their objections and responses to Plaintiffs' first sets of requests for production of documents and interrogatories. *See generally* Mot. at 4. In doing so, each VCE and MLIC objected to document requests and interrogatories, and definitions used therein, implicating their internal cybersecurity systems. *See, e.g.*, Mot. Appendix at 26, 33–37. Shortly thereafter, each VCE and MLIC individually met and conferred with Plaintiffs regarding the internal cybersecurity systems requests (among other matters) and made clear that such discovery was impermissible. *See, e.g.*, **Exhibit 1** (October 31, 2025 Letter) (objections to at-issue RFP); **Exhibit 2** (December 19, 2025 Letter) at 1–2 (construing Plaintiffs' proposed definitions as excluding "TIAA's internal systems" and agreeing to produce documents and respond to interrogatories relating to the MOVEit data breach, transfer of data to PBI, and vendor vetting—not TIAA's internal cybersecurity systems); Mot. Ex. H (January 7, 2026 Letter) (Plaintiffs confirming an "impasse" with Genworth as to internal cybersecurity requests).

In the face of Plaintiffs' prolonged silence following the VCEs' definitive statements that internal cybersecurity systems fell outside the scope of permissible discovery, the VCEs concluded Plaintiffs had abandoned their quest for such discovery. Months later, Plaintiffs purportedly decided to "follow up" on the requests for "[i]nformation and documentation regarding TIAA's internal computer networks, computer systems, and data networks" that had already reached an impasse, as well as some entirely new challenges to other requests. **Exhibit 3** (February 17, 2026

3

Letter) at 1–5; **Exhibit 4** (Email Thread Beginning February 17, 2026) at 12–14.[3] Plaintiffs refused TIAA's request to meet and confer to clarify Plaintiffs' objections. *Id*. at 7–8, 11–12, 14–15.

Instead, on April 2, 2026, at the tail end of a meet and confer with all Bellwether Defendants about a separate issue, Plaintiffs' counsel mentioned they would be filing a motion to compel the following day—though they did not specify which defendants or discovery issues would be subject to that motion. The VCEs first learned Plaintiffs' anticipated motion concerned them when they were copied on an email to the Court later that day. Plaintiffs' counsel then emailed all VCEs on April 6, 2026 demanding that, within 48 hours, each provide a "'yes' or 'no'" response as to whether they would agree with Plaintiffs' largely unaltered, original discovery requests (notwithstanding that most had confirmed an impasse as to those requests months earlier).[4] *See* Mot. at 12–13. Most VCEs again confirmed they would not produce discovery regarding internal cybersecurity.[5] *See* Mot. Ex. B at 1–5 (TIAA); Mot. Ex. I (Genworth) and Mot. Ex. C at 6 (Milliman and MLIC).

Although the instant dispute has been crystallized since at least December or January, Plaintiffs did not even advise the Court that it would need to resolve this dispute until April 9—

---

[3] Many of the VCEs and MLIC received no such letter, so they were under the presumption that Plaintiffs had abandoned their efforts—especially since Plaintiffs were aware there was no vendor relationship between MLIC and PBI, and most VCEs had already produced the vetting materials received from PBI shortly before the incident (the same materials Plaintiffs discussed during the recent relevant time period dispute conference before the Court, where Plaintiffs claimed they needed to go back two years because they were unsure of the audit cycles of certain Defendants).

[4] TIAA responded to Plaintiffs' drive-by meet and confer by explaining the request contravened Local Rule 37.1 and that Plaintiffs' email ignored prior proposed and actual compromises between the parties. *Id*. at 1–4. As just one glaring example, Plaintiffs initially claimed a dispute with TIAA as to RFP B. *Id*. at 1. TIAA pointed out that it had agreed to Plaintiffs' proposed compromise, and Plaintiffs responded that they "[a]greed" no dispute, in fact, existed. *Id*. at 1. Yet Plaintiffs now claim in the motion that RFP B is still disputed as to TIAA. Genworth has been subjected to the same back and forth on RFP B. After Genworth explained it already had produced "data flow diagrams and data transmission worksheets showing the process for transferring data between Genworth and PBI," Plaintiffs claimed this production was "inadequate" only because it "does not include communications responsive to this RFP." Mot., Ex. I. However, consistent with the language of the request, Plaintiffs' motion represents that RFP B "simply requests a diagram," Mot. at 12—not communications. Genworth has produced precisely the diagrams requested (which, incidentally, show that Genworth did "include[] a WAF" in the transfer process). *See* GENWORTH-MOVEIT-0000019. Accordingly, no dispute remains for RFP B as to Genworth either.

[5] OSF, Virginia Mason, and CHI are still awaiting Plaintiffs' responses to some proposed compromise positions, including on topics that are the subject of Plaintiffs' Motion.

4

less than 30 days before substantial completion.

        **B.**        **Plaintiffs' Motion Pertains to Search Terms Despite a Court-Imposed Deadline to Raise Such Disputes by December 18, 2025.**

At the same time as these substantive discussions, the parties were also negotiating search terms. On November 24, 2025, the VCEs/VCECs provided their initial set of proposed custodial search terms. *See* Mot. Ex. G at 5; **Exhibit 5** (November 24, 2025 Email). In doing so, they made clear, consistent with their prior discovery objections, that they would not agree to search terms encompassing their internal cybersecurity systems. Over the following weeks, the parties met and conferred and traded multiple iterations of the search term list, through which the VCEs/VCECs accepted many of Plaintiffs' proposed terms. Plaintiffs expressly understood and acknowledged the VCEs' position as to internal cybersecurity terms, at minimum, by December 4, 2025. *See* Mot. Ex. G at 4 (acknowledging that the VCEs/VCECs' "terms are limited by those Defendants' position that they need not produce documents related to their cybersecurity practice."). Ultimately, the parties agreed on search terms pertaining to Progress, MOVEit and each VCE's respective Vendor on December 22, 2025. *See id.*, Ex. M at 1–3 (December 22, 2025 email).

Although the deadline for the parties to raise "any disputes about Plaintiffs' search terms with Judge Levenson" was "December 18, 2025," ECF 1681 at 1, Plaintiffs have never presented any dispute about search terms with the Court, let alone search terms specifically concerning internal cybersecurity systems. *See* Mot. at 8 (confirming that Plaintiffs ceased search term negotiations in December 2025) (citing Ex. F).

## III.    Plaintiffs Seek to Compel Responses to Seven Requests.

Plaintiffs' motion demands production as to seven requests, which are summarized in Mot. Ex. A. These are the only requests before the Court and, especially in light of the impending substantial completion deadline, Plaintiffs have abandoned any other disputes arising from the VCEs/VCECs' written discovery responses.

**LEGAL STANDARD**

"Pursuant to Federal Rule of Civil Procedure 26(b), parties are entitled to discovery

5

'regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case.'" *Katz v. Liberty Power Corp., LLC*, No. 18-CV-10506-ADB, 2020 WL 3492469, at *1 (D. Mass. June 26, 2020) (quoting Fed. R. Civ. P. 26(b)). "[T]he court must limit discovery if it determines that . . . the proposed discovery is outside the scope permitted by Rule 26(b)(1)." *AMAG Pharms., Inc. v. Am. Guarantee & Liab. Ins. Co.*, No. 21-CV-10618-LTS, 2022 WL 16950437, at *2 (D. Mass. Nov. 15, 2022) (quoting Rule 26(b)(2)).

"On a motion to compel, '[t]he party seeking information in discovery over an adversary's objection has the burden of showing its relevance.'" *Controlled Kinematics, Inc. v. Novanta Corp.*, No. 17-CV-11029-ADB, 2019 WL 3082354, at *2 (D. Mass. July 15, 2019). "Once a showing of relevance is made, the party opposing disclosure bears the burden of showing that the requested discovery is improper." *Id*. "'District courts exercise broad discretion to manage discovery matters' and 'to tailor discovery narrowly.'" *Id.* at *3. "When exercising this discretion, courts assess disputed discovery requests in light of the proportionality considerations articulated in Rule 26(b)(1), including 'the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.'" *Id*. (quoting Fed. R. Civ. P. 26(b)(1)).

## ARGUMENT

**I.     Discovery Into the VCE/VCECs' Internal Cybersecurity Systems Is Irrelevant, Disproportionate and Prejudicial.**

**A.     Internal Cybersecurity Systems Discovery Is Irrelevant to Plaintiffs' Claims Against the VCE/VCECs.**

Plaintiffs' motion to compel discovery into the VCEs' internal cybersecurity systems should be denied because the Court's motion to dismiss ruling unambiguously limited Plaintiffs' VCE theory of liability to the VCEs' vetting and oversight of their respective Vendors—not the adequacy of the VCEs' (or VCECs') own cybersecurity systems. The VCEs'/VCECs' internal cybersecurity systems were never breached, and multiple courts addressing analogous hub-and-spoke data breach cases have squarely rejected discovery into the internal cybersecurity systems

6

of entities whose own systems were not breached. Nor do Plaintiffs' attempts to expand discovery beyond the vetting framework permitted by the Court find any support in the Court's prior comments or rulings on unrelated discovery disputes.

### i.    Discovery Regarding VCEs' Internal Cybersecurity Is Irrelevant to Plaintiffs' Vetting-Based Claims.

In its motion to dismiss ruling, *see* MDL Order No. 23 at 15–21, the Court clearly stated that Plaintiffs' claims against the VCEs are based solely on a theory of inadequate vetting or oversight, as distinguished from the theories as to the Vendors and Direct Users:

> The duty manifests differently between direct-user Defendants and VCE Defendants. In Plaintiffs' telling, the ***direct-user Defendants*** (PBI, Delta Dental, Maximus, and Welltok), *as the holders of software licenses from Progress,* and therefore as the entities who had control over the MOVEit Transfer software installed on their servers, ***had a duty to implement these procedures on their computer systems***. The ***VCE Defendants*** (Genworth, TIAA, Corewell, etc.), who contracted with the direct users and shared Plaintiffs' data through the MOVEit software, ***had a duty to ensure that the direct users had implemented these or other comparable safeguards*** to protect Plaintiffs' data before sharing it.

*Id*. at 16 (emphases added). The Court reiterated that principle several times. *See, e.g.*, *id.* at 16 ("Broadly speaking, Plaintiffs contend that the ***VCE Defendants had a duty to vet*** the direct users' security practices before contracting with them and a duty thereafter to audit the direct users periodically.") (emphasis added); *id.* at 21 ("[I]f [VCEs] failed to take proper precautionary measures or failed to ***adequately vet their vendors***, that is sufficient for proximate causation.") (emphasis added). Plaintiffs readily acknowledge that the Court permitted only a vetting-based negligence theory as to VCEs (and gloss over the further distinction for VCECs like MLIC who did not contract with a Vendor). *See*, *e.g.*, Mot. 17. The VCEs' internal cybersecurity systems therefore have no bearing on the relevant issues, *i.e.*, how they vetted their Vendors.

In a failed effort to escape this simple truth, Plaintiffs run through an incomprehensible series of examples and rhetorical questions through which they strain to tie the VCEs' irrelevant internal cybersecurity to their relevant vendor vetting practices. *See* Mot. at 14–17. For example, they postulate that if TIAA did not itself use a WAF, that may say something about whether it ensured that PBI did so. *See* Mot. at 14. But there is no need for that circuitous speculation because,

7

as Plaintiffs acknowledge, TIAA has already provided vetting-related discovery directly showing that it *did* ensure that PBI used a WAF. *See id*. at 11 ("TIAA inquired as to PBI's use of a Web Application Firewall ("WAF") as far back as 2018."). And Plaintiffs' series of rhetorical questions fail to support relevance: they do not even attempt to explain how it could possibly matter how "the VCE protect[ed] the data before they transmitted it" or "test[ed] and enforce[d] their controls" for transmitting data, given that the breach did not occur on the VCEs' servers or while the data was in flight during transmission between the VCEs and their Vendors. Mot. at 12. Moreover, as discussed below, the VCEs have already produced discovery showing precisely what mechanisms were utilized to transport the at-issue data.

In short, to the extent Plaintiffs want to know whether the VCEs ensured their Vendors followed specific cybersecurity standards, that information has already been captured by the vetting-related discovery about which there is no dispute. That is precisely why Plaintiffs' response to the Court's question, *see* ECF 1770, differentiating between "truly 'local'" cybersecurity measures and those that are "local[] but bear on more general risks" is unenlightening. *See* Mot. at 11. Plaintiffs do not need to take a detour into the VCEs' internal cybersecurity systems to discern whether there are "cybersecurity industry standards" that were not followed and may have "contributed to the MOVEit data breach" at their Vendors. They will receive that information through discovery from the Vendors themselves and through agreed-upon vetting discovery from VCEs.[6] The internal cybersecurity systems documents sought in Plaintiffs' motion simply are not relevant to the negligence claim primarily driving this litigation. *See Cates v. Zeltiq Asethetics, Inc.*, No. 20-MC-91234-NMG, 2020 WL 5517457, at *2 (D. Mass. Sept. 14, 2020) ("the scope of discovery is not unlimited, and the court must restrict discovery . . . outside the scope of discovery permitted by Rule 26(b)(1)"); *see also Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292 (9th Cir. 2000) ("A complaint guides the parties' discovery, putting the defendant on notice of the evidence it needs to adduce in order to defend against the plaintiff's allegations.").

---

[6] To answer the Court's question more directly, given the differences, companies typically have separate units that handle internal cybersecurity and those that handle vendor-vetting and external risk management practices.

Plaintiffs next turn to their tagalong claims for injunctive and declaratory relief, and argue that by allowing for "prospective injunctive relief, which requires [VCEs] to 'employ adequate security protocols consistent with law and industry standards to protect consumers' Private Information,'" the Court necessarily sanctioned inquiry into the adequacy of VCEs' internal cybersecurity programs. Mot. at 7, 14. Plaintiffs misread the Court's decision. As with the negligence claim, the Court grounded its declaratory relief ruling in the Direct User's cybersecurity by making clear that any declaratory relief must be "premised on allegations that the 'security measures on [the] *MOVEit software* remain inadequate,'" such that "'the risk remains that further compromises of [Plaintiffs'] Private Information will occur in the future.'" MDL Order No. 23 at 116 (emphasis added); *see also id.* at 59 (the requested injunctive relief "addresses the risk of a separate, future data breach due to ongoing deficiencies in *PBI's cybersecurity program*") (emphasis added). Discovery concerning the VCEs/VCECs' internal cybersecurity systems will not reveal any information about whether "'security measures on [the] MOVEit software"—which none of the VCEs or VCECs use—"remain inadequate.'" *Id.*

### ii.    No Other Court Has Permitted Expansive Discovery Into Non-Breached Defendants' Cybersecurity.

Despite routinely bringing other hub-and-spoke cases to the Court's attention, Plaintiffs do not identify *a single opinion* supporting wide-ranging discovery into the security of systems that were not impacted by a data breach. *See* Mot. at 14–18. Multiple courts have, however, agreed with the VCEs' position on this very issue.

In parallel state court MOVEit litigation, the plaintiffs advanced the same vendor-vetting theory against the California Public Employees' Retirement System ("CalPERS") and sought wide-ranging discovery concerning CalPERS's internal cybersecurity systems. *See* **Exhibit 6** (*Cheng* Discovery Dispute Letter). The Superior Court of California rejected the request. Plaintiffs falsely denigrate that court as supplying "essentially no reasoning or citations to authority," Mot. at 15, but the *Cheng* court explained its reasoning clearly: in light of the complaint's vetting theory, "information regarding CalPERS' vendor management and vendor oversight with regard to those

9

vendors who CalPERS entrusted with its members' PII is . . . discoverable," but "CalPERS cybersecurity measures regarding its own systems are not relevant." ECF 1733-7 at 1.

Other courts have decided this issue similarly. In *In re American Medical Collection Agency, Inc. Customer Data Sec. Breach Litig* ("*AMCA*"), No. CV 19-MD-2904 (D.N.J.), another vetting-based hub-and-spoke data breach case that Plaintiffs have relied upon throughout this case, the plaintiffs also sought discovery concerning the non-breached defendants' internal cybersecurity systems. The court denied those "exceedingly broad" requests because they sought "discovery that, at best, is marginally relevant" since "[the plaintiffs] have not brought any claims based on defendants' internal cyber-security practices, or a breach of defendants' computer systems." ECF 1733-9 at 9.[7] The court further observed that (like here) "Plaintiffs do not provide a single case where a court allowed discovery into cyber-security incidents or breaches of computer systems that were not, themselves, the subject of the litigation." *Id.* at 12.

Plaintiffs try to distinguish *AMCA* because this discovery issue was decided before a ruling on the defendants' motion to dismiss. *See* Mot. at 15–16. But that only makes *AMCA* **more** favorable for the VCEs. In this case, the Court has already cemented that Plaintiffs' VCE theory is limited to vetting and therefore, in the words of the *AMCA* court, Plaintiffs must "tailor" their requests to that sole theory this Court has allowed to proceed. ECF 1733-9 at 19. Plaintiffs also note that the special discovery master in *AMCA* later ordered the production of limited go-get documents and information. *See* Mot. at 16. That discrete discovery was not, as Plaintiffs claim, "similar" to the instant requests for a wide-ranging audit of the VCEs' internal cybersecurity. *See* Mot. Ex. K at 2.

Similarly, in *Crowe v. Managed Care of North America, Inc.*, No. 23-61605-CIV-SINGHA (S.D. Fla.), the plaintiffs brought claims against non-breached Healthplex arising from a breach of Managed Care of North America's systems. The *Crowe* court rejected the plaintiffs' request for discovery related to Healthplex's internal data security policies and procedures because "HP

---

[7] These materials from *AMCA* were previously filed in relation to the parties' briefing on the relevant time period dispute. *See generally* ECF 1733.

systems were not breached" and discovery concerning its internal cyber security programs "is not proportional as a result and not relevant." ECF 1733-8 at 70:18-24; *see also id*. at 72:7-8, 72:12-13, 72:18-21. Plaintiffs primarily discount *Crowe* because it relied on *AMCA*, Mot. at 17—though, as just discussed, *AMCA* is directly on point and the difference in procedural posture reinforces the applicability of that court's reasoning here. Plaintiffs also try to distinguish *Crowe* because those plaintiffs did not bring theories based on "ineffective vetting." *Id*. That undermines Plaintiffs' position. Even though the *Crowe* claims were broader than Plaintiffs' theory here, the court ***still*** limited discovery.

### iii. Prior Discovery and Court Rulings Did Not Address This Issue.

Beyond distorting the Court's motion to dismiss ruling, Plaintiffs mischaracterize two other aspects of these proceedings to suggest that this relevance dispute has already been resolved. Plaintiffs contend that (i) the Court's comments in addressing unrelated issues somehow bear upon the dispute here and (ii) the VCEs' and VCEC's production of documents during the fact sheet process touching upon internal cybersecurity systems implicitly concedes the relevance of their internal cybersecurity. Plaintiffs are wrong on both fronts.

First, Plaintiffs suggest that the Court's comments during the February 26, 2026 conference concerning the relevant time period dispute addressed, and apparently resolved, this issue. Mot. at 8–9. But, during the February 26 (and April 9) conference about relevant time periods applicable to all discovery requests, the Court did not address the substance of any requests. And, if anything, the Court's comments during those hearings *support* the VCEs/VCEC's position. During these conferences, the Court repeatedly stated that the relevant time period should be viewed in the context of "procurement cycle[s]"—which, for VCEs and VCECs, means the cycle for ***vetting of their Vendors***. February 26, 2026 Hr'g Tr. at 21:24; *see also id*. at 24:7-17; 26:3-7; 27:5-10; 27:18-19; 29:17-30:5 (discussing relevant time period "if the answer is we vetted our vendors very carefully 10 years before we hired them . . ."); *see also* April 9, 2026 Hr'g Tr. at 8–12 ("[A]t various different times, different of bellwether defendants would have contracted either with their vendors, VCEs, or -- and would have done some degree of vetting or consideration of vendor

11

suitability in that process."). The Court declined Plaintiffs' demand for Defendants to search for needles in a haystack going back in time and it should do the same as to documents about the VCEs/VCECs' irrelevant internal cybersecurity. *See id*. at 18:1–6.

Second, Plaintiffs suggest that because the Defendant Fact Sheets include "some cyber hygiene 'go-gets,'" the Court has determined and the VCEs have conceded that broad discovery about internal cybersecurity systems is relevant. Mot. at 7. Not so. The VCEs/VCECs have always maintained their position that, "the VCE/VCECs do not believe risk assessments *of their internal environments* are relevant because the MOVEit event did not occur in the VCE/VCECs' internal environments." ECF 1298 at 9 (emphasis in original). The Court's approval of a handful of narrow requests in the fact sheets applicable to all Defendants does not mean that full-blown discovery on that issue would be permitted, much less the boundless custodial and go-get discovery Plaintiffs now seek. Furthermore, fact sheet discovery occurred *months before the Court's motion to dismiss ruling*, which resolved any ambiguity regarding the claims against the VCEs and unambiguously cabined Plaintiffs' theory of liability to vetting.

### B.   Internal Cybersecurity Discovery Is Disproportionate to the Needs of This Case.

The Court also should deny Plaintiffs' Motion because the requests are facially overly broad and would balloon the review universe by hundreds of thousands of additional documents *per VCE*, relegating the vetting-related discovery actually relevant to Plaintiffs' core theory to a footnote. Particularly in light of Plaintiffs' months-long delay in raising this issue until the eve of the substantial completion deadline, the VCEs/VCECs will be significantly prejudiced if the scope of discovery is drastically expanded at this late stage.

The scope of documents and information Plaintiffs seek regarding the VCEs/VCECs' internal cybersecurity is staggering. As just one example, RFP C seeks:

> Documents Concerning retention or destruction of PII and PHI from Your and/or [Vendor's] *Computer Network* and *Computer System*, including PII and PHI from Your *Computer Network* and *Computer System* held in [Vendor's] MOVEit environment and PII and PHI from Your *Computer Network* and *Computer System* held by any third-party's *Computer Network* and *Computer System*.

Mot. Ex. A at 1 (emphasis added). In turn, Computer Network, Computer System, and Data Network are broadly defined to encompass each VCE's or VCEC's *entire* set of servers and computers through which data is accessed, stored, and transferred internally—regardless of whether they "connect[] to the MOVEit software." **Exhibit 7** (Plaintiffs' First Set of RFPs to TIAA) at 3–4.

When the terms "Computer Network" and "Computer System" are replaced with their definitions, and the nested definition of "Data Network," RFP C requests:

> Documents Concerning retention or destruction of PII and PHI from Your and/or [Vendor's] (i) servers (whether physical, web-based or virtual), desktop computers, laptop computers, tablets, mobile phones, networking equipment, backup storage, internet sites, intranet sites and the software, programs, applications—including [the VCE's], [the Vendor's] and Progress'—platforms, scripts, operating systems or databases used to control, access, store, add, delete or modify any data or information stored on any of the foregoing non-exclusive list and (ii) system designed to transfer data from one network access point to another network access point via data switching, transmission lines and system controls, including PII and PHI from Your servers (whether physical, web-based or virtual), desktop computers, laptop computers, tablets, mobile phones, networking equipment, backup storage, internet sites, intranet sites and the software, programs, applications—including [the VCE's], [the Vendor's] and Progress'—platforms, scripts, operating systems or databases used to control, access, store, add, delete or modify any data or information stored on any of the foregoing non-exclusive list and (ii) system designed to transfer data from one network access point to another network access point via data switching, transmission lines and system controls, held in PBI's MOVEit environment and PII and PHI from Your servers (whether physical, web-based or virtual), desktop computers, laptop computers, tablets, mobile phones, networking equipment, backup storage, internet sites, intranet sites and the software, programs, applications—including [the VCE's], [the Vendor's] and Progress'—platforms, scripts, operating systems or databases used to control, access, store, add, delete or modify any data or information stored on any of the foregoing non-exclusive list and (ii) system designed to transfer data from one network access point to another network access point via data switching, transmission lines and system controls, held by any third-party's Computer Network and Computer System.

This is so overbroad and unduly burdensome on its face, that it borders on absurd. And Plaintiffs have refused to offer any compromise position to narrow the request. *See* Mot. Ex. A at 1. This same problem also infects the remaining at-issue requests, which incorporate these overbroad "Computer Network" and "Computer System" definitions, as well an expansive "Data Security" definition. *See id*. at 1–2. At bottom, Plaintiffs seek documents and information concerning, quite literally, every aspect of the VCEs' internal cybersecurity systems, which is disproportionate to

13

whatever minimal relevance Plaintiffs ascribe to these materials. *See Ocean Semiconductors LLC v. Analog Devices Inc.*, No. 24-CV-11759-PBS, 2025 WL 3114358, at *1 (D. Mass. Nov. 6, 2025) (discovery must be "'proportional to the needs of the case.'") (quoting Fed. R. Civ. P. 26(b)(1)).

Given this overbreadth, Plaintiffs' requested discovery likely would pull in hundreds of thousands of additional documents per VCE. For example, as TIAA advised Plaintiffs months ago, it would need to review more than 400,000 additional documents based on the internal cybersecurity search terms Plaintiffs demanded—*72 times greater* than the volume of documents pulled in by the agreed-upon terms about vendor vetting. *See* Mot. Ex. M at 4; *cf.* Mot. at 17 (noting that internal systems discovery was unduly burdensome in *Crowe* because it resulted in "500,000 hits for 'Plaintiffs' proposed terms for internal cybersecurity'"). When multiplied across all VCEs and VCECs, this expansion of the review universe by *millions* of additional documents is plainly disproportionate, and it would dwarf the vetting-related discovery that is actually relevant to Plaintiffs' claims. *See Osidi v. Assurance IQ, LLC*, No. 21-CV-11320-ADB, 2022 WL 623733, at *1 (D. Mass. Mar. 3, 2022) ("Controlling the scope of discovery is particularly appropriate where discovery will impose considerable expense and the claims may be resolved on issues that require only limited or targeted discovery."). This case should remain focused on Plaintiffs' vetting theory and not be transformed into a free-ranging audit of security of the VCEs' and VCEC's non-breached internal systems.

Finally, the Court should deny the requested discovery for an additional reason: Plaintiffs have not diligently pursued this discovery and the VCEs will be unduly prejudiced if the scope of discovery expands dramatically less than two weeks before the April 30 substantial completion deadline. *See Universitas Educ., LLC v. Granderson*, No. 15-CV-11848-DJC, 2025 WL 889377, at *14 (D. Mass. Mar. 21, 2025) ("Even assuming [a party] had demonstrated that the requested discovery was essential, she would still not be entitled to relief because she has not demonstrated due diligence in conducting discovery."). As discussed, Plaintiffs have been on notice since October 2025, *six months ago*, that the VCEs/VCECs objected to discovery concerning their internal cybersecurity systems. The VCEs/VCECs reiterated their position on multiple occasions,

14

and several expressly confirmed an impasse as to the specific requests addressed in this Motion as early as December or January. Yet Plaintiffs allowed weeks and months to pass between communications with Defendants on this issue, and failed to bring this fully crystallized dispute to the Court's attention for several months. *See supra* Statement of Facts § II.

That unjustified delay has compounded the burden of Plaintiffs' requested discovery: it would require the eleventh-hour addition of potentially hundreds of thousands of internal cybersecurity-related documents to the significant document discovery that already must be completed by April 30, and with dozens of depositions slated to begin only a couple of weeks later and run through the summer. *Cf. Haviland v. Cath. Health Initiatives-Iowa, Corp.*, 692 F. Supp. 2d 1040, 1044 (S.D. Iowa 2010) (denying motion to compel because parties do not have "carte blanche rights to demand sizeable discovery requests up to the last possible minute"). The time has long since passed for Plaintiffs to pursue this discovery, and the Court should not upend the discovery process in the final days before the substantial completion deadline.

### C.    Plaintiffs' Discovery Requests Also Fail When Examined Individually.

As discussed, all of the disputed requests relating to VCEs' internal cybersecurity systems are irrelevant, disproportionate and prejudicial, and each category of requests should be rejected for additional reasons as well.

**RFP B (Sutter, Corewell, VM, CHI, OSF, Milliman and MLIC):**[8] RFP B requests diagrams or schema showing the "Computer Network" or "Computer System" relating to "the transfer of data" between each VCE and its Vendor's "MOVEit environment." This request is based on a mistaken premise and irrelevant in any event. First, from the VCEs' perspective, they transferred data (via secure and encrypted means) to their Vendors—not "to [a] MOVEit environment." *See* GENWORTH-MOVEIT-00002613 (showing transferred location as a PBI secure server not identified as a MOVEit environment). Therefore, the VCEs do not have any

---

[8] Plaintiffs' Exhibit A suggests a dispute exists with TIAA and Genworth as to RFP B. However, as noted above (*see supra* n.4), TIAA agreed to a compromise reformulation of RFP B and Genworth has already produced the diagrams and schema Plaintiffs requested.

documents responsive to the request as written. Second, because there is no dispute that the data breaches occurred on the Vendors' systems *after* the transfer process had been completed—not during the process of transmission while the data was in flight—information "related to the transfer of data" has no relevance to Plaintiffs' claims. *See* CAC ¶ 1887 (alleging that data "being stored on PBI's MOVEit servers," *i.e.*, after it was transferred to PBI by VCEs, was "vulnerable to cyberattack"); *id.* ¶ 1891 (alleging that CL0P exfiltrate "data stored on the [MOVEit Transfer] server at the time of the event"). To use Plaintiffs' example, whether or not the VCEs employed a WAF during the data transfer process is unrelated to whether the Vendors themselves used a WAF around their networks to protect the at-rest data stored on those networks that purportedly "could've prevented" the MOVEit data breaches and the "theft of the PII/PHI of the VCE's customers" from the Vendors' systems. Mot. at 12.

**RFP C (all VCEs and MLIC):** Plaintiffs next seek documents relating to the VCEs' policies for retaining or destroying PII and PHI on their own systems. As discussed above, the MOVEit incidents occurred on PBI's and Welltok's systems and affected only the personal information stored on *those Vendors' systems*. Plaintiffs provide no rationale for why they need the VCEs' policies for data retention or destruction on their *non-breached* systems. Instead, Plaintiffs make the conclusory statement that those guidelines are "relevant to th[e] allegation" that Welltok, one of the breached Vendors, not a VCE, failed to comply with FTC guidelines regarding data destruction but they fail to explain *how a VCE's data retention practices* relate to a Vendor's alleged non-compliance with regulations. Mot. at 13.

**RFP D and Rog A (all VCEs and MLIC):**[9] In RFP D and Rog A,[10] Plaintiffs request documents and information about the VCEs' own "Data Security" practices and tools—an

---

[9] Plaintiffs also group RFP E, which requests "Documents and Communications sufficient to identify Your tools for enforcing Your Policies and Procedures," in this category—though the *only* VCE to whom Plaintiffs issued this request was Genworth. For the same reasons as the other requests in this category, which were issued to all VCEs, documents regarding the "tools" Genworth used internally to enforce its policies and procedures for its own internal data security are irrelevant to Genworth oversight of PBI's data security.

[10] Plaintiffs concede that OSF produced its "policies and procedures concerning its controls over personal data." Mot. at 14. Thus, there is no dispute as to OSF on RFP D and Rog A.

exceedingly broad topic that would encompass everything from physical security standards for access to the VCEs' offices, to the administrative controls regarding which employees can access specific information, to the technical structure of the VCEs' own computer networks. But, as discussed above, Plaintiffs' theory as to the VCEs is that they were "negligent in their duty" to protect consumer personal information because they failed to exercise reasonable oversight over their Vendors' cybersecurity. Mot. at 13. To use Plaintiffs' example, whether a VCE used a "least privileges" policy to limit access to data on its own system has nothing to do with whether that VCE's Vendor employed such a policy or whether such a policy, as implemented by the Vendor, could have prevented or limited the MOVEit breach. *See id*. at 14.

**Rog B (all VCEs and MLIC):** Finally, Plaintiffs claim that Rog B seeks information about data breaches that each VCE suffered before the MOVEit incidents, but "only data breaches with similar characteristics as the MOVEit Data Breach." Mot. at 14. That is false. Plaintiffs' request contains a laundry list of potential exploit vectors that cover virtually every way a bad actor might attack a company's systems. *See* Mot. Ex. 1 at 2–3. Rog B asks for information about any time a bad actor stole personal information, either from the VCE or from any third-party vendor to whom the VCE had provided that information, through any of those attack methods. *See id*. Plaintiffs made no effort to limit Rog B to prior data breaches with "similar characteristics" to the MOVEit incidents. In fact, when the VCEs attempted to compromise and limit the request to similar prior breaches—*i.e.*, data breaches through one of those listed attack vectors that occurred at the VCEs' *vendors* (not on their own systems) and that were sufficiently serious to require reporting under state laws—Plaintiffs rejected that good-faith compromise. *See* Mot. Ex. B. Only reportable attacks on vendors that exploited zero-day vulnerabilities would even conceivably bear on Plaintiffs' theory of relevance: that the VCEs should have known they allegedly "lacked adequate processes for *vetting/monitoring third parties to ensure* that they were safe" from MOVEit-like attacks. Mot. at 14 (emphasis added).

17

## II.    Data Valuation Discovery Is Irrelevant.

As to RFP N, Plaintiffs ask the Court to compel documents from Sutter Health, Virginia Mason, CHI, and OSF showing "what if any value the VCEs derive from" data provided to their Vendors. Mot. at 18. They claim this discovery is relevant because it "could be used to determine how much should be returned to the Plaintiffs." *Id*. But Sutter Health, Virginia Mason, CHI, and OSF are presently unaware of any documents responsive to RFP N, and would have informed plaintiffs as much (or followed up on specific asks) had plaintiffs properly met and conferred on this topic. In any event, the value of the data *to the VCEs* (if any) is not relevant to the value of the data *to Plaintiffs*. It is not value Plaintiffs have lost that could be "returned" as "damages." Mot. at 18. In fact, Plaintiffs have not been deprived of their data at all. *See Gubala v. Time Warner Cable, Inc.*, 846 F.3d 909, 913 (7th Cir. 2017) ("Time Warner did not take the plaintiff's personal information away from him; he still has it . . . he hasn't been deprived of anything."). And even if a VCE derived some form of value from Plaintiffs' data (either individually or in the aggregate), "it does not follow that the same information has independent economic value to an individual [plaintiff]." *Adkins v. Facebook, Inc.*, 424 F. Supp. 3d 686, 697 (N.D. Cal. 2019) (declining to certify class based on plaintiff's "speculative" damages theory).

Tellingly, Plaintiffs do not cite a case that applies their suggested damages theory. The court in *Smallman v. MGM Resorts International*, 638 F. Supp. 3d 1175 (D. Nev. 2022), merely held that "interfering with [plaintiffs'] fiscal autonomy" alleged a cognizable theory of damage. *Id.* at 1191. It did not hold that the value of such fiscal autonomy could be discovered from MGM Resorts. *Id.* Likewise, the court in *In re Marriott* did not resolve whether plaintiffs had presented a viable damages model using Marriott's valuation of consumer data. *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 341 F.R.D. 128, 154 (D. Md. 2022), *class cert. vacated* 78 F.4th 677 (4th Cir. 2023). Rather, the plaintiffs offered a different, "inherent" market value theory, which the court excluded as unreliable. *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 602 F. Supp. 3d 767, 783, 789–91 (D. Md. 2022) (expert's proposal "to determine the market value

18

of PII by 'looking at revenues' fails to account for the serious shortfalls of this methodology identified in" study relied on by expert) (citation omitted).

Plaintiffs' pivot to seeking "revenues" based on the Special Discovery Master's Order in *AMCA* does not change the analysis. *See* Mot. at 18; Mot. Ex. K. While the Special Discovery Master ordered production of certain "financial information" related to the use of the vendor, he encouraged the parties to "continue to meet and confer" on compensation-related requests, Mot. Ex. K at 2, and declined "to say one way or the other in terms of relevancy" of such requests, *id.* at 22 (Tr. 68:10–11). In sum, as to RFP N, Plaintiffs have not met their burden to show relevance.

### III.    Milliman and MLIC's Discovery Responses Are Proper and Plaintiffs' Complaints Are a Red Herring.

Milliman and MLIC's October 2025 objections to Plaintiffs' discovery requests were proper. Milliman and MLIC expressly identified why Plaintiffs' requests were objectionable, and their positions have been clear since October 2025. Although Plaintiffs' Motion does not identify any request in particular in this odd, general section devoted to Milliman and its customer MLIC, Plaintiffs ignore the fact that over several months Plaintiffs continually narrowed their requests (abandoning efforts to obtain irrelevant information). So, while Milliman and MLIC had initially agreed to supplement responses (after Plaintiffs largely refused to confer as to specific requests), Plaintiffs then began engaging with both Milliman and MLIC as part of the global conferrals in February 2026 regarding the specific discovery responses that they wanted supplemented. *See, supra* Statement of Facts § II.B. These conferrals continued until earlier this month. *See* Mot. Ex. C at 7 (Plaintiffs on April 6, 2026: "***[s]o there be no doubt, we have isolated the outstanding requests***, grouped by topic, for a final statement of your position. We have grouped the requests by letter and topic area . . .") (emphasis added). Both Milliman and MLIC responded to that ultimatum, again setting forth their positions and attempts to compromise where appropriate. *See id.* Plaintiffs responded with a terse reply that they still "need guidance from the Court on the relevance objections you maintain even in your email below." *Id.*

It is obvious that Plaintiffs' bizarre, half-baked request in this motion (which ignores the parties' various recent conferrals on these very issues *that are the subject of this motion*) is nothing more than an attempt to bog down Milliman and MLIC on the eve of the substantial completion deadline before depositions are set to commence. This is, of course, improper. *See* Fed. R. Civ. P. 26, Advisory Committee's Notes to 1983 Amendment (criticizing "advocates [who] attempt to use discovery tools as tactical weapons rather than to expose the facts and illuminate the issues").

Moreover, Plaintiffs' toothless request is an attempt to divert attention from a glaring issue that illustrates how unserious Plaintiffs have been taking their discovery obligations. Specifically, Plaintiffs recently revealed that they simply ignored all of the materials that Milliman previously produced concerning the very vetting that Plaintiffs claimed to need. *See* **Exhibit 8** (Email Thread Beginning April 2, 2026) at 2 (explaining that Plaintiffs "overlooked the production Bates numbered MS_0000110-MS_0000335 transmitted on October 6, 2025," and noting that Plaintiffs never followed up "over the next six months asking us for the documents referenced in our responses . . . ."). These documents were specifically referenced by Bates number in the written discovery responses related to Milliman's vetting of PBI. So, the only logical conclusion one can reach—by virtue of their admission that they lost the document production—is that Plaintiffs never reviewed the written discovery responses that specifically identified those same documents in the first place. And, Plaintiffs subsequently ignored the later correspondence from Milliman and MLIC's counsel in early March where these documents were again referenced in explicit terms. *See* Ex. 4 at 8–9 (March 3, 2026 Email). The Court should not countenance these improper tactics.

As a result, no further supplementation of any requests is required, especially as to those requests that (i) Plaintiffs long abandoned, (ii) were not addressed *at all* during the prior meet and confer process, and (iii) were not part of the outstanding requests referenced in Plaintiffs' correspondence immediately before filing this instant motion.

## CONCLUSION

For these reasons, Plaintiffs' motion to compel internal cybersecurity systems discovery should be denied in its entirety.

20

Dated: April 20, 2025

Respectfully submitted,

By: /s/ Marc R. Shapiro
**Orrick Herrington & Sutcliffe LLP**
Marc R. Shapiro (*pro hac vice*)
51 West 52nd Street
New York, NY 10019
(212) 506-3546
mrshapiro@orrick.com

Aravind Swaminathan (*pro hac vice*)
401 Union Street, Suite 3300
Seattle, WA 98101
(206) 839-4340
aswaminathan@orrick.com

*Counsel for Defendant Teachers Insurance and Annuity Association of America*

By: /s/ Jack W. Pirozzolo
**Sidley Austin LLP**
Jack W. Pirozzolo (BBO # 564879)
60 State Street, 36th Floor
Boston, MA 02109
(617) 223-0304
jpirozzolo@sidley.com

*Counsel for Defendants Genworth Life Insurance Co., Genworth Financial, Inc., and Genworth Life and Annuity Insurance Co.*

By: /s/ Kyle T. Cutts
**BakerHostetler LPP**
Kyle T. Cutts (*pro hac vice*)
127 Public Square, Suite 2000
Cleveland, Ohio 44114
(216) 861-7576
kcutts@bakerlaw.com

*Counsel for Defendants OSF Healthcare System, CHI Health - NE, and Virginia Mason Franciscan Health*

By: /s/ Michael J. Dailey
**Gordon Rees Scully Mansukhani LLP**
Craig J. Mariam (*pro hac vice*)

21

Michael J. Dailey (*pro hac vice*)
Lara S. Garner (*pro hac vice*)
633 West Fifth Street, 52nd Floor
Los Angeles, CA 90071
(213) 576-5000
cmariam@grsm.com
mdailey@grsm.com
lsgarner@grsm.com

*Counsel for Defendants Milliman Solutions, LLC, Milliman, Inc. d/b/a Milliman Intelliscript, and MEMBERS Life Insurance Company*

By: */s/  Christopher G. Dean*
**McDonald Hopkins LLC**
Christopher G. Dean (*pro hac vice*)
Jeffrey S. Haut (*pro hac vice*)
Luke A. Davis (*pro hac vice*)
600 Superior Avenue, E., Suite 2100
Cleveland, Ohio 44114
(216) 348-5400
cdean@mcdonaldhopkins.com
jhaut@mcdonaldhopkins.com
ldavis@mcdonaldhopkins.com

*Counsel for Defendant Sutter Health*

By: */s/  Michael G. Latiff*
**McDonald Hopkins PLC**
Michael G. Latiff (admitted *pro hac vice*)
Timothy J. Lowe (admitted *pro hac vice*)
39533 Woodward Avenue, Suite 318
Bloomfield Hills, MI 48304
(248) 646-5070
mlatiff@mcdonaldhopkins.com
tlowe@mcdonaldhopkins.com

**McDonald Hopkins LLC**
Jennifer W. Torrez (admitted *pro hac vice*)
300 N. LaSalle Street, Suite 1400
Chicago, Illinois 60654
(312) 280-0111
jtorrez@mcdonaldhopkins.com

*Counsel for Defendant Corewell Health East*

22

**CERTIFICATE OF SERVICE**

I hereby certify that, on this date, the foregoing document was filed electronically via the

Court's CM/ECF System, which will send notice of the filing to all counsel of record.

Dated: April 20, 2026                              */s/ Marc R. Shapiro*
                                                   Marc R. Shapiro